RONALD O. KAYE, SBN 145051
Email: rok@kmbllaw.com
STACEY R. BROWN, SBN 245661
KAYE, McLANE, BEDNARSKI & LITT, LLP
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101
Tel: (626) 844-7660
Fax: (626) 844-7670

Attorneys For Plaintiff
KELLY SOO PARK

FILED 2014 JAN 15 AM 11:00 CLERK U.S. DISTRICT COURT CENTRAL DIST. OF CALIF. LOS ANGELES BY:___

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELLY SOO PARK., <br><br> Plaintiff, <br><br> vs. <br><br> DETECTIVE KAREN THOMPSON; AND DOES 1-10, INCLUSIVE; <br><br> Defendants. | CASE NO: CV14-00330 - SJO(RZx) <br><br> **COMPLAINT FOR DAMAGES:** <br><br> (1) **DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. §1983, VIOLATION OF COMPULSORY PROCESS AND RIGHT TO A FAIR TRIAL;** <br><br> 2) **JOINT ACTION/ CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, 42 U.S.C. §1983;** <br><br> (3) **DECLARATORY RELIEF.** <br><br> **DEMAND FOR JURY TRIAL.** |

# I.

## SUMMARY OF ALLEGATIONS

1. In March 2008, Juliana Redding was strangled in her home in Santa Monica, California. Santa Monica Police Department Detective Karen Thompson took over the cold case and requested permission to work on it during her own time. In 2010, DNA found at the crime scene was matched to Plaintiff Kelly Soo Park. In response to this finding, the Santa Monica Police Department awarded Defendant Thompson the Medal of Merit for "solving" the case – years before a trial in the case was held.

2. In early 2013, a few months before trial, the defense obtained powerful physical and testimonial evidence that the murder was actually committed by the victim's then-boyfriend. The evidence included the boyfriend's confession of strangling Julianna Redding, made while he was strangling another girlfriend, Melissa Ayala. When Defendant Thompson heard of this evidence, rather than investigate the boyfriend, she intimidated witness Ayala and lied to her to prevent her from testifying.

3. At trial, the prosecution's own expert testified that the DNA match did not prove that Ms. Park committed the murder. She was acquitted on all counts.

4. Ms. Park's acquittal does not excuse Detective Thompson's conduct of intimidating Ms. Ayala, either as a matter of law or as a matter of fairness. Ms. Park had the right to present evidence *proving* that the ex-boyfriend killed Juliana Redding and that Ms. Park did not. Detective Thompson illegally prevented her from doing so.

5. As a result of Defendant Thompson's conduct, and her interference with Ms. Park's ability to present critical evidence, Ms. Park, despite being

1

acquitted of all charges by a jury, continues to be branded a murderer and suffer damages as a result.[1]

## II.

## JURISDICTION AND VENUE

6. This action is brought by Plaintiff Kelly Soo Park. ("Plaintiff" or "Park") pursuant to 42 U.S.C. §1983.

7. This Court has jurisdiction under 28 U.S.C. §1343(4) for violations of the 1871 Civil Rights Enforcement Act, as amended, including 42 U.S.C. §1983, and under 28 U.S.C. §1331.

8. The acts and omissions complained of commenced in May 2010, and continued through June 4, 2013 within the Central District of California. Therefore, venue lies in this District pursuant to 28 U.S.C. §1391.

## III.

## PARTIES

9. Plaintiff Kelly Soo Park is a resident of the State of California and resided within the jurisdiction of the State of California at all times herein alleged.

10. At times relevant herein, Defendant Detective Karen Thompson was employed by and working on behalf of the Santa Monica Police Department and resided within the jurisdiction of the State of California. In her capacity as a detective at the Santa Monica Police Department, she actively participated in the investigation resulting in the prosecution of Plaintiff Park. Defendant Thompson is sued in her individual and official capacity.

11. Plaintiff is informed and believes, and thereon alleges that Defendants sued herein as Does 1 through 10, inclusive, were police officers, and were at all relevant times acting in the course and scope of their employment and agency.

---

[1] Despite Plaintiff's acquittal, the Santa Monica Police Department's reference to Plaintiff's arrest for the murder of Julianna Redding remains on the police department's official website.

2

Each Defendant is the agent of the other. Plaintiff alleges that each of the Defendants named as a "Doe" was in some manner responsible for the acts and omissions alleged herein. Plaintiff will ask leave of this Court to amend the Complaint to allege such names and responsibility when that information is ascertained.

## IV.
## GENERAL ALLEGATIONS

12. Plaintiff is informed and believes, and thereon alleges that, at all times herein mentioned, each of the Defendants was the agent and/or employee and/or co-conspirator of each of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the scope of such agency, employment and/or conspiracy, and with the permission and consent of other co-Defendants.

13. Each paragraph of this complaint is expressly incorporated into each cause of action which is a part of this complaint.

14. The acts and omissions of all Defendants were engaged in maliciously, callously, oppressively, wantonly, recklessly, and with deliberate indifference to the rights of Plaintiff.

## IV.
## FACTUAL ALLEGATIONS

A. OVERVIEW

15. In preparation for a criminal trial, Defendant and Santa Monica Police Department Detective Karen Thompson engaged in explicit, unconstitutional acts to prevent Plaintiff Park from presenting the exculpatory testimony of key defense witness Melissa Ayala in support of Plaintiff's criminal defense to murder charges filed by the Los Angeles County District Attorney's Office.

16. Contrary to her role as a law enforcement officer seeking the truth, Defendant Thompson presented false evidence to Ms. Ayala, caused Ms. Ayala to

fear that her boyfriend, John Gilmore, was a threat to her safety, and accused Plaintiff's defense team of acting unethically and in support of getting a "guilty" person – Plaintiff – "off" from the pending murder charges. In this manner, Defendant Thompson encouraged, both implicitly and explicitly, Plaintiff's key defense witness, Ms. Ayala, to not testify on behalf of Plaintiff at the upcoming murder trial. Far from acting as an impartial law enforcement officer, Defendant Thompson's bias against Plaintiff, her resulting commitment to having Plaintiff found guilty at trial at all costs, and her need to justify the Medal of Merit already awarded to her for "solving" this case, caused Defendant Thompson to interfere with Plaintiff's presentation of evidence in support of her criminal defense.

**B.   BACKGROUND**

17. On March 15, 2008, Julianna Redding died by strangulation in her home.

18. As months passed with no leads regarding who was responsible for Ms. Redding's death, Defendant Thompson requested permission from her employer, the Santa Monica Police Department, to investigate the crime on her own time.

19. In the spring of 2010, Defendant Thompson matched DNA found on Ms. Redding's body to that of Plaintiff Kelly Soo Park, and in June 2010, the Los Angeles County District Attorney's Office filed a Complaint charging Plaintiff Kelly Soo Park for the murder of Juliana Redding.

20. The evidence supporting this murder charge against Plaintiff stemmed overwhelmingly from Plaintiff's DNA which was found on the body and in the home of Juliana Redding.

21. In September of 2011, a year and a half before the trial commenced, and during the ongoing investigation, Defendant Thompson was awarded a Medal of Merit by the Santa Monica Police Department for "solving" the murder of Ms. Redding by matching DNA found on Ms. Redding's body to Plaintiff.

22. Prior to Ms. Redding's death, John Gilmore was the boyfriend of Juliana Redding. At the time of the murder, Mr. Gilmore had a history of domestic violence, and previously had assaulted Ms. Redding. Mr. Gilmore also had a history of breaking into and destroying property in Ms. Redding's home, including days before Ms. Redding was murdered. During the investigation of Ms. Redding's murder, a number of witnesses advised the Santa Monica police of his violent temper toward Juliana Redding.

23. On the night of March 15, 2008, Mr. Gilmore sent multiple text messages to Juliana Redding. Ms. Redding did not respond to his messages. In a series of escalating text messages, Mr. Gilmore spoke about their prior relationship, his love for her, and his anger/frustration that Ms. Redding would not respond to his messages. In several of these text messages, prior to Ms. Redding's murder, Mr. Gilmore accused Ms. Redding of "ruin[ing] it all," and "You honestly couldn't be more hurtful…"

24. Defendant Detective Karen Thompson was the lead investigator of the Santa Monica Police Department investigating the murder of Juliana Redding. In her investigation of John Gilmore, Defendant Thompson learned about Mr. Gilmore's history of violence against Ms. Redding. In fact, on March 3, 2008, twelve days before the murder, Defendant Thompson learned that Mr. Gilmore became enraged when Ms. Redding ignored his text messages, and appeared unannounced at her apartment where he pounded on the window and broke the apartment gate. At the time, Ms. Redding was in bed, but let him inside the apartment. While inside, Mr. Gilmore violently threw furniture throughout the apartment. Despite this information, Defendant Thompson persisted on pursuing Plaintiff as the sole suspect of the crime.

25. Officers from the Santa Monica Police Department interviewed Mr. Gilmore concerning his whereabouts on the night of the murder. Mr. Gilmore admitted that he was about one mile away from the scene of the murder, but tried

5

to establish an alibi by telling the police that he attended a party until 12:30 a.m. / 1:00 a.m. that morning, and left in the company of friends. Contrary to his alibi, Mr. Gilmore's text messages reveal that he left the party at 10:30 p.m., apparently alone, giving him ample time to commit the murder and return to the party.

26. Plaintiff's murder trial was set for May of 2013.

27. On January 31, 2013, Plaintiff's investigator contacted and interviewed witness Melissa Ayala. After Ms. Redding was killed, her boyfriend, John Gilmore, began dating Melissa Ayala, but at the time of the interview, they were no longer dating.

28. During the interview, Ms. Ayala told Plaintiff's criminal defense investigator that Mr. Gilmore had been violent toward her, and that he had choked her on at least three occasions. On the first of these occasions, prior to his choking of Ms. Ayala, Mr. Gilmore stated: "You want to see how she [Julianna] felt?" This threat occurred during a conversation in which Ms. Ayala had brought up Ms. Redding's death. On the second occasion, while choking Ms. Ayala, Mr. Gilmore stated that he was: "Going to show you how [Julianna] felt."

29. Ms. Ayala reenacted these incidents when Mr. Gilmore choked and threatened her to Plaintiff's criminal defense investigator.

30. During the interview, Ms. Ayala expressed to Plaintiff's defense investigator that she was afraid of Mr. Gilmore, but committed to testifying about Mr. Gilmore's violent conduct and threats toward her, and the statements he had made about Ms. Redding's death.

31. Mr. Gilmore was convicted of a domestic violence offense in connection with the choking of Ms. Ayala. He had been violent toward her on a number of other occasions, including such things as pushing her out of a moving vehicle because she "bought the wrong brand of beer."

32. After learning of this important exculpatory evidence that Mr. Gilmore had choked Ms. Ayala while admitting to strangling Julianna Redding,

6

Plaintiff provided notice to the Los Angeles County District Attorney of her intention to use Ms. Ayala as a witness for her criminal defense at trial.

### C. DEFENDANT THOMPSON INTENTIONALLY PREVENTED PLAINTIFF'S PRESENTATION OF EXCULPATORY EVIDENCE

33. On February 6, 2013, after receiving notice that Plaintiff intended to call Ms. Ayala as a witness, Defendant Thompson contacted Ms. Ayala for the first time. In that conversation, which Defendant Thompson recorded, Defendant Thompson identified herself as a detective for the Santa Monica Police Department. Defendant Thompson then made multiple statements to Ms. Ayala in an effort to prevent Ms. Ayala from testifying for Plaintiff at the upcoming murder trial.

34. Detective Thompson impressed upon Ms. Ayala that John Gilmore was not the murderer of Juliana Redding; that the defense investigators engaged in unethical conduct and lied to her; and that Plaintiff was, in fact, guilty of the murder of Juliana Redding.

35. In particular, Defendant Thompson made the following statements in that February 6, 2013 conversation in order to convince witness Melissa Ayala not to testify on behalf of Plaintiff:

   a. "And first, what I want to tell you is that John [Gilmore] is not the killer."

   b. "But the two people who showed up at your house two weeks ago. . . they are private investigators who were hired by the defense team that is representing the killer [Plaintiff] on this case."

   c. "They are private investigators who are hired by her defense attorneys to try and shoot holes in – in our prosecution of their – of the bad guy [Plaintiff]."

   d. "But I don't think that [John Gilmore] is a bad person and I never – I certainly don't think he committed this murder."

7

e. "This girl's [Plaintiff] DNA is on her neck . . . The killer [Plaintiff] left her DNA on the front of her tank top and on the back of her tank top."

f. "We also have blood on the front door handle . . . so the killer [Plaintiff] was injured during the struggle and she left her blood DNA on the door handle."[2]

g. "So there isn't any doubt in my mind that we have arrested the proper person [Plaintiff] for this murder."

h. "So Julianna's dad backed out of a business deal . . . this girl [Plaintiff] went there to convince Juliana to get her dad back on board and Julianna didn't agree to it and the girl [Plaintiff] lost her temper and killed her."

i. "So [Plaintiff's investigators] bent the facts to try to, you know, make you think something else."

j. "This woman [Plaintiff] – is involved in a murder and knows a person who is dead and doesn't come forward for two years? She didn't come forward at all until we arrested her. . . So again, it shows her guilt."

k. "…they're [Plaintiff's investigators] going to tell every lie they can to try and get her off."

l. "What we are anticipating is that they're [Plaintiff's investigators] gonna try to blame this all on John [Gilmore]. . . Don't believe what they're saying."

m. "They [John Gilmore and Julianna Redding] were, you know, talking on the phone the night before. That's another thing. John – you know, they talked at 9:45 p.m. at night and Julianna told John,

---

[2] This information was false, and Defendant Thompson was aware that this was a false representation of the evidence.

8

'Well, I'm just going to watch Seinfeld'; right? Which we know comes on at ten o'clock. 'And, you know, if you decide that you want to come over, you can.'"[3]

36. After Defendant Thompson provided this information, including demonstrably false information, with the intention of persuading witness Melissa Ayala to not testify for the defense, she warned Ms. Ayala that Mr. Gilmore, the man who had been convicted of domestic violence against Ms. Ayala, was "upset" when he heard what Ms. Ayala was saying. Defendant Thompson then encouraged Ms. Ayala to not testify on behalf of Plaintiff:

    a.    Detective Thompson: "John [Gilmore] was really upset about the whole thing because he – he feels like they just made you lose faith in him, I guess."

        Melissa Ayala: "Yeah, they kind of did."

    b.    Detective Thompson: ". . . the defense, who is going to drag you into this, is they might put you on the stand and ask you to testify about the domestic violence incident [with John Gilmore]. But we are aware that they're to do this and we are already filing motions to squash it because they're not really allowed to –"

        Melissa Ayala: "I don't want to."

    c.    Detective Thompson: "You're not under any obligation to do anything. And if some –"

        Melissa Ayala: "I just don't – I don't – I don't want to hurt John in any way."

37. On information and belief, Defendant Thompson's statements during this February 6, 2013, telephone call reflecting: (a) that Plaintiff was guilty of the

---

[3] This information was false. Defendant Thompson was aware that this was a false representation of the evidence.

9

murder of Julianna Redding – including direct misrepresentations of the evidence in the case; (b) that all the evidence demonstrated that John Gilmore was innocent of the murder; (c) that the defense investigators deliberately lied to Ms. Ayala; and (d) that John Gilmore was upset with Ms. Ayala – caused Melissa Ayala to change her mind about providing any testimony or evidence for Plaintiff's defense at Plaintiff's upcoming murder trial. Defendant Thompson intended this result.

38. After speaking with Defendant Thompson on February 6, 2013, witness Melissa Ayala refused any further contact with Plaintiff's investigators working on behalf of her criminal defense.

39. Based on this important exculpatory evidence to the murder of Julianna Redding and the direct evidence of John Gilmore's culpability, Plaintiff subpoenaed Melissa Ayala as a witness in the upcoming murder trial. Knowing that Plaintiff planned to call Ms. Ayala at the trial, and that she would be subpoenaed, Defendant Thompson instructed Ms. Ayala, "But when you get [a subpoena], you know, you can call me and let me know and I'll tell you, you know, what to do."

40. In a sworn declaration filed on May 3, 2013, Defendant Thompson stated that she had *not* spoken to Ms. Ayala for investigatory purposes. Instead, she said that the "only reason" for her call to Ms. Ayala was to "repair the damage the Private Investigators had done to her relationship [with Mr. Gilmore]." But Ms. Ayala and Mr. Gilmore had broken off their relationship long before Defendant Thompson's call. Moreover, Mr. Gilmore was convicted of domestic violence for abusing Ms. Ayala during that relationship.

41. Contrary to her representation, Defendant Thompson intended that her February 6, 2013 conversation with Ms. Ayala would convince Ms. Ayala not to testify for the defense. In doing so, she fabricated evidence, gave unqualified opinions on Mr. Gilmore's innocence and upstanding character, and made implicit threats to Ms. Ayala's safety.

10

42. On information and belief, based on the exculpatory evidence Melissa Ayala could provide for Plaintiff's criminal defense, Defendant Thompson and/or Defendant Does engaged in discussions with the police officers from the El Segundo Police Department to charge Ms. Ayala with assault and criminal threats against John Gilmore. This incident occurred approximately one year earlier, in the spring of 2012. Consequently, a few weeks before trial, the Los Angeles County District Attorney's Office filed a complaint against Melissa Ayala alleging felony conspiracy, assault, and criminal threats for conduct that occurred from that incident. As of this writing, this case has yet to be presented to a court at a preliminary hearing to determine whether there is probable cause against Melissa Ayala.

43. On May 9, 2013, the Friday before Plaintiff's criminal trial, witness Melissa Ayala appeared in court pursuant to Plaintiff's criminal defense subpoena. In a discussion outside of the courtroom between Ms. Ayala's criminal defense attorney and the Deputy District Attorney assigned to Plaintiff's criminal case, the Deputy District Attorney threatened to "recuse" the defense attorney if he did not instruct Ms. Ayala to invoke Fifth Amendment right against self-incrimination. After this conversation between Ms. Ayala's defense attorney and the Deputy District Attorney, Ms. Ayala invoked her Fifth Amendment right against self-incrimination and declined to testify in response to the defense subpoena.

**D. MS. AYALA WAS NOT THE ONLY WITNESS DEFENDANT THOMPSON IMPROPERLY SOUGHT TO PREVENT FROM TESTIFYING**

44. Apart from Ms. Ayala, Defendant Thompson intentionally and improperly prevented the testimony of two other potential witnesses.

45. First, Defendant Thompson was concerned that Plaintiff might present alibi testimony through a witness named Ronnie Case, an associate of Plaintiff. Defendant Thompson played an integral part in having charges filed against

11

Ronnie Case. In her effort to prevent Mr. Case from testifying on behalf of Plaintiff, Defendant Thompson sent an email to other law enforcement officers in which she admits that her motive in having Mr. Case arrested in Ventura County was to "twist him [Mr. Case] a little to see if we can flip him (with some immunity) [against Plaintiff]. I hope [Mr. Case] has harsh feelings toward the lovely Ms. Park."

46. Defendant Thompson travelled from Santa Monica to Ventura to interrogate Mr. Case upon his arrest. According to the tape of that interrogation, Ms. Thompson and another law enforcement officer told Mr. Case he was "going from being a witness [for the defense] to a defendant" and that "now you can't get on the stand and be a witness for her."

47. In her attempt to have Mr. Case testify *against* Plaintiff, Defendant Thompson told Mr. Case that Plaintiff and her associates would likely kill Mr. Case in the future and suggested that Mr. Case would be safer if he cooperated with law enforcement.

48. Defendant Thompson also interfered with another potential witness, namely Plaintiff's then—fiancé, now husband, Thomas Chronister. Mr. Chronister is a retired Commander with the City of Oxnard Police Department. In June of 2012, Mr. Chronister had a successful and reputable 29 year career with the Department. On information and belief, Defendant Thompson was concerned that Mr. Chronister could provide character testimony in Ms. Park's favor. Therefore, Defendant Thompson began to contact officials with the Oxnard Police Department, sullying his reputation and calling his ethics into question. Defendant Thompson also caused Mr. Chronister to lose certain rights and privileges to which Mr. Chronister would have otherwise been entitled upon retirement in good standing. She did so in order to undermine his usefulness as a character witness.

49. Further, during interviews with other acquaintances of Plaintiff, Defendant Thompson characterized Plaintiff as a "con artist," "high up in the

12

criminal enterprise," "slick," "sociopath," and "chameleon," and accused Plaintiff of "money laundering" "fraud," and accused her of the "sinister abuse of every governmental agency," all in an effort to taint Plaintiff's reputation and good standing with these persons

### E. PLAINTIFF PARK WAS ACQUITTED.

50. In May of 2013, the Los Angeles County District Attorney's Office proceeded to trial against Plaintiff for the murder of Juliana Redding. On June 4, 2013, even without the testimony of witness Melissa Ayala, the jury acquitted Plaintiff of all criminal charges for the murder of Juliana Redding.

51. In establishing Plaintiff's innocence, the prosecution's DNA expert testified that Plaintiff's DNA could have been transferred to Ms. Redding's body by the killer when he or she wiped down the apartment to rid the scene of any finger prints or DNA of the real killer. The transfer likely resulted from the real killer using a towel or item of clothing that Plaintiff had used or worn. The defense presented witnesses who explained why such an item would have been in the victim's house. Defense witnesses also explained that items found in Ms. Redding's house had apparently been moved from another house which Plaintiff frequented, explaining why a single plate found in Ms. Redding's sink had Plaintiff's fingerprint.

52. Although Plaintiff was ultimately acquitted, such an acquittal was far less likely without the testimony of Ms. Ayala. Given the DNA found in the house, a verdict in favor of the prosecution was a very real possible outcome. Without the critical testimony of Ms. Ayala at trial – demonstrating the likely third party culpability of John Gilmore – Defendant Thompson directly and deliberately interfered with Plaintiff's presentation of her defense to the criminal charges. Moreover, Plaintiff's inability to present evidence about the real killer limited her to a failure-of-proof case rather than proving her innocence. Thus, post-trial news coverage portrayed her as essentially "getting away with murder."

## F. PARTICIPATION, STATE OF MIND AND DAMAGES

53. Defendant Thompson and Defendant Does 1-10 acted without authorization of law.

54. Each Defendant participated in the violations alleged herein, or directed the violations alleged herein, or knew of the violations alleged herein and failed to act to prevent them. Each Defendant ratified, approved or acquiesced in the violations alleged herein.

55. As joint actors with joint obligations, each Defendant was and is responsible for the failures and omissions of the other.

56. Each Defendant acted individually and in concert with the other Defendants and others not named in violating Plaintiff's rights.

57. Each Defendant acted with a deliberate indifference to or, reckless disregard for, an accused's rights to present evidence in support of her defense and/or for the Plaintiff's right to due process of law.

58. As a direct and proximate result of the aforesaid acts, omissions, and decisions of the Defendants, Plaintiff has suffered great mental and physical pain, suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, apprehension, and loss of financial stability which have caused Plaintiff to sustain damages in a sum to be determined at trial.

59. Additionally, as a direct and proximate result of the aforesaid acts, omissions and decisions of the Defendants, Plaintiff, despite being acquitted of all charges, continues to be branded a murderer. Without being able to provide her full defense at the time – a defense which included the testimony of Melissa Ayala – Plaintiff's defense was limited, and although she was ultimately acquitted, only a part of the story was told at trial.

60. On November 23, 2013, CBS' television program "48 Hours" aired an hour-long segment detailing the police investigation of the murder of Juliana Redding and Plaintiff's trial. While there was discussion of evidence by the

prosecution that was kept out (that Plaintiff allegedly was an "enforcer" for Dr. Munir Uwaydah), there was *no mention whatsoever* of the evidence which Melissa Ayala would have presented reflecting Mr. Gilmore's confession to the murder. And, when referencing that the criminal defense wanted to argue that Mr. Gilmore may have been the killer, the "48 Hours" episode represented that Mr. Gilmore's alibi was essentially airtight. Due to the acts of the Defendants, Plaintiff has suffered, and continues to suffer, and is likely to suffer in the future, extreme and severe mental anguish.

61. All damages sought by Plaintiff stem from the conduct of Defendants in preventing her from presenting critical evidence in support of her criminal defense, as alleged above. As such, Plaintiff seeks no damages for malicious prosecution or for her incarceration pending trial. She does, in contrast, seek damages for the emotional distress caused to her from having her ability to present the most complete defense interfered with, and the increased anxiety it caused her regarding her murder trial.

62. The aforementioned acts of the Defendants, and each of them, was willful, wanton, malicious, oppressive, in bad faith and done with reckless disregard or with deliberate indifference to the constitutional rights of the Plaintiff, entitling Plaintiff to exemplary and punitive damages from each Defendant in an amount to be proven at the trial of this matter.

63. By reason of the above described acts and omissions of Defendants, Plaintiff was required to retain an attorney to institute and prosecute the within action, and to render legal assistance to Plaintiff that she might vindicate the loss and impairment of her rights, and by reason thereof, Plaintiff requests payment by Defendants of a reasonable sum for attorney's fees pursuant to 42 U.S.C. § 1988.

## FIRST CLAIM FOR RELIEF

**DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. § 1983 –SIXTH AMENDMENT AND FOURTEENTH AMENDMENT VIOLATIONS**
(Against Defendant Thompson and Does 1-10)

15

64. Plaintiff realleges paragraphs 1 through 63, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

65. Defendant Thompson and Does 1-10, while acting under color of law, deprived Plaintiff of her civil rights by violating her right to compulsory process based on the deprivation of the testimony of witness Melissa Ayala as required under the Sixth Amendment of the United States Constitution. By depriving Plaintiff of the testimony of witness Ayala, Defendant Thompson and Does 1-10 violated Plaintiff's Fourteenth Amendment right to a fair trial.

66. The actions of each defendant were done with deliberate indifference to or reckless disregard for Plaintiff's rights or for the truth.

67. Defendant Thompson and Does 1-10 Sixth and Fourteenth Amendment violations asserted herein encompass, but are not limited to:

    A. Stating to witness Melissa Ayala that John Gilmore was unequivocally innocent of the crime of the murder of Julianna Redding. In making this point, Defendant Thompson presented false evidence to Melissa Ayala;

    B. Stating to witness Melissa Ayala that Plaintiff was the "killer" / guilty of the murder of Julianna Redding;

    C. Stating to witness Melissa Ayala that John Gilmore was "upset" with witness Melissa Ayala, thereby causing her to be fearful of his retaliation, particularly when he repeatedly engaged in domestic violence against witness Melissa Ayala in the past; and

    D. Stating to witness Melissa Ayala that Plaintiff's investigators were presenting her with false information, and that they would engage in unethical conduct going and "tell every lie they can to try and get her off."

68. The constitutional source of the obligation to permit Plaintiff to present exculpatory evidence in her defense is the Sixth Amendment and the due process clause of the Fourteenth Amendment, and Plaintiff's due process rights were

violated by the conduct alleged herein. Plaintiff brings this claim as both a procedural and a substantive due process violation. To the extent that any court were to conclude that the source of Plaintiff's right to compulsory process is any constitutional source other than due process, this claim is brought on those bases as well.

69. Defendant Thompson and the other Doe defendants were each jointly and severally responsible to permit Plaintiff to present evidence in support of her criminal defense. Each engaged in, knew or should have known of the unconstitutional conduct alleged herein and failed to prevent it, which each had a responsibility to do, and each ratified, approved or acquiesced in it.

70. As a result of defendants', and each of their, violations of Plaintiff's constitutional right to present evidence in support of her criminal defense, Plaintiff was damaged as alleged below.

## SECOND CLAIM FOR RELIEF

## JOINT ACTION/CONSPIRACY TO VIOLATE CIVIL RIGHTS – 42 U.S.C. §1983 – SIXTH AND FOURTEENTH AMENDMENT VIOLATIONS
(Against Defendants Thompson and Does 1-10)

71. Plaintiff realleges paragraphs 1 through 70, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

72. Defendants Thompson and Does 1-10 were jointly and severally responsible as investigators assigned Plaintiff's case to not interfere with Plaintiff's ability to present evidence in support of her criminal defense.

73. Defendants Thompson and Does 1-10, acting under color of state law, acted in concert, conspired and agreed to deprive Plaintiff of rights, privileges, or immunities secured by the Constitution and laws of the United States, in particular the right to present evidence in support of her criminal defense of which they were aware, as elaborated above. Each effort to interfere with Plaintiff's right to present

evidence in support of her criminal defense constitutes an overt act in furtherance of said conspiracy.

74. Alternatively as joint actors with joint obligations, each of them was and is responsible for the failures and omissions of the other.

75. As a result of defendants', and each of their, violations of Plaintiff's constitutional right to present evidence in support of her defense, Plaintiff was damaged as alleged below.

## THIRD CLAIM FOR RELIEF

## DECLARATORY RELIEF
### §1983 – SIXTH AND FOURTEENTH AMENDMENT VIOLATIONS
### (Against Defendants Thompson and Does 1-10)

76. Plaintiff realleges paragraphs 1 through 75, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

77. Plaintiff is entitled to declaratory relief with the respect to the unconstitutionality of the conduct of Defendant Thompson and Does 1-10. Plaintiff requests that the Court declare that the acts and/or omissions of Defendant Thompson, and Does 1-10 violated Plaintiff's rights under the Sixth and Fourteenth Amendments of the United States.

WHEREFORE, Plaintiff, Kelly Soo Park, requests relief on her own behalf as follows, and according to proof, against each Defendant:

1. General and compensatory damages in an amount according to proof;
2. Special damages in an amount according to proof;
3. Exemplary and punitive damages against each Defendant, in an amount according to proof;
4. A declaration that the acts and/or omissions of each Defendant violated Plaintiff's rights under the United States Constitution;

///

5. Costs of suit, including attorneys' fees, under 42 U.S.C. §1988; and,

6. Such other relief as may be warranted or as is just and proper.

Respectfully submitted,

KAYE, McLANE, BEDNARSKI & LITT, LLP

DATED: January 13, 2014    By: _____
RONALD O. KAYE
Attorneys for Plaintiff
Kelly Soo Park

## JURY DEMAND

Trial by jury of all issues is demanded.

KAYE, McLANE, BEDNARSKI & LITT, LLP

DATED: January 13, 2014    By: _____
RONALD O. KAYE
Attorneys for Plaintiff
Kelly Soo Park