1   MARSHA JONES MOUTRIE, City Attorney
    JEANETTE SCHACHTNER, Deputy City Attorney
2   Bar No. 116671
    ANTHONY SERRITELLA, Deputy City Attorney
3   Bar No. 72597
    1685 Main Street, Room 310
4   Santa Monica, California 90401
    jeanette.schachtner@smgov.net
5   anthony.serritella@smgov.net
    Telephone: (310) 458-8328
6   Facsimile:  (310) 451-5862

7   Attorneys for Defendant
    KAREN THOMPSON
8

9
                    **UNITED STATES DISTRICT COURT**
10
               **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
11

| | |
|---|---|
| KELLY SOO PARK, | CASE NO.: CV 14-00330-SJO(RZX) |
| Plaintiff, | Honorable S. James Otero (Courtroom 1) |
| v. | |
| DETECTIVE KAREN THOMPSON; AND DOES 1-10, INCLUSIVE | **NOTICE OF MOTION AND MOTION BY DEFENDANT KAREN THOMPSON TO DISMISS UNDER RULE 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| Defendants. | **REQUEST FOR JUDICIAL NOTICE CONCURRENTLY FILED** |
| | Date:        April 7, 2014 Time:        10:00 a.m. Ctrm:        1 |
| | Complaint Filed:   01/15/2014 |
| | Trial Date:        None |
| | Per Local Rule 7-3, counsel met and conferred on 2/11/2014 |

        PLEASE TAKE NOTICE that on April 7, 2014 at 10:00 a.m., or as soon

thereafter as this matter may be heard in Courtroom 1 of the above-entitled court

located at 312 N. Spring Street, Los Angeles, CA 90012, Defendant Karen Thompson

will and hereby moves the Court for dismissal of Plaintiff's Complaint, and each cause

of action against her, on the grounds that the Complaint fails to state a claim upon which relief can be granted.

This motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) and is based upon this Notice of Motion, the Memorandum of Points and Authorities, and the concurrently filed Request for Judicial Notice, as well as all pleadings and papers on file in this action, and upon such other matters as may be presented to the Court prior to or at the time of the hearing.

Pursuant to Local Rule 7-3, on February 11, 2014, defendant's and plaintiff's counsel met and conferred in-person in plaintiff's counsels' office regarding the substance of the motion.

DATED: March 3, 2014                    Respectfully submitted,

                                        MARSHA JONES MOUTRIE
                                        City Attorney

                                         */s/ Jeanette Schachtner*
                                        By:_____
                                          JEANETTE SCHACHTNER
                                          Deputy City Attorney
                                          ANTHONY P. SERRITELLA
                                          Deputy City Attorney

                                        Attorneys for Defendant,
                                        DETECTIVE KAREN THOMPSON

# **TABLE OF CONTENTS**

Page

I.     INTRODUCTION .................................................... 1

II.    STATEMENT OF FACTS............................................ 2

       A.    Juliana Redding's Murder........................................ 2

       B.    Detective Thompson's Conversation With Melissa Ayala ....................... 3

       C.    The Pre-Trial Motions And The Court's Rulings........................ 6

             1.    The Motion to Preclude Evidence of Third Party Culpability ........ 6

             2.    Park's Motion to Dismiss Based on Thompson's Alleged
                   Outrageous Conduct. ........................................ 7

             3.    The Court Precludes Evidence of Third Party Culpability
                   and Denies Park's Motion for Dismissal........................ 7

             4.    Park's Motion To Grant Ayala Use Immunity Is Denied .............. 10

       D.    Plaintiff's Complaint .......................................... 10

III.   NO COGNIZABLE LEGAL THEORY IS ALLEGED ..................... 11

IV.    PARK'S FIRST CLAIM FOR RELIEF FAILS TO STATE A
       COGNIZABLE CLAIM FOR A VIOLATION OF THE SIXTH AND
       FOURTEENTH AMENDMENTS........................................ 12

       A.    Plaintiff's Does Not Establish That Thompson Intimidated Ayala.......... 12

       B.    Thompson Did Not Interfere With The Right to Compulsory
             Process........................................................ 13

V.     PARK'S COMPLAINT FAILS TO STATE A CLAIM FOR
       CONSPIRACY OR JOINT ACTION................................... 17

VI.    THOMPSON IS ENTITLED TO QUALIFIED IMMUNITY ................. 19

VII.   PARK'S CLAIM FOR DECLARATORY RELIEF FAILS ................. 20

VIII.  CONCLUSION .................................................... 21

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ..................................................................................11

*Balistreri v. Pacifica Police Dep't,*
  901 F.2d 696 (9th Cir. 1990) ..................................................................11

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ..................................................................................11

*Edwards v. Balisok,*
  520 U.S. 641, 648 (1997) ..........................................................................17

*Kyles v. Whitley,*
  514 U.S. 419, 435 (1995) ..........................................................................16

*Outdoor Media Grp., Inc. v. City of Beaumont,*
  506 F.3d 895 (9th Cir.2007) ......................................................................12

*People v. Hall,*
  41 Cal.3d 826 (1986) ..................................................................................6

*Rovario v. United States,*
  353 U.S. 53 (1957) ....................................................................................14

*Smiddy v. Varney,*
  803 F.2d  (9th Cir. 1986) ..........................................................................15

*Smith v. Almada,*
  640 F.3d 931 (9th Cir. 2011) ....................................................................16

*Sprewell v. Golden State Warriors,*
  266 F.3d 9798 (9th Cir. 2001) ................................................................12

*Starr v. Baca,*
  652 F.3d 1202 (9th Cir. 2011) ................................................................12

*Strickler v. Greene,*
  527 U.S. 263 (1999) ..................................................................................16

*United States v. Matlock,*
  491 F.2d 504 (6th Cir. 1974) ..................................................................15

*United States v. Valenzuela-Bernal,*
  458 U.S. 858 (1982) ..................................................................................14

*Washington v. Texas,*
  388 U.S. 14 at 19 (1967) ..........................................................................13

*Webb v. Texas,*
  409 U.S. 95 (1972) ....................................................................................13

*Williamson v. United States,*

1

512 U.S. 594 (1994) .................................................................. 14

*Workman v. Bell*,
160 F.3d 276 *republ. at* 178 F.3d 759 (6th Cir. 1998) ................................. 15

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANT THOMPSON'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORTOF MOTION TO DISMISS UNDER RULE 12(B)(6)**

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

In her lawsuit, Kelly Soo Park ("Park") alleges Detective Thompson ("Thompson") violated her rights under the Sixth and Fourteenth Amendments to compel ostensibly exculpatory witness testimony at her criminal trial. The records from the criminal court prosecution, which Thompson requests this Court judicially notice, however, show that it was not Thompson's acts, but the actions of the prosecutor (who argued in pretrial proceedings against such testimony), and the trial judge (who ruled the evidence to be inadmissible under long-established California Supreme Court precedent) that caused the evidence to be disallowed.

In addition, even if one could infer that Thompson interfered with Park's right to compulsory process, there was no violation of Park's right to a fair trial, because Park was acquitted of the murder charges. There is no case which establishes she has a right to sue under such circumstances. Unlike cases brought for *Brady* violations, Park does not allege the arrest or prosecution was brought or continued without probable cause. There is no suggestion made that if the witness had testified that the charges would have been dismissed, nor could the trial result – an acquittal – have been any more favorable. Thus, the record directly contradicts Park's allegations.

This Motion raises several legal issues regarding this novel case: (1) Does the complaint allege a viable claim that Thompson engaged in any act which interfered with Park's rights to a fair trial? (2) Because Park was acquitted, does she have a right to sue under Section 1983 for alleged interference with a witness? (3) Does Park's complaint sufficiently allege a conspiracy under the pleading standards established by *Iqbal*?  (4) Does Park sufficiently allege a claim for declaratory relief separate and apart from her damage claim under Section 1983?  Defendant submits that the answer to each of the questions is an unqualified "no."

And, finally, even if there is disagreement over the response to these questions, given the absence of case law establishing a violation of the right alleged, in the

1  *factual context presented*, is Thompson entitled to qualified immunity?  There should

2  be little debate – Thompson is entitled to qualified immunity and should not be

3  required to defend against this lawsuit. Although the law clearly establishes that a

4  criminal defendant has a Sixth and Fourteenth Amendment right to compel the

5  attendance of witnesses at trial, the specific issue in the context of this case has never

6  been squarely addressed by Supreme Court or the Ninth Circuit holdings.

7  **II.   STATEMENT OF FACTS**

8      To put plaintiff's Complaint in context, defendant Thompson has requested in a

9  concurrently filed document that this Court take Judicial Notice ("RJN") of the

10  underlying criminal proceedings which form the basis of the allegations against her.

11  The following factual synopsis, taken from documents obtained from the criminal

12  court proceedings, help put Park's allegations in context.  (RJN 376-378)

13      **A.   Juliana Redding's Murder**

14      On the evening of March 15, 2008, Juliana Redding ("Redding"), a 21-year old

15  aspiring model, was brutally strangled after a violent struggle in her Santa Monica

16  apartment. (RJN 376-378)

17      A thorough police investigation pieced together the events that preceded

18  Redding's murder. Redding had gone to dinner with a female friend. At dinner,

19  Redding spoke with her on-again and off-again boyfriend, John Gilmore ("Gilmore"),

20  and argued. The two had earlier arranged to see each other that evening, but Gilmore

21  decided he would instead spend the evening at a party with co-workers instead of

22  going to Redding's apartment. He went to buy beer at a grocery store with friends as

23  recorded on the store's monitoring system just before 9 p.m.  Starting about 9:30 p.m.,

24  Gilmore and Redding exchanged text messages about his decision to attend the party

25  and to break their date. At 9:45 and 9:46 p.m., Redding tried to call Gilmore via cell

26  phone, but Gilmore missed both calls. At 9:52 p.m., Redding dialed 9-1-1 from her

27  cell phone, but the call never connected. At 9:53 p.m., Redding's neighbor heard loud

28  screaming and items being thrown coming from inside Redding's apartment. At 9:53

p.m., Gilmore called Redding's cellphone, the phone was answered but immediately disconnected.  Gilmore called again and although the phone was picked up, he heard static and then a disconnection. At 9:55 p.m., Gilmore called a third time, but the call went straight to voicemail. Throughout the night, Gilmore continued to call and send text messages to Redding's cell phone, but he never got any response. (RJN 376-378)

Gilmore left the party at about 12:30 a.m. to get something to eat, his presence also recorded on a security monitoring system. After leaving there, Gilmore and one of his friends went to ZJ Boarding House where they both worked and spent the night, Gilmore's presence again captured on a security monitoring system there.  According to his friends, Gilmore never was out of their presence that night. Beginning at about 9:00 a.m. the following morning and throughout the day, Gilmore tried to reach Redding to no avail. Concerned that Redding was nowhere to be found, Gilmore contacted Redding's mother, who in turned contacted the police to conduct a welfare check; Gilmore returned to the apartment to meet the police.  (RJN 376-378)

Santa Monica police officers arrived at about 6 p.m. Upon entry, they noticed the strong odor of gas. They discovered Redding's dead body inside the apartment, along with a burning candle on a coffee table in the living room and gas emanating from the oven in the kitchen. There were signs of a violent struggle, including a fingernail that had been ripped off of Redding. (RJN 376-378)

The coroner determined strangulation to be the cause of death. Based on the circumstantial evidence, the police investigators' concluded that the time of death was approximately 10:00 p.m.  Evidence collected from the scene included blood and a fingerprint found on a plate in the kitchen, as well as DNA samples from the kitchen stove, Redding's neck, her clothes, her cell phone, and the front interior door of Redding's apartment. The DNA, once tested, belonged to Park. (RJN 376-378)

**B.    Detective Thompson's Conversation With Melissa Ayala**

In preparation for the upcoming trial, Detective Thompson contacted Gilmore to serve him with a trial subpoena. During that conversation, Gilmore told Thompson

1   that Park's investigators had contacted his girlfriend, Ayala, and told her that Gilmore
2   was Redding's killer and that he was a rapist. Gilmore was upset and told Thompson
3   that Ayala had broken off their marriage engagement. Thompson asked Gilmore if he
4   wanted her to call Ayala, and he said, "Yes."  (RJN 474)

5       Thus, on February 6, 2013, Thompson telephoned Ayala and tape-recorded the
6   conversation. (RJN 344 transcript, 371Audio CD)  Plaintiff's complaint contains
7   snippets from that conversation. As this Court will note from the complete transcript
8   and audio CD, the conversation began with Thompson telling Ayala she had just
9   learned from Gilmore that Park's investigators had contacted her. (RJN 345) After
10  Thompson laid out the case against Park, she informed Ayala that there was not "any
11  doubt in my mind that we have arrested the proper person for this murder." (RJN 351)

12      Throughout the conversation, Ayala was crying. She told Thompson, "I just
13  didn't want to be dragged into this in the first place." (*Id.*) Ayala told Thompson that
14  Park's investigators claimed Redding had been dating Park, and "…that's why her
15  DNA was all over Juliana. And then they had like all these papers and saying that
16  John [Gilmore] was like raping this like 15-year-old girl and like so they pretty much
17  brainwashed me." (RJN 352) Thompson explained that she obtained Juliana Redding's
18  phone records from November 2007 to the March 15, 2008 murder, and that Park and
19  Redding "never exchanged one text message or one telephone call" and that "there is
20  no viable explanation for why Kelly's DNA is all over Juliana." (RJN 352-353)

21      Ayala explained to Thompson that she did not know Gilmore at the time of the
22  murder and Ayala also said, "I don't want to be a part of it.  I don't." (RJN 354)  After
23  further discussing what Thompson believed to be Park's defense theories, she
24  explained that Gilmore had fully cooperated with the investigation—allowed
25  photographs, examination for scratches under his shirt, allowed the taking of DNA
26  from his saliva and from under his fingernails, the taking of fingerprints, and giving a
27  2-3 hour interview. (RJN 356-357) In contrast, Thompson asked why if Park new
28  Redding she "did not come forward until the time of her arrest—two years after the

1    murder. Thompson surmised the conduct "shows her guilt." (RJN 357)

2         Thompson told Ayala that the prosecution would not be calling her to testify

3    since she did not know Gilmore back in 2008, but that she might be dragged in by the

4    defense to testify about the domestic violence incident. She also told Ayala that

5    motions to quash were being filed to try to prevent this. Ms. Ayala then responded, "I

6    don't want to."  Thompson also informed Ayala that she might have to testify, but the

7    most she would have to talk about would be the domestic violence and "that will be

8    it." (RJN 360) Finally, Ayala asked, "So if these people come like trying to call me or

9    come back again, what am I supposed to –" (RJN 360-61);  Thompson replied: "You

10   don't have to talk to them. …" (RJN 361)

11        Thompson reiterated that it was the defense's job to create confusion, and that if

12   they could get just one juror to have doubt about Park's guilt because of Gilmore's

13   domestic violence by the use of his hands around Ayala's neck, Park would get off.

14   (RJN 364) Then, a colloquy occurred regarding Ayala's duty to appear at trial if

15   subpoenaed:

16        [THOMPSON] So – so they prob- -- my guess is they probably are going to try

17   to call you to testify about that. And you – and you are under an obligation to appear if

18   you get a subpoena from the court. …[AYALA] Okay. [THOMPSON] But you –

19   legally that's a court order for you to show.  But until you have a subpoena, you don't

20   have to go anywhere.[AYALA]  Okay.[THOMPSON] Okay?  And you don't have to

21   talk to them if you don't want to.  You – if they call you, you don't even need to call

22   back.  You can just not call back. [AYALA]  Okay.[THOMPSON]  You're not under

23   any obligation to do anything.  And if some – [AYALA]  I just don't – I don't – I don't

24   want to hurt John in any way.[THOMPSON]  No, I understand.  But – but you have to

25   tell the truth and you'll have to let us do our job and our job will be, you know, to –

26   make all  -- to talk with the crazy juror that might believe this story, out of that story.

27   [AYALA] Yeah. (RJN 364-365)

28        After some additional discussion, Thompson concluded the telephone

1    conversation by telling Ayala, "Hang in there." (RJN 376)

2    **C.    The Pre-Trial Motions And The Court's Rulings**

3    A criminal complaint and subsequent Grand Jury Indictment charged Park with

4    second degree murder. Proceedings were held before Los Angeles Superior Court

5    Judge Kathleen Kennedy. While some have characterized the evidence against Park as

6    overwhelmingly in support of her guilt, Park was acquitted of Redding's murder. (See

7    Complaint ¶ 60 and "48-Hours" episode referred to in plaintiff's Complaint -

8    http://www.tv.com/shows/48-hours/watch/hollywood-secrets-2995128/) (RJN 497)

9    On May 9, 10 and 15, 2013, five witnesses testified at the pre-trial hearings on

10    the issues of the admissibility of third party culpability evidence from Ayala and

11    alleged misconduct by Det. Thompson.

12    **1.    The Motion to Preclude Evidence of Third Party Culpability**

13    On May 9-10, Judge Kennedy heard testimony and argument by Park in

14    opposition to the prosecution's motion to exclude third party culpability evidence and

15    in favor of the motion to dismiss for alleged outrageous conduct. Judge Kennedy

16    denied Park's motion to dismiss, but granted the prosecutor's motion to exclude

17    evidence of third party culpability. (RJN 36-40)

18    The prosecutor and police knew that Gilmore had an arrest record which began

19    in 2002. They also knew that on May 18, 2012, four years *after* Redding's murder,

20    Gilmore was convicted of a domestic battery (Penal Code § 273.5) after pushing his

21    then-girlfriend (Ayala) onto their bed and grabbing her neck. The prosecutor also

22    knew that in that same case, Ayala had complained that Gilmore had grabbed her by

23    the neck before.  (RJN 376-378) Thus, on April 9, 2013, Deputy District Attorney

24    Stacy Oken-Wiese ("DDA Oken-Weise") filed a motion to exclude evidence that

25    Gilmore was the perpetrator of the murder and relied on the standards relating to so-

26    called "third party culpability" established by the California Supreme Court in *People*

27    *v. Hall*, 41 Cal.3d 826 (1986).  In particular, the prosecutor argued that such "evidence

28    only raises a reasonable doubt as to the defendant's guilt when it directly or

circumstantially links the third party to the actual commission of the crime." (RJN 373ff)  Park opposed the prosecution motion on May 6, 2013. (RJN 392ff)

### 2.   Park's Motion to Dismiss Based on Thompson's Alleged Outrageous Conduct.

That same day, Park's attorneys filed a motion to dismiss which they styled, "Motion to Dismiss Based on Outrageous Government Misconduct." The motion contained a request for an evidentiary hearing.  The moving papers claimed, among other things, that Officer Thompson's conduct during her February 6, 2013 telephone conversation with Ayala was "astonishing and outrageous." (RJN 457ff) The attorneys also claimed that on March 27, 2013, the Los Angeles DA filed a complaint against Ayala for conduct that occurred in the Spring of 2012, making it "even less likely [for Ayala] to make it to the witness stand." (RJN 462)

### 3.   The Court Precludes Evidence of Third Party Culpability and Denies Park's Motion for Dismissal

In considering the motion to exclude third party culpability, Judge Kennedy listened to the tape-recorded telephone conversation between Ayala and Thompson and also heard testimony on whether there was any evidence that the recently filed criminal charges against Ayala were procured in any manner by either Officer Thompson or Park's prosecutor, DDA Okun-Wiese. Park's attorney also proffered evidence that Gilmore, Redding's boyfriend at the time of the murder, had several years after Redding's murder been accused of domestic violence by Ayala.

Park's Investigator Linda Larsen testified about her meeting with Ayala where she learned about the so-called "third party culpability" testimony. Unlike Thompson's interview of Ayala, investigator Larsen did not record the Ayala interview.

Lester Kuriyama, a Deputy District Attorney assigned to the Airport courthouse, filed the criminal case against Ayala and two other individuals that had been investigated by the El Segundo Police Department alleging that on April 1, 2012, Ayala and the other two defendants made criminal threats and assaulted victims

1  Claudia Diaz and John Gilmore. (RJN 200-203)  DA Kuriyama testified that he had

2  never met or spoken with the prosecutor in the Park case, did not have any contact

3  with Detective Thompson, or with any member of the Santa Monica Police

4  Department about the filing of the case in the Airport Court. (RJN 204)

5         Eric Atkinson, an El Segundo PD detective, testified he investigated the case

6  charging Ayala. He stated the offense occurred in April 2012, but that it took a while

7  to investigate as it was an assault with a deadly weapon case [use of a dog as a

8  weapon to commit the assault], which required interview of witnesses, photo lineups,

9  surveillance tape examination, and the like. During the investigation, he made no

10  contact with the prosecutor in the Park case, or with any member of the Santa Monica

11  Police Department, including Officer Thompson. He received no communication from

12  any outside source that influenced his handling of the case.

13         Ayala was also present, having been subpoenaed by Park's attorney, as was

14  Ayala's attorney, Robert Coppola Jr.  Mr. Coppola informed the court that he would

15  have his client assert her rights not to testify. Ayala took the stand, and asserted her

16  rights based on the advice of counsel under the Fifth Amendment and California

17  Constitution not to testify. Judge Kennedy stated:  "…if today Miss Ayala is asserting

18  her 5th Amendment rights and not going to testify, then I am going to preclude you

19  from mentioning anything about the third party culpability defense." (RJN 237) She

20  stated, however, that if she changed her mind, then the court would hold a hearing

21  outside the presence of the jury to revisit the issue. The judge also reiterated that the

22  evidence of Mr. Gilmore's alleged third party culpability (the alleged violent

23  outbursts, etc.) were "not going to come in if you don't have the connecting evidence

24  to the crime itself. And the connecting evidence to the crime itself, from my

25  understanding of all of this stuff, is Mr. Gilmore's statements. And if you cannot admit

26  Mr. Gilmore's statements, then none of that other stuff [i.e. testimony from Ms. Ayala]

27  is going to come in. None of it." (RJN 238)

28         Insofar as Mr. Ivanov, a handyman who Park's attorneys suggested had stalked

**DEFENDANT THOMPSON'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORTOF MOTION TO DISMISS UNDER RULE 12(B)(6)**

Redding, the court also found, "There is insufficient nexus, based on the proffer …to admit third party culpability evidence as to Ivan Ivanov."  (RJN 244)

As to the Ayala interviews, Judge Kennedy stated she was "not particularly enamored with either of the conversations [by the defense investigator or by Thompson] that occurred with Miss Ayala *** Both sides appear to be trying to sort of court favor or whatever with this witness, Ayala. But I don't think that either of those interviews, from what I have heard of them, and the taped interview of Thompson and Ayala rise to the level of some kind of misconduct. [¶] The way that the record of the interview with Detective Thompson and Miss Ayala is is that Detective Thompson did not know the details of what Miss Ayala had said to [Park's investigator] Miss Larsen and didn't apparently try to find out those details. [¶] After commenting about Ayala's volatile relationships with her boyfriends, Judge Kennedy stated:  "I don't think necessarily that Detective Thompson is responsible for that I don't find that there was misconduct on the part of Detective Thompson that would justify this court either ordering a grant of immunity or ordering that hearsay evidence come in at this trial." (RJN 251ff)

Judge Kennedy concluded regarding Ayala: "Her expression throughout that phone call of not wanting to get involved, she said that over and over again. And at the conclusion or near the end of that phone call Detective Thompson says, 'If you receive a subpoena, you will have to testify and you are going to have to tell the truth.' And it is left there.  And whether a witness wants to talk to law-enforcement or whether a witness wants to talk to a defense investigator, it is up to that witness to make that decision for themselves. [¶]  She is under subpoena now. She has a case pending against her. She has counsel to advise her on that. And at the moment she has indicated that she wished to assert her 5th Amendment rights. [¶] The court doesn't see that there is any remedy necessary because I don't find that there was misconduct on the part of Detective Thompson that would justify this court either order a grant of immunity or ordering that hearsay evidence come in at this trial." (RJN 252-53)

### 4.    Park's Motion To Grant Ayala Use Immunity Is Denied

Park also filed a motion seeking to grant Ayala use immunity. (RJN 486) At the hearing held on May 15, 2013, in opposition to Park's motion, the prosecution argued that at the prior week's hearing, the court denied a motion to dismiss based on the alleged misconduct of Thompson, and that "it was very clear that, by the tape recording of Miss Ayala, she didn't want to be involved in the first place."  (RJN 316) The prosecutor also argued that the evidence from Ayala was not "clearly exculpatory" (RJN 317) and that the court "should not grant Miss Ayala immunity." (RJN 318)

In response, Park's attorney argued there was evidence Gilmore had used violence against Redding, although not against her person. (RJN 329-30) The prosecutor retorted that there was Redding continued to see Gilmore even after these events, and that it was simply a young couple having an on-and-off-again relationship. (RJN 333)  Moreover, the prosecutor pointed out that none of the defense evidence established that Gilmore ever laid a hand on Redding. (Id.)

Judge Kennedy, concluded that the defense had not established a nexus between Gilmore and the murder, denied the motion to admit that evidence of third party culpability (RJN 334-337), and elaborated her reasoning:

> So I don't believe that her Due Process rights or right to a fair trial are
> compromised by requiring the defense to adhere to the standards that the
> California Supreme Court has set forth with regard to third party culpability and
> the Evidence Code and everything else that applies to both sides.  [¶] So the
> motion to admit that evidence is denied.  (RJN 336)

### D.    Plaintiff's Complaint

Even though Park was acquitted of Redding's murder, Park claims Thompson is liable for interfering with her right to compulsory process and fair trial under the 6th and 14th Amendments. Park asserts her lawyer's investigator learned on January 31, 2013, that **after** Juliana Redding was murdered, Gilmore, Redding's former boyfriend,

1  started to date Ayala. (¶ 27)  Park claims Ayala told her investigator that Gilmore had

2  been violent with her and choked her on at least three occasions, and had stated to her

3  "You want to see how she [Juliana] felt" and that he was "Going to show you how

4  [Juliana] felt." (¶ 28)  Park alleges Ayala's testimony about her boyfriend was

5  "important exculpatory evidence that Gilmore had choked Ms. Ayala while admitting

6  to strangling Juliana Redding."  (¶ 32)

7       Park alleges that after "receiving notice that Plaintiff intended to call Ms. Ayala

8  as a witness, Thompson contacted Ms. Ayala…"[1] Speculating on Thompson's state of

9  mind, Park concludes that Thompson "made multiple statements to Ms. Ayala in an

10  effort to prevent Ms. Ayala from testifying for Plaintiff at the upcoming murder trial."

11  (¶ 33 & 34) Park also alleges certain "particular" conduct during the telephone

12  conversation, which her complaint purports to summarize. (¶ 35) Park's complaint

13  focuses on Thompson's alleged interference with Ayala as a potential defense witness.

14  (¶ 27 ff. & ¶ 31)

15  **III.   NO COGNIZABLE LEGAL THEORY IS ALLEGED**

16       Dismissal under Rule 12(b)(6) can be based on "the lack of a cognizable legal

17  theory" or "the absence of sufficient facts alleged under a cognizable legal theory."

18  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  "Factual

19  allegations must be enough to raise a right to relief above the speculative level." *Bell*

20  *Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The complaint must "contain

21  sufficient factual matter, accepted as true, to state a claim for relief that is plausible on

22  its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

23       *Iqbal's* plausibility standard requires "more than a sheer possibility that a

24  defendant has acted unlawfully."  Instead the complaint must allege sufficient

25  _____

26  [1] Plaintiff's Complaint states that Thompson contacted Ayala after Park notified
   the prosecution that she intended to call Ayala.  (Comp. ¶ ¶ 32 & 33)  In fact, and
27  contrary to her allegations, Park's own attorney – pursuant to Judge Kennedy's
   questioning – admitted that Thompson's interview occurred some 6 days after Park's
28  investigator contacted Ayala and in response to Gilmore telling Thompson about it,
   NOT after Park had disclosed Ayala to the prosecutor as a defense witness.

underlying facts to provide fair notice and enable the defendant to defend him or herself effectively. *Starr v. Baca*, 652 F.3d 1202, 1261 (9th Cir. 2011).  Whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

The court may consider "allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Outdoor Media Grp., Inc. v. City of Beaumont*, 506 F.3d 895, 899 (9th Cir.2007). While the Court must construe the factual allegations as true and in the light most favorable to the plaintiff, the Court need not blindly accept unwarranted deductions of fact or unreasonable inferences.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

As discussed below, while plaintiff's complaint concludes that Detective Thompson violated and conspired to violate her compulsory process right under the 6th and 14th Amendments which allegedly denied her a right to fair trial, it fails to state any cognizable claim, as well as sufficient facts to support the claims.

## IV.   PARK'S FIRST CLAIM FOR RELIEF FAILS TO STATE A COGNIZABLE CLAIM FOR A VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS

First—what this case does not involve:  Park does not allege she was falsely arrested or that she was maliciously prosecuted.  Instead, her complaint alleges deprivation of the right to a fair trial because Ayala (and perhaps others) were allegedly discouraged by Officer Thompson from testifying in the criminal trial.

### A.   Plaintiff's Does Not Establish That Thompson Intimidated Ayala

Park's complaint alleges a distorted and misleading picture of the interview Officer Thompson had with Ms. Ayala. There is nothing about the conversation from which any reasonable inference can be made that Officer Thompson either exerted any pressure on Ayala not to testify, or even encouraged her not to testify. In fact, plaintiff

1  admits and the criminal court trial record shows that Ayala declined to testify because

2  she had been charged in another case in another court with felony assault against

3  Gilmore and asserted her Fifth Amendment right not to testify at a pre-trial hearing in

4  Park's case.

5        As the record establishes, Thompson called Ayala because Gilmore asked her to

6  do so.  And, in spite of Park's allegations in her lawsuit, the telephone call between

7  Thompson and Ayala did not result in what Park alleges to be any improper conduct

8  or interference with Park's right to call Ms. Ayala as a witness for her defense.

9        **B.    Thompson Did Not Interfere With The Right to Compulsory Process**

10       The plaintiff alleges violation of her rights under the Compulsory Process

11  Clause ("Compulsory Process") of the Sixth Amendment to the U.S. Constitution, and

12  thus, violation of her right to Due Process.  Compulsory Process grants to a defendant

13  in a criminal action the right "to have compulsory process for obtaining witnesses in

14  his favor."  U.S. Const. Amend. VI.

15       The Supreme Court has discussed the Sixth Amendment right in several cases,

16  the question in each being whether the right extends to more than granting a defendant

17  the power to subpoena witnesses. Thus, the Court has held the right extends also to

18  require admission of relevant evidence offered by the defense in certain

19  circumstances, and is considered part of the Sixth Amendment's so-called "right to

20  present a defense" which constitutes "a fundamental element of due process of law."

21  *Washington v. Texas*, 388 U.S. 14 at 19 (1967).

22       *Webb v. Texas*, 409 U.S. 95 (1972) illustrates how the Court applies the rule.

23  That case reversed a conviction because the trial judge improperly singled out the

24  defense's only witness and gave a prolonged warning that if he falsely testified he

25  could be charged with perjury and could be added to the sentence he was then serving

26  and diminishing the likelihood of parole. After the warning, the witness refused to

27  testify and was excused by the judge. The Court wrote: "In the circumstances of this

28  case, we conclude the judge's threatening remarks, directed only at the single witness

1    for the defense, effectively drove that witness off the stand, and thus deprived the

2    petitioner of due process of law ... " *Id.* at 98.

3        Subsequently, in *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982), the

4    Court considered what government action could violate the rights to compulsory and

5    due process. There, the Government's lawyer deported several undocumented persons

6    who were eyewitnesses to the charged crime before the defense had an opportunity to

7    interview them. The Court held that the Executive Branch's obligation to execute

8    immigration policy justified the prompt deportation of illegal alien witnesses upon the

9    prosecutor's good faith determination that they possessed no evidence favorable to the

10   defense. The Court elaborated and held the right to a fair trial through Compulsory

11   Process is violated only by "a plausible showing that the testimony of the deported

12   witnesses would have been material and favorable to his defense, in ways not merely

13   cumulative to the testimony of available witnesses." *Id.* at 873.  In so concluding, the

14   Court relied on its holding in *Rovario v. United States*, 353 U.S. 53 (1957), which

15   held an informant's identity had to be disclosed because that evidence was <u>highly</u>

16   <u>relevant</u>.  Finally, the court held that sanctions are only warranted if there is a

17   reasonable likelihood that the testimony could have affected the judgment of the trier

18   of fact. *Id*. at 873-74.  In ruling, the court noted that because determinations of

19   materiality are often best made in light of all the evidence adduced at trial, judges may

20   wish to defer ruling on motions until after the presentation of evidence. *Id*. at 864.

21       In this case, the evidence of third party culpability was not <u>highly relevant</u>:

22   Park's attorneys merely attempted to use impermissible character evidence that the

23   victim's boyfriend several years *after* the murder had engaged in acts of domestic

24   violence against another person. Not all evidence, however, is mandated under

25   Compulsory Process. Evidence that is inherently unreliable hearsay may not be

26   admissible. See *Williamson v. United States*, 512 U.S. 594, 598 (1994). Applying the

27   standards established by the California Supreme Court in *People v. Hall, supra,* Judge

28   Kennedy precluded the proffered evidence when she found the evidence about Ayala

1  allegedly being a victim of acts committed by John Gilmore several years later to be

2  inadmissible.

3        Moreover, the complaint fails to allege that Thompson engaged in conduct

4  designed to frustrate Park's attorneys from locating or subpoenaing witnesses.  To the

5  contrary, the evidence shows that Ayala was subpoenaed by Park's attorneys, actually

6  appeared at trial, but refused to testify based on the advice of her counsel.

7        The statement made to Ayala by Thompson that she was free not to talk to

8  defense lawyers and investigators was not improper, since a witness is free to talk or

9  not talk unless compelled by subpoena.  *United States v. Matlock*, 491 F.2d 504 (6th

10  Cir. 1974); *Workman v. Bell*, 160 F.3d 276 *republ. at* 178 F.3d 759 (6th Cir. 1998)

11  (prosecutor may so advise).  Indeed, Judge Kennedy noted as much.

12        Finally, Park's complaint fails to acknowledge is that it was the prosecutor – not

13  Thompson - who filed the April 9, 2013 motion in limine to preclude evidence of

14  Gilmore's alleged "third party culpability," including evidence from Ayala. Park

15  makes no allegation whatsoever that Thompson played any role in formulating this

16  legal strategy—the prosecutor in the exercise of her prosecutorial discretion, not the

17  investigating officer, makes legal decisions about what motions to file. *See Smiddy v.*

18  *Varney*, 803 F.2d  (9th Cir. 1986) (chain of causation broken by independent actions

19  of prosecutor in exercising prosecutorial discretion).  Although Ayala was charged

20  with criminal conduct in a separate and unrelated matter, the record establishes those

21  charges were brought about by actions independent of Thompson. (See discussion

22  infra at p.   )  And, of course, the determination of admissibility was ultimately made

23  by Judge Kennedy, not by the investigating officer Thompson and she should not be

24  held liable for Judge Kennedy's considered decision.[2]

25        Arguendo, even if Det. Thompson's actions might be seen as somehow

26  interfering with Park's trial rights, she cannot sue under Section 1983 because she was

27

28 _____

[2] Similarly, it was the prosecutor, not Detective Thompson, who refused to grant Ayala any form of immunity.

**DEFENDANT THOMPSON'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORTOF MOTION TO DISMISS UNDER RULE 12(B)(6)**

1   acquitted.  Moving party's attorneys have found no case law directly on point allowing

2   this lawsuit, so they look to persuasive authority relating to post-acquittal Section

3   1983 lawsuits involving failure to disclose exculpatory evidence under *Brady*.

4       In *Smith v. Almada*, 640 F.3d 931 (9th Cir. 2011), superseding 623 F3d 1078,

5   the Ninth Circuit explained that to state a Section 1983 claim under Brady, the

6   plaintiff must allege (1) the evidence was exculpatory or impeachment, (2) that was

7   suppressed by actions of government officials, and (3) "the nondisclosure prejudiced

8   the plaintiff." *See Strickler v. Greene*, 527 U.S. 263 (1999).  As to prejudice, the Ninth

9   Circuit noted that *Strickler* stated: "… strictly speaking, there is never a real 'Brady

10   violation' unless the nondisclosure was so serious that there is a reasonable probability

11   that the suppressed evidence would have produced a different verdict." 623 F.3d at

12   939, quoting 527 U.S. at 281.

13       Judge Gwin, concurring in *Smith*, discussed the absence of authority for such

14   claims.  He noted and discussed decisions from the Fourth, Sixth, Tenth and Eleventh

15   Circuits which preclude *Brady* lawsuits after a criminal defendant has been acquitted,

16   because plaintiffs who file such actions cannot be said to have been prejudiced.  He

17   noted that the Seventh Circuit, although not completely foreclosing such lawsuits,

18   requires plaintiffs to show that no trial would have occurred if police had disclosed the

19   allegedly exculpatory evidence.  640 F.3d at 941-42.  Those courts "logically find that

20   an acquitted defendant … cannot show 'that the favorable evidence …put the whole

21   case in such a different light as to undermine the confidence in the verdict." *Id*. at

22   942, citing and adding emphasis to *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

23       Even if one were to adopt the more expansive view of the Seventh Circuit, Park

24   does not allege the criminal charges against her would not have been filed had the

25   allegedly exculpatory evidence been known to the prosecutor. Instead, as argued

26   herein, Thompson did nothing to prevent the introduction of exculpatory evidence—

27   the prosecutor moved, and the trial court granted, a prosecution's motion in limine to

28   exclude the evidence.

16

Finally, Plaintiff should not be allowed to challenge the underlying judgment of acquittal—which is essentially what her lawsuit would require.  Allowing Park to do so would implicate the validity of the judgment of acquittal. *See Heck v. Humphrey*, 512 U.S. 477 (1994).  *Heck* prevents a person from bringing an action that-even if it does not directly challenge the conviction or other decision-would imply that the conviction or other decision was invalid. The practical importance of this rule is that a plaintiff cannot attack his conviction in a civil rights action for damages; the decision must have been successfully attacked before the civil rights action for damages is filed. The *Heck* rule was first announced with respect to an action for damages, but the Supreme Court has since applied the rule to an action that sought declaratory relief as well as damages. *See Edwards v. Balisok*, 520 U.S. 641, 648 (1997). That *Heck* applies to both damages and equitable relief was further clarified in *Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005). Whether the *Heck* rule applies requires one to consider whether success in the § 1983 action would "necessarily demonstrate the invalidity of the confinement or its duration." *Id*. at 82. Park was acquitted, nonetheless, there appears no valid reason why the *Heck* rule should not be applied, and this lawsuit foreclosed.

## V.    PARK'S COMPLAINT FAILS TO STATE A CLAIM FOR CONSPIRACY OR JOINT ACTION

"A civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage. To prove a civil conspiracy, the plaintiff must show that the conspiring parties reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.  To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy.  A defendant's knowledge of and participating in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions." *Gilbrook v.*

1   *City of Westminster*, 177 F.3d 839, 856-57 (9th Cir. 1987) (citations and quotes

2   omitted).  *In accord*, *Lacy v. Maricopa County*, 693 F.3d 896, 934-35 (9th Cir. 2012)

3   (en banc).

4          A conspiracy is not itself a constitutional tort under § 1983. As stated in

5   *Cassettari v. Nev. Cnty.*, 824 F.2d 735, 739 (9th Cir. 1987), "[t]he insufficiency of

6   these allegations to support a section 1983 violation precludes a conspiracy claim

7   predicated upon the same general allegations." "It does not enlarge the nature of the

8   claims asserted by the plaintiff, as there must always be an underlying constitutional

9   violation." *Lacy v. Maricopa County*, 693 F.3d 896, 935.  The conspiracy may,

10  however, enlarge the pool of responsible defendants by demonstrating their causal

11  connections to the violation; the fact of the conspiracy may make a party liable for the

12  unconstitutional actions of the party with whom he or she has conspired. *Id*.

13         After *Twombly* and *Iqbal*, *supra*, a complaint may not simply conclude that a

14  conspiracy existed, but rather must plead facts from which the existence of a

15  conspiracy may reasonably be inferred. *Lacy v. Maricopa County*, 693 F.3d at 937

16         Here, plaintiff's Second Claim for Relief for Joint Action/Conspiracy does not

17  proffer detailed allegations regarding the nature of the conspiracy, the communication

18  or interaction between the conspirators, the nature or mechanics of the acts taken in

19  furtherance of the conspiracy, or the motives of the allegedly conspiring parties.

20  Rather, Defendant Thompson is forced to sift through the first 70 paragraphs of

21  plaintiff's complaint to figure out which allegations support the claim against her and

22  her alleged co-conspirators. Indeed, striped of the type of conclusory allegations

23  deemed improper by *Iqbal*, *Twombly* and *Star* (e.g.  paragraphs 54-56 and 71-75), the

24  only allegation that appears to directly relate to the alleged conspiracy is contained in

25  paragraph 42, which falls woefully short of the factual support required for pleading a

26  conspiracy.  Furthermore, as established by the request for judicial notice and

27  discussed above, plaintiff is well aware of the identity of all individuals involved in

28  Park's criminal investigation, as well as the charges against Ayala.  If plaintiff could

1    state a viable claim, she would have done so. [3]

2         As discussed above, plaintiff is required to assert facts to support her claim, as

3    well as identify those individuals who participated in the alleged conspiracy. This she

4    has failed to do.  Absent facts, and disregarding plaintiffs' thread-bare allegations,

5    there can be no conspiracy claim as it requires more than one actor.

6    **VI.    THOMPSON IS ENTITLED TO QUALIFIED IMMUNITY**

7         "Qualified immunity shields federal and state officials from money damages

8    unless a plaintiff pleads facts showing (1) that the official violated a statutory or

9    constitutional right, and (2) that the right was clearly established" at the time of the

10   challenged conduct.  *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)."  *Ashcroft v. al-*

11   *Kidd,* 563 U.S. ___ (May 31, 2011) (Slip Opn. at p. 3).

12        The conduct of officials "violates clearly established law when, at the time of

13   the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every

14   'reasonable official would have understood that what he is doing violates that right.'"

15   *al-Kidd, supra* (Slip Opn. at 9) The Court does not "require a case directly on point,

16   but existing precedent must have placed the statutory or constitutional question

17   beyond debate."  *Id.*  Moreover, the courts are "not to define clearly established law at

18   a high level of generality[,]" *id.* (Slip Opn. at 10).  In other words, "[t]he general

19   proposition, for example, that an unreasonable search or seizure violates the Fourth

20   Amendment is of little help in determining whether the violative nature of particular

21   conduct is clearly established.  See *Saucier v. Katz,* 533 U.S. 194, 201-202 (2001)[.]"

22   *al-Kidd, supra.*

23   _____

24   [3] Plaintiff's Conspiracy claim is entirely dependent on the existence of Doe defendants
25   and plaintiff will likely assert she does not know their true identity. It is noteworthy
26   that nowhere in her complaint does plaintiff assert that she is ignorant of the alleged
27   conspirators' identity.  Arguably, Park's counsel cannot do so without violating Rule
     11.
28

1   "Qualified immunity gives government officials breathing room to make
2   reasonable but mistaken judgments about open legal questions. When properly
3   applied, it protects 'all but the plainly incompetent or those who knowingly violate the
4   law.'" *Id.* (Slip Opn. at p. 12)

5   In this case, Thompson could not have known that her specific conduct could
6   expose her to civil liability reasonably in regard to Kelly Soo Park.  Even if, however,
7   a Constitutional violation is assumed, *arguendo*, the qualified immunity analysis
8   requires asking whether the rights were so "clearly established" as to alert a
9   reasonable official to the Constitutional parameters in light of the specific context of
10  the case.  The existence of clearly settled law is a question for the court, as is the
11  question of whether a reasonable officer could have believed the condut to be lawful,
12  in light of clearly established law and the information the detective possessed.  *See*
13  *Hunter v. Bryant* , 502 U.S. 224, 229 (1991).

14  **VII.   PARK'S CLAIM FOR DECLARATORY RELIEF FAILS**

15  Plaintiff cannot maintain her Third Claim for Declaratory Relief because no
16  case or controversy exists for such claim. "In a case of actual controversy…, any court
17  … may declare the rights and other legal relations of any interested party seeking such
18  declaration, whether or not further relief is or could be sought.  Any such declaration
19  shall have the force and effect of a final judgment or decree and shall be reviewable as
20  such." 28 U.S.C.A. § 2201, 2202.

21  Article III justiciability requisites must be satisfied.  *Mayfield v. United States*
22  *of America*, 599 F. 3d 964, 969 (2010). (noting that a plaintiff must demonstrate
23  standing separately for each form of relief sought). Thus, a plaintiff must allege and
24  prove a live "case or controversy" whether or not the relief she seeks is one for
25  damages, for declaratory judgment or an injunction.  *Id.*  To establish standing, a
26  plaintiff must show that a favorable decision will likely redress his injury. *Id*. 971.
27  And, absent a threat of future injury to the plaintiff, a case or controversy does not
28  exist.  *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)

1

## VIII.        CONCLUSION

2          For the foregoing reasons, as well as those advanced in reply and at the hearing,

3    the motion to dismiss should be granted.

4    DATED:  March 3, 2014                    MARSHA JONES MOUTRIE
                                                City Attorney
5
6                                                 */s/ Jeanette Schachtner*
                                                By:_____
7                                                    JEANETTE SCHACHTNER
                                                     Deputy City Attorney
8
                                                Attorneys for Defendant,
9                                                DETECTIVE KAREN THOMPSON

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANT THOMPSON'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORTOF MOTION TO DISMISS UNDER RULE 12(B)(6)**