**EXHIBIT A**

7

```
                    SUPERIOR COURT OF CALIFORNIA
                     COUNTY OF LOS ANGELES
NO. BA361202                                    PAGE NO.  1
THE PEOPLE OF THE STATE OF CALIFORNIA    VS.    CURRENT DATE 02/11/14
DEFENDANT 01:  KELLY SOO PARK
LAW ENFORCEMENT AGENCY EFFECTING ARREST: L.A. SUPERIOR CT-CENTRAL

BAIL: APPEARANCE  AMOUNT     DATE     RECEIPT OR  SURETY COMPANY   REGISTER
        DATE      OF BAIL    POSTED    BOND NO.                    NUMBER
   12/01/10  $3,500,000.00 11/01/10 IS4M1015    AMERICAN CONTRACTORS 70305004

CASE FILED ON 10/07/10.
 INDICTMENT FILED.
OFFENSE(S):
   COUNT 01: 187(A) PC FEL
COMMITTED ON OR ABOUT 03/15/08 IN THE COUNTY OF LOS ANGELES
NEXT SCHEDULED EVENT:
  10/07/10  1100 AM  INITIAL FILING   DIST CENTRAL DISTRICT DEPT 100



ON 10/07/10 AT 1100 AM  IN CENTRAL DISTRICT DEPT 100

CASE CALLED FOR INITIAL FILING
PARTIES: PETER ESPINOZA (JUDGE)  EDWIN HERNANDEZ (CLERK)
               JEANNE IANNONE       (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS  NOT PRESENT IN COURT, AND NOT REPRESENTED BY COUNSEL
 - BKG# 1361598        ** DDA: ALAN JACKSON **
  .
  DEPUTY DISTRICT ATTORNEY'S HALIM DHANIDINA AND ERIC HARMON ALSO
  PRESENT.
  .
  VALERIE AENLLE-ROCHA, DEPUTY DISTRICT ATTORNEY IS PRESENT AS
  GRAND JURY ADVISOR.
  .
  AT 11:15 A.M., THE GRAND JURY RETURNS INTO THE COURT WITH 23
  MEMBERS PRESENT.  THE FOREPERSON PRESENTS THE FOLLOWING
  INDICTMENT TO THE COURT AND STATES THAT FOURTEEN OR MORE GRAND
  JURORS WERE PRESENT AND CONCURRED IN THE RETURN OF THE
  INDICTMENT.  THE COURT FINDS THE INDICTMENT TO BE A TRUE BILL.
  .
  ON PEOPLE'S MOTION, ARRAIGNMENT IS SET ON CALENDAR AS INDICATED

  BELOW.
  .
  OUT OF THE PRESENCE OF THE GRAND JURORS:
  ON PEOPLE'S MOTION, AN ARREST WARRANT IS ISSUED IN THE AMOUNT OF
  $3,500,000.00.
  .
  HARDCOPY ARREST WARRANT ISSUED THIS DATE.
  .
  ARREST WARRANT INFORMATION IS FAXED THIS DATE TO THE LOS ANGELES
  COUNTY SHERIFF AT (562) 345-4417.
NEXT SCHEDULED EVENT:
  10/08/10  1000 AM  ARRAIGNMENT   DIST CENTRAL DISTRICT DEPT 100
NEXT SCHEDULED EVENT:
  ARREST WARRANT ISSUED


ON 10/08/10 AT 1000 AM  IN CENTRAL DISTRICT DEPT 100
```

**8**

CASE NO. BA361202                          PAGE NO.   2
DEF NO.  01                                DATE PRINTED 02/11/14


 NUNC PRO TUNC ORDER PREPARED. IT APPEARING TO THE COURT THAT THE MINUTE ORDER
 IN THE ABOVE ENTITLED ACTION DOES NOT PROPERLY REFLECT THE COURT'S ORDER. SAID
 MINUTE ORDER IS AMENDED NUNC PRO TUNC AS OF THAT DATE.  ALL OTHER ORDERS ARE
TO REMAIN IN FULL FORCE AND EFFECT. DETAILS LISTED AT END OF THIS MINUTE ORDER.
CASE CALLED FOR ARRAIGNMENT
PARTIES: PETER ESPINOZA (JUDGE)  BLANCA PEREZ  (CLERK)
                 DONNA BENNETT  (REP)     ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY JENNIFER KELLER PRIVATE
  COUNSEL
   THE DEFENDANT IS ARRAIGNED.
DEFENDANT STATES HIS/HER TRUE NAME AS KELLY SOO PARK.
DEFENDANT WAIVES ARRAIGNMENT, READING OF INFORMATION/INDICTMENT, AND STATEMENT
OF CONSTITUTIONAL AND STATUTORY RIGHTS.
DEFENDANT WAIVES FURTHER ARRAIGNMENT.
DEFENDANT PLEADS NOT GUILTY TO COUNT 01, 187(A) PC.
  COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.

  -BOOKING #1361598 / DDA: ALAN JACKSON #173647, ERIC HARMAN AND
  -HALIM DHANIDINA
  .
 HARD COPY ARREST WARRANT IS ORDERED RECALLED AND QUASHED.  HARD
 COPY WARRANT RECALL NUMBER 334824 IS ISSUED THIS DATE.
  .
 THE INDICTMENT IS ORDERED UNSEALED AS TO THIS DEFENDANT.
  .
 DEFENDANT WAIVES FURTHER READING OF THE INDICTMENT, ADVISEMENT
 OF CONSTITUTIONAL AND STATUTORY RIGHTS, PLEADS NOT GUILTY AND
 DENIES ALL ALLEGATIONS CONTAINED IN THE INDICTMENT
  .
 THE CASE IS ASSIGNED TO DEPARTMENT 144, THE HONORABLE KEITH L.
 SCHWARTZ, JUDGE PRESIDING, FOR PURPOSES OF CONTINANCE BAIL
 HEARING, THIS DATE AT 1:30 P.M., MATTER HAVING BEEN ASSIGNED BY
 THE JUDGE SUPERVISING THE MASTER CALENDAR.
  .
 THE DEFENDANT IS ORDERED REMANDED.  BAIL IS SET AT $3,500,000.00
 (THREE MILLION, FIVE HUNDRED THOUSAND DOLLARS).
  .
 THE BAILIFF IS DIRECTED TO TRANSPORT THE DEFENDANT TO DEPARTMENT

 144 AT THE AIRPORT COURTHOUSE, FORTHWITH.
BAIL SET AT $3,500,000.
NEXT SCHEDULED EVENT:
10/08/10   130 PM  FURTHER PROCEEDINGS    DIST WEST DISTRICT DEPT 144

CUSTODY STATUS: REMANDED TO CUSTODY


ON 10/08/10 AT  130 PM  IN WEST DISTRICT DEPT 144

CASE CALLED FOR FURTHER PROCEEDINGS
PARTIES: KEITH L. SCHWARTZ (JUDGE)  STACEY ENSLEY  (CLERK)
                 MARCY KNOBEL        (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY KAY RACKAUCKAS PRIVATE
  COUNSEL
BAIL SET AT $3,500,000
  BOTH COUNSEL STIPULATE THAT ALL MOTION HEARINGS HEARD ON CASE
  NUMBER SA074676 ALSO APPLY TO THIS NEW CASE NUMBER BA361202.
  .

CASE NO. BA361202                          PAGE NO.   3
DEF NO.  01                                DATE PRINTED 02/11/14

  1275.1 BAIL MOTION IS RECALLED AND HEARD.
  .
  THE FOLLOWING PEOPLE ARE SWORN AND TESTIFY FOR THE DEFENSE:
  JOSH HERMAN(BOND AGENT) AND JAY PARK
  .
  THE FOLLOWING EXHIBITS ARE SUBMITTED INTO EVIDENCE BY THE
  DEFENSE AND ORDERED PLACED UNDER COURT SEAL.
  A-(TAX RETURN OF JAY PARK)
  B-(TAX RETURN OF JAY PARK)
  C-(GRANT DEED)
  .
  1275.1 BAIL MOTION IS CONTINUED TO OCTOBER 15, 2010 IN THIS
  DEPARTMENT.
  .
  EXHIBIT RECEIPT NUMBER 1651351 ISSUED.
NEXT SCHEDULED EVENT:
  10/15/10   830 AM  MOTION   DIST WEST DISTRICT DEPT 144


CUSTODY STATUS: DEFENDANT REMANDED


ON 10/15/10 AT  830 AM  IN WEST DISTRICT DEPT 144

  NUNC PRO TUNC ORDER PREPARED. IT APPEARING TO THE COURT THAT THE MINUTE ORDER
  IN THE ABOVE ENTITLED ACTION DOES NOT PROPERLY REFLECT THE COURT'S ORDER. SAID
  MINUTE ORDER IS AMENDED NUNC PRO TUNC AS OF THAT DATE.  ALL OTHER ORDERS ARE
TO REMAIN IN FULL FORCE AND EFFECT. DETAILS LISTED AT END OF THIS MINUTE ORDER.
CASE CALLED FOR MOTION
PARTIES: KEITH L. SCHWARTZ (JUDGE)  STACEY ENSLEY  (CLERK)
                  MARCY KNOBEL       (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY KAY RACKAUCKAS PRIVATE
  COUNSEL
BAIL SET AT $3,500,000
  1275.1 BAIL MOTION HEARING IS RE-CALLED.
  .
  THE FOLLOWING PEOPLE ARE SWORN AND TESTIFY FOR THE DEFENSE:
  PAUL LOVEALL AND DOUGLAS GISEN
  .
  THE FOLLOWING EXHIBIT IS ADMITTED INTO EVIDENCE FOR THE PEOPLE:

  1-(ROBERT KAUFMAN E-MAIL)
  EXHIBIT RECEIPT NUMBER 1689044 ISSUED.
  .
  THE COURT ORDERS DEFENDANT, KELLY SOO PARK, TO SURRENDER HER
  PASSPORT THIS DATE. PASSPORT IS ORDERED SURRENDERED AND
  FORWARDED TO THE U.S. PASSPORT OFFICE. THE DEFENDANT MAY NOT
  REAPPLY FOR A PASSPORT PENDING THE RESOLUTION OF THE IMMEDIATE
  CASE. THE DEFENDANT IS DIRECTED TO OBTAIN A CERTIFIED COPY OF A
  MINUTE ORDER THAT REFLECTS THE CASE DISPOSITION WHEN
  REQUESTING RETURN OF PASSPORT FROM THE U.S. PASSPORT OFFICE. A
  CERTIFIED COPY OF TODAY'S MINUTE ORDER AND THE PASSPORT ISSUED
  IN THE NAME OF KELLY SOO PARK ARE FORWARDED TO THE COURT MANAGER
  FOR PROCESSING AND MAILING.
  .
  1275.1 BAIL HOLD STANDS.

```
CASE NO. BA361202                           PAGE NO.   4
DEF NO.  01                                 DATE PRINTED 02/11/14
```

   .
   BAIL SET IN THE SUM OF THREE MILLION FIVE HUNDRED THOUSAND
   DOLLARS.
   .
   .
NEXT SCHEDULED EVENT:
   11/01/10   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST WEST DISTRICT DEPT 144

CUSTODY STATUS: DEFENDANT REMANDED


ON 11/01/10 AT  830 AM  IN WEST DISTRICT DEPT 144

CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KEITH L. SCHWARTZ (JUDGE)  JERRY BENNETT  (CLERK)
                 MARCY KNOBEL          (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY KAY RACKAUCKAS PRIVATE
   COUNSEL

   1275.1 BAIL MOTION IS RE-CALLED.
   .
   THE COURT MAKES THE FOLLOWING FINDINGS:
   SOURCE OF ALL FUNDS FOND TO BE VALID. 1275.1 HOLD IS RELEASED.
   .
   DEFENDANT ORDERED TO REPORT TO SENTIENL ELECTRONIC MONITORING
   WITHIN 24 HOURS OF RELEASE FROM CUSTODY.
   .
   THE DEFENDANT MAY TRAVEL WITHIN THE FOLLOWING COUNTIES:
   LOS ANGELES, ORANGE COUNTY, RIVERSIDE COUNTY, AND VENTURA
   COUNTY.
   .
   MATTER SET FOR DECEMBER 1, 2010 IN DEPARTMENT 100 AT FOLTZ
   CRIMINAL COURT BUILDING.
   .
   TIME WAIVER TAKEN AS TO THE 10/60 DAY RULE.
   .
   RELEASE NUMBER AB008279 ISSUED.
   .
   FIVE WEEK TRIAL ESTIMATE GIVEN.
   COURT ORDERS AND FINDINGS:

   -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
 UPON MOTION OF DEFENDANT
   12/01/10   900 AM  PRETRIAL CONF/TRIAL SETTING   DIST WEST DISTRICT DEPT 144

CUSTODY STATUS: BAIL TO STAND


ON 12/01/10 AT  830 AM  IN CENTRAL DISTRICT DEPT 100

CASE CALLED FOR PRELIM SETTING/RESETTING
PARTIES: PATRICIA M. SCHNEGG (JUDGE)  BLANCA PEREZ  (CLERK)
                 RENE MARIE EVANKO         (REP)  HALIM DHANIDINA  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY KAY RACKAUCKAS PRIVATE
   COUNSEL
   -SURETY BOND / DDA: HALIM DHANIDINA #193406 & ERIC HARMON 198461
   -LONG CAUSE CASE - 5 WEEKS
   .
   ATTORNEY, JENNIFER KELLER IS ALSO PRESENT ON BEHALF OF THE

**11**

```
CASE NO. BA361202                           PAGE NO.   5
DEF NO.  01                                 DATE PRINTED 02/11/14

  DEFENDANT.
  .
  THE MATTER IS HERE FOR ASSIGNMENT TO A LONG CAUSE COURT.  THE
  MATTER IS ASSIGNED TO DEPARTMENT 109, FORTHWITH AND FOR ALL
  PURPOSES, BY THE JUDGE SUPERVISING THE MASTER CALENDAR.
  .
  ALL PARTIES ARE SO NOTIFIED.  THE DEFENDANT IS ORDER APPEAR IN
  DEPARTMENT 109, FORTHWITH.
  COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
  12/01/10  1000 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT
    109

CUSTODY STATUS: BAIL TO STAND


ON 12/01/10 AT 1000 AM  IN CENTRAL DISTRICT DEPT 109


CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                SHAWN DIPMORE       (REP)  HALIM DHANIDINA  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY KAY RACKAUCKAS PRIVATE
  COUNSEL
  -BOND D.D.A.                    ERIC HARMON AND HALIM DHANIDINA
  .
  FILE RECEIVED FROM DEPARTMENT 100.
  .
  THE COURT AND COUNSEL CONFER REGARDING MEDIA REQUEST.
  .
  THE COURT HEARS DEFENSE OBJECTION TO MEDIA REQUEST AND MEDIA
  REQUEST IS GRANTED OVER THE DEFENSE OBJECTION.
  MEDIA REQUEST IS SIGNED BY JUDGE KATHLEEN KENNEDY, AND FILED.
  .
  THE COURT AND COUNSEL CONFER REGARDING DISCOVERY MOTION FILED ON
  11-30-10.
  .
  PRETRIAL CONFERENCE/TRIAL SETTING AND HEARING ON DISCOVERY ARE
  SET ON THE DATE AND TIME INDICATED BELOW.
  .
  THE PEOPLE TO FILE RESPONSE NO LATER THAT 1-5-11 AND DEFENSE
  REPLY TO BE FILED BY 1-14-11.
  COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
WAIVES STATUTORY TIME.
NEXT SCHEDULED EVENT:
 UPON MOTION OF DEFENDANT
  01/19/11   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT
    109

CUSTODY STATUS: BAIL TO STAND


ON 01/19/11 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                LAURIE SMALL       (REP)  ALAN J. JACKSON  (DA)
```

**12**

```
CASE NO. BA361202                               PAGE NO.   6
DEF NO.  01                                     DATE PRINTED 02/11/14

DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY KAY RACKAUCKAS PRIVATE
  COUNSEL
 -BOND             1 WEEK T/E  D.D.A. ERIC HARMON/HALIM DHANIDINA
 .
 DEPUTY DISTRICT ATTORNEY ERIC HARMON APPEARS THIS DATE.
 .
 ORDER ON MEDIA REQUEST TO PERMIT COVERAGE HAS BEEN SIGNED BY
 JUDGE KATHLEEN KENNEDY
 .
 THE COURT HAS READ AND CONSIDERED DEFENSE MOTION TO MODIFY A
 CONDITION OF RELEASE-FILED ON 1-12-10.
 .
 MOTION IS ARGUED AND DENIED.
 .
 THE COURT AND COUNSEL CONFER REGARDING DISCOVERY ISSUES AND THE
 COURT FINDS THE PEOPLE HAVE COMPLIED IN PART.
 .
 THE COURT HAS READ AND CONSIDERED:
 .
 DEFENSE NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF
 UNREDACTED DISCOVERY-FILED ON 11-30-10
 .
 DEFENSE WRITTEN REPLY TO PROSECUTION OPPOSITION TO MOTION TO
 COMPEL PRODUCTION OF UNREDACTED DISCOVERY-FILED ON 1-14-11
 .
 THE PEOPLE TO COMPLY WITH DEFENSE REQUEST FOR DISCOVREY OR FILE
 WRITTEN REPLY SHOWING GOOD CAUSE NOT TO COMPLY WITH SAID REQUEST
 .
 DEFENSE MOTION FOR RETURN OF PROPERTY TO BE HEARD ON ANOTHER
 DATE AND TIME.
 .
 THE DEFENSE TO FILE A MOTION TO COMPEL.
 .
 THE COURT AND COUNSEL CONFER REGARDING POSSIBLE APPOINTMENT OF A
 SPECIAL MASTER TO REVIEW CERTAIN PROPERTY THE DEFENSE IS ASKING
 BE RETURNED.
 .
 FURTHER PRETRIAL CONFERENCE/TRIAL SETTING AND MOTIONS ARE
 CONTINUED ON DEFENSE MOTION TO THE DATE AND TIME INDICATED BELOW
 COURT ORDERS AND FINDINGS:

 -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
WAIVES STATUTORY TIME.
NEXT SCHEDULED EVENT:
 UPON MOTION OF DEFENDANT
  02/08/11   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT
    109

CUSTODY STATUS: BAIL TO STAND


ON 02/08/11 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                    SHAWN DIPMORE      (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY KAY RACKAUCKAS PRIVATE
  COUNSEL
 -BOND          1 WEEK T/E    D.D.A. ERIC HARMON/HALIM DHANIDINA
 .
```

**13**

CASE NO. BA361202                          PAGE NO.   7
DEF NO.  01                                DATE PRINTED 02/11/14

   THE COURT AND COUNSEL CONFER REGARDING DISCOVERY ISSUES.
   .
   THE COURT FINDS THAT SPECIAL MASTER IS NOT REQUIRED AT THIS
   TIME.
   .
   DEFENSE MOTION FOR RETURN OF PROPERTY SIEZED PURSUANT TO SEARCH
   WARRANT TO BE HEARD ON THE NEXT HEARING DATE.
   .
   STIPULATION THAT JUDGE KENNEDY MAY HOLD HEARING ON SEACH WARRANT
   SIGNED BY JUDGE BIDERMAN.
   .
   WRITTEN MOTION FOR RETURN OF PROPERTY TO BE FILED.
   .
   MATTER IS CONTINUED FOR FURTHER PRETRIAL CONFERENCE/TRIAL
   SETTING ON THE DATE AND TIME INDICATED BELOW.
   COURT ORDERS AND FINDINGS:
   -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
WAIVES STATUTORY TIME.

NEXT SCHEDULED EVENT:
 BY STIPULATION CAUSE CONTINUED TO
  02/28/11   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT
   109

CUSTODY STATUS: BAIL TO STAND


ON 02/24/11 AT  130 PM :

   PEOPLE'S OPPOSITION TO DEFENDANT'S MOTION FOR COMPLIANCE WITH
   INFORMAL DISCOVERY IS FILED.
MATTER PREV SET/REMAIN ON CLDR


ON 02/28/11 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KATHLEEN KENNEDY (JUDGE)   DONNA PEALE  (CLERK)
                   LYNN EVANS      (REP)   ALAN J. JACKSON  (DA)

DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY KAY RACKAUCKAS PRIVATE
   COUNSEL
   -IN CAMERA REVIEW
   MATTER IS CALLED FOR DEFENSE DISCOVERY REQUEST FOR INFORMATION
   ON THE DEFENDANT'S HARD DRIVE.
   .
   THE PEOPLE REQUEST AN IN CAMERA REVIEW.
   .
   ALL PARTIES ARE ORDERED TO RETURN ON BELOW DATE FOR THE IN
   CAMERA REVIEW.
   COURT ORDERS AND FINDINGS:
   -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
WAIVES STATUTORY TIME.
NEXT SCHEDULED EVENT:
 UPON MOTION OF DEFENDANT

**14**

```
CASE NO. BA361202                              PAGE NO.   8
DEF NO.  01                                    DATE PRINTED 02/11/14

   03/24/11   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT
    109

CUSTODY STATUS: BAIL TO STAND


ON 03/22/11 AT 1000 AM :

   DEFENSE NOTICE OF MOTION AND MOTION FOR COMPLIANCE WITH INFORMAL
   DISCOVERY- FILED ON 2-22-11
   .
   PEOPLE'S OPPOSITION- FILED ON 2-24-11
   .
   DEFENSE NOTICE OF MOTION AND MOTION FOR COMPLIANCE WITH INFORMAL
   DISCOVERY- FILED THIS DATE
   .
   PEOPLE'S APPLICATION FOR A COURT INQUIRY REGARDING POSSIBLE
   CONFLICT OF INTEREST AND APPOINTMENT OF SEPARATE ADVISORY

   COUNSEL- FILED THIS DATE


ON 03/24/11 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                 LAURIE SMALL      (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY KAY RACKAUCKAS PRIVATE
   COUNSEL
   -BOND                 D.D.A. ERIC HARMON AND HALIM DHANIDINA
   .
   THE PARTIES STIPULATE TO MEDIA REQUEST TO PHOTOGRAPH, RECORD OR
   BROADCAST PROCEEDINGS.
   .
   THE PEOPLE INFORM THE COURT THAT THEY DO NOT WISH TO BE PRIVY TO
   DEFENSE RESPONSE TO PEOPLE'S APPLICATION FOR A COURT INQUIREY
   REGARDING POSSIBLE CONFLICT OF INTEREST AND APPOINTMENT OF
   SEPARATE ADVISORY COUNSEL.
   .
   DEFENSE TO FILE RESPOSE UNDER SEAL.
   .
   MATTER IS CONTINUED FOR HEARING ON DEFENSE MOTION FOR RETURN OF
   PROPERTY AND RESOLUTION OF CONFLICT ISSUE TO THE DATE AND TIME
   INDICATED BELOW.
   .
   FURTHER PRETRIAL CONFERENCE/TRIAL SETTING IS CONTINUED TO THE
   SAME DATE AND TIME ON DEFENSE MOTION.
   COURT ORDERS AND FINDINGS:
   -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
WAIVES STATUTORY TIME.
NEXT SCHEDULED EVENT:
 UPON MOTION OF DEFENDANT
   04/22/11   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT
     109
```

**15**

CASE NO. BA361202                           PAGE NO.   9
DEF NO.  01                                 DATE PRINTED 02/11/14


CUSTODY STATUS: BAIL TO STAND


ON 04/22/11 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
               LAURIE SMALL       (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY KAY RACKAUCKAS PRIVATE
  COUNSEL
  -SURETY BOND    1 HOUR HEARING          D.D.A. ERIC HARMON
  .
  NOTICE OF MOTION AND MOTION TO CONTINUE PEOPLE'S APPLICATION FOR
  COURT INQUIRY REGARDING POSSIBLE CONFLICT OF INTEREST AND
  APPOINTMENT F SEPARATE ADVISORY COUNSEL- FILE ON 2-21-11
  .
  MOTION TO CONTINUE IS GRANTED AND MATTER IS CONTINUE FOR MOTION

  AND PRETRIAL HEARING/TRIAL SETTING TO THE DATE AND TIME
  INDICATED BELOW.
  COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
WAIVES STATUTORY TIME.
NEXT SCHEDULED EVENT:
 UPON MOTION OF DEFENDANT
  05/20/11   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT
   109

CUSTODY STATUS: BAIL TO STAND


ON 05/20/11 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

  NUNC PRO TUNC ORDER PREPARED. IT APPEARING TO THE COURT THAT THE MINUTE ORDER
 IN THE ABOVE ENTITLED ACTION DOES NOT PROPERLY REFLECT THE COURT'S ORDER. SAID
 MINUTE ORDER IS AMENDED NUNC PRO TUNC AS OF THAT DATE.  ALL OTHER ORDERS ARE
 TO REMAIN IN FULL FORCE AND EFFECT. DETAILS LISTED AT END OF THIS MINUTE ORDER.
 CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
 PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)

               LAURIE SMALL       (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY KAY RACKAUCKAS PRIVATE
  COUNSEL
  -BOND     (NEW DEFENSE COUNSEL)       D.D.A. ERIC HARMON
  .
  THE COURT HAS READ AND CONSIDERED DEFENSE MOTION FOR LEAVE TO
  WITHDRAW AS ATTORNEY- FILED THIS DATE.
  .
  MOTION IS GRANTED PENDING SUBSTITUTION OF COUNSEL AND MATTER IS
  CONTINUED TO THE DATE AND TIME INDICATED BELOW.
  .
  THE COURT AND COUNSEL CONFER REGARDING FEES RECEIVED BY DEFENSE
  COUNSEL AND THE COURT FINDS THAT IT HAS NO JURISDICTION OVER
  SAID FEES AND PENDING ANY MOTIONS FOR RETURN OF FEES, THE
  COURT SUGGESTS THAT NOTHING BE DONE UNTIL THE NEXT HEARING DATE.

CASE NO. BA361202                          PAGE NO.  10
DEF NO.  01                                DATE PRINTED 02/11/14

 .
 PRETRIAL CONFERENCE/TRIAL SETTING IS CONTINUED TO THE DATE AND
 TIME INDICATED BELOW.
 COURT ORDERS AND FINDINGS:
 -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
WAIVES STATUTORY TIME.
NEXT SCHEDULED EVENT:
 UPON MOTION OF DEFENDANT
  06/30/11   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT
   109

CUSTODY STATUS: BAIL TO STAND


ON 05/31/11 AT 1000 AM :



ON 06/30/11 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                LAURIE SMALL        (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY KAY RACKAUCKAS PRIVATE
 COUNSEL
 -BOND   (NEW DEFENSE COUNSEL)      D.D.A. ERIC HARMON
 D.D.A. ALAN JACKSON APPEARS THIS DATE FOR THE STATE.
 .
 PEOPLE'S MOTION TO TRANSFER PROPERTY FOR FEDERAL ADOPTIVE
 FORFEITURE- FILED THIS DATE.
 .
 THE COURT AND COUNSEL CONFER REGARDING PEOPLE'S MOTION FILED
 THIS DATE AND THE COURT ORDERS THAT ALL MOTIONS AND ANY
 FURTHER PROCEEDINGS BE HELD IN ABEYANCE PENDING THE APPOINTMENT
 OF NEW DEFENSE COUNSEL.
 .
 FURTHER THE COURT ORDERS THAT FEES RECEIVED BY DEFENSE COUNSEL
 AS RETAINER IN THE ABOVE ENTITLED CASE BE HELD IN A TRUST

 ACCOUNT PENDING FURTHER ORDER OF THE COURT.
 .
 MATTER IS CONTINUED TO THE DATE AND TIME INDICATED BELOW FOR
 PRETRIAL CONFERENCE / TRAIL SETTING, MOTIONS AND APPOINTMENT OF
 NEW COUNSEL.
 COURT ORDERS AND FINDINGS:
 -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
WAIVES STATUTORY TIME.
NEXT SCHEDULED EVENT:
 UPON MOTION OF DEFENDANT
  07/21/11  1100 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT
   109

CUSTODY STATUS: BAIL TO STAND


ON 07/21/11 AT 1100 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                PAULA C. CHAVEZ        (REP)  ALAN J. JACKSON  (DA)

**17**

CASE NO. BA361202                          PAGE NO.  11
DEF NO.  01                                DATE PRINTED 02/11/14

DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY STEPHEN BERNARD PRIVATE
  COUNSEL
  -BOND    D.D.A. ERIC HARMON / ALAN JACKSON
  D.D.A. ALAN JACKSON DOES NOT APPEAR THIS DATE.
  D.D.A. ANTHONY COLANNINO AND D.D.A. SAMER HATHOUT APPEAR THIS
  DATE ON PEOPLE'S MOTION TO TRANSFER PROPERTY.
  BENJAMIN GLUCK APPEARS THIS DATE ON BEHALF OF FRONTLINE, A
  PROFESSIONAL CORPORATION,ON PEOPLE'S MOTION TO TRANSFER PROPERTY
  .
  ATTORNEY STEPHEN BERNARD IS SUBSTITUTED IN AS COUNSEL FOR
  DEFENDANT KELLY PARK, AND DEFENSE COUNSEL KAY RACKAUCKAS IS
  RELIEVED.
  .
  PEOPLE'S MOTION TO TRANSFER PROPERTY FOR FEDERAL ADOPTIVE
  FORFEITURE IS ARGUED.
  .
  THE COURT FINDS THAT IT HAS NO JURISDICTION OVER FUNDS AND THE
  COURTS PREVIOUS ORDER THAT FUNDS BE HELD IN TRUST- IS LIFTED.

  .
  ON DEFENSE MOTION MATTER IS CONTINUED TO THE DATE AND TIME
  INDICATED BELOW FOR FURTHER PRETRIAL CONFERENCE / TRIAL SETTING.
  COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
WAIVES STATUTORY TIME.
NEXT SCHEDULED EVENT:
 UPON MOTION OF DEFENDANT
  09/14/11   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT
   109

CUSTODY STATUS: BAIL TO STAND


ON 09/14/11 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
             LYNN EVANS        (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY STEPHEN BERNARD PRIVATE
  COUNSEL

  -BOND    D.D.A. ERIC HARMON / ALAN JACKSON
  -DEFENSE COUNSEL: STEPHEN BERNARD / ALENA KLIMIANOK
  .
  D.D.D. ERIC HARMON DOES NOT APPEAR THIS DATE.
  .
  CAUSE CALLED FOR HEARING ON DEFENSE MOTION FOR RETURN OF
  PROPERTY.
  .
  THE COURT HAS READ AND CONSIDERED DEFENSE AMENDED AND RENEWED
  NOTICE OF MOTION AND MOTION FOR AN ORDER TO RETURN DEFENDANT'S
  COMPUTERS AND HARD DISC DRIVES AND/OR FOR AN ORDER COMPELLING
  RELEASE OF PRISTINE MIRROR IMAGES OF DATA ON SAID HDDS, AND
  AUDIT LOGS OF SAME- FILED ON 9-2-11
  PEOPLE'S OPPOSITION- FILED ON 9-2-11
  DEFENDANT'S REPLY- FILED ON 9-2-11

**18**

CASE NO. BA361202                        PAGE NO.  12
DEF NO.  01                              DATE PRINTED 02/11/14

 .
 DEFENSE MOTION FOR IN-CAMERA HEARING PURSUANT TO PENAL CODE
 SECTION 1536.5 IS ARGUED AND GRANTED.
 .
 IN-CAMERA HEARING HELD WITH KAREN THOMPSON- COURT REPORTER LYNN
 EVANS IS ALSO IN ATTEDANCE TO RECORD PROCEEDINGS.
 .
 AFTER IN CAMRA HEARING AND IN OPEN COURT: THE PEOPLE AGREE TO
 RETURN PROPERTY AS REQUESTED BY THE DEFENSE.
 .
 THE PEOPLE PROVIDE OTHER AND DIFFERENT DISCOVRY TO THE DEFENSE
 THIS DATE, AND THE DEFENSE IS IN RECEIPT OF SAID DISCOVERY.
 .
 MATTER IS CONTINUED FOR FURTHER PRETRIAL CONFERENCE / TRIAL
 SETTING ON THE DATE AND TIME INDICATED BELOW.
 COURT ORDERS AND FINDINGS:
 -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
WAIVES STATUTORY TIME.

NEXT SCHEDULED EVENT:
 UPON MOTION OF DEFENDANT
  11/10/11   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT
   109

CUSTODY STATUS: BAIL TO STAND


ON 10/26/11 AT 1000 AM :

  AMENDED AND RENEWED NOTICE OF MOTION AND MOTION FOR AND ORDER TO
  RETURN DEFENDANT'S PROPERTY; DECLARATION OF STEPHEN BERNARD IN
  SUPPORT THEREOF- FILED THIS DATE
  .
  NOTICE OF MOTION AND MOTOIN FOR AN ORDER TO RETURN DEFENDANT'S
  CURRENCY PREVIOUSLY SEIZED FROM DEFENDANT'S RESIDENCE;
  DECLARATION OF STEPHEN BERNARD IN SUPPORT THEREOF- FILED THIS
  DATE



ON 11/10/11 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                  LYNN EVANS       (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY STEPHEN BERNARD PRIVATE
  COUNSEL
  -BOND    D.D.A. ERIC HARMON
  .
  THE COURT HAS READ AND CONSIDERED DEFENSE NOTICE OF MOTION AND
  MOTION FOR AN ORDER TO TEMPORARILY REMOVE DEFENDANT'S MONITORING
  DEVICE TO ALLOW FOR DEFENDANT'S DIAGNOSTIC TESTING- FILED THIS
  DATE
  .
  MOTION IS GRANTED UPON THE FILING OF DECLARATION AND AFFIDAVIDIT
  FROM THE BONDSMEN AND SENTINEL ELECTRONIC MONITORING PROGRAM.

**19**

CASE NO. BA361202                              PAGE NO.  13
DEF NO.  01                                    DATE PRINTED 02/11/14

.
THE COURT HAS READ AND CONSIDERED DEFENDANT'S MOTION FOR AN
ORDER TO RETURN DEFENDANT'S CURRENCY PREVIOUSLY SEIZED FROM
DEFENDANT'S RESIDENCE- FILED ON 10-26-11
.
PEOPLE'S OPPOISTION TO RETURN OF ITEMS SEIZED BY WAY OF SEARCH
WARRANT- FILED ON 11-8-11.
.
MOTION IS ARGUED IN PART AND HEARING IS CONTINUED TO THE DATE
AND TIME INDICATED BELOW.
.
THE COURT HAS READ AND CONSIDERED DEFENDANT'S AMENDED AND
RENEWED MOTION FOR AN ORDER TO RETURN DEFENDANT'S PROPERTY-
FILED ON 10-26-11
.
MOTION IS ARGUED IN PART AND THE PARTIES ARE ENCOURAGED TO
CONFER INFORMALLY AND TRY TO REACH A STIPULATION REGARDING THE
RETURN OF PROPERTY BY THE NEXT HEARING DATE.

.
PRETRIAL CONFERENCE / TRIAL SETTING / AND HEARING ON DISCOVERY
MOTION ARE TRAILED TO THE DATE AND TIME INDICATED BELOW.
COURT ORDERS AND FINDINGS:
-THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
BY STIPULATION CAUSE CONTINUED TO
  11/15/11   830 AM  DISC MOT/PTC/TRIAL STG   DIST CENTRAL DISTRICT DEPT 109

CUSTODY STATUS: BAIL TO STAND


ON 11/15/11 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR DISC MOT/PTC/TRIAL STG
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                LYNN EVANS        (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY STEPHEN BERNARD PRIVATE
 COUNSEL
 -BOND    D.D.A. ERIC HARMON
 .
THE COURT AND COUNSEL CONFER INFORMALLY AND STIPULATE TO
DISCOVERY.
.
THE COURT AND COUNSEL CONFER REGARDING DEFENSE MOTION TO
TEMPORARILY REMOVE DEFENDANT'S MONITORING DEVICE AND THE PEOPLE
REMAIN OPPOSED TO THE REMOVAL OF THE ANKLE BRACELET.
.
ON DEFENSE MOTION MATTER IS CONTINUED FOR FURTHER PRETRIAL
CONFERENCE / TRIAL SETTING TO THE DATE AND TIME INDICATED BELOW.
.
.
ORDER TO TEMPORARILY REMOVE DEFENDANT'S MONITORING DEVICE TO
ALLOW FOR DEFENDANT'S DIAGNOSTIC TESTING IS SIGNED BY
JUDGE KATHLEEN KENNEDY THIS DATE- ORDER FILED.
.

**20**

CASE NO. BA361202
DEF NO.  01

PAGE NO.  14
DATE PRINTED 02/11/14

  ORDER TO RETURN DEFENDANT'S CURRENCY PREVIOUSLY SEIZED FROM
  DEFENDANT'S RESIDENCE IS SIGNED BY JUDGE KATHLEEN KENNEDY THIS
  DATE, ORDER FILED.
  .
  ORDER TO RETURN DEFENDANT'S PROPERTY PREVIOUSLY SEIZED FROM
  DEFENDANT'S RESIDENCE IS SIGNED BY JUDGE KATHLEEN KENNEDY THIS
  DATE, ORDER FILED.
  COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
WAIVES STATUTORY TIME.
NEXT SCHEDULED EVENT:
 BY STIPULATION CAUSE CONTINUED TO
   01/19/12   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT
    109

CUSTODY STATUS: BAIL TO STAND


ON 01/19/12 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                 LYNN EVANS      (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY STEPHEN BERNARD PRIVATE
  COUNSEL
  -BOND    D.D.A. ERIC HARMON / ALAN JACKSON   0/90
  D.D.A. ALAN JACKSON IS ALSO IN ATTENDANCE THIS DATE.
  .
  THE COURT HAS READ AND CONSIDERED DEFENDANT'S MOTION FOR AN
  ORDER TO EXPAND DEFENDANT'S TRAVEL BOUNDRIES- FILED ON 1-13-12.
  .
  MOTION IS ARGUED AND DENIED.
  .
  THE COURT AND COUNSEL CONFER REGARDING DISCOVERY.
  .
  THE PARTIES TO MEET INFORMALLY AND STIPULATE TO DISCOVERY
  ISSUES.
  .
  MATTER IS CONTINUED FOR FURTHER PRETRIAL CONFERENCE / TRIAL

  SETTING, TIME IS WAIVED PLUS 90 DAYS.
  COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
WAIVES STATUTORY TIME.
NEXT SCHEDULED EVENT:
 UPON MOTION OF DEFENDANT
   03/19/12   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT
    109

CUSTODY STATUS: BAIL TO STAND


ON 03/01/12 AT 1000 AM :

  MOTION FOR ORDER COMPELLING TRANSFER OF PHYSICAL EVIDENCE FOR
  INSPECTION AND TESTING- FILED THIS DATE
  MOTION TO COMPEL PRETRIAL DISCOVERY- FILED THIS DATE


ON 03/19/12 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

**21**

CASE NO. BA361202                              PAGE NO.  15
DEF NO.  01                                    DATE PRINTED 02/11/14


CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                LAURIE SMALL       (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY STEPHEN BERNARD PRIVATE
  COUNSEL
  -BOND   30/90   4 EK T/E  D.D.A. ERIC HARMON / ALAN JACKSON
  -DEFENSE COUNSEL: STEPHEN BERNARD / ALENA KLIMIANOK
  D.D.A. ALAN JACKSON IS ALSO IN ATTENDANCE THIS DATE.
.
DEFENSE ATTORNEY ALENA KLIMIANOK ALSO APPEARS THIS DATE.
.
THE COURT HAS READ AND CONSIDERED:
DEFENSE NOTICE OF MOTION AND MOTION FOR AN ORDER COMPELLING
TRANSFER OF PHYSICAL EVIDENCE FOR INSPECTION AND TESTING- FILED
ON 3-1-12.
.
DEFENSE NOTICE OF MOTION AND MOTION TO COMPEL PRETRIAL

DISCOVERY- FILED ON 3-1-12.
.
PEOPLE'S OPPOSITION TO DEFENSE MOTION AND MOTION TO COMPEL
PRETRIAL DISCOVERY AND MOTION AND MOTION FOR AN ORDER COMPELLING
TRANSFER OF PHYSICAL EVIDENCE FOR INSPECTION AND TESTING- FILED
ON 3-2-12.
.
DEFENSE REPLY TO PEOPLE'S OPPOSITION TO DEFENSE MOTION AND
MOTION TO COMPEL PRETRIAL DISCOVERY AND MOTION AND MOTION FOR AN
ORDER COMPELLING TRANSFER OF PHYSICAL EVIDENCE FOR INSPECTION
AND TESTING- FILED ON 3-14-12.
THE COURT FINDS THAT THE PARTIES HAVE RESOLVED AND STIPULATED TO
CERTAIN DISCOVERY ISSUES.
.
THE COURT ORDERS THE PEOPLE TO PROVIDE THE DEFENSE WITH POLICY
AND PROTOCOL SECTION OF MANUAL THAT PERTAINS TO THE COLLECTION
OF EVIDENCE AND STORAGE PRESERVATION.
.
FURTHER HEARING ON DISCOVERY IS SET ON THE DATE AND TIME
INDICATED BELOW WITH DISCOVERY COMPLIANCE SET ON THE SAME DATE
AND TIME.
.
THE COURT AND COUNSEL CONFER REGARDING SCHEDULING AND THE PEOPLE
INDICATE THAT THEY ARE READY FOR TRIAL AND WISH TO SET A TRIAL
DATE.
.
ON PEOPLE'S MOTION, THE COURT HEARS FROM THE VICTIMS' FAMILY
REGARDING SETTING A TRIAL DATE.
.
THE COURT AND COUNSEL CONFER REGARDING TRIAL TIME ESTIMATE.
.
THE PARTIES STIPULATE TO PRESCREEN PROSPECTIVE JURORS FOR
HARDSHIP, AND AGREE TO SIGN A WRITTEN STIPULATION ON THE NEXT
HEARING DATE.
.
FOR THE PURPOSE OF A MORE ACCURATE TIME ESTIMATE THE PARTIES ARE

**22**

CASE NO. BA361202                           PAGE NO.  16
DEF NO.  01                                 DATE PRINTED 02/11/14

  TO SUBMIT A WITNESS LIST ON THE NEXT HEARING DATE.
  .
  FURTHER PRETRIAL CONFERENCE / TRIAL SETTING, AND DISCOVERY
  HEARING / COMPLIANCE, IS TRAILED TO THE DATE AND TIME INDICATED
  BELOW.
  COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
 UPON MOTION OF DEFENDANT
  04/16/12   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT
   109

CUSTODY STATUS: BAIL TO STAND


ON 04/16/12 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING

PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
              LAURIE SMALL       (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
  COUNSEL
  - BOND  4WK T/E   DDA'S ERIC HARMON / ALAN JACKSON
  - DEFENSE COUNSEL: GEORGE BUEHLER  /   MARK KASSABIAN
  DEFENSE COUNSELS' GEORGE BUEHLER AND MARK KASSABIAN
  ARE SUBSTITUTED IN THIS DATE.
  .
  DEFENSE COUNSELS' STEPHEN BERNARD AND ALENA KLIMIANOK ARE
  RELIEVED.
  .
  DEFENSE MOTION TO CONTINUE IS GRANTED AND MATTER IS CONTINUED TO
  THE DATE AND TIME INDICATED BELOW.
  COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
WAIVES STATUTORY TIME.
NEXT SCHEDULED EVENT:
 UPON MOTION OF DEFENDANT
  06/11/12   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT
   109


CUSTODY STATUS: BAIL TO STAND


ON 06/11/12 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
              LAURIE SMALL       (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
  COUNSEL
  -BOND 4-5 WK T/E  D.D.A. ERIC HARMON
  -DEFENSE COUNSEL: GEORGE BUEHLER / MARK KASSABIAN
  .
  THE COURT AND COUNSEL CONFER REGARDING DISCOVERY.
  .
  THE COURT AND COUNSEL CONFER REGARDING SCHEDULING.
  .
  THE PEOPLE INQUIRE IF THE COURT IS IN RECEIPT OF ANY RECORDS

CASE NO. BA361202                           PAGE NO.  17
DEF NO.  01                                 DATE PRINTED 02/11/14

  SUBPOENAED BY THE STATE.
  .
  REQUESTED RECORDS HAVE NOT BEEN RECEIVED BY THE COURT.
  .
  STIPULATION THAT UPON RECEIPT OF SAID RECORDS, THE PEOPLE MAY
  REMOVE THEM FOR THE PURPOSES OF MAKING COPIES.
  .
  THE COURT AND COUNSEL CONFER REGARDING POSSIBLE STIPULATION TO
  PRE-SCREEN FOR JUROR HARDSHIP.
  .
  MATTER IS CONTINUED TO THE DATE AND TIME INDICATED BELOW FOR
  FURTHER PRETRIAL CONFERENCE / TRIAL SETTING.
  COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
WAIVES STATUTORY TIME.
NEXT SCHEDULED EVENT:
 BY STIPULATION CAUSE CONTINUED TO
  07/11/12   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT

     109

CUSTODY STATUS: BAIL TO STAND


ON 07/11/12 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
              LAURIE SMALL       (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
  COUNSEL
  -BOND 5-6 WK T/E  D.D.A. ERIC HARMON
  -DEFENSE COUNSELS: GEORGE BUEHLER / MARK KASSABIAN
  ORDER FOR MEDIA COVERAGE IS SIGNED BY JUDGE KATHLEEN KENNEDY
  THIS DATE.
  .
  DEFENSE NOTICE OF MOTION TO CONTINUE- FILED ON 7-10-12.
  .
  NOTICE OF MOTION AND MOTION FOR ORDER TO COMPEL DEFENSE
  DISCOVERY; MEMORANDUM OF POINTS AND AUTHORITIES; AND SUPPORTING

  DECLARATION- FILED THIS DATE.
  .
  THE COURT AND COUNSEL CONFER REGARDING SCHEDULING.
  .
  THE COURT AND COUNSEL CONFER REGARDING DISCOVERY ISSUES.
  .
  MATTER IS CONTINUED ON DEFENSE MOTION TO THE DATE AND TIME
  INDICATED BELOW FOR FURTHER PRETRIAL CONFERENCE / TRIAL SETTING.
  COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
WAIVES STATUTORY TIME.
NEXT SCHEDULED EVENT:
 UPON MOTION OF DEFENDANT
  08/17/12   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT
    109

**24**

CASE NO. BA361202                          PAGE NO.  18
DEF NO.  01                                DATE PRINTED 02/11/14


CUSTODY STATUS: BAIL TO STAND


ON 08/17/12 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                 LAURIE SMALL        (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
  COUNSEL
  -BOND 5-6 WK T/E  D.D.A. ERIC HARMON
  -DEFENSE COUNSELS: GEORGE BUEHLER / MARK KASSABIAN
  PRETRIAL CONFERENCE HELD AND MATTER IS CONTINUED FOR FURTHER
  PRETRIAL CONFERENCE / TRIAL SETTING TO THE DATE AND TIME
  INDICATED BELOW.
  COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.

WAIVES STATUTORY TIME.
NEXT SCHEDULED EVENT:
 BY STIPULATION CAUSE CONTINUED TO
  10/02/12   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT
   109

CUSTODY STATUS: BAIL TO STAND


ON 10/02/12 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                 LAURIE SMALL        (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
  COUNSEL
  -BOND 5-6 WK T/E  15 OF 30  DDA: ERIC HARMON / STACY OKUN-WIESE
  -DEFENSE COUNSELS: GEORGE BUEHLER / MARK KASSABIAN
  .
  THE COURT AND COUNSEL CONFER REGARDING PEOPLE'S MOTION FOR COURT
  IQUIREY REGARDING POSSIBLE CONFLICT OF INTEREST AND APPOINTMENT

  OF ADVISORY COUNSEL.

  .
  THE COURT INDICATES THAT A WRITTEN WAIVER OF CONFLICT IS
  REQUIRED AND THE COURT APPOINTS BAR PANEL ATTORNEY
  FRANKLIN PETERS AS ADVISORY COUNSEL FOR THE LIMITED PURPOSE OF
  ADVISING THE DEFENDANT ON THE CONFLICT OF INTEREST.
  .
  MATTER IS CONTINUED TO THE DATE AND TIME INDICATED BELOW FOR
  FURTHER PRETRIAL CONFERENCE, HEARING ON CONFLICT, AND VARIOUS
  OTHER DISCOVERY MOTIONS.
  COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
 BY STIPULATION CAUSE CONTINUED TO
  10/17/12   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT

**25**

CASE NO. BA361202                           PAGE NO.  19
DEF NO.  01                                 DATE PRINTED 02/11/14

   109

CUSTODY STATUS: BAIL TO STAND


ON 10/17/12 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                LAURIE SMALL       (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
   COUNSEL
   -BOND 5-6 WK T/E 22/30 DDA: ERIC HARMON / STACY OKUN-WIESE
   -DEFENSE COUNSEL: GEORGE BUEHLER / MARK KASSABIAN
   DEPUTY DISTRICT ATTORNEY ERIC HARMON DOES NOT APPEAR THIS DATE.
   .
   BAR PANEL ATTORNEY FRANKLIN PETERS APPEARS THIS DATE ON BEHALF
   OF DEFENDANT KELLY PARK FOR THE LIMITED PURPOSE OF COUNSEL ON

   CONFLICT.
   .
   ATTORNEY FRANKLIN PETERS MOTION FOR CONTINUANCE IS GRANTED, THE
   COURT FINDS THAT ATTORNEY PETERS NEEDS TIME TO REVIEW WAIVER
   PREPARED BY THE DISTRICT ATTORNEY AND SUBMITTED TOTHE DEFENSE
   THIS DATE.
   .
   THE COURT AND COUNSEL CONFER REGARDING POSSIBLE FUTURE MOTION TO
   SUPRESS EVIDENCE.
   .
   PRETRIAL CONFERENCE / TRIAL SETTING IS CONTINUED TO THE DATE AND
   TIME INDICATED BELOW.
   COURT ORDERS AND FINDINGS:
   -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
 UPON MOTION OF DEFENDANT
  10/24/12   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT
    108

CUSTODY STATUS: BAIL TO STAND


ON 10/24/12 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                LAURIE SMALL       (REP)  ALAN J. JACKSON  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
   COUNSEL
   -BOND 5-6 WK T/E 22/30 DDA: ERIC HARMON / STACY OKUN-WIESE
   -DEFENSECOUNSEL:GEORGEBUEHLER/MARKKASSABIAN
   DEPUTY DISTRICT ATTORNEY ERIC HARMON DOES NOT APPEAR THIS DATE.
   .
   BAR PANEL ATTORNEY FRANKLIN PETERS APPEARS THIS DATE ON BEHALF
   OFDEFENDANTKELLYPARKFORTHELIMITEDPURPOSEOFCOUNSELON
   CONFLICT.
   .
   THE DEFENDANT SIGNS WAIVER OF CONFLICT DOCUMENT PROVIDED BY THE

**26**

CASE NO. BA361202                          PAGE NO.  20
DEF NO.  01                                DATE PRINTED 02/11/14

 DISTRICT ATTORNEY- WAIVER FILED THIS DATE
 .
 THE DEFENDANT IS ADVISED THAT SHE HAS A RIGHT TO CONFLICT FREE
 COUNSEL AND THE DEFENDANT UNDERSTANDS THE DANGERS INVOLVED IN
 WAIVER OF CONFLICT AND SPECIFICALLY GIVES UP THE RIGHT TO BE
 REPRESENTED BY ATTORNEYS WHO HAVE NO CONFLICT.
 .
 THE COURT AND COUNSEL CONFER REGARDING DISCOVERY ISSUES AND
 DEFENSE MOTION TO SUPPRESS EVIDENCE.
 .
 WRITTEN MOTION TO SUPPRESS EVIDENCE TO BE FILED BEFORE THE NEXT
 HEARING DATE.
 .
 CASE IS CONTINUED TO THE DATE AND TIME INDICATED BELOW FOR
 FURTHER PRETRIAL CONFERENCE / TRIAL SETTING AND MOTIONS.
 COURT ORDERS AND FINDINGS:
 -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
WAIVES STATUTORY TIME.

NEXT SCHEDULED EVENT:
 UPON MOTION OF DEFENDANT
  11/27/12   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT
    109

CUSTODY STATUS: BAIL TO STAND


ON 11/27/12 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                 LAURIE SMALL       (REP)  STACY L. WIESE  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
  COUNSEL
  -4 WK T/E JT 3-11-13 0/10 DDA: ERIC HARMON / STACY OKUN-WIESE
  -DEFENSE COUNSEL: GEORGE BUEHLER / MARK KASSABIAN
  DEPUTY DISTRICT ATTORNEY ERIC HARMON DOES NOT APPEAR THIS DATE.
 .
 DEPUTY DISTRICT ATTORNEY MARK BURNLEY APPEARS THIS DATE.
 .
 CAUSE CALLED FOR VARIOUS MOTIONS.
 .
 THE COURT HAS READ AND CONSIDERED THE CITY OF SANTA MONICA'S
 MOTION FOR ORDER QUASHING SUBPOENA DUCES TECUM SERVED UPON
 SANTA MONICA POLICE DEPARTMENT- FILED ON 11-26-12
 AND DEFENSE OPPOSITION FILED THE SAME DATE.
 .
 DEPUTY CITY ATTORNEY, MEISHYA YANG, APPEARS THIS DATE ON BEHALF
 OF THE CITY OF SANTA MONICA.
 .
 THE COURT AND COUNSEL CONFER REGARDING STIPULATION BY THE
 CITY OF SANTA MONICA TO COMPLY WITH SUBPOENA.
 .
 PROTECTIVE ORDER IS SIGNED BY THE COURT AND A REDACTED COPY OF
 REQUESTED DISCOVERY TO BE PROVIDED TO THE DEFENSE WITHIN 7 DAYS.

CASE NO. BA361202                          PAGE NO.  21
DEF NO.  01                                DATE PRINTED 02/11/14

.
.
THE COURT AND COUNSEL CONFER REGARDING DISCOVERY RECIEVED UNDER
SUBPOEANA BY THE COURT AND DISCOVERY RECIEVED BY THE PARTIES
THAT HAVE BEEN TURNED OVER TO THIS COURT UNOPENED.
.
DISCOVERY RECEIVED BY DEFENSE FROM THE SHERIFF'S DEPARTMENT
PURSUANT TO SUBPOENA IS RELEASED BACK TO THE DEFENSE.
.
THE REMAINING DISCOVERY RECEIVED BY THE COURT IS REMOVED BY THE
DISTRICT ATTORNEY FOR THE PURPOSE OF MAKING COPIES, AS MORE
FULLY REFLECTED IN THE NOTES OF THE COURT REPORTER.
.
THE COURT HAS READ AND CONSIDERED DEFENSE MOTION TO SUPPRESS
WIRETAP EVIDENCE AND DECLARATION- EACH FILED ON 11-9-12 AND
PEOPLE'S RESPONSE TO MOTION TO SUPPRESS EVIDENCE PURSUANT TO
PENAL CODE SECTIONS 629.72 AND 1538.5- FILED ON 11-15-12
.

MOTION ARGUED AND DENIED.
.
THE COURT HAS READ AND CONSIDERED DEFENSE MOTION TO UNSEAL
WIRETAP APPLICATION AFFIDAVIT HOBBS ATTACHMENT- FILED ON 11-9-12
.
THERE IS NO OBJECTION BY THE PEOPLE TO PROVIDE COPY OF
ATTACHMENT TO THE DEFENSE.
.
THE COURT AND COUNSEL CONFER REGARDING PEOPLE'S MOTION TO ADMIT
EVIDENCE UNDER EVIDENCE CODE SECTION 1101(B) AND MOTION TO BE
HEARD ON THE DATE AND TIME INDICATED BELOW.
.
THE COURT AND COUNSEL CONFER REGARDING SCHEDULING.
.
ALL PARTIES ANNOUNCING READY FOR TRIAL, JURY TRAIL IS SET ON
3-11-13 AT 8:30 A.M. IN DEPARTMENT 109, TIME WAIVED PLUS 10 DAYS
.
THE COURT FINDS THE TIME TIME ESTIMATE IS 4 WEEKS.
.
THE COURT AND COUNSEL CONFER REGARDING POSSIBLE STIPULATION TO
PRE-SCREEN PROSPECTIVE JURORS FOR HARDSHIP.

 COURT ORDERS AND FINDINGS:
 -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
 BY STIPULATION CAUSE CONTINUED TO
  12/11/12   830 AM  PRETRIAL CONFERENCE   DIST CENTRAL DISTRICT DEPT 109
WAIVES STATUTORY TIME.
NEXT SCHEDULED EVENT:
 BY STIPULATION CAUSE CONTINUED TO
  03/11/13   830 AM  JURY TRIAL   DIST CENTRAL DISTRICT DEPT 109

CUSTODY STATUS: BAIL TO STAND


ON 11/28/12 AT 1000 AM :

 THE DISTRICT ATTORNEY RETURNS SUBPOENAED RECORDS REMOVED FROM
 THE COURT FILE.


ON 12/07/12 AT 1000 AM :

```
CASE NO. BA361202                        PAGE NO.  22
DEF NO.  01                              DATE PRINTED 02/11/14
```

    DEFENSE APPLICATION FOR ORDER- FILED UNDER SEAL ON 12-06-12
    DEFENSE EX PARTE APPLICATION TO FILE DOCUMENTS UNDER SEAL AND IN
    CAMERA- FILED UNDER SEAL ON 12-06-12
    DEFENSE MOTION TO CONTINUE- FILED ON 12-06-12
    .
    PROPOSED ORDERS SIGNED BY JUDGE KATHLEEN KENNEDY THIS DATE AND
    FILED UNDER SEALED.


ON 12/11/12 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR PRETRIAL CONFERENCE
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
              LAURIE SMALL       (REP)  STACY L. WIESE  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
  COUNSEL

    -1101(B) MOTION 1 HOUR   D.D.A ERIC HARMON / STACY OKUN-WIESE
    -DEFENSE COUNSEL: GEORGE BUEHLER / MARK KASSABIAN
    .
    DEPUTY DISTRICT ATTORNEY ERIC HARMON DOES NOT APPEAR THIS DATE
    .
    DEFENSE MOTION TO CONTINUE HEARING ON PEOPLE'S MOTION TO ADMIT
    EVIDENCE OF PRIOR CONDUCT PURSUANT TO EVIDENCE CODE SECTION
    1101(B) IS GRANTED AND MATTER IS CONTINUED TO THE DATE AND TIME
    INDICATED BELOW.
    .
    SUBPOENAED RECORDS ARE TURNED OVER TO DEFENSE COUNSEL BY
    STIPULATION.
    COURT ORDERS AND FINDINGS:
    -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
 UPON MOTION OF DEFENDANT
  01/04/13   830 AM  MOTION   DIST CENTRAL DISTRICT DEPT 109

CUSTODY STATUS: BAIL TO STAND


ON 01/04/13 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

    NUNC PRO TUNC ORDER PREPARED. IT APPEARING TO THE COURT THAT THE MINUTE ORDER
   IN THE ABOVE ENTITLED ACTION DOES NOT PROPERLY REFLECT THE COURT'S ORDER. SAID
   MINUTE ORDER IS AMENDED NUNC PRO TUNC AS OF THAT DATE.  ALL OTHER ORDERS ARE
   TO REMAIN IN FULL FORCE AND EFFECT. DETAILS LISTED AT END OF THIS MINUTE ORDER.
   CASE CALLED FOR MOTION
PARTIES: KATHLEEN KENNEDY (JUDGE)  MELODY RAMIREZ  (CLERK)
              ANGELA DEVER       (REP)  STACY L. WIESE  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
  COUNSEL
   1101(B) MOTION 1 HOUR DDA/STACY OKUN-WIESE
   DEFENSE COUNSEL: GEORGE BUEHLER / MARK KASSABIAN
   .
   MOTION IS CONTINUED TO 2/18/13.  COUNSEL FOR THE DEFENSE TO
   FILE THEIR RESPONSE BY 2/14/13.

CASE NO. BA361202                                    PAGE NO.  23
DEF NO.  01                                          DATE PRINTED 02/11/14

.
IF THE PEOPLE WISH TO RESPOND, PAPERS TO BE FILED BY 2/21/13.
.
TRIAL SET FOR 3/11/13 IS ADVANCED AND CONTINUED TO 3/18/13
AS DAY 0 OF 10.
.
NUNC PRO TUNC IN ERROR THIS DATE.
COURT ORDERS AND FINDINGS:
-THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
  02/28/13    830 AM  MOTION    DIST CENTRAL DISTRICT DEPT 109

CUSTODY STATUS: BAIL TO STAND


ON 01/29/13 AT 1000 AM :

  SUBPOENAED RECORDS FROM THE COURT FILE FOR THE PURPOSE OF MAKING

  COPIES ARE RETURNED.
  .
  AS TO RECORDS RECEIVED THIS DATE:
  THE PEOPLE REMOVE SUBPOENAED RECORDS FROM THE COURT FILE FOR
  THE PURPOSE OF MAKING COPIES, AS PREVIOUSLY STIPULATED BY THE
  PARTIES.


ON 02/04/13 AT 1000 AM :

  NOTICE OF MOTION AND MOTION FOR PRETRIAL DISCOVERY (PITCHESS)-
  FILED THIS DATE
  DECLARATION OF MARK M. KASSABIAN IN SUPPORT OF MOTION FOR
  PRETRIAL DISCOVERY (PITCHESS)- FILED UNDER SEAL THIS DATE
  NOTICE OF MOTION AND MOTION TO SUPPRESS WIRETAP (RENEWED)- FILED
  THIS DATE
  DEFENDANT KELLY SOO PARK'S EX PARTE APPLICATION TO FILE
  DOCUMENTS UNDER SEAL AND IN CAMERA- FILED THIS DATE UNDER SEAL
  ORDER SIGNED BY JUDGE KATHLEEN KENNEDY THIS DATED- FILED UNDER
  SEAL



ON 02/05/13 AT 1000 AM :



ON 02/05/13 AT 1030 AM :

  SUBPOENAED RECORDS PREVIOUSLY REMOVED FROM THE COURT FILE BY THE
  DISTRICT ATTORNEY ARE RETURNED THIS DATE.


ON 02/14/13 AT 1000 AM :

  RESPONDENT CITY OF SANTA MONICA'S OPPOSITION TO MOTION FOR
  PRE-TRIAL DISCOVERY- FILED THIS DATE
  .
  DEFENSE OPPOSITION TO MOTION TO ADMIT EVIDENCE OF OTHER CONDUCT-

**30**

CASE NO. BA361202
DEF NO.  01

PAGE NO.  24
DATE PRINTED 02/11/14

   FILED THIS DATE.


ON 02/28/13 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

   NUNC PRO TUNC ORDER PREPARED. IT APPEARING TO THE COURT THAT THE MINUTE ORDER
 IN THE ABOVE ENTITLED ACTION DOES NOT PROPERLY REFLECT THE COURT'S ORDER. SAID
 MINUTE ORDER IS AMENDED NUNC PRO TUNC AS OF THAT DATE.  ALL OTHER ORDERS ARE
TO REMAIN IN FULL FORCE AND EFFECT. DETAILS LISTED AT END OF THIS MINUTE ORDER.
CASE CALLED FOR MOTION
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                  LAURIE SMALL       (REP)  STACY L. WIESE  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
  COUNSEL
  -DDA: STACY OKUN-WIESE
  -DEFENSE COUNSEL: GEORGE BUEHLER / MARK KASSABIAN
  .

   THE CAUSE IS CALLED FOR PITCHES MOTION HEARING.
   ALL PARTIES ARE PRESENT AND READY TO PROCEED.
   .
   MEISHYA YANG, DEPUTY CITY ATTORNEY, IS PRESENT FOR THE LOS
   ANGELES POLICE DEPARTMENT.
   .
   THE MOTION IS HEARD, ARGUED AND GRANTED.
   .
   AN IN CAMERA HEARING IS HELD IN CHAMBERS.
   CRAIG HANEY, CUSTODIAN OF RECORDS FOR THE LOS ANGELES
   POLICE DEPARTMENT, IS PRESENT.
   .
   THE TRANSCRIPT OF THE PROCEEDINGS HELD IN CHAMBERS IS ORDERED
   SEALED AND IS NOT TO BE UNSEALED WITHOUT A COURT ORDER.
   .
   NO DISCOVERABLE INFORMATION IS FOUND BY THE COURT.
   .
   .
   AS TO PEOPLE'S MOTION TO ADMIT OTHER CRIMES- HEARING IS HELD.
   THE COURT HAS READ AND CONSIDERED:
   PEOPLE'S  MOTION TO ADMIT EVIDENCE OF OTHER CONDUCT

   FILED ON 9-24-12 AND 11-29-12 SUPPLEMENTAL FILED ON 11-29-12
   AND
   DEFENSE OPPOSITION TO MOTION TO ADMIT EVIDENCE OF OTHER CRIMES-
   FILED ON 2-14-13
   .
   MOTION IS ARGUED AND DENIED, THE COURT FINDS THAT THE PEOPLE
   HAVE NOT MET THEIR BURDEN OF PROOF UNDER EVIDENCE CODE SECTION
   1101(B).
   .
   RENEWAL OF WIRETAP UNSEALING CONTINUES TO BE DENIED.
   .
   THE DEFENSE REMOVE SUBPOENAED RECORDS FROM THE COURT FILE.
   THE PURPOSE OF MAKING COPIES.
   .
   THE COURT AND COUNSEL CONFER REGARDING SCHEDULING AND JURY TRIAL

CASE NO. BA361202
DEF NO.  01

PAGE NO.  25
DATE PRINTED 02/11/14

IS SET ON THE DATE AND TIME INDICATED BELOW AS DAY 0 OF 10 DAYS.
.
STIPULATION TO PRESCREEN JURORS IS SIGNED BY ALL PARTIES AND FAX
FAXED TO THE JURY DIVISION AT 213 680-9749.
.
.
MINUTE ORDER AMENDED ON 3-1-13 BY DEPUTY CLERK LORRAINE TOWNSEND
BY DELETING
CASE CONTINUED TO 3-1-13
AND SUBSTITUTION
CASE CONTINUED TO 5-13-13
COURT ORDERS AND FINDINGS:
-THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
WAIVES STATUTORY TIME.
NEXT SCHEDULED EVENT:
BY STIPULATION CAUSE CONTINUED TO
  05/13/13   830 AM  PRETRIAL CONF/TRIAL SETTING   DIST CENTRAL DISTRICT DEPT
    109


CUSTODY STATUS: BAIL TO STAND


ON 04/09/13 AT 1000 AM :

  PEOPLE'S MOTION AND MOTION IN LIMINE TO EXCLUDE EVIDENCE OF
  ALLEGED THIRD PARTY CULPABILITY- FILED THIS DATE.



ON 04/25/13 AT 1000 AM :

  DEFENSE NOTICE OF MOTION AND MOTION IN LIMINE TO EXCLUDE
  REFERENCE TO "JAMES BOND" GIRL
  *
  DEFENSE NOTICE OF MOTION AND MOTION IN LIMINE TO EXCLUDE
  REFERENCES TO PRESCRIPTION DRUGS FOUND DURING DEFENDANT'S ARREST
  *
  DEFENSE NOTICE OF MOTION AND MOTION IN LIMINE TO EXCLUDE
  RECORDING, TRANSCRIPT, AND TESTIMONY OF POLICE ENCOUNTER WITH

  DEFENDANT AT ANIMAL SHELTER ON JUNE 17, 2010
  *
  DEFENSE NOTICE OF MOTION AND MOTION IN LIMINE TO EXCLUDE
  GRAPHIC AND PREJUDICIAL PHOTOGRAPHS OF DECEDENT
  *
  DEFENSE NOTICE OF MOTION AND MOTION TO BAR TELEVISING OF
  PROCEEDINGS
  *
  DEFENSE NOTICE OF MOTION AND MOTION IN LIMINE TO EXCLUDE
  REFERENCES TO (1) ALLEGATIONS OF ILLEGAL ACTIVITIES MY MUNIR
  UWAYDAH; (2) INVESTIGATION OF UWAYDAH AND BUSINESS ENTITIES; AND
  (3) UWAYDAH'S DEPARTURE AND ABSENCE FROM THE U.S.
  *
  DEFENDNAT'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF FRAUD OR
  BUSINESS WRONGDOING

CASE NO. BA361202                        PAGE NO.  26
DEF NO.  01                              DATE PRINTED 02/11/14

    *
    DEFENSE NOTICE OF MOTION AND MOTION TO COMPEL PRETRIAL DISCOVERY
    OF NOTES AND REPORT'S REGARDING M.A.
    *
    DEFENSE NOTICE OF MOTION AND MOTION TO COMPEL PRETRIAL DISCOVERY
    OF REPORTS REGARDING RONNIE CASE
    .
    ALL OF THE MOTIONS LISTED ABOVE ARE FILED THIS DATE.
NEXT SCHEDULED EVENT:
    05/09/13   830 AM  MOTION    DIST CENTRAL DISTRICT DEPT 109


ON 05/09/13 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR MOTION
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                  LAURIE SMALL       (REP)  STACY L. WIESE  (DA)

DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
    COUNSEL
    CAUSE CALLED FOR VARIOUS PRETRIAL MOTIONS.
    .
    THE COURT HAS READ AND CONSIDERED:
    DEFENSE NOTICE OF MOTION AND MOTION TO BAR TELEVISING OF
    PROCEEDINGS- FILED ON 4-25-13, AND
    PEOPLE'S OPPOSITION- FILED ON 5-3-13
    .
    MOTION IS ARGUED AND DENIED.
    .
    THE COURT HAS READ AND CONSIDERED:
    DEFENSE MOTION TO DISMISS CHARGES BASED ON OUTRAGEOUS
    GOVENMENT MISCONDUCT- FILED ON 5-6-13, AND
    PEOPLE'S RESPONSE- FILED ON 5-7-13
    .
    DEFENSE WITNESS CALLED SWORN AND EXAMINED: LYNDA LARSEN
    .
    MOTION ARGUED.
    .
    DEFENSE EXHIBITS ATTACHED TO MOTION MARKED AS F AND G ARE PLAYED

    IN OPEN COURT.
    .
    COURT'S EXHIBITS MARKED FOR IDENTIFICATION: #A- COPY OF
    TRANSCRIPT, #B- COPY OF TRANSCRIPT
    .
    FURTHER HEARING IS CONTINUED TO THE DATE AND TIME INDICATED
    BELOW ALONG WITH DEFENSE MOTION TO EXCLUDE THIRD PARTY
    CULPABILITY.
    .
    THE COURT HAS READ AND CONSIDERED:
    DEFENSE NOTICE OF MOTION AND MOTION TO COMPEL PRETRIAL DISCOVERY
    OF REPORTS REGARDING RONNIE CASE- FILED ON 4-25-13, AND
    PEOPLE'S OPPOSITION- FILED ON 5-3-13
    .
    THE COURT FINDS THAT THE PEOPLE HAVE PROVIDED ALL DISCOVERY

CASE NO. BA361202                           PAGE NO.  27
DEF NO.  01                                 DATE PRINTED 02/11/14

REGARDING RONNIE CASE.
.
THE COURT HAS READ AND CONSIDERED:
DEFENSE NOTICE OF MOTION AND MOTION TO COMPEL PRETRIAL DISCOVERY
OF NOTES AND REPORTES REGARDING M.A.- FILED ON 4-25-13, AND
PEOPLE'S OPPOSITION- FILED ON 5-3-13
.
THE COURT FINDS THAT WITH THE EXCEPTION DISCOVERY REQUEST ITEM
#4, THE PEOPLE HAVE PROVIDED ALL DISCOVERY AND THE PEOPLE ARE
ORDERED TO COMPLY WITH REQUESTED ITEM #4.
.
THE COURT HAS READ AND CONSIDERED:
DEFENDNAT'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF FRAUD OR
BUSINESS WRONGDOING- FILED ON 4-9-13, AND
PEOPLE'S OPPOSITION- FILED ON 5-3-13
.
THE PEOPLE CONCEDE
.

THE COURT HAS READ AND CONSIDERED:
DEFENSE NOTICE OF MOTION AND MOTION IN LIMINE TO EXCLUDE
GRAPHIC AND PREJUDICIAL PHOTOGRAPHS OF DECEDENT- FILED ON
4-25-13, AND
PEOPLE'S OPPOSITION- FILED ON 5-3-13
.
THE PEOPLE ARE ORDERED TO CHOSE A PHOTOGRAPH FROM PHOTOGRAPHS
LISTED #16 THRU 21, AND FROM #1 THRU #5, OTHERWISE DEFENSE
MOTION IS DENIED.
.
THE COURT HAS READ AND CONSIDERED:
DEFENSE NOTICE OF MOTION AND MOTION IN LIMINE TO EXCLUDE
REFERENCE TO "JAMES BOND" GIRL- FILED ON 4-25-13, AND
PEOPLE'S OPPOSITION- FILED ON 5-3-13
.
THE PEOPLE CONCEDE.
.
THE COURT HAS READ AND CONSIDERED:
DEFENSE NOTICE OF MOTION AND MOTION IN LIMINE TO EXCLUDE
REFERENCES TO (1) ALLEGATIONS OF ILLEGAL ACTIVITIES MY MUNIR
UWAYDAH; (2) INVESTIGATION OF UWAYDAH AND BUSINESS ENTITIES; AND

(3) UWAYDAH'S DEPARTURE AND ABSENCE FROM THE U.S.- FILED ON
4-25-13, AND
PEOPLE'S OPPOSITION- FILED ON 5-3-13
.
THE PEOPLE CONCEDE TO #1 AND #2, #3 IS ARGUED AND DENIED.
.
THE COURT HAS READ AND CONSIDERED:
DEFENSE NOTICE OF MOTION AND MOTION IN LIMINE TO EXCLUDE
REFERENCES TO PRESCRIPTION DRUGS FOUND DURING DEFENDANT'S ARREST
FILED ON 4-25-13, AND
PEOPLE'S OPPOSITION- FILED ON 5-3-13
.
THE PEOPLE CONCEDE
.
THE DEFENSE IS ORDERED TO DISCLOSE WITNESS IDENTIFICATION AND

CASE NO. BA361202                          PAGE NO.  28
DEF NO.  01                                DATE PRINTED 02/11/14

  COMPLY WITH DISCOVERY OBLIGATION.
  .
  THE DEFENSE IS ADMONISHED TO PROVIDE ALL REPORTS.
  .
  THE COURT ORDERS DEFENSE WITNESS NOT BE REVELED TO JOHN
  GILMORE.
  .
  CASE IS CONTINUED TO THE DATE AND TIME INDICATED BELOW FOR
  CONTINUING HEARING ON MOTIONS.
  COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
  05/10/13   830 AM  MOTION   DIST CENTRAL DISTRICT DEPT 109

CUSTODY STATUS: BAIL TO STAND


ON 05/09/13 AT 1100 AM :


  EX PARTE APPLICATION FOR CERTIFICATE ORDERING OUT-OF-STATE
  WITNESS KRIS REDDING TO ATTEND TRIAL- FILED THIS DATE
  ORDER SIGNED BY JUDGE KATHLEEN KENNEDY THIS DATE- ORDER FILED
  .
  EX PARTE APPLICATION FOR CERTIFICATE ORDERING OUT-OF-STATE
  WITNESS ASHLEY KALIL SMITH TO ATTEND TRIAL- FILED THIS DATE
  ORDER SIGNED BY JUDGE KATHLEEN KENNEDY THIS DATE- ORDER FILED


ON 05/10/13 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

  NUNC PRO TUNC ORDER PREPARED. IT APPEARING TO THE COURT THAT THE MINUTE ORDER
  IN THE ABOVE ENTITLED ACTION DOES NOT PROPERLY REFLECT THE COURT'S ORDER. SAID
  MINUTE ORDER IS AMENDED NUNC PRO TUNC AS OF THAT DATE.  ALL OTHER ORDERS ARE
  TO REMAIN IN FULL FORCE AND EFFECT. DETAILS LISTED AT END OF THIS MINUTE ORDER.
  CASE CALLED FOR MOTION
  PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                LAURIE SMALL        (REP)  STACY L. WIESE  (DA)
  DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE

  COUNSEL
  ORDER ON MEDIA REQUEST TO PERMIT COVERAGE HAS BEEN SIGNED BY
  JUDGE KATHLEEN KENNEDY THIS DATE- ORDER FILED (NO WITNESS
  COVERAGE)
  .
  FURTHER HEARING ON PRESS COERAGE IS HEARD WITH ATTORNEY
  KELLI SAGER APPEARING ON BEHALF OF CBS, NBC, DATELINE AND
  48 HOURS.
  .
  THE COURT HEARS ARGUMENT FOR COVERAGE OF WITNESS TESTIMONY.
  .
  COUNSEL FOR MEDIA AGENCY TO SUBMIT STUDIES REGARDING CAMERAS
  IN THE COURTROOM AND HOW THEY AFFECT OR NOT AFFECT JURORS AND
  WITNESSES.
  .

**35**

CASE NO. BA361202
DEF NO.  01

PAGE NO.  29
DATE PRINTED 02/11/14

HEARING IS CONTINUED TO 5-13-13 AT 8:30 A.M.
.
HEARING ON DEFENDANT'S MOTION TO DISMISS BASED ON GOVERNMENT
MISCONDUCT AND
PEOPLE'S MOTION AND MOTION IN LIMINE TO EXCLUDE EVIDENCE OF
ALLEGED THIRD PARTY CULPABILITY- FILED ON 4-9-13 RESUME.
.
DEFENSE SUPPLEMENTAL AUTHORITIES RE CREDIBILITY ASSESSMENTS
REGARDING EVIDENCE OF THIRD PARTY CULPABILITY- FILED THISDATE.
.
PEOPLE'S WITNESS CALLED SWORN AND EXAMINED: LESTER KURIYAMA,
ERIC ATKINSON
THE COURT AND COUNSEL CONFER REGARDING  PEOPLE'S MOTION TO
EXCLUDE EVIDENCE OF THIRD PARTY CULPABILITY  AND THE COURT
INDICATES THAT AT THIS TIME THERE IS INSUFFICIENT  EVIDENCE OF
THIRD PARTY CULPABILITY.
.
DEFENSE REQUEST TO FILED DECLARATION BY MARK KASSABIAN IS

REJECTED BY THE COURT.
.
DEFENSE WITNESS , MELISA AYALA, ACCOMPANIED BY COUNSEL ROBERT
COPPOLA,  IS CALLED, AND SWORN.
.
DEFENSE WITNESS , MELISA AYALA, INVOKES HER 5TH AMENDMENT RIGHT
NOT TO TESTIFY.
.
THE COURT INDICATES THAT THE STATE OF THE RECORD DOES NOT
SUPPORT THIRD PARTY CULPABILITY AS TO JOHN GILMORE AND EVEN LESS
AS TO IVAN IVANOV, AND IS INADMISSIBLE.
.
DEFENSE WITNESS , MELISA AYALA IS RELEASED  ON CALL (48 HOUR )
TO THE DEFENSE VIA HER ATTORNEY, ROBERT COPPOLA.
.
DEFENSE MOTION TO DISMISS CHARGES BASED ON OUTRAGEOUS GOVERNMENT
MISCONDUCT IS ARGUED AND DENIED.
.
HEARING ON DEFENSE MOTION EXCLUDE EVIDENCE OF THIRD PARTY
CULPABILITY CONTINUES IN ADDITION TO MOTION TO LIMIT / EXCLUDE
EVIDENCE PURSUANT TO EVIDENCE CODE SECTION 402.
.
DEFENSE WITNESS CALLED SWORN AND EXAMINED: GREGG STUTCHMAN
.
DEFENSE EXHIBITS MARKED FOR IDENTIFICATION: #A- COPY OF LIST,
#B- CURRICULUM VITA, #C- REPORT THAT INCLUDES 2 CD-R'S
.
HEARING IS CONTINUED TO A LATER DATE AND TIME.
.
THE COURT AND COUNSEL CONFER REGARDING SCHEDULING.
.
DEFENSE MOTION FOR JURY QUESTIONNAIRE IS DENIED, MOTION IS NOT
TIMELY.
.
THE COURT AND COUNSEL CONFER REGARDING PROPOSED QUESTIONS TO THE
JURY.

CASE NO. BA361202                              PAGE NO.  30
DEF NO.  01                                   DATE PRINTED 02/11/14

.
MATTER REMAINS SET FOR JURY TRIAL IN DEPARTMENT 109
ON 5-13-13 AT 8:30 A.M.
.
.
.
***NUNC PRO TUNC VERBIAGE APPEARS IN ERROR.
NEXT SCHEDULED EVENT:
PRETRIAL CONF/TRIAL SETTING

CUSTODY STATUS: BAIL TO STAND


ON 05/13/13 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

  NUNC PRO TUNC ORDER PREPARED. IT APPEARING TO THE COURT THAT THE MINUTE ORDER
 IN THE ABOVE ENTITLED ACTION DOES NOT PROPERLY REFLECT THE COURT'S ORDER. SAID
 MINUTE ORDER IS AMENDED NUNC PRO TUNC AS OF THAT DATE.  ALL OTHER ORDERS ARE
TO REMAIN IN FULL FORCE AND EFFECT. DETAILS LISTED AT END OF THIS MINUTE ORDER.
CASE CALLED FOR PRETRIAL CONF/TRIAL SETTING
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                 LAURIE SMALL     (REP)  STACY L. WIESE  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
 COUNSEL
 DEFENSE ATTORNEY MARK M. KASSABIAN IS ALSO PRESENT ON BEHALF OF
 THE DEFENDANT.
.
INVESTIGATION OFFICER, KAREN THOMPSON IS ALLOWED TO REMAIN AT
COUNSEL TABLE TO ASSIST THE PEOPLE.
.
LEE MEIHLS, JURY CONSULTANT IS ALLOWED TO REMAIN AT COUNSEL
TABLE TO ASSIST THE DEFENSE.
.
OUTSIDE THE PRESENCE OF ANY PROSPECTIVE JURORS:
THE COURT HAS READ AND CONSIDERED MEMORANDUM IN SUPPORT OF
PERMITTING TELEVISION COVERAGE OF TRIAL- FILED 5-10-13
.
FURTHER HEARING ON PRESS COERAGE IS HEARD WITH ATTORNEY
KELLI SAGER APPEARING ON BEHALF OF CBS, NBC, DATELINE AND ITNESS

48 HOURS.
.
MOTION IS ARGUED AND THE COURT'S PREVIOUS ORDER STANDS.
.
BRIEF RE: ADMISSION OF M.A.'S STATEMENT UNDER EVIDENCE CODE
SECTION 1230- FILED THIS DATE
BRIEF RE: GRANTING IMMUNITY TO M.A.- FILED THIS DATE
DEFENDANT KELLY SOO PARK'S SUPPLEMENTAL MEMORANDUM IN SUPPORT
OF ADMISSIBILITY OF JOHN GILMOR'S OTHER ACTS- FILED THIS DATE
DECLARATION OF MARK M. KASSABIAN IS SUPPORT- FILED THIS DATE
DEFENSE MOTION TO CONTINUE- FILED THIS DATE
.
MOTIONS TO BE HEARD AT A LATER DATE AND TIME.
.
THE COURT AND COUNSEL CONFER REGARDING MISSING PROSPECTIVE

**37**

CASE NO. BA361202                        PAGE NO.  31
DEF NO.  01                              DATE PRINTED 02/11/14

JURORS AND THE COURT INDICATES THAT PROSPECTIVE JURORS C-6506
AND O-5521 ARE NOT IN COURT, BUT HAVE BEEN CONTACTED BY THE     R
COURT CLERK AND WILL BE IN COURT ON 5-14-13.
.
IN ADDITION, PROSPECTIVE JUROR S-0844 WILL BE IN COURT LATER
THIS MORNING.
.
A PANEL OF 61 PROSPECTIVE JURORS ARRIVE AND ARE SWORN RE:
QUALIFICATIONS
.
LATER JUROR S-0844 ARRIVES AND IS SWORN RE: QUALIFICATIONS
.
THE PARTIES ARE INTRODUCED, THE CHARGES AND THE PEOPLE'S WITNESS
LIST IS READ TO THE PROSPECTIVE JURORS.
.
VOIR DIRE IS COMMENCED.
.
THE PROSPECTIVE JURORS ARE ADMONISHED AND EXCUSED UNTIL THE DATE

INDICATED BELOW AT 9:30 A.M.
.
THE PARTIES AND THE DEFENDANT ARE ORDERED TO RETURN ON THE DATE
AND TIME INDICATED BELOW.
.
.
MINUTES AMENDED ON 5-14-13 BY DEPUTY CLERK LORRAINE TOWNSEND BY
DELETING:
CONTINUED FOR RETRIAL, AND SUBSTITUTING
CONTINUED FOR JURY TRIAL
COURT ORDERS AND FINDINGS:
-THE INITIAL JURY PANEL IS ADMONISHED.

-THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
  05/14/13   930 AM  JURY TRIAL    DIST CENTRAL DISTRICT DEPT 109

CUSTODY STATUS: BAIL TO STAND


ON 05/14/13 AT  930 AM  IN CENTRAL DISTRICT DEPT 109

  NUNC PRO TUNC ORDER PREPARED. IT APPEARING TO THE COURT THAT THE MINUTE ORDER
IN THE ABOVE ENTITLED ACTION DOES NOT PROPERLY REFLECT THE COURT'S ORDER. SAID
MINUTE ORDER IS AMENDED NUNC PRO TUNC AS OF THAT DATE.  ALL OTHER ORDERS ARE
TO REMAIN IN FULL FORCE AND EFFECT. DETAILS LISTED AT END OF THIS MINUTE ORDER.
CASE CALLED FOR JURY TRIAL
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
              LAURIE SMALL       (REP) STACY L. WIESE  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
  COUNSEL
  JURY TRIAL RESUMES FROM 05-14-13 WITH ALL PARTIES, THE DEFENDANT
  AND THE PROSPECTIVE JURORS PRESENT AS BEFORE.
.
OUTSIDE THE PRESENCE OF ANY JURORS: THE COURT AND COUNSEL CONFER
REGARDING LATE, MISSING AND SICK JURORS.
.

**38**

CASE NO. BA361202                                    PAGE NO.  32
DEF NO.  01                                          DATE PRINTED 02/11/14

    WITH THE PROSPECTIVE JURORS NOW PRESENT:
    VOIR DIRE RESUMES.
    .
    A PANEL OF 12 JURORS AND 4 ALTERNATE ARE SELECTED, ADMONISHED
    AND ORDERED TO RETURN TO DEPARTMENT 109 ON 5-15-13 AT 10:00 A.M.
    .
    OUTSIDE THE PRESENCE OF ANY JURORS:
    THE COURT AND COUNSEL CONFER REGARDING SCHEDULING.
    .
    THE PARTIES AND THE DEFENDANT ARE ORDERED TO RETURN ON THE DATE
    AND TIME INDICATED BELOW.
    COURT ORDERS AND FINDINGS:
    -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
    05/15/13   930 AM  JURY TRIAL   DIST CENTRAL DISTRICT DEPT 109

CUSTODY STATUS: BAIL TO STAND


ON 05/15/13 AT  930 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR JURY TRIAL
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                LAURIE SMALL       (REP)  STACY L. WIESE  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
    COUNSEL
    JURY TRIAL RESUMES FROM 05-14-13 WITH ALL PARTIES, THE DEFENDANT
    THE JURY AND THE ALTERNATE JURORS PRESENT AS BEFORE.
    .
    ORDERS ON MEDIA REQUEST TO PERMIT COVERAGE HAS BEEN SIGNED BY
    JUDGE KATHLEEN KENNEDY THIS DATE- ORDERS FILED
    .
    OUTSIDE THE PRESENCE OF ANY JURORS:
    THE COURT HAS READ AND CONSIDERED:
    DEFENSE BRIEF RE: GRANTING IMMUNITY TO M.A.- FILED ON 5-13-13
    PEPOLE'S OPPOSITION TO DEFENDANT'S REQUEST TO GRANT USE
    IMMUNITY TO MELISSA AYALA- FILED 5-14-13
    .
    MOTION IS ARGUED AND DENIED.
    .
    THE COURT HAS READ AND CONSIDERED: PEOPLE'S MOTION TO EXCLUDE
    RECORDING AND TRANSCRIPT OF JOHN GILMORE INTERVIEW- FILED
    5-14-13
    MOTION ARGUED AND GRANTED.
    .
    HEARING ON PEOPLE'S MOTION TO EXCLUDE ADMISSIBILITY OF THIRD
    PARTY CULPABILITY RESUMES.
    .
    THE COURT HAS READ AND CONSIDERED:
    DEFENSE SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ADMISSIBILITY OF
    JOHN GILMORE'S OTHER ACTS AND DECLARATION OF MARK M. KASSABIAN-
    EACH FILED ON 5-13-13
    PEOPLE'S OPPOSITION TO DEFENDANT'S MOTION TO INTRODUCE PRIOR BAD
    ACTS OF JOHN GILMORE TO SUPPORT THIRD PARTY CULPABILITY- FILED

CASE NO. BA361202
DEF NO.  01

PAGE NO.  33
DATE PRINTED 02/11/14

ON 5-14-13
MOTION ARGUED AND MOTION IS DENIED.
.
THE COURT HAS READ AND CONSIDERED DEFENSE MOTION TO CONTINUE-
FILED ON 5-13-13.
.
MOTION IS ARGUED AND DENIED.
.
DEFENSE MOTION FOR STAY IS ARGUED AND DENIED.
.
THE COURT HAS READ AND CONSIDERED DEFENSE BRIEF RE: ADMISSION
OF M.A.'S STATEMENT UNDER EVIDENCE CODE SECTION 1230- FILED ON
5-13-13
MOTION IS ARGUED AND DENIED.
.
THE PEOPLE ADD WITNESS TO WITNESS LIST.
.
PEOPLE'S EXHIBITS #1 THRU #91 ARE MARKED FOR IDENTIFICATION BY

STIPULATION.
.
PEOPLE'S EXHIBIT LIST IS FILED THIS DATE AND INCORPORATED
HEREIN BY REFERENCE.
.
EXHIBITS LISTED AS FOLLOWS:
1 =     (2) PHOTOS OF JULIANA REDDING
2 =     PHOTO OF  MUNIR UWAYDAH'S
3 =     EMAIL AND ATTACHED INSURANCE FORM FOR UWAYDAH'S RANGE
ROVER
4 =    PHOTO TAKEN ON 3/15/08 OF JULIANA AT TENGU RESTAURANT
5 =     PHOTO OF JULIANA, JESSICA CRISSEY, ASHLEY KALIL AND
UWAYDAH ON A PRIVATE JET GOING TO    LAS VEGAS FOR JULIANA'S
21ST BIRTHDAY
6 =     PHOTO DEPICTING A LOUIS VUITTON KEYCHAIN
7 =     SCREEN SHOT OF GOOGLE MAPS "STREET VIEW" IMAGE OF
JULIANA'S APARTMENT (1527 CENTINELA AVENUE, APT A)
8 =     SCREEN SHOT GOOGLE MAPS SATELLITE IMAGE OF JULIANA'S
APARTMENT (1527 CENTINELA AVENUE, APT A)
9 =     PHOTO DEPICTING THE OUTSIDE FRONT DOOR AND BEDROOM
WINDOW OF JULIANA'S APARTMENT (1527 CENTINELA AVENUE, APT A)

10 =     PHOTO DEPICTING THE OUTSIDE FRONT DOOR AND LIVING ROOM
WINDOWS OF JULIANA'S APARTMENT (1527 CENTINELA AVENUE, APT A)
11 =     PHOTO DEPICTING THE INSIDE REAR KITCHEN DOOR OF
JULIANA'S APARTMENT (1527 CENTINELA AVENUE, APT A)
12 =     PHOTO DEPICTING THE REAR SIDE FENCE OF JULIANA'S
APARTMENT (1527 CENTINELA AVENUE, APT A)
13 =     PHOTO DEPICTING THE KITCHEN OF JULIANA'S APARTMENT
(1527 CENTINELA AVENUE, APT A)
14 =     PHOTO DEPICTING THE LIVING ROOM OF JULIANA'S APARTMENT
(1527 CENTINELA AVENUE, APT A)
15 =     PHOTO DEPICTING THE LIVING ROOM FLOOR OF JULIANA'S
APARTMENT (1527 CENTINELA AVENUE, APT A)
16 =     PHOTO TAKEN FROM THE HALLWAY DEPICTING JULIANA ON HER
BED INSIDE OF HER BEDROOM (1527 CENTINELA AVENUE, APT A)
17 =     PHOTO DEPICTING JULIANA'S LEGS CROSSED ON HER BED

**40**

CASE NO. BA361202                              PAGE NO.   34
DEF NO.   01                                   DATE PRINTED 02/11/14

    INSIDE OF HER BEDROOM (1527 CENTINELA AVENUE, APT A)
    18 =     PHOTO DEPICTING BLOOD DROP UNDERNEATH JULIANA'S FOOT ON
    HER BEDROOM FLOOR (1527 CENTINELA AVENUE, APT A)
    19 =     PHOTO DEPICTING BROKEN COFFEE TABLE LEG INSIDE IN THE
    LIVING ROOM OF JULIANA'S APARTMENT (1527 CENTINELA AVENUE, APT
    A)
    20 =     PHOTO DEPICTING A PORTION OF JULIANA'S BROKEN NECKLACE
    INSIDE OF A COFFEE TABLE TRAY IN JULIANA'S LIVING ROOM (1527
    CENTINELA AVENUE, APT A)
    21 =     PHOTO DEPICTING THE OTHER HALF OF JULIANA'S BROKEN
    NECKLACE UNDER THE COFFEE TABLE IN HER APARTMENT (1527 CENTINELA
    AVENUE, APT A)
    22 =     PHOTO DEPICTING THE COFFEE TABLE WITH A TRAY AND LAMP
    ON IT IN JULIANA'S APARTMENT (1527 CENTINELA AVENUE, APT A)
    23 =     PHOTO DEPICTING THE UNCOVERED CUSHION ON THE COUCH IN
    JULIANA'S LIVING ROOM (1527 CENTINELA AVENUE, APT A)
    *****MINUTES CONTINUED THIS DATE AT 10:00 A.M.
    COURT ORDERS AND FINDINGS:

    -JURY IS SWORN TO TRY THE CAUSE.

    -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
    NEXT SCHEDULED EVENT:
    05/16/13   900 AM  JURY TRIAL    DIST CENTRAL DISTRICT DEPT 109

CUSTODY STATUS: BAIL TO STAND


ON 05/15/13 AT 1000 AM :

    24 =     PHOTO DEPICTING THE UNPLUGGED LAMP INSIDE JULIANA'S
    LIVING ROOM (1527 CENTINELA AVENUE, APT A)
    25 =     PHOTO DEPICTING THE SPILLED OIL AND LIT CANDLE ON THE
    COFFEE TABLE IN JULIANA'S APARTMENT (1527 CENTINELA AVENUE, APT
    A)
    26 =     PHOTO DEPICTING JULIANA DECEASED WITH HER ARMS UP ON
    HER BED INSIDE OF HER BEDROOM (1527 CENTINELA AVENUE, APT A)
    27 =     PHOTO DEPICTING JULIANA'S LEGS HANGING OFF OF HER BED
    INSIDE OF HER BEDROOM  (DECEASED) (1527 CENTINELA AVENUE, APT A)
    28 =     PHOTO DEPICTING THE INTERIOR FRONT DOOR INSIDE OF

    JULIANA'S APARTMENT (1527 CENTINELA AVENUE, APT A)
    29 =     PHOTO DEPICTING THE INTERIOR LOCKS OF THE FRONT METAL
    DOOR OF JULIANA'S APARTMENT (1527
    CENTINELA AVENUE, APT A)
    30 =     DIAGRAM OF THE INTERIOR OF JULIANA'S APARTMENT (1527
    CENTINELA AVENUE, APT A)
    31 =     DIAGRAM OF THE LIVING ROOM INSIDE JULIANA'S APARTMENT
    AND TWO LEGENDS (1527 CENTINELA AVENUE, APT A)
    32 =     DIAGRAM OF THE KITCHEN INSIDE JULIANA'S APARTMENT AND
    TWO LEGENDS (1527 CENTINELA AVENUE, APT A)
    33 =     DIAGRAM OF JULIANA'S BEDROOM AND TWO LEGENDS (1527
    CENTINELA AVENUE, APT A)
    34 =     PHOTO DEPICTING AN ARROW POINTING TO A KITCHEN SINK
    INSIDE OF JULIANA'S APARTMENT (1527 CENTINELA AVENUE, APT A)
    35 =     PHOTO DEPICTING THE LATENT PRINT CARD WITH THE

CASE NO. BA361202                           PAGE NO.  35
DEF NO.  01                                 DATE PRINTED 02/11/14

DEFENDANT'S FINGERPRINT ON IT
36 =     PHOTO DEPICTING THE SIDE OF JULIANA DECEASED ON HER BED
(1527 CENTINELA AVENUE, APT A)
37 =     PHOTO DEPICTING JULIANA'S HANDS OVER HER HEAD WHILE SHE
IS LYING ON HER BED (1527 CENTINELA AVENUE, APT A)
38 =     PHOTO DEPICTING JULIANA'S ACRYLIC NAIL ON THE FLOOR
INSIDE OF HER APARTMENT (1527 CENTINELA AVENUE, APT A)
39 =     PHOTO DEPICTING ZOOMED OUT PHOTO OF JULIANA'S ACRYLIC
NAIL BEHIND THE COUCH INSIDE OF HER APARTMENT (1527 CENTINELA
AVENUE, APT A)
40 =     PHOTO DEPICTING THE CUT ON JULIANA'S HEEL
41 =     PHOTO DEPICTING JULIANA'S CELL PHONE ON HER NIGHT STAND
INSIDE OF HER BEDROOM (1527 CENTINELA AVENUE, APT A)
42 =     PHOTO DEPICTING JULIANA'S CELL PHONE WITH EVIDENCE
19 (1527 CENTINELA AVENUE, APT A)
43 =     PHOTO OF NAIL ON FLOOR BOARD WITH EVIDENCE PLACARD 25
(1527 CENTINELA AVENUE, APT A)
44 =     PHOTO DEPICTING TV STAND WITH PLATE BEHIND IT INSIDE

JULIANA'S APARTMENT (1527 CENTINELA AVENUE, APT A)
45 =     PHOTO DEPICTING PLATE WITH EVIDENCE PLACARD 6 INSIDE
JULIANA'S APARTMENT (1527 CENTINELA AVENUE, APT A)
46 =     PHOTO DEPICTING LIT CANDLE ON JULIANA'S COFFEE TABLE
(1527 CENTINELA AVENUE, APT A)
47 =     PHOTO DEPICTING JULIANA'S UNPLUGGED COMPUTER SITTING ON
THE COUCH (1527 CENTINELA AVENUE, APT A)
48 =     PHOTO DEPICTING THE FRONT STOVE KNOB ON THE STOVE IN
JULIANA'S KITCHEN (1527 CENTINELA AVENUE, APT A)
49 =     ENVELOPE CONTAINING DNA SWABS FROM RIGHT FRONT STOVE
KNOB
50 =     PACKAGE CONTAINING JULIANA'S CELL PHONE
51 =     PACKAGE CONTAINING DNA SWAB FOR JULIANA'S CELL PHONE
52 =     PACKAGE CONTAINING DNA SWAB FROM INTERIOR DOOR HANDLE
53 =     PACKAGE CONTAINING JULIANA'S TANK TOP
54 =     PHOTOGRAPH OF FINGERPRINT CARD
55 =     DEFENDANT'S 10-PRINT CARD
56 =     FINGERPRINT COMPARISON CHART
57 =     PACKAGE CONTAINING DRY NECK SWABS
58 =     PHOTOGRAPH OF GREEN CANDLE
59 =     PHOTOGRAPH OF DEFENDANT WALKING TO HER CAR AT THE

ANIMAL SHELTER
60 =     PHOTOGRAPH OF DEFENDANT TALKING WITH DETECTIVE BAMBRICK
61 =     PHOTOGRAPH OF DEFENDANT BEING ARRESTED
62 =     CD OF AUDIO RECORDING OF DETECTIVE BAMBRICK'S CONTACT
WITH THE DEFENDANT AT THE ANIMAL     SHELTER
63 =     TRANSCRIPT OF THE AUDIO RECORDING OF DETECTIVE
BAMBRICK'S CONTACT WITH THE DEFENDANT AT THE ANIMAL SHELTER
64 =     DEFENDANT'S BOOKING SHEET FROM 6/17/10
65 =     BACKSIDE OF DEFENDANT'S FINGERPRINT CARD
66 =     PACKAGE CONTAINING DEFENDANT'S DNA REFERENCE SAMPLE
67 =     12 PAGE DOCUMENT FROM JULIANA'S CELL PHONE
68 =     JULIANA'S CELL PHONE RECORDS
69 =     DEFENDANT'S CELL PHONE RECORDS
70 =     CORONER'S DIAGRAM #22
71 =     CORONER'S PHOTO OF THE RIGHT SIDE OF JULIANA'S FACE

CASE NO. BA361202                                    PAGE NO.  36
DEF NO.  01                                          DATE PRINTED 02/11/14

72 =       CORONER'S PHOTO OF THE FRONT OF JULIANA'S FACE
73 =       CORONER'S PHOTO OF JULIANA'S RIGHT EYE
74 =        CORONER'S PHOTO OF JULIANA'S LEFT EYE
75 =     CORONER'S DIAGRAM #20G
76 =       CORONER'S PHOTO OF JULIANA'S NECK
77 =       CORONER'S DIAGRAM #24
78 =       CORONER'S DIAGRAM # 34
79 =       CORONER'S PHOTO OF JULIANA'S SCALP PULLED BACK
80 =       CORONER'S PHOTO OF THE RIGHT SIDE OF JULIANA'S SCALP
PULLED BACK
81 =       CORONER'S DIAGRAM #20
82 =       CORONER'S DIAGRAM # 21
83 =       CORONER'S PHOTO OF JULIANA'S BACK
84 =       CORONER'S PHOTO OF JULIANA'S LOWER BACK
85 =       CORONER'S PHOTO OF JULIANA'S RIGHT HIP
86 =        CORONER'S PHOTO OF JULIANA'S LEGS
87 =       CORONER'S PHOTO OF JULIANA'S KNEES
88 =        CORONER'S DIAGRAM #23

89 =       CORONER'S PHOTO OF JULIANA'S LEFT HAND
90 =       CORONER'S PHOTO OF JULIANA'S RIGHT THUMB
*****MINUTES CONTINUED THIS DATE AT 10:30 A.M.


ON 05/15/13 AT 1030 AM :

    ***MINUTES CONTINUED FROM THIS DATE AT 10:00 A.M.
    91 =      11 PAGE PRINTOUT FROM JULIANA'S CELL PHONE (LABELED
    BACK-UP)
    .
    INVESTIGATING OFFICER, LYNDA LARSEN REMAINS AT COUNSEL
    TABLE TO ASSIST THE PEOPLE.
    .
    ON DEFENSE MOTION WITNESSES ARE EXCLUDED.
    .
    THE MEDIA IS ADMONISHED.
    .
    BY ORDER OF THE COURT, A PANEL OF 12 JURORS AND 2 ALTERNATE

    JURORS ARE IMPANELED AND AGREE TO TRY THE CAUSE AS
    REFLECTED ON THE CASE INFORMATION SHEET FILED THIS DATE WITHIN
    THE JURY CONFIDENTIAL ENVELOPE AND INCORPORATED HEREIN BY
    REFERENCE.
    .
    THE JURY IS PRE-INSTRUCTED BY THE COURT.
    .
    PEOPLE'S WITNESS CALLED SWORN AND EXAMINED: GREG REDDING
    .
    THE COURT AND COUNSEL CONFER AT SIDEBAR, AS MORE FULLY REFLECTED
    IN THE NOTES OF THE COURT REPORTER.
    .
    PEOPLE'S WITNESS, REMAINS SWORN AND RESUMES TESTIMONY
    .
    PEOPLE'S EXHIBITS MARKED FOR IDENTIFICATION: #92- COPY OF LETTER

CASE NO. BA361202                              PAGE NO.  37
DEF NO.  01                                    DATE PRINTED 02/11/14

  #93- COPY OF LETTER
  .
  PEOPLE'S WITNESS CALLED SWORN AND EXAMINED: KELLY DUNCAN
  .
  WITNESS IS EXCUSED, BUT REMAINS ON CALL ON DEFENSE MOTION.
  .
  PEOPLE'S WITNESS CALLED SWORN AND EXAMINED: BRIAN VAN HOLT,
  JESSICA CRISSEY, NATASHA HOVEY, ROBERT HERNANDEZ, RICHARD LEVIS,
  .
  THE COURT AND COUNSEL CONFER AT SIDEBAR, AS MORE FULLY REFLECTED
  IN THE NOTES OF THE COURT REPORTER.
  .
  THE JURY AND THE ALTERNATE JURORS ARE ADMONISHED AND EXCUSED
  UNTIL THE DATE AND TIME INDICATED BELOW.
  .
  THE PARTIES AND THE DEFENDANT ARE ORDERED TO RETURN ON THE DATE
  AND TIME INDICATED BELOW.
  .

  .
  .
  LATER AND OFF THE RECORD: PEOPLE'S POWER POINT PRESENTATION
  PRESENTED TO THE JURY DURING PEOPLE'S OPENING STATEMENTS IS
  FILED THIS DATE.


ON 05/16/13 AT  900 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR JURY TRIAL
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                  LAURIE SMALL       (REP)  STACY L. WIESE  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
   COUNSEL
   JURY TRIAL RESUMES FROM 05-15-13 WITH ALL PARTIES, THE DEFENDANT
   THE JURY AND THE ALTERNATE JURORS PRESENT AS BEFORE.
   .
   PEOPLE'S WITNESSES CALLED SWORN AND EXAMINED:
   LYNN MITCHELL- PARISH, GARY MARSHALL, LESLIE FUNO,
   JENNIFER ZYCHOWSKI

   .
   OUTSIDE THE PRESENCE OF ANY JURORS:
   THE COURT INFORMS THE PARTIES THAT JUROR #6 HAS A DOCTORS
   APPOINTMENT ON THE 21ST, AND THE COURT WILL CONFER WITH JUROR AT
   A LATER TIME.
   .
   IN THE PRESENCE OF THE JURY AND THE ALTERNATE JURORS:
   .
   PEOPLE'S WITNESS REMAINS SWORN AND RESUMES TESTIMONY.
   .
   PEOPLE'S EXHIBITS MARKED FOR IDENTIFICATION: #94- COPY OF 2
   PHOTOGRAPHS ON A SINGLE SHEET OF PAPER
   .
   PEOPLE'S WITNESS CALLED SWORN AND EXAMINED: CATHY KYWAHARA,
   MICHELLE DIMAS

**44**

CASE NO. BA361202                                   PAGE NO.  38
DEF NO.  01                                         DATE PRINTED 02/11/14

.
PEOPLE'S EXHIBITS MARKED FOR IDENTIFICATION: #95- COPY OF
PHOTOGRAPH
.
PEOPLE'S WITNESSES CALLED SWORN AND EXAMINED: STEPHEN BEVAN,
MARGARET KALEVATI
.
THE COURT AND COUNSEL CONFER AT SIDEBAR WITH JUROR #6, AS MORE
FULLY REFLECTED IN THE NOTES OF THE COURT REPORTER.
.
.
PEOPLE'S WITNESS REMAINS SWORN AND RESUMES TESTIMONY.
.
PEOPLE'S WITNESS CALLED SWORN AND EXAMINED: HEE SEOK AHN,
MICHAEL BAMBRICK
.
TAPE MARKED AS PEOPLE'S EXHIBIT #62 PLAYED IN OPEN COURT.
.

THE COURT AND COUNSEL CONFER AT SIDEBAR, AS MORE FULLY REFLECTED
IN THE NOTES OF THE COURT REPORTER.
.
THE JURY AND THE ALTERNATE JURORS ARE ADMONISHED AND EXCUSED
UNTIL THE DATE INDICATED BELOW AT 10:45 A.M.
.
BY STIPULATION
SUBPOENAED RECORDS ARE REMOVED BY THE PEOPLE FOR THE PURPOSE OF
MAKING COPIES.
COURT ORDERS AND FINDINGS:
-THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
  05/17/13  1030 AM  JURY TRIAL    DIST CENTRAL DISTRICT DEPT 109

CUSTODY STATUS: BAIL TO STAND


ON 05/17/13 AT 1030 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR JURY TRIAL
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)

                LAURIE SMALL      (REP)  STACY L. WIESE  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
  COUNSEL
  JURY TRIAL RESUMES FROM 05-16-13 WITH ALL PARTIES, THE DEFENDANT
  THE JURY AND THE ALTERNATE JURORS PRESENT AS BEFORE.
.
PEOPLE'S WITNESS, MICHAEL BAMBRICK, REMAINS SWORN AND RESUMES
TESTIMONY.
.
PEOPLE'S EXHIBITS MARKED FOR IDENTIFICATION: #96- COPY OF CARD
.
PEOPLE'S WITNESS CALLED SWORN AND EXAMINED: DAVID ENRIQUEZ
.
PEOPLE'S EXHIBITS MARKED FOR IDENTIFICATION: #97- COPY OF FRONT
AND BACK OF DRIVERS LICENSE AND IDENTIFICATION CARDS

**45**

CASE NO. BA361202                              PAGE NO.  39
DEF NO.  01                                   DATE PRINTED 02/11/14

.
PEOPLE'S WITNESS CALLED SWORN AND EXAMINED: FELICIA BRURKE,
.
EXAMINATION INTERRUPTED TO CALL LOUIS PENA OUT OF ORDER BY
STIPULATION.
.
PEOPLE'S WITNESS CALLED SWORN AND EXAMINED: LOUIS PENA
.
PEOPLE'S EXHIBITS MARKED FOR IDENTIFICATION: #98- COPY OF A
PHOTOGRAPH, #99- COPY OF A PHOTOGRAPH, #100- COPY OF A
PHOTOGRAPH
.
PEOPLE'S WITNESS, FELICIA BRURKE, REMAINS SWORN AND RESUMES
TESTIMONY.
.
OUTSIDE THE PRESENCE OF ANY JURORS:
THE COURT AND COUNSEL CONFER REGARDING JUROR #6 WHO HAS
SUBMITTED A NOTE TO THE COURT REQUESTING TIME OFF ON 6-21-13.

.
THE PEOPLE STIPULATE TO EXCUSING JUROR #6, THE DEFENSE WISHES TO
KEEP HER.
.
WITH THE JURY AND THE ALTERNATE JURORS NOW PRESENT:
.
PEOPLE'S WITNESS, FELICIA BRURKE, REMAINS SWORN AND RESUMES
TESTIMONY.
.
PEOPLE'S WITNESS CALLED SWORN AND EXAMINED: ANNETTE MCALL
.
TO ACCOMMODATE JUROR #6 THE JURY AND THE ALTERNATE JURORS ARE
EXCUSED ON 5-21-13 ONLY.
.
THE JURY AND THE ALTERNATE JURORS ARE ADMONISHED AND EXCUSED
UNTIL THE DATE AND TIME INDICATED BELOW.
.
THE PARTIES AND THE DEFENDANT ARE ORDERED TO RETURN ON THE DATE
AND TIME INDICATED BELOW.
COURT ORDERS AND FINDINGS:
-THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.

NEXT SCHEDULED EVENT:
  05/20/13   930 AM  JURY TRIAL    DIST CENTRAL DISTRICT DEPT 109

CUSTODY STATUS: BAIL TO STAND


ON 05/20/13 AT  930 AM  IN CENTRAL DISTRICT DEPT 109

  NUNC PRO TUNC ORDER PREPARED. IT APPEARING TO THE COURT THAT THE MINUTE ORDER
 IN THE ABOVE ENTITLED ACTION DOES NOT PROPERLY REFLECT THE COURT'S ORDER. SAID
 MINUTE ORDER IS AMENDED NUNC PRO TUNC AS OF THAT DATE.  ALL OTHER ORDERS ARE
TO REMAIN IN FULL FORCE AND EFFECT. DETAILS LISTED AT END OF THIS MINUTE ORDER.
CASE CALLED FOR JURY TRIAL
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                  LAURIE SMALL       (REP)  STACY L. WIESE  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
  COUNSEL
  JURY TRIAL RESUMES FROM 05-17-13 WITH ALL PARTIES, THE DEFENDANT
  THE JURY AND THE ALTERNATE JURORS PRESENT AS BEFORE.

**46**

CASE NO. BA361202                                    PAGE NO.  40
DEF NO.  01                                          DATE PRINTED 02/11/14

.
PEOPLE'S WITNESS, ANNETTE MCALL, REMAINS SWORN AND RESUMES
TESTIMONY.

.
PEOPLE'S EXHIBITS MARKED FOR IDENTIFICATION:101EVIDENCE ENVELOPE
CONTAINING A SMALLER ENVELOPE CONTAINING A LATENT PRINT CARD,
#102- COPY OF CRIME LAB REPORT, #103- COPY OF A DIAGRAM,
#104- COPY OF TYPING RESULTS AND INTERRETATION

.
PEOPLE'S WITNESS CALLED SWORN AND EXAMINED: ERIN KELLY,
GERALD LUKIEWSKI

.
PEOPLE'S WITNESS, JENNIFER ZYCHOWSKI, REMAINS SWORN AND IS
RECALLED BY THE STATE.

.
PEOPLE'S EXHIBITS MARKED FOR IDENTIFICATION: #105- PRINT CARD
#106- PRINT CARD, DEPARTMENT OF MOTOR VEHICLES DOCUMENT, #108-
COPY OF PHOTOGRAPH

.
PEOPLE'S WITNESS CALLED SWORN AND EXAMINED: MARK WINER

.
THE COURT AND COUNSEL CONFER AT SIDEBAR, AS MORE FULLY REFLECTED
IN THE NOTES OF THE COURT REPORTER.

.
THE PEOPLE REMOVE A DOCUMENT FROM SUBPOENAED RECORDS, FOR THE
PURPOSE OF MARKING AS AN EXHIBIT.

.
PEOPLE'S WITNESS CALLED SWORN AND EXAMINED: KAREN THOMPSON

.
PEOPLE'S EXHIBITS MARKED FOR IDENTIFICATION: #109- CERTIFIED COP
COPY OF STATEMENT OF INFORMATION FORM, #110- COPY OF BUYER
REGISTRATION, #111- BANK OF AMERICA CHECKING ACCOUNT STATEMENT,
#112- BANK OF AMERICA CHECKING ACCOUNT STATEMENT, #113- BANK
OF AMERICA PRIMA ACCOUNT STATEMENT, #114- BOOKING SHEET AND
PHOTOGRAPH, #115- COPY OF CHECK

.
THE PEOPLE REST
OUTSIDE THE PRESENCE OF ANY JURORS: WITH THE EXCEPTION OF
PEOPLE'S EXHIBITS #58, 68, AND 69, THE PEOPLE MOVE TO RECEIVE

PEOPLE'S EXHIBITS #1 THRU #115, MOTION TO BE HEARD AT A LATER
TIME.

.
THE COURT HEARS AND RULES ON MOTIONS TO LIMIT / EXCLUDE EVIDENCE
PURSUANT TO EVIDENCE CODE SECTION 402.

.
THE COURT AND COUNSEL CONFER REGARDING POSSIBLE STIPULATION.

.
IN THE PRESENCE OF THE JURY AND THE ALTERNATE JURORS:
DEFENSE WITNESS CALLED SWORN AND EXAMINED: WENDY TALAVERA,
CHER BROOKS, SARAH MURPHY

.
THE COURT AND COUNSEL CONFER AT SIDEBAR, AS MORE FULLY REFLECTED
IN THE NOTES OF THE COURT REPORTER.
.

**47**

CASE NO. BA361202
DEF NO.  01

PAGE NO.  41
DATE PRINTED 02/11/14

THE JURY AND THE ALTERNATE JURORS ARE ADMONISHED AND EXCUSED
UNTIL THE DATE INDICATED BELOW AT 10:30 A.M.
.
THE PARTIES AND THE DEFENDANT ARE ORDERED TO RETURN ON THE DATE
AND TIME INDICATED BELOW.
.
****ON 5-20-13 NUNC PRO TUNC VERBIAGE APPEARS IN ERROR.
COURT ORDERS AND FINDINGS:
-THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
  05/22/13   900 AM  JURY TRIAL    DIST CENTRAL DISTRICT DEPT 109

CUSTODY STATUS: BAIL TO STAND


ON 05/22/13 AT  900 AM  IN CENTRAL DISTRICT DEPT 109


CASE CALLED FOR JURY TRIAL
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                LAURIE SMALL        (REP)  STACY L. WIESE  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
  COUNSEL
  JURY TRIAL RESUMES FROM 05-20-13 WITH ALL PARTIES, THE DEFENDANT
  THE JURY AND THE ALTERNATE JURORS PRESENT AS BEFORE.
.
OUTSIDE THE PRESENCE OF ANY JURORS: THE COURT AND COUNSEL CONFER
REGARDING JURY INSTRUCTIONS.
.
THE DEFENDANT PERSONALLY WAIVES HER RIGHT TO TESTIFY, COUNSEL
JOINS.
.
DEFENSE MOTION FOR ACQUITTAL IS DENIED.
.
WITH THE EXCEPTION OF OF EXHIBITS #58, 68, 69, AND 56 PEOPLE'S
EXHIBIT'S #1 TRU #115 ARE RECEIVED INTO EVIDENCE.
.
THE COURT AND COUNSEL CONFER AT SIDEBAR, AS MORE FULLY REFLECTED
IN THE NOTES OF THE COURT REPORTER.
.
THE COURT AND COUNSEL CONFER REGARDING JUROR #12 WHO IS IN THE
HOSPITAL AND THE PARTIES STIPULATE TO EXCUSE JUROR #12.
.
THE DEFENSE MAKES AN OFFER OF PROOF REGARDING WITNESS.
.
IN THE PRESENCE OF THE JURY AND THE ALTERNATE JURORS:
BY RANDOM DRAWING, THE COURT SELECTS ALTERNATE JUROR #3 TO TAKE
SEAT #12, AND NEW JUROR IS DULY SWORN TO TRY THE CAUSE.
.
PEOPLE'S WITNESS CALLED SWORN AND EXAMINED: JEFF FICHBACH,
MARY OGRADY
.
THE DEFENSE REST.
.

CASE NO. BA361202                              PAGE NO.  42
DEF NO.  01                                   DATE PRINTED 02/11/14

THE JURY AND THE ALTERNATE JURORS ARE INSTRUCTED BY THE COURT.
.
THE PEOPLE AND THE DEFENSE PRESENT CLOSING ARGUMENTS.
.
THE PEOPLE ARGUE IN REBUTTAL.
.
THE JURY IS GIVEN FINAL INSTRUCTIONS BY THE COURT.
.
THE JURY AND THE ALTERNATE JURORS ARE ADMONISHED.
.
AT 3:44 P.M.,  THE JURY RETIRES TO DELIBERATE, UNDER THE
CHARGE OF BAILIFF SEAN PHANEUF WHO IS DULY SWORN.
.
JURY DELIBERATION COMMENCES.
.
OUTSIDE THE PRESENCE OF ANY JURORS:
THE VERDICTS ARE REVIEWED AND APPROVED BY ALL COUNSEL.
.

ALL COUNSEL ARE PLACED ON CALL TO THE COURT.
.
PEOPLE'S MOTION TO REMAND DEFENDANT PURSUANT TO PENAL CODE
SECTION 1129 IS ARGUED AND DENIED.
.
AT 4:10 P.M. THE JURY REMAINS ADMONISHED AND BREAK FOR THE
EVENING, TO RESUME DELIBERATIONS ON THE DATE AND TIME INDICATED
BELOW.
COURT ORDERS AND FINDINGS:
-THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
   05/23/13    900 AM  JURY DELIBERATIONS    DIST CENTRAL DISTRICT DEPT 109

CUSTODY STATUS: BAIL TO STAND


ON 05/23/13 AT  900 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR JURY DELIBERATIONS
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                   LAURIE SMALL       (REP)  STACY L. WIESE  (DA)

DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
   COUNSEL
   AT 9:05 A.M. JURY DELIBERATIONS RESUME, WITH ALL JURORS PRESENT
AS BEFORE.
.
AT 8:45 A.M. THE JURY SUBMITS A QUESTION, ALL PARTIES ARE
NOTIFIED TO APPEAR.
.
WITH ALL PARTIES AND THE DEFENDANT PRESENT: THE COURT AND
COUNSEL CONFER REGARDING SUBMITTED QUESTION AND STIPULATE TO
REPLY.
AT 10:34 A.M.
THE COURT'S REPLY IS WRITTED ON THE SAME QUESTIONNAIRE
SUBMITTED BY THE JURY AND RETURNED TO THE DELIBERATING JURORS.
.

CASE NO. BA361202                          PAGE NO.   43
DEF NO.  01                                DATE PRINTED 02/11/14

  AT 10:46 A.M. THE JURY TAKES A BREAK AND RESUME DELIBERATIONS AT
  11:00 A.M
  AT 12:00 P.M. DEFENDANT KELLY SOO PARK IS ORDERED TO RETURN THIS
  DATE AT 1:30 P.M.
  AT 12:00 P.M. THE JURY REMAINS ADMONISHED AND BREAK FOR LUNCH,
  AT 1:32 P.M. JURY DELIBERATIONS RESUME.
  AT 2:48 P.M. THE JURY SUBMITS REQUEST FOR READ-BACK.
  .
  THE PARTIES CONFER OFF THE RECORD REGARDING STIPULATION TO
  READ-BACK.
  AT 4:05 P.M. THE JURY REMAINS ADMONISHED AND BREAK FOR THE
  EVENING, TO RESUME DELIBERATIONS ON THE DATE AND TIME INDICATED
  BELOW.
  .
  THE DEFENDANT IS ORDERED TO RETURN.
  COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:

  05/24/13   900 AM  JURY DELIBERATIONS   DIST CENTRAL DISTRICT DEPT 109

CUSTODY STATUS: BAIL TO STAND


ON 05/24/13 AT  900 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR JURY DELIBERATIONS
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                LAURIE SMALL       (REP)  STACY L. WIESE  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
  COUNSEL
  AT 9:06 A.M. JURY DELIBERATIONS RESUME, WITH ALL JURORS
  PRESENT.
  .
  OUTSIDE THE PRESENCE OF ANY JURORS: THE COURT AND COUNSEL CONFER
  REGARDING READBACK AND THE PARTIES REACH A STIPULATION.
  .
  AT 9:12 A.M. WITH THE JURY AND THE ALTERNATE JURORS NOW
  PRESENT: READ-BACK COMMENCES.
  READ-BACK CONCLUDES AT 9:38 A.M.

  .
  THE COURT AND COUNSEL CONFER AT SIDEBAR, AS MORE FULLY REFLECTED
  IN THE NOTES OF THE COURT REPORTER.
  .
  JURY DELIBERATIONS RESUME AT 9:40 A.M.
  AT 10:40 A.M. THE JURY TAKES A BREAK AND RESUME DELIBERATIONS AT
  10:58 A.M
  AT 12:00 P.M. THE JURY REMAINS ADMONISHED AND BREAK FOR LUNCH,
  AT 1:34 P.M. JURY DELIBERATIONS RESUME.
  AT 3:15 P.M. THE JURY REQUESTS READ-BACK
  OUTSIDE THE PRESENCE OF ANY JURORS: THE COURT AND COUNSEL CONFER
  REGARDING REQUESTED READ-BACK.
  .
  WITH THE JURY AND THE ALTERNATE JURORS NOW PRESENT: THE JURY AND
  THE ALTERNATE JURORS ARE ADMONISHED AND EXCUSED UNTIL THE DATE

CASE NO. BA361202                          PAGE NO.  44
DEF NO.  01                                DATE PRINTED 02/11/14

  INDICATED BELOW AT 1:30 P.M.
.
  THE PARTIES AND THE DEFENDANT ARE ORDERED TO RETURN ON THE DATE
  AND TIME INDICATED BELOW.
  COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
  05/28/13  1100 AM  JURY DELIBERATIONS   DIST CENTRAL DISTRICT DEPT 109

CUSTODY STATUS: BAIL TO STAND


ON 05/28/13 AT 1100 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR JURY DELIBERATIONS
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
               LAURIE SMALL       (REP)  STACY L. WIESE  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE

  COUNSEL
  OFF THE RECORD AND
  OUTSIDE THE PRESENCE OF ANY JURORS: THE COURT AND COUNSEL CONFER
  REGARDING READBACK AND THE PARTIES REACH A STIPULATION.
.
  AT 1:41 P.M. WITH THE JURY AND THE ALTERNATE JURORS NOW
  PRESENT: READ-BACK COMMENCES.
  READ-BACK CONCLUDES AT 3:15 P.M.
.
  AT 3:20 P.M. JURY DELIBERATIONS RESUME, WITH ALL JURORS
  PRESENT.
  AT 4:00 P.M. THE JURY REMAINS ADMONISHED AND BREAK FOR THE
  EVENING, TO RESUME DELIBERATIONS ON THE DATE AND TIME INDICATED
  BELOW.
.
  THE JURORS SUBMIT A REQUEST FOR FINGERPRINT CARD.
.
  THE DEFENDANT IS ORDERED TO RETURN ON THE DATE AND TIME
  INDICATED BELOW.
  COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.

NEXT SCHEDULED EVENT:
  05/29/13   900 AM  JURY DELIBERATIONS   DIST CENTRAL DISTRICT DEPT 109

CUSTODY STATUS: BAIL TO STAND


ON 05/29/13 AT  900 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR JURY DELIBERATIONS
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
               LAURIE SMALL       (REP)  STACY L. WIESE  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
  COUNSEL APPEARING BY ON CALL
  AT 9:05 A.M. JURY DELIBERATIONS RESUME, WITH ALL JURORS
  PRESENT.
  AT 10:16 A.M. THE JURY TAKES A BREAK AND RESUME DELIBERATIONS AT
  10:38 A.M
  AT 11:58 P.M. THE JURY REMAINS ADMONISHED AND BREAK FOR LUNCH,
  DEFENDANT IS ORDERED TO RETURN AT 1:30 P.M.

CASE NO. BA361202                          PAGE NO.  45
DEF NO.  01                                DATE PRINTED 02/11/14

  AT 1:30 P.M. JURY DELIBERATIONS RESUME.
  AT 4:00 P.M. THE JURY REMAINS ADMONISHED AND BREAK FOR THE
  EVENING, TO RESUME DELIBERATIONS ON THE DATE AND TIME INDICATED
  BELOW.
  COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
  05/30/13   900 AM  JURY DELIBERATIONS   DIST CENTRAL DISTRICT DEPT 109

CUSTODY STATUS: BAIL TO STAND


ON 05/30/13 AT  900 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR JURY DELIBERATIONS
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                 LAURIE SMALL        (REP)  STACY L. WIESE  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE

  COUNSEL APPEARING BY ON CALL
  AT 9:00 A.M. JURY DELIBERATIONS RESUME, WITH ALL JURORS
  PRESENT.
  AT 10:45 A.M. THE JURY TAKES A BREAK AND RESUME DELIBERATIONS AT
  11:08 A.M
  AT 12:00 P.M. THE JURY REMAINS ADMONISHED AND BREAK FOR LUNCH,
  DEFENDANT IS ORDERED TO RETURN AT 1:30 P.M.
  AT 1:33 P.M. JURY DELIBERATIONS RESUME.
  AT 3:47 P.M. THE JURY REMAINS ADMONISHED AND BREAK FOR THE
  EVENING, TO RESUME DELIBERATIONS ON THE DATE AND TIME INDICATED
  BELOW.
  COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
  05/31/13   900 AM  JURY DELIBERATIONS   DIST CENTRAL DISTRICT DEPT 109

CUSTODY STATUS: BAIL TO STAND


ON 05/31/13 AT  900 AM  IN CENTRAL DISTRICT DEPT 109


CASE CALLED FOR JURY DELIBERATIONS
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                 LAURIE SMALL        (REP)  STACY L. WIESE  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
  COUNSEL
  AT 8:58 A.M. JURY DELIBERATIONS RESUME WITH ALL JURORS PRESENT.
  .
  AT 10:09 A.M., THE JURY SUBMITS A REQUEST FOR READ-BACK OF JURY
  INSTRUCTION, ALL PARTIES ARE NOTIFIED TO APPEAR.
  .
  WITH ALL PARTIES, THE DEFENDANT, THE JURY, AND THE ALTERNATE
  JURORS PRESENT: THE COURT READS JURY INSTRUCTION #521.
  .
  AT 11:06 A.M. JURY DELIBERATIONS RESUME.
  .

CASE NO. BA361202                        PAGE NO.  46
DEF NO.  01                              DATE PRINTED 02/11/14

  OUTSIDE THE PRESENCE OF ANY JURORS: THE COURT AND THE DISTRICT
  ATTORNEY CONFER REGARDING POSSIBLY REMOVING FIRST DEGREE
  MURDER ALLEGATION FROM THE JURORS CONSIDERATION.
  .
  AT 12:00 P.M. THE JURY REMAINS ADMONISHED AND BREAK FOR LUNCH,
  .
  DEFENDANT IS ORDERED TO RETURN AT 1:30 P.M. THIS DATE.
  .
  AT 1:34 P.M. JURY DELIBERATIONS RESUME.
  .
  AT 3:20 P.M. NOTE FROM JUROR #3 REQUESTING TO BE EXCUSED FROM
  JURY SERVICE ON JUNE 3, FROM 9:30 A.M AND 2:00 P.M. IS RECEIVED
  BY THE COURT.
  .
  THE COURT'S BAILIFF IS DIRECTED IN TO INFORM JUROR THAT REQUEST
  IS DENIED.
  .
  AT 4:10 P.M. THE JURY REMAINS ADMONISHED AND BREAK FOR THE

  EVENING, TO RESUME DELIBERATIONS ON THE DATE AND TIME INDICATED
  BELOW.
  .
  DEFENDANT KELLY SOO PARK IS ORDERED TO RETURN ON THE DATE AND
  TIME INDICATED BELOW.
NEXT SCHEDULED EVENT:
JURY DELIBERATIONS

CUSTODY STATUS: BAIL TO STAND


ON 06/03/13 AT  900 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR JURY DELIBERATIONS
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                 LAURIE SMALL       (REP)  STACY L. WIESE  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
  COUNSEL
  AT 9:00 A.M. JURY DELIBERATIONS RESUME WITH ALL JURORS
  PRESENT.
  AT 12:00 P.M. THE JURY REMAINS ADMONISHED AND BREAK FOR LUNCH,

  AT 1:34 P.M. JURY DELIBERATIONS RESUME.
  .
  AT 3:24 P.M. THE JURY INDICATE THAT THEY HAVE REACHED A VERDICT,
  ALL PARTIES ARE ORDERED TO APPEAR.
  .
  OUTSIDE THE PRESENCE OF ANY JURORS: THE AUDIENCE IS ADMONISHED
  BY THE COURT.
  .
  WITH ALL PARTIES, THE DEFENDANT THE JURY AND THE ALTERNATE
  JURORS PRESENT:
  THE COURT FINDS THAT THE JURY HAS REACHED A VERDICT AS TO THE
  GREATER CHARGE, BUT THERE IS A QUESTION WRITTEN ON THE VERDICT,
  AND IT APPEARS THAT THEY MAY BE HUNG ON THE LESSER CHARGE.
  .
  THE COURT QUESTIONS THE JURY FOREPERSON REGARDING SUBMITTED

**53**

CASE NO. BA361202                          PAGE NO.   47
DEF NO.  01                                DATE PRINTED 02/11/14

QUESTION AND FINDS THAT THE JURY MAY BE DEADLOCKED
.
THE COURT FURTHER QUESTIONS THE JURY FOREPERSON AS TO WHETHER
THE COURT CAN FURTHER ASSIST THE JURORS IN REACHING A UNANIMOUS
DECISION.
.
THE JURORS ARE INSTRUCTED TO RETURN TO THE JURY ROOM TO DISCUSS
HOW THE COURT CAN FURTHER ASSIST THE JURORS IN REACHING
UNANIMOUS DECISION.
.
AT 4:05 A.M. THE JURY SUBMITS REPLY,
THE JURY REMAINS ADMONISHED AND BREAK FOR THE
EVENING, TO RESUME DELIBERATIONS ON THE DATE INDICATED
BELOW AT 9:00 A.M.
.
OUTSIDE THE PRESENCE OF ANY JURORS: THE COURT AND COUNSEL CONFE
REGARDING THE JUROR'S REPLY.
.

DEFENSE MOTION TO READ VERDICT IN THE IS DENIED AT THIS TIME AS
IT IS AMBIGUOUS AND THE COURT INTENDS TO ASK THE JURY FOR
CLARIFICATION.
.
MATTER IS CONTINUED TO THE DATE AND TIME INDICATED BELOW FOR
FURTHER CONSIDERATION OF RESPONSE TO JUROR'S QUESTION.
.
THE PARTIES AND THE DEFENDANT ARE ORDERED TO RETURN ON THE DATE
AND TIME INDICATED BELOW.
COURT ORDERS AND FINDINGS:
-THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
  06/04/13   830 AM  JURY DELIBERATIONS   DIST CENTRAL DISTRICT DEPT 109

CUSTODY STATUS: BAIL TO STAND


ON 06/04/13 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR JURY DELIBERATIONS
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)

                LAURIE SMALL      (REP)  STACY L. WIESE  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
  COUNSEL
  OUTSIDE THE PRESENCE OF ANY JURORS: THE COURT AND COUNSEL CONFER
  REGARDING RESPONSE TO JURORS SUBMITTED QUESTION.
.
THE COURT TO ASK FOR CLARIFICATION FROM THE JURORS REGARDING
QUESTION.
.
AT 9:00 A.M. WITH ALL JURORS NOW PRESENT:
JURORS ARE DIRECTED TO COMMUNICATE IN WRITING WEATHER OR NOT THE
VERDICT AS TO COUNT 1 IS OR IS NOT UNANIMOUS.
.
THE JURY IS INSTRUCTED BY THE COURT.
.

**54**

CASE NO. BA361202                              PAGE NO.  48
DEF NO.  01                                    DATE PRINTED 02/11/14

    AT 9:17 A.M. THE JURY RETURNS TO THE JURY ROOM.
    .
    AT 9:19 A.M. THE JURY REACH UNANIMOUS DECISION.
    .
    AT 9:40 A.M. WITH ALL PARTIES THE DEFENDANT, THE JURY AND THE
    ALTERNATE JURORS PRESENT THE FOLLOWING VERDICTS ARE READ:
        WE, THE JURY IN THE ABOVE-ENTITLED ACTION, FIND THE
    DEFENDANT, KELLY SOO PARK, NOT GUILTY OF THE CRIME OF MURDER IN
    THE FIRST DEGREE OF JULIANA REDDING, A HUMAN BEING, IN VIOLATION
    OF PENAL CODE SECTION 187(A), A FELONY, AS CHARGED IN COUNT 1 OF
    THE INFORMATION.
    DATED THIS 4 DAY OF JUNE 2013, JUROR#4, JUROR ID#121664051
    .
    THE JURY IS POLLED AND EACH ANSWER IN THE AFFIRMATIVE THAT IS
    THEIR VERDICT.
    .
    COUNSEL WAIVE RE-READING OF THE VERDICT AS RECORDED.
    .

    THE COURT ORDERS THE VERDICT RECORDED. THE VERDICTS READ PLUS
    REMAINING VERDICTS ARE FILED AND PLACED WITHIN THE COURT'S FILE
    ALONG WITH THE JURY INSTRUCTIONS GIVEN.
    .
    AT 9:46 A.M. JURY DELIBERATIONS RESUME AS TO LESSER CHARGE IN
    COUNT 1.
    .
    OUTSIDE THE PRESENCE OF ANY JURORS: DISCUSSIONS REGARDING
    RESPONSE TO JURY QUESTION SUBMITTED ON 6-3-13 CONTINUES.
    .
    THE COURT TO ALLOW LIMITED ARGUMENT RELATED TO THE ISSUES PUT
    BEFORE THE COURT IN THE JURORS QUESTION. OVER THE DEFENSE
    OBJECTION.
    .
    WITH THE JURY AND THE ALTERNATE JURORS NOW PRESENT: THE PARTIES
    EACH PRESENT LIMITED ARGUMENT.
    .
    AT 10:10 A.M. JURY DELIBERATIONS RESUME.
    .
    AT 10:38 A.M. THE JURY REACH VERDICTS, ALL PARTIES ARE NOTIFIED
    TO APPEAR.

    COURT ORDERS AND FINDINGS:
    -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
    06/04/13  1100 AM  VERDICT   DIST CENTRAL DISTRICT DEPT 109

CUSTODY STATUS: BAIL TO STAND


ON 06/04/13 AT 1100 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR VERDICT
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                 LAURIE SMALL  (REP)      STACY L. WIESE  (DA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY GEORGE W. BUEHLER PRIVATE
 COUNSEL
COUNT (01) : DISPOSITION: ACQUITTED BY JURY
    AT 9:40 A.M. WITH ALL PARTIES THE DEFENDANT, THE JURY AND THE
    ALTERNATE JURORS PRESENT THE FOLLOWING VERDICTS ARE READ:
        WE, THE JURY IN THE ABOVE-ENTITLED ACTION, FIND THE

**55**

CASE NO. BA361202                              PAGE NO.  49
DEF NO.  01                                    DATE PRINTED 02/11/14

   DEFENDANT, KELLY SOO PARK, NOT GUILTY OF THE CRIME OF SECOND
   DEGREE MURDER OF JULIANA REDDING, A HUMAN BEING, IN VIOLATION
   OF PENAL CODE SECTION 187(A), A LESSER INCLUDED OFFENSE TO THAT
   CHARGED IN COUNT 1 OF THE INFORMATION.
   DATED THIS 4 DAY OF JUNE 2013, JUROR#4, JUROR ID#121664051
   .
   THE JURY IS POLLED AND EACH ANSWER IN THE AFFIRMATIVE THAT IS
   THEIR VERDICT.
   .
   COUNSEL WAIVE RE-READING OF THE VERDICT AS RECORDED.
   .
   THE COURT ORDERS THE VERDICT RECORDED. THE VERDICTS READ PLUS
   REMAINING VERDICTS ARE FILED AND PLACED WITHIN THE COURT'S FILE
   ALONG WITH THE JURY INSTRUCTIONS GIVEN.
   .
   THE JURY IS GIVEN IT'S FINAL INSTRUCTIONS BY THE COURT AND
   EXCUSED.
   .

   THE COURT ORDERS BAIL EXONERATED AND ELECTRONIC MONITORING
   DEVICE REMOVED.
   .
   A COPY OF THIS MINUTE ORDERS IS FAXED TO "PAULA," AT THE
   SENTINEL OFFICE @213 613-1740 FOR THE REMOVAL OF ELECTRONIC
   MONITORING DEVICE.
NEXT SCHEDULED EVENT:
   PROCEEDINGS TERMINATED

CUSTODY STATUS: BAIL EXONERATED


ON 06/05/13 AT 1000 AM :

   ORDER TO VIEW, COPY, SCAN, PHOTOGRAPH OR VIDEOTAPE EXHIBITS HAS
   BEEN SIGNED BY JUDGE KATHLEEN KENNEDY THIS DATE- ORDER FILED


ON 06/10/13 AT  900 AM :

   ORDER FOR SURRENDER OF PASSPORT IS LIFTED, AND PASSPORT IS TO BE
   RETURNED TO KELLY SOO PARK FORTHWITH BY ORDER OF THE COURT.
   .
   THE DEFENDANT DIRECTED TO MAIL A CERTIFIED COPY OF THIS MINUTE
   ORDER TO THE U.S. PASSPORT OFFICE LOCATED AT:
   OFFICE OF LEGAL AFFAIRS - PASSPORT OFFICE
   ATTENTION:  HEAD OF LEGAL AFFAIRS
   2100 PENNSYLVANIA AVENUE NW, 3RD FLOOR
   WASHINGTON, D.C.  20037


ON 06/11/13 AT  300 PM  IN CENTRAL DISTRICT DEPT CLK

CASE CALLED FOR MANUAL ADR SUBMITTED
PARTIES: NONE (JUDGE)  NONE  (CLERK)
                NONE       (REP)  NONE  (DDA)
DEFENDANT IS  NOT PRESENT IN COURT, AND NOT REPRESENTED BY COUNSEL
   ORIGINAL ARREST DISPOSITION REPORT PREPARED AND FORWARDED TO

```
CASE NO. BA361202                        PAGE NO.  50
DEF NO.  01                              DATE PRINTED 02/11/14

  THE DEPARTMENT OF JUSTICE.
NEXT SCHEDULED EVENT:
PROCEEDINGS TERMINATED


ON 06/14/13 AT 1000 AM :

  ORDER TO VIEW, COPY, SCAN, PHOTOGRAPH OR VIDEOTAPE EXHIBITS HAS
  BEEN SIGNED BY JUDGE KATHLEEN KENNEDY THIS DATE- ORDER FILED


ON 08/23/13 AT 1000 AM :

  - MOTION FOR RETURN OF PROPERTY
  ***NO LEGAL FILE
  .

  NOTICE OF MOTION AND MOTION FOR RETURN OF PROPERTY- FILED THIS
  DATE.
  HEARING SET ON THE DATE AND TIME INDICATED BELOW.
NEXT SCHEDULED EVENT:
  09/06/13   830 AM  MOTION   DIST CENTRAL DISTRICT DEPT 109


ON 09/06/13 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR MOTION
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                NONE      (REP)  NONE  (DDA)
DEFENDANT IS  NOT PRESENT IN COURT, AND NOT REPRESENTED BY COUNSEL
  -MOTION FOR RETURN OF PROPERTY
  ***NO LEGAL FILE
  MOTION FOR RETURN OF PROPERTY IS CONTINUED TO THE DATE AND
  TIME INDICATED BELOW
  PURSUANT TO E-MAIL COMMUNICATION WITH DEFENSE COUNSEL,
  MARK KASSABIAN.
  .

  THE DEFENSE TO GIVE NOTICE.
NEXT SCHEDULED EVENT:
  09/19/13   830 AM  MOTION   DIST CENTRAL DISTRICT DEPT 109


ON 09/19/13 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR MOTION
PARTIES: KATHLEEN KENNEDY (JUDGE)  MONICA LEYVA  (CLERK)
                DIANA VAN DYKE     (REP)  STACY L. WIESE  (DA)
DEFENDANT IS  NOT PRESENT IN COURT, BUT REPRESENTED BY MARK M. KASSABIAN
  PRIVATE COUNSEL
  -DA: STACY WIESE
  .
  DEBORAH BRAZIL, APPEARING FOR THE PEOPLE.
  .
  THE MATTER IS CONTINUED TO 11-04-13 IN DEPARTMENT 109.
NEXT SCHEDULED EVENT:
```

CASE NO. BA361202                          PAGE NO.   51
DEF NO.  01                                DATE PRINTED 02/11/14

MOTION

CUSTODY STATUS: RELEASED ON OWN RECOGNIZANCE


ON 11/04/13 AT  830 AM  IN CENTRAL DISTRICT DEPT 109

CASE CALLED FOR MOTION
PARTIES: KATHLEEN KENNEDY (JUDGE)  LORRAINE TOWNSEND  (CLERK)
                 LAURIE SMALL       (REP)  STACY L. WIESE  (DA)
DEFENDANT IS  NOT PRESENT IN COURT, BUT REPRESENTED BY MARK M. KASSABIAN
  PRIVATE COUNSEL
  -MOTION FOR RETURN OF PROPERTY
  .
  THE COURT CONFERS OFF THE RECORD AND IN CAMERA WITH DETECTIVE
  KAREN THOMPSON.
  .
  IN OPEN COURT: HEARING FOR RETURN OF PROPERTY IS CONTINUED TO

  THE DATE AND TIME INDICATED BELOW, PENDING DECLARATION OF
  DETECTIVE KAREN THOMPSON.
NEXT SCHEDULED EVENT:
  11/14/13   830 AM  MOTION   DIST CENTRAL DISTRICT DEPT 109


ON 11/13/13 AT 1000 AM :

  ****NO LEGAL FILE
  STIPULATION FOR ORDER FOR RETURN OF PROPERTY; PROPOSED ORDER-
  FILED THIS DATE.
  ORDER SIGNED BY JUDGE KATHLEEN KENNEDY THIS DATE.
  DATE OF 11-14-13 IS ADVANCE, VACATED, AND DELETED.



02/11/14


I HEREBY CERTIFY THIS TO BE A TRUE AND CORRECT COPY OF THE ELECTRONIC DOCKET
ON FILE IN THIS OFFICE AS OF THE ABOVE DATE.
SHERRI R. CARTER ,EXECUTIVE OFFICER/CLERK OF SUPERIOR COURT, COUNTY OF LOS
ANGELES, STATE OF CALIFORNIA
BY _____, DEPUTY

**58**

**EXHIBIT B**

1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

2           FOR THE COUNTY OF LOS ANGELES

3     DEPARTMENT NO. 109   HON. KATHLEEN KENNEDY, JUDGE

4

5   THE PEOPLE OF THE STATE OF CALIFORNIA, ) NO. BA361202-01
                                )
6                           )
7                         )
8             PLAINTIFF,      )

VS.

KELLY SOO PARK,

DEFENDANT.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MAY 9, 2013

-oOo-

APPEARANCES:

  FOR THE PEOPLE:  STACY OKUN-WIESE,
                  DEPUTY DISTRICT ATTORNEY

  FOR THE DEFENDANT:  GEORGE BUEHLER,
                  MARK M. KASSABIAN,
                  ATTORNEYS AT LAW

**COPY**         LAURIE A. SMALL
                             C.S.R. NO. 4654
                             OFFICIAL COURT REPORTER

```
 1              INDEX FOR THURSDAY, MAY 9, 2013

 2

 3

 4                  M A S T E R   I N D E X

 5

 6

 7            CHRONOLOGICAL INDEX OF WITNESSES

 8

 9   PEOPLE'S WITNESSES        DIRECT   CROSS   REDIRECT   RECROSS

10

11   LYNDA LARSEN                37      54
     (THIRD PARTY CULPABILITY
12   HEARING)

13

14

15                        E X H I B I T S

16

17                                  FOR    IN
                                  IDENT.  EVD.   WITHDRAWN
18   COURT'S

19    A     PEOPLE'S TRANSCRIPT OF       80
            GILMORE AUDIO
20
      B     DEFENSE TRANSCRIPT OF        80
21          GILMORE AUDIO

22

23

24

25

26

27

28
```

```
1    CASE NUMBER:           BA361202-01
2    CASE NAME:             PEOPLE VERSUS KELLY SOO PARK
3    LOS ANGELES, CA        THURSDAY, MAY 9, 2013
4    DEPARTMENT 109         HON. KATHLEEN KENNEDY, JUDGE
5    REPORTER:              LAURIE A. SMALL, CSR NO. 4654
6    TIME:                  8:40 A.M.
7
8    APPEARANCES:
9      DEFENDANT KELLY SOO PARK, PRESENT WITH COUNSEL,
10   GEORGE W. BUEHLER AND MARK M. KASSABIAN, ATTORNEYS AT
11   LAW;
12     STACY OKUN-WIESE, DEPUTY DISTRICT ATTORNEY,
13   REPRESENTING THE PEOPLE OF THE STATE OF CALIFORNIA.
14
15     THE COURT:  GOOD MORNING.
16     MR. BUEHLER:  GOOD MORNING, YOUR HONOR.
17     THE COURT:  ALL RIGHT.  THIS IS THE MATTER OF
18   PEOPLE VERSUS KELLY SOO PARK.
19          COUNSEL STATE YOUR APPEARANCES.
20     MR. BUEHLER:  GOOD MORNING, YOUR HONOR.
21          GEORGE BUEHLER AND MARK KASSABIAN FOR THE
22   DEFENDANT KELLY PARK.
23     MS. OKUN-WIESE:  STACY OKUN-WIESE FOR THE PEOPLE.
24     THE COURT:  ALL RIGHT.
25          THE FIRST -- WE HAVE MANY PRETRIAL MOTIONS
26   ON CALENDAR TODAY.  AND THE FIRST ONE I WANT TO
27   HANDLE IS THE MEDIA MOTION.
28          THE DEFENSE FILED A MOTION ENTITLED NOTICE
```

1    OF MOTION, AND MOTION TO BAR TELEVISING OF

2    PROCEEDINGS.  AND THE PEOPLE FILED OR MADE REFERENCE

3    TO OPPOSING THAT MOTION.  CORRECT?

4        MS. OKUN-WIESE:  YES.

5        THE COURT:  WE HAVE RECEIVED MEDIA REQUESTS FROM

6    A NUMBER OF SOURCES.  DO YOU HAVE ALL THOSE?

7        THE COURT CLERK:  YES.  I JUST WANT TO MAKE SURE

8    I HAVE THEM ALL RIGHT HERE.

9        THE COURT:  ALL RIGHT.

10           FOR THE RECORD, I HAVE RECEIVED MEDIA

11   REQUEST FROM DATELINE NBC FOR OPENING, CLOSING,

12   VERDICT AND VARIOUS WITNESSES.  THAT WAS RECEIVED --

13   WELL IT WAS IN MY FAX MACHINE THIS MORNING AND

14   APPARENTLY WAS SENT YESTERDAY AT 5:15 TO MY FAX

15   MACHINE.

16           I HAVE A REQUEST FROM KTTV FOX 11 NEWS FOR

17   THE TRIAL.  THAT WAS RECEIVED ON MAY 8TH AT 1:18.

18           I HAVE A REQUEST FROM KTTV FOX 11 NEWS.

19   ALL PRETRIAL MOTIONS.  THIS ONE DOESN'T HAVE FAX

20   INFORMATION ON IT; I AM NOT SURE WHEN I RECEIVED IT.

21   FOR TODAY, MAY 9TH.

22           I RECEIVED ANOTHER ONE FROM KTTV FOX 11

23   NEWS FOR ALL OF TRIAL STARTING MAY 13TH.

24           I RECEIVED REQUESTS FROM CBS NEWS FOR

25   OPENING ARGUMENT, CERTAIN WITNESSES, CLOSING

26   ARGUMENTS, VERDICT AND SENTENCING.

27           I RECEIVED A MEDIA REQUEST FROM KABC TV

28   CHANNEL 7 FOR OPENING STATEMENTS, TRIAL, CLOSING

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1    ARGUMENTS.  THAT WAS RECEIVED ON MAY 8TH AT 10:10.

2              I HAVE ANOTHER REQUEST FROM KABC TV CHANNEL

3    7 -- IT LOOKS LIKE MAYBE IT IS A DUPLICATE, AND

4    FROM -- ANOTHER ONE FROM KTTV FOX 11 NEWS.  TRIAL,

5    OPENING STATEMENTS, CLOSING ARGUMENTS, VERDICT, AS

6    SOON AS JURY IS IMPANELED.

7              AND ONE MORE FROM THE JUPITER ENTERTAINMENT

8    OXYGEN NETWORK FOR TELEVISING THE ENTIRE TRIAL.

9              NOW I DON'T -- IS THERE ANYBODY -- ARE

10   THERE ANY MEDIA PEOPLE HERE TODAY?  OKAY.

11             SO THERE IS -- FROM WHAT AGENCIES ARE YOU

12   FROM?

13        AUDIENCE MEMBER:  I AM FROM FOX.  FROM FOX.

14        AUDIENCE MEMBER:  ABC.

15        AUDIENCE MEMBER:  DATELINE.

16        AUDIENCE MEMBER:  CBS NEWS.

17      THE COURT:  OKAY.  AND I GUESS THESE OTHER PEOPLE

18   AREN'T HERE.

19             BUT -- SO NONE OF YOU MEDIA PEOPLE ARE

20   SENDING A LAWYER TO APPEAR TO BE HEARD WITH REGARD TO

21   THESE MOTIONS; IS THAT CORRECT?

22        AUDIENCE MEMBER:  NO, MA'AM.

23        AUDIENCE MEMBER:  THAT'S CORRECT.

24        AUDIENCE MEMBER:  NO.

25      THE COURT:  NOW BASICALLY IN YOUR MOTION YOU SAY

26   THAT YOU FEEL THAT YOUR DEFENDANT CANNOT RECEIVE A

27   FAIR TRIAL IF THERE IS ANY TELEVISION OR INTERNET

28   BROADCAST OF THESE PROCEEDINGS.  AND I GUESS I WOULD

```
 1    LIKE TO UNDERSTAND WHAT MAKES YOU SAY THAT.

 2        MR. BUEHLER:  YOUR HONOR, FIRST OF ALL JUST AS A

 3    GENERAL PROPOSITION, I THINK THAT TELEVISION CAMERAS

 4    IN A COURTROOM IS DISTRACTING TO EVERYBODY CONCERNED,

 5    INCLUDING THE JURY.

 6            MORE SPECIFICALLY, IN THIS CASE THERE HAS

 7    BEEN A LOT OF PUBLICITY ABOUT THIS CASE BACK SEVERAL

 8    YEARS AGO AND AT VARIOUS POINTS LEADING UP TO THE

 9    TRIAL.  THERE HAS BEEN A LOT OF STUFF ON THE

10    INTERNET.  AND I THINK TO HAVE TELEVISION CAMERAS IS

11    GOING TO INCREASE THE LIKELIHOOD THAT SOME JURORS ARE

12    GOING TO BE EXPOSED TO, AND ONCE THEY SEE HOW THIS IS

13    BEING TELEVISED, WILL ACTUALLY SEEK OUT SOME OF THE

14    TELEVISION COVERAGE.  JURORS SWEAR NOT TO DO THAT,

15    BUT WE KNOW THAT THEY OFTEN DON'T REALLY FOLLOW THAT.

16    AND EVEN IF THEY ARE TRYING TO FOLLOW THAT, THEY

17    STILL GET EXPOSED TO IT.

18            SO I THINK THERE IS A REAL DANGER IN A CASE

19    LIKE THIS THAT JURORS WILL BE INFECTED BY WHAT'S

20    GOING ON IN THE MEDIA.  SO I THINK TO MINIMIZE THAT

21    DANGER -- AND OF COURSE IT IS IMPORTANT FOR THE

22    DEFENDANT'S RIGHT TO A FAIR TRIAL TO HAVE A JURY

23    THAT'S NOT INFLUENCED BY OUTSIDE SOURCES --

24        THE COURT:  SO FROM YOUR POINT OF VIEW THEN,

25    THERE SHOULD NEVER BE A CAMERA ANYWHERE NEAR A

26    COURTHOUSE; IS THAT WHAT YOU ARE SAYING?

27        MR. BUEHLER:  I WON'T DENY -- NO.  THEY CAN BE

28    OUTSIDE.
```

1       I DON'T DENY THAT THAT WOULD BE MY GENERAL

2  APPROACH, YES.  IN THIS TYPE OF CASE -- NOT EVERY

3  CASE ATTRACTS THIS KIND OF ATTENTION.  NOT EVERY CASE

4  HAS THE TYPE OF SPECULATION AND STORIES ABOUT

5  PEOPLE -- ABOUT EVIDENCE THAT'S NOT GOING TO BE

6  INTRODUCED INTO THIS COURTROOM GOING ON IN THE MEDIA.

7       SO I THINK THERE IS A SPECIAL DANGER IN

8  THIS CASE OF THE JURY BEING EXPOSED TO THINGS THAT

9  ARE NOT GOING TO BE EVIDENCE IN THIS CASE AND THAT

10  COULD PREJUDICE THEIR VIEW OF THE DEFENSE.  AND I

11  THINK WE JUST INCREASE THAT DANGER IF WE NOW ALLOW

12  THE PROCEEDINGS TO BE TELEVISED.

13       THE SECOND THING THAT I AM CONCERNED ABOUT

14  HERE IS THAT WE HAVE AT LEAST TWO WITNESSES -- AND

15  THERE MAY BE MORE -- WHO MAY NOT WANT TO BE ON

16  TELEVISION AND WHO MAY BE -- THEY ARE ALREADY

17  FRIGHTENED ABOUT PARTICIPATING IN ANY WAY IN THIS

18  CASE, WHETHER THROUGH INTERVIEWS OR THROUGH

19  TESTIMONY.

20       AND SO TO HAVE THE PROCEEDINGS TELEVISED

21  WILL JUST FURTHER ENHANCE, INCREASE THAT FEAR AND

22  THAT RELUCTANCE OF AT LEAST TWO PEOPLE, AND MAYBE

23  MORE, TO COME IN AND TESTIFY.

24       SO THOSE ARE OUR REASONS, YOUR HONOR.

25    THE COURT:  ALL RIGHT.

26       PEOPLE?

27  MS. OKUN-WIESE:  THE PEOPLE ARE FINE WITH HAVING THE

28  MEDIA PRESENT.  I AGREE WITH THE COURT; THERE ARE

1    CASES THAT HAVE MEDIA ATTENTION.  AND I DISAGREE WITH

2    COUNSEL THAT THIS IS A PARTICULAR CASE WHERE THERE

3    ARE STORIES GOING ON IN THE MEDIA.  I THINK THAT'S

4    WITH EVERY CASE THAT'S PRESENTED WITH THE MEDIA

5    THERE.  THEY ARE GOING TO WRITE A STORY.

6              AND THE JURORS TAKE AN OATH TO FOLLOW THE

7    COURT'S INSTRUCTIONS.  AND ONE OF THOSE INSTRUCTIONS

8    IS TO NOT FOLLOW THE MEDIA, TO NOT GO ON THE INTERNET

9    AND TO NOT READ THE NEWSPAPERS.  AND WE HAVE TO

10   ENTRUST THAT THE JURORS ARE GOING TO FOLLOW THE

11   COURT'S RULING.  AND I WOULD SUBMIT TO THE COURT.

12        THE COURT:  YOU KNOW, WHETHER OR NOT I ALLOWED

13   TELEVISION CAMERAS IN THIS COURTROOM, I CERTAINLY AM

14   IN NO POSITION TO BAR THE MEDIA FROM THIS COURTROOM

15   WITHOUT THEIR CAMERAS.  AND SO THERE IS GOING TO

16   BE -- IF THE MEDIA IS INTERESTED IN THIS CASE AND

17   REPORTERS FOLLOW THIS CASE, THEY ARE GOING TO WRITE

18   ARTICLES ABOUT THIS CASE.

19              THERE ARE GOING TO BE THINGS ON THE

20   INTERNET ABOUT THIS CASE; THERE ARE GOING TO BE

21   THINGS ON TELEVISION ABOUT THE CASE.  SO THE MERE

22   FACT THAT I WOULD SAY THAT I AM NOT GOING TO ALLOW

23   TELEVISION CAMERAS IN THE COURTROOM IS NOT GOING TO

24   PREVENT THERE FROM BEING COVERAGE ABOUT THIS CASE.

25   NOR SHOULD IT.

26              AND QUITE FRANKLY, I DON'T UNDERSTAND WHY

27   SOME PEOPLE ARE SO AFRAID OF HAVING THE MEDIA COVER A

28   CASE.  I MEAN, I JUST FINISHED A CASE WHERE THE MEDIA

1    WAS IN HERE EVERY SINGLE DAY.  AND THE JURORS

2    DELIBERATED 19 DAYS, AND THERE WAS NO INDICATION THAT

3    ANY OF THOSE JURORS READ, LISTENED TO, WATCHED ANY OF

4    THE ACCOUNTS OF THAT PARTICULAR CASE.

5         AND THERE WERE -- EVERY DAY THERE WERE

6    THINGS ON THE NEWS, AND EVERY DAY -- THE L.A. TIMES

7    HAD TWO REPORTERS HERE FOR EVERY DAY OF THE TRIAL.

8    AND THERE WAS AN ARTICLE, AT LEAST ONE, EVERY SINGLE

9    DAY.

10        AND SO I JUST -- AND PLUS, I MEAN -- EXCUSE

11   ME BUT HAVE YOU HEARD OF THE FIRST AMENDMENT?  THE

12   FIRST AMENDMENT PROTECTS FREEDOM OF THE PRESS.  AND

13   QUITE FRANKLY, FROM MY POINT OF VIEW, I THINK IT

14   ACTUALLY HELPS FOR THE PUBLIC TO KNOW WHAT HAPPENS IN

15   COURTROOMS.

16        IS ALL THE COVERAGE ACCURATE?  NO, IT IS

17   NOT.  THERE ARE -- A LOT OF TIMES THEY ARE SAYING

18   WHAT I READ ABOUT MYSELF OR ABOUT CASES THAT ARE

19   INACCURATE.  BUT DOES THAT MEAN THAT WE DON'T ALLOW

20   THE PRESS COVERAGE?  NO.

21        THE PROBLEM THAT I DO HAVE, HOWEVER, IS

22   WITH REGARD TO WHEN WITNESSES TESTIFY, IF THERE WAS

23   SOME WAY -- AND I THINK THERE IS A WAY BUT THE MEDIA

24   DOESN'T WANT TO SPEND THE MONEY.  AND THAT'S FINE; I

25   MEAN, THEY HAVE A BUDGET.  I HAVE A BUDGET.

26        BUT THE IDEA OF HAVING A GUY WITH A BIG

27   CAMERA RIGHT BY MY JURY BOX WHEN WITNESSES COME UP TO

28   TESTIFY AND BEING THERE AND PRESENT IS NOT SOMETHING

1   THAT I THINK IS APPROPRIATE.

2         AND, YOU KNOW, I HAVE BEEN WATCHING -- I

3   WATCHED SOMETIMES THE COVERAGE OF OTHER TRIALS.  AND

4   THERE HAS BEEN A TRIAL GOING ON IN ARIZONA THAT HAS

5   GOTTEN A LOT OF COVERAGE.  AND IT HAS BEEN COVERED

6   GAVEL TO GAVEL, SO-TO-SPEAK.  AND YET IN THAT

7   COURTROOM YOU DON'T SEE THE CAMERA.  EVER.

8         AND I KNOW THERE HAVE BEEN TRIALS THAT HAVE

9   BEEN COVERED HERE IN THIS BUILDING; CONRAD MURRAY FOR

10  ONE; PHIL SPECTER, ANOTHER, WHICH ACTUALLY -- WHICH

11  THERE IS MUCH MORE INTEREST IN THOSE CASES THAN IN

12  THIS CASE, BY THE WAY.  MUCH MORE, BY LEAPS AND

13  BOUNDS.  AND THE CAMERAS WERE SITUATED IN SUCH A WAY

14  IN THOSE CASES THAT THEY WERE NOT VISIBLE TO

15  WITNESSES, TO JURORS -- TURN OFF YOUR CELL PHONES OR

16  LEAVE THE COURTROOM -- AND I THINK THAT'S MUCH

17  PREFERRED, BECAUSE MY EXPERIENCE HAS BEEN -- AND I

18  HAVE BEEN DOING THIS A LONG TIME -- SINCE THE

19  O.J. SIMPSON PRELIM WHEN I ALLOWED CAMERAS IN THE

20  COURTROOM BACK IN 1994, I HAVE A LOT OF EXPERIENCE

21  WITH THIS.

22        MA'AM, GET OUT OF HERE.

23        SO THERE IS A WAY TO DO IT WHERE THE

24  CAMERAS ARE NOT SITTING THERE RIGHT NEXT TO THE JURY

25  BOX OR THERE ISN'T A GUY POINTING THIS HUGE CAMERA AT

26  A WITNESS.  AND I WOULD BE INCLINED TO ALLOW THAT

27  KIND OF COVERAGE FOR WITNESSES.

28        I DON'T HAVE A PROBLEM WITH CAMERAS BEING

1    IN THE COURTROOM FOR -- WITH A GUY STANDING THERE

2    DURING OPENING STATEMENTS, CLOSING ARGUMENTS AND SOME

3    MATTERS WHERE WITNESSES ARE NOT TESTIFYING.  BUT I DO

4    THINK THAT FOR WITNESS TESTIMONY, THAT I WOULD NOT

5    ALLOW LIVE COVERAGE UNLESS IT COULD BE DONE IN SUCH A

6    WAY THAT THE CAMERA IS NOT THERE AS A BIG PRESENCE

7    THAT EVERYONE IS AWARE OF.

8         AND OBVIOUSLY, OF COURSE, ANY SHOWING OF

9    JURORS WOULD BE ABSOLUTELY PROHIBITED; I THINK THE

10   MEDIA IS AWARE OF THAT.

11        SO I DON'T HAVE A PROBLEM WITH HAVING A

12   CAMERA COVERING THESE MOTIONS TODAY, PROVIDING THAT

13   WITNESSES ARE NOT GOING TO TESTIFY.

14        AND I DON'T KNOW IF THERE ARE GOING TO BE

15   ANY WITNESSES THAT TESTIFY, BUT WHILE WITNESSES

16   TESTIFY, I WOULDN'T WANT A CAMERA THERE THAT'S

17   PRESENT AND VISIBLE BECAUSE I DO THINK IT CHANGES THE

18   ATMOSPHERE FOR WITNESSES.

19        SO IF THERE IS SOME WAY TO DO IT WHERE THE

20   CAMERA IS INCONSPICUOUS AND WE CAN'T SEE IT AND

21   WITNESSES CAN'T SEE IT, FINE.  BUT NOT IN THE ABSENCE

22   OF THAT.

23        SO THAT WOULD BE MY RULING.

24     MR. BUEHLER:  THANK YOU, YOUR HONOR.

25     THE COURT:  OKAY.

26        SO I DON'T KNOW IF SOMEBODY WANTS TO SET UP

27   SOMETHING THIS MORNING.  OKAY.

28        IF THERE IS A SITUATION WHERE THERE IS

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1  GOING TO BE COVERAGE OF SOME PARTS OF THIS TRIAL,

2  THEN YOU FOLKS NEED TO COOPERATE IN TERMS OF HOW YOU

3  ARE GOING TO USE YOUR CAMERA.

4          SO USUALLY YOU GUYS AGREE ON WHO IS GOING

5  TO COVER IT.  AND I ASSUME THAT YOU WILL DO THAT IN

6  THIS CASE.

7      AUDIENCE MEMBER:  YES, MA'AM.  YES, WE JUST

8  WORKED THAT OUT.

9      THE COURT:  OKAY.

10     THE BAILIFF:  THERE WILL BE ONE POOL CAMERA?

11     THE COURT:  YES.

12     THE BAILIFF:  OKAY.

13     THE COURT:  AND I AM LETTING HIM GO GET IT, OR --

14     THE BAILIFF:  HE CAN SET UP RIGHT NOW?

15     THE COURT:  YES.

16         SO I WILL TAKE A BREAK, UNTIL HE IS READY,

17 FOR A COUPLE MINUTES.

18     MR. KASSABIAN:  TO ALERT THE COURT, MISS PARK'S

19 ANKLE BRACELET MIGHT START BEEPING SINCE IT DOESN'T

20 GET A SIGNAL.

21     THE COURT:  OKAY.  WELL I WON'T KICK HER OUT OF

22 THE COURTROOM.

23     MR. KASSABIAN:  I JUST WANTED TO LET YOU KNOW,

24 YOUR HONOR.

25

26         (BRIEF RECESS)

27

28     THE COURT:  ALL RIGHT, WE ARE BACK ON THE RECORD

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1    IN THE MATTER OF PEOPLE VERSUS KELLY SOO PARK.

2           THE DEFENDANT IS PRESENT WITH COUNSEL; THE

3    PEOPLE ARE REPRESENTED.  AND WE ARE GOING TO HANDLE

4    THE ADDITIONAL MOTIONS, WHICH THERE ARE NUMEROUS.

5           I SUPPOSE THE NEXT ONE WE CAN HANDLE WOULD

6    BE THE ONE THAT IS CALLED NOTICE OF MOTION AND MOTION

7    TO DISMISS CHARGES BASED ON OUTRAGEOUS GOVERNMENT

8    MISCONDUCT, REQUEST FOR EVIDENTIARY HEARING AND OTHER

9    REMEDIES, MEMORANDUM OF POINTS AND AUTHORITIES.

10          AND I DID READ THAT MOTION.  THERE IS AN

11   ACCOMPANYING EXHIBIT 1 WHICH IS A TRANSCRIPT OF A

12   TELEPHONE CALL BETWEEN DETECTIVE THOMPSON AND A

13   WITNESS.

14          AND THE PEOPLE FILED AN OPPOSITION TO

15   DEFENDANT'S MOTION TO DISMISS CHARGES BASED ON

16   ALLEGED GOVERNMENT MISCONDUCT.  AND THEY ATTACH

17   NUMEROUS EXHIBITS TO THEIR OPPOSITION.

18          THE MOTION FILED BY THE DEFENSE WAS FILED

19   ON MAY 6TH.  THE OPPOSITION FILED BY THE PROSECUTION

20   WAS FILED LATE ON MAY 7TH.  I READ BOTH OF THESE

21   YESTERDAY.

22          I WILL STATE, WITH REGARD TO THE EXHIBITS

23   THAT WERE ATTACHED TO THE PEOPLE'S OPPOSITION, A LOT

24   OF THOSE WERE CDS OF RECORDINGS OF INTERVIEWS.

25   HOWEVER, WITH REGARD TO EXHIBIT F, WHICH WAS A CD, IT

26   WOULDN'T PLAY IN MY COMPUTER.  IT SAID "MEDIA NOT

27   SUPPORTED."  AND I COULDN'T HEAR ANYTHING; I DON'T

28   KNOW WHAT IT IS.

1    WITH REGARD TO G WHICH IS ANOTHER CD, IT

2    STARTED TO PLAY, AND THEN IT GOT STUCK AND KEPT

3    REPEATING THE SAME THING OVER AGAIN.  I DON'T KNOW

4    HOW MUCH WAS ON THAT CD THAT I WASN'T ABLE TO HEAR.

5        MS. OKUN-WIESE:  JUST FOR THE COURT'S

6    INFORMATION, EXHIBIT F WAS THE TWO-MINUTE PORTION OF

7    THE INTERVIEW OF JOHN GILMORE WHERE THE DEFENSE

8    ALLEGES HE MADE THESE STATEMENTS.  AND EXHIBIT G WAS

9    THEIR ENHANCED VERSION.  AND I ACTUALLY CHECKED BOTH

10   OF THEM ON MY COMPUTER.  THEY ARE BOTH WAVE FILES, SO

11   I DON'T KNOW WHY THEY WOULDN'T PLAY.  BUT IF THE

12   COURT WOULD LIKE, I CAN GO GET MY COMPUTER FROM

13   UPSTAIRS TO PLAY THEM FOR THE COURT BECAUSE I THINK

14   IT IS IMPORTANT FOR THIS MOTION TO HEAR WHAT THE

15   DEFENSE IS INDICATING MR. GILMORE SAID.

16       THE COURT:  NO, I AGREE.  BECAUSE NOT ONLY FOR

17   THIS MOTION BUT FOR THE MOTION WITH REGARD TO THIRD

18   PARTY CULPABILITY, I BELIEVE THAT THOSE TAPES -- THAT

19   TAPE AND WHAT ALLEGEDLY WAS STATED THERE IS CRITICAL,

20   AND -- BUT I WAS NOT ABLE, ON MY COMPUTER, TO BE ABLE

21   TO HEAR THOSE.

22       SO --

23       MS. OKUN-WIESE:  I WILL HAVE MY LAW CLERK GO

24   UPSTAIRS AND GET A COMPUTER RIGHT NOW.

25       MR. KASSABIAN:  ACTUALLY, YOUR HONOR, I THINK WE

26   HAVE COPIES OF THEM WITH US.

27       THE COURT:  COPIES OF?

28       MR. KASSABIAN:  OF THE DISKS, OF THE ENHANCED

```
1    DISK.
2         MS. OKUN-WIESE:  DO YOU HAVE A COMPUTER?
3         MR. KASSABIAN:  I DON'T HAVE A COMPUTER.
4         THE COURT:  WELL GO AHEAD AND GO GET A COMPUTER
5    BECAUSE I HAVE -- IT IS NOT THAT I DON'T HAVE COPIES
6    OF THE CD; I HAVE THEM.  BUT THEY DIDN'T WORK.  AND I
7    DON'T KNOW, MAYBE YOURS WILL WORK IN MY COMPUTER.
8              BUT I WILL LET THEM GO -- SHE SAID SHE
9    TRIED THESE.  WE WILL GET A COMPUTER.
10             I HAVE LISTENED TO ALL THE OTHER ONES, THE
11   FIRST -- EARLIER EXHIBITS.  THEY WERE ON A DIFFERENT
12   KIND OF A DISK.  SO I DON'T KNOW IF THAT MADE A
13   DIFFERENCE.  I AM NOT A TECH PERSON.  I PUT IT IN MY
14   COMPUTER AND IF IT WORKS OR IT DOESN'T, I DON'T KNOW
15   HOW TO PRESS ANY MAGIC BUTTONS TO GET THINGS TO WORK.
16             SO DO YOU WANT TO BE HEARD WITH REGARD TO
17   YOUR MOTION AT THIS TIME?
18        MR. BUEHLER:  YES, YOUR HONOR.
19             LET ME JUST SAY FIRST THAT WE WERE UNAWARE
20   THAT THE EXHIBITS WERE PROVIDED TO THE COURT.  SO I
21   DON'T KNOW WHAT THE COURT HAS BEEN LISTENING TO OR
22   WHAT BEARING IT HAS ON THIS MOTION.
23        THE COURT:  DIDN'T THE DEFENSE RECEIVE THE SAME
24   THING I DID?
25        MS. OKUN-WIESE:  I E-MAILED THE DEFENSE A COPY OF
26   THE MOTION YESTERDAY.  AND I PUT INTO THE MAIL ON MAY
27   7TH WHAT I FILED IN THE MOTION.
28             I RECEIVED THEIR MOTION THE MORNING OF
```

1  MAY 7TH, AND I WROTE MY RESPONSE IN ONE DAY.

2          SO I E-MAILED THEM THE MOTION YESTERDAY.

3  IT INDICATES IN THE MOTION WHAT THE EXHIBITS ARE.

4  AND I PROVIDED ACTUALLY TO THE COURT -- EXHIBIT G IS

5  ACTUALLY THE DISK THAT THE DEFENSE GAVE ME.  THEIR

6  COPY IS WHAT I PROVIDED TO THE COURT TO MAKE SURE THE

7  COURT HAD THEIR ENHANCED VERSION.

8      MR. BUEHLER:  I DON'T MIND THE COURT LOOKING AT

9  WHATEVER IS PERTINENT TO THIS MOTION; I AM JUST

10  SAYING THAT WE DIDN'T RECEIVE IT.

11          I AM STILL NOT SURE WHAT THE COURT HAS

12  HEARD.  AND I DON'T SEE -- ALL WE RECEIVED IS THE

13  PEOPLE'S OPPOSITION.

14      MS. OKUN-WIESE:  AND THE OTHER COPY IS IN THE

15  MAIL WITH THE EXHIBITS.  I CAN'T MAIL THE EXHIBITS

16  OVER THE E-MAIL.  AND WITH THE SHORT NOTICE THAT I

17  RECEIVED ON THEIR MOTION, I TURNED IT AROUND AS FAST

18  AS I COULD.

19      MR. BUEHLER:  RIGHT.  I AM NOT NECESSARILY

20  COMPLAINING; I AM JUST ADVISING THE COURT.

21      MS. OKUN-WIESE:  FOR THE RECORD --

22      THE COURT:  OKAY.  SO WHY DON'T -- RIGHT NOW WHY

23  DON'T YOU DESCRIBE WHAT EACH EXHIBIT WAS.

24      MS. OKUN-WIESE:  EXHIBIT --

25      THE COURT:  A.

26      MS. OKUN-WIESE:  -- EXHIBIT A IS THE RECORDING

27  BETWEEN DETECTIVE THOMPSON AND MELISA AYALA.

28          EXHIBIT B IS THE 273.5 REPORT WITH

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1   MISS AYALA AS THE ALLEGED VICTIM AND JOHN GILMORE AS

2   THE SUSPECT.

3          EXHIBIT C IS A PHONE RECORD FROM

4   JULIANA REDDING'S CELL PHONE.

5          EXHIBIT D ARE THE TEXT MESSAGES RECOVERED

6   FROM JULIANA'S CELL PHONE.

7          EXHIBIT E ARE ADDITIONAL DOCUMENTS FROM

8   JULIANA'S CELL PHONE.

9          EXHIBIT F IS THE PORTION OF JOHN GILMORE'S

10  INTERVIEW ON MARCH 17TH, THE PORTION WHERE HE IS

11  ALONE IN THE INTERVIEW ROOM CRYING.

12         AND EXHIBIT G IS THE SAME PORTION BUT

13  ENHANCED BY THE DEFENSE.

14    THE COURT:  NOW I ASSUME THAT YOU HAVE ALL OF

15  THESE THINGS, ALTHOUGH YOU MAY NOT HAVE THEM WITH YOU

16  OR WHATEVER.  BUT YOU -- IN THE DISCOVERY THAT YOU

17  RECEIVED, I ASSUME THAT YOU HAVE EVERYTHING?

18    MR. BUEHLER:  I THINK SO, YOUR HONOR, FROM WHAT'S

19  BEEN DESCRIBED.

20    THE COURT:  OKAY.

21         AND AS I INDICATED, I REVIEWED EVERYTHING

22  EXCEPT FOR THE LAST TWO, F AND G, BECAUSE THEY DIDN'T

23  WORK IN MY COMPUTER.  BUT I HAVE REVIEWED ALL THE

24  OTHER EXHIBITS.

25    MR. BUEHLER:  VERY WELL, YOUR HONOR.

26    THE COURT:  OKAY.

27         NOW DO YOU WISH TO BE HEARD?

28    MR. BUEHLER:  I DO.

```
1    THE COURT:  OKAY.
2        MR. BUEHLER:  LET ME START OUT BY SAYING THAT
3    THIS INTERVIEW OF THIS WITNESS -- AND I WILL JUST
4    REFER TO HER AS THE WITNESS -- REFER TO HER IN THE
5    PAPERS AS M.A.
6        THE COURT:  RIGHT.
7        MR. BUEHLER:  THE INTERVIEW OF THIS WITNESS CAME
8    ABOUT BECAUSE INFORMATION HAD BEEN HEARD -- HAD BEEN
9    RECEIVED FROM A DIFFERENT WITNESS; NAMELY THE
10   WITNESS' THEN BOYFRIEND, NOT JOHN GILMORE, THAT THE
11   WITNESS HAD SAID THINGS ABOUT HAVING BEEN CHOKED BY
12   JOHN GILMORE AND THAT GILMORE HAD SAID TO HER THINGS
13   ABOUT CHOKING THE VICTIM IN THIS CASE,
14   JULIANA REDDING.
15            SO THAT'S HOW THE INTERVIEW COMES ABOUT.
16   THAT'S HOW OUR DEFENSE INVESTIGATOR, WHO IS A VERY
17   EXPERIENCED, REPUTABLE DEFENSE INVESTIGATOR, GOES AND
18   MEETS WITH THIS WITNESS AND ASKS HER ABOUT HER
19   EXPERIENCE WITH JOHN GILMORE.
20            AND SHE IS HERE TODAY, AND SHE CAN TESTIFY
21   ABOUT HOW SHE MADE CONTACT WITH THE WITNESS AND WHAT
22   TRANSPIRED THROUGH THAT INTERVIEW.
23       THE COURT:  WAIT.  M.A. IS HERE TODAY?  OR SOME
24   OTHER WITNESS IS HERE TODAY?
25       MR. BUEHLER:  LYNDA LARSEN, THE INVESTIGATOR WHO
26   CONDUCTED THE INTERVIEW WITH M.A.
27       THE COURT:  NOW WAS THAT INTERVIEW OF M.A. BY
28   LYNDA LARSEN RECORDED?
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1      MR. BUEHLER:  NO.

2      THE COURT:  OKAY.

3      MR. BUEHLER:  THE -- BUT SHE CAN TESTIFY ABOUT

4  IT.

5           AND WE ALSO HAVE HER REPORT WHICH HAS BEEN

6  RETURNED -- TURNED OVER TO THE PEOPLE AND WAS TURNED

7  OVER TO THE PEOPLE SEVERAL WEEKS AGO, HER REPORT OF

8  THE INTERVIEW OF M.A.

9           AND AS THE COURT KNOWS, M.A. GAVE SOME VERY

10  SIGNIFICANT TESTIMONY, STATEMENTS ABOUT HER

11  EXPERIENCE OF HAVING BEEN CHOKED SEVERELY, ON THREE

12  OCCASIONS BY JOHN GILMORE, AND JOHN GILMORE, ON TWO

13  OF THOSE OCCASIONS, SAYING THAT "THIS IS HOW IT FELT

14  FOR JULIANA," OR, "YOU CAN SEE NOW HOW IT FELT FOR

15  JULIANA."

16           SO THOSE ARE CLEARLY ADMISSIONS THAT ARE

17  EXCULPATORY TO JOHN GILMORE.

18      THE COURT:  THEY ARE EXCULPATORY TO --

19      MR. BUEHLER:  INCULPATORY TO JOHN GILMORE AND

20  EXCULPATORY FOR THE DEFENDANT.

21      THE COURT:  OKAY.

22      MR. BUEHLER:  NOW THE PROBLEM WE HAVE IS THAT

23  THAT WITNESS HAS NOT -- HAS REFUSED TO TALK TO OUR

24  INVESTIGATOR SINCE SHORTLY AFTER THAT INTERVIEW IN

25  LATE JANUARY.  JANUARY 31ST WAS THE DATE OF THE

26  INTERVIEW.  AND WE NOW KNOW WHY; BECAUSE WE HEARD

27  JUST LAST WEEK -- WE RECEIVED THIS RECORDING OF AN

28  INTERVIEW THAT THE DETECTIVE HAD WITH THE WITNESS IN

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1    WHICH THE DETECTIVE IS CLEARLY, RIGHT FROM THE START

2    OF THAT INTERVIEW, NOT INTERESTED IN FINDING OUT WHAT

3    THE WITNESS HAD TO SAY ABOUT JOHN GILMORE OR WHAT

4    INFORMATION THAT WITNESS MIGHT HAVE ABOUT WHO

5    MURDERED JULIANA REDDING.  HER PURPOSE WAS TO

6    CONVINCE THE WITNESS THAT JOHN GILMORE IS NOT THE

7    KILLER; THAT THE DEFENDANT IS THE KILLER; THAT SHE

8    KNOWS JOHN GILMORE IS NOT THE KILLER, AND THAT THE

9    DEFENDANT IS THE KILLER; THAT THESE DEFENSE

10   INVESTIGATORS LIKE TO SWEEP IN AND SHOW THEIR BADGES

11   AND DECEIVE PEOPLE.  YOU CAN'T TRUST THEM.  THEIR

12   PURPOSE IS TO FIND WAYS TO POKE HOLES INTO THE TRUTH,

13   THE PROSECUTION'S CASE.  SO YOU CAN'T TRUST THEM;

14   THEY ARE UNPRINCIPLED.  THEY ARE NOT SEEKING THE

15   TRUTH.  THEY ARE TRYING TO UNDERMINE THE TRUTH.

16           AND FURTHERMORE, THE DETECTIVE IMPRESSES

17   UPON THE WITNESS THAT JOHN GILMORE IS A GOOD GUY;

18   THAT JOHN GILMORE IS NOT A KILLER, AND MOREOVER, HE

19   IS NOT A BAD PERSON.  HE HAD SOME PROBLEMS WHEN HE

20   WAS YOUNGER.

21           NOW THE DETECTIVE IS TALKING TO A WOMAN WHO

22   HAS BEEN ABUSED BY THIS MAN.  AND IN FACT,

23   JOHN GILMORE HAS BEEN CONVICTED OF FELONY DOMESTIC

24   VIOLENCE WITH THIS WITNESS AS THE VICTIM.  AND YET

25   DETECTIVE THOMPSON IS ENCOURAGING THE WITNESS TO NOT

26   LOSE FAITH IN JOHN GILMORE.

27           NOW AFTER THE FIRST PART OF THAT INTERVIEW,

28   AND THE WAY THE DETECTIVE COMES ON TO THIS WITNESS,

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1   THIS WITNESS -- WHAT THE WITNESS KNOWS IS THAT

2   GILMORE IS THE BAD GUY AND -- NO.  "GILMORE IS THE

3   GOOD GUY; THE DEFENDANT AND HER ATTORNEYS AND HER

4   INVESTIGATORS ARE BAD PEOPLE, AND IF I WANT TO BE ON

5   THE RIGHT SIDE, I NEED TO BE ON THE SIDE OF THE

6   DETECTIVE AND JOHN GILMORE."

7          AND THEREFORE, LATER IN THE INTERVIEW THE

8   WITNESS STARTS TALKING ABOUT, "WELL, I WAS

9   BRAINWASHED.  THEY TOLD ME THIS.  THEY TOLD ME THAT."

10  AND ONE CAN WELL UNDERSTAND WHY AT THAT POINT IN THE

11  INTERVIEW SHE WOULD BEGIN TO DEFEND HERSELF AND TRY

12  TO HAVE REASONS WHY SHE WOULD HAVE COOPERATED WITH

13  THESE TERRIBLE PEOPLE WHO REPRESENT A KILLER.

14         NOW THAT INTERVIEW, WHETHER IT WAS DONE

15  MALICIOUSLY OR JUST OUT OF SOME EXCESSIVE ENTHUSIASM

16  FOR HER VIEW OF THE EVIDENCE IN THIS CASE, IT WAS

17  NONETHELESS CALCULATED TO AND DID HAVE THE EFFECT OF

18  TAKING A WITNESS WHO HAS IMPORTANT TESTIMONY AND

19  TURNING HER TO THE POINT WHERE SHE NO LONGER WILL

20  SPEAK TO DEFENSE.

21         AND SINCE THAT INTERVIEW SHE HAS HAD A

22  CHARGE FILED AGAINST HER, A FELONY CHARGE BASED ON AN

23  INCIDENT THAT HAPPENED ALMOST A YEAR AGO, IN APRIL OF

24  2012, SO OVER A YEAR AGO NOW.  AND FOR SOME REASON

25  THAT NOTHING HAD BEEN DONE ON THAT CASE, AS FAR AS WE

26  KNOW, UNTIL JUST AS THE TRIAL IN THIS CASE IS

27  APPROACHING; SHE SUDDENLY -- THEY FILED A FELONY

28  COMPLAINT AGAINST HER.  THERE IS A WARRANT OUT FOR

```
1    HER ARREST WITH AN $80,000 BAIL WHICH FOR SOME REASON
2    HASN'T BEEN EXECUTED.
3         THE COURT:  STILL?
4         MR. BUEHLER:  THAT'S MY UNDERSTANDING FROM WHAT
5    WE CAN TELL FROM THE RECORD.
6              SO WE HAVE A WITNESS WHO HAS BEEN
7    INTERFERED WITH BY THE DETECTIVE WITH THE CLEAR
8    PURPOSE OF CONVINCING HER THAT THE DEFENDANT IS BAD,
9    HER LAWYERS ARE BAD AND SHE SHOULD NOT BE COOPERATING
10   WITH THEM.  AND IF SHE WANTS TO HAVE THE GOODWILL OF
11   THE SANTA MONICA POLICE DEPARTMENT, SHE WON'T BE
12   COOPERATING WITH THEM.  THAT'S THE CLEAR IMPORT OF
13   EVERYTHING SHE TELLS HER.
14             AND WE ALSO HAVE THAT WITNESS WITH A CHARGE
15   PENDING OVER HER HEAD WHICH OF COURSE GIVES HER A
16   VERY CONVENIENT REASON WHY SHE COULD NOT TESTIFY IN
17   THIS CASE NOW.
18             NOW I DON'T THINK YOU HAVE TO GO BEYOND
19   JUST READING THE TRANSCRIPT OF THIS INTERVIEW BY
20   DETECTIVE THOMPSON TO SEE WHAT'S GOING ON AND TO SEE
21   HOW THAT WOULD INTIMIDATE ANY WITNESS.  AND IT EVEN
22   GOES -- THE REALLY STRANGE THING IS THAT THE WITNESS
23   OBVIOUSLY HAS A PROBLEM WITH MEN LIKE JOHN GILMORE,
24   MEN WHO ABUSE WOMEN.  AGAIN, HIS CONVICTION, HIS
25   FELONY CONVICTION FOR DOMESTIC VIOLENCE IS WITH HER
26   AS THE VICTIM.
27             SO YOU HAVE GOT -- I MEAN, FOR ANY ADULT
28   PERSON, WHETHER THEY ARE A LAW-ENFORCEMENT OFFICER OR
```

1   NOT, TO BE TELLING THIS WITNESS SHE SHOULD HAVE FAITH

2   IN JOHN GILMORE -- AND THE DETECTIVE SAYS THINGS

3   LIKE, "HE IS NOT A BAD PERSON. BACK WHEN HE WAS 21

4   HE DID A FEW BAD THINGS," ALL OF WHICH IS NOT TRUE;

5   HE HAS DONE A LOT OF BAD THINGS A LOT MORE RECENTLY.

6            "I JUST REACHED OUT TO JOHN."

7            I MEAN, SHE TALKS ABOUT JOHN AS HE IS THIS

8   IMPORTANT PERSON; THAT WE NEED TO MAKE SURE WE DON'T

9   DO ANYTHING THAT HURTS JOHN.

10           THE WHOLE SPIRIT OF WHAT SHE IS DOING WITH

11  THIS WOMAN IS TO TELL HER TO TRUST THE GUY WHO HAS

12  ALREADY CHOKED HER THREE TIMES, TO NOT THINK ILL OF

13  HIM AND TO MAKE SURE "YOU DON'T GIVE ANY TESTIMONY

14  THAT MIGHT HURT JOHN AND MIGHT HURT THE PROSECUTION'S

15  CASE."

16           NOW THAT'S NOT RIGHT. THAT VIOLATES THE

17  RULES OF THIS GAME. THIS GAME IS ABOUT EVERYBODY

18  HAVING EQUAL ACCESS TO WITNESSES. AND IF A WITNESS

19  HAS SOMETHING TO SAY, THEN THEY ARE TO BE ENCOURAGED

20  TO COME IN AND SAY IT IF IT IS RELEVANT.

21       THE COURT:  WELL A WITNESS HAS A RIGHT NOT TO

22  TALK TO YOU.

23       MR. BUEHLER:  OF COURSE.

24       THE COURT:  AND I -- I THINK IT IS UNFORTUNATE

25  THAT THE INTERVIEW THAT WAS CONDUCTED BY YOUR

26  INVESTIGATORS WITH THE WITNESS WAS NOT TAPE RECORDED,

27  BECAUSE I THINK WHAT REALLY HAPPENED DURING THE

28  COURSE OF THAT INTERVIEW IS PROBABLY GOING TO BE

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1  DISPUTED BY THAT WITNESS AND YOUR INVESTIGATORS.  AND
2  IF THERE WERE A TAPE WE WOULD KNOW.  BECAUSE THE WAY
3  IT WAS -- IN MY READING OF THE PAPERWORK HERE AND THE
4  TRANSCRIPT, AND HEARING THE PHONE CONVERSATION WITH
5  THE WITNESS, IT WAS SUGGESTED THAT YOUR
6  INVESTIGATORS, NUMBER ONE, DIDN'T CLEARLY IDENTIFY
7  THEMSELVES, FLASHING THEIR BADGES AND ACTING AS IF
8  THEY WERE LAW-ENFORCEMENT AS OPPOSED TO INVESTIGATORS
9  WORKING FOR DEFENSE ATTORNEYS, AND TOLD THE WITNESS
10  THAT MR. GILMORE WAS A RAPIST AND SOME OTHER THINGS.
11          NOW I WASN'T THERE, OBVIOUSLY, BUT I THINK
12  IT IS UNFORTUNATE THAT WE DON'T HAVE A TAPE RECORDING
13  OF THAT INTERVIEW BECAUSE THEN WE REALLY WOULD KNOW,
14  WOULDN'T WE?
15      MR. BUEHLER:  WELL, YOUR HONOR, I DON'T THINK --
16  MOST INVESTIGATORS I KNOW DON'T GO AROUND TAPING
17  INTERVIEWS.  THEY DON'T TAPE MOST OF THEIR
18  INTERVIEWS.  WE GET ALL KIND OF REPORTS FROM
19  WITNESSES WHERE -- WE ARE RELYING UPON WHAT THEY ARE
20  REPORTING TO US THE WITNESS SAID.  IT IS A VERY
21  STANDARD PRACTICE TO NOT TAPE INTERVIEWS --
22      THE COURT:  I UNDERSTAND A LOT OF TIMES THINGS
23  AREN'T TAPED.  BUT A LOT OF THINGS ARE TAPED.  I AM
24  NOT SAYING SURREPTITIOUSLY.  "I AM GOING TO TAPE
25  RECORD THIS INTERVIEW.  DO YOU HAVE ANY OBJECTION?"
26  AND A TAPE RECORDER IS PUT ON THE TABLE, AND IT IS
27  TAPE RECORDED.  AND THERE IS NOTHING ILLEGAL OR
28  IMPROPER WITH DOING THAT IN THAT FASHION.

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1      MR. BUEHLER:  NOW YOUR HONOR IS ASSUMING THAT

2  THIS WITNESS WOULD RECANT --

3      THE COURT:  I DON'T KNOW WHAT THE WITNESS IS

4  GOING TO SAY.  I HAVE NO WAY OF KNOWING.  BUT --

5      MR. BUEHLER:  BUT LET ME POINT OUT --

6      THE COURT:  IT WOULDN'T SURPRISE ME THAT WE MAY

7  HAVE A COUPLE OF DIFFERENT VERSIONS OF THIS

8  PARTICULAR INTERVIEW.

9      MR. BUEHLER:  BUT THE WITNESS DIDN'T, IN THIS

10  INTERVIEW WITH DETECTIVE THOMPSON, SAY ANYTHING TO

11  INDICATE THAT SHE SAID ANYTHING TO THE INVESTIGATOR

12  THAT WASN'T TRUE.

13          WE KNOW THAT TO THE EXTENT SHE TALKED ABOUT

14  BEING CHOKED BY JOHN GILMORE, WE HAVE POLICE REPORTS

15  RELATING TO THAT.  WE DON'T HAVE IN THE POLICE

16  REPORTS WHAT SHE SAYS JOHN GILMORE TOLD HER.

17      THE COURT:  RIGHT.  I HAVE READ THOSE POLICE

18  REPORTS, AND THERE IS NO REFERENCE TO WHAT YOU

19  SUGGEST AT ALL.

20      MR. BUEHLER:  SO?

21      THE COURT:  NO, I AM JUST --

22      MR. BUEHLER:  I --

23      THE COURT:  YOU KNOW, "SO"?  I AM TELLING YOU

24  THAT THAT'S NOT THERE.

25      MR. BUEHLER:  THE PEOPLE MAKE THAT POINT AS IF

26  THAT'S IMPORTANT, AS IF ONLY WHAT'S IN A POLICE

27  REPORT COUNTS, AS IF I SHOULDN'T EVEN BE SENDING AN

28  INVESTIGATOR OUT BECAUSE IT WILL ALL BE IN THE POLICE

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

84

1    REPORT.

2             WE OFTEN FIND THERE ARE THINGS IN THE

3    POLICE REPORT THAT ARE NOT IN POLICE REPORTS THAT

4    WITNESSES SAY THAT ARE VERY IMPORTANT.  AND THIS IS

5    ONE OF THOSE INSTANCES.

6             SO I DON'T KNOW HOW TO SOLVE THE COURT'S

7    PROBLEM EXCEPT WE ARE PREPARED TO HAVE THE

8    INVESTIGATOR TESTIFY ABOUT WHAT HAPPENED.

9             NOW -- BUT STILL, YOUR HONOR, THE

10   DETECTIVE, REGARDLESS OF WHAT HAPPENED IN THAT

11   INTERVIEW, THE DETECTIVE STARTS OFF WITH THE

12   ASSUMPTION THAT THEY CAME IN AND THEY WAVED BADGES.

13   THEY DIDN'T WAVE BADGES.

14      THE COURT:  I DON'T KNOW; I WASN'T THERE AND I

15   DIDN'T SEE IT.  BUT IF IT WERE RECORDED, WE COULD

16   KNOW, COULDN'T WE?

17      MR. BUEHLER:  WE COULD.  BUT DOES THAT JUSTIFY

18   THE DETECTIVE, ASSUMING THEY WAVED BADGES?

19             SHE WASN'T THERE EITHER.  SO WHY IS SHE

20   TELLING THE WITNESS, "OH, THEY CAME IN AND THEY WAVED

21   THEIR BADGES"?

22      THE COURT:  I DON'T KNOW.  LIKE I SAID -- AND --

23   I THINK THIS PROBABLY IS A MATTER THAT I AM GOING TO

24   HAVE TO HEAR TESTIMONY ABOUT.

25      MR. BUEHLER:  BUT WHY HASN'T THE DETECTIVE

26   STARTED HER INTERVIEW BY FINDING OUT WHAT HAPPENED IN

27   THE INTERVIEW?  SHE JUST COMES IN AND SAYS "I HEARD

28   FROM JOHN GILMORE."  AND FIRST THING, "JOHN GILMORE

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1    IS NOT THE KILLER."

2              AND FIRST, "WHAT CAN I TELL YOU" -- "WELL,

3    I CAN TELL YOU" -- "WHAT I WANT TO TELL YOU IS THAT

4    JOHN IS NOT THE KILLER."

5              SO IF JOHN IS NOT THE KILLER, IT IS THE

6    OFFICIAL POSITION OF THE SANTA MONICA POLICE

7    DEPARTMENT, SPOKEN TO SOMEBODY WHO HAS BEEN IN

8    TROUBLE WITH THE SANTA MONICA POLICE DEPARTMENT,

9    SPOKEN TO SOMEBODY WHO HAS A LOT OF REASON TO NOT

10   WANT THE SANTA MONICA POLICE DEPARTMENT BREATHING

11   DOWN HER NECK.  SHE --

12        THE COURT:  EXCUSE ME, BUT I THOUGHT IT WAS SOME

13   OTHER POLICE DEPARTMENT THAT SHE WAS IN TROUBLE WITH.

14        MR. BUEHLER:  EL SEGUNDO.

15              POLICE DEPARTMENTS.

16              BUT SHE IS LEADING THE LIFE -- SHE IS

17   HANGING OUT WITH PEOPLE LIKE JOHN GILMORE.  SHE HAS

18   REASON TO BE CONCERNED ABOUT ANY POLICE OFFICER THAT

19   COMES TO HER.  AND RIGHT OFF THE BAT, "THE TRUTH IS,

20   JOHN IS NOT THE KILLER."  SO WHAT DOES THAT TELL A

21   WITNESS EXCEPT THAT "IF I SAY SOMETHING THAT MIGHT

22   IMPLY HE IS THE KILLER, THEN I AM IN TROUBLE WITH

23   THESE PEOPLE.  I AM GOING AGAINST THEM."

24              THAT'S WITNESS TAMPERING.  THAT'S TRYING TO

25   INFLUENCE A WITNESS TO NOT TALK TO THE DEFENSE, TO

26   NOT FEEL FREE TO SHARE HER TESTIMONY.

27              THERE ARE PLACES TO CROSS-EXAMINE PEOPLE.

28   THERE ARE PLACES TO TEST THE VERACITY OF WHAT A

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
1   PERSON SAYS.  BUT THIS IS DESIGNED TO EVEN KEEP HER
2   FROM TALKING TO THE DEFENSE.  AND I DON'T KNOW HOW
3   YOUR HONOR CAN READ THIS WITHOUT SEEING THAT THAT'S
4   WHAT'S GOING ON.
5       THE COURT:  NOW LET ME ASK YOU THIS:  HAVE YOU
6   DISCLOSED THIS WITNESS TO THE PROSECUTION AT THE TIME
7   THAT DETECTIVE HAD INTERVIEWED HER?
8       MR. BUEHLER:  NO, WE DISCLOSED IT --
9       MS. OKUN-WIESE:  APRIL --
10      MR. BUEHLER:  WHEN WE FIRST RECEIVED THE POLICE
11  REPORTS OF JOHN GILMORE'S ASSAULT ON THIS WITNESS,
12  WE, THOSE WERE PRODUCED TO THE PEOPLE.
13      THE COURT:  I AM SORRY?
14      MR. BUEHLER:  THOSE WERE PRODUCED -- COPIES OF
15  THOSE REPORTS WERE PRODUCED TO THE PEOPLE.  THEY HAD
16  NEVER FOUND THEM AND PRODUCED THEM TO US.  WE DID THE
17  RESEARCH; WE FOUND THIS -- THESE CRIMINAL ACTIVITIES
18  OF JOHN GILMORE.  WE PRODUCED THAT TO THEM, SO THEY
19  WERE AWARE OF THAT AS SOON AS WE WERE.
20          WE DID NOT PRODUCE THE -- OUR
21  INVESTIGATOR'S INTERVIEW OF THE WITNESS UNTIL ABOUT
22  THREE WEEKS AGO, I BELIEVE IT IS -- THIRTY DAYS
23  BEFORE TRIAL.
24      THE COURT:  AND THIS INTERVIEW BY
25  DETECTIVE THOMPSON OF THIS WITNESS OCCURRED?
26      MR. BUEHLER:  SIX DAYS AFTER THE INTERVIEW BY OUR
27  INVESTIGATOR.
28      THE COURT:  OKAY, BUT I MEAN IT DIDN'T OCCUR
```

1    AFTER YOUR DISCLOSURE OF THE WITNESS TO THE

2    PROSECUTION?

3        MR. BUEHLER:   NO.   APPARENTLY IT OCCURRED AFTER

4    JOHN GILMORE CALLED DETECTIVE THOMPSON AND SAID THEY

5    WENT AND TALKED TO MELISA -- TO THE WITNESS, AND THAT

6    SHE HAS TOLD THEM SOMETHING BAD HAPPENED.

7            SOMEHOW GILMORE FOUND OUT.   I DON'T KNOW

8    HOW GILMORE FOUND OUT THAT THIS INTERVIEW HAD

9    OCCURRED.   HE APPARENTLY CALLED, BECAUSE THE

10   DETECTIVE REFERS IN THE TELEPHONE CONVERSATION TO

11   HAVING HEARD FROM JOHN GILMORE ABOUT THIS.

12           AND THEN SHE GOES AND SHE HAS THIS

13   INTERVIEW.   AND WE WERE NOT AWARE OF THIS INTERVIEW;

14   WE DIDN'T RECEIVE THIS RECORDING UNTIL LAST WEEK.

15   THAT'S WHY THE MOTION IS BEING BROUGHT NOW.

16       THE COURT:   ALL RIGHT.

17           MISS WIESE?

18       MS. OKUN-WIESE:   FIRST OF ALL, I PROVIDED THE

19   INFORMATION ABOUT MR. GILMORE'S FELONY CONVICTION

20   SEVERAL MONTHS AGO.   THEY DID NOT PROVIDE THE

21   INFORMATION THAT THEY WERE GOING TO CALL MELISA AYALA

22   UNTIL APRIL 12TH.   THEY PROVIDED ME WITH A WITNESS

23   LIST ON THAT DAY, AND THEY PROVIDED ME WITH HER

24   INTERVIEW.

25           WHEN DETECTIVE THOMPSON SPOKE TO MISS AYALA

26   ON FEBRUARY 6TH, THE ONLY INFORMATION SHE HAD AT THAT

27   POINT WAS THAT MISS AYALA HAD BEEN CONTACTED BY A

28   PRIVATE INVESTIGATOR.

1              I PROVIDED THE COURT WITH A RECORDING OF

2    THAT INTERVIEW BECAUSE I FELT THAT IT WAS IMPORTANT

3    FOR THE COURT TO HEAR HOW DETECTIVE THOMPSON SPOKE

4    WITH HER AND ALSO HOW MISS AYALA RESPONDED TO THAT

5    CONVERSATION.

6              AS THE COURT POINTED OUT, MISS AYALA'S

7    INTERVIEW WITH THE DEFENSE INVESTIGATORS WAS NOT

8    RECORDED.  HER CONVERSATION, HOWEVER, WITH DETECTIVE

9    THOMPSON WAS RECORDED.

10             EVEN ASSUMING THE COURT BELIEVES THE

11   PRIVATE INVESTIGATOR, THAT THIS IS WHAT MELISA SAID

12   ON THAT DATE TO HER, IT STILL DOES NOT EQUATE TO AN

13   ADMISSION BY JOHN GILMORE.

14             AND I WAS JUST HANDED IN COURT THIS MORNING

15   BY MR. BUEHLER AN INTERVIEW WITH NICHOLAS SCHWARCZ

16   WHO IS THE EX-BOYFRIEND OF MISS AYALA WHO INITIALLY

17   GAVE THEM HER CONTACT INFORMATION.  AND IN THIS

18   INTERVIEW BY PRESUMABLY THE SAME DEFENSE

19   INVESTIGATORS, NICHOLAS SCHWARCZ TELLS THEM THAT

20   MISS AYALA TOLD HIM "YOU COULD END UP THE SAME WAY AS

21   JULIANA REDDING DID."

22             NONE OF THESE STATEMENTS ARE CONSISTENT.

23   NONE OF THESE STATEMENTS MEAN THAT JOHN GILMORE

24   ADMITTED HIS GUILT IN THE MURDER OF JULIANA REDDING.

25             AND I WANT TO REMIND THE COURT THAT I

26   PROVIDED THE COURT WITH THE 273.5 REPORT.  IN

27   ADDITION TO THE OFFICER'S REPORT OF THE INCIDENT,

28   THERE IS ALSO A NOTATION AT THE END OF THAT REPORT

1   THAT MISS AYALA WENT AND VISITED MR. GILMORE THE

2   FOLLOWING DAY AFTER HE WAS ARRESTED.  THAT CONTACT

3   WAS REPORTED.

4            MR. GILMORE ALSO SPOKE TO WITNESSES, AND --

5   MISS AYALA ON THE TELEPHONE.  AND NOT ONCE AT ALL

6   DURING THAT REPORT IS THE NAME JULIANA REDDING EVER

7   MENTIONED.

8            THE COURT NEEDS SOME BACKGROUND ON

9   MISS AYALA, NICHOLAS SCHWARCZ AND MR. GILMORE.

10           THESE THREE INDIVIDUALS HAVE BEEN AT EACH

11  OTHER'S THROATS FOR YEARS.  MISS AYALA APPARENTLY

12  GOES FROM MR. GILMORE TO MR. SCHWARCZ, BACK TO

13  MR. GILMORE AND THEN BACK TO MR. SCHWARCZ.

14           AND I EVEN HAVE A REPORT PROVIDED BY

15  COUNSEL THAT INDICATES THAT ON SEPTEMBER 6TH OF 2011

16  MISS AYALA FILED A NOTICE OF A RESTRAINING ORDER

17  AGAINST MR. GILMORE.

18           THEN ON SEPTEMBER 15TH SHE GOES IN AND

19  REQUESTS A DISMISSAL.

20           THIS IS A VERY TUMULTUOUS RELATIONSHIP

21  BETWEEN THESE INDIVIDUALS.  THEY GO BACK AND FORTH,

22  BACK AND FORTH.  SO IT DOESN'T SURPRISE ME THAT UPON

23  HEARING THAT HER CURRENT FIANCE IS A RAPIST AND A

24  MURDERER, SHE MAY SAY SOME NEGATIVE THINGS ABOUT HIM.

25  ALTHOUGH I DON'T REALLY KNOW WHAT THOSE NEGATIVE

26  THINGS WERE BECAUSE WE DON'T HAVE A RECORDING.

27           WHAT HAPPENED IN THIS INSTANCE WAS, THESE

28  DEFENSE INVESTIGATORS WENT TO MISS AYALA WHO WAS AT

1   THAT TIME ENGAGED TO MR. GILMORE; THEY WAVED A PIECE

2   OF PAPER IN FRONT OF HER AND CALLED HIM A RAPIST.

3          THERE IS ABSOLUTELY NO EVIDENCE THAT

4   JOHN GILMORE IS A RAPIST.

5          THEY ARE GOING AROUND DEFAMING THIS

6   INDIVIDUAL TO HIS FIANCE, AND THEN THEY TELL HIM --

7   TELL HER THAT HE IS RESPONSIBLE FOR THE MURDER.

8          THEY ARE THE INDIVIDUALS WHO ARE CREATING A

9   PROBLEM AND TRYING TO DISSUADE A WITNESS IN THIS

10  CASE, NOT DETECTIVE THOMPSON.

11         DETECTIVE THOMPSON MERELY CONTACTED

12  MISS AYALA BECAUSE JOHN GILMORE WAS UPSET.  HIS

13  FIANCE WHO HE THINKS HE IS GOING TO MARRY WAS JUST

14  TOLD HE IS A RAPIST AND A MURDERER.  SO DETECTIVE

15  THOMPSON STATES, "WOULD YOU LIKE ME TO TALK TO HER?"

16  AND HE SAID YES.

17         YOU CAN HEAR BY THE TONE OF HER VOICE AND

18  BY THE TONE OF MISS AYALA'S VOICE, THIS ISN'T AN

19  INTERVIEW.  DETECTIVE THOMPSON IS NOT QUESTIONING HER

20  ABOUT HER DOMESTIC VIOLENCE; SHE IS NOT QUESTIONING

21  HER ABOUT ANYTHING THAT HAS TO DO WITH THIS CASE.

22         SHE IS PROVIDING HER THE FACTS, THE FACTS

23  THAT HAVE BEEN PROVIDED IN THE MEDIA.

24         JOHN GILMORE AND MISS AYALA ARE VERY WELL

25  AWARE OF THE FACTS SURROUNDING THIS CASE.  AND YOU

26  CAN HEAR BY THE TONE OF MISS AYALA'S VOICE, SHE

27  DOESN'T WANT TO BE INVOLVED, AND SHE SAYS THAT

28  NUMEROUS TIMES.

```
 1              AND IN RESPONSE TO THAT, DETECTIVE THOMPSON
 2    SAYS, "YOU KNOW WHAT?  YOU MIGHT HAVE TO COME INTO
 3    COURT AND YOU MAY HAVE TO TALK ABOUT YOUR DOMESTIC
 4    VIOLENCE.  AND YOU KNOW WHAT?  IF THAT HAPPENS, YOU
 5    HAVE TO TELL THE TRUTH."
 6              THAT'S WHAT DETECTIVE THOMPSON TELLS HER.
 7    SHE DOESN'T TELL HER NOT TO COME TO COURT; SHE
 8    DOESN'T TELL HER IF SHE DOESN'T COOPERATE THAT SHE IS
 9    GOING TO BE ARRESTED, WHICH BRINGS ME TO ANOTHER
10    POINT.
11              TIME AND TIME AGAIN DEFENSE COUNSEL IS
12    CALLING NOT ONLY DETECTIVE THOMPSON'S ETHICS INTO
13    QUESTION, BUT MY ETHICS INTO QUESTION.  I SPOKE TO
14    COUNSEL AFTER THEY CALLED ME OR SENT ME THE LETTER
15    REGARDING MISS AYALA'S ARREST.  I AT THAT TIME HAD NO
16    IDEA THERE WAS ANY INVESTIGATION GOING ON INTO
17    MISS AYALA.
18              AND BY THE WAY, THAT CASE INVOLVES
19    JOHN GILMORE AS THE VICTIM.  AND THE CHARGES ARE
20    CRIMINAL THREATS, 245 AND CONSPIRACY.
21         THE COURT:  CONSPIRACY TO DO WHAT?
22         MS. OKUN-WIESE:  CONSPIRACY TO COMMIT THE 245.
23              SHE WENT --
24         THE COURT:  WITH WHOM?
25         MS. OKUN-WIESE:  TWO OTHER INDIVIDUALS.
26              AND THEY TOOK A PIT BULL THERE, AND THAT
27    PIT BULL WAS ORDERED TO SICK JOHN GILMORE.
28              I HAVE HAD NO CONTACT WITH OUR OFFICE IN
```

1   AIRPORT BRANCH; I HAVE HAD NO CONTACT WITH EL SEGUNDO

2   POLICE DEPARTMENT.  EITHER HAS DETECTIVE THOMPSON.

3   AND WE BOTH SIGNED DECLARATIONS DECLARING THAT WE

4   HAVE HAD NO CONTACT.  AND I TOLD COUNSEL THAT A MONTH

5   AGO WHEN HE SENT ME THAT REQUEST FOR INFORMATION ON

6   THAT CASE.

7            AND NOW HE IS FILING A MOTION CALLING INTO

8   QUESTION MY ETHICS.  AND I DON'T APPRECIATE IT.

9            SUBMITTED.

10      THE COURT:  SO THIS CASE IN AIRPORT COURT IS

11  STILL PENDING?

12      MS. OKUN-WIESE:  IT IS PENDING AND -- I WASN'T

13  LOOKING SPECIFICALLY FOR THAT YESTERDAY WHEN I LOOKED

14  AT THE CASE, BUT I BELIEVE THE ARREST WARRANTS WERE

15  ISSUED ON APRIL 3RD.

16      THE COURT:  I MEAN, THAT CREATES ANOTHER ISSUE,

17  OF COURSE, BECAUSE THAT, MORE THAN ANYTHING -- WHAT

18  DETECTIVE THOMPSON MIGHT HAVE SAID TO THE WITNESS IS

19  MOST LIKELY A SITUATION WHERE SHE HAS A 5TH AMENDMENT

20  RIGHT NOT TO TESTIFY AND CERTAINLY HAS THE RIGHT TO

21  HAVE COUNSEL PRESENT AND WOULD MAKE HER CONCEIVABLY

22  UNAVAILABLE IF SHE ASSERTS HER 5TH AMENDMENT RIGHT.

23           AND I REALLY FEEL THAT, WITH REGARD TO THIS

24  MOTION, THAT THE COURT NEEDS TO HEAR FROM HER.

25      MS. OKUN-WIESE:  IF -- AND I WROTE THIS IN THE

26  MOTION; THAT IF THE COURT HEARS AND RULES ON THE

27  THIRD PARTY CULPABILITY MOTION ANYWAY AND RULES IN

28  THE PEOPLE'S FAVOR, THIS ISN'T AN ISSUE.

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1   THE COURT:  BUT YOU SEE, WITH REGARD TO THE
2   THIRD-PARTY CULPABILITY MOTION, IF MR. GILMORE MADE
3   STATEMENTS WHILE HE WAS CHOKING THIS WITNESS TO THE
4   EFFECT OF, "NOW YOU KNOW WHAT JULIANA FELT," OR WORDS
5   TO THAT EFFECT, WHICH IS THE ASSERTION FROM THE
6   DEFENSE, THAT SEEMS TO BE EVIDENCE THAT BEARS ON THE
7   THIRD PARTY CULPABILITY ISSUE.  AND, I MEAN, I THINK
8   IT IS RATHER CRITICAL THAT THAT'S WHAT WAS SAID, AND
9   I THINK I HAVE TO TAKE THAT INTO ACCOUNT.
10      BUT THAT'S WHY -- YOU KNOW, I FIND IT
11  PARTICULARLY FRUSTRATING THAT THERE IS NO TAPE
12  RECORDING OF THIS INTERVIEW, THE INITIAL INTERVIEW OF
13  HER.
14      BUT IT MOST DEFINITELY TO ME BEARS UPON THE
15  THIRD-PARTY CULPABILITY MOTION AND THIS OTHER MOTION.
16      BUT -- AND I REALLY THINK I NEED TO HEAR
17  FROM HER WITH REGARD TO THAT.
18      I MEAN, I WILL OBVIOUSLY HEAR FROM THEIR
19  WITNESS, MISS LYNDA -- WHAT WAS HER LAST NAME?
20      MR. BUEHLER:  LARSEN, YOUR HONOR.
21      THE COURT:  BUT I WOULD ASSUME THAT -- THAT I
22  WOULD NEED TO HEAR FROM THE WITNESS AS WELL.
23      AND SO IT REALLY -- IT JUST COMPLICATES
24  THIS WHOLE SITUATION INCREDIBLY.
25      SO, YOU KNOW, IT IS DEFINITELY AN ISSUE.  I
26  DON'T KNOW EXACTLY WHAT THE BEST WAY TO RESOLVE IT
27  WOULD BE, BUT -- AND I DON'T IMAGINE THAT YOU HAVE
28  THIS PERSON UNDER SUBPOENA.  OR MAYBE YOU DO; I DON'T

1   KNOW.

2       MS. OKUN-WIESE:  I DON'T.  AND QUITE FRANKLY, SHE

3   WON'T SPEAK TO ME EITHER.  I HAVE LEFT HER SEVERAL

4   MESSAGES AFTER I RECEIVED THEIR INFORMATION.  AND I

5   HAVEN'T SPOKEN TO HER.

6           AND I HAVE -- I DON'T KNOW WHERE SHE IS AT,

7   AND I DON'T KNOW IF THE DEFENSE HAS MADE ATTEMPTS TO

8   CONTACT HER OR SUBPOENA --

9       THE COURT:  IS SHE UNDER SUBPOENA?

10      MR. BUEHLER:  YES, SHE IS, YOUR HONOR.  WE DID

11  SUBPOENA.

12      THE COURT:  SO THE DEFENSE HAS HER UNDER

13  SUBPOENA.  SO PRESUMABLY WE CAN GET HER HERE.

14          I ASSUME THAT SHE DOES HAVE COUNSEL IN HER

15  CASE AT THE AIRPORT.  OR IF SHE HAS NEVER BEEN

16  ARRAIGNED ON THE WARRANT, MAYBE SHE DOESN'T.  I DON'T

17  KNOW.

18      MR. BUEHLER:  MY UNDERSTANDING IS SHE HAS NOT

19  BEEN ARRESTED.  THAT'S, AGAIN, JUST CHECKING THE

20  PUBLIC RECORDS.

21      THE COURT:  OKAY.

22          IN ANY EVENT, MAYBE YOU WANT TO CALL

23  MISS LARSEN RIGHT NOW.

24      MR. BUEHLER:  COULD I RESPOND TO A COUPLE THINGS,

25  YOUR HONOR?

26      THE COURT:  OKAY.

27      MR. BUEHLER:  ONE IN PARTICULAR I WANT TO RESPOND

28  TO, WHICH IS THE SUGGESTION THAT I AM QUESTIONING

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1    MISS OKUN-WIESE'S ETHICS, I DO NOT MEAN TO BE DOING

2    THAT.  I TOOK AT FACE VALUE WHAT SHE TOLD ME; THAT

3    SHE KNEW NOTHING ABOUT THE FILING OF THIS CASE

4    AGAINST THE WITNESS, AND I CONTINUE TO TAKE THAT AT

5    FACE VALUE.

6          MY CONCERN IS, THERE ARE OTHER PEOPLE

7    INVOLVED IN THE PROSECUTION TEAM.  THERE IS DETECTIVE

8    THOMPSON.  THERE COULD BE OTHER PEOPLE.  SO I DON'T

9    KNOW HOW IT COULD HAVE COME ABOUT, BUT THERE ARE WAYS

10   THAT THIS WITNESS COULD HAVE BEEN CHARGED IN THAT

11   OTHER CASE WITHOUT MISS OKUN-WIESE KNOWING THAT.

12          SO I DO NOT MEAN TO QUESTION HER ETHICS,

13   AND I APOLOGIZE THAT SHE THINKS I WAS DOING THAT.

14      THE COURT:  ALL RIGHT.

15      MR. BUEHLER:  OKAY.

16          WE CAN -- SHALL I CALL A WITNESS?

17      THE COURT:  IF YOU WANT ME TO HEAR FROM THEM.

18      MR. BUEHLER:  YES.

19          MISS LYNDA LARSEN.

20      MR. KASSABIAN:  YOUR HONOR, WILL THE CAMERA BE

21   TURNED OFF DURING TESTIMONY?

22      THE COURT:  I AM GOING TO ASK THAT THE CAMERA BE

23   TURNED OFF WHILE THE WITNESS TESTIFIES.

24

25

26

27

28

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

MOTION RE THIRD PARTY CULPABILITY

LYNDA LARSEN,

CALLED AS A WITNESS BY THE DEFENSE,

WAS SWORN AND TESTIFIED AS FOLLOWS:


THE COURT CLERK:  YOU DO SOLEMNLY SWEAR THE
TESTIMONY YOU ARE ABOUT TO GIVE IN THE CAUSE NOW
PENDING BEFORE THIS COURT TO BE THE TRUTH, THE WHOLE
TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

THE WITNESS:  YES.

THE COURT CLERK:  THANK YOU.

PLEASE BE SEATED RIGHT THERE ON THE WITNESS
STAND.

MR. BUEHLER:  I DON'T KNOW IF THE COURT HAS A
COPY OF MISS LARSEN'S INTERVIEW MEMORANDUM?  IF NOT,
I CAN SUPPLY IT TO THE COURT.

THE COURT:  I DO NOT.

MR. BUEHLER:  AND THE PEOPLE DO HAVE IT.

MS. OKUN-WIESE:  I DO.

THE COURT:  DO YOU HAVE ANY OBJECTION TO THE
COURT HAVING THAT?

MS. OKUN-WIESE:  I DO HAVE AN OBJECTION.  SHE IS
GOING TO TESTIFY TO IT, SO I WOULD RATHER SHE JUST
TESTIFY TO HER REPORT.

THE COURT:  OKAY, THAT'S FINE.

THE COURT CLERK:  PLEASE STATE YOUR NAME; THEN
SPELL YOUR FIRST AND LAST NAME FOR THE RECORD.

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
 1              THE WITNESS:  THANK YOU.
 2                  MY NAME IS LYNDA LARSEN.  L-Y-N-D-A.
 3      L-A-R-S-E-N.
 4          THE COURT:  YOU MAY INQUIRE.
 5
 6                      DIRECT EXAMINATION
 7      BY MR. BUEHLER:
 8          Q    GOOD MORNING, MISS LARSEN.
 9          A    GOOD MORNING.
10               SORRY; I HAVE A SORE THROAT.
11          Q    WHAT DO YOU DO FOR A LIVING?
12          A    I AM A LICENSED PRIVATE INVESTIGATOR.
13          Q    AND HOW LONG HAVE YOU BEEN A LICENSED
14      PRIVATE INVESTIGATOR?
15          A    I HAVE BEEN LICENSED SINCE 1988 AND HAVE
16      WORKED IN THE FIELD SINCE 1981.
17          Q    DID YOU, ON JANUARY 31ST, 2013, INTERVIEW A
18      PERSON WE ARE REFERRING TO HERE AS M.A.?
19          A    YES.
20          Q    AND CAN YOU DESCRIBE TO THE COURT -- FIRST
21      OF ALL, YOU WERE RETAINED BY ME SOME MONTHS AGO TO
22      WORK AS AN INVESTIGATOR IN THIS CASE ON BEHALF OF
23      KELLY PARK?
24          A    YES.
25          Q    AND HAVE YOU INTERVIEWED A NUMBER OF
26      WITNESSES IN THIS CASE?
27          A    YES.
28          Q    NOW HOW DID IT COME ABOUT ON JANUARY 31ST,
```

```
1    2013, THAT YOU INTERVIEWED M.A.?

2         A    MY COLLEAGUE HAD INTERVIEWED

3    NICHOLAS SCHWARCZ TWO DAYS PRIOR, AND HE --

4    MR. SCHWARCZ HAD TOLD MY COLLEAGUE A NUMBER OF THINGS

5    ABOUT WHAT HE HAD HEARD FROM MELISSA, ABOUT HER ABUSE

6    BY MR. GILMORE.  AND SO MY COLLEAGUE SUGGESTED THAT I

7    SPEAK WITH HER; THAT SHE MIGHT BE MORE COMFORTABLE

8    WITH A FEMALE INSTEAD OF A MALE INTERVIEWING HER.

9              AND SO THEY MADE ARRANGEMENTS AT THAT TIME.

10   WE WERE GOING TO MEET WITH HER THE NEXT DAY, AND --

11        Q    WHEN YOU SAY "WE WERE GOING TO MEET WITH

12   HER," WOULD THAT BE YOU AND YOUR COLLEAGUE?

13        A    YES.

14        Q    WHAT IS YOUR COLLEAGUE'S NAME?

15        A    TIM BOYD SMITH.

16        Q    AND DID YOU MEET WITH M.A.?

17        A    YES, I DID.  WE -- THEY RESCHEDULED FOR THE

18   31ST, DUE TO HER WORK SCHEDULE.  THEY CALLED AND

19   RESCHEDULED.  "THEY" MEANING MR. SCHWARCZ AND MELISA.

20   THEY WERE LIVING TOGETHER AT THE TIME AND

21   COORDINATING THEIR SCHEDULES.

22              AND THEN --

23        THE COURT:  SO AT THAT TIME M.A. WAS LIVING WITH

24   MR. SCHWARCZ?

25        THE WITNESS:  THAT'S CORRECT.

26   BOYFRIEND/GIRLFRIEND RELATIONSHIP.

27   BY MR. BUEHLER:

28        Q    AND WHERE DID YOU MEET WITH M.A.?
```

1    A    MET WITH HER ON THE EVENING OF THE 31ST AT

2  MR. SCHWARCZ' HOME.

3    Q    AND WHO WAS THERE?

4    A    MR. SCHWARCZ WAS THERE AND MISS A. WAS

5  THERE.  M.A. WAS THERE.  AND MY COLLEAGUE AND MYSELF.

6    Q    AND SO CAN YOU RECALL WHAT WORDS WERE FIRST

7  SPOKEN BETWEEN YOU AND M.A.?

8    A    WELL, NICHOLAS SCHWARCZ HAD ALREADY TOLD

9  MR. BOYD SMITH ABOUT WHAT WAS SAID ABOUT THE PREVIOUS

10  CHOKINGS OF M.A. BY MR. GILMORE, ABOUT "YOU WANT TO

11  KNOW HOW SHE FELT?" OR, "THIS IS HOW SHE FELT."

12          AND ONE HAD OCCURRED ON LIKE AN ENGAGEMENT

13  VACATION.  AND ONE HAD OCCURRED AT THEIR RESIDENCE

14  LATER.  SO I ALREADY SORT OF HAD THE INFORMATION --

15    Q    LET ME -- SO LET ME JUST CLARIFY THAT.

16          SO MR. BOYD SMITH PASSED ON TO YOU

17  STATEMENTS THAT MR. SCHWARCZ HAD MADE TO HIM ABOUT

18  THINGS HE HAD HEARD FROM M.A. ABOUT HER RELATIONSHIP

19  WITH GILMORE?

20    A    CORRECT.  HE -- YES.

21          SO MR. BOYD SMITH HAD INTERVIEWED

22  MR. SCHWARCZ, AND HE TOLD HIM SORT OF A LITANY OF

23  THINGS ABOUT WHAT MELISA HAD TOLD HIM IN THE PAST AND

24  HIS OWN EXPERIENCE WITH MR. GILMORE.

25    Q    SO WHAT TRANSPIRED IN YOUR INTERVIEW WITH

26  M.A.?

27    A    SO IT WAS A FRIENDLY -- YOU KNOW, I DON'T

28  HAVE A BADGE.  I GAVE HER A BUSINESS CARD JUST LIKE I

1    GAVE THE COURT REPORTER. AND IT HAS MY NAME, MY

2    BUSINESS, MY LICENSE NUMBER. THERE IS NO INSIGNIA,

3    ANY SORT OF LAW-ENFORCEMENT. I AM NOT FORMER

4    LAW-ENFORCEMENT.

5        Q    DID YOU TELL HER ANYTHING ABOUT WHO YOU

6    REPRESENTED OR WHAT YOUR PURPOSE WAS?

7        A    YES, YES.

8        Q    WHAT DID YOU TELL HER?

9        A    I TOLD HER THAT I WORK FOR THE ATTORNEY FOR

10   MISS PARK. I USED MARK KASSABIAN'S NAME JUST BECAUSE

11   I WORKED WITH MARK MORE RECENTLY ON IT, YOUR

12   CO-COUNSEL.

13           AND SHE ALREADY KNEW THAT WE WORKED FOR THE

14   DEFENDANT. AND BOTH SHE AND NICK, OR MR. SCHWARCZ

15   WERE LIKE, "WELL, YOU KNOW, SHE DESERVES HER DAY IN

16   COURT. AND, YOU KNOW, THIS IS OUR INFORMATION."

17           AND THEY WERE BOTH CONVINCED THAT HE WAS --

18   YOU KNOW, HAD THE POTENTIAL TO KILL SOMEONE, BASED

19   UPON M.A.'S PRIOR EXPERIENCE WITH HIM ON AT LEAST TWO

20   SIGNIFICANT OCCASIONS.

21       Q    SO THAT "HE" HAD THE POTENTIAL TO KILL,

22   REFERRING TO JOHN GILMORE?

23       A    YES, MISS -- M.A. TOLD ME THAT SHE LIVED IN

24   FEAR FOR HER LIFE; THAT SHE HAD MEN WALK HER TO HER

25   CAR AT WORK.

26           I BELIEVED HER. SHE WAS CRYING. SHE HAD A

27   BREAKDOWN DURING OUR MEETING. WE CAN GO THROUGH IT,

28   BUT --

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1    Q    OKAY.  LET'S START AT THE BEGINNING OF THE

2   INTERVIEW.

3        AFTER YOU INTRODUCED YOURSELF, HOW DID THE

4   INTERVIEW THEN PROCEED?

5    A    I SAT DOWN WITH HER ON THE COUCH.  AND THE

6   TWO MEN SORT OF WALKED IN AND OUT.  YOU KNOW, TRIED

7   TO GIVE US OUR PRIVACY.

8        AND WE STARTED, YOU KNOW, LIKE HOW SHE AND

9   JOHN MET, AT A PARTY.

10        THE FIRST INCIDENTS OF VIOLENCE WAS WHEN

11   SHE BROUGHT THE WRONG BEER.  AND HE THREW HER UP

12   AGAINST THE WALL WITH HIS HAND ON HER THROAT.  YOU

13   KNOW, SIGNIFICANT.

14        ON ANOTHER OCCASION HE WAS THROWING HER IN

15   AND OUT OF A CAR.  THERE WAS NO CHOKING IN THAT, BUT

16   IT WAS A VIOLENT EXPERIENCE.  IN AND OUT OF A CAR,

17   BEING DRAGGED OUT OF A VEHICLE.  HE HAD ATTEMPTED TO

18   BATTER HER IN THE MORNING, BUT HE WAS VOMITING, SO HE

19   COULDN'T FOLLOW THROUGH.

20        THE MORE SIGNIFICANT I GUESS THIRD EVENT

21   WOULD BE WHEN HE HAD PROPOSED TO HER.  THEY WERE

22   ENGAGED, AND WENT ON VACATION TO SOME SORT OF BED AND

23   BREAKFAST OR SOMETHING IN TEMECULA OR MURRIETA,

24   SOMETHING LIKE THAT.  AND THEY WERE HAVING AN

25   ARGUMENT.  AND SHE BEGAN THE ARGUMENT BY SAYING, "I

26   KNOW YOU KILLED JULIANA."  AND I GUESS HE -- I AM NOT

27   SURE WHAT EXACTLY HE SAID, BUT SHE SAID HE THREW HER

28   ON THE BED AND STARTED CHOKING HER, AND -- AND TOLD

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1   HER SOMETHING TO THE EFFECT OF, "YOU WANT TO KNOW HOW

2   SHE FELT?  DO YOU WANT TO KNOW HOW JULIANA FELT?"

3            AND SHE SAID HIS PHONE RANG.  HE PICKED UP

4   THE PHONE AND HE BROKE OUT OF HIS STATE AND TOOK THE

5   CALL.  AND IF NOT FOR THAT CALL, YOU KNOW, SHE MIGHT

6   NOT HAVE LIVED THROUGH THE EXPERIENCE.

7            I DON'T HAVE A LOT OF INFORMATION ABOUT

8   WHAT HAPPENED IN BETWEEN THE NEXT -- THAT INCIDENT

9   AND THE NEXT INCIDENT.  BUT THE NEXT INCIDENT

10  OCCURRED AT THEIR RESIDENCE WHEN SHE WAS LIVING WITH

11  HIM IN EL SEGUNDO.  AND AGAIN THEY WERE FIGHTING.

12  AND SHE HAD FOUND SOME PHOTOGRAPHS OF OTHER WOMEN OR

13  GIRLS WITH JOHN ON HIS LAPTOP.  AND SHE CONFRONTED

14  HIM, AND HE GOT ANGRY, TOOK THE LAPTOP AND THREW IT

15  AT HER.  I AM NOT SURE IF IT STRUCK HER.  THREW IT AT

16  HER.  THREW HER ON THE BED, GOT BACK ON TOP OF HER

17  AND WAS CHOKING HER WHERE SHE SAID SHE SAW STARS;

18  THAT SHE WAS GOING OUT.  AND AGAIN, "YOU WANT TO KNOW

19  HOW JULIANA FELT?"  IT WAS A VERY EVOCATIVE

20  EXPERIENCE.

21           AT THAT POINT IN OUR INTERVIEW I ASKED MY

22  COLLEAGUE, YOU KNOW, "COULD YOU COME IN AND COULD YOU

23  TAKE PHOTOGRAPHS OF WHAT HAPPENED?"  AND I ASKED M.A.

24  TO DEMONSTRATE ON ME.

25     THE COURT:  I AM SORRY?

26     THE WITNESS:  I ASKED M.A. TO DEMONSTRATE ON ME

27  WHAT HAD HAPPENED TO HER.  AND I LIED DOWN ON THE

28  COUCH, AND SHE STRADDLED MY BODY WITH HER KNEES,

1    HOLDING DOWN MY ARMS AND MY SHOULDERS, PUTTING HER
2    HANDS ON MY THROAT.  AND MY COLLEAGUE PHOTOGRAPHED IT
3    ON HIS PHONE.  AND IT WAS I THINK A VERY REGRESSIVE
4    OR SOME SORT OF AN EVOCATIVE EXPERIENCE FOR HER.  I
5    THINK SHE RE-EXPERIENCED SOMETHING.  SHE IMMEDIATELY
6    GOT VERY UPSET AND LEFT THE ROOM AND WAS CRYING.  SO
7    WE LET HER BE.  LET HER BE.
8         I BELIEVE SHE WENT BACK TO HER BEDROOM.
9    NICK WENT AND CHECKED ON HER, MADE SURE SHE WAS OKAY.
10        SHE CAME BACK AND LOOKED AS IF SHE WAS
11   STILL CRYING.  SHE WAS COMPLETELY FLUSHED FROM HER
12   CHEST UP TO HER NECK TO HER ARMS, HER FACE.  SHE WAS
13   WEARING A TANK TOP.
14        I SAID "ARE YOU OKAY?  WE DON'T HAVE TO DO
15   THIS.  YOU KNOW.  WE CAN" -- "I DON'T WANT YOU TO GO
16   INTO SOME SORT OF STATE."
17        AND THEN SHE GOT LIKE SUPER PARANOID THAT I
18   WAS WORKING FOR JOHN GILMORE'S FATHER AND WANTED ME
19   TO ERASE THE PHOTOGRAPHS, WHICH WE DID.  MY COLLEAGUE
20   TOOK THE PHONE, SHOWED IT TO HER; THAT HE WAS ERASING
21   THE PHOTOGRAPHS.  THAT CALMED HER DOWN.  BUT SHE WAS
22   STILL WORRIED THAT I SOMEHOW WAS WORKING -- THAT THE
23   FATHER HAD MONEY OR SOMETHING LIKE THAT, OR
24   INFLUENCE, AND THAT I WAS WORKING FOR THE FATHER IN
25   SOME REGARD FOR JOHN.
26        I SAID I AM NOT ALLOWED TO DO THAT.  MY
27   LICENSE -- YOU KNOW, I HAVE TO TELL THE TRUTH ABOUT
28   WHO I AM AND WHO I AM WORKING FOR.

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)
104

1    SO I TAKE OUT -- I HAD ALREADY TOLD HER
2    ABOUT MARK.  SO I TAKE OUT THE PAPERS THAT I HAVE
3    WITH ME, WHICH IS MY JOHN GILMORE FILE.  AND IT HAS
4    THE SUBPOENAS FOR POLICE RECORDS.  AND I WAS SHOWING
5    HER MARK'S -- MR. KASSABIAN'S NAME ON THE HEADER AS
6    THE COUNSEL IN PEOPLE VERSUS KELLY SOO PARK, AND THAT
7    WE HAD SUBPOENAED VARIOUS RECORDS FROM EL SEGUNDO,
8    MANHATTAN BEACH, ET CETERA.  AND SHE WANTED TO LOOK
9    AT THEM.
10    SHE WAS PRETTY UPSET, AND AT THIS POINT
11    WANTED ME TO WRITE A DECLARATION ABOUT WHO I WAS,
12    WHICH I DID DO.
13    SO I LET HER LOOK AT THE RECORDS.  AND I AM
14    WRITING THE DECLARATION:  "I LYNDA LARSEN, AM
15    RETAINED BY MARK KASSABIAN IN THE MATTER OF PEOPLE V.
16    KELLY PARK."  AND I PUT DOWN MY LICENSE NUMBER, MY
17    DATE OF BIRTH, AND I SIGNED IT UNDER PENALTY OF
18    PERJURY.
19    SHE IS LOOKING THROUGH THE DOCUMENTS AND
20    SHE FINDS THE ITEM AT ISSUE, I BELIEVE, WHICH IS THE
21    POLICE REPORT FOR THE STAT RAPE OF A 15 YEAR-OLD
22    GIRL.  AND SHE BECAME VERY FIXATED ON THE DATE, NOT
23    THAT IT WAS A RAPE --
24    Q    THIS WAS A POLICE REPORT RELATING TO WHOM?
25    A    MR. GILMORE WAS THE SUSPECT, AND IT WAS A
26    REPORT -- THE VICTIM WAS NOT IDENTIFIED BECAUSE SHE
27    WAS A MINOR.
28    BUT IT WAS A CONSENSUAL EXPERIENCE; IT

1    WASN'T A RAPE.  IT WAS A STATUTORY RAPE.  AND IT WAS

2    A POLICE REPORT, AND IT WAS ATTACHED TO THE SUBPOENA

3    RETURN.

4            THE INFORMATION HAD COME BACK ON -- FROM

5    THE SUBPOENA, AND IT WAS ATTACHED TO THE SUBPOENA.

6            SO ANYWAY SHE STARTS -- MISS M.A. STARTS

7    LIKE LOOKING AT THE DATE OF THE -- I GUESS THE LAST

8    CONTACT THAT MR. GILMORE HAD HAD WITH THIS MINOR.

9    AND SHE SAYS, "THAT'S WHEN I WAS DATING HIM."  AND

10   SHE GETS OFF ON THAT TANGENT WHERE SHE IS NOW MAD

11   INSTEAD OF BEING IN THIS SORT OF LIKE REGRESSIVE

12   STATE OF BEING A VICTIM.  NOW SHE IS REALLY ANGRY AND

13   GETTING AGITATED.  LIKE, "THAT'S WHEN I WAS DATING

14   HIM.  WHY WAS HE SEEING THIS GIRL?"

15           AND I AM LIKE, "I DON'T KNOW."  YOU KNOW, I

16   HAVE NO IDEA.

17           SO WE TRY AND REGROUP.  I AM WRITING THE

18   DECLARATION.  I DON'T HAVE A COPY -- SHE DIDN'T HAVE

19   A COPY MACHINE.  IT WAS JUST A ONE LITTLE PARAGRAPH

20   THING.  I LEFT IT THERE.  I SAID, "I THINK THIS IS

21   ENOUGH FOR TONIGHT.  LET'S REGROUP."

22           SHE SAID SHE WANTED ME TO MEET HER PARENTS;

23   THAT THERE HAVE BEEN A LOT OF EXPERIENCES HER PARENTS

24   HAD WITH GILMORE.  HE TRIED TO KILL HIMSELF AND SHOW

25   UP AT THE HOUSE.  HE WAS ALWAYS HARASSING M.A. AT

26   THEIR HOME, AT THE GRANDPARENTS' HOME.  SHE WAS

27   AFRAID FOR HER OWN SAFETY.

28           I HAD A LEGAL PEPPER SPRAY THING ON MY KEY

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
 1    CHAIN.  WE TALKED ABOUT THAT; THAT I WAS GOING TO --
 2    SHE WAS AFRAID FOR HER SAFETY, AND I WAS CONCERNED
 3    FOR HER SAFETY.  AND I SAID, "YOU KNOW, IT IS A CHEAP
 4    LITTLE THING.  YOU CAN GET IT AT A SPORTING GOODS
 5    STORE."
 6         SO I MADE ARRANGEMENTS THAT -- I GOT HER
 7    ONE.  AND I RETURNED THE NEXT DAY, AND I MET WITH HER
 8    AT THAT SAME LOCATION.  AND I JUST GAVE HER THE
 9    PEPPER SPRAY AND GAVE HER A HUG, YOU KNOW, AND SAID
10    "CALL ME IF ANYTHING COMES UP."
11         AND SHE SAID THAT SHE WAS SEEING HER
12    THERAPIST ON MONDAY AND THAT SHE WOULD, YOU KNOW,
13    DEAL WITH IT.
14         AND I SAID, "JUST KEEP A LOW PROFILE.  YOU
15    KNOW, CHANGE YOUR ROUTE."  I TRIED TO GIVE HER SOME
16    REAL BASIC SORT OF SECURITY SUGGESTIONS.
17         BUT IN ANY EVENT, WE MADE ARRANGEMENTS THAT
18    I WOULD MEET WITH HER AGAIN AND HER FAMILY.
19         I LET HER BE FOR THE WEEKEND.  SHE SAID SHE
20    WAS GOING TO SEE HER THERAPIST ON MONDAY.  I WANTED
21    TO RESPECT THAT.
22         SO I AM NOT SURE EXACTLY WHEN I CALLED
23    NEXT, BUT I PROBABLY CALLED THAT TUESDAY OR
24    WEDNESDAY; I AM NOT SURE WHAT THAT DATE WOULD BE, BUT
25    I SAW HER ON THE 31ST.
26         SO I WOULD HAVE SEEN HER WITH THE PEPPER
27    SPRAY ON THE 1ST, AND THAT WAS A SATURDAY, I BELIEVE.
28    AND THEN SUNDAY, MONDAY, TUESDAY -- ANYWAY, I DIDN'T
```

1   HEAR BACK FROM HER.  AND I THOUGHT WELL MAYBE HER

2   THERAPIST SAID "YOU NEED TO HAVE SOME CLOSURE."  THIS

3   IS MY FIRST GUESS.

4            AND I CALLED MR. KASSABIAN AND I SAID "SHE

5   IS NOT CALLING BACK.  I AM GUESSING IT IS THE

6   THERAPIST."

7            NEXT THING, I AM -- IT IS THE 6TH.  I

8   BELIEVE IT IS THE 6TH.  I AM DRIVING AROUND BIG BEER

9   AND I GET A CALL FROM MY COLLEAGUE, MR. BOYD SMITH,

10  AND HE TELLS ME THAT NICHOLAS HAD CALLED HIM AND SAID

11  THAT HE AND M.A. HAD A FIGHT.  IT WAS THAT SHE HAD

12  GONE BACK TO JOHN.  I MEAN, HE WAS PRETTY CERTAIN SHE

13  HAD GONE BACK TO JOHN, AND THAT A DETECTIVE HAD

14  CALLED HER AND, YOU KNOW, TOLD HER THAT I WAS A LIAR

15  AND THAT I HAD FALSIFIED DOCUMENTS.

16           AND I WAS LIKE, YOU KNOW, I AM NOT A LIAR

17  AND I DIDN'T FALSIFY DOCUMENTS.  AND I THINK HE

18  BELIEVED ME BECAUSE I HAD MET HIM BEFORE.  AND HE

19  SAID "NOW DON'T" -- "DON'T TELL MELISA THAT YOU KNOW

20  ABOUT THIS BECAUSE I AM NOT SUPPOSED TO TELL HER I

21  CALLED YOU."

22           I SAID, "OKAY, I WON'T."

23           AND I DIDN'T ATTEMPT HER AGAIN.

24           HE HAD SINCE -- I THINK MY COLLEAGUE MADE

25  AN ADDITIONAL ATTEMPT TO FOLLOW UP AND SEE WHAT OR

26  IF -- OR WHATEVER HAD HAPPENED.  AND I DON'T BELIEVE

27  HE CALLED HIM BACK.

28           AND THEN EVENTUALLY MY COLLEAGUE SERVED

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1   BOTH M.A. AND NICHOLAS -- WHO WERE THEN AGAIN LIVING

2   TOGETHER AT THE TIME OF SERVICE -- THEY WERE SERVED

3   AT NICHOLAS' HOME --

4       Q    AND WHEN WAS THE TIME OF SERVICE, DO YOU

5   RECALL?

6       A    I AM NOT CERTAIN.  I DIDN'T DO THE SERVICE.

7   BUT IT WAS WITHIN THE LAST MONTH.

8       Q    SO AFTER YOUR INTERVIEW --

9       THE COURT:  SO THEY ARE LIVING TOGETHER NOW?  OR

10  IS SHE -- OR M.A. IS WITH JOHN NOW?  OR --

11      THE WITNESS:  AT THE TIME OF THE SERVICE I DIDN'T

12  KNOW ABOUT THE POLICE FILING, SO IT MUST HAVE BEEN

13  BEFORE THAT -- THEY WERE LIVING AT MR. SCHWARCZ'

14  HOME.  SO AT THE TIME I INTERVIEWED HER AT THE END OF

15  JANUARY, SHE WAS LIVING AT MR. SCHWARCZ' HOME,

16  NICHOLAS SCHWARCZ.

17          AND THEN AT THE TIME OF THE SERVICE, MY

18  COLLEAGUE SERVED HER, AND -- HE HAD SERVED THEM BOTH

19  AT THE RESIDENCE.  I DON'T RECALL THE DATE.

20  BY MR. BUEHLER:

21      Q    BUT THAT WAS AT MR. SCHWARTZ' HOME AS WELL?

22      A    THAT'S CORRECT.

23      Q    THEY WERE BOTH THERE AT THE TIME?

24      A    THAT'S -- NOT EXPECTING US -- I THINK MY

25  COLLEAGUE HAD CALLED TO SAY "I WOULD LIKE TO MAKE AN

26  APPOINTMENT TO SERVE YOU, PUT YOU ON CALL."  BECAUSE

27  I HAD TOLD MELISA -- EXCUSE ME, I HAD TOLD M.A.

28  BEFORE THAT WE COULD PUT HER ON CALL AND NOT MAKE HER

```
1    LIKE SIT AROUND AND WAIT FOR COURT.  YOU KNOW, THAT
2    WE COULD GIVE HER SOME ACCOMMODATION IN TERMS OF
3    TIMING BECAUSE SHE HAS A JOB.
4         Q    WHEN IS THE LAST TIME THAT YOU ATTEMPTED TO
5    CONTACT M.A.?
6         A    IT WOULD HAVE BEEN BEFORE NICHOLAS CALLED
7    ME.  I DIDN'T WANT TO -- I DIDN'T CALL HER AGAIN.
8         Q    SO IN OTHER WORDS, NICHOLAS CALLED YOU AND
9    TOLD YOU THAT SHE WAS BACK WITH JOHN GILMORE; IS THAT
10   CORRECT?
11        A    YES.
12        Q    OKAY.  AND SO AFTER THAT YOU MADE NO
13   FURTHER EFFORTS TO CONTACT HER; IS THAT CORRECT?
14        A    NO.
15        Q    OKAY.
16        A    THAT'S CORRECT.  I DID NOT.  I DID NOT MAKE
17   ANY FURTHER EFFORT.
18        Q    OKAY.
19             WHEN YOU TALKED ABOUT HER BEING AFRAID, DID
20   SHE SAY WHO SHE WAS AFRAID OF?
21        A    SHE SAID SHE WAS AFRAID OF JOHN GILMORE;
22   THAT SHE WAS AFRAID HE WOULD KILL HER; THAT HE HAD
23   ATTEMPTED TO KILL HER IN THE PAST.  THAT'S WHY SHE
24   HAD HER MALE FRIENDS AT WORK WALK HER TO THE CAR.
25   AND I -- I BELIEVED HER.  I MEAN, SHE SEEMED TO
26   REALLY EXUDE THAT --
27        THE COURT:  BUT THEN SHE WENT BACK TO HIM AFTER
28   THAT?
```

```
 1        THE WITNESS:  I ASSUME.  THAT'S WHAT I WAS TOLD.
 2   BY MR. BUEHLER:
 3        Q    DID -- NOW IN YOUR INTERVIEW OF HER ON
 4   JANUARY 31ST, DID YOU TELL HER ANYTHING ABOUT THAT
 5   YOU BELIEVED THAT JOHN GILMORE WAS THE MURDERER IN
 6   THIS CASE?
 7        A    I DON'T THINK SO.  I THINK I HAD JUST SAID,
 8   "IT SEEMS CONSISTENT.  THIS CHOKING BEHAVIOR SEEMS
 9   CONSISTENT WITH WHAT HAPPENED TO THE VICTIM."  YOU
10   KNOW.  I WASN'T THERE, OBVIOUSLY.
11        AND THEN SHE TOLD ME THAT THERE WAS ANOTHER
12   VICTIM; THAT JOHN HAD ANOTHER GIRLFRIEND THAT HE HAD
13   HURT.  SHE DIDN'T SAY CHOKED, BUT HAD HURT.  AND SHE
14   KNEW HER FIRST NAME; DIDN'T KNOW HER LAST NAME.
15        Q    WHEN YOU MET WITH HER, WAS SHE -- DID SHE
16   INDICATE ANY UNWILLINGNESS TO SPEAK WITH YOU ABOUT
17   THIS?
18        A    NO.  SHE WAS VERY FORTHCOMING.  SUPER
19   FRIENDLY.  AND, YOU KNOW, THEY WERE MAKING CALLS BACK
20   TO US ABOUT RESCHEDULING; THAT WE HAD HAD -- MY
21   PARTNER -- MY COLLEAGUE HAD SEEN MR. SCHWARCZ ON DAY
22   B -- A, AND THEN WE WERE GOING TO SEE THEM DAY B.
23        AND THEY CALLED BACK AND SAID NO, THAT
24   DOESN'T WORK WITH HER SCHEDULE.  CAN YOU COME DAY C?
25        YES.  WHAT'S A GOOD TIME?
26        SO THERE WERE NO MORE LIKE DROP-IN VISITS.
27   IT WAS ALL PHONE CALLS AND POLITE CONVERSATION.
28        Q    OKAY.
```

1       DID YOU -- SO DID SHE JUST WILLINGLY TALK

2   ABOUT THESE INCIDENTS?  DID YOU HAVE TO TELL HER --

3   TELL HER ANYTHING IN ORDER TO INDUCE HER TO TALK?

4       A    IT WAS LIKE ASKING HER TO DESCRIBE A CAR

5   ACCIDENT.  YOU KNOW.  I KIND OF ALREADY KNEW THE

6   INFORMATION, BUT I WANTED TO HEAR IT FIRSTHAND.  AND

7   MY COLLEAGUE THOUGHT IT WAS BETTER IF IT WAS A FEMALE

8   TO FEMALE.

9       AND SO I JUST, YOU KNOW, SORT OF INTRODUCED

10  MYSELF.  AND THE MEN RETREATED.  AND I ASKED HER WHEN

11  THEY MET, AND JUST SORT OF THE BASICS.  WHAT WAS THE

12  FIRST TIME?  WHAT WAS THE SECOND -- I TRIED TO DO IT

13  IN A CHRONOLOGICAL ORDER.

14      SHE DIDN'T GET UPSET.  IT WAS SORT OF KIND

15  OF ROUTINE.  AND IT WAS ONLY UNTIL WE DID THE

16  REENACTMENT THAT SHE REALLY LOST -- SEEMED TO REGRESS

17  INTO SOME SORT OF STATE WHERE SHE LEFT THE ROOM AND

18  CAME BACK AS IF SHE HAD HAD SOME SORT OF, YOU KNOW,

19  STRESS REACTION, A VISIBLE STRESS REACTION.

20      Q    SO PRIOR TO HER TELLING YOU ABOUT THOSE

21  INCIDENTS WITH MR. GILMORE, HAD YOU DISCUSSED WITH

22  HER IN ANY WAY THE EVIDENCE IN THIS CASE?

23      A    NO.  I -- YOU KNOW, I JUST SAID THAT I WORK

24  FOR MARK KASSABIAN; THAT KELLY PARK HAD BEEN ACCUSED;

25  THAT WE WERE INTERVIEWING OTHER PEOPLE.  WHO SHOULD

26  WE INTERVIEW.

27      I ASKED ABOUT SOME OF HIS FRIENDS, WHO

28  MIGHT BE GOOD TO SPEAK TO, ANY OTHER GIRLFRIENDS.

```
 1              SHE ALSO REFERRED ME TO A PRIOR ROOMMATE
 2    THAT SHE HAD KIND OF KNOWN WHEN JOHN WAS LIVING WITH
 3    THIS MAN, AND THAT SHE AND THIS MAN WOULD JOKE THAT
 4    JOHN WAS THE PSYCHO EX-BOYFRIEND KILLER; THAT IT WAS
 5    SORT OF THIS, YOU KNOW, JOKE BETWEEN THEM, SHE AND
 6    THIS THIRD-PARTY ROOMMATE, LIKE THEY WOULD -- YOU
 7    KNOW, JOHN WOULD ALWAYS SAY THAT JULIANA WAS KILLED
 8    BY THE PSYCHO EX-GIRLFRIEND.  SO THE JOKE BETWEEN THE
 9    TWO OF THEM WAS THAT JOHN WAS THE PSYCHO
10    EX-GIRLFRIEND BECAUSE -- BECAUSE M.A. HAD EXPLAINED
11    THAT HE WOULD OFTEN BLANK OUT OR BLACK OUT AND
12    WOULDN'T HAVE ANY SORT OF MEMORY OF WHAT HAD HAPPENED
13    THE NIGHT BEFORE.
14              SHE GAVE AN EXAMPLE OF ONE DAY HE TRASHED
15    THE ENTIRE HOME, BROKE ALL THE FURNITURE.  AND SHE
16    CAME HOME FROM WORK AND SHE SAID, "WHAT DID YOU DO TO
17    THE HOUSE?"  YOU KNOW, "WHAT HAVE YOU DONE?"  SO HE
18    HAD NO RECOLLECTION OF HAVING DESTROYED THE HOUSE
19    DURING THE DAY AND THEN BLAMED HER FOR IT AT NIGHT.
20              AND THAT ROOMMATE WHO WE SUBSEQUENTLY
21    INTERVIEWED SAID THAT HE HAD HAD THE SAME EXPERIENCE
22    WITH JOHN; THAT WHEN HE GOES INTO THESE VIOLENT
23    STATES, HE BLACKS OUT AND HAS NO RECOLLECTION.  WHEN
24    HE WOULD HAVE A CONVERSATION WITH HIM THE NEXT DAY
25    ABOUT, "WELL LAST NIGHT YOU SAID YOU WERE GOING TO
26    MOVE OUT," JOHN WOULD SAY "NO, I DIDN'T.  I NEVER
27    SAID I WAS GOING TO MOVE OUT."  BECAUSE HE WAS ASKED
28    TO MOVE OUT BECAUSE HE WAS DESTROYING THE PLACE AND
```

1    HAVING BIG SCENES AT THE HOUSE.

2            SO THIS SORT OF BLACKOUT, THAT JOHN

3    WOULDN'T HAVE A RECOLLECTION OF HAVING DONE

4    SOMETHING, IS WHY THEY WOULD JOKE ABOUT JOHN BEING

5    THE PSYCHO EX-BOYFRIEND.

6        Q    IN DOING YOUR JOB AS AN INVESTIGATOR AND

7    INTERVIEWING PEOPLE, DO YOU CONSIDER YOURSELF UNDER

8    AN OBLIGATION TO TELL THE PEOPLE YOU INTERVIEW THE

9    TRUTH?

10       A    YES, I DO.

11       Q    DO YOU ALWAYS DO THAT?

12       A    YES, I DO.

13       Q    DID YOU SAY ANYTHING TO M.A. THAT WAS NOT

14   THE TRUTH?

15       A    NO.  I TRY TO LISTEN.  YOU KNOW, IT IS

16   MY -- MY TRAINING IS, YOU KNOW, THE MORE YOU TALK,

17   THE LESS YOU GET.  AND THAT IF YOU JUST SORT OF SIT

18   AND LISTEN, YOU KNOW, LIKE YOU WOULD WITH A THERAPIST

19   ALMOST --

20       Q    DID YOU PRETEND TO BE LAW-ENFORCEMENT?

21       A    NO.  I WOULDN'T KNOW HOW.  I HAVE NEVER

22   BEEN LAW-ENFORCEMENT.

23       Q    AND YOU NEVER SHOWED HER A BADGE?

24       A    I DON'T -- NO.  I DON'T HAVE A BADGE.

25            I GAVE HER MY BUSINESS CARD.  LATER ON WHEN

26   SHE WANTED ME TO WRITE THE DECLARATION THAT I WASN'T

27   WORKING FOR JOHN GILMORE'S FATHER -- HIS NAME, I

28   DON'T RECALL -- I TOOK OUT MY LICENSE THAT'S IN MY

1   BILLFOLD THAT HAS MY DRIVER'S LICENSE.  I TOOK OUT MY
2   PRIVATE INVESTIGATOR LICENSE SO I COULD WRITE DOWN MY
3   LICENSE NUMBER BECAUSE I HAVE TWO DIFFERENT -- I HAVE
4   A CORPORATE LICENSE AND AN INDIVIDUAL LICENSE.  SO I
5   BROUGHT OUT MY -- I SHOWED HER MY STATE OF CALIFORNIA
6   LICENSE.  IT DOESN'T -- IT DOESN'T HAVE A BADGE.  IT
7   HAS A STATE SEAL BUT IT IS NOT -- IT IS DISCREET.
8        MR. BUEHLER:  THANK YOU.
9            NO FURTHER QUESTIONS.
10       THE COURT:  CROSS?
11
12                    CROSS-EXAMINATION
13  BY MS. OKUN-WIESE:
14       Q    YOU INDICATED THAT THERE WAS A PHOTOGRAPH
15  THAT WAS ERASED?
16       A    YES.
17       Q    CAN YOU DESCRIBE HOW THAT CAME ABOUT?
18       A    WHEN WE HAD DONE THE REENACTMENT WHERE SHE
19  HAD GOTTEN ON TOP OF ME; I WAS HER AND SHE WAS JOHN.
20  AND THEN I ASKED MY COLLEAGUE TO DO THE PHOTOGRAPH.
21  HE DID IT WITH HIS PHONE.  AND SO HE TOOK A
22  PHOTOGRAPH OF MELISA ON TOP OF ME STRADDLING ME,
23  CHOKING ME.
24            AND THEN AFTER SHE HAD HER SORT OF LIKE --
25  YOU KNOW, MELT DOWN OR WHATNOT, SHE ASKED THAT WE
26  ERASE IT FROM THE PHONE, WHICH WE DID BECAUSE SHE WAS
27  GOING NUTS.  SHE WAS VERY AGITATED AND REALLY UPSET.
28            I SAID "OKAY, FINE.  WE WILL ERASE IT."

1          BUT WE HAD ASKED HER BEFORE, YOU KNOW,

2    COULD WE PHOTOGRAPH -- COULD WE TAKE A PHOTOGRAPH OF

3    WHAT HAPPENED SO IT IS NOT JUST ME DESCRIBING IT.

4        Q    SO IT WASN'T A RECORDING?

5        A    NO.  IT WASN'T A RECORDING.  IT WAS --

6        Q    YOU DID WRITE IN YOUR REPORT THAT SHE ASKED

7    THAT THE RECORDING BE ERASED, WHICH AT THE TIME YOU

8    OBLIGED AND YOU ERASED IT?

9        A    I MISSTATED.  I THOUGHT IT WAS A RECORDING.

10   I THOUGHT IT WAS A VIDEO STILL, BUT APPARENTLY IT WAS

11   A PHOTOGRAPH.

12       Q    SO YOU HAD A CELL PHONE WITH YOU THAT COULD

13   RECORD, CORRECT?

14       A    I -- MY COLLEAGUE DID.

15       Q    DO YOU HAVE A CELL PHONE?

16       A    YES.

17       Q    DOES IT RECORD?

18       A    NO, I DON'T BELIEVE SO.

19       Q    BUT HIS CELL PHONE DOES RECORD?

20       A    YES.

21       Q    AND YOU CHOSE NOT TO RECORD HER INTERVIEW

22   WITH HER?

23       A    NO.  USUALLY IT MAKES PEOPLE REALLY

24   INHIBITED.

25          I MEAN, NORMALLY WHAT I WILL DO IS I WILL

26   DO SORT OF A PRE-INTERVIEW, AND THEN I WILL -- YOU

27   KNOW, ONCE I UNDERSTAND, YOU KNOW, FROM SOUP TO NUTS

28   PRETTY MUCH WHAT THEY ARE GOING TO SAY, I WILL RECAP

1   IT.  BUT SHE WAS SO -- AND AT THAT TIME I WILL EITHER

2   DO A WRITTEN STATEMENT, WHERE THEY SIGN UNDER PENALTY

3   OF PERJURY, OR RECORD IT.  BUT SHE WAS SO LIKE -- I

4   CAN'T EVEN DESCRIBE HER STATE.  SHE HAD -- LIKE SHE

5   HAD REGRESSED INTO BEING A VICTIM AGAIN WHERE SHE

6   WAS, YOU KNOW, SHAKING.

7          AND I JUST SAID "LET'S JUST QUIT FOR

8   TONIGHT AND LET'S MEET AGAIN."  AND AT THAT TIME I

9   PLANNED ON EITHER DOING A WRITTEN -- I TALKED TO

10  MR. KASSABIAN.  "DO YOU WANT IT WRITTEN?  DO YOU WANT

11  TO RECORD IT?"  BECAUSE NORMALLY WE DO SOME SORT OF A

12  PRE-INTERVIEW BEFORE WE RECORD ANYONE.

13      Q    HOW LONG WAS THIS INTERVIEW?

14      A    I BELIEVE IT WAS PROBABLY LESS THAN TWO

15  HOURS.

16      Q    AND YOU WENT THERE KNOWING WHAT YOU WERE

17  GOING THERE FOR BECAUSE YOU HAD PREVIOUSLY TALKED TO

18  MR. SCHWARCZ, CORRECT?

19      A    I HAD NOT SPOKEN TO MR. SCHWARCZ.

20      Q    BUT YOU SPOKE TO YOUR PARTNER WHO SPOKE TO

21  MR. SCHWARCZ WHO RECEIVED SOME INFORMATION REGARDING

22  SOME STATEMENT THAT MR. GILMORE ALLEGEDLY MADE,

23  CORRECT?

24      A    THAT'S CORRECT.

25      Q    AND YOU WENT TO THIS LOCATION WITH THAT

26  PARTNER, CORRECT?

27      A    YES.

28      Q    AND MR. SCHWARCZ WAS THERE WITH M.A.?

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1       A     YES.

2       Q     WHEN YOU INTERVIEWED MISS SCHWARCZ -- M.A.,

3   WHO WAS IN THE ROOM WITH YOU?

4       A     THE TWO GUYS WERE SORT OF IN AND OUT.  THEY

5   WOULD GO IN THE FRONT AND GO IN THE BACK TO GIVE US

6   SOME PRIVACY.

7       Q     WHAT TWO GUYS?

8       A     MY COLLEAGUE AND MR. SCHWARCZ.

9       Q     SO THEY WERE IN AND OUT DURING THE

10  INTERVIEW?

11      A     YEAH.  FRONT YARD, BACKYARD, I GUESS.

12      Q     WERE YOU AWARE OF WHAT TYPE OF RELATIONSHIP

13  MR. SCHWARCZ HAD WITH MR. GILMORE?

14      A     YES.

15      Q     SO YOU WERE AWARE THAT EACH ONE OF THEM HAS

16  BEEN ARRESTED FOR CRIMES AGAINST THE OTHER?

17      A     YES.

18      Q     ARE YOU AWARE OF THE RELATIONSHIP BETWEEN

19  MISS M.A. AND MR. GILMORE?

20      A     YES, AS FAR AS I HAVE READ AND WHAT SHE HAS

21  TOLD ME, THAT'S CORRECT.

22            I HAVE NOT SPOKEN TO HIM; I DON'T KNOW.

23      Q     DID YOU KNOW WHAT TYPE OF RELATIONSHIP THEY

24  HAD, MEANING ON AGAIN OFF AGAIN --

25      A     YES, YES.

26      Q     AND WERE YOU AWARE THAT BOTH OF THEM HAD

27  FILED RESTRAINING ORDERS AGAINST EACH OTHER?

28      A     YES.  YES, I HAD READ THEM.  I GOT THEM

1    FROM THE COURT.

2        Q    HOW LONG HAD MR. SCHWARCZ BEEN DATING M.A.?

3        A    I WOULD BELIEVE SINCE AT LEAST BEFORE THE

4    FIRST RESTRAINING ORDER.

5        Q    WHICH WAS WHEN?

6        A    I HAVE IT IN MY REPORT.

7        Q    HOW LONG WAS MISS M.A. DATING MR. GILMORE?

8        A    SHE SAID SHE MET HIM IN 2010 AT A PARTY.

9    THEY WERE ON AGAIN, OFF AGAIN.

10            THE D.V. CASE, THE DOMESTIC VIOLENCE CASE

11   WAS FEBRUARY OF 2012, SO THEY WERE APPARENTLY OFF AT

12   THAT TIME.

13       Q    WAS IT YOUR UNDERSTANDING THAT WHEN M.A.

14   WOULD BREAK UP WITH MR. GILMORE, SHE WOULD GO BACK TO

15   MR. SCHWARCZ?

16       A    YES, SHE TOLD ME.

17       Q    SO SHE WENT BACK AND FORTH BETWEEN THE TWO

18   OF THEM CONSISTENTLY, CORRECT?

19       A    SHE SAID NICO WAS A SAFE PLACE; THAT HE DID

20   NOT ABUSE HER.

21       Q    AND IS HE THE OTHER INDIVIDUAL THAT'S

22   CHARGED WITH HER IN THE 2012 CASE WHERE MR. GILMORE

23   IS THE VICTIM?

24       A    YES.

25       Q    AND HE IS THE INDIVIDUAL THAT TOOK HIS PIT

26   BULL AND TOLD HIM TO GET MR. GILMORE, CORRECT?

27       A    THAT'S WHAT THE, YEAH, REPORT SAYS.

28            I HAVEN'T SEEN THE POLICE REPORT; I HAVE

1    JUST SEEN THE COMPLAINT.

2         Q    WHEN WAS THE INCIDENT IN TEMECULA?

3         A    SHE SAID IT WAS WHEN HE PROPOSED TO HER.

4         Q    WHICH WAS WHEN?

5         A    AND SHE COULDN'T REMEMBER THE DATE, BUT IT

6    WAS BEFORE SHE HAD MOVED IN WITH HIM IN EL SEGUNDO.

7    I BELIEVE IT WOULD HAVE BEEN AFTER VALENTINE'S DAY OF

8    2011 BECAUSE THAT'S WHEN MAXINE THREW HIM OUT OF

9    THE -- THE OTHER GIRL THREW HIM OUT OF HER HOUSE THE

10   END OF FEBRUARY, 2011 --

11        Q    SO IT WAS --

12        A    AND THAT'S WHEN MELISA SAID THEY GOT BACK

13   TOGETHER AND HE PROPOSED.

14        Q    SO THE INCIDENT IN TEMECULA OCCURRED PRIOR

15   TO THE DOMESTIC VIOLENCE IN EL SEGUNDO THAT WAS

16   REPORTED IN 2012, CORRECT?

17        A    THAT'S CORRECT.

18        Q    DID YOU READ THAT 2012 273.5 REPORT?

19        A    YES.

20        Q    AND THERE IS NO MENTION OF TEMECULA IN

21   THERE, IS THERE?

22        A    NO.

23        Q    DID YOU GO OVER THAT REPORT WITH HER?

24        A    NO.  I WENT OVER "JUST TELL ME IN YOUR OWN

25   WORDS WHAT HAPPENED."

26        Q    DID YOU TELL HER THAT YOU WERE AWARE OF

27   THAT REPORT?

28        A    I TOLD HER THAT I KNEW THERE WAS -- YEAH,

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1    THAT -- WHAT SHE HAD SAID IN THE REPORT, AND THAT HE

2    HAD BEEN CONVICTED; HE WAS ON PROBATION.

3            SHE SAID THAT HE WAS HARASSING HER NOW

4    BECAUSE HE NEEDED TO GET OFF PROBATION BECAUSE HE

5    WANTED TO MOVE TO CANADA.  SO IT WAS -- THAT WAS THE

6    REASON FOR THE CURRENT HARASSMENT.

7        Q    AND IT IS BASED ON YOUR INFORMATION NOW

8    THAT M.A. IS WITH MR. SCHWARCZ AT THIS TIME?

9        A    AS OF THE DATE OF THE SERVICE, WOULD HAVE

10   BEEN WITH -- WITHIN THE LAST THREE TO FOUR WEEKS.  I

11   COULD TELL YOU IF I HAD MY REPORT.

12       Q    BUT AFTER YOUR INTERVIEW WITH HER, ON

13   FEBRUARY 6TH SHE WENT BACK TO JOHN GILMORE, CORRECT?

14       A    THIS IS WHAT MR. SCHWARCZ TOLD MR. BOYD

15   SMITH.  AND HE TOLD ME ON THE PHONE.  BUT -- HE SAID,

16   YOU KNOW, "I THINK SHE WENT BACK WITH JOHN."

17       Q    AND THAT WAS ALLEGEDLY AFTER

18   DETECTIVE THOMPSON'S CONVERSATION WITH HER ON

19   FEBRUARY 6TH?

20       A    I GUESS.  I DON'T KNOW.

21       Q    WELL, YOU TESTIFIED A FEW MINUTES AGO THAT

22   MR. SCHWARCZ CALLED YOUR PARTNER ON FEBRUARY 6TH?

23       A    THAT'S WHAT I BELIEVE.

24       Q    BUT THE REPORT SAYS -- YOUR REPORT SAYS

25   THAT NICHOLAS CALLED LATER THAT WEEK AND TOLD YOU

26   THAT A FEMALE SANTA MONICA POLICE OFFICER CALLED

27   MELISA "A DAY OR TWO AFTER OUR MEETING"?

28       A    THAT'S CORRECT.  BECAUSE HE TALKED TO HIM

1    FIRST, AND THEN HE CALLED ME.

2         Q    AND SO BECAUSE OF THAT, MR. SCHWARCZ

3    BELIEVED THAT MELISA HAD TOLD JOHN ABOUT THE MEETING

4    AND MOVED ON TO HIM?

5         A    THAT WAS HIS UNDERSTANDING, OR WHATEVER HE

6    COULD DEDUCE.

7         Q    NOW WHEN YOU TESTIFIED A MINUTE AGO, YOU

8    SAID YOU ARE NOT EXACTLY SURE WHAT JOHN SAID TO

9    MELISA, "SOMETHING TO THE EFFECT OF, 'DO YOU WANT TO

10   KNOW HOW JULIANA FELT?'"

11        A    THERE WERE TWO DIFFERENT OCCASIONS.  I

12   HAD --

13        Q    WELL, WHEN YOU TESTIFIED EARLIER YOU SAID

14   "SOMETHING TO THE EFFECT OF."

15        A    I HAVE THEM IN MY REPORTS IF YOU WANT ME TO

16   QUOTE THEM.  I WROTE DOWN EXACTLY WHAT SHE TOLD ME.

17        Q    SPEAKING OF THAT, DO YOU HAVE NOTES?

18        A    I DO.

19        Q    DID YOU PROVIDE THEM TO COUNSEL?

20        A    YES.

21        Q    DO YOU HAVE THEM HERE WITH YOU TODAY?

22        A    I DO.

23        MS. OKUN-WIESE:  I WOULD LIKE TO GET A COPY OF

24   THOSE.

25        THE COURT:  OKAY.

26        MR. BUEHLER:  THAT'S FINE, YOUR HONOR.

27   BY MS. OKUN-WIESE:

28        Q    SO THESE STATEMENTS THAT ARE IN QUOTATIONS

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)
122

```
 1   ARE NOT "SOMETHING TO THE EFFECT OF," THOSE --
 2        A    NO, THAT'S VERBATIM FROM MY NOTES.
 3        Q    AND WHEN SHE TOLD YOU THAT, DID SHE SAY,
 4   "THIS IS EXACTLY WHAT HE SAID WHEN HE WAS CHOKING
 5   ME"?
 6        A    SHE SAID THERE WAS A PARTICULAR PHRASE ON
 7   THE TEMECULA ONE, AND A PARTICULAR PHRASE ON THE
 8   EL SEGUNDO ONE.
 9        Q    AND THEN THERE WAS A SEPARATE INTERVIEW BY
10   YOUR PARTNER WITH NICHOLAS SCHWARCZ, CORRECT?
11        A    CORRECT.
12        Q    HAVE YOU SEEN A COPY OF THAT REPORT?
13        A    YES.
14        Q    OKAY.  AND ALLEGEDLY MR. SCHWARCZ WAS TOLD
15   BY M.A. THAT DURING A FIGHT BETWEEN JOHN AND MELISA,
16   M.A., DURING A VACATION -- AND THIS IS IN QUOTES --
17   "MELISA TOLD MR. SCHWARCZ THAT JOHN SAID 'YOU COULD
18   END UP THE SAME WAY AS JULIANA REDDING DID'"?
19        A    YES.
20        Q    OKAY.  SO THAT'S A QUOTE AS WELL?
21        A    THAT'S CORRECT.
22        Q    AND IS THAT REFERRING TO THE TRIP TO
23   TEMECULA?
24        A    IT WAS -- I BELIEVE IT WAS A VACATION.  I
25   DON'T KNOW.  I GUESS YOU WOULD HAVE TO ASK HER,
26   BUT --
27        Q    OKAY.  SO WITH THAT STATEMENT IN MIND, "YOU
28   COULD END UP THE SAME WAY AS JULIANA REDDING DID," IS
```

1    THAT THE SAME THING AS, "GOING TO SHOW YOU HOW

2    JULIANA FELT" IN QUOTES?

3        A    THAT'S WHAT SHE TOLD ME, AND THAT'S WHAT I

4    WROTE DOWN.

5        Q    AND THEN THE SECOND STATEMENT IN RESPONSE

6    TO M.A. ACCUSING MR. GILMORE OF KILLING JULIANA,

7    MR. GILMORE ALLEGEDLY STATES, "YOU WANT TO SEE HOW

8    SHE FELT?"

9        A    RIGHT.  THAT'S WHEN THEY ARE HAVING THE

10   ARGUMENT IN TEMECULA.

11       Q    SO THOSE ARE THREE COMPLETELY DIFFERENT

12   STATEMENTS, CORRECT?

13       A    WELL, SHE -- I DIDN'T TALK TO NICHOLAS.

14   THIS IS WHAT SHE TOLD HIM.  BUT WHEN I SPOKE TO

15   MELISA, SHE TOLD ME ONE STATEMENT PER THE TEMECULA

16   INCIDENT AND ONE STATEMENT PER THE EL SEGUNDO

17   INCIDENT.  AND THOSE ARE IN MY NOTES.

18       Q    AND THE POINT I AM TRYING TO MAKE IS, THERE

19   IS A STATEMENT BY MR. SCHWARCZ WHO GOT THIS WHOLE

20   THING STARTED?

21       A    CORRECT.

22       Q    AND HIS --

23       A    WELL --

24       Q    -- ACTUAL STATEMENT IN QUOTES IS THAT

25   MELISA TOLD HIM, QUOTE, "YOU COULD END UP THE SAME

26   WAY AS JULIANA REDDING DID."  END QUOTE.  THAT IS

27   DIFFERENT THAN THE STATEMENT SHE PROVIDED YOU,

28   CORRECT?

```
1       A      YES.

2       Q      NOW YOU WENT IN TO M.A.'S HOUSE OR

3    MR. SCHWARCZ' HOUSE WITH A STACK OF REPORTS INVOLVING

4    JOHN GILMORE, CORRECT?

5       A      I HAD A BRIEFCASE WITH MY GILMORE FILE.

6    AND BECAUSE SHE HAD A -- SHE WAS ONE OF THE VICTIMS

7    IN THE CASES -- I WAS INTERVIEWING OTHER VICTIMS OF

8    HIS OTHER CASES, OF HIS OTHER ASSAULT CASES.  SO I

9    HAD ALL THE STUFF TOGETHER WITH ME.

10      Q      AND YOU PULLED IT OUT IN FRONT OF YOU?

11      A      WHEN SHE WANTED ME TO PROVE WHO I WAS, I --

12   I DON'T REMEMBER EXACTLY WHAT ORDER, BUT I DID GET MY

13   LICENSE OUT OF MY PURSE, AND I SHOWED HER THE PAPER.

14             SHE WANTED TO KNOW PROOF OF WHO MARK

15   KASSABIAN WAS.  YOU KNOW, THAT HE WASN'T

16   JOHN GILMORE'S LAWYER HIRED BY JOHN GILMORE'S DAD,

17   WHICH I DIDN'T UNDERSTAND.  SO I BROUGHT OUT THE

18   PAPERS, AND I WAS SHOWING HER THE SUBPOENA REQUEST TO

19   THE POLICE AGENCIES.  AND ATTACHED WERE THE RETURNS,

20   SUBPOENA RETURNS.

21      Q      AND INCLUDED IN THAT WERE THE ACTUAL

22   REPORTS?

23      A      CORRECT.

24      Q      AND YOU PROVIDED HER WITH COPIES OF HIS

25   REPORTS?

26      A      YES.  SHE ASKED TO LOOK AT THEM.

27      Q      AND SO YOU GAVE THEM TO HER?

28      A      YES.
```

```
 1      Q    OKAY.
 2           WHAT WAS YOUR PURPOSE IN DOING THAT?
 3      A    SHE WANTED TO SEE THE -- I GUESS THAT I WAS
 4 TALKING -- THAT I WAS BEING TRUTHFUL ABOUT WHO I WORK
 5 FOR.
 6      Q    BUT THAT INFORMATION CONCERNING
 7 JOHN GILMORE AND ALLEGED VICTIMS IN THOSE CASES WHICH
 8 HAVE NOT GONE TO COURT, THAT'S CONFIDENTIAL
 9 INFORMATION.  AND YOU GAVE HER THAT INFORMATION,
10 CORRECT?
11      A    I THOUGHT IT WAS PUBLIC RECORD, BUT IT WAS
12 A SUBPOENA RETURN.
13      Q    RIGHT.  YOU GOT THAT INFORMATION FROM A
14 SUBPOENA?
15      A    THAT'S CORRECT.
16      Q    AND THAT WAS GIVEN TO YOU.  TO YOUR
17 KNOWLEDGE, ARE YOU AWARE YOU ARE NOT SUPPOSED TO
18 PROVIDE THAT TO THIRD PARTIES?
19      A    NO.
20      Q    WHAT WAS YOUR PURPOSE IN GIVING HER THAT
21 INFORMATION?  TO GET HER UPSET?
22      A    NO.  I WASN'T TRYING TO GET HER UPSET.  I
23 WAS TRYING TO CALM HER DOWN.
24      Q    AND YOU INDICATED THAT THERE IS A REPORT IN
25 THERE ABOUT A 15 YEAR-OLD GIRL.  DO YOU KNOW HOW THAT
26 DOCUMENT CAME ABOUT?
27      A    IT WAS ON A SUBPOENA RETURN.
28      Q    DO YOU KNOW WHAT KIND OF DOCUMENT THAT IS?
```

1        A     IT LOOKED LIKE A POLICE REPORT.

2        Q     DID YOU READ IT?

3        A     NOT REALLY.

4        Q     SO YOU HAVE NO IDEA ABOUT ANYTHING

5   CONCERNING A 15 YEAR-OLD GIRL, DO YOU?

6        A     WELL, I READ IT TO THE EXTENT WHERE THE

7   VICTIM'S NAME WAS OUT.  IT HAD HER AGE, AND IT WAS A

8   STAT RAPE.  AND IT HAD HIS ADDRESS, JOHN GILMORE'S

9   NAME AND ADDRESS.

10       Q     ARE YOU AWARE THAT THERE IS NO NAMED

11  INDIVIDUAL IN THAT REPORT?  THAT THAT INFORMATION IS

12  CONFIDENTIAL?

13       A     THE GIRL IS NOT NAMED IN THAT REPORT.

14       Q     CORRECT.

15       A     RIGHT.

16       Q     YOU JUST STATED THAT HER NAME WAS IN THE

17  REPORT.

18       A     NO, I SAID HER NAME -- IF I MISSPOKE, I AM

19  SORRY.

20       THE COURT:  I DON'T THINK SHE SAID THAT.

21       THE WITNESS:  THE GIRL'S NAME WAS NOT IN THE

22  REPORT.

23            JOHN GILMORE'S NAME AND HIS ADDRESS WAS IN

24  THE REPORT.  THE GIRL -- THERE WAS A SHORT STATEMENT

25  THAT SAID IT WAS CONSENSUAL; THAT IT WASN'T A RAPE

26  RAPE, YOU KNOW, BUT BECAUSE OF HER AGE IT WAS A STAT

27  RAPE.

28       MS. OKUN-WIESE:  RIGHT.

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1    BY MS. OKUN-WIESE:

2        Q    AND THERE WAS NO FURTHER PROSECUTION.  IT

3    WAS CONSENSUAL AND THE CASE WAS CLOSED, CORRECT?

4        A    I DON'T RECALL THAT, BUT I DO RECALL THAT

5    THE GIRL WASN'T IDENTIFIED.

6        Q    DO YOU RECALL TELLING MELISA THAT JOHN WAS

7    A RAPIST?

8        A    NO.

9        Q    DID YOU TELL HER HE WAS A MURDERER?

10       A    NO.  I DON'T USE TERMS LIKE THAT.

11       Q    WELL WHEN YOU TOLD HER THAT HIS CHOKING OF

12   M.A. WAS CONSISTENT WITH THE CHOKING OF MISS REDDING,

13   WHAT WERE YOU TRYING TO INFER?

14       A    I SAID IT SEEMED LIKE THERE WAS A PATTERN

15   BETWEEN -- TO ME IT SEEMED LIKE -- JOHN GILMORE HAD

16   BEEN A SUSPECT IN THE CASE FOR A LONG TIME, AND THAT

17   THE CHOKING OF MS. -- OF M.A., THE DIFFERENT EVENTS

18   AND THEN HIM TELLING HER, "DO YOU WANT TO FEEL

19   LIKE" -- "WHAT IT FELT LIKE?"  YOU KNOW, "DO YOU WANT

20   TO FEEL HOW JULIANA FELT," THAT THAT SEEMED LIKE IT

21   WAS CONSISTENT WITH HIM CHOKING JULIANA, LIKE HE HAD

22   DONE IT BEFORE.

23            "YOU WANT TO KNOW HOW IT FEELS LIKE?"

24       Q    SO IT WAS CONSISTENT WITH HIM BEING THE

25   MURDERER?

26       A    YEAH.  I SAID CHOKING HER, BUT I DIDN'T SAY

27   MURDERER.  I TRY NOT TO BE INFLAMMATORY.

28       Q    AND YOU NEVER TOLD HER THAT JOHN WAS

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1  GETTING AWAY WITH ALL THIS RAPE STUFF AND ALL THESE

2  OTHER CASES BECAUSE HE KNOWS SOMEBODY INSIDE?

3     A    WELL I ASKED HER -- IN ONE OF HIS CASES

4  HE -- WHERE HE IS ASSAULTING ANOTHER WOMAN, HE TOLD

5  SOMEBODY HIS GRANDFATHER WAS IN THE F.B.I.  AND SO I

6  SAID, "IS THE DAD IN LAW-ENFORCEMENT?  THE FATHER IN

7  LAW-ENFORCEMENT?"

8            AND THEY ARE LIKE, "YOU KNOW, IT SEEMS LIKE

9  HE IS TEFLON," LIKE NOBODY CAN -- LIKE CHARGES DON'T

10  STICK.

11     Q    WELL YOU ARE AWARE HE DOES HAVE SOME

12  CONVICTIONS, CORRECT?

13     A    YES.

14     Q    DID YOU EVER CONSIDER THE BACKGROUND

15  BETWEEN THESE THREE INDIVIDUALS WHEN YOU WERE

16  INTERVIEWING THEM?

17     A    YES.

18     Q    ARE YOU A LICENSED PSYCHOLOGIST OR

19  THERAPIST?

20     A    NO.

21     Q    NOW YOU INDICATED THAT M.A. TOLD YOU SHE

22  WAS EXTREMELY AFRAID OF GILMORE AND THOUGHT THAT HE

23  WOULD KILL HER, CORRECT?

24     A    YES.

25     Q    AND THEN IMMEDIATELY AFTER HER INTERVIEW

26  WITH YOU, AND THEN SHE SPOKE TO DETECTIVE THOMPSON,

27  SHE WENT BACK TO HIM, CORRECT?

28     A    I DON'T KNOW.  THAT'S WHAT I WAS TOLD BY --

1   NICK THOUGHT THAT SHE WENT BACK TO HIM.

2       Q    WELL SHE LEFT NICK, CORRECT?

3       A    YES.  HE SAID THEY BROKE UP.

4       Q    DO YOU KNOW ANYTHING ABOUT MISS M.A.'S

5   BACKGROUND, ANYTHING ABOUT HER MENTAL HEALTH?

6       A    YOU KNOW, I DID A BACKGROUND CHECK ON HER

7   JUST TO VERIFY SHE DIDN'T HAVE ANY PRIORS BECAUSE I

8   WANTED TO MAKE SURE SHE WAS BEING, YOU KNOW, LIKE A

9   CREDIBLE WITNESS; THAT SHE COULD, YOU KNOW, BE A

10  WITNESS.  AND I DIDN'T FIND ANY PRIORS OTHER THAN

11  LIKE A CAR ACCIDENT CASE AND A DIVORCE CASE.

12      Q    DO YOU KNOW ANYTHING ABOUT A MENTAL

13  HISTORY?

14      A    NO.

15           SHE TOLD ME WHERE SHE WORKED, AND I ASSUME

16  THAT THEY DID DRUG TESTING THERE.  SO I THOUGHT SHE

17  WAS CLEAN IN THAT REGARD.

18      Q    DID YOU ASK HER IF SHE WAS ON DRUGS?

19      A    NO, I DIDN'T ASK HER.

20      Q    WERE YOU AWARE THAT SHE IS A SUBSTANCE

21  ABUSER?

22      A    NO.  I THOUGHT BECAUSE OF HER JOB THAT SHE

23  HAS, SHE WOULD BE DRUG TESTED.

24      Q    WHERE DOES SHE WORK?

25      A    AS A LONGSHOREMAN.

26      Q    WHERE?

27      A    AT THE PORT.

28      Q    DOES SHE STILL WORK THERE?

1      A    AS OF THE TIME I INTERVIEWED HER SHE WORKED

2   THERE; SHE SAID SHE NEEDED TO BE WALKED TO HER CAR BY

3   A MALE CO-WORKER.

4      Q    AND WHEN WAS THAT -- THAT WAS DURING HER

5   INTERVIEW WITH YOU?

6      A    YEAH, AND THE NEXT DAY.  SO END OF JANUARY,

7   THIS YEAR.

8      Q    AND FROM THE INFORMATION YOU RECEIVED, SHE

9   THEN GOT BACK WITH JOHN GILMORE?

10     A    YEAH, BUT I THINK THAT SHE GOT BACK WITH

11  NICO OR MR. SCHWARCZ.

12     Q    AND YOU ARE AWARE OF THE RESTRAINING ORDER

13  THAT SHE HAD PUT ON MR. GILMORE, AND THEN FIVE DAYS

14  LATER WENT IN AND ASKED FOR A DISMISSAL?

15     A    YES.  SHE SAID SHE HAD A PROBLEM.  THAT'S

16  WHY SHE WENT THROUGH A THERAPIST.  SHE COULDN'T STAY

17  AWAY FROM HIM.  SHE LOVED HIM, BUT SHE KNEW HE WOULD

18  KILL HER.  YOU KNOW, IT WAS ONE OF THOSE CLASSIC

19  DOMESTIC VIOLENCE SYNDROMES.

20          I AM NOT A THERAPIST, BUT I HAVE BEEN TO

21  SEMINARS AND WHATNOT.  THAT SEEMED CONSISTENT WITH

22  THE PATTERN.

23     Q    WHAT KIND OF BACKGROUND DO YOU HAVE IN

24  DOMESTIC VIOLENCE?

25     A    I SAID I HAVE NOT HAD A PERSONAL

26  BACKGROUND; I AM NOT A THERAPIST, BUT I GO TO A LOT

27  OF SEMINARS PUT ON BY DEFENSE AND PROSECUTORS ABOUT,

28  YOU KNOW, DOMESTIC VIOLENCE SYNDROME.  I HAVE

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
 1    LISTENED TO A LOT OF EXPERTS SPEAK ON THEM.

 2         Q     WHEN WAS THE LAST SEMINAR YOU WENT TO?

 3         A     IN THIS YEAR.  FEBRUARY.

 4         Q     FEBRUARY 2013?

 5         A     YEAH.

 6         Q     WHAT WAS THE NAME OF THE SEMINAR?

 7         A     IT WAS THE CAPITAL CASE DEFENSE THING IN

 8    MONTEREY.

 9         Q     THE CAPITAL CASE DEFENSE THING?

10         A     CAPITAL CASE -- THEY CALL IT DEATH CAMP.  I

11    DON'T RECALL THE EXACT NAME OF IT.  IT IS FOR CAPITAL

12    CASES.  AND THEY HAVE EXPERTS COME AND TALK.  I GO TO

13    THEM PRETTY OFTEN.

14         Q     YOU INDICATED THAT YOU HAVE BEEN A PRIVATE

15    INVESTIGATOR, A LICENSED ONE, SINCE 1988, CORRECT?

16         A     CORRECT.

17         Q     WHAT TYPE OF TRAINING DID YOU RECEIVE TO

18    BECOME A PRIVATE INVESTIGATOR?

19         A     MY FATHER WAS AN INVESTIGATOR.  HE IS A

20    CRIMINAL DEFENSE INVESTIGATOR.

21               I SORT OF GREW UP IN THE BUSINESS.  I

22    WORKED IN THE NEWS BUSINESS, AND THEN I WENT AND I

23    TRAINED FOR A VERY PROMINENT, YOU KNOW, INVESTIGATOR.

24               SO IT WAS -- YOU GET A LICENSE FROM

25    ON-THE-JOB TRAINING.  SO I DO NOT HAVE A POLICE

26    BACKGROUND.  YOU TAKE A TEST; YOU GET A LICENSE.  YOU

27    HAVE 3,000 HOURS EXPERIENCE PLUS A TEST; YOU GET A

28    LICENSE.
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1     MS. OKUN-WIESE:  I HAVE NOTHING FURTHER.

2     THE COURT:  REDIRECT?

3     MR. BUEHLER:  NO, YOUR HONOR.

4     THE COURT:  YOU MAY STEP DOWN.  THANK YOU.

5     THE WITNESS:  THANK YOU, YOUR HONOR.

6     THE COURT:  DO YOU INTEND TO CALL ANY ADDITIONAL

7  WITNESSES AT THIS TIME?

8     MR. BUEHLER:  YOUR HONOR, MR. BOYD SMITH IS HERE.

9  I WOULD NOT INTEND TO CALL HIM.  IF THE PEOPLE WANT

10  TO EXAMINE HIM OR IF THE COURT WANTS TO HEAR FROM

11  HIM, WE CAN HAVE HIM TESTIFY ABOUT HIS INTERACTIONS

12  WITH NICHOLAS SCHWARCZ.

13     MS. OKUN-WIESE:  I BELIEVE SHE TESTIFIED TO WHAT

14  WAS STATED IN THE REPORT.

15     THE COURT:  ALL RIGHT.

16     MR. BUEHLER:  WITH THAT, WE REST, YOUR HONOR.

17     THE COURT:  OKAY.

18        DO YOU INTEND TO CALL ANY WITNESSES?

19     MS. OKUN-WIESE:  NO.

20     THE COURT:  YOU CAN TURN THAT BACK ON, IF YOU

21  WANT.

22        DO YOU WISH TO BE HEARD AT THIS TIME?

23     MR. BUEHLER:  YES, YOUR HONOR.

24        THE POINT I WOULD LIKE TO MAKE IS THAT THE

25  TENOR OF MANY OF THE DISTRICT ATTORNEY'S REMARKS AND

26  QUESTIONS TO THE WITNESS SEEMS TO HAVE TO DO WITH

27  TRYING TO ATTACK THE CREDIBILITY OF WHAT M.A. SAID OR

28  ATTACK THE CREDIBILITY OF THE INVESTIGATOR AS TO

1    WHETHER SHE SAID THOSE THINGS.

2            THE QUESTION OF -- THE STATEMENTS ON THEIR

3    FACE ARE CLEARLY RELEVANT.

4            THE FACT THAT SHE MAY NOT HAVE SAID THEM IN

5    THE CONTEXT WHERE A POLICE OFFICER PUT IT IN A POLICE

6    REPORT, OR THE FACT SHE MAY NOT HAVE MADE THOSE

7    STATEMENTS IN HER APPLICATION FOR THE RESTRAINING

8    ORDER IS GOOD FODDER FOR CROSS-EXAMINATION WHEN THE

9    WITNESS TESTIFIES; IT IS NOT A BASIS FOR SAYING THAT

10   THAT'S NOT RELEVANT TESTIMONY AND THAT IT IS NOT

11   HIGHLY EXCULPATORY TESTIMONY FOR THE DEFENDANT.

12           SO WE HAVE A WITNESS WHO HAS MADE

13   STATEMENTS THAT ARE VERY RELEVANT AND VERY

14   EXCULPATORY.  AND I BELIEVE THAT ON THE FACE OF THE

15   DETECTIVE'S INTERVIEW OF THIS WITNESS, AFTER SHE

16   LEARNED ABOUT THE FACT THAT THE DEFENSE INVESTIGATOR

17   HAD TALKED TO HER, WAS INTENDED TO AND HAD THE EFFECT

18   OF PERSUADING THIS WITNESS TO NOT HAVE ANYTHING MORE

19   TO DO WITH THE DEFENSE.

20           AND I HAVE EVERY REASON TO SUSPECT -- WE

21   DON'T YET REALLY KNOW, BUT I HAVE EVERY REASON TO

22   SUSPECT THAT THAT DAMAGE IS IRREVERSIBLE AND THAT SHE

23   IS NOT GOING TO BE WILLING TO SPEAK TO US, AND SHE IS

24   NOT GOING TO WANT TO COME IN HERE AND TESTIFY.

25           AND AS LONG AS SHE HAS GOT A CRIMINAL CASE

26   PENDING AGAINST HER, I AM SURE NO LAWYER IS GOING TO

27   PERMIT HER TO COME IN HERE TO TESTIFY.

28           SO THE TOTAL SUM OF THAT IS THAT WE HAVE AN

1    IMPORTANT WITNESS WHO IS NOW UNAVAILABLE, AND SHE IS

2    UNAVAILABLE BECAUSE OF ACTIONS OF THE LEAD DETECTIVE

3    IN THIS CASE.

4            HER UNAVAILABILITY DOESN'T HAVE TO BE DUE

5    SOLELY TO THAT; THE CASE LAW SAYS THAT.  BUT IF

6    THAT'S A SUBSTANTIAL FACTOR IN THAT WITNESS NOT BEING

7    AVAILABLE, IT AMOUNTS TO DESTROYING EVIDENCE.

8            SO I MEAN, THE ULTIMATE SANCTION --

9        THE COURT:  WELL, I MEAN, YOU ARE MAKING CERTAIN

10   LEAPS OF FAITH WHICH MAY OR MAY NOT PROVE TO BE THE

11   CASE.

12       MR. BUEHLER:  I UNDERSTAND, YOUR HONOR.

13       THE COURT:  BUT MY INCLINATION IS THAT THESE

14   STATEMENTS THAT ARE ATTRIBUTED TO MR. GILMORE ARE

15   DECLARATIONS AGAINST PENAL INTEREST PRESUMABLY, AND

16   WOULD BE EXCEPTIONS TO THE HEARSAY RULE.  NOW I ALSO

17   DO FEEL THAT THEY BEAR ON THE THIRD-PARTY CULPABILITY

18   MOTION.

19           NOW ONE THING I THINK SHOULD BE NOTED; THAT

20   IN THE INTERVIEW WITH M.A. DONE BY DETECTIVE

21   THOMPSON, SHE SAYS SEVERAL TIMES SHE DOESN'T WANT TO

22   TESTIFY; SHE DOESN'T WANT TO BE INVOLVED.  AND I

23   DON'T THINK THAT WAS AS THE RESULT OF WHAT DETECTIVE

24   THOMPSON SAID.

25           SHE SEVERAL TIMES IS SAYING THROUGHOUT THAT

26   INTERVIEW THAT SHE DIDN'T WANT TO TESTIFY.  BUT A LOT

27   OF PEOPLE DON'T WANT TO TESTIFY.  THEY GET A SUBPOENA

28   AND THEY TAKE AN OATH AND THEY COME TO COURT AND THEY

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1   DO TESTIFY, WHETHER THEY WANT TO OR NOT.

2          BUT IT DOES CONCERN ME, AS I THINK IT

3   SHOULD CONCERN YOU, ABOUT THE EFFECT OF HER HAVING

4   THIS PENDING CRIMINAL CASE AT THE AIRPORT COURT.

5          IT ALSO CONCERNS ME, AS IT SHOULD CONCERN

6   YOU, THAT MR. GILMORE WHO IS I THINK ON YOUR WITNESS

7   LIST HAS 5TH AMENDMENT SELF-INCRIMINATION RIGHTS THAT

8   ARE IMPLICATED BY THE TESTIMONY AND SITUATION.

9          AND JUST HOW YOU, THE PROSECUTION, INTENDS

10  TO DEAL WITH THOSE ISSUES -- IF YOU INTEND TO DEAL

11  WITH THEM IN SOME WAY TO OBVIATE THE PROBLEM -- IS

12  SOMETHING THAT I THINK YOU NEED TO TAKE INTO

13  CONSIDERATION AND GIVE SOME SERIOUS THOUGHT TO.

14          I DON'T KNOW WHAT YOU WANT TO DO.

15  MS. OKUN-WIESE:  WELL IF THE COURT EXCLUDES THE

16  THIRD-PARTY CULPABILITY, THE PEOPLE AREN'T GOING TO

17  CALL MR. GILMORE.

18          FOR THE COURT TO FIND A DECLARATION AGAINST

19  INTEREST, IT HAS TO BE TRUSTWORTHY.  AND I JUST DON'T

20  KNOW HOW IN THIS CASE A STATEMENT MADE BY A PRIVATE

21  INVESTIGATOR INDICATING --

22  THE COURT:  WELL THE PRIVATE INVESTIGATOR

23  OBVIOUSLY WOULD NOT BE ABLE TO TESTIFY TO THAT

24  STATEMENT BECAUSE -- I MEAN, BASICALLY IT IS DOUBLE

25  HEARSAY.

26  MS. OKUN-WIESE:  I KNOW.  MY ISSUE IS, THE COURT

27  SAID IT IS HEARSAY; THERE IS A DECLARATION AGAINST

28  INTEREST.  I AM THINKING THAT THE COURT IS GOING TO

1    THINK THAT MISS AYALA CAN'T TESTIFY BECAUSE SHE HAS A

2    5TH AMENDMENT RIGHT AND SHE IS UNAVAILABLE.  BUT THE

3    STATEMENTS HAVE NO TRUSTWORTHINESS TO THEM, AND LET

4    ME POINT OUT WHY I THINK THAT.

5         BECAUSE WE HAVE THE 273.5 REPORT; IT

6    MENTIONS NOTHING IN THERE; BECAUSE THE STATEMENT, IN

7    QUOTES, THAT NICHOLAS SCHWARCZ PROVIDED TO THE OTHER

8    PRIVATE INVESTIGATOR IS NOTHING LIKE THE TWO

9    STATEMENTS ALLEGEDLY PROVIDED TO MISS LARSEN.

10        SO THEY ARE IN QUOTES, BUT WHEN MISS LARSEN

11   TESTIFIED SHE SAID "IT IS SOMETHING TO THE EFFECT

12   OF."  AND I DON'T BELIEVE THOSE STATEMENTS IMPLICATE

13   MR. GILMORE AT ALL.

14        WE HAVE MR. GILMORE WITH A COMPLETE ALIBI.

15   THE PEOPLE DO NOT HAVE ANY BELIEF THAT MR. GILMORE

16   HAD ANYTHING TO DO WITH THIS CRIME.

17        WE BELIEVE STRONGLY, AND BEYOND A

18   REASONABLE DOUBT, THAT THE DEFENDANT IS GUILTY OF

19   THIS CRIME.  AND I --

20      THE COURT:  WELL, I MEAN, I UNDERSTAND THAT'S

21   YOUR POSITION.  OF COURSE THAT'S YOUR POSITION.  AND

22   IF YOU DIDN'T HAVE THAT BELIEF, THEN YOU SHOULDN'T BE

23   GOING FORWARD WITH THE PROSECUTION.

24        OBVIOUSLY THE PROSECUTION FEELS THAT THE

25   DEFENDANT, KELLY SOO PARK, IS RESPONSIBLE.

26        THE ISSUE OF THIRD-PARTY CULPABILITY,

27   HOWEVER, IS -- I MEAN, I AM FAMILIAR WITH THE CASE OF

28   HALL AND ALL THOSE OTHER CASES.  AND THEY SAY OF

1   COURSE NOT ONLY IN THEIR MOTION OF THIRD-PARTY

2   CULPABILITY THAT THEY INTEND TO SHOW THAT

3   JOHN GILMORE WAS THE KILLER; THEY ALSO SAY THEY

4   INTEND TO SHOW THAT SOME OTHER PERSON WAS THE KILLER

5   AS WELL.

6       MS. OKUN-WIESE:  RIGHT.  AND PART OF THAT MOTION

7   IS THE TAPE.  AND I WANT THE COURT TO HEAR THAT TAPE

8   BEFORE THE COURT RULES ON THIS MOTION BECAUSE ONCE

9   YOU HEAR THIS TAPE, ENHANCED OR NOT ENHANCED, HE IS

10  NOT SAYING WHAT THEY STATE IN THEIR MOTION.

11      THEY DIDN'T EVEN PROVIDE THE COURT WITH THE

12  RECORDING.  THEY BLATANTLY SAID, "HE SAYS, 'I FOUND

13  YOU WITH SOMEONE.  I DID IT.'"

14      HE IS NOT SAYING THAT.  BUT I URGE THE

15  COURT TO LISTEN TO IT.

16      THE COURT:  OKAY, LET'S PLAY IT RIGHT NOW.

17      SO WHICH EXHIBIT ARE YOU PLACING INTO THAT

18  COMPUTER?

19      MS. OKUN-WIESE:  F.

20      THE COURT:  OKAY.

21      MR. BUEHLER:  IS THIS THE UNENHANCED VERSION?

22      MS. OKUN-WIESE:  THIS IS THE UNENHANCED.  AND

23  THEN I WILL PLAY G WHICH IS THE ENHANCED.

24      MR. BUEHLER:  THANK YOU.

25      THE COURT:  IS THERE A TRANSCRIPT OF THIS?

26      MR. BUEHLER:  I CAN GIVE THE COURT A COPY OF THE

27  REPORT WHICH -- IT HAS A TRANSCRIPT OF THE

28  STATEMENTS.

```
1        MS. OKUN-WIESE:  WELL, IT IS THE TRANSCRIPT -- I
2    HAVE MY OWN TRANSCRIPT.  BUT I WOULD ASK FOR THE TWO
3    MINUTES BEFORE THE COURT LOOKS AT EITHER TRANSCRIPT,
4    THE COURT LISTEN TO IT.
5        THE COURT:  OKAY.
6        MR. BUEHLER:  JUST FOR CONTEXT, YOUR HONOR, THIS
7    IS -- THIS IS DURING A BREAK IN THE CONVERSATION
8    BETWEEN THE DETECTIVE AND MR. GILMORE.
9        THE COURT:  OKAY.
10       MR. BUEHLER:  SO HE IS ALONE IN THIS ROOM WHILE
11   ALL THIS OCCURS, UNAWARE HE IS BEING RECORDED.
12       THE COURT:  IS THERE A VIDEO OR IS THIS JUST AN
13   AUDIO?
14       MS. OKUN-WIESE:  THERE IS A VIDEO.  THEIRS IS NOT
15   ON VIDEO; THEIRS IS AUDIO ONLY.
16       MR. BUEHLER:  IT IS JUST -- RIGHT.
17       MS. OKUN-WIESE:  YOUR HONOR, I AM GOING TO HAVE
18   IT BE PRESENTED TO THE COURT BECAUSE THIS IS THE
19   ACTUAL VIDEO, AND I WOULD LIKE THE COURT TO SEE IT
20   WHILE YOU ARE REVIEWING IT.
21       THE COURT:  WELL YOU CAN HOOK IT UP TO THE
22   SCREEN.
23            WHY DON'T WE TAKE A BRIEF BREAK, AND YOU
24   CAN GET THAT HOOKED UP.
25       MS. OKUN-WIESE:  OKAY.
26
27            (RECESS)
28
```

1    THE COURT:  ALL RIGHT, WE ARE ONCE AGAIN ON THE
2    RECORD IN THE MATTER OF PEOPLE VERSUS PARK.
3         THE DEFENDANT IS PRESENT WITH COUNSEL; THE
4    PEOPLE ARE REPRESENTED.
5         ARE WE READY NOW?
6    MS. OKUN-WIESE:  IS THE COURT READY?
7    THE COURT:  YES.
8
9         (AUDIO AND VIDEO PLAYED)
10
11   MS. OKUN-WIESE:  AND NOW I WOULD LIKE TO PLAY
12   EXHIBIT G WHICH IS THE ENHANCED VERSION.
13   THE COURT:  AND THIS IS AUDIO ONLY, CORRECT?
14   MS. OKUN-WIESE:  THIS IS AUDIO ONLY, YES.  THIS
15   WAS PROVIDED BY DEFENSE.
16
17        (AUDIO PLAYED)
18
19   MS. OKUN-WIESE:  AND THEN IT IS BROKEN DOWN INTO
20   EACH TRACK.  DOES THE COURT NOW WANT A COPY OF EACH
21   SIDE'S TRANSCRIPT TO GO ALONG WITH THAT?
22   THE COURT:  SURE.
23   MS. OKUN-WIESE:  THEY ARE BOTH ONE PAGE.
24   THE COURT:  DO YOU WANT TO MARK THOSE AS
25   EXHIBITS?
26        WE PROBABLY SHOULD MARK ALL OF THIS --
27   EVERYTHING THAT WE HAVE BEEN -- WELL, THE TAPE AND
28   THE AUDIO -- AUDIOVISUAL AND THE AUDIO TAPES ARE THE

1   EXHIBITS F AND G THAT WERE ATTACHED TO THE PEOPLE'S

2   OPPOSITION TO DEFENDANT'S MOTION TO DISMISS CHARGES

3   BASED ON ALLEGED OUTRAGEOUS GOVERNMENT MISCONDUCT.

4        THESE TWO TRANSCRIPTS, HOW SHOULD THEY BE

5   MARKED, LORI?

6     THE COURT CLERK:  COURT'S A AND COURT'S B.

7     THE COURT:  OKAY.

8     MS. OKUN-WIESE:  OKAY.  COURT A WILL BE THE

9   PEOPLE'S TRANSCRIPT, AND COURT B WILL BE THE DEFENSE

10  TRANSCRIPT.

11

12        (MARKED FOR IDENTIFICATION COURT'S

13        EXHIBIT NO. A, PEOPLE'S TRANSCRIPT OF

14        GILMORE AUDIO.)

15

16        (MARKED FOR IDENTIFICATION COURT'S

17        EXHIBIT NO. B, DEFENSE TRANSCRIPT OF

18        GILMORE AUDIO.)

19

20     THE COURT:  I GUESS I AM A LITTLE CONFUSED BY

21  THESE TRANSCRIPTS.  THEY DON'T SEEM TO BE OF THE SAME

22  THING.

23     MS. OKUN-WIESE:  THEY ARE OF THE SAME THING.

24        WHEN IT STARTS WITH THE DETECTIVE, AND HE

25  IS TELLING HIM HE IS GOING TO HAVE A TECHNICIAN COME

26  IN AND TAKE HIS PHOTOGRAPH --

27     THE COURT:  RIGHT.

28     MS. OKUN-WIESE:  -- THAT'S WHERE IT STARTS.  AND

1    THEN IT ENDS -- THEIRS ENDS AND THEN OURS ENDS RIGHT

2    AT THE LITTLE ASTERISK THAT I PUT RIGHT BEFORE HE

3    MAKES A PHONE CALL TO HIS DAD.

4        THE COURT:  OH, WELL YOU DIDN'T TELL ME WHAT THAT

5    ASTERISK WAS.

6        MS. OKUN-WIESE:  OH, I AM SORRY.

7        THE COURT:  I AM READING ALL THIS OTHER STUFF.

8    AND I AM LIKE, I DON'T KNOW WHAT THAT IS.

9            OKAY.

10           NOW WHAT IS THIS TRACK TWO, TRACK THREE,

11   TRACK FOUR BUSINESS?

12       MS. OKUN-WIESE:  THAT IS THE TRACKS THEY BROKE

13   DOWN IN THEIR TAPE THAT THEY SENT ME.

14           TRACK ONE IS THE WHOLE RECORDING.

15       THE COURT:  IS THAT WHAT WE HEARD?

16       MS. OKUN-WIESE:  THAT'S WHAT WE HEARD.  AND THEN

17   TRACK TWO BREAKS DOWN THE FIRST STATEMENT HE

18   ALLEGEDLY MAKES.  AND THEN TRACK THREE IS THE SECOND

19   STATEMENT, AND THEN TRACK FOUR.

20           SO WOULD THE COURT LIKE ME TO PLAY THOSE

21   TRACKS?

22       THE COURT:  YES.

23       MR. BUEHLER:  MAY I JUST ADD, YOUR HONOR, THIS

24   WAS DONE BY A GENTLEMAN NAMED MR. STUTCHMAN WHO IS AN

25   EXPERT IN ENHANCING AND INTERPRETING THINGS LIKE THIS

26   THAT ARE DIFFICULT TO DISCERN.

27           SO THE TRACKS THE COURT WILL NOW HEAR ARE

28   THE RESULT OF WHAT HE HAS ENHANCED.  AND THEN I

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
 1    BELIEVE ON EACH TRACK IT WILL PLAY SEVERAL TIMES AT

 2    THE ORDINARY SPEED, AND THEN HE HAS IT SLOW DOWN A

 3    COUPLE OF TIMES.

 4              SO IT IS NOT -- WHEN SHE SAYS "THEY," I

 5    DIDN'T DO THIS; WE HAD AN EXPERT DO THIS.

 6         MS. OKUN-WIESE:  THIS IS TRACK TWO.

 7

 8              (AUDIO PLAYED)

 9

10         MS. OKUN-WIESE:  AND THIS IS TRACK THREE.

11

12              (AUDIO PLAYED)

13

14         MS. OKUN-WIESE:  AND THEN THIS IS TRACK FOUR.

15

16              (AUDIO PLAYED)

17

18         MS. OKUN-WIESE:  THAT'S IT.

19         THE COURT:  OKAY.

20         MR. BUEHLER:  WE ALSO FILED, YOUR HONOR, THE

21    REPORT FROM STUTCHMAN FORENSIC LABORATORY, THE

22    COMPANY THAT USED THESE TAPES.

23         MS. OKUN-WIESE:  I WOULD OBJECT; HE IS NOT HERE

24    TESTIFYING.  THE COURT CAN LISTEN TO THE TAPE AND

25    MAKE YOUR OWN ASSESSMENT.

26         THE COURT:  I AM NOT GOING TO ACCEPT THAT REPORT.

27    I MEAN, IT IS HEARSAY.  SHE IS OBJECTING.

28              IF BOTH SIDES STIPULATE THAT I CONSIDER IT,
```

1    FINE.

2        MR. BUEHLER:  THEN I WOULD PROFFER THAT -- WOULD

3    IT BE APPROPRIATE FOR THE COURT -- FOR US TO HAVE

4    MR. STUTCHMAN COME IN AND TESTIFY TO --

5        THE COURT:  WELL THAT'S UP TO YOU.

6            YOU KNOW, THIS IS -- IF YOU ARE WANTING TO

7    GET THIS ADMITTED ON THE BASIS OF WHAT IT SAYS ON

8    YOUR TRANSCRIPT.  BECAUSE QUITE FRANKLY, I DON'T HEAR

9    IT THAT WAY.

10       MS. OKUN-WIESE:  AND I WOULD OBJECT.  EVEN IF HE

11   DID COME INTO COURT, IT IS UP TO THE TRIER OF FACT TO

12   DETERMINE WHAT'S IN THAT STATEMENT.  AND TRANSCRIPTS

13   ARE AN AID TO WHAT IS ON THE RECORDING, AND I

14   DON'T -- I DON'T BELIEVE THAT IT WOULD BE RIGHT FOR

15   THIS EXPERT TO COME IN HERE AND TESTIFY TO WHAT HE

16   HEARD.

17           I --

18       THE COURT:  WELL -- AND THAT MAY BE SO, BUT I

19   THINK THAT WITH REGARD TO MY HEARING HIM OUT OF THE

20   PRESENCE OF THE JURY WITH REGARD TO WHAT WAS DONE TO

21   ENHANCE THIS TAPE AND THINGS LIKE THAT, IT IS

22   PROBABLY RELEVANT.

23       MS. OKUN-WIESE:  BUT I DON'T THINK IT IS RELEVANT

24   FOR HIM TO BE ABLE TO GIVE HIS OPINION THAT THAT'S

25   WHAT IT SAYS.

26           I AGREE WITH THE COURT; THAT HE CAN

27   DESCRIBE WHAT HE DID AND HOW HE ENHANCES IT; THAT'S

28   HIS EXPERTISE.  BUT TO COME IN HERE AND GIVE HIS

1   OPINION AS TO WHAT IS STATED IN THAT TRANSCRIPT WHEN

2   NOBODY ELSE CAN HEAR THAT, I DON'T FEEL THAT THAT'S

3   RELEVANT.

4       THE COURT:  WELL, I MIGHT HEAR HIM OUT OF THE

5   PRESENCE OF THE JURY, JUST TO HEAR WHAT HE SAYS.  BUT

6   I DON'T HEAR IT THE WAY IT IS STATED HERE PERSONALLY.

7       MR. BUEHLER:  HE DOES, YOUR HONOR -- AND HE HAS

8   BEEN QUALIFIED TO -- TESTIFY ABOUT ENHANCING SOUND

9   RECORDINGS, AND BASED ON HIS EXPERIENCE, HIS LONG

10  YEARS OF LISTENING TO THINGS, ALSO TO WHAT IT IS

11  SAYING.

12        HE HAS BEEN --

13      THE COURT:  I WILL HEAR WHAT HE HAS TO SAY.  IS

14  HE AVAILABLE TODAY?

15      MR. BUEHLER:  HE IS NOT AVAILABLE TODAY.  HE

16  LIVES UP NORTH.

17      THE COURT:  IS HE AVAILABLE TOMORROW?

18      MR. BUEHLER:  NO -- WE CALLED HIM.  I THINK HE

19  COULD PROBABLY BE AVAILABLE MONDAY.

20      THE COURT:  WELL, WE HAVE A JURY OF 65 PEOPLE

21  COMING IN ON MONDAY.  I DON'T KNOW WHEN WE CAN GET TO

22  HIM, UNLESS HE CAN BE HERE AT 8:30 ON MONDAY BECAUSE

23  THE JURY IS COMING IN AT 10:00.

24      MR. BUEHLER:  I CAN'T CONFIRM RIGHT NOW BECAUSE

25  WE WEREN'T ABLE TO REACH HIM.

26        I MEAN, LET ME SAY --

27      THE COURT:  IS HE LOCAL SOME PLACE?

28      MR. BUEHLER:  NO.  HE IS IN NAPA VALLEY.

1     THE COURT:  WELL, HE IS AT LEAST IN CALIFORNIA.

2        MR. BUEHLER:  HE IS.  AND HE -- HE HAS DONE THIS

3     FOR YEARS.

4            HE WORKED FOR LAW-ENFORCEMENT.  HE

5     TESTIFIES FOR LAW-ENFORCEMENT --

6        THE COURT:  WELL I SUGGEST THAT YOU WAIT TO ARGUE

7     THE MERITS OF YOUR MOTION UNTIL HE IS ACTUALLY HERE

8     AND I CAN HEAR HIM BECAUSE I AM NOT GOING TO MAKE A

9     RULING WITHOUT HEARING FROM HIM.

10       MR. BUEHLER:  VERY WELL, YOUR HONOR.

11       THE COURT:  OKAY.

12       MS. OKUN-WIESE:  WITH RESPECT TO THE COURT NOT

13    MAKING A RULING, IF THE COURT IS CONSIDERING JUST

14    BASED UPON THE HEARSAY STATEMENTS OF M.A. WHETHER OR

15    NOT THE THIRD-PARTY CULPABILITY WOULD COME IN AND BE

16    PRESENTED TO THE JURY, THE PEOPLE ARE ASKING TO HAVE

17    A FULL-BLOWN HEARING ON JOHN GILMORE'S INNOCENCE.

18            I THINK THAT THE COURT NEEDS TO UNDERSTAND

19    THAT MR. GILMORE HAD NOTHING TO DO WITH THE CRIME; HE

20    WAS NOT THERE.  AND I WOULD LIKE TO PRESENT THAT TO

21    THE COURT OUTSIDE THE PRESENCE OF THE JURY.

22    OTHERWISE, WE WILL BE PRESENTING A TRIAL BETWEEN M.A.

23    AND MR. GILMORE AND THEN MR. GILMORE AND THIS CASE TO

24    THE JURY, AS WELL AS THE ORIGINAL MURDER CASE.

25       THE COURT:  WELL THAT'S FINE.  I MEAN, I AM NOT

26    GOING TO PRECLUDE EITHER SIDE FROM PRESENTING

27    WHATEVER EVIDENCE THEY WANT TO PRESENT WITH REGARD TO

28    THE THIRD-PARTY CULPABILITY EVIDENCE.  AND IF YOU

```
 1    FEEL THAT THERE IS RELEVANT EVIDENCE THAT YOU WANT TO
 2    PRESENT ON THE ISSUE, I AM OPEN TO HEARING IT.
 3         MS. OKUN-WIESE:  OKAY.
 4         THE COURT:  SO WITH REGARD TO THIS PARTICULAR
 5    ISSUE OF THIS TAPE, I DON'T THINK THERE IS ANYTHING
 6    MORE WE CAN DO AT THE MOMENT UNTIL WE HAVE YOUR
 7    EXPERT.
 8              SO MAYBE WE NEED TO DEFER BOTH THOSE
 9    MOTIONS FOR RIGHT NOW?
10         MS. OKUN-WIESE:  YES.
11         THE COURT:  AND SEE WHAT ELSE MAYBE WE CAN DO
12    RIGHT NOW.
13              I HAVE SOMETHING CALLED NOTICE OF MOTION
14    AND MOTION TO COMPEL PRETRIAL DISCOVERY OF REPORTS
15    REGARDING RONNIE CASE.
16              AND THEN IN YOUR PAPERS I THINK YOU
17    INDICATE THAT THOSE HAD PREVIOUSLY BEEN TURNED OVER?
18         MS. OKUN-WIESE:  YES.
19         THE COURT:  AND DO YOU ACKNOWLEDGE THAT YOU HAVE
20    RECEIVED THOSE REPORTS THAT YOU REFERENCED IN THIS
21    MOTION?
22         MR. BUEHLER:  WE HAVE RECEIVED SOME REPORTS, YOUR
23    HONOR.  I DON'T KNOW THAT THEY ARE COMPLETE, SO I
24    BELIEVE -- I BELIEVE -- WOULD IT BE APPROPRIATE FOR
25    THE COURT TO ORDER THAT THAT DISCOVERY BE PRODUCED SO
26    IF THERE IS ANYTHING THAT HASN'T YET BEEN PRODUCED,
27    THERE WILL BE AN OUTSTANDING ORDER FOR IT TO BE
28    PRODUCED?
```

1        I MEAN, I ACCEPT THE REPRESENTATION THEY

2    HAVE GIVEN US EVERYTHING IF THAT'S THE

3    REPRESENTATION.  BUT I THINK IT WOULD BE APPROPRIATE

4    TO HAVE AN ORDER.

5        MS. OKUN-WIESE:  THERE ARE ADDITIONAL RECORDINGS

6    OF THE VENTURA CASE.  HOWEVER, IF THOSE RECORDINGS

7    ARE TURNED OVER, IT IS GOING TO COMPROMISE THAT

8    INVESTIGATION.  BUT THAT CASE HAS NOTHING TO DO WITH

9    THIS CASE.

10       THE COURT:  WELL, NOW RONNIE CASE IS NOT LISTED

11   ON ANYBODY'S WITNESS LIST, CORRECT?

12       MS. OKUN-WIESE:  CORRECT.

13       THE COURT:  IS THAT RIGHT?

14       MR. BUEHLER:  YES, YOUR HONOR.

15       THE COURT:  THEN I AM NOT ORDERING ANYTHING

16   FURTHER TO BE TURNED OVER ON THAT ISSUE.

17        OKAY.  NEXT WE HAVE NOTICE OF MOTION AND

18   MOTION TO COMPEL PRETRIAL DISCOVERY OF NOTES AND

19   REPORTS REGARDING M.A.

20        AND WHAT'S THE STATUS OF THIS DISCOVERY

21   REQUEST?

22       MS. OKUN-WIESE:  THERE IS NOTHING.  WE TURNED

23   OVER THE RECORDING OF DETECTIVE THOMPSON WITH

24   MISS AYALA.  THE COURT HAS THAT; IT WAS ATTACHED AS

25   AN EXHIBIT TO THE DISMISSAL MOTION.  AND THERE IS

26   NOTHING ELSE.

27        AND BOTH COUNSEL AND I -- EXCUSE ME -- BOTH

28   THE DETECTIVE AND I SIGNED DECLARATIONS.

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1      THE COURT:  MR. BUEHLER?

2       MR. BUEHLER:  IF I COULD HAVE JUST A MOMENT, YOUR

3   HONOR, I AM HAVING TROUBLE FINDING THAT MOTION.

4           I AM SORRY, I AM NOT SURE I CAUGHT WHAT THE

5   PEOPLE'S REPRESENTATION WAS ON THIS.  WAS IT THAT YOU

6   HAD TURNED OVER EVERYTHING?

7       MS. OKUN-WIESE:  THERE IS NOTHING ELSE IN

8   EXISTENCE.

9       MR. BUEHLER:  WELL, THIS GOES TO THE QUESTION OF

10  WHY -- WHY THE EL SEGUNDO CASE WAS FILED RECENTLY.

11          AND FRANKLY, GIVEN THE CONTEXT IN WHICH

12  THIS OCCURS AGAINST THIS PARTICULAR WITNESS, IT SEEMS

13  TO ME THAT THERE WOULD BE A BURDEN ON THE PEOPLE TO

14  EXPLAIN HOW IT CAME ABOUT THAT THIS CASE, AFTER THIS

15  MANY MONTHS, WAS FILED.

16          I AM SURE THAT SOMEBODY IN THE DISTRICT

17  ATTORNEY'S OFFICE HAS MADE DECISIONS ABOUT THIS CASE,

18  HAS CONFERRED WITH THE EL SEGUNDO POLICE AND HAS COME

19  TO SOME CONCLUSION THAT AT THIS POINT THIS CASE

20  SHOULD BE FILED.  IT MAY BE BECAUSE THEY HAD SOME

21  CONTINUING INVESTIGATION GOING ON; I DON'T KNOW.  BUT

22  SHOULDN'T WE HAVE -- AREN'T WE ENTITLED TO KNOW WHAT

23  THE DECISION MAKING PROCESS WAS FOR FILING THIS CASE

24  AGAINST THE WITNESS, A POTENTIAL WITNESS FOR THE

25  DEFENDANT IN THIS MURDER CASE THAT NOW HANGS OVER

26  THAT WITNESS AND IS CREATING A PROBLEM WITH THAT

27  WITNESS BEING ABLE TO TESTIFY?  I THINK IT IS HIGHLY

28  RELEVANT.

1    THE COURT:  WHEN YOU SAY THERE IS NOTHING ELSE:
2         (READING:)  ALL NOTES AND REPORTS
3         FROM THE SANTA MONICA POLICE
4         DEPARTMENT REGARDING M.A. AND
5         REGARDING THE DECISION TO FILE THE
6         COMPLAINT AGAINST HER.
7
8         YOU ARE SAYING THERE IS NOTHING?
9    MS. OKUN-WIESE:  SANTA MONICA HAD NOTHING TO DO
10   WITH THE DECISION TO FILE ON HER.
11   THE COURT:  OKAY.
12        SO THEY SAY THEY DON'T HAVE THAT.
13        (READING:)  NUMBER TWO, ALL
14        COMMUNICATIONS BETWEEN THE SANTA
15        MONICA POLICE DEPARTMENT INCLUDING
16        DETECTIVE KAREN THOMPSON AND THE
17        EL SEGUNDO POLICE DEPARTMENT
18        REGARDING M.A. AND REGARDING THE
19        DECISION TO FILE A COMPLAINT AGAINST
20        HER.
21
22        ARE THERE ANY SUCH?
23   MS. OKUN-WIESE:  NO.
24   THE COURT:  OKAY.
25        (READING:)  NUMBER THREE, ALL
26        COMMUNICATIONS BETWEEN THE
27        SANTA MONICA POLICE DEPARTMENT
28        INCLUDING DETECTIVE KAREN THOMPSON

```
 1              AND THE LOS ANGELES DISTRICT
 2              ATTORNEY'S OFFICE REGARDING M.A. AND
 3              REGARDING THE DECISION TO FILE THE
 4              COMPLAINT AGAINST HER.
 5
 6          ARE THERE ANY -- IS THERE ANYTHING?
 7      MS. OKUN-WIESE:  NO.
 8      THE COURT:  (READING:)  NUMBER FOUR,
 9              ALL COMMUNICATIONS BETWEEN THE
10              LOS ANGELES COUNTY DISTRICT
11              ATTORNEY'S OFFICE AND EL SEGUNDO
12              POLICE DEPARTMENT REGARDING M.A. AND
13              REGARDING THE DECISION TO FILE A
14              COMPLAINT AGAINST HER.
15
16          NOW HAVE YOU REALLY INVESTIGATED NUMBER
17      FOUR?
18      MS. OKUN-WIESE:  NO.  I DID HAVE MY HEAD DEPUTY
19  CONTACT THE HEAD DEPUTY OVER THERE TO TRY TO GET A
20  COPY OF THE FILE OR TO FIND OUT ANY INFORMATION.
21  THEY HAVE NOT GOT BACK TO US.
22          BUT I DON'T KNOW WHAT THOSE COMMUNICATIONS
23  ARE.
24      THE COURT:  I AM SORRY?
25      MS. OKUN-WIESE:  I DON'T KNOW WHAT THOSE
26  COMMUNICATIONS ARE.
27      THE COURT:  WELL YOU NEED TO FIND OUT.
28      MS. OKUN-WIESE:  AND WE HAVE A CALL IN.  I HAD MY
```

1   HEAD DEPUTY CALL SO THAT I DIDN'T HAVE TO BE

2   INVOLVED, BECAUSE THEY WERE INSINUATING I HAD

3   SOMETHING TO DO WITH THAT FILING.

4          I HAVE NOT SPOKEN TO ANYBODY IN THAT D.A.'S

5   OFFICE, NOR HAVE I SPOKEN TO ANYBODY AT EL SEGUNDO.

6   SO I DIDN'T WANT TO GET INVOLVED, SO MY HEAD DEPUTY

7   MADE THE PHONE CALL TO THAT HEAD DEPUTY WHO

8   APPARENTLY IS OUT WITH A MEDICAL ISSUE.  SO HE

9   CONTACTED THE ASSISTANT HEAD DEPUTY, AND HE WAS

10  WAITING FOR A CALL BACK.

11      THE COURT:  WELL THEN YOU NEED TO DO MORE THAN

12  JUST TELL ME THAT THERE ISN'T ANYTHING.

13      MS. OKUN-WIESE:  OKAY.  WE ARE GETTING A COPY --

14  WE REQUESTED A COPY OF THE FILE.  SO I DON'T KNOW

15  WHAT ELSE --

16      THE COURT:  WELL --

17      MS. OKUN-WIESE:  -- I COULD DO UNLESS --

18      THE COURT:  WELL THIS IS ONE DISTRICT ATTORNEY'S

19  OFFICE.  SO YOU ARE TELLING ME THAT -- THIS IS THE

20  AIRPORT D.A.'S OFFICE.  "WE CAN'T GET IT" OR "WE

21  CAN'T DO IT," THAT'S NOT GOING TO FLY.

22      MS. OKUN-WIESE:  I AM NOT SAYING THAT I CAN'T DO

23  IT.  WHAT I AM SAYING IS I DIDN'T WANT TO GET

24  INVOLVED BECAUSE OF THE INSINUATION BY COUNSEL AND

25  HIS --

26      THE COURT:  WELL, THEN, IF YOU ARE NOT GOING TO

27  DO IT PERSONALLY, THEN WHOEVER IS GOING TO DO IT

28  PERSONALLY NEEDS TO GET IT DONE.

```
1        MS. OKUN-WIESE:  OKAY.

2        THE COURT:  SO NUMBER FOUR REMAINS OUTSTANDING.

3   AND THEY ARE GOING TO GET THAT.

4        MR. BUEHLER:  I THINK IT IS AN APPROPRIATE

5   REQUEST.

6             CAN THE COURT GRANT THE ORDER, AND THEN

7   THEY CAN GIVE US THEIR RESPONSE THEN AS TO WHAT THEY

8   HAVE FOUND?

9        THE COURT:  I AM ORDERING IT, BUT I DON'T HAVE AN

10  ORDER TO SIGN.

11       MR. BUEHLER:  WE WILL PROVIDE ONE, YOUR HONOR.

12       THE COURT:  NEXT.

13            NOTICE OF MOTION, MOTION IN LIMINE TO

14  EXCLUDE RECORDING OF TRANSCRIPT AND TESTIMONY OF

15  POLICE ENCOUNTER WITH DEFENDANT AT ANIMAL SHELTER ON

16  JUNE 17TH, 2010.

17            NOW I HAVE READ THE MOTION.  I CONSIDERED

18  THE RESPONSE.

19            DO YOU WANT TO BE HEARD?

20       MR. BUEHLER:  YES, YOUR HONOR.

21            AS I UNDERSTAND THE PEOPLE'S RESPONSE, THEY

22  SAY THAT OFFICER BAMBRICK WHO WILL COME AND TESTIFY

23  THAT IT DIDN'T SEEM TO HIM THAT THE DEFENDANT IN HER

24  RESPONSES WAS CREDIBLE --

25       THE COURT:  WELL HE IS NOT GOING TO BE ABLE TO

26  TESTIFY TO HIS OPINION OF WHETHER THE DEFENDANT IS

27  CREDIBLE OR NOT.

28       MR. BUEHLER:  I AGREE.  I MEAN, THAT'S HOW I
```

1    UNDERSTAND WHAT THEY ARE SAYING.

2        THE COURT:  I MEAN, THE JURY WOULD ULTIMATELY

3    MAKE THAT DECISION.  BUT THE OFFICER, THE DETECTIVE,

4    DOESN'T HAVE THE RIGHT TO SAY THAT.

5            AND I DON'T THINK THAT YOU WOULD THINK THAT

6    YOU COULD DO THAT, RIGHT?

7        MS. OKUN-WIESE:  NO.

8        MR. BUEHLER:  WELL, THEN THERE IS NOTHING IN THE

9    TRANSCRIPT, THERE IS NOTHING IN THE WORDS SPOKEN THAT

10   IS RELEVANT HERE; THAT IT IS IN ANY WAY INCULPATORY.

11           IT IS A BASIC RELEVANCE ISSUE.  SHE IS

12   ACCOSTED BY SOME OFFICERS WHO ARE IN PLAIN CLOTHES.

13   THEY ARE NOT EVEN IDENTIFYING THEMSELVES.  THEY ARE

14   SAYING THEY ARE POLICE OFFICERS, BUT THERE IS NOTHING

15   ABOUT THE CAR THEY ARE DRIVING AND THE WAY THEY ARE

16   DRESSED OR ANYTHING THAT INDICATES THEY ARE POLICE

17   OFFICERS.  AND OBVIOUSLY THAT'S -- THAT WOULD BE A

18   SHOCKING THING TO ANYBODY TO BE STOPPED ON THE STREET

19   AND SAY "WE NEED TO TAKE YOUR FINGERPRINTS BECAUSE

20   YOU ARE A SUSPECT IN A MURDER INVESTIGATION."

21           SO HOW IS IT RELEVANT TO BRING IN A

22   TRANSCRIPT OR A RECORDING OF WHAT SHE SAYS IN

23   RESPONSE TO THE OFFICERS?  ALL SHE IS DOING IS

24   EXPRESSING CONFUSION, SAYING "WELL MAYBE I WANT TO

25   TALK TO A LAWYER."

26           I DON'T UNDERSTAND HOW THAT'S -- HOW THAT'S

27   RELEVANT.  IS IT BECAUSE SHE ASKED FOR A LAWYER, THAT

28   THEREFORE SHE MUST BE GUILTY?  WHAT'S THE RELEVANCE

```
 1    OF IT?

 2        MS. OKUN-WIESE:  NO.  SHE SAYS SHE DOESN'T KNOW

 3    JULIANA REDDING, EXCEPT HER DNA IS ALL OVER THE

 4    APARTMENT.

 5            HER REACTION TO DETECTIVE BAMBRICK WHEN HE

 6    SHOWS HER THE PHOTOGRAPH, ACCORDING TO WHAT HE SAYS,

 7    HER KNEES BUCKLED.  SHE BEGAN SHAKING.  SHE SAYS,

 8    "OH, MY GOD.  I DON'T KNOW WHO YOU ARE TALKING

 9    ABOUT."  AND SHE GOES THROUGH HER WHOLE THING, AND

10    THEN SHE REFUSES TO GIVE FINGERPRINTS, AND SHE IS

11    ARRESTED.

12        THE COURT:  I THINK IT IS RELEVANT.  I MEAN, YOU

13    MAY HAVE YOUR TAKE ON IT AND YOUR EXPLANATION FOR IT,

14    BUT THEY DON'T HAVE TO ACCEPT YOURS OR HERS.

15            THE -- IT HAS SOME TENDENCY AND REASON TO

16    PROVE A FACT IN ISSUE.  AND YOUR MOTION TO EXCLUDE

17    THAT IS DENIED.

18            NEXT, DEFENSE MOTION IN LIMINE TO EXCLUDE

19    EVIDENCE OF FRAUD, OF BUSINESS WRONGDOING.

20            AND I THINK THIS MIGHT BE ONE OF THOSE

21    MOTIONS THAT BASICALLY YOU ARE CONCEDING YOU ARE NOT

22    GOING TO PRESENT THE INFORMATION REGARDING

23    DR. WHATEVER -- HOWEVER YOU PRONOUNCE HIS NAME.

24        MS. OKUN-WIESE:  CORRECT.

25        THE COURT:  SO YOU BASICALLY CONCEDED THIS,

26    CORRECT?

27        MS. OKUN-WIESE:  YES.

28        THE COURT:  ALL RIGHT.
```

```
 1              NEXT WAS --

 2        MR. BUEHLER:  MAY I INQUIRE, YOUR HONOR?

 3              THE PEOPLE HAVE ON THEIR WITNESS LIST TWO

 4    WITNESSES:  JERRY LUKIEWSKI AND DAVID SPANHAUER.  WE

 5    ARE UNABLE TO THINK OF WHAT THE RELEVANCE OF THEIR

 6    TESTIMONY WOULD BE EXCEPT AS TO BUSINESS ACTIVITIES

 7    OF DR. UWAYDAH.

 8        MS. OKUN-WIESE:  THEY WOULD ONLY COME INTO PLAY

 9    IF THE DEFENDANT TESTIFIED AND THE COURT PERMITTED

10    THE PRIOR ACTS TO COME IN.

11        MR. BUEHLER:  OKAY.

12        THE COURT:  ALL RIGHT.

13              THE NEXT ONE IS NOTICE OF MOTION AND MOTION

14    IN LIMINE TO EXCLUDE GRAPHIC AND PREJUDICIAL

15    PHOTOGRAPHS OF DECEDENT.

16              AND I DO HAVE THE OPPOSITION THAT WAS FILED

17    BY THE PROSECUTION WHICH INCLUDED A NUMBER OF

18    EXHIBITS WHICH INCLUDE CRIME SCENE PHOTOGRAPHS AND

19    AUTOPSY PHOTOGRAPHS UNDER EXHIBIT B AND C.

20              AND FRANKLY, UNTIL WE GET TO C, NUMBER 16,

21    I DON'T FIND THE PREVIOUS PHOTOGRAPHS TO BE

22    PARTICULARLY GRAPHIC.  I HAVE SEEN A LOT OF CRIME

23    SCENE AND AUTOPSY PHOTOGRAPHS IN MY CAREER, AND THESE

24    DON'T SEEM TO BE PARTICULARLY GRAPHIC.  THE ONLY ONES

25    THAT ARGUABLY -- I GUESS THERE IS A FEW AROUND THE 8,

26    9 AND 10 AND 11 OF THE EYE, WHICH ARE SOMEWHAT

27    GRAPHIC, BUT THE ONES THAT ARE REALLY I GUESS GRAPHIC

28    ARE FROM 16 -- WHICH I GUESS THE SKULL IS PEELED BACK
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1    IN THOSE PHOTOGRAPHS.

2        MS. OKUN-WIESE:  CORRECT.

3            AND I ACTUALLY MET WITH DR. PENA LAST WEEK

4    AND WENT THROUGH THESE PHOTOGRAPHS.  AND HE PICKED

5    OUT THESE PHOTOGRAPHS AND WENT THROUGH, AND THAT'S

6    WHY I CIRCLED A COUPLE OF PLACES IN THE PHOTOGRAPHS.

7    THOSE ARE FOR HIM TO EXPLAIN THE HEMORRHAGING AT THAT

8    POINT AND WHAT TYPE OF INJURIES SHE SUFFERED.

9            AND COUNSEL CAN ATTEST TO I HAD DIFFERENT

10   PHOTOGRAPHS INITIALLY IN MY PREMARKED EXHIBITS, AND

11   THEN I CHANGED THEM WHEN I MET WITH DR. PENA AND HE

12   WENT THROUGH THE DISCUSSION OF HER INJURIES.

13       THE COURT:  MY INCLINATION IS THAT YOU DON'T NEED

14   16, 17, 18, 19 AND 20 AND 21, BUT YOU CAN PICK TWO OF

15   THOSE PHOTOGRAPHS FROM WITHIN THAT SECTION, AND

16   DR. PENA CAN TESTIFY ABOUT THE INJURIES USING TWO OF

17   THOSE PHOTOGRAPHS.

18           AND I WOULD ALSO SAY THAT -- I MEAN, I

19   ASSUME THAT THE ONES OF THE EYE ARE DEALING WITH

20   PETECHIAL HEMORRHAGING ON THE EYE.

21       MS. OKUN-WIESE:  RIGHT.  AND THERE WAS ALSO AN

22   INJURY TO THE EYE WHICH IS SHOWN BY THE BLACK MARK.

23       THE COURT:  SO I ALSO THINK THAT YOU COULD

24   PROBABLY DO THAT WITH FEWER THAN ONE, TWO, THREE,

25   FOUR, FIVE PHOTOGRAPHS.

26           AND IF THERE IS ONE PHOTOGRAPH THAT SHOWS

27   BOTH THE INJURY TO THE EYE AND THE HEMORRHAGING THAT

28   YOU ARE REFERRING TO, I THINK YOU SHOULD PICK THAT

1   ONE AND USE ONE.

2          I DON'T THINK THE JURY NEEDS TO SEE FIVE

3   DIFFERENT VERSIONS OF THE EYE, OR ALL THOSE VERSIONS

4   OF THE SCALP PULLED BACK.

5     MS. OKUN-WIESE:  NUMBER 11 IS THE RIGHT EYE.  AND

6   THE OTHER ONES YOU IDENTIFIED, 8, 9 AND 10, THOSE ARE

7   OF THE --

8     THE COURT:  OKAY, SO PICK ONE OF THE RIGHT EYE,

9   ONE OF THE LEFT EYE.

10         IN OTHER PARTICULARS, THE MOTION TO EXCLUDE

11  THE CRIME SCENE AND AUTOPSY PHOTOGRAPHS IS DENIED.

12         NEXT MOTION IS NOTICE OF MOTION AND MOTION

13  IN LIMINE TO EXCLUDE REFERENCES TO, QUOTE "JAMES BOND

14  GIRL."

15         I THINK THE PEOPLE HAVE CONCEDED THAT YOU

16  ARE NOT OPPOSING THAT MOTION, CORRECT?

17    MS. OKUN-WIESE:  CORRECT.

18    THE COURT:  ALL RIGHT.

19         ALL RIGHT.  THE NEXT ONE IS NOTICE OF

20  MOTION AND MOTION IN LIMINE TO EXCLUDE REFERENCES TO,

21  NUMBER ONE, ALLEGATIONS OF ILLEGAL ACTIVITIES BY

22  MUNIR UWAYDAH; I AM NOT SURE IF I AM PRONOUNCING THAT

23  RIGHT.

24         NUMBER TWO, INVESTIGATION OF UWAYDAH AND

25  BUSINESS ENTITIES.

26         AND NUMBER THREE, UWAYDAH'S DEPARTURE AND

27  ABSENCE FROM THE UNITED STATES.

28         NOW AS I UNDERSTAND IT, YOU ARE NOT

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1    OPPOSING NUMBER ONE AND TWO, BUT MAYBE NUMBER THREE

2    WITH REGARD TO UWAYDAH'S DEPARTURE AND ABSENCE FROM

3    THE U.S.

4         MS. OKUN-WIESE:  RIGHT.  HE LEFT WITHIN 48 HOURS

5    OF THE DEFENDANT BEING ARRESTED, AFTER HAVING

6    CONVERSATIONS WITH THE DEFENDANT, AFTER SHE WAS

7    FINGERPRINTED AND TAKEN TO THE STATION.  AND THEN SHE

8    WAS RELEASED AND THEN ARRESTED.  AND WHEN SHE WAS

9    ARRESTED, HE SPLIT AND HE HAS BEEN GONE EVER SINCE.

10             I THINK IT IS RELEVANT TO SHOW THE

11   RELATIONSHIP AND -- I BELIEVE THAT I MISSPOKE EARLIER

12   WHEN THE COURT STATED THAT THE PEOPLE DIDN'T WANT TO

13   BRING IN ANY EVIDENCE OF FRAUD OR WRONGDOING ON

14   MUNIR UWAYDAH'S PART.  I DON'T INTEND TO BRING THAT

15   IN, BUT THERE WAS, AS I NOTED IN MY PAPERWORK, A

16   RELATIONSHIP BETWEEN MISS REDDING'S FATHER AND

17   MUNIR UWAYDAH, AND I INTEND TO BRING THAT IN BECAUSE

18   IT GIVES THE ONLY CONTEXT TO THESE RELATIONSHIPS.

19        THE COURT:  RIGHT.

20             I THINK -- I WAS REFERENCING -- I THINK WE

21   WERE TALKING ABOUT ALL KINDS OF OTHER STUFF THAT

22   SUPPOSEDLY, MAYBE, POSSIBLY --

23        MS. OKUN-WIESE:  RIGHT.  AND I DON'T INTEND TO

24   BRING IN HIS ALLEGED HEALTH CARE FRAUD OR ANY OF THAT

25   STUFF.

26        THE COURT:  I DO HAVE A CONCERN ABOUT THIS NUMBER

27   THREE, THOUGH, BECAUSE WHAT YOU WANT TO SUGGEST IS

28   BASICALLY -- IF I AM INTERPRETING THIS RIGHT, YOU

1   WANT TO PRESENT EVIDENCE THAT HE BASICALLY FLED THE

2   COUNTRY AFTER MISS PARK WAS ARRESTED FOR THIS, AND

3   SOMEHOW THAT'S RELEVANT TO SHOW MISS PARK IS GUILTY

4   HOW?

5        MS. OKUN-WIESE:  WELL, THE ONLY LINK BETWEEN

6   MISS REDDING AND THE DEFENDANT IS MUNIR UWAYDAH.  HE

7   IS THE ONLY LINK.  THERE IS NO OTHER CONNECTION

8   BETWEEN THEM.

9        THE COURT:  WELL I UNDERSTAND THAT.  BUT BACK TO

10  MY QUESTION.  HIS FLEEING THE COUNTRY, IF THAT'S WHAT

11  HE DID, IS RELEVANT TO SHOW MISS PARK IS GUILTY HOW?

12       MS. OKUN-WIESE:  IT GOES TO SHOW HER CONNECTION

13  WITH MR. UWAYDAH.

14       THE COURT:  I DON'T THINK SO.  I WOULD NOT --

15  BECAUSE THERE ARE OTHER EXPLANATIONS FOR HIM LEAVING

16  THE COUNTRY BEYOND THE FACT THAT SHE GOT ARRESTED,

17  AND THOSE OTHER EXPLANATIONS BEING, HE IS BEING

18  INVESTIGATED FOR ALL KINDS OF OTHER VIOLATIONS OF THE

19  LAW.  AND I JUST THINK IT IS TOO MUCH OF A STRETCH TO

20  USE HIS SOMEHOW LEAVING THE COUNTRY AS EVIDENCE THAT

21  SHE IS GUILTY.  AND SO NO.

22       MS. OKUN-WIESE:  OKAY.

23       MR. BUEHLER:  YOUR HONOR, MAY I MAKE AN INQUIRY?

24       THE COURT:  ABOUT WHAT?

25       MR. BUEHLER:  ABOUT THIS SUBJECT OF INFORMATION

26  ABOUT DR. UWAYDAH COMING IN.

27            AS I UNDERSTAND WHAT THE PEOPLE ARE

28  SAYING --

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
 1        THE COURT:  ARE YOU TALKING ABOUT NOW WITH REGARD
 2   TO REDDING'S FATHER?
 3        MR. BUEHLER:  YES.
 4        THE COURT:  OKAY.
 5        MR. BUEHLER:  YES.
 6             AS THE PEOPLE JUST ARTICULATED AND THEY SAY
 7   IN THEIR PAPERS, THEY BELIEVE THAT THEY SHOULD BE
 8   ABLE TO BRING INTO EVIDENCE TESTIMONY ABOUT THE
 9   BUSINESS NEGOTIATIONS BETWEEN MR. REDDING AND
10   DR. UWAYDAH.  THAT -- THAT'S A VAGUE TOPIC OF
11   EVIDENCE.
12             I DON'T KNOW -- FRANKLY, I THINK WE WOULD
13   BE ENTITLED TO AN OFFER OF PROOF OR AN EXPLANATION
14   FROM THE PEOPLE AS TO HOW THEY SEE THAT AS RELEVANT.
15             THEY KEEP TALKING ABOUT SHOWING THE
16   CONNECTION, SHOWING THE CONNECTION BETWEEN KELLY PARK
17   AND DR. UWAYDAH.  I MEAN, I WILL STIPULATE SHE WAS
18   EMPLOYED BY DR. UWAYDAH.  BUT WHAT IS IT ABOUT THE
19   NEGOTIATIONS WITH GREG REDDING THAT THEY ARE GOING TO
20   BRING IN EVIDENCE ABOUT THAT IS RELEVANT TO WHO
21   KILLED JULIANA REDDING?
22        THE COURT:  WELL, THE PEOPLE'S THEORY IS THAT WAS
23   THE MOTIVE FOR THE MURDER.  I MEAN, THAT'S THEIR
24   THEORY.
25        MR. BUEHLER: .WELL IT DOESN'T MAKE SENSE FROM THE
26   STANDPOINT THAT THE EVIDENCE THAT THEY HAVE PRODUCED
27   IN DISCOVERY SHOWS THAT DR. UWAYDAH TERMINATED THE
28   NEGOTIATIONS.  IT WAS SORT OF A JOINT THING.
```

1    DR. UWAYDAH HAD A LAWYER FROM HIS -- A LETTER FROM

2    HIS LAWYER --

3        THE COURT:  I HAVE READ ALL THAT.

4        MR. BUEHLER:  OKAY.

5            SO MY QUESTION IS, WHAT -- BECAUSE MY

6    CONCERN IS THAT WHAT THIS IS REALLY DESIGNED TO DO IS

7    TO GIVE MR. REDDING, GREG REDDING, A -- PUT HIM ON

8    THE WITNESS STAND AND ASK HIM ABOUT A LOT OF THINGS

9    THAT HE THOUGHT WERE SHADY ABOUT DR. UWAYDAH.

10   QUESTIONS HE HAD, THINGS HE INVESTIGATED ABOUT WIVES

11   HE HAD ALLEGEDLY IN EUROPE AND CHILDREN HE WASN'T

12   PAYING FOR, AND THIS GAVE HIM -- HE WASN'T -- "DO I

13   WANT TO GO INTO BUSINESS WITH THIS GUY?"

14           HE TRIES TO DO RESEARCH; HE HIRES SOMEONE

15   ONLINE TO DO SOME DETECTIVE WORK.

16           I THINK THE PURPOSE IS SIMPLY TO CREATE A

17   VERY BAD PICTURE OF DR. UWAYDAH AND THEN SAY, WELL

18   KELLY PARK IS AN ASSOCIATE OF THIS GUY.  SO

19   BASICALLY, TO PREJUDICE HER IN THE EYES OF THE JURY

20   BECAUSE OF HER ASSOCIATION WITH DR. UWAYDAH.

21           THERE IS NOTHING IN THE NEGOTIATIONS -- I

22   KNOW THERE IS A THEORY THAT, FOR EXAMPLE, WAS VOICED

23   BY DETECTIVE THOMPSON WHEN SHE WAS TALKING TO M.A.,

24   BUT THAT DOESN'T WITHSTAND SCRUTINY WHEN YOU LOOK AT

25   WHAT GREG REDDING HAS SAID TO THE SANTA MONICA POLICE

26   DEPARTMENT IN HIS INTERVIEWS AND WHAT YOU SEE IN THE

27   DOCUMENTS OF THE NEGOTIATIONS BETWEEN DR. UWAYDAH AND

28   GREG REDDING.

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1          SO IT IS A PRETTY VAGUE, YOU KNOW, BASIS

2    THAT THEY ARE OFFERING FOR WHY THIS IS RELEVANT.

3          "WE ARE ENTITLED TO PUT THAT INTO EVIDENCE

4    TO SHOW THE RELATIONSHIP."  I DON'T UNDERSTAND WHAT

5    THAT MEANS.  I DON'T UNDERSTAND HOW THAT TRANSLATES

6    INTO REAL EVIDENCE THAT'S RELEVANT TO WHETHER -- TO

7    WHO MURDERED JULIANA REDDING.

8        THE COURT:  DO YOU WANT TO ARTICULATE THAT?

9        MS. OKUN-WIESE:  JULIANA BROKE UP WITH

10   MR. UWAYDAH BECAUSE OF WHAT HER FATHER TOLD HER.  HE

11   FOUND OUT THAT HE WAS MARRIED; HE HAD KIDS.

12         HE TOLD HER RIGHT WHEN SHE WAS GOING ON HER

13   21ST BIRTHDAY WITH HIM.  AND THEY HAD A HUGE FIGHT

14   AND THEY BROKE UP.

15         SUBSEQUENT TO THE THAT, GREG REDDING

16   STARTED IN HIS BUSINESS RELATIONSHIP WITH

17   MR. UWAYDAH.

18         THE PART THAT I WANT TO BRING IN IS THAT

19   MR. REDDING SENT A LETTER THROUGH HIS ATTORNEY -- AND

20   I ATTACHED THAT AS AN EXHIBIT -- AND THAT LETTER

21   INDICATES SOME OF HIS CONCERNS.  BASED UPON THOSE

22   CONCERNS HE BACKED OUT OF THE DEAL, MR. UWAYDAH

23   BACKED OUT OF THE DEAL.

24         BUT MR. UWAYDAH IS NOW AWARE OF ALL OF

25   MR. REDDING'S CONCERNS.  THREE OR FOUR DAYS LATER,

26   HIS DAUGHTER ENDS UP DEAD.

27         MR. UWAYDAH IS NOT ONE OF THESE PEOPLE THAT

28   LETS THINGS GO.  AND OUR THEORY IS THAT THE DEFENDANT

```
 1    WENT THERE FOR A PURPOSE.  SHE WENT THERE TO -- TO
 2    TELL THEM TO STOP MESSING WITH WHO THEY ARE MESSING
 3    WITH.  WHATEVER THE REASON, SHE ENDED UP KILLING
 4    JULIANA REDDING.  AND SHE WENT THERE AS A BASIS OF
 5    DR. UWAYDAH.  AND IT IS ALL BASED ON EVERYTHING
 6    THAT'S HAPPENED.  IT IS THE INFORMATION THAT UWAYDAH
 7    WAS -- STRIKE THAT.
 8              IT IS THE INFORMATION THAT MR. REDDING
 9    PROVIDED TO HIS DOCTOR -- TO HIS DAUGHTER.  HIS
10    DAUGHTER THEN BREAKS UP WITH HIM.  HE THEN GETS
11    ADDITIONAL INFORMATION ABOUT UWAYDAH'S BUSINESS
12    VENTURES AND HE DECIDES HE WANTS TO BACK OUT.
13              BUT THAT INFORMATION WAS CONVEYED TO
14    MR. UWAYDAH, AND THEN DAYS LATER WE HAVE JULIANA WHO
15    WAS KILLED.
16        THE COURT:  WELL, I MEAN, I THINK IT IS RELEVANT
17    ON THE ISSUE OF MOTIVE, NOT NECESSARILY FOR THE TRUTH
18    OF THE MATTER, BUT FOR THE BELIEFS AND STATE OF MIND.
19              AND, YOU KNOW, THE JURY MAY NOT BUY IT; I
20    DON'T KNOW.  BUT I THINK THEY ARE ENTITLED TO PRESENT
21    IT.
22        MR. BUEHLER:  YOUR HONOR, I THINK IT IS VERY WEAK
23    IN TERMS OF RELEVANCE, AND IT IS VERY INFLAMMATORY IN
24    TERMS OF BEING A VEHICLE TO BRING IN THINGS ABOUT
25    DR. UWAYDAH THAT MAKE HIM SOUND LIKE A SCOUNDREL.
26    AND FROM THAT, WE WOULD HAVE -- WE WOULD POISON THE
27    JURY'S ATTITUDE TOWARDS KELLY PARK BECAUSE OF HER
28    RELATIONSHIP WITH DR. UWAYDAH.
```

```
1          SHE IS NOT RESPONSIBLE FOR WHAT HER
2    EMPLOYER MAY DO IN TERMS OF MARRYING PEOPLE AND HOW
3    HONEST HE IS WITH JULIANA REDDING AND SO FORTH.  AND
4    SHE HAS GOT NOTHING TO DO WITH THAT.
5         THE COURT:  AND YOU CAN MAKE THAT POINT IN FRONT
6    OF THE JURY.
7              NOTICE OF MOTION AND MOTION IN LIMINE TO
8    EXCLUDE REFERENCES TO PRESCRIPTION DRUGS FOUND DURING
9    DEFENDANT'S ARREST.
10             YOU DON'T INTEND TO PRESENT THAT EVIDENCE,
11   CORRECT?
12        MS. OKUN-WIESE:  NO.
13        THE COURT:  ALL RIGHT.
14             ALL RIGHT.  AND THEN WE HAVE THE OTHER
15   CONDUCT MOTION WHICH I -- I AM LOOKING FOR.
16             I HAVE THE OPPOSITION; THERE SHOULD BE THE
17   ACTUAL MOTION.
18             WHEN DID YOU FILE THAT MOTION?
19        MS. OKUN-WIESE:  THE OTHER CONDUCT?
20        THE COURT:  YES.
21        MS. OKUN-WIESE:  WE ALREADY HEARD THAT.
22        THE COURT:  THAT'S WHAT I THOUGHT.  WHY DO I HAVE
23   THIS UP HERE?
24             OKAY, IT IS DONE.
25        MS. OKUN-WIESE:  IT IS DONE.
26        THE COURT:  ALL RIGHT.
27             SO YOU HAVE THE ONE MOTION THAT YOU FILED
28   UNDER SEAL TO REGULATE DISCLOSURE OF A WITNESS.
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1    AND YOU NEED TO DISCLOSE THAT WITNESS NOW.

2    WE ARE GOING TO START TRIAL IN A COUPLE DAYS.  YOU

3    CANNOT NOT DISCLOSE THAT WITNESS TO THE PROSECUTION

4    AT THIS POINT.

5         I CAN ORDER THEM NOT TO GIVE THAT

6    INFORMATION TO MR. GILMORE, IF THAT'S YOUR CONCERN;

7    BUT YOU NEED TO COMPLY WITH THE DISCOVERY OBLIGATIONS

8    WITH REGARD TO THAT WITNESS FORTHWITH.

9    MS. OKUN-WIESE:  AND YOUR HONOR, THAT RAISES

10   ANOTHER ISSUE.  IT IS THE PEOPLE'S POSITION THAT --

11   ASSUMING THE COURT PERMITS THE INTRODUCTION OF THE

12   THIRD-PARTY CULPABILITY -- THAT THE DEFENSE IS

13   ATTEMPTING TO BRING FORTH ESSENTIALLY 1101B EVIDENCE.

14   AND THEY NEED TO MAKE A SHOWING OF WHAT -- YOU KNOW,

15   WHAT THE -- THEY HAVE A BURDEN JUST LIKE WE HAD A

16   BURDEN.  AND IT IS MY UNDERSTANDING, BASED UPON THEIR

17   MOTION FILED YESTERDAY, THAT THEY ARE BRINGING IT IN

18   TO SHOW IDENTITY, WHICH IS THE MOST STRINGENT

19   REQUIREMENT UNDER 1101B.  AND I DON'T KNOW THAT THEY

20   CAN MEET THAT BURDEN.

21   THE COURT:  WELL I DON'T KNOW THAT THEY CAN

22   EITHER.  BUT SO FAR THEY HAVEN'T EVEN ATTEMPTED TO

23   MEET THAT BURDEN.  AND THEY ARE GOING TO HAVE TO

24   OBVIOUSLY SATISFY THE 1101B REQUIREMENTS IN ORDER TO

25   GET THAT IN.

26        BUT RIGHT NOW THEY NEED TO DISCLOSE THEIR

27   WITNESS TO YOU, WHICH THEY HAVEN'T DONE APPARENTLY.

28   SO THEY NEED TO DO THAT.

1    MS. OKUN-WIESE:  THEY HAVEN'T.  AND ALSO WITH

2    RESPECT TO THE THIRD-PARTY CULPABILITY, I UNDERSTAND

3    THAT IF THE COURT PERMITS THE THIRD-PARTY CULPABILITY

4    AND THAT STATEMENT ALLEGING THE ADMISSION BY

5    MR. GILMORE AS TO THE MURDER OF JULIANA REDDING, BUT

6    EVERYTHING ELSE THAT THEY HAVE TALKED ABOUT IN THEIR

7    THIRD-PARTY CULPABILITY MOTION, ALL OF THEIR JANE DOE

8    STUFF AND ALL OF THEIR STUFF REGARDING

9    JULIANA REDDING PRIOR TO THE MURDER AND ALL OF THE

10   INCIDENTS THAT OCCURRED BETWEEN M.A. AND JOHN GILMORE

11   AFTER THE MURDER, THAT IS, AGAIN, ALL 1101B EVIDENCE.

12       THE COURT:  RIGHT.

13       MS. OKUN-WIESE:  OKAY.

14       THE COURT:  NOW HAVE I COVERED ALL THESE MOTIONS?

15       MS. OKUN-WIESE:  THE PEOPLE FILED A MOTION TO

16   COMPEL DISCOVERY.

17       THE COURT:  THAT'S CORRECT.  AND OTHER THAN THE

18   ONE THAT YOU FILED UNDER SEAL THAT YOU DID NOT WANT

19   TO DISCLOSE, IS THERE OTHER DISCOVERY THAT HAS NOT

20   BEEN TURNED OVER TO THE PROSECUTION?

21       MS. OKUN-WIESE:  THEY TURNED OVER THREE REPORTS

22   THIS MORNING FROM THEIR PRIVATE INVESTIGATOR.  AND I

23   RECEIVED THE NOTES OF THE PRIVATE INVESTIGATOR, AND

24   THEN THEY TOOK THEM BACK TO MAKE A COPY, WHICH IS

25   FINE.

26       BUT MY INDICATION AT THIS POINT IS THAT --

27   IS THERE STILL OUTSTANDING DISCOVERY?  AND I ALSO

28   NEVER RECEIVED ANYTHING REGARDING THE DNA.

1       THE COURT:  YOU MEAN THEY TESTED THE DNA?

2       MS. OKUN-WIESE:  WELL, THE REASON THE CASE GOT

3    CONTINUED WAS FOR THEM TO TEST THE DNA.  AND WE WERE

4    WAITING -- IT WAS SUPPOSED TO COME BACK MARCH 1ST.

5       I NEVER -- I REQUESTED THAT INFORMATION,

6    AND I NEVER RECEIVED ANYTHING.

7       MR. BUEHLER:  I DON'T THINK WE ARE REQUIRED TO

8    TURN IT OVER, YOUR HONOR, BECAUSE WE ARE NOT CALLING

9    ANY WITNESSES TO TESTIFY --

10      THE COURT:  SO YOU ARE NOT GOING TO CALL ANY

11   WITNESSES WITH REGARD TO DNA?

12      MR. BUEHLER:  NOT REGARDING THOSE TESTS THAT WERE

13   DONE.

14      WE ARE TALKING TO A WITNESS THAT WE

15   DON'T -- WE HAVEN'T -- AS SOON AS WE HAVE A REPORT

16   FROM THAT WITNESS, WE WILL TURN IT OVER.

17      THE COURT:  AND BY THE WAY -- NOW I AM NOT SAYING

18   THAT YOU ARE DOING THIS, BUT I HAVE BEEN ON THE BENCH

19   FOR ALMOST 25 YEARS.  AND THIS WHOLE THING ABOUT "AS

20   SOON AS I GET A REPORT I AM GOING TO TURN IT OVER,"

21   BUT THEN ALL THESE WITNESSES SOMEHOW JUST DON'T GET

22   AROUND TO MAKING THESE REPORTS, EVEN THOUGH THEY HAVE

23   DONE THE WORK AND THEY HAVE THEIR OPINIONS AND THEY

24   HAVE COMMUNICATED THEM ORALLY, I AM GOING TO TELL YOU

25   RIGHT NOW THAT IF I FIND OUT THAT THAT'S HAPPENED IN

26   THIS CASE, THAT WITNESS WON'T TESTIFY.

27      MR. BUEHLER:  I --

28      THE COURT:  SO YOU HAD BETTER GET YOUR REPORTS,

1    IF THERE ARE GOING TO BE REPORTS FROM SOME WITNESS

2    THAT YOU INTEND TO CALL ON DNA OR ANY OTHER SUBJECT,

3    AND TURN THEM OVER TO THE PROSECUTION.  BECAUSE WE

4    ARE NOT GOING TO DO THAT LITTLE TAP DANCE.

5         MR. BUEHLER:  I AM NOT DOING A TAP DANCE, YOUR

6    HONOR.

7         THE COURT:  OKAY, GOOD.  THEN IT IS NOT GOING TO

8    BE AN ISSUE.

9         MR. BUEHLER:  I DO BELIEVE WE HAD TURNED OVER --

10   WITH THE THREE ADDITIONAL REPORTS WE TURNED OVER

11   TODAY, THAT WE HAVE TURNED OVER ALL DISCOVERY WE

12   HAVE.

13         IF THE PEOPLE THINK THERE IS SOMETHING WE

14   HAVEN'T TURNED OVER --

15         MS. OKUN-WIESE:  WELL --

16         THE COURT:  WELL I DON'T KNOW HOW THEY WOULD

17   KNOW.

18         MR. BUEHLER:  I THINK THERE WAS A QUESTION THAT

19   HAD BEEN RAISED ABOUT OUR INVESTIGATOR GOING OUT AND

20   TALKING TO OTHER FRIENDS OF JOHN GILMORE.  MOST OF

21   THEM WON'T TALK TO HER, SO WE DON'T HAVE ANY REPORTS.

22         MS. OKUN-WIESE:  ARE THERE NOTES LIKE THERE WERE

23   NOTES THIS MORNING?  ARE THERE ADDITIONAL NOTES ON

24   REPORTS THAT WERE WRITTEN?

25         MR. BUEHLER:  I WILL INQUIRE.

26         THE COURT:  OKAY.

27         NOW WITH REGARD TO THIS THIRD-PARTY

28   CULPABILITY EVIDENCE, YOU SAY YOU WANT TO PRESENT

1   SOME EVIDENCE ON THAT POINT WITH REGARD TO YOUR CASE
2   AGAINST THE DEFENDANT AND AS -- AND JOHN GILMORE, THE
3   CASE AGAINST HIM?
4       MS. OKUN-WIESE:  RIGHT.  IF --
5       THE COURT:  NOW DO YOU WANT TO DO THAT THIS
6   AFTERNOON, OR DO YOU WANT TO DO THAT TOMORROW?
7       MS. OKUN-WIESE:  ONE OF OUR WITNESSES IS UP
8   NORTH.  I AM GOING TO FLY HIM DOWN.  I CAN MAKE SOME
9   PHONE CALLS RIGHT NOW.
10          I INTEND TO CALL THE TWO WITNESSES THAT
11  WERE WITH HIM ALL NIGHT.  AND WE HAVE VIDEO THAT CAN
12  BE PRESENTED.
13          AND I HAVE THE PHONE RECORDS WHICH I
14  BELIEVE THE COURT ALREADY HAS.  AND THEN I CAN PUT
15  JOHN GILMORE ON AS WELL.
16      THE COURT:  OKAY.  SO CAN WE DO THAT TOMORROW?
17      MS. OKUN-WIESE:  I WILL TRY TO.  I MEAN, CAN I GO
18  UPSTAIRS AND MAKE SOME PHONE CALLS AND THEN GET BACK
19  TO THE COURT?
20      THE COURT:  YOU CAN GO UPSTAIRS AND MAKE SOME
21  PHONE CALLS.  AND EVERYBODY COMES BACK AT 1:30, AND
22  WE WILL SEE WHERE GO.
23      MS. OKUN-WIESE:  ALL RIGHT, THANK YOU.
24      THE COURT:  SO WE ARE IN RECESS RIGHT NOW.
25
26          (WHEREUPON, A LUNCH RECESS WAS
27          TAKEN UNTIL 1:30 P.M. OF THE
28          SAME DAY.)

```
 1   CASE NUMBER:              BA361202

 2   CASE NAME:                PEOPLE VERSUS KELLY SOO PARK

 3   LOS ANGELES, CA           THURSDAY, MAY 9, 2013

 4   DEPARTMENT 109            HON. KATHLEEN KENNEDY, JUDGE

 5   REPORTER:                 LAURIE A. SMALL, CSR NO. 4654

 6   TIME:                     1:31 P.M.

 7

 8   APPEARANCES:

 9    DEFENDANT KELLY SOO PARK, PRESENT WITH COUNSEL,

10   GEORGE W. BUEHLER AND MARK M. KASSABIAN, ATTORNEYS AT

11   LAW;

12    STACY OKUN-WIESE, DEPUTY DISTRICT ATTORNEY,

13   REPRESENTING THE PEOPLE OF THE STATE OF CALIFORNIA.

14

15    THE COURT:  ALL RIGHT, WE ARE ONCE AGAIN ON THE

16   RECORD IN THE MATTER OF PEOPLE VERSUS PARK.

17        THE DEFENDANT IS PRESENT WITH COUNSEL; THE

18   PEOPLE ARE REPRESENTED.

19    MS. OKUN-WIESE:  WE WILL HAVE WITNESSES HERE

20   TOMORROW.

21    THE COURT:  OKAY.

22    MS. OKUN-WIESE:  INCLUDED IN THOSE WILL BE THE

23   EL SEGUNDO DETECTIVE WHO FILED THE CASE; ALSO THE

24   FILING DEPUTY FROM THE D.A.'S OFFICE.

25        ALSO IT CAME TO MY ATTENTION OVER THE LUNCH

26   HOUR THAT MISS AYALA TURNED HERSELF IN.  SHE BONDED

27   OUT.  WE HAD HER SERVED TO BE IN COURT TOMORROW.

28    THE COURT:  OKAY.
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1      MS. OKUN-WIESE:  AND WE HAVE APPROXIMATELY SEVEN

2  WITNESSES, NOT INCLUDING THE EL SEGUNDO DETECTIVE,

3  MELISA AND THE D.A.

4      THE COURT:  OKAY.

5          IT SEEMS LIKE IT WOULD BE SENSIBLE FOR US

6  TO ADJOURN THE PROCEEDINGS AT THIS TIME AND CONTINUE

7  TOMORROW?

8      MS. OKUN-WIESE:  YES.

9      MR. BUEHLER:  MAY WE HAVE THE NAMES OF THE SEVEN

10  WITNESSES?

11      MS. OKUN-WIESE:  SURE.

12      MR. BUEHLER:  WE CAN DO THAT AFTERWARDS.

13      THE COURT:  OKAY.

14          ALL RIGHT, THEN THE DEFENDANT AND COUNSEL

15  ARE ORDERED BACK TOMORROW AT --

16      MR. BUEHLER:  ONE OTHER THING.  SO WE ARE

17  PREPARED TO TURN OVER NOW WHAT WE FILED UNDER SEAL,

18  YOUR HONOR, REGARDING JANE DOE.

19      THE COURT:  OKAY.

20      MR. BUEHLER:  BUT WE WOULD LIKE AN ORDER THAT

21  THIS WILL NOT BE DISCLOSED IN ANY WAY TO

22  JOHN GILMORE.

23      THE COURT:  SO ORDERED.

24          ALL RIGHT.  THEN COUNSEL AND THE DEFENDANT

25  ARE ORDERED BACK TOMORROW MORNING AT 9:00 A.M.

26          BAIL TO STAND.

27      MS. OKUN-WIESE:  THANK YOU.

28      MR. BUEHLER:  THANK YOU, YOUR HONOR.

1          THE COURT:  THANK YOU.

2          MR. BUEHLER:  YOUR HONOR, MAYBE I SHOULD JUST

3     ALERT THE COURT.  WE DID SPEAK TO GREG STUTCHMAN WHO

4     IS THE --

5          THE COURT:  THE EXPERT?

6          MR. BUEHLER:  YES.  AND HE CAN BE HERE AT 1:30

7     TOMORROW.

8          THE COURT:  PERFECT.

9          MR. BUEHLER:  VERY GOOD.

10         THE COURT:  OKAY.

11         MR. KASSABIAN:  THANK YOU, YOUR HONOR.

12

13             (THE MATTER WAS CONTINUED TO FRIDAY, MAY

14             10, 2013, AT 9:00 A.M.)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                   FOR THE COUNTY OF LOS ANGELES

 3          DEPARTMENT 109     HON. KATHLEEN KENNEDY, JUDGE

 4

 5   THE PEOPLE OF THE STATE OF CALIFORNIA,    )
                                               )
 6                                             )
                             PLAINTIFF,        )BA361202-01
 7                                             )
                                               )
 8                   VS.                       )
                                               )
 9                                             )
     KELLY SOO PARK,                           )
10                                             )
                                               )
11                           DEFENDANT.        )
                                               )
12   _____)

13

14              I, LAURIE A. SMALL, OFFICIAL

15   REPORTER OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,

16   FOR THE COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT I DID

17   CORRECTLY REPORT THE PROCEEDINGS CONTAINED HEREIN AND THAT

18   THE FOREGOING PAGES, 1 THROUGH 112, INCLUSIVE, COMPRISE A

19   FULL, TRUE AND CORRECT TRANSCRIPT OF THE PROCEEDINGS AND

20   TESTIMONY TAKEN IN THE ABOVE-ENTITLED MATTER ON

21   MAY 9, 2013.

22              THIS TRANSCRIPT WAS PREPARED IN

23   COMPLIANCE WITH 237(A)(2) OF THE CODE OF CIVIL PROCEDURE.

24   DATED THIS 7TH DAY OF FEBRUARY, 2014.

25

26                          LAURIE A. SMALL
27                CSR NO. 4654, OFFICIAL REPORTER

28
```

**174**

**EXHIBIT C**

```
 1           SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                 FOR THE COUNTY OF LOS ANGELES

 3       DEPARTMENT NO. 109    HON. KATHLEEN KENNEDY, JUDGE

 4

 5
         THE PEOPLE OF THE STATE OF CALIFORNIA, ) NO. BA361202-01
 6                                              )
                                                )
 7                                              )
                            PLAINTIFF,          )
 8                                              )
                 VS.                            )
 9                                              )
                                                )
10                                              )
         KELLY SOO PARK,                        )
11                                              )
                                                )
12                          DEFENDANT.          )
                                                )
13       ─────────────────────────────────────
                 REPORTER'S TRANSCRIPT OF PROCEEDINGS
14
                            MAY 10, 2013
15
                             -OOO-
16

17   APPEARANCES:

18    FOR THE PEOPLE:      STACY OKUN-WIESE,
                           DEPUTY DISTRICT ATTORNEY
19

20

21    FOR THE DEFENDANT:   GEORGE BUEHLER,
                           MARK M. KASSABIAN,
22                         ATTORNEYS AT LAW

23

24

25

26   **COPY**

27                         LAURIE A. SMALL
                           C.S.R. NO. 4654
28                         OFFICIAL COURT REPORTER
```

INDEX FOR FRIDAY, MAY 10, 2013

M A S T E R   I N D E X

CHRONOLOGICAL INDEX OF WITNESSES

| PEOPLE'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| LESTER KURIYAMA | 23 | 28 | | |
| ERIC ATKINSON | 36 | 40 | | |

| DEFENSE WITNESS | | | | |
|---|---|---|---|---|
| MELISA AYALA | 64 | | | |
| GREGG STUTCHMAN | 79 | | | |
| | 111 | 115 | | |

VOIR DIRE

| | | | | |
|---|---|---|---|---|
| GREGG STUTCHMAN | 104 | | | |

EXHIBITS

| PEOPLE'S | FOR IDENT. | IN EVD. | WITHDRAWN |
|---|---|---|---|
| NONE ON THIS DATE | | | |

DEFENSE

| A | PARTIAL LIST OF CASES RE STUTCHMAN TESTIMONY | 92 | | |
|---|---|---|---|---|
| B | COPY OF MR. STUTCHMAN'S CV | 94 | | |
| C | COPY OF STUTCHMAN REPORT | 102 | | |

177

```
 1    CASE NUMBER:          BA361202
 2    CASE NAME:            PEOPLE VERSUS KELLY SOO PARK
 3    LOS ANGELES, CA       FRIDAY, MAY 10, 2013
 4    DEPARTMENT 109        HON. KATHLEEN KENNEDY, JUDGE
 5    REPORTER:             LAURIE A. SMALL, CSR NO. 4654
 6    TIME:                 9:13 A.M.
 7
 8    APPEARANCES:
 9      DEFENDANT KELLY SOO PARK, PRESENT WITH COUNSEL,
10    GEORGE W. BUEHLER AND MARK M. KASSABIAN, ATTORNEYS AT
11    LAW;
12      STACY OKUN-WIESE, DEPUTY DISTRICT ATTORNEY,
13    REPRESENTING THE PEOPLE OF THE STATE OF CALIFORNIA.
14
15      THE COURT:  GOOD MORNING.
16          ALL RIGHT, WE ARE ON THE RECORD IN THE
17    MATTER OF PEOPLE VERSUS KELLY PARK.  THE DEFENDANT IS
18    PRESENT WITH COUNSEL; THE PEOPLE ARE REPRESENTED.
19          THE FIRST ISSUE IS, THERE IS AN ATTORNEY
20    FOR CBS AND NBC THAT WANTS TO BE HEARD WITH REGARD TO
21    PRESS COVERAGE; IS THAT CORRECT?
22      MS. SAGER:  YES, YOUR HONOR.
23          I UNDERSTOOD THAT THERE WAS AN ISSUE ABOUT
24    THE CAMERA COVERAGE WITH RESPECT TO WHAT KIND OF
25    CAMERA YOUR HONOR WOULD ALLOW IN THE COURTROOM,
26    WHETHER IT IS THE KIND OF CAMERA THAT'S IN HERE TODAY
27    THAT'S IN THE BACK OF THE COURTROOM, OR WHETHER THE
28    COURT WAS GOING TO REQUIRE OR WANTED TO HEAR WHETHER
```

1    SHE SHOULD REQUIRE A ROBOTIC CAMERA TO BE STATIONED

2    IN THE COURTROOM.

3         AND IF THE COURT IS STILL CONSIDERING

4    REQUIRING A ROBOTIC CAMERA, I WOULD LIKE TO BE HEARD

5    ON THAT ISSUE.

6       THE COURT:  COULD YOU PLEASE IDENTIFY YOURSELF

7    FOR THE RECORD.

8       MS. SAGER:  IT IS KELLY SAGER.  AND I AM HERE ON

9    BEHALF OF 48 HOURS AND DATELINE, CBS AND NBC

10   PROGRAMS.

11      THE COURT:  OKAY.

12        WHAT I HAD INDICATED YESTERDAY -- AND JUST

13   FOR THE RECORD, THE DEFENSE HAD FILED A MOTION TO BAR

14   TELEVISION COVERAGE ENTIRELY.  AND NO REPRESENTATIVE,

15   NO LEGAL REPRESENTATIVE OF ANY MEDIA OUTLET APPEARED

16   TO OPPOSE THIS MOTION YESTERDAY.

17        NOW THE PROSECUTION, THROUGH THE DISTRICT

18   ATTORNEY, OPPOSED THE MOTION.  BUT -- AND I HAD MADE

19   OUR PUBLIC INFORMATION OFFICER AWARE OF THAT MOTION

20   AND SENT A COPY OF IT TO THEM WHEN WE RECEIVED IT.

21        I KIND OF EXPECTED THAT IF YOU CARED -- YOU

22   BEING THE MEDIA CARED, THAT SOMEONE WOULD HAVE

23   APPEARED YESTERDAY.

24        BUT THE MEDIA PEOPLE THAT WERE HERE JUST

25   KIND OF SHRUGGED THEIR SHOULDERS.  I MEAN, THE MEDIA

26   WAS HERE, BUT NOBODY WAS HEARD.

27      MS. SAGER:  I APOLOGIZE, YOUR HONOR.  I WAS ONLY

28   RETAINED LAST NIGHT SO I ONLY FOUND OUT ABOUT THIS

1    BEING AN ISSUE WHEN I RECEIVED A CALL AT THE END OF

2    THE DAY YESTERDAY WHEN I UNDERSTOOD YOU ASKED FOR

3    REPRESENTATION AND TO BE HERE TODAY.

4              I CAN'T UNDERSTAND WHY NO ONE BROUGHT IT TO

5    THE ATTENTION OF LEGAL HOUSE COUNSEL BEFORE TODAY'S

6    HEARING, SO I APOLOGIZE FOR MAKING THE COURT GO

7    THROUGH THIS EXERCISE AGAIN.

8         THE COURT:  AS I INDICATED YESTERDAY ON THE

9    RECORD, I HAVE HAD A LOT OF EXPERIENCE WITH MEDIA IN

10   MY COURTROOM, AND I GENERALLY AM -- YOU KNOW, ALLOW A

11   LOT OF MEDIA HERE FOR VARIOUS THINGS.  BUT WHAT DOES

12   CONCERN ME IS, IN A JURY TRIAL, NUMBER ONE, HAVING A

13   CAMERA BY THE JURY BOX WHICH IS -- THERE ARE NO

14   JURORS IN HERE TODAY SO IT IS FINE.  BUT IT -- WE

15   PROTECT THE IDENTITY OF JURORS.  IF JURORS WANT TO,

16   YOU KNOW, MAKE THEIR IDENTITY KNOWN AFTER THE TRIAL

17   IS OVER, IT IS UP TO THEM.  YOU KNOW, WHATEVER THEY

18   WANT TO DO IS FINE WITH ME.

19              BUT DURING THE COURSE OF THE TRIAL,

20   OBVIOUSLY WE PROTECT FROM THE RECORD THEIR NAMES AND

21   ONLY REFER TO THEM BY NUMBER AND OF COURSE WOULD NOT

22   PERMIT JURORS TO BE SHOWN.

23              AND I THINK QUITE FRANKLY THE JURORS ARE A

24   BIT NERVOUS ABOUT THEIR IDENTITIES BEING SEEN WHEN

25   THE CAMERA IS RIGHT NEXT TO THE JURY BOX; THAT'S ONE

26   THING.

27              AND THE OTHER THING THAT CONCERNS ME IS THE

28   EFFECT OF A VISIBLE CAMERA WHEN WITNESSES ARE

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1    TESTIFYING.

2            AND YOU KNOW, IT DOESN'T SEEM LIKE THERE

3    HAS BEEN -- I MEAN, THIS IS THE MEDIA CAPITAL OF THE

4    WORLD, AND IT DOESN'T SEEM LIKE THERE HAS BEEN ANY

5    ADVANCEMENT, IMPROVEMENT IN THIS WHOLE DEAL IN ALL

6    THE YEARS I HAVE BEEN DOING THIS.  I MEAN, IT IS THE

7    SAME THING; THAT THERE IS A CAMERA WITH A GUY, AND IT

8    IS THERE, AND EVERYBODY IS LIKE AWARE OF IT AND SEES

9    IT.

10           AND I THINK IT IS FINE FOR LAWYERS BECAUSE

11   I THINK LAWYERS ARE PROFESSIONAL ENOUGH TO DEAL -- TO

12   BE ABLE TO DEAL WITH IT.  AND PERHAPS FOR SOME

13   WITNESSES IT IS FINE BECAUSE THEY ARE SOPHISTICATED

14   ENOUGH AND EXPERIENCED ENOUGH IN BEING IN A COURTROOM

15   SITUATION.

16           BUT FOR THE AVERAGE JANE DOE OR JOHN DOE

17   THAT COMES INTO COURT TO TESTIFY, IT IS A VERY

18   NERVE-RACKING EXPERIENCE IN THE FIRST PLACE BECAUSE

19   IT IS SOMETHING THAT THEY DON'T NORMALLY DO.  AND

20   THEN WHEN YOU ADD A LEVEL OF A VISIBLE CAMERA THAT'S

21   THERE, IT REALLY CONCERNS THE COURT THAT THE

22   TESTIMONY OF THESE PEOPLE WILL BE AFFECTED, EITHER

23   INCREASING THEIR NERVES OR PERHAPS ENCOURAGING THEM

24   TO SAY OR DO THINGS THAT THEY WOULDN'T NORMALLY DO.

25           I DON'T KNOW.

26           I MEAN, YOU KNOW, WITNESSES COME IN ALL

27   DIFFERENT SHAPES AND SIZES AND HAVE DIFFERENT

28   AGENDAS.

1    THAT'S THE COURT'S CONCERN.

2    MS. SAGER:  I APPRECIATE THAT, YOUR HONOR.

3        I HAVE BEEN DOING THIS A VERY LONG TIME AS

4    WELL, AND I HAD HOPED THAT BY 25 YEARS PLUS INTO MY

5    PROFESSIONAL CAREER WE WOULD BE AT THE POINT WHERE

6    EVERY COURTROOM WOULD HAVE A CAMERA, AND IT WOULD BE

7    WIRED IN AND THE BUILDINGS WOULD BE MODERNIZED.  AND

8    UNFORTUNATELY, BECAUSE OF ECONOMIC TIMES AND BUDGETS,

9    BOTH OF THE COURT'S AND MEDIA COMPANIES', THAT HASN'T

10   HAPPENED.

11       AND I HOPE THAT AT SOME POINT BEFORE I

12   RETIRE, THAT WE WILL BE WHERE OTHER STATES HAVE NOW

13   GOTTEN LIKE ARIZONA WHERE THE NEW COURT BUILDINGS

14   HAVE ALL OF THIS STUFF AUTOMATICALLY BECAUSE IT HAS

15   ALREADY BEEN BUILT INTO THE COURTROOMS.

16       SO I SHARE YOUR FRUSTRATION IN THAT REGARD.

17       I DO THINK THE EQUIPMENT CERTAINLY, SINCE I

18   HAVE BEEN PRACTICING LAW, HAS GOTTEN MUCH BETTER.  WE

19   NO LONGER HAVE TO HAVE THE GIANT CAMERAS WITH

20   LIGHTING THAT'S SPECIAL AND WIRING ALL OVER THE

21   COURTROOMS.  THAT USED TO BE A SERIOUS PROBLEM WITH

22   DISTRACTION AND WITNESS CONCERNS.  SO IT HAS GOTTEN

23   BETTER, BUT I UNDERSTAND THAT IT IS NOT WHERE I THINK

24   EITHER THE COURT OR CERTAINLY THE MEDIA COMPANIES

25   WOULD LIKE IT TO BE.

26       THAT BEING SAID, THERE HAVE BEEN MANY, MANY

27   STUDIES DONE, ALL OVER THE COUNTRY, ABOUT WITNESS --

28   WITNESSES AND JURORS AND WHETHER THEY ARE IMPACTED BY

1    THE PRESENCE OF A CAMERA IN THE COURTROOM.  NOT A

2    STATIONARY CAMERA ON THE WALL AS YOUR HONOR I KNOW

3    HAS CONSIDERED, BUT A CAMERA THAT THEY CAN ACTUALLY

4    SEE.  AND EVERY STUDY HAS COME TO THE SAME

5    CONCLUSION; THAT JUST LIKE LAWYERS, WITNESSES, EVEN

6    THOUGH THEY ARE NERVOUS ABOUT THE PROCEEDINGS,

7    QUICKLY FORGET ABOUT THE CAMERA BEING THERE BECAUSE

8    THEY ARE VERY FOCUSED ON WHAT IS HAPPENING, THEIR

9    TESTIMONY AND THE REACTION OF THE JURORS AND THE

10   LAWYERS ASKING THEM QUESTIONS.  AND THAT'S THE FOCUS

11   OF THEIR ATTENTION.  THE SAME AS IT IS WITH JURORS

12   AND WITNESSES; THE SAME AS IT IS WITH LAWYERS.

13        AND SO WHILE I UNDERSTAND WHY THE COURT

14   WOULD BE CONCERNED ABOUT THAT, AND RIGHTFULLY SO, I

15   WOULD HOPE THAT YOU TAKE SOME SOLACE IN KNOWING THAT

16   UNIVERSALLY THE EXPERIENCE HAS BEEN THAT IT DOESN'T

17   CHANGE WITNESSES' TESTIMONY.  IT DOESN'T IMPAIR THEM

18   FROM BEING ABLE TO TESTIFY.  IT DOESN'T DISTRACT THEM

19   BECAUSE IT IS NOT SOMETHING THAT THEY NOTICE AFTER

20   FIRST SEEING IT IN THE COURTROOM.  IT IS SIMPLY NOT

21   THAT LARGE OR THAT BIG A FOCUS OF THEIR ATTENTION.

22        THE PLACEMENT IN THE COURTROOM IS SOMETHING

23   THAT THE COURT CERTAINLY CAN CONTROL.  IF IT WOULD

24   BE, IN YOUR HONOR'S VIEW, LESS A CONCERN FOR A

25   WITNESS OR A JUROR IF THE CAMERA WAS IN SOME OTHER

26   PLACE THAT MIGHT BE NOT DIRECTLY IMPACT THE FOCUS OF

27   ATTENTION BETWEEN THE WITNESS TALKING TO THE JURY,

28   THAT'S CERTAINLY SOMETHING THAT COULD BE DONE AND THE

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1    CAMERA CAN BE POSITIONED IN A WAY THAT WOULD ONLY

2    CAPTURE THE WITNESS AND THE COURT AND NOT SWING TO

3    CAPTURE THE JURORS.

4         BECAUSE CERTAINLY I UNDERSTAND, AND THE

5    INDIVIDUALS WHO WOULD BE IN THE COURTROOM ARE VERY

6    EXPERIENCED AND THEY UNDERSTAND, THAT THEY ARE NOT

7    PERMITTED TO FILM THE JURORS; THEY ARE NOT PERMITTED

8    TO FILM THE AUDIENCE.  SO A CAMERA CAN BE STATIONED

9    AT SOME OTHER POINT IN THE AUDIENCE SO THAT IT

10   WOULDN'T HAVE THE SAME CONCERNS THAT THE COURT MIGHT

11   HAVE IF IT IS LOCATED RIGHT NEXT TO THE JURY BOX.

12        I DO THINK THE JURORS' ATTENTION IS GOING

13   TO BE FOCUSED IN THIS DIRECTION, SO HAVING A CAMERA

14   BEHIND THEM MAY NOT BE AS MUCH OF AN IMPACT AS YOUR

15   HONOR IS CONCERNED ABOUT.  BUT THAT'S CERTAINLY

16   SOMETHING THAT WE WOULD BE HAPPY TO WORK WITH THE

17   COURT ON.

18        THE PROBLEM WITH A ROBOTIC CAMERA -- AND IN

19   A PERFECT WORLD WE WOULD HAVE THEM IN EVERY COURTROOM

20   BECAUSE THEY WOULD LOOK JUST LIKE THAT (INDICATING),

21   AND NOBODY WOULD NOTICE IT.  BUT THE PROBLEM WHY THAT

22   DOESN'T EXIST IS TWOFOLD; ONE IS PURELY LOGISTICS.

23        AS I UNDERSTAND, JURY SELECTION IS STARTING

24   ON MONDAY.  TO NOW WIRE A COURTROOM AND SET UP FOR A

25   ROBOTIC CAMERA THAT'S NOT ALREADY IN PLACE WOULD

26   REQUIRE AT LEAST A FULL COURT DAY OF LOGISTICS TO GET

27   THAT DONE.  AND THE COURT SIMPLY DOESN'T HAVE A DAY

28   WHERE NOTHING ELSE IS GOING TO BE HAPPENING BEFORE

1    THE TRIAL STARTS.

2         BUT THE SECOND PROBLEM -- AND BECAUSE THE

3    COURT I KNOW IS FAMILIAR WITH BUDGETS AND BUDGET

4    PROBLEMS, IT IS THE SAME CONCERN THAT THE MEDIA

5    COMPANIES HAVE; IT IS VERY EXPENSIVE TO HAVE A

6    ROBOTIC CAMERA THAT'S INSTALLED IN A COURTROOM.

7         AND WHERE THERE ARE 100 DIFFERENT MEDIA

8    COMPANIES THAT ARE INTERESTED IN THE PROCEEDING, THEY

9    CAN MAKE THOSE COSTS SPREAD OVER A LOT OF DIFFERENT

10   COMPANIES.  BUT IT IS SEVERAL THOUSAND DOLLARS A DAY

11   TO RENT THE EQUIPMENT.  IT IS NOT SOMETHING THAT IS

12   STANDARD FOR MOST NEWS ORGANIZATIONS, AND CERTAINLY

13   NOT FOR THE TWO THAT I REPRESENT.  THEY WOULD HAVE TO

14   HIRE SOMEONE TO COME TO LOS ANGELES WITH THAT

15   EQUIPMENT AND THEN PAY ON A DAILY BASIS AT LEAST A

16   COUPLE THOUSAND DOLLARS A DAY FOR THE EQUIPMENT

17   RENTAL ALONE, PLUS THE COST OF THE PERSON WHO IS THE

18   EXPERT ON THE ROBOTIC CAMERA TO BE HERE IN

19   LOS ANGELES.

20        SO THE EXPENSE OF DOING THAT FOR EVEN IN

21   LARGE ORGANIZATIONS IS ASTRONOMICAL.  SMALLER

22   ORGANIZATIONS, IF THAT IS SOMETHING THAT THE COURT

23   WERE TO REQUIRE IN EVERY CASE, WOULD NEVER BE ABLE TO

24   COVER A COURTROOM.

25        AND BECAUSE THERE ARE VERY STRONG BENEFITS

26   TO HAVING THE PUBLIC SEE WHAT ACTUALLY HAPPENS IN A

27   COURTROOM, THAT KIND OF ECONOMIC PRESSURE ON MEDIA

28   COMPANIES I SUBMIT WOULD NOT BE REASONABLE FOR THE

```
 1     COURT TO REQUIRE WHEN THE PROBLEMS THAT MAY BE
 2     CONCERNS THAT THE DEFENSE HAS RAISED ABOUT THE
 3     CAMERAS I REALLY DON'T THINK WOULD BE AN ISSUE IN
 4     THIS CASE.
 5           I AM HAPPY TO ADDRESS ANY QUESTIONS THE
 6     COURT HAS ABOUT HOW WE COULD SET IT UP OR ANYTHING
 7     DEALING WITH THIS SUBJECT MATTER.
 8        THE COURT:  WELL, I MEAN YOU SAY THIS POINT
 9     WHERE, YOU KNOW, THERE IS -- THERE ISN'T SUFFICIENT
10     TIME TO DO IT.  THERE WOULD HAVE BEEN TIME TO DO IT
11     IF THE MEDIA HAD RESPONDED AT THE TIME THAT THE
12     MOTION WAS FILED BY THE DEFENSE WHICH, YOU KNOW, THE
13     PUBLIC INFORMATION OFFICER KNEW AND DISSEMINATED THAT
14     INFORMATION TO THE MEDIA.
15           BUT I MEAN, A MOTION COMES IN HERE TO BAR
16     TELEVISION CAMERAS.  YOU KNOW, WHO DO I SEND IT TO?
17     I MEAN, I GAVE IT TO PUBLIC INFORMATION SO THEY COULD
18     COMMUNICATE WITH THE MEDIA BECAUSE THE MEDIA IS NOT A
19     PARTY.  THE MEDIA, IN QUOTES, IS NOT A PARTY TO THE
20     ACTION.
21           SO, YOU KNOW, THERE WAS A BIT OF A DROPPING
22     OF THE BALL, SO-TO-SPEAK, IT SEEMS TO ME.
23        MS. SAGER:  I DO APOLOGIZE FOR THAT.  AS I SAID,
24     I WASN'T AWARE THAT THERE WAS EVEN A PROCEEDING GOING
25     ON THAT RELATED TO CAMERAS YESTERDAY.  AND I WASN'T
26     RETAINED UNTIL YESTERDAY, AT THE END OF THE DAY.
27        THE COURT:  WELL I AM NOT BLAMING YOU PERSONALLY.
28        MS. SAGER:  NO, I UNDERSTAND.
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1      BUT THE REQUEST TO BAN CAMERAS ENTIRELY IS

2   SOMEWHAT OF A DIFFERENT ISSUE THAN WOULD THE COURT

3   REQUIRE A ROBOTIC CAMERA AS OPPOSED TO A CAMERA IN

4   THE BACK OF THE COURTROOM.

5      THE COURT:  WELL, I MEAN, YOU KNOW, I HANDLED A

6   NUMBER OF I GUESS WHAT YOU CALL HIGH PROFILE CASES

7   OVER THE YEARS, INCLUDING THE CITY OF BELL CASE JUST

8   RECENTLY.  AND, YOU KNOW, WE HAD CAMERAS IN THE

9   COURTROOM FOR OPENING STATEMENTS, CLOSING ARGUMENTS

10  AND VERDICT, AND IT WAS -- I MEAN, YOU KNOW, THE SAME

11  THING.  OF COURSE THE TESTIMONY IN THAT CASE WASN'T

12  PERHAPS AS COMPELLING AS THE TESTIMONY IN THIS CASE

13  IS LIKELY TO BE, BUT NONETHELESS, I MEAN THAT'S, YOU

14  KNOW, HOW I HANDLED IT.

15      AND I HAVE HAD CAMERAS IN THE COURTROOM

16  MANY, MANY, MANY TIMES OVER THE COURSE OF MY CAREER,

17  INCLUDING THE O.J. SIMPSON PRELIM BACK IN 1994.  AND

18  THAT WAS LIKE THE FIRST TIME, AND NOBODY KNEW REALLY

19  WHAT WAS KIND GOING ON, YOU KNOW, AT THAT POINT IN

20  TERMS OF ALL -- I MEAN THAT WAS LIKE, YOU KNOW, A BIG

21  SEA CHANGE IN HOW CASES WERE COVERED.

22      MS. SAGER:  IT MAY HAVE BEEN THE FIRST TIME I

23  APPEARED IN FRONT OF YOU YOUR HONOR WAS AT THE

24  PRELIMINARY HEARING.  AND IT WAS A DIFFERENCE.  AND I

25  THINK THE CAMERAS THEN WERE EVEN BIGGER THAN THE ONE

26  THAT'S IN THE COURTROOM TODAY.

27      AND I KNOW YOUR HONOR HAS HAD A LOT OF

28  EXPERIENCE AND HOPEFULLY A POSITIVE EXPERIENCE WHERE,

1    BASED ON THE EXPERIENCE THAT THE COURT HAS, THE

2    CONCERNS THAT MAY BE RAISED BY SOMEONE WHO HASN'T HAD

3    THAT EXPERIENCE OR A JUDGE THAT'S UNFAMILIAR WITH HOW

4    CAMERAS WORK IN THE COURTROOM, THAT YOUR HONOR KNOWS

5    THAT IT SIMPLY DOESN'T CAUSE THE PROBLEMS THAT PEOPLE

6    WHO HAVE NEVER HAD THAT EXPERIENCE MIGHT EXPECT.  AND

7    EVERYONE WHO IS IN THE COURTROOM BECOMES ACCUSTOMED

8    TO IT VERY QUICKLY.  BECAUSE FRANKLY, THE CAMERA IS

9    UBIQUITOUS NOW.  NO MATTER WHERE YOU GO, PEOPLE HAVE

10   SOME KIND OF CAMERA.  AND THE IDEA THAT YOU MIGHT BE

11   ON VIDEO OR BE AUDIO TAPED IS NOT SOMETHING THAT

12   CARRIES THE SAME KIND OF CONCERN AS IT MIGHT HAVE

13   WHEN I WAS FIRST PRACTICING LAW AND WHEN YOU TOOK THE

14   BENCH, BECAUSE EVERYBODY IS USED TO THE IDEA THAT YOU

15   ARE FILMED EVERYWHERE YOU GO.

16            SO THE IDEA THAT YOU MIGHT BE FILMED IN A

17   COURTROOM WHEN EVERYONE KNOWS YOU ARE ACTUALLY BEING

18   FILMED ON A SECURITY CAMERA NO MATTER WHAT, IT --

19        THE COURT:  I DON'T KNOW THAT EVERYBODY KNOWS

20   THAT IN HERE.  I MEAN, I KNOW IT BUT I DON'T KNOW

21   THAT EVERYBODY ELSE KNOWS THAT.

22            MR. BUEHLER, DO YOU WISH TO BE HEARD?

23        MR. BUEHLER:  ONLY TO SAY, YOUR HONOR, THAT WE

24   WOULD LIKE THE COURT TO USE AS -- OR DIRECT THAT THE

25   FILMING BE AS UNOBTRUSIVE AS POSSIBLE.  THAT'S OUR

26   FALLBACK.  IF WE ARE GOING TO HAVE FILMING, THEN YES,

27   WE WOULD LIKE IT TO BE AS UNOBTRUSIVE AS POSSIBLE.

28        THE COURT:  PEOPLE?

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)
188

1    MS. OKUN-WIESE:  I SUBMIT.

2    THE COURT:  YOU KNOW, I -- I STILL -- I MEAN,

3    DESPITE THE FACT THAT, YEAH, EVERYBODY HAS GOT A

4    CAMERA, EVERYBODY HAS A CELL PHONE CAMERA, EVERYBODY

5    TAKES A PICTURE OF EVERYTHING, I STILL THINK IT IS

6    DIFFERENT WHEN THERE IS THIS MAJOR, HUGE CAMERA

7    THAT'S -- YOU KNOW, THAT'S SITTING THERE.

8         AND I AM AWARE THAT THERE ARE WITNESSES IN

9    THIS CASE THAT ARE -- I GUESS I WOULD DESCRIBE THEM

10   AS RELUCTANT.  AND THAT IS WHERE I AM PARTICULARLY

11   CONCERNED BECAUSE A WITNESS WHO IS ALREADY RELUCTANT

12   TO COME INTO COURT TO TESTIFY WOULD PROBABLY, FROM A

13   COMMON SENSE ANALYSIS, BE BEEN MORE RELUCTANT KNOWING

14   THAT THEY ARE GOING TO BE FILMED AND THEY MIGHT BE ON

15   THE -- YOU KNOW, THE 6:00 O'CLOCK NEWS OR DATELINE OR

16   48 HOURS OR WHATEVER IT IS.

17        AND THAT WORRIES ME BECAUSE WE ARE NOT HERE

18   TO PROVIDE TELEVISION PROGRAMMING FOR THE NETWORKS.

19   I MEAN, THAT'S NOT WHAT WE ARE DOING HERE.  WE ARE

20   HERE TO DETERMINE WHETHER THE DEFENDANT IS GUILTY,

21   BEYOND A REASONABLE DOUBT, OF THE CHARGE AGAINST HER.

22        AND THE IDEA THAT, YOU KNOW, THE PRESS

23   OBSERVES THAT AND DISSEMINATES WHAT HAPPENS HERE, I

24   THINK THAT'S A GOOD THING.  I AGREE WITH YOU; IT IS A

25   GOOD THING FOR THE PUBLIC TO SEE WHAT HAPPENS.

26        BUT IT IS NOT A GOOD THING IN MY OPINION TO

27   AFFECT THE DEMEANOR OF WITNESSES, AND THAT'S WHAT I

28   AM WORRIED ABOUT IN THIS MATTER.

1      SO I AM, AT THIS POINT, NOT INCLINED TO

2  CHANGE MY ORDER OF YESTERDAY TO ALLOW CAMERAS FOR

3  WITNESS TESTIMONY BECAUSE I DO THINK THEY ARE JUST

4  TOO VISIBLE, AND I THINK THE DANGER OF AFFECTING THE

5  OUTCOME OF THE TRIAL OR THE OUTCOME OF HOW THE

6  WITNESSES TESTIFY OR THEIR DEMEANOR, PARTICULARLY

7  WHEN THE COURT KNOWS THAT THEY ARE RELUCTANT

8  WITNESSES IN THIS MATTER, HAS TO BE AN OVERRIDING

9  CONCERN FOR ME AT THIS POINT.

10      SO I AM NOT PREPARED AT THIS TIME TO AMEND

11  THE ORDER THAT I MADE YESTERDAY.

12      MS. SAGER:  AND YOUR HONOR, AGAIN, THE ONLY THING

13  I WOULD ASK YOU TO CONSIDER -- IT IS NOT AN

14  ALL-OR-NOTHING PROPOSITION.  AND I CERTAINLY

15  APPRECIATE THAT IT IS NOT THE COURT'S JOB TO PROVIDE

16  TELEVISION NETWORK PROGRAMMING OR NEWS PROGRAMMING.

17      I DO THINK THAT ONE OF THE ISSUES THE

18  COURTS FACE IN GENERAL IS PEOPLE JUST DON'T KNOW WHAT

19  IT IS THAT HAPPENS HERE.  IT IS A VERY IMPORTANT

20  PROCESS AND A VERY SERIOUS AND DIGNIFIED PROCESS.

21      THE COURT:  WELL THEY CAN WATCH HLN.  AND THEY

22  HAVE SEEN, FOR THE LAST FOUR MONTHS -- THAT'S ALL

23  THEY DO OVER THERE.  I MEAN, THERE ARE A LOT OF

24  OPPORTUNITIES FOR PEOPLE TO FIND OUT WHAT'S GOING ON

25  IN COURTROOMS.

26      MS. SAGER:  BUT PEOPLE WHO ARE INTERESTED IN THIS

27  PARTICULAR CASE AND WON'T BE ABLE TO COME DOWN TO

28  COURT AND WATCH IT EVERY DAY, IF IT IS NOT BEING

1    TELEVISED IN SOME MANNER, THEY SIMPLY WON'T GET THAT

2    INFORMATION.  I DO THINK THERE IS A VERY IMPORTANT

3    PUBLIC BENEFIT THAT'S SERVED BY THAT.

4          NOW IF THERE IS A PARTICULAR WITNESS THAT

5    THE COURT IS CONCERNED ABOUT, IT IS NOT A ZERO-SUM

6    GAME WHERE THE COURT HAS TO SAY YOU CAN TELEVISE

7    EVERYTHING.  THE COURT CAN MAKE A DECISION THAT

8    CERTAIN WITNESSES WOULD NOT BE TELEVISED IF THEY HAVE

9    EXPRESSED RELUCTANCE TO TESTIFY ON CAMERA, OR THE

10   COURT COULD EXPERIMENT WITH PUTTING A CAMERA IN A

11   PLACE THAT WILL BE MUCH LESS VISIBLE TO A WITNESS WHO

12   IS TESTIFYING SUCH AS A CORNER OVER HERE THAT MIGHT

13   NOT EVEN BE IN THE WITNESS' POINT OF VIEW WHEN THEY

14   ARE TESTIFYING AND FACING THE JURY.

15         AND THOSE ARE THINGS THAT I WOULD JUST ASK

16   THE COURT TO CONSIDER THAT MIGHT SERVE BOTH THE

17   INTEREST OF HAVING WHAT THE COURT I KNOW IS VERY

18   CONCERNED ABOUT, A FULL AND FAIR TRIAL, BUT ALSO

19   SERVE THE INTEREST OF THE PUBLIC IN SEEING WHAT

20   ACTUALLY IS HAPPENING IN THESE PROCEEDINGS.

21         AND I DO THINK THOSE ARE OPPORTUNITIES THAT

22   THE COURT COULD TAKE ADVANTAGE OF, IF YOU WOULD

23   CONSIDER IT.

24       THE COURT:  NOW I DON'T KNOW WHERE A CAMERA WOULD

25   BE THAT WOULD BE LESS OBTRUSIVE.  I DON'T KNOW

26   WHETHER A CAMERA OVER THERE WOULD BE MORE OR LESS OF

27   A CONCERN, FOR EXAMPLE, TO JURORS.

28         BECAUSE THE CAMERA BEHIND THE JURY BOX,

```
1   THEY ARE NOT LOOKING AT IT, BUT THEY WOULD BE ABLE TO
2   LOOK AT IT.  THEY PROBABLY WOULD LOOK AT IT.
3           I DON'T -- I -- I DON'T KNOW.
4      MS. SAGER:  WELL THAT'S WHY, YOUR HONOR, I
5   POINTED YOU TO THE MANY STUDIES THAT HAVE BEEN DONE.
6   AND I APOLOGIZE; I WOULD BE HAPPY TO SUBMIT SOMETHING
7   ON THAT, BUT BECAUSE I GOT BROUGHT INTO THIS SO LATE,
8   I HADN'T SUBMITTED ANYTHING.
9           BUT TYPICALLY THAT'S THE KIND OF CAMERA
10  THAT'S IN A COURTROOM.  AND THEY HAVE HAD THEM IN
11  COURTROOMS WHERE THEY HAVE INTERVIEWED WITNESSES
12  BEFORE AND AFTER AND DURING PROCEEDINGS AND SAID,
13  "DID THIS HAVE ANY IMPACT ON YOUR TESTIMONY?"
14          AND OVER AND OVER AGAIN WITNESSES SAID,
15  "YOU KNOW, I COMPLETELY FORGOT IT WAS THERE.  I WAS
16  NERVOUS ABOUT COMING INTO COURT, BUT THE CAMERA
17  DIDN'T REALLY ADD TO THAT."
18          AND THEY HAVE DONE THOSE STUDIES PRECISELY
19  TO FIND OUT HOW REAL PEOPLE IN REAL SITUATIONS WILL
20  REACT IF THERE IS A CAMERA IN THE COURTROOM VERSUS
21  PROCEEDINGS WHERE THERE IS NOT.
22          AND SO WHILE THOSE CONCERNS ARE OFTEN
23  EXPRESSED, THE EMPIRICAL STUDIES IN FACT HAVE SHOWN
24  THE OPPOSITE TO BE TRUE; THAT PEOPLE SIMPLY DON'T
25  HAVE A PROBLEM WITH THE CAMERA IN THE COURTROOM.  AND
26  THAT'S -- I CAN'T TELL YOU OF A PARTICULAR WITNESS IN
27  THIS CASE, YOUR HONOR, BECAUSE I DON'T KNOW THEM AND
28  I HAVEN'T SPOKEN TO THEM.  BUT PEOPLE ARE OFTEN
```

1    RELUCTANT TO COME INTO COURT AND TESTIFY.  AND I

2    DON'T THINK ANYBODY RELISHES THE IDEA OF COMING IN

3    AND BEING UNDER OATH AND BEING SUBJECTED TO

4    QUESTIONING.  BUT THAT'S PART OF THE PROCESS.  THE

5    FACT THAT THIS IS A PUBLIC PROCEEDING AND PEOPLE WILL

6    SEE IT AND THERE WILL BE AN AUDIENCE, THOSE ARE ALL

7    THINGS THAT GO ALONG WITH THE PROCEEDING.  THE CAMERA

8    DOESN'T REALLY ADD TO WHATEVER THE CONCERNS ARE OF A

9    WITNESS WHO IS COMING INTO A PROCEEDING THAT'S

10   UNFAMILIAR TO THEM.  IT IS NOTHING MORE THAN WHAT

11   THEY ARE ALREADY EXPERIENCING.  AND THAT'S WHAT THE

12   STUDIES HAVE SHOWN REPEATEDLY.

13      THE COURT:  WELL, IF YOU WANT TO SUBMIT SOMETHING

14   ON MONDAY WITH SOME OF THESE STUDIES, BECAUSE I AM

15   NOT FAMILIAR WITH ANY STUDIES.

16      MS. SAGER:  CERTAINLY.  I WOULD BE HAPPY TO DO

17   THAT, YOUR HONOR.

18      THE COURT:  ALL RIGHT.  SO 8:30 ON MONDAY.

19      MS. SAGER:  THANK YOU.

20          JUST TO BE CLEAR, YOUR HONOR, DO YOU WANT

21   ME BACK AT 8:30 ON MONDAY OR DO YOU JUST WANT PAPERS

22   BY 8:30 ON MONDAY?

23      THE COURT:  IT IS UP TO YOU.  I MEAN, I WANT AT

24   LEAST PAPERS.

25      MS. SAGER:  OKAY.

26      THE COURT:  OKAY?

27      MS. SAGER:  THANK YOU, YOUR HONOR.

28      THE COURT:  ALL RIGHT.

1    ALL RIGHT.  NOW BACK ON THE ISSUE OF THE

2    THIRD-PARTY CULPABILITY MOTION.  AND I DO HAVE WHAT

3    WAS FILED THIS MORNING BY THE DEFENSE, WHICH I HAVE

4    HAD AN OPPORTUNITY TO READ.

5         AND I ASSUME THAT YOU WERE FURNISHED A COPY

6    OF THAT AS WELL?

7    MS. OKUN-WIESE:  I JUST RECEIVED A COPY, YES.

8    THE COURT:  AS DID THE COURT.

9         AND BASICALLY THE IMPORT OF WHAT THE

10   DEFENSE HAS FILLED THIS MORNING IS, THE COURT CANNOT

11   JUST MAKE A CREDIBILITY DETERMINATION, DECIDE THAT

12   THE PROFFERED DEFENSE IS NOT BELIEVABLE AND THEN BAR

13   THE THIRD PARTY CULPABILITY EVIDENCE ON THAT GROUNDS.

14   THAT'S BASICALLY WHAT I AM GETTING FROM WHAT YOU

15   HAVE --

16   MR. BUEHLER:  YES, YOUR HONOR.

17        AND CONTEMPLATING THE FACT THAT THE PEOPLE

18   ARE CALLING IN I THINK SOME SEVEN WITNESSES TODAY WHO

19   WERE ASSOCIATES OF MR. GILMORE AND WERE AT THE PARTY

20   THAT CONSTITUTES HIS ALIBI FOR THE NIGHT OF THE

21   MURDER, I WAS ASSUMING THAT THE PURPOSE OF THIS

22   PROCEEDING THEN WOULD BE TO TRY TO ESTABLISH WHAT THE

23   PEOPLE CALL THE AIRTIGHT ALIBI, WHICH WOULD THEN RULE

24   OUT THE THIRD PARTY CULPABILITY EVIDENCE BECAUSE HE

25   HAS GOT AN AIRTIGHT ALIBI AND HE COULDN'T HAVE DONE

26   IT.

27        AND OUR RESPONSE TO THAT IS, HE MAY HAVE

28   SOME ALIBI EVIDENCE, BUT WHETHER THAT ALIBI EVIDENCE

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1    IS AIRTIGHT OR WOULD CARRY THE DAY WITH THE JURY IN

2    OPPOSITION TO THE EVIDENCE THAT WE WANT TO PUT IN

3    SHOWING THAT HE MAY HAVE COMMITTED THE MURDER, THAT'S

4    FOR THE JURY TO DECIDE, AND IT IS NOT PART OF THE

5    DECISION ABOUT WHETHER OR NOT THE THIRD-PARTY

6    CULPABILITY EVIDENCE WILL BE ALLOWED.

7            AND I THINK THAT'S CLEAR FROM READING THE

8    CASE LAW, AND I THINK IT IS -- I MEAN THIS WOULD --

9    THE WAY THE PEOPLE SEEM TO WANT TO DO IT SORT OF

10   AMOUNTS TO A SUMMARY JUDGMENT MOTION IT SEEMS TO ME;

11   THAT THE COURT IS GOING TO DEPRIVE US OF OUR RIGHT TO

12   HAVE A JURY TRIAL ON WHETHER OR NOT THE ALIBI

13   EVIDENCE OUTWEIGHS THE EVIDENCE OF MR. GILMORE'S

14   CULPABILITY.  RATHER THAN HAVING THE JURY DECIDE IT,

15   THE COURT WOULD DECIDE IT, AND I DON'T THINK THAT'S

16   THE APPROPRIATE PROCEDURE.

17           NOW WE ARE READY TO PROCEED, AND WE WILL

18   PROCEED IF THE COURT WISHES TO HEAR THE EVIDENCE.

19   BUT I JUST WANT TO MAKE IT CLEAR AT THE OUTSET THAT

20   WE QUESTION THE REASON FOR GOING THROUGH THIS

21   EXERCISE, AND WE CERTAINLY OBJECT TO THE IDEA THAT IN

22   DECIDING THE QUESTION OF THIRD PARTY -- OF THE

23   ADMISSIBILITY OF THIRD PARTY CULPABILITY EVIDENCE,

24   THAT THE COURT CAN ENGAGE IN THE PROCESS OF WEIGHING

25   THE CREDIBILITY OF THE PEOPLE'S ALIBI EVIDENCE.

26     MS. OKUN-WIESE:  WELL THE DEFENSE HAS A BURDEN

27   WHEN IT COMES TO THIRD PARTY CULPABILITY.  AND WHAT

28   THEY HAVE PROVIDED THE COURT THUS FAR IS HEARSAY

1   STATEMENTS OF MELISA AYALA.  AND I BELIEVE THE COURT

2   YESTERDAY INDICATED THE COURT WANTED TO HEAR FROM

3   MISS AYALA BECAUSE QUITE FRANKLY AT THIS POINT IT IS

4   JUST HEARSAY STATEMENTS.

5            AND THEY PROVIDED STATEMENTS THAT

6   JOHN GILMORE ALLEGEDLY ADMITTED HE DID IT.  THE COURT

7   HEARD THAT VIDEO IN COURT.  AND EVEN THE COURT STATED

8   "I DIDN'T HEAR THAT."

9            AND WE WANT TO PRESENT THE COURT WITH THE

10  THEORY THAT THE DEFENSE -- THE DEFENDANT DID THE

11  CRIME IN THIS CASE, NOT JOHN GILMORE.  WE HAVE NOT

12  CHARGED JOHN GILMORE.

13           AND YESTERDAY THE COURT SAID TO ME, "I

14  UNDERSTAND THAT'S YOUR THEORY AND I UNDERSTAND THAT

15  YOU BELIEVE IN THAT THEORY, BUT I DON'T HAVE ANY

16  EVIDENCE TO SUPPORT THAT."

17           AT THIS JUNCTURE THE DEFENSE HASN'T MET

18  THEIR BURDEN FOR THIRD PARTY CULPABILITY.  THEY ARE

19  ASKING THE COURT TO MAKE A CREDIBILITY CALL AS TO

20  HEARSAY STATEMENTS PROVIDED BY THEIR PRIVATE

21  INVESTIGATOR THAT MISS AYALA ALLEGEDLY MADE WHEN SHE

22  MET WITH THEM.

23      THE COURT:  WELL HERE IS THE POINT.  NOW NUMBER

24  ONE, I DON'T THINK I CAN MAKE THE CREDIBILITY

25  DETERMINATION AND SAY I DON'T BELIEVE IT; THEREFORE,

26  IT DOESN'T COME IN.

27           WITH REGARD TO THAT TAPE RECORDING, FOR

28  EXAMPLE, I DIDN'T HEAR "I DID IT."  NO MATTER HOW

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1    MANY TIMES THAT PARTICULAR TRACK WAS SLOWED DOWN OR

2    HOW SLOW IT GOT OR WHATEVER IT WAS.

3            AND I THINK PROBABLY THAT PARTICULAR TAPE

4    REALLY WAS WORKING ON MY COMPUTER, BUT I DIDN'T

5    UNDERSTAND WHAT I WAS LISTENING TO.  AND IT KEPT ON

6    REPEATING, AND I THOUGHT THERE WAS A MALFUNCTION.

7    YOU KNOW WHAT I AM SAYING?  BECAUSE I DIDN'T KNOW

8    WHAT IT WAS.

9            BUT IN ANY EVENT, I THINK THAT ASSUMING

10   THAT THEIR EXPERT CAN SAY HOW HE ENHANCED THE TAPE, I

11   THINK THAT THAT COULD COME IN.

12           BUT HIS CONCLUSION THAT IT SAYS "I DID IT"

13   WOULD ALSO BE USURPING THE JURY'S ROLE.  THE JURY HAS

14   TO DECIDE WHAT IT SAYS, SO I DON'T THINK MOST

15   LIKELY -- AND I WILL HEAR FROM HIM THIS AFTERNOON

16   WHEN HE IS HERE.  BUT I DON'T THINK THAT I WOULD

17   ALLOW HIM TO STATE THAT THAT'S WHAT THE TAPE SAYS;

18   THAT THE JURY CAN LISTEN TO THE ENHANCED VERSION,

19   ASSUMING THAT IT MEETS FOUNDATIONAL REQUIREMENTS,

20   AND, YOU KNOW, YOU COULD ARGUE THAT THAT'S WHAT IT

21   SAYS.

22           BUT WE ARE NOT GOING TO HAVE SOME, QUOTE

23   UNQUOTE EXPERT SAY THAT'S WHAT IT SAYS, I DON'T

24   THINK.

25           TO THIS ISSUE OF THE ADMISSIBILITY OF

26   STATEMENTS, I MEAN THE THIRD-PARTY CULPABILITY

27   DEFENSE, IF IT COMES IN, IN THIS CASE, HAS TO COME IN

28   WITH COMPETENT EVIDENCE.  AND THE EVIDENCE SO FAR ARE

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1    HEARSAY STATEMENTS.  AND YOU ARE NOT GOING TO BE ABLE
2    TO PRESENT THAT THROUGH HEARSAY STATEMENTS.  I MEAN,
3    YOU NEED TO HAVE THE ACTUAL WITNESSES THAT SUPPOSEDLY
4    SAID THIS.
5         NOW I UNDERSTAND THAT MISS AYALA HAS AN
6    ATTORNEY WHO IS GOING TO BE HERE.  I DON'T KNOW IF HE
7    IS HERE.
8         OKAY, THE GENTLEMAN IS WAVING HIS HAND.  SO
9    APPARENTLY THERE IS SOMEBODY ON HER BEHALF.  AND SO I
10   AM GOING TO TAKE A RECESS AND LET EVERYBODY TALK A
11   LITTLE BIT.
12        BUT THAT'S A POINT.
13        IT WOULD SEEM TO ME THAT THIS OTHER
14   INDIVIDUAL THAT'S NICHOLAS SCHWARCZ --
15        MS. OKUN-WIESE:  HE IS HERE AS WELL.
16        THE COURT:  I DON'T KNOW WHETHER HE HAS A LAWYER.
17        THAT'S YOU ALSO?  THERE MAY BE A BIT OF A
18   CONFLICT; I DON'T KNOW.  DO YOU REPRESENT BOTH OF
19   THEM IN THE CRIMINAL CASE?
20        AUDIENCE MEMBER:  MAY I APPROACH YOUR HONOR?
21        THE COURT:  YES.  AND STATE YOUR APPEARANCE
22   PLEASE.
23        MR. COPPOLA JR.:  YES, OF COURSE.
24        I AM ROBERT COPPOLA, C-O-P-P-O-L-A, JR.
25   AND ORIGINALLY I WAS ONLY APPEARING TODAY FOR
26   MELISA AYALA WHO I UNDERSTAND WAS SERVED WITH A
27   SUBPOENA TO APPEAR THIS MORNING ON YESTERDAY.
28        THE COURT:  RIGHT.

```
1        MR. COPPOLA JR.:  IN A FELONY PROSECUTION OUT OF
2   THE AIRPORT COURT IN WHICH EACH OF THEM WAS BOOKED
3   YESTERDAY, I PRESENTLY REPRESENT BOTH OF THEM.  AN
4   ARRAIGNMENT IS SCHEDULED JULY 10TH.
5        THE COURT:  OKAY.
6        MR. COPPOLA JR.:  SO I DON'T HAVE ANY INFORMATION
7   ABOUT ANYTHING OTHER THAN WHAT I HAVE JUST HEARD HERE
8   IN COURT TODAY.
9        THE COURT:  OKAY.  WELL I AM GOING TO TAKE A
10  BREAK SO ALL YOU FOLKS CAN CONFER ABOUT THIS SO YOU
11  CAN BE BROUGHT UP TO SPEED AS TO WHAT'S GOING ON.
12  AND THEN WE CAN FIGURE OUT WHERE WE GO.
13       MR. COPPOLA JR.:  VERY WELL, YOUR HONOR.
14       MS. OKUN-WIESE:  YOUR HONOR, BEFORE THE COURT
15  TAKES THE BREAK I DO HAVE THE D.A. HERE FROM AIRPORT
16  BRANCH AND ALSO THE DETECTIVE HERE.  IF WE COULD CALL
17  THEM TO THE STAND BRIEFLY, AND I COULD GET THEM OUT
18  OF HERE AND THEN WE CAN MOVE ON; IS THAT POSSIBLE?
19       THE COURT:  ALL RIGHT.
20       MS. OKUN-WIESE:  THANK YOU.
21            THE PEOPLE CALL LESTER KURIYAMA.
22
23                 LESTER KURIYAMA,
24            CALLED AS A WITNESS BY THE PEOPLE,
25            WAS SWORN AND TESTIFIED AS FOLLOWS:
26
27       THE COURT CLERK:  YOU DO SOLEMNLY SWEAR THE
28  TESTIMONY YOU ARE ABOUT TO GIVE IN THE CAUSE NOW
```

```
1    PENDING BEFORE THIS COURT TO BE THE TRUTH, THE WHOLE
2    TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?
3         THE WITNESS:  I DO.
4         THE COURT CLERK:  THANK YOU.  PLEASE BE SEATED.
5              PLEASE STATE YOUR NAME; THEN SPELL YOUR
6    FIRST AND LAST NAME FOR THE RECORD.
7         THE WITNESS:  LESTER KURIYAMA.  L-E-S-T-E-R.
8    K-U-R-I-Y-A-M-A.
9         THE COURT:  YOU CAN POINT THAT MICROPHONE UNDER
10   YOUR CHIN, PLEASE, AND SPEAK UP.
11        THE WITNESS:  OKAY.
12        THE COURT:  YOU MAY INQUIRE.
13        MS. OKUN-WIESE:  THANK YOU, YOUR HONOR.
14
15                   DIRECT EXAMINATION
16   BY MS. OKUN-WIESE:
17        Q    GOOD MORNING.  SIR.
18        A    GOOD MORNING.
19        Q    WHERE ARE YOU EMPLOYED?
20        A    THE AIRPORT BRANCH OF THE D.A.'S OFFICE.
21        Q    WHAT DO YOU DO FOR THE D.A.'S OFFICE?
22        A    I HAVE BEEN FILING THERE SINCE JUNE OF LAST
23   YEAR.
24        Q    ARE YOU THE FILING DEPUTY IN CASE SA083571?
25        A    YES, I AM.
26        Q    WHO ARE THE NAMED DEFENDANTS IN THAT CASE?
27        A    NICHOLAS SCHWARCZ, MELISA AYALA AND
28   ANTHONY BUTTERFIELD.
```

```
1        Q      WHAT POLICE AGENCY INVESTIGATED THAT CASE?

2        A      THE EL SEGUNDO POLICE DEPARTMENT.

3        Q      WAS THERE A SPECIFIC DETECTIVE ON IT?

4        A      YES, ERIC ATKINSON.

5        Q      WHEN WAS THE CASE FILED?  WELL LET ME ASK

6   YOU THIS:  WHEN WAS THE CASE INITIALLY BROUGHT IN FOR

7   FILING?

8        A      THE CASE WAS BROUGHT IN TO ME -- I DON'T

9   KNOW THE PRECISE DATE, BUT THE OFFENSE OCCURRED ON

10  APRIL 1ST, AND I KNOW --

11       THE COURT:  APRIL 1ST OF WHAT YEAR?

12       THE WITNESS:  OF 2012, YOUR HONOR.

13       THE COURT:  OKAY.

14       THE WITNESS:  I KNOW THAT THE THIRD DEFENDANT WHO

15  IS BUTTERFIELD WAS NOT IDENTIFIED THE FIRST TIME I

16  TOOK A LOOK AT THE CASE.

17            FROM THIS FILE IT APPEARS THAT HE WAS

18  IDENTIFIED, THE THIRD SUSPECT WAS IDENTIFIED, IN

19  SEPTEMBER OF 2012.

20       Q      WAS THE CASE BROUGHT IN FOR FILING

21  SUBSEQUENT TO HIS IDENTIFICATION?

22       A      YES.

23       Q      AND WAS IT -- GO ON.

24       A      I ACTUALLY MET WITH DETECTIVE ATKINSON

25  SEVERAL TIMES.  I ASKED FOR SOME FURTHER

26  INVESTIGATION.  BUTTERFIELD WAS IDENTIFIED IN

27  SEPTEMBER.  DETECTIVE ATKINSON DID A RE-INTERVIEW OF

28  THE VICTIM, CLAUDIA DIAZ.
```

1               I FILED A PC 422, A CRIMINAL THREAT AGAINST

2      MELISA AYALA FOR THE THREAT AGAINST CLAUDIA DIAZ.

3      SHE WAS REINTERVIEWED IN NOVEMBER OF 2012.  AND I

4      BELIEVE IT CAME IN FOR FILING WITH ALL THE

5      SUPPLEMENTAL REPORTS -- I AM NOT SURE ABOUT THE EXACT

6      DATE, BUT I BELIEVE IT WAS ABOUT JANUARY.

7               I SUBMITTED THE CASE FOR FILING.  IT WAS

8      FOR A WARRANT IN FEBRUARY OF THIS YEAR.  AND IT LOOKS

9      LIKE IT WAS FILED ON MARCH 26TH OF THIS YEAR.  AND

10     WARRANTS WERE ISSUED, I BELIEVE, ON APRIL 5TH OF THIS

11     YEAR.

12          Q    WHAT ARE THE CHARGES IN THE CASE?

13          A    THERE IS A CONSPIRACY CHARGE AGAINST ALL

14     THREE DEFENDANTS.  SCHWARCZ, AYALA AND BUTTERFIELD.

15          THE COURT:  NOW A CONSPIRACY TO DO WHAT?

16          THE WITNESS:  TO COMMIT AN ASSAULT ON THE VICTIM

17     IN THE CASE.

18     BY MS. OKUN-WIESE:

19          Q    WHO IS THE VICTIM IN THAT COUNT?

20          A    THE VICTIM IN THIS PARTICULAR COUNT IS

21     JOHN GILMORE.

22          Q    AND WHAT ARE THE ADDITIONAL CHARGES?

23          A    IN ADDITION TO THE CONSPIRACY TO COMMIT THE

24     ASSAULT, THERE IS AN ACTUAL ASSAULT THAT WAS

25     COMMITTED.  ALL THREE DEFENDANTS ARE CHARGED IN COUNT

26     TWO.  THAT'S A PENAL CODE SECTION 245(A)(1).

27               IN COUNT THREE THERE IS A CRIMINAL THREAT,

28     AND THAT'S AGAINST DEFENDANT NUMBER THREE,

1    ANTHONY BUTTERFIELD.

2             COUNT FOUR, IT IS A CRIMINAL THREAT.  THE

3    VICTIM IN THAT COUNT IS CLAUDIA DIAZ.

4        THE COURT:  WHO IS THE VICTIM IN COUNT THREE?

5        THE WITNESS:  COUNT THREE -- THE VICTIM IN COUNTS

6    ONE, TWO AND THREE IS JOHN GILMORE.

7        THE COURT:  OKAY.

8        THE WITNESS:  IN COUNT FOUR THE VICTIM IS CLAUDIA

9    DIAZ, D-I-A-Z.

10       THE COURT:  AND THAT'S ONLY AGAINST --

11       THE WITNESS:  THAT'S ONLY AGAINST MELISA AYALA.

12       THE COURT:  OKAY.

13       THE WITNESS:  COUNT FIVE, I CHARGED VANDALISM

14   AGAINST ONLY DEFENDANT NUMBER THREE,

15   ANTHONY BUTTERFIELD.

16            AND THERE ARE ADDITIONAL SPECIAL

17   ALLEGATIONS AGAINST MR. BUTTERFIELD.  I FILED A

18   STRIKE ALLEGATION AGAINST HIM.

19   BY MS. OKUN-WIESE:

20       Q    WERE THE ALLEGATIONS AGAINST MISS DIAZ

21   SEPARATE AND APART FROM THE CRIMES IN ONE, TWO AND

22   THREE AGAINST JOHN GILMORE?

23       A    YES.

24            AFTER THE ASSAULT ON JOHN GILMORE WHICH

25   OCCURRED ABOUT 2:15 IN THE MORNING, THE THREE

26   DEFENDANTS THEN FLED TO WHERE SCHWARCZ AND AYALA WERE

27   LIVING IN L.A.P.D. PACIFIC DIVISION JURISDICTION.

28            AT THAT POINT, ABOUT 2:30 IN THE MORNING,

1    AYALA THREATENED THE VICTIM WHO WAS A NEIGHBOR OF

2    SCHWARCZ AND AYALA.

3        THE COURT:  SO DIAZ DOESN'T HAVE ANY ASSOCIATION

4    WITH GILMORE, TO YOUR KNOWLEDGE?

5        THE WITNESS:  NO.  TO MY KNOWLEDGE, NO.  NONE AT

6    ALL.

7    BY MS. OKUN-WIESE:

8        Q    PRIOR TO TODAY'S DATE, HAVE WE EVER MET?

9        A    NO.  I MET YOU THIS MORNING.

10       Q    DID YOU HAVE ANY CONTACT WITH ANYBODY FROM

11   MAJOR CRIMES WITH RESPECT TO THE FILING AGAINST

12   MISS AYALA?

13       A    NO.

14       Q    DO YOU KNOW DETECTIVE THOMPSON SEATED IN

15   COURT?

16       A    I HAVE SEEN HER BEFORE BECAUSE I BELIEVE

17   SHE IS FROM SANTA MONICA P.D., AND THEY HANDLE CASES

18   OUT OF AIRPORT COURT.

19       Q    HAD YOU, PRIOR TO FILING THE CASE THAT YOU

20   ARE HERE TO TESTIFY ABOUT, HAD ANY CONTACT WITH

21   DETECTIVE THOMPSON REGARDING THAT CASE?

22       A    NO.

23       Q    DID YOU HAVE ANY CONTACT WITH ANYBODY FROM

24   THE SANTA MONICA POLICE DEPARTMENT CONCERNING THE

25   CASE YOU ARE HERE TESTIFYING ABOUT?

26       A    NO.  NOT AT ALL.

27       MS. OKUN-WIESE:  I HAVE NOTHING FURTHER.

28       THE COURT:  CROSS?

```
 1          MR. BUEHLER:  YES, YOUR HONOR.

 2

 3                        CROSS-EXAMINATION

 4     BY MR. BUEHLER:

 5          Q     GOOD MORNING, SIR.

 6          A     GOOD MORNING.

 7          Q     HOW LONG HAVE YOU BEEN THE FILING DEPUTY IN

 8     THE AIRPORT BRANCH?

 9          A     WELL I AM ONE OF THREE FILING DEPUTIES

10     THERE.

11          Q     HOW LONG HAVE YOU --

12          A     I HAVE BEEN THERE SINCE JUNE OF LAST YEAR.

13          Q     JUNE OF LAST YEAR.

14                WERE YOU THE ONE THAT WAS INVOLVED IN EACH

15     STEP OF THE WAY IN THIS CASE LEADING UP TO THE

16     FILING?

17          A     YES.

18          Q     NOW COUNT ONE THAT'S BEEN CHARGED, THAT WAS

19     AN OFFENSE ON APRIL 1ST, 2012?

20          A     YES, SIR.

21          Q     AN ALLEGED OFFENSE.

22                AND CAN YOU BRIEFLY TELL US WHAT THE NATURE

23     OF THE ASSAULT IS THAT WAS -- THAT'S CHARGED IN THAT

24     CASE.

25          A     WELL WHAT HAPPENED IS, IT STARTED ABOUT

26     2:00 O'CLOCK A.M.  THE DEFENDANT SCHWARCZ' TRUCK WAS

27     SEEN NEAR THE RESIDENCE OF JOHN GILMORE.

28                THERE WAS A SUSPECT WHO GOT OUT OF THE
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
1    TRUCK AND HAD A PIT BULL DOG.  SOMETIME LATER ALL
2    THREE, DEFENDANTS SCHWARCZ, AYALA AND BUTTERFIELD,
3    ARE THEN SEEN AT THE TAVERN, WHICH IS A BAR ON MAIN
4    STREET IN EL SEGUNDO.  THERE AN EMPLOYEE IDENTIFIED
5    ALL THREE.  THIS ACTUALLY -- THE ACTUAL
6    IDENTIFICATION OF BUTTERFIELD OCCURRED IN SEPTEMBER
7    OF 2012, BUT WE NOW KNOW THAT THE THREE WERE SEEN AT
8    THE TAVERN BAR ABOUT 2:11 A.M.
9         AT THAT TIME NICHOLAS SCHWARCZ APPROACHED
10   THE -- A GUY NAMED ANDREW HALL WHO IS AN EMPLOYEE OF
11   THE BAR AND SAID THAT HE WAS LOOKING FOR OUR VICTIM.
12   HE WANTED TO -- WELL APPARENTLY HE WANTED TO BEAT HIM
13   UP.
14        Q    THAT WOULD BE MR. GILMORE?
15        A    YES.  THAT WOULD BE MR. GILMORE WHO LIVED
16   FAIRLY CLOSE TO THE TAVERN.
17        SOMETIME AFTER THEY ARE SEEN AT THE BAR,
18   MR. BUTTERFIELD IS AT THE DOOR OF GILMORE, KNOCKING
19   ON THE DOOR, BANGING ON THE DOOR.  BROKE THE WINDOW.
20        GILMORE AND ONE -- ANOTHER PERSON THAT WAS
21   IN THE RESIDENCE AT THE TIME CAME OUT.  AND AT THAT
22   TIME BUTTERFIELD HAD HIS DOG, WHICH WAS A PIT BULL,
23   ATTACK GILMORE.  GILMORE HAD TO RUN AWAY.  SO HE GOT
24   AWAY.
25        BUT THAT'S THE SUBSTANCE OF THE COUNT ONE.
26   IT IS A CONSPIRACY TO COMMIT AN ASSAULT ON GILMORE.
27        Q    AND IT WAS BUTTERFIELD'S PIT BULL?
28        A    I BELIEVE SO.  BUT THERE WAS MORE THAN ONE
```

```
 1    PIT BULL, APPARENTLY.
 2         Q    OKAY.
 3              WAS --
 4         A    IF I CAN ADD SOMETHING HERE?
 5         Q    SURE.
 6         A    AFTER THE ASSAULT ON GILMORE, THEY THEN
 7    WENT TO THE RESIDENCE OF AYALA AND SCHWARCZ.  AND
 8    THAT'S WHERE THE THREAT BY AYALA AGAINST DIAZ
 9    OCCURRED.  SO SHE SAW THEM COME ABOUT 2:30 IN THE
10    MORNING.
11         THE COURT:  WHO DID?  DIAZ?
12         THE WITNESS:  DIAZ DID.  SHE SAW THAT THEY HAD
13    PIT BULLS.  AND THAT'S WHEN AYALA THREATENED DIAZ.
14    BY MR. BUEHLER:
15         Q    LET ME ASK -- I HAVE BEEN PROVIDED FROM
16    SOME SOURCE, I FORGOT WHO NOW --
17         THE COURT:  I AM SORRY?
18         MR. BUEHLER:  I HAVE BEEN PROVIDED BY A SOURCE
19    THAT I DON'T REMEMBER RIGHT NOW WHERE I GOT THIS
20    FROM, IF IT WAS DISCOVERY IN THIS CASE OR PERHAPS WAS
21    PULLED BY MY PRIVATE INVESTIGATOR, BUT I HAVE A
22    REPORT FROM THE EL SEGUNDO POLICE DEPARTMENT.  IT HAS
23    GOT THE NUMBER 12-989 ON IT.
24         Q    IS THAT PART OF YOUR DOCUMENTS ON THIS
25    CASE?
26         A    THAT'S THE EL SEGUNDO POLICE DEPARTMENT
27    D.R. NUMBER, 12-989.
28         Q    OKAY.  THIS IS DATED APRIL 1ST -- I AM
```

```
 1    SORRY.  IT IS DATED APRIL 2ND, FROM R.T. BUTTER, THE
 2    REPORTING OFFICER.
 3         THE COURT:  APRIL 2ND, 2012?
 4         MR. BUEHLER:  YES, YOUR HONOR.
 5              MAY I JUST APPROACH, YOUR HONOR?
 6         THE COURT:  SURE.
 7         THE WITNESS:  ACTUALLY IT IS APRIL 1ST.
 8         MR. BUEHLER: OKAY.
 9         Q    SO WHAT I HAVE IS THE INITIAL REPORT IN THE
10    CASE; IS THAT CORRECT?
11         A    IT LOOKS LIKE IT, YES.
12         Q    ONE OF FOUR FOR THE FIRST REPORT.
13              AND THEN I HAVE A SECOND ONE, ONE OF FIVE
14    PAGES.  IS THAT THE SECOND REPORT THAT WAS FILED?
15         A    YES.
16         Q    SO DO YOU HAVE -- SO I HAVE TWO REPORTS
17    THAT ARE THE INITIAL TWO REPORTS IN YOUR FILE.
18              DO YOU HAVE AN ADDITIONAL -- I MEAN
19    SUBSEQUENT POLICE REPORTS THAT WERE GENERATED?
20         A    YES.  THERE WERE SUBSEQUENT REPORTS THAT
21    WERE GENERATED.
22         Q    NOW THE FIRST REPORT, IS THAT THE REPORT
23    THAT DESCRIBES THE ASSAULT THAT'S THE SUBJECT OF
24    COUNT ONE?
25         A    YES.
26         Q    IT INVOLVES A PIT BULL?
27         A    YES.
28         Q    AND IT INVOLVES -- IT INVOLVES INITIALLY
```

1    MR. GILMORE LEAVING HIS RESIDENCE AND CHASING AFTER

2    SOMEONE THAT HE BELIEVED BROKE IN HIS WINDOW?

3         A    YES.

4         Q    AND THEN MR. GILMORE EVENTUALLY CATCHES UP

5    TO THE SUSPECT, AND THE SUSPECT THEN REPORTEDLY SICKS

6    HIS PIT BULL ON MR. GILMORE?

7         A    YES.

8         Q    AND MR. GILMORE RUNS BACK, BEING CHASED BY

9    THE PIT BULL?

10        A    RIGHT.

11        Q    THEN THERE IS ALSO REFERENCE IN THAT REPORT

12   TO A WITNESS NAMED RYAN REED.  IT IS AT THE BOTTOM OF

13   THE THIRD PAGE.

14        A    YES.

15        Q    AND MR. REED INDICATES THAT HE FOLLOWED

16   MR. GILMORE AS MR. GILMORE WAS RUNNING AFTER THE

17   SUSPECT?

18        A    YES.

19        Q    AND HE SAW -- THEN HE SAW MR. GILMORE

20   RUNNING AWAY FROM THE SUSPECT AND THE PIT BULL?

21        A    WELL THERE IS SOMETHING THAT HAPPENED

22   BEFORE THAT.

23             RIGHT, HE DID SEE HIM RUN AWAY FROM THE

24   SUSPECT, BUTTERFIELD AND THE PIT BULL.

25        Q    AND HE ALSO REPORTED THAT THE SUSPECT WAS

26   HOLDING THE PIT BULL BY ITS COLLAR?

27        A    RIGHT.

28        Q    SO WERE YOU ABLE TO DETERMINE WHETHER

1    MR. GILMORE WAS ACCURATE IN HIS REPORT THAT THE PIT

2    BULL CHASED HIM?

3        A    THAT'S WHAT GILMORE SAID; THAT HE GOT

4    CHASED BY THE PIT BULL.

5        Q    AND THAT WAS APPARENTLY CONTRADICTED BY

6    MR. REED, THE OTHER WITNESS?

7        A    I DON'T KNOW IF THAT NECESSARILY

8    CONTRADICTS HIM.

9        THE COURT:  YOU KNOW, THIS IS ALL VERY

10   INTERESTING, I GUESS.  BUT I DON'T KNOW THAT I NEED

11   TO KNOW ALL OF THESE DETAILS OF THE ATTACK ITSELF.

12        I MEAN, CHARGES HAVE BEEN FILED.

13   ALLEGATIONS HAVE BEEN MADE.  FOR THE COURT'S

14   INTEREST, IF THERE IS A COURT INTEREST IN THIS CASE,

15   IT IS HOW THE EXISTENCE OF THIS CASE WAS EITHER

16   INFLUENCED OR CHOREOGRAPHED IN SOME WAY BY THE

17   SANTA MONICA POLICE DEPARTMENT OR HOW THE EXISTENCE

18   OF THIS CASE IS GOING TO AFFECT THE AVAILABILITY OF

19   WITNESSES THAT YOU PLAN ON HAVING TESTIFY WITH REGARD

20   TO THIRD-PARTY CULPABILITY.

21        BUT EVERY LITTLE DETAIL OF THIS ALLEGED

22   ATTACK, I AM NOT GOING TO MAKE ANY CREDIBILITY

23   DETERMINATIONS OR DECIDE WHETHER SOMEONE IS GUILTY OR

24   NOT OF THAT UNDERLYING CASE IN THE AIRPORT COURT.

25        MR. BUEHLER:  I UNDERSTAND, YOUR HONOR, AND I

26   APPRECIATE THE COURT'S INDULGENCE.  SO I WILL MOVE ON

27   AT THIS POINT.

28        Q    SO WOULD YOU AGREE WITH ME THAT IT IS A

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1    LITTLE BIT UNUSUAL FOR A CASE INVOLVING A SERIOUS

2    CHARGE OF ASSAULT TO HAVE OCCURRED ON APRIL 1ST OF

3    LAST YEAR AND THEN NOT TO BE THE SUBJECT OF A CHARGE

4    AND A WARRANT FOR ARREST UNTIL APPROXIMATELY A YEAR

5    LATER?  IS THAT UNUSUAL, OR DOES THAT COMMONLY HAPPEN

6    IN YOUR EXPERIENCE?

7         A    WELL WE ARE PRETTY BUSY AT THE AIRPORT

8    COURT.  AND IT IS PROBABLY PRETTY COMMON.

9              I KNOW THAT I HAVE STACKS OF CASES -- WE

10   HAVE -- THERE ARE THREE FILING DEPUTIES.  AND WE HAVE

11   TO PRIORITIZE OUR CASES, OBVIOUSLY.

12             THE FIRST PRIORITY IS OF COURSE CUSTODY

13   CASES WHERE WE HAVE TO FILE THEM QUICKLY.  THE NEXT

14   ARE PEOPLE THAT HAVE BEEN ARRESTED AND THEY HAVE

15   BAILED OUT; WE HAVE SPECIFIC DATES TO MEET.

16             THE WARRANTS COME LAST, BASICALLY.  AND

17   THERE ARE STACKS OF WARRANTS.  AND AT THE AIRPORT,

18   YOU KNOW, WITH THE BUDGET SHORTFALLS AND SO FORTH, I

19   COULD FINISH UP MY PART OF THE FILING AND SUBMIT IT

20   TO THE SECRETARIES WHO ALSO HAVE TO PRIORITIZE; IT

21   COULD TAKE TWO TO THREE MONTHS FROM WHEN I FILE IT TO

22   WHEN IT IS ACTUALLY TAKEN INTO THE COURT AND FILED

23   WITH THE COURT.

24             SO IT HAPPENS.  ESPECIALLY -- NOT ONLY THAT

25   KIND OF DELAY OR THAT KIND OF TIMEFRAME, BUT I HAD

26   FURTHER INVESTIGATION THAT I REQUESTED WHICH TAKES

27   MONTHS BECAUSE THE INVESTIGATORS HAVE OTHER CASES

28   THAT THEY ARE WORKING ON, SO THEY HAVE TO COORDINATE

1   THINGS.

2        Q    AND -- I AM SORRY, IF YOU COULD JUST

3   DESCRIBE FOR ME AGAIN WHAT THE FURTHER INVESTIGATION

4   WAS.

5        A    WELL ONE OF THE THINGS I HAD

6   DETECTIVE ATKINSON DO WAS RE-INTERVIEW DIAZ,

7   CLAUDIA DIAZ.

8            THE INITIAL REPORT WAS TAKEN BY L.A.P.D.

9   PACIFIC DIVISION, AND I WANTED SOME FURTHER

10  INVESTIGATION.  AND THAT OCCURRED IN NOVEMBER OF

11  2012.  THAT'S WHEN FURTHER INTERVIEW TOOK PLACE.

12           I ALSO WATCHED THE VIDEO TAPE WITH

13  DETECTIVE ATKINSON AT THE TAVERN BAR WHICH SHOWED

14  SOME OF WHAT WAS GOING ON THAT NIGHT ABOUT -- BETWEEN

15  2:00 AND 2:30 A.M.

16       MR. BUEHLER:  NO FURTHER QUESTIONS, YOUR HONOR.

17  BUT I WOULD MAKE A REQUEST THAT I BE PROVIDED WITH

18  THE ADDITIONAL REPORTS IN THE CASE.  I HAVE TWO OF

19  THEM.  SO IF THE DISTRICT ATTORNEY'S OFFICE COULD LET

20  ME HAVE COPIES OF ADDITIONAL REPORTS.

21       THE COURT:  I ASSUME YOU HAVE NO OBJECTION TO

22  THAT?

23       THE WITNESS:  ARE YOU ASKING ME, YOUR HONOR?

24       THE COURT:  SURE.

25       THE WITNESS:  OKAY.

26           WELL IF THE COURT ORDERS THAT THEY BE

27  TURNED OVER.

28       THE COURT:  OKAY.  THAT'S MY ORDER.

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
1              DO YOU HAVE ANY REDIRECT?
2         MS. OKUN-WIESE:  NO, I DON'T.
3         THE COURT:  THANK YOU, MR. KURIYAMA.
4         THE WITNESS:  THANK YOU, YOUR HONOR.
5         MS. OKUN-WIESE:  THE PEOPLE CALL ERIC ATKINSON.
6
7                    ERIC ATKINSON,
8         CALLED AS A WITNESS BY THE PEOPLE,
9         WAS SWORN AND TESTIFIED AS FOLLOWS:
10
11        THE COURT CLERK:  YOU DO SOLEMNLY SWEAR THE
12   TESTIMONY YOU ARE ABOUT TO GIVE IN THE CAUSE NOW
13   PENDING BEFORE THIS COURT TO BE THE TRUTH, THE WHOLE
14   TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?
15        THE WITNESS:  I DO.
16        THE COURT CLERK:  THANK YOU.  PLEASE BE SEATED.
17             PLEASE STATE YOUR NAME; THEN SPELL YOUR
18   FIRST AND LAST NAME FOR THE RECORD.
19        THE WITNESS:  ERIC ATKINSON.  E-R-I-C.
20   A-T-K-I-N-S-O-N.
21
22                  DIRECT EXAMINATION
23   BY MS. OKUN-WIESE:
24        Q    GOOD MORNING, SIR.
25             WHAT IS YOUR OCCUPATION?
26        A    DETECTIVE, EL SEGUNDO POLICE DEPARTMENT.
27        Q    WERE YOU INVOLVED IN A FILING OF CASE
28   SA083571?
```

```
 1        A     WE REFER TO OUR CASES THROUGH EL SEGUNDO
 2   CASE OR D.R. NUMBERS, SO I WOULD HAVE TO LOOK THAT
 3   EXACT CASE NUMBER UP.
 4        Q     IT IS A CASE INVOLVING MELISA AYALA,
 5   NICHOLAS SCHWARCZ AND MR. BUTTERFIELD IN APRIL OF --
 6        A     YES.
 7        Q     -- 2002.
 8              I AM SORRY, 2012.
 9              WERE YOU THE INVESTIGATING OFFICER ON THAT
10   CASE?
11        A     YES, I WAS.
12        Q     DO YOU RECALL WHEN YOU FIRST TOOK THE CASE
13   IN FOR FILING?
14        A     DO I RECALL WHAT DATE THAT WAS?
15        Q     THE APPROXIMATE TIME.
16        A     I WOULD HAVE TO CHECK MY FILES TO SEE
17   THE --
18        THE COURT:  DO YOU HAVE THAT WITH YOU?
19        THE WITNESS:  I DO, YES.
20        THE COURT:  OKAY, GO AHEAD.
21        THE WITNESS:  THANK YOU, YOUR HONOR.
22              I BELIEVE IT WAS APPROXIMATELY NOVEMBER OF
23   2012.
24   BY MS. OKUN-WIESE:
25        Q     AND THE OFFENSE OCCURRED IN APRIL OF 2012;
26   IS THAT CORRECT?
27        A     THAT'S CORRECT.
28        Q     IS THERE A REASON THAT IT TOOK YOU SEVEN
```

1    MONTHS TO TAKE IT IN FOR FILING?

2         A    YES.   THOROUGH INVESTIGATIONS TAKE TIME.

3         Q    WHAT TYPE OF INVESTIGATION ARE YOU TALKING

4    ABOUT?

5         A    IT WAS AN ASSAULT WITH A DEADLY WEAPON

6    INVESTIGATION.

7         Q    WHAT TYPE OF INVESTIGATION DID YOU HAVE TO

8    DO?

9         A    INTERVIEW MULTIPLE WITNESSES, CONDUCT

10   SIX-PACK PHOTO LINEUPS.   RETRIEVE SURVEILLANCE,

11   SECURITY FOOTAGE.

12        Q    WHEN YOU WERE FIRST PROVIDED WITH THE CASE,

13   THERE WAS THE INITIAL REPORTS THAT ACCOMPANIED IT,

14   CORRECT?

15        A    CORRECT.

16        Q    WERE THERE NAMED SUSPECTS IN THOSE?

17        A    NO, THERE WAS NOT.

18        Q    SO IT WAS PART OF YOUR INVESTIGATION

19   FINDING OUT WHO THE ACTUAL SUSPECTS WERE?

20        A    CORRECT.

21        Q    AND IS THAT HOW YOU -- STRIKE THAT.

22             YOU INDICATED THAT YOU WENT AND LOOKED AT

23   SURVEILLANCE TAPES AND SPOKE TO MULTIPLE WITNESSES;

24   IS THAT CORRECT?

25        A    THAT'S CORRECT.

26        Q    AND IS THAT WHAT YOU WERE DOING DURING

27   THOSE SEVEN MONTHS?

28        A    YES.

1    Q    WHAT HAPPENED WHEN YOU TOOK IT IN FOR

2    FILING?

3    A    THE CASE GOT FILED.

4    Q    DID YOU TAKE IT IN PRIOR TO THE ACTUAL

5    FILING OF THE CASE AT A POINT EARLIER IN TIME?

6    A    YES, I BELIEVE SO.

7    Q    AND AT THAT TIME WERE YOU ASKED TO DO

8    FURTHER INVESTIGATION?

9    A    YES.

10   Q    DO YOU RECALL WHAT THAT FURTHER

11   INVESTIGATION WAS?

12   A    THERE IS -- IT WAS A LONG INVESTIGATIVE

13   PROCESS, SO THERE WERE SEVERAL STEPS ALONG THE WAY.

14        BUT I COULD -- I COULD ESTIMATE WHAT THOSE

15   THINGS WOULD BE, BUT THERE WAS NUMEROUS STEPS IN THE

16   INVESTIGATION.

17   Q    WHEN YOU INITIALLY TOOK IT IN FOR FILING,

18   DID YOU HAVE ALL THREE OF YOUR SUSPECTS NAMED?

19   A    NO, I DID NOT.

20   Q    HOW MANY DID YOU HAVE NAMED?

21   A    I HAD TWO OUT OF THREE.

22   Q    AND IT TOOK YOU SOME ADDITIONAL TIME TO GET

23   THE NAME OF THE THIRD INDIVIDUAL?

24   A    IT DID.

25   Q    AT ANY TIME DURING YOUR INVESTIGATION DID

26   YOU HAVE ANY CONTACT WITH MYSELF?

27   A    NO.

28   Q    DID YOU HAVE ANY CONTACT WITH

```
1    DETECTIVE KAREN THOMPSON SEATED TO MY RIGHT?
2         A    NO.
3         Q    HAD YOU EVER MET DETECTIVE THOMPSON PRIOR
4    TO SEEING HER IN COURT RIGHT NOW?
5         A    NO.
6         Q    HAD YOU EVER MET MYSELF PRIOR TO COMING TO
7    COURT TODAY?
8         A    NO.
9         Q    DID YOU HAVE ANY CONTACT WITH ANYBODY AT
10   THE SANTA MONICA POLICE DEPARTMENT REGARDING THE
11   FILING OF THIS CASE?
12        A    NO.
13        MS. OKUN-WIESE:  I HAVE NOTHING FURTHER.
14        THE COURT:  CROSS?
15        MR. BUEHLER:  THANK YOU.
16
17                  CROSS-EXAMINATION
18   BY MR. BUEHLER:
19        Q    GOOD MORNING, SIR.
20        A    GOOD MORNING.
21        Q    SO YOU SAY THAT WHEN YOU TOOK THE CASE IN
22   FOR FILING, IT WAS FILED?
23        A    EVENTUALLY IT WAS FILED, YES, SIR.
24        Q    SO INITIALLY -- YOU SAY INITIALLY YOU TOOK
25   IT IN, IN NOVEMBER OF LAST YEAR, CORRECT?
26        A    THAT'S AN ESTIMATION.  I -- I DON'T HAVE A
27   HARD NUMBER ON THAT, BUT THAT'S AN ESTIMATION.
28        Q    OKAY.  AND THEN YOU WERE ASKED TO DO
```

```
1     FURTHER INVESTIGATION TO IDENTIFY THE THIRD SUSPECT?

2          A     YES, SIR.

3          Q     AND HOW LONG DID IT TAKE YOU TO IDENTIFY

4     THE THIRD SUSPECT, DO YOU RECALL?

5          A     IT TOOK ME A FEW MONTHS.

6                YEAH, ONE OF MY WITNESSES STEPPED UP

7     EVENTUALLY AND, YOU KNOW, WE GOT SOME INFORMATION.

8     WE FOLLOWED UP ON THAT INFORMATION WHICH LED US TO

9     IDENTIFYING THE THIRD SUSPECT.

10         Q     DO YOU KNOW JOHN GILMORE?

11         A     I DO.

12         Q     HE IS THE -- ONE OF THE VICTIMS IN THIS

13    CASE?

14         A     YES, SIR.

15         Q     DID YOU KNOW JOHN GILMORE BEFORE YOU

16    INVESTIGATED THIS CASE?

17         A     NO, SIR.  I AM SORRY, STRIKE THAT.

18               I HAD ONE ADDITIONAL CASE PRIOR TO THIS

19    ONE, MAYBE A COUPLE MONTHS BEFORE, THAT IT WAS A

20    CRIMINAL THREATS CASE.  AND HE WAS ONE OF THE

21    INVOLVED PARTIES IN THAT CASE.  SO YES, I HAD HEARD

22    OF HIS NAME BEFORE.

23         THE COURT:  SO HE WAS AN INVOLVED PARTY, MEANING

24    SOMEBODY THAT SUPPOSEDLY MADE A THREAT OR SOMEONE WHO

25    RECEIVED A THREAT?

26         THE WITNESS:  RECEIVED A THREAT.

27    BY MR. BUEHLER:

28         Q     WAS THAT CASE FILED, DO YOU RECALL?
```

1        A    NO, IT WAS NOT.

2        Q    WAS THERE ANYTHING OUT OF THE ORDINARY,

3    BASED ON YOUR EXPERIENCE, IN THE INVESTIGATION OF

4    THIS CASE?

5        A    NO, SIR.

6        Q    YOU JUST HANDLED THIS CASE IN THE REGULAR

7    WAY YOU INVESTIGATE ALL OF YOUR CASES?

8        A    YES, SIR.

9        Q    DID YOU RECEIVE ANY COMMUNICATIONS FROM ANY

10   OUTSIDE SOURCE THAT INFLUENCED YOUR HANDLING OF THE

11   CASE?

12       A    NO, SIR.

13       MR. BUEHLER:  NO FURTHER QUESTIONS.

14       THE COURT:  ANY REDIRECT?

15       MS. OKUN-WIESE:  NOTHING FURTHER.  NO, THANK YOU.

16       THE COURT:  THANK YOU, DETECTIVE.  YOU MAY STEP

17   DOWN.

18       THE WITNESS:  THANK YOU, YOUR HONOR.

19       THE COURT:  ALL RIGHT, I AM GOING TO TAKE A BREAK

20   RIGHT NOW.  YOU CAN SPEAK TO COUNSEL.  AND WE WILL

21   SEE WHERE WE GO FROM THERE.

22       MR. BUEHLER:  THANK YOU, YOUR HONOR.

23

24           (RECESS)

25

26       THE COURT:  ALL RIGHT, WE ARE ONCE AGAIN ON THE

27   RECORD IN THE MATTER OF PEOPLE VERSUS PARK.

28           THE DEFENDANT IS PRESENT WITH COUNSEL; THE

1   PEOPLE ARE REPRESENTED.

2       MS. OKUN-WIESE:  THE PEOPLE CALL LYNN MITCHELL

3   PARRISH.

4           AND THIS --

5       MR. BUEHLER:  YOUR HONOR, BEFORE WE PROCEED, IF I

6   MAY, I GUESS THINGS ARE SORT OF AT A STANDSTILL IN

7   TERMS OF -- I CONFERRED WITH THE ATTORNEY FOR

8   MELISA AYALA.  I BELIEVE THE PEOPLE HAVE SUGGESTED

9   THAT THE -- THAT MELISA AYALA AND MR. SCHWARCZ NEED

10  SEPARATE COUNSEL.

11      THE COURT:  WELL, THEY MAY.  I MEAN THAT'S WHY I

12  INDICATED THERE MAY BE A CONFLICT.  BUT THEY MAY BE

13  WILLING TO WAIVE THE CONFLICT; I DON'T KNOW.  I MEAN,

14  IT IS REALLY KIND OF UP TO THEM AT SOME POINT.

15      MR. BUEHLER:  LET --

16      MS. OKUN-WIESE:  I SPOKE TO HER ATTORNEY, AND HE

17  WANTS TO REVIEW THE REPORTS WHICH WE ARE PROVIDING

18  FOR HIM.  SO THAT'S WHY I ASKED IF WE COULD JUST MOVE

19  ON INSTEAD OF WASTING THE COURT'S TIME.

20      THE COURT:  WELL LET HIM REVIEW THE REPORT, AND

21  THEN I GUESS WE WILL GO FROM THERE TO SEE WHETHER WE

22  NEED TO GET ANOTHER LAWYER HERE OR NOT.

23      MR. BUEHLER:  I AM JUST TRYING TO UNDERSTAND WHAT

24  THE PEOPLE WANT TO ACCOMPLISH TODAY BECAUSE I ASSUME

25  THAT THEY WANT TO HAVE MISS AYALA TAKE THE STAND

26  TODAY AND --

27      THE COURT:  WELL I THINK THAT'S PRESUMABLY WHAT

28  THEY WANT TO DO, BUT --

1    MS. OKUN-WIESE:  WELL, THE PEOPLE FEEL THAT IT IS

2    NOT OUR BURDEN TO PROVE THIRD-PARTY CULPABILITY.  AND

3    YESTERDAY A WHOLE BUNCH OF HEARSAY STATEMENTS CAME

4    IN, AND THAT WAS IT.  AND THE DEFENSE ALLUDED TO THE

5    FACT THAT THEY HAVEN'T HAD -- IN THEIR MOTION THEY

6    ALLUDED TO THE FACT THAT THEY HAVEN'T HAD CONTACT

7    WITH HER SINCE DETECTIVE THOMPSON HAD CONTACT WITH

8    HER.  YESTERDAY WE LEARNED DIFFERENTLY; THAT THEY DID

9    CONTACT HER AND DID SUBPOENA HER.

10       AND I BELIEVE THAT THE COURT SAID, "I WOULD

11   LIKE TO HEAR FROM MISS AYALA."

12       WE GOT WORD, BECAUSE MISS AYALA TOLD

13   MR. GILMORE THAT SHE WAS TURNING HERSELF IN, SO WE

14   CONTACTED EL SEGUNDO AND HAD THEM SERVE HER SO THAT

15   SHE COULD BE HERE.  BECAUSE THAT'S PART OF THEIR

16   WHOLE CLAIM; THAT THEY COULDN'T REACH HER BECAUSE OF

17   OUR CONTACT WITH HER, OR DETECTIVE THOMPSON'S CONTACT

18   WITH HER.

19       SO SHE IS HERE TODAY.

20       BUT ALL WE HAVE AT THIS JUNCTURE FOR THE

21   THIRD-PARTY CULPABILITY ARE THE HEARSAY STATEMENTS OF

22   THE DEFENSE INVESTIGATOR, AND WE HAVE THE TAPE THAT

23   WAS PRESENTED BY THE PEOPLE IN COURT.

24       THE PEOPLE ARE GOING TO PRESENT TODAY

25   MR. GILMORE WHO IS GOING TO SAY HE DIDN'T MAKE THOSE

26   STATEMENTS AND THE WITNESSES WHO WERE WITH

27   MR. GILMORE FOR THE TWO-DAY DURATION WITHIN WHICH

28   MISS JULIANA REDDING WAS MURDERED.

1    THE COURT:  SEE, YOU -- YOU -- IN YOUR THIRD

2   PARTY CULPABILITY CLAIM, YOU HAVE TO SHOW ME THAT YOU

3   HAVE COMPETENT EVIDENCE OF IT.  AND PRESUMABLY THAT

4   EVIDENCE IS FROM MISS AYALA.

5    MR. BUEHLER:  MISS AYALA.  OR IF MISS AYALA WERE

6   TO RECANT, THEN FROM MISS LARSEN.

7        SO WE -- WE HAVE EVIDENCE THAT THE

8   STATEMENTS WERE MADE.

9        NOW IF MISS AYALA IS GOING TO ASSERT THE

10   5TH AMENDMENT PRIVILEGE -- NOT HERE; WHETHER SHE DOES

11   IT RIGHT HERE IS ANOTHER QUESTION.  THE QUESTION IS

12   WHETHER SHE DOES IT AT TRIAL.  IF SHE IS GOING TO

13   ASSERT THE 5TH AMENDMENT PRIVILEGE, THAT CREATES

14   ANOTHER PROBLEM FOR US.

15        ONE SOLUTION FOR THAT PROBLEM WOULD BE FOR

16   THE PEOPLE TO IMMUNIZE HER FOR PURPOSES OF THIS

17   PROCEEDING.  BUT I GET THE IMPRESSION -- I JUST

18   WANT -- IF THE COURT WANTS TO DO IT, I AM GLAD TO DO

19   IT.  BUT THE PEOPLE ARE EFFECTIVELY TRYING TO HAVE --

20   TO TRY THE ISSUE HERE OF WHETHER SHE MADE THE

21   STATEMENTS OR WHETHER SHE DIDN'T.

22        THERE ARE DIFFERENT AVENUES WE GO DOWN,

23   DEPENDING ON WHAT SHE SAYS.

24    THE COURT:  WELL IT IS KIND OF A COMBINATION, IT

25   SEEMS TO ME, YOUR MOTION TO PRESENT THIRD PARTY

26   CULPABILITY EVIDENCE AND A 402 BECAUSE -- I MEAN, NOT

27   ONLY -- I MEAN, THERE HAS TO BE A -- SOME KIND OF A

28   CONNECTION BETWEEN THE PERSON THAT YOU CLAIM IS THE

NOT TO BE REPRODU222 PER GOVERNMENT CODE 69954(D)

1    REAL KILLER, WHICH YOU CLAIM IS JOHN GILMORE; HE HAS
2    TO HAVE HAD THE OPPORTUNITY TO HAVE COMMITTED THE
3    CRIME OR SOME CONNECTION TO THE CRIME, OR THERE HAS
4    TO BE SOMETHING -- SOME EVIDENCE CONNECTING HIM TO
5    IT.  AND THE EVIDENCE THAT CONNECTS HIM TO IT HAS TO
6    BE EVIDENCE THAT IS ADMISSIBLE EVIDENCE.
7            AND SO FAR WHAT THE COURT HAS HEARD IS NOT
8    ADMISSIBLE EVIDENCE.  SO --
9        MR. BUEHLER:  YOUR HONOR, THE COURT HAS HEARD
10   EVIDENCE OF STATEMENTS THAT MR. GILMORE MADE.  IF
11   THOSE STATEMENTS CAME IN THROUGH MISS AYALA, THEY ARE
12   ADMISSIBLE.  IF THEY COME IN THROUGH LINDA LARSEN
13   BECAUSE MISS AYALA RECANTS, THEY ARE ADMISSIBLE.  SO
14   ONE WAY OR THE OTHER, THEY ARE GOING TO COME IN HERE
15   UNLESS THE PEOPLE TRY TO BLOCK IT THROUGH THE FACT
16   THAT THERE IS NOW A PENDING PROSECUTION OF
17   MISS AYALA.
18       THE COURT:  WELL, YOU SAY UNLESS THE PEOPLE TRY
19   TO BLOCK IT.
20           THE -- I HAVEN'T HEARD ANY EVIDENCE THAT
21   THE -- THAT THE PROSECUTOR IN THIS CASE OR THE
22   DETECTIVE IN THIS CASE SOMEHOW HAD SOMETHING TO DO
23   WITH THE FILING OF THE CHARGES.
24           SO YOU SAY WHETHER THE PEOPLE TRY TO BLOCK
25   IT.  A DEFENDANT'S RIGHT AGAINST SELF-INCRIMINATION
26   IS A PERSONAL RIGHT TO THAT DEFENDANT.  SO I DON'T
27   KNOW EXACTLY WHAT YOU ARE SAYING, THE PEOPLE TRY TO
28   BLOCK IT.

```
 1         MR. BUEHLER:  LET ME STEP BACK THEN.  I DON'T
 2   MEAN THE PEOPLE ARE TRYING TO BLOCK IT THROUGH
 3   SOMETHING DONE THROUGH THE FILING OF THE CHARGE.  AND
 4   WE HAVE GONE THROUGH THAT; THAT WAS A SUSPICION ON
 5   OUR PART.  SO FAR THAT'S NOT BORNE OUT; I WILL GRANT
 6   THE COURT.
 7              BUT I MEAN, THE PEOPLE HAVE WAYS OF GETTING
 8   AROUND THE 5TH AMENDMENT ASSERTION, IF IT IS MADE,
 9   AND IT WOULD BE TO GRANT IMMUNITY.  SO THE FAILURE TO
10   DO THAT WOULD -- IN MY VIEW, WOULD BE BLOCKING VERY
11   IMPORTANT EVIDENCE COMING IN.
12              SO I THINK THERE ARE WAYS OF US TRYING TO
13   DEAL WITH A LEGITIMATE ASSERTION OF THE 5TH
14   AMENDMENT; THAT'S ALL I AM SAYING.
15              WE DON'T REALLY KNOW -- AND I DON'T KNOW
16   THAT WE CAN KNOW TODAY -- I MEAN, THE WITNESS MIGHT
17   BE WILLING TO TESTIFY TODAY BUT NOT TWO WEEKS FROM
18   NOW AT THE POINT IN THE TRIAL.
19              SHE MIGHT BE NOT WILLING TO TESTIFY TODAY
20   ONLY BECAUSE SHE DOESN'T HAVE A LAWYER WHO IS UP TO
21   SPEED YET, BUT BE WILLING TO TESTIFY WHEN WE GET TO
22   THAT POINT IN TRIAL.
23         THE COURT:  WELL, WE ARE STARTING THIS TRIAL A
24   COUPLE OF DAYS FROM NOW.  I MEAN, WE ARE DOING 402'S
25   IN CONNECTION WITH THE TRIAL.
26         MR. BUEHLER:  I UNDERSTAND.  THAT'S MY CONCERN.
27         THE COURT:  THAT'S YOUR CONCERN?
28         MR. BUEHLER:  THAT'S MY CONCERN TO GET THIS
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1   RESOLVED AND TO MAKE SURE WE ALL UNDERSTAND WHAT THE

2   ISSUE REALLY IS.

3          THE ISSUE ISN'T US TRYING -- YOU KNOW,

4   WHETHER OR NOT SHE WILL -- WHETHER OR NOT HER

5   TESTIMONY IS TRUE.  OUR BURDEN IS TO MAKE A PROFFER.

6   AND WE HAVE FILED A DOCUMENT THAT RELATES THE

7   EVIDENCE IN THIS CASE -- IT LINKS MR. GILMORE TO THE

8   MURDER.  IT IS NOT JUST MISS AYALA'S STATEMENTS; IT

9   IS NOT JUST WHAT HE SAID AT THE POLICE DEPARTMENT

10  WHEN HE WAS BEING INTERVIEWED; IT IS THE EVIDENCE IN

11  THE DISCOVERY IN THIS CASE WHICH SHOWS A HISTORY OF

12  VIOLENCE IN HIS RELATIONSHIP WITH MISS REDDING; SHOWS

13  ANGER AND FIGHTS ESCALATING THROUGH THE WEEK OF HER

14  MURDER, PARTICULARLY ON THE NIGHT OF THE MURDER.

15         IT SHOWS --

16     THE COURT:  WELL YOU ARE SAYING YOU WANT TO

17  PRESENT PROPENSITY EVIDENCE.  AND YOU HAVE TO HAVE --

18  THERE ARE CERTAIN STEPS THAT YOU HAVE TO TAKE TO GET

19  THAT EVIDENCE ADMITTED.  AND IF IT IS 1108 OR 1101 OR

20  WHATEVER, YOU HAVEN'T FILED ANY MOTION TO GET OTHER

21  KINDS OF INCIDENTS ADMITTED.

22     MR. BUEHLER:  YOUR HONOR, WE ADDRESSED THOSE

23  ISSUES IN THE PAPERS WE FILED.  AND I CAN FILE --

24  CITE A -- REMEMBER, IT IS THE PEOPLE'S MOTION.  IT IS

25  THEIR MOTION TO BLOCK US FROM DOING THIS.  WE

26  RESPONDED AND WE GAVE THE COURT THE LAW THAT I

27  BELIEVE SHOWS CLEARLY THAT MR. GILMORE'S VIOLENCE NOT

28  AGAINST OTHER PEOPLE BUT AGAINST THIS VICTIM IN THIS

1   CASE IS ADMISSIBLE AGAINST HIM AS TO THE MURDER OF
2   THE VICTIM IN THIS CASE, JUST AS IF HE WERE THE
3   CHARGED DEFENDANT IN THIS CASE.  HIS PRIOR ACTS OF
4   VIOLENCE AGAINST THE MURDERED VICTIM IN THIS CASE
5   WOULD BE ADMISSIBLE AGAINST HIM.  AND THERE IS PLENTY
6   OF CASE LAW THAT SAYS THAT.
7           SO THAT, I BELIEVE, IS CLEARLY ADMISSIBLE.
8   AND IT IS PART --
9       THE COURT:  I DON'T AGREE WITH YOU.
10      MR. BUEHLER:  WELL CAN I CITE A CASE FOR THE
11  COURT THEN THAT I THINK CLEARLY SAYS THAT?  OR WOULD
12  THE COURT PREFER THAT I FILE A BRIEF ON IT?
13          I MEAN, PEOPLE VERSUS LINKENAUGER CLEARLY
14  SAYS THAT.
15      MS. OKUN-WIESE:  I DISAGREE.  EVERYTHING HE IS
16  TRYING TO BRING IN WOULD BE 1101B EVIDENCE.
17          AND I AGREE WITH THE COURT THAT THERE HAS
18  TO BE A BURDEN THAT'S MET.  HE CAN FRAME IT HOWEVER
19  HE WANTS TO FRAME IT, BUT WHATEVER WAY YOU LOOK AT
20  PROPENSITY EVIDENCE, IT MUST COME IN UNDER 1101B.  HE
21  CAN'T MEET THAT BURDEN.
22          HE IS TRYING TO BRING IN ALL THIS OUTSIDE
23  EVIDENCE TO MAKE MR. GILMORE LOOK LIKE A MURDERER.
24  HE WANTS TO USE PRIOR ACTS TO PROVE THAT HE WAS THE
25  PERSON WHO COMMITTED THE MURDER OF JULIANA REDDING.
26  AND HE CAN'T DO THAT.
27          IN ORDER TO BRING IN THIRD PARTY
28  CULPABILITY, THERE HAS TO BE A NEXUS TO THE ACTUAL

1    CRIME, AND HE CAN'T PROVE THAT EITHER.

2          EVEN WITH MISS AYALA'S STATEMENT, IF THE

3    COURT ACCEPTED THOSE STATEMENTS, IF MISS AYALA CAME

4    IN HERE AND SAID, "YES, HE TOLD ME, 'YOU WANT TO FEEL

5    LIKE I FELT?'" WE DON'T KNOW THE SURROUNDING

6    CIRCUMSTANCES OF THAT. WE DON'T KNOW WHETHER OR NOT

7    SHE PUSHED HIS BUTTONS TO MAKE HIM SAY THAT.

8          WHAT WE WILL FIND OUT TODAY, THROUGH THE

9    EVIDENCE, THROUGH THESE WITNESSES, IS THAT

10   MR. GILMORE HAD NOTHING TO DO WITH JULIANA REDDING'S

11   MURDER. SO THEREFORE, THEY FAIL TO MEET THEIR BURDEN

12   FOR THIRD-PARTY CULPABILITY. THEN MISS AYALA NEVER

13   COMES INTO COURT DURING THE TRIAL.

14         THAT'S WHY WE ARE DOING THIS MINI TRIAL

15   BEFORE THE ACTUAL TRIAL.

16         352.

17         I AGREE WITH THE COURT; THIS IS A 402

18   HEARING. THAT'S WHY IT IS DONE BEFORE WE ARE IN THE

19   PRESENCE OF THE JURY.

20     MR. BUEHLER: .PEOPLE VERSUS HALL, CITED BY BOTH

21   PERSONS:

22         (READING:) WE REAFFIRM THE

23         ADMISSIBILITY OF ANY RELEVANT

24         EVIDENCE THAT RAISES A REASONABLE

25         DOUBT AS TO DEFENDANT'S GUILT

26         INCLUDING EVIDENCE TENDING TO SHOW

27         THAT A PARTY OTHER THAN THE

28         DEFENDANT COMMITTED THE OFFENSE

1     CHARGED.

2

3          IN THIS CASE, THE SUPREME COURT SAID IT WAS

4     ERROR FOR THE COURT NOT TO HAVE GRANTED THE PROFFER

5     OF THE DEFENSE IN THAT CASE TO SHOW EVIDENCE THAT

6     SOMEBODY ELSE HAD COMMITTED THE MURDER.

7          THE COURT:  HALL IS THE SEMINAL CASE ON THIRD

8     PARTY CULPABILITY.  I AM FAMILIAR WITH HALL.  THAT

9     DOESN'T ADDRESS THE ISSUE OF OTHER PRIOR BAD ACTS

10    WHICH IS NOT WHAT HALL ADDRESSES.

11         MR. BUEHLER:  OKAY, BUT IT DOES ADDRESS THE

12    ISSUE -- THE ASSERTION THAT WE ARE GOING TO DECIDE

13    THIS ISSUE BY HAVING MR. GILMORE COME IN AND SAY "I

14    DIDN'T COMMIT THE MURDER."  OR TO SHOW VARIOUS

15    REASONS WHY THEY THINK MISS AYALA'S STATEMENTS

16    SHOULDN'T BE CREDITED.  THOSE ARE ALL JURY QUESTIONS,

17    ONCE THE PROOF OF ADMISSIBLE EVIDENCE HAS BEEN MADE.

18         THE COURT:  I MEAN, I TEND TO AGREE WITH COUNSEL

19    ON THIS ISSUE.  I MEAN, YOU CAN PRESENT YOUR

20    WITNESSES AND THEY CAN SAY X, Y AND Z.  AND THEY HAVE

21    THEIR WITNESSES THAT SAY A, B, AND C.  AND THE JURY

22    HAS TO SORT IT OUT.

23          THE FACT THAT YOU PRESENT WITNESSES THAT

24    SAY THAT MR. GILMORE WAS AT A PARTY OR WAS AT A BAR

25    OR WAS IN HAWAII OR WHATEVER IT IS I DON'T THINK

26    ANSWERS THE QUESTION OF WHETHER THEY CAN BRING THIRD

27    PARTY CULPABILITY EVIDENCE IN.

28         MS. OKUN-WIESE:  BUT THE CASE LAW SAYS THAT THEY

1    CANNOT JUST PROVIDE ANY EVIDENCE, ANY REMOTE

2    EVIDENCE.  THERE HAS TO BE A LINK TO THE ACTUAL

3    PERPETRATION OF THE CRIME.

4         WE HAVE NO IDEA WHERE THOSE STATEMENTS CAME

5    FROM.  WE HAVE ONE PERSON WHO IS OBVIOUSLY VERY ANGRY

6    AT MR. GILMORE, AND HE IS ALLEGEDLY MAKING THESE

7    STATEMENTS.

8         THAT'S WHAT THEY HAVE PRESENTED.  THAT'S

9    NOT SUFFICIENT FOR THIRD PARTY CULPABILITY.  AND THEN

10   WE ARE GOING TO HAVE A TRIAL WITHIN A TRIAL WITH

11   FIFTEEN EXTRA WITNESSES TALKING ABOUT WHERE

12   MR. GILMORE IS ON THE NIGHT IN QUESTION, HOW HE HAS

13   LEFT NOT ONE INKLING OF DNA AT THE LOCATION WHERE HIS

14   CELL PHONE RECORDS PUT HIM.

15      THE COURT:  WELL, YEAH, WE MAY END UP DOING THAT.

16   BUT SEE -- LET'S JUST TURN THIS ON ITS HEAD FOR A

17   MOMENT.  LET'S SAY THAT NOBODY HAD BEEN ARRESTED FOR

18   MISS REDDING'S MURDER.

19      MS. OKUN-WIESE:  OKAY.

20      THE COURT:  AND EVIDENCE CAME, BUT -- IT WAS

21   CLEAR THAT SHE WAS MURDERED.  AND EVIDENCE CAME TO

22   THE ATTENTION OF THE AUTHORITIES THAT MR. GILMORE OR

23   IT COULD BE ANYBODY SAYS, AS HE IS ALLEGEDLY CHOKING

24   ANOTHER WOMAN, "I AM GOING TO MAKE YOU FEEL LIKE

25   JULIANA DID," OR SOMETHING LIKE THAT.  AND THAT WAS

26   ALL THE EVIDENCE YOU HAD.

27         I MEAN, I DON'T KNOW WHETHER IT WOULD BE

28   FILED, BUT IT IS KIND OF LIKE A CORPUS COPOUT SORT OF

1   A THING IN A WAY.

2          I MEAN, EVIDENCE IF BELIEVED THAT TENDS TO

3   SHOW THAT THAT INDIVIDUAL WAS GUILTY -- I MEAN --

4     MS. OKUN-WIESE:  WELL YOU WOULD HOPE THAT THE

5   POLICE AGENCY, AS THEY DID IN THIS CASE, WOULD FULLY

6   INVESTIGATE IT.

7          AND THEY DID FULLY INVESTIGATE

8   JOHN GILMORE.  I MEAN, THAT'S WHY WE HAVE THE VIDEOS.

9   THAT'S WHY WE HAVE ALL THE WITNESSES WHO WERE AT THE

10  PARTY.  THAT'S WHY THEY GOT A REFERENCE SAMPLE FROM

11  MR. GILMORE TO CHECK IT AGAINST THE DNA THAT WAS

12  FOUND ON MISS REDDING AND AT THE LOCATION.  THAT'S

13  WHY THEY FOLLOWED EVERY STEP.  AND HE WAS ELIMINATED

14  AS A SUSPECT.

15    THE COURT:  AND IF -- NUMBER ONE, THAT -- THE

16  VIDEO TAPE FROM THE POLICE, QUOTE UNQUOTE STATION,

17  WHATEVER IT WAS, THAT DOESN'T CONVINCE ME THERE IS

18  ANY CONNECTION AT ALL.

19          THIS OTHER STATEMENT, IF THERE IS COMPETENT

20  EVIDENCE OF IT, WHICH I HAVE YET TO HEAR, THAT'S A

21  DIFFERENT STORY IN TERMS OF IN MY MIND THIRD PARTY

22  CULPABILITY DEFENSE.  AND THAT'S WHERE THE ISSUE IS

23  RIGHT NOW ON WHETHER MISS AYALA -- OR IF MR. SCHWARCZ

24  WAS PRESENT OR HEARD ANY OF THOSE STATEMENTS --

25  TESTIFIES IN FRONT OF THE JURY AS TO THOSE

26  STATEMENTS.  THAT'S THE CRUX OF IT.

27          AND SO YEAH, UNDER THE THEORY, I MEAI

28  YEAH, I GUESS YOU DO HAVE ANOTHER WHOLE PART (

1    EVIDENCE THAT IS PRESENTED TO DEBUNK THAT THEORY IF

2    THE THEORY COMES IN, BUT I DON'T THINK I AM THE

3    PERSON TO MAKE THE CREDIBILITY CALL.

4        MS. OKUN-WIESE:  SO AS THE COURT STANDS RIGHT

5    NOW, THE COURT DOESN'T HAVE SUFFICIENT EVIDENCE TO

6    RULE ON THE THIRD PARTY CULPABILITY?  OR DOES THE

7    COURT -- THE COURT SAID YOU DON'T HAVE CREDIBLE

8    EVIDENCE --

9        THE COURT:  BECAUSE I HAVE THE HEARSAY FROM

10   MISS LARSEN.  BUT MISS LARSEN DIDN'T HEAR THE

11   STATEMENTS OF MR. GILMORE.

12       MS. OKUN-WIESE:  CORRECT.

13       THE COURT:  SO THERE HAS TO BE SOME EVIDENCE,

14   ADMISSIBLE EVIDENCE OF MR. GILMORE MAKING STATEMENTS

15   IF -- I MEAN, THE WHOLE OFFER OF PROOF IS THAT

16   MR. GILMORE MADE THESE INCRIMINATING STATEMENTS

17   IMPLICATING HIM IN THE MURDER.  AND SO FAR I HAVEN'T

18   HEARD ANYBODY THAT'S HEARD HIM SAY THAT.

19       MR. BUEHLER:  YOUR HONOR, ALL I AM SAYING IS THAT

20   I THINK THE WAY THIS IS SUPPOSED TO PROCEED AS I READ

21   THE CASE LAW IS, WE ARE AT A PROFFER STAGE NOW.

22           I MEAN THE PROFFER, YOUR HONOR, IS WE THINK

23   WE CAN PRODUCE THIS EVIDENCE WHICH SHOWS THAT "X"

24   RATHER THAN DEFENDANT COMMITTED THE CRIME.  CAN WE

25   GET IT IN?  YES.  IF YOU CAN PRODUCE EVIDENCE, YOU

26   CAN GET IT IN.

27           PEOPLE OFTEN PROFFER EVIDENCE, AND DURING

28   THE COURSE IF YOU DON'T PRODUCE, YOU CAN'T GET IT IN.

1        SO TO THE EXTENT THERE ARE ISSUES OF --

2    SOMETIMES WITNESSES DISAPPEAR OR SOMETHING.  THE

3    QUESTION NOW IS WHETHER OR NOT WHAT WE ARE PROFFERING

4    WOULD BE -- WOULD QUALIFY UNDER THE STANDARDS FOR

5    EVIDENCE OF THIRD PARTY CULPABILITY.

6        THE COURT:  YEAH, BUT I MEAN IF YOU DON'T HAVE A

7    WITNESS THAT IS -- CAN TESTIFY TO IT, THEN IT IS NOT

8    GOING TO COME IN AND THE JURY IS NOT GOING TO HEAR

9    IT, AND YOU ARE NOT GOING TO MENTION IT IN YOUR

10   OPENING STATEMENT.  SO THE RUBBER MEETS THE ROAD

11   TODAY.

12       MR. BUEHLER:  I WOULD LIKE TO HAVE MISS AYALA

13   TELL US TODAY THAT SHE WILL TESTIFY AT THE TRIAL.

14   BECAUSE OF THE PROCEDURAL SITUATION WITH HER OTHER

15   CASE AND SHE JUST GOT A LAWYER IN THAT CASE; SHE HAS

16   JUST BEEN ARRESTED ON THAT CASE; SHE IS OBVIOUSLY A

17   LITTLE BIT UP IN THE AIR.  SO I AM WILLING TO FOLLOW

18   WHATEVER THE COURT WANTS TO DO IN TERMS OF THAT.  BUT

19   I DON'T THINK THE COURT CAN SAY, "NO, YOU CAN'T ADMIT

20   IT."  YOU KNOW.  "YOU ARE NOT GOING TO GET TO PUT IN

21   YOUR THIRD PARTY CULPABILITY EVIDENCE BECAUSE YOU ARE

22   NOT CERTAIN AT THIS POINT WHETHER OR NOT SHE WILL

23   TESTIFY."

24       AND I FRANKLY THINK THERE ARE WAYS AROUND

25   THE PROBLEM IF -- I MEAN --

26       THE COURT:  WELL, YOU ARE TALKING ABOUT THE

27   PEOPLE GRANTING HER IMMUNITY.

28       MR. BUEHLER:  WELL, I HEARD THE PEOPLE SAY OUT

1    THERE THEY MAY CHANGE THEIR MIND; THAT THEY WOULD
2    GRANT HER IMMUNITY.
3        THE COURT:  THEY WOULD OR WOULD NOT?
4        MR. BUEHLER:  WOULD.  TO MISS AYALA'S LAWYER.
5    NOW I AM NOT SURE --
6        THE COURT:  AND THAT'S SOMETHING THAT, YOU KNOW,
7    IS --
8        MR. BUEHLER:  I UNDERSTAND.
9        THE COURT:  -- BETWEEN ALL OF YOU.
10           NOW THE LAWYER IS BACK IN HERE, SO I DON'T
11    KNOW IF MR. --
12        MR. COPPOLA JR.:  MAY I APPROACH, YOUR HONOR?
13        THE COURT:  YES.
14        MR. COPPOLA JR.:  YES, YOUR HONOR.
15        THE COURT:  YOU HAVE HAD A CHANCE TO CONFER WITH
16    YOUR CLIENTS?
17        MR. COPPOLA JR.:  YOUR HONOR, I DID -- I DID
18    BRIEFLY.  BUT AGAIN, I STILL -- EVERYTHING I HAVE
19    HEARD IN HERE IS THE FIRST TIME I HAVE HEARD PRETTY
20    MUCH ALL THE INVOLVEMENT THAT MY CLIENT WOULD HAVE IN
21    THE AIRPORT CASE.  AND I HAVE HEARD SOME OF THE
22    ARGUMENT.
23           I WAS GIVEN COPIES OF A COUPLE OF POLICE
24    REPORTS TO PERUSE.  I HAVE NOT BEEN ABLE TO GO OVER
25    THEM SUFFICIENTLY.
26           IT WOULD BE MY INTENTION TODAY TO HAVE MY
27    CLIENT ASSERT HER RIGHTS UNDER THE CALIFORNIA AND
28    UNITED STATES CONSTITUTIONS NOT TO TESTIFY.  I JUST

1   DON'T KNOW ENOUGH ABOUT IT, AND I BELIEVE THAT ANY

2   IDENTIFICATION OF ANY INDIVIDUAL WITH HER WOULD FORM

3   A LINK IN THE CHAIN OF EVIDENCE IN THE -- IF I CAN

4   CALL IT THE AIRPORT CASE, THE CASE THAT SHE IS FACING

5   FOR WHICH SHE WAS BOOKED YESTERDAY.

6         SO AT THIS MOMENT, WHAT I WOULD BE DOING IS

7   ADVISING HER TO TAKE HER 5TH AMENDMENT RIGHTS.

8      THE COURT:  AND AGAIN, IT IS HER PERSONAL RIGHT.

9   SO WE WOULD NEED TO KNOW WHETHER SHE WANTS TO FOLLOW

10  YOUR ADVICE OR NOT.

11     MR. COPPOLA JR.:  NO, I UNDERSTAND.

12        I WOULD ASK IF I CAN JUST STAND NEXT TO HER

13  DURING QUESTIONING.  AND WE HAVE GOT A CARD FOR HER

14  TO READ.

15     THE COURT:  SURE.

16     MS. OKUN-WIESE:  WELL IT SOUNDS TO ME BY WHAT THE

17  COURT SAID, THE COURT DOESN'T HAVE COMPETENT EVIDENCE

18  AT THIS POINT TO RULE ON THE THIRD PARTY CULPABILITY

19  MOTION, AND YOU ARE NOT GOING TO PERMIT COUNSEL TO

20  ARGUE THAT UNTIL THEY BRING MISS AYALA IN.  IS THAT

21  CORRECT?  BECAUSE AT THIS POINT WE ARE NOT GOING TO

22  GRANT HER IMMUNITY IF THAT'S GOING TO BE THE COURT'S

23  RULING.

24     THE COURT:  WELL AT THIS POINT I HAVEN'T HEARD

25  EVIDENCE THAT WOULD COME IN THAT COULD BE ADMITTED

26  BECAUSE MISS LARSEN DID NOT HEAR MR. GILMORE'S

27  STATEMENTS, IF HE MADE THOSE STATEMENTS.

28     MS. OKUN-WIESE:  CORRECT.

```
 1        THE COURT:  MISS LARSEN HEARD MISS AYALA SAY THAT
 2   MR. GILMORE MADE THOSE STATEMENTS.  THAT'S WHAT SHE
 3   TESTIFIED TO.
 4        MS. OKUN-WIESE:  CORRECT.
 5        THE COURT:  SO THERE IS -- WE ARE MISSING A LINK
 6   IN THE ADMISSION OF THE EVIDENCE AT THIS POINT.
 7        MS. OKUN-WIESE:  WOULD THE COURT INSTRUCT COUNSEL
 8   NOT TO MENTION JOHN GILMORE UNTIL MISS AYALA IS
 9   BROUGHT IN AND TESTIFIES DURING THE TRIAL?
10        THE COURT:  WELL, I MEAN, I SUPPOSE WE COULD FIND
11   OUT NOW WHETHER SHE INTENDS TO -- WHETHER SHE ASSERTS
12   HER 5TH AMENDMENT RIGHTS.
13             I MEAN, COUNSEL IS GOING TO RECOMMEND THAT
14   SHE DO SO, BUT SHE DOESN'T HAVE TO FOLLOW HIS ADVICE.
15   AND I DON'T KNOW THAT SHE IS GOING TO DO IT UNTIL SHE
16   TELLS ME SHE IS.
17             SO, YOU KNOW, DO YOU WANT TO CALL HER AND
18   SEE WHAT HAPPENS?
19        MR. BUEHLER:  I AM NOT CALLING HER.  I WILL STAND
20   ON THE FACT THAT I DON'T THINK I AM REQUIRED TO CALL
21   HER.
22             THE PEOPLE --
23        THE COURT:  WELL IF YOU ARE NOT GOING TO CALL
24   HER, THEN YOUR EVIDENCE IS OUT.
25        MR. BUEHLER:  AND SO TWO WEEKS FROM NOW IF SHE --
26   IF AFTER SHE HAS HAD MORE SEASONED -- HER COUNSEL
27   KNOWS MORE ABOUT THIS CASE AND HE SAYS THAT SHE -- HE
28   ADVISES HER TO TESTIFY, THE COURT WOULD SAY IT IS
```

```
 1   OUT?  I DON'T QUITE FOLLOW THAT.

 2           AND I WILL GO BACK TO THE FACT THAT THIS

 3   ISSUE GOES ON PROFFERS.  EVERY TIME EVIDENCE IS

 4   PROFFERED, THE COURT ISN'T MAKING SURE THAT YOU ARE

 5   GOING TO BE ABLE TO ADMIT IT, THAT SOMETHING ISN'T

 6   GOING TO COME UP; IT IS JUST A PROFFER.

 7           AND WE ARE PROFFERING MORE THAN MISS AYALA.

 8   WE ARE PROFFERING THE EVIDENCE IN GOVERNMENT'S

 9   DISCOVERY, THE PEOPLE'S DISCOVERY.

10      MS. OKUN-WIESE:  WHICH IS 1101B EVIDENCE.

11      THE COURT:  YOU HAVEN'T MET AN 1101B BURDEN.

12      MR. BUEHLER:  (READING:)  EVIDENCE

13          TENDING TO ESTABLISH PRIOR QUARRELS

14          BETWEEN DEFENDANT AND DECEDENT AND

15          THE MAKING OF THREATS BY THE FORMER

16          IS PROPERLY ADMITTED TO SHOW THE

17          MOTIVE AND STATE OF MIND OF THE

18          DEFENDANT IN A MURDER CASE.

19      THE COURT:  WE ARE NOT DEALING WITH A DEFENDANT

20   HERE; WE ARE DEALING WITH A WITNESS.

21      MR. BUEHLER:  IT IS THE SAME ISSUE THOUGH, YOUR

22   HONOR.  IT IS THE SAME ISSUE.

23      THE COURT:  UNDER 1101B THERE ARE CERTAIN

24   THINGS -- OR 1108 -- THAT ARE REQUIRED UNDER THE

25   EVIDENCE CODE WHICH YOU HAVE NOT COMPLIED WITH.

26      MR. BUEHLER:  SO THE COURT IS SAYING PROCEDURALLY

27   THE COURT WANTS A MOTION WRITTEN?

28      THE COURT:  PROCEDURALLY I WANT YOU TO COMPLY
```

1   PROBLEMS. AND I HAVE HAD A WITNESS -- WE HAD

2   TESTIMONY WE THOUGHT BACK A COUPLE MONTHS AGO, BUT

3   THAT WITNESS SUDDENLY WOULDN'T ANSWER OUR

4   INVESTIGATOR'S TELEPHONE CALLS. AND SHE DOESN'T KEEP

5   CALLING HER UP BECAUSE IN HER PROFESSION SHE IS NOT

6   SUPPOSED TO BE HARASSING PEOPLE.

7           YES, WE SERVED HER, BUT SHE DID NOT MAKE

8   HERSELF AVAILABLE FOR FURTHER INTERVIEW FOR US.

9           SO WHAT WERE WE SUPPOSED TO DO? AND THE --

10  I THINK THE PROBLEM HERE IS THAT THE COURT -- YES, WE

11  ARE ON THE EVE OF TRIAL, BUT I THINK UNDER THE LAW WE

12  ARE CLEARLY MEETING THE STANDARD FOR THE

13  ADMISSIBILITY OF THIRD PARTY CULPABILITY EVIDENCE.

14          WE HAVE WAY MORE EVIDENCE THAN ALL THE

15  CASES THAT THE PEOPLE CITE FOR, "YOU KNOW, OH,

16  SO-AND-SO WAS SEEN IN THE VICINITY, AND HE HAD MADE

17  SOME THREATS THREE YEARS AGO" OR SOMETHING LIKE THAT.

18          WE HAVE ONGOING FIGHTING, QUARRELLING

19  BETWEEN THESE TWO PEOPLE IN A RELATIONSHIP THAT'S

20  ALWAYS BEEN FULL OF THAT STUFF, INCLUDING VIOLENT

21  OUTBURSTS BY MR. GILMORE.

22      THE COURT: AND THAT'S NOT GOING TO COME IN IF

23  YOU DON'T HAVE THE CONNECTING EVIDENCE TO THE CRIME

24  ITSELF. AND THE CONNECTING EVIDENCE TO THE CRIME

25  ITSELF, FROM MY UNDERSTANDING OF ALL OF THIS STUFF,

26  IS MR. GILMORE'S STATEMENTS. AND IF YOU CANNOT ADMIT

27  MR. GILMORE'S STATEMENTS, THEN NONE OF THAT OTHER

28  STUFF IS GOING TO COME IN. NONE OF IT.

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1      MR. BUEHLER:  WELL, I -- I RESPECTFULLY DISAGREE.

2    I THINK THE COURT IS WRONG ON THAT.  BUT --

3      THE COURT:  THAT'S WHY THEY PAY ME THE BIG BUCKS.

4      MR. BUEHLER:  YES.

5          BUT I AM JUST -- I THINK THE LAW IS CLEAR

6    THAT IT DOES COME IN; THAT THE OTHER EVIDENCE WE

7    HAVE --

8      THE COURT:  WELL I AM TELLING YOU WHAT MY OPINION

9    OF THE LAW IS.  AND MY OPINION IS, IF YOU CAN'T GET

10   THE CONNECTING EVIDENCE IN, NONE OF THAT OTHER STUFF

11   IS COMING IN.

12     MR. BUEHLER:  OKAY.

13         YOUR HONOR, I WOULD LIKE TO FILE FOR THE

14   RECORD A DECLARATION OF MR. KASSABIAN WHICH ATTACHES

15   A NUMBER OF THE DISCOVERY REPORTS IN THIS CASE THAT

16   CONTAIN THE TYPE OF EVIDENCE I AM TALKING ABOUT.

17     THE COURT:  NO.

18     MR. BUEHLER:  I CAN'T FILE IT?

19     THE COURT:  NO.

20     MR. BUEHLER:  OH, OKAY.  THEN I HAVE OFFERED TO

21   FILE IT.

22     THE COURT:  FINE.

23     MR. BUEHLER:  AND IT WOULD SHOW THESE THINGS DO

24   SHOW THERE ARE PRIOR ACTS OF VIOLENCE BY MR. GILMORE

25   TOWARDS MISS REDDING; AS I SAID, THE ESCALATING ANGER

26   BETWEEN THEM LEADING UP TO THE NIGHT OF THE MURDER,

27   INCLUDING RIGHT BEFORE THE PEOPLE'S ALLEGED TIME OF

28   THE MURDER AND THE FACT THAT HE WAS -- EXHIBITED A

1    LOT OF JEALOUSY AND RAGE DURING THE COURSE OF THAT

2    RELATIONSHIP.  I THINK THAT'S HIGHLY RELEVANT.  IT IS

3    NOT PROPENSITY EVIDENCE AGAINST OTHER PEOPLE; IT IS

4    EVIDENCE RELATING TO THE DECEDENT IN THIS CASE.

5          SO I THINK THAT'S ALL ADMISSIBLE, AND IT IS

6    PART OF THE EVIDENCE SUPPORTING THE THIRD PARTY

7    CULPABILITY.  SO I AM JUST MAKING MY RECORD.

8        THE COURT:  OKAY.  I AM -- REITERATE NOW FOR THE

9    THIRD TIME THAT'S NOT ADMISSIBLE WITHOUT CONNECTING

10   EVIDENCE TO THE INCIDENT ITSELF.

11       MR. BUEHLER:  I DO UNDERSTAND.  THANK YOU.

12       THE COURT:  SO THERE IS NO INTENTION THAT YOU ARE

13   AT THIS TIME -- OR ANYBODY -- TO CALL MELISA AYALA?

14       MR. BUEHLER:  NO, I WOULD LIKE TO CALL HER THEN,

15   AND WE WILL SEE IF SHE IS WILLING TO TESTIFY.

16       THE COURT:  OKAY.

17          IS SHE OUT IN THE HALL?

18       MR. COPPOLA JR.:  I BELIEVE SO, YOUR HONOR.

19       THE COURT:  CAN YOU GET HER FOR ME PLEASE?

20       MR. COPPOLA JR.:  YES.

21       THE COURT:  THANK YOU.

22

23                 MELISA AYALA,

24         CALLED AS A WITNESS BY THE DEFENSE,

25         WAS SWORN AND TESTIFIED AS FOLLOWS:

26

27       MR. COPPOLA JR.:  WHERE DO YOU WANT HER, YOUR

28   HONOR?

1       THE COURT:  JUST COME OVER HERE TO GET SWORN.

2  FACE THE CLERK AND RAISE YOUR RIGHT HAND PLEASE.

3       THE COURT CLERK:  DO YOU SOLEMNLY SWEAR THE

4  TESTIMONY YOU ARE ABOUT TO GIVE IN THE CAUSE NOW

5  PENDING BEFORE THIS COURT TO BE THE TRUTH, THE WHOLE

6  TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

7       THE WITNESS:  YES.

8       THE COURT CLERK:  THANK YOU.  PLEASE BE SEATED

9  RIGHT UP THERE.

10      THE COURT:  AND YOU CAN COME UP WITH HER.

11      MR. COPPOLA JR.:  THANK YOU, YOUR HONOR.

12      THE COURT CLERK:  PLEASE STATE YOUR NAME, THEN

13  SPELL YOUR FIRST AND LAST NAME FOR THE RECORD.

14      THE WITNESS:  MELISA AYALA.  M-E-L-I-S-A.

15  A-Y-A-L-A.

16      THE COURT:  FOR THE RECORD, COUNSEL IS --

17      MR. COPPOLA JR.:  ROBERT COPPOLA, C-O-P-P-O-L-A,

18  JR.

19      THE COURT:  AND IS UP NEXT TO THE WITNESS.

20      MR. COPPOLA JR.:  THANK YOU, YOUR HONOR.

21      THE COURT:  MR. BUEHLER?

22

23                    DIRECT EXAMINATION

24  BY MR. BUEHLER:

25      Q    GOOD MORNING, MISS AYALA.

26      A    GOOD MORNING.

27      Q    DO YOU KNOW A MAN NAME JOHN GILMORE?

28      A    UPON ADVICE OF COUNSEL I REFUSE TO ANSWER

1  THE QUESTION AND WISH TO ASSERT MY RIGHTS UNDER THE

2  UNITED STATES CONSTITUTION, 5TH AMENDMENT, AND THE

3  CALIFORNIA CONSTITUTION, ARTICLE 1 SECTION 15.

4      Q    MISS AYALA, ON JANUARY 31ST OF THIS YEAR,

5  WERE YOU INTERVIEWED BY A PERSON NAMED LYNDA LARSEN?

6      A    UPON ADVICE OF COUNSEL I REFUSE TO ANSWER

7  THE QUESTION AND WISH TO ASSERT MY RIGHTS UNDER THE

8  UNITED STATES CONSTITUTION, 5TH AMENDMENT AND THE

9  CALIFORNIA CONSTITUTION, ARTICLE 1 SECTION 15.

10     Q    MISS AYALA, HAVE YOU EVER BEEN THE VICTIM

11  OF AN ASSAULT BY JOHN GILMORE?

12     A    UPON ADVICE OF COUNSEL I REFUSE TO ANSWER

13  THE QUESTIONS AND WISH TO ASSERT MY RIGHT -- MY

14  RIGHTS UNDER THE UNITED STATES CONSTITUTION, 5TH

15  AMENDMENT AND THE CALIFORNIA CONSTITUTION, ARTICLE 1

16  SECTION 15.

17     Q    MISS AYALA, HAS JOHN GILMORE, A PERSON

18  NAMED JOHN GILMORE, EVER MADE STATEMENTS TO YOU ABOUT

19  THE MURDER OF JULIANA REDDING?

20     A    UPON ADVICE OF COUNSEL I REFUSE TO ANSWER

21  THE QUESTION AND WISH TO ASSERT MY RIGHTS UNDER THE

22  UNITED STATES CONSTITUTION, 5TH AMENDMENT AND THE

23  CALIFORNIA CONSTITUTION, ARTICLE 1 SECTION 15.

24     MR. BUEHLER:  I THINK THAT'S ADEQUATE, YOUR

25  HONOR.

26     THE COURT:  MISS AYALA, I ASSUME THAT THAT WOULD

27  BE YOUR RESPONSE TO ALL FURTHER QUESTIONS OF COUNSEL

28  CONCERNING THIS CASE?

1          THE WITNESS:  YES.

2          THE COURT:  YES?

3          THE WITNESS:  UH-HUH.

4          THE COURT:  YES?

5          THE WITNESS:  YES.

6          THE COURT:  ALL RIGHT.

7               DID YOU WANT TO ASK HER ANY QUESTIONS?

8          MS. OKUN-WIESE:  NO.

9          THE COURT:  ALL RIGHT, YOU MAY STEP DOWN.  THANK

10    YOU.

11         MR. COPPOLA JR.:  THANK YOU, YOUR HONOR.

12         THE COURT:  THANK YOU.

13              ALL RIGHT.  SO ON THE PRESENT STATE OF THE

14    RECORD, UNLESS YOU HAVE SOME OTHER EVIDENCE THAT YOU

15    INTEND TO OFFER, I DO NOT SEE THE THIRD PARTY

16    CULPABILITY EVIDENCE AS TO JOHN GILMORE AS BEING

17    ADMISSIBLE UNDER THE STATE OF THE EVIDENCE.

18              NOW THERE WAS ANOTHER PERSON THAT YOU

19    MENTIONED IN YOUR RESPONSE TO THE PEOPLE'S MOTION ON

20    THIRD PARTY CULPABILITY.  CAN YOU REMIND ME OF WHO

21    THAT WITNESS IS?

22         MR. BUEHLER:  HIS NAME, YOUR HONOR, IS IVAN

23    IVANOV.  I-V-A-N.  I-V-A-N-O-V.

24         THE COURT:  AND IT SEEMED TO ME THAT THERE WAS

25    EVEN LESS EVIDENCE AS TO MR. IVANOV --

26         MR. BUEHLER:  THE EVIDENCE, YOUR HONOR, IS

27    SUMMARIZED AT PAGE FOUR OF OUR OPPOSITION TO THE

28    PEOPLE'S MOTION TO EXCLUDE EVIDENCE OF THIRD PARTY

1    CULPABILITY.

2        THE COURT:  I AM LOOKING THROUGH THE

3    SUPPLEMENTAL.  I CAN'T FIND IT.

4            YOU KNOW, LORI, I DON'T HAVE ALL THE

5    MOTIONS THAT I HAD UP HERE YESTERDAY.

6        THE COURT CLERK:  OKAY.  AND YOU ARE LOOKING FOR?

7        THE COURT:  I AM LOOKING FOR THE DEFENSE

8    OPPOSITION TO THE PEOPLE'S MOTION ON THIRD -- TO

9    EXCLUDE ALLEGED THIRD PARTY CULPABILITY.

10       THE COURT CLERK:  I DON'T SEE ONE.

11           DID YOU GUYS FILE ONE?

12       THE COURT:  YES, THERE WAS.  THERE DEFINITELY

13   WAS.

14       THE COURT CLERK:  ALL RIGHT.  LET'S SEE WHAT I

15   HAVE.

16           HERE IT IS.

17       MR. BUEHLER:  IT IS ON PAGE FOUR, YOUR HONOR.

18       THE COURT:  OKAY.

19           OKAY.  AND I HAVE REVIEWED WHAT YOU HAVE ON

20   PAGE FOUR AND FIVE, AND I DON'T SEE ANY CONNECTION TO

21   THE CRIME ITSELF IN YOUR SUMMARY OF MR. IVANOV'S

22   RATHER ODD AND SOUNDS LIKE A LITTLE CRAZY BEHAVIOR,

23   IF THAT'S REALLY WHAT HAPPENED.

24       MR. BUEHLER:  YES.  I WON'T ARGUE AT LENGTH, BUT

25   I THINK THE COMBINATION OF THE CIRCUMSTANCES -- THESE

26   EVENTS HAPPENING IN THE FLOWERS, SORT OF A FORM OF

27   STALKING, THESE ANONYMOUS GIFTS OF FLOWERS THAT,

28   AFTER MISS REDDING'S MURDER, THE POLICE WERE ABLE TO

1    DETERMINE HAD BEEN SENT BY MR. IVANOV --

2        THE COURT:  I AM SORRY, YOU ARE SPEAKING SO

3    QUIETLY I CAN'T HEAR YOU.

4        MR. BUEHLER:  I AM SORRY.

5            AFTER MISS REDDING'S MURDER, THE POLICE

6    WERE ABLE TO TRACE THE FLOWERS BACK TO MR. IVANOV,

7    WHEN HE SENT THE FLOWERS.  THEY WERE SENT

8    ANONYMOUSLY.  THAT'S IN TWO MONTHS PRIOR TO THE

9    MURDER.

10            AND THEN THERE IS NO ALIBI FOR MR. IVANOV.

11    AND HE DID -- WHEN THEY INTERVIEWED HIM WITHIN THE

12    WEEK OF THE MURDER HE HAD A LOT OF CUTS, BRUISES,

13    ABRASIONS ON HIS FACE --

14        THE COURT:  HE HAD A LOT OF WHAT?

15        MR. BUEHLER:  CUTS AND ABRASIONS ON HIS FACE,

16    HANDS AND SO FORTH.

17            SO I THINK THAT COMBINATION OF

18    CIRCUMSTANCES IS SUFFICIENT, UNDER THE STANDARDS SET

19    FORTH IN PEOPLE VERSUS HALL.

20        MS. OKUN-WIESE:  THERE HAS TO BE SOME NEXUS TO

21    THE ACTUAL CRIME.  AND MR. IVANOV, ACCORDING TO THE

22    RECITATION OF FACTS, IS A HANDYMAN.  AND HE SENT

23    MISS REDDING FLOWERS A MONTH BEFORE SHE WAS KILLED.

24    MAYBE HE HAD A CRUSH ON HER.  THAT DOESN'T LINK HIM

25    TO THE CRIME AT ALL.

26        THE COURT:  THERE IS INSUFFICIENT NEXUS, BASED ON

27    THE PROFFER CONTAINED ON PAGE FOUR AND FIVE, TO ADMIT

28    THIRD PARTY CULPABILITY EVIDENCE AS TO IVAN IVANOV.

```
1    SO THAT WILL NOT BE PERMITTED.
2        MR. BUEHLER:  YOUR HONOR, GOING BACK TO
3    MISS AYALA FOR THE MOMENT, COULD WE HAVE THE COURT
4    ORDER HER TO BE ON CALL?
5        THE COURT:  MAYBE SHE CAN BE ON CALL THROUGH HER
6    COUNSEL?
7        MR. COPPOLA JR.:  I WOULD APPRECIATE THAT, YOUR
8    HONOR.
9            IF I MAY, YOUR HONOR, COULD WE ALSO DO THAT
10   WITH RESPECT TO NICHOLAS SCHWARCZ, S-C-H-W-A-R-C-Z?
11   EACH OF THEM WAS SUBPOENAED FOR MONDAY.
12       MR. BUEHLER:  YES.
13       THE COURT:  AND MONDAY WE ARE GOING TO BE
14   SELECTING A JURY, SO IN ANY EVENT, WE WOULDN'T NEED
15   THEM ON MONDAY.
16           BUT IF THAT WORKS FOR YOU, HAVING THEM ON
17   CALL THROUGH COUNSEL, THAT PROBABLY IS THE MOST
18   SENSIBLE WAY TO PROCEED.
19       MR. BUEHLER:  VERY GOOD, YOUR HONOR.  YES.
20       MR. COPPOLA JR.:  I WOULD APPRECIATE THAT,
21   COUNSEL AND YOUR HONOR.
22           24 HOURS?  48 HOURS?  CAN YOU GIVE ME A
23   TIMEFRAME?
24       THE COURT:  48 HOURS.
25       MR. COPPOLA JR.:  THANK YOU VERY MUCH.
26       THE COURT:  CAN THEY BE EXCUSED FOR TODAY THEN?
27       MR. BUEHLER:  YES, YOUR HONOR.
28       MR. COPPOLA JR.:  THANK YOU VERY MUCH.
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1      THE COURT:  THANK YOU.

2             ALL RIGHT.  NOW I GUESS THE OUTSTANDING

3    MOTION THAT THE COURT HAS NOT MADE A RULING ON YET IS

4    THE MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT

5    MISCONDUCT.

6             DO YOU WISH TO BE HEARD?

7      MR. BUEHLER:  YES, YOUR HONOR.

8             I WON'T ARGUE FOR DISMISSAL SINCE I DON'T

9    THINK THE COURT WILL SERIOUSLY ENTERTAIN THAT, GIVEN

10   THE SERIOUSNESS OF THE CHARGES IN THIS CASE.

11            I WOULD LIKE TO REITERATE WHAT I SAID

12   BEFORE; THAT I THINK ON THE FACE OF THE TELEPHONE

13   CONVERSATION BETWEEN DETECTIVE THOMPSON AND

14   MISS AYALA, THAT THAT -- WHATEVER THE MOTIVES WERE,

15   WHATEVER THE INTENTIONS WERE, CLEARLY THAT WENT

16   BEYOND LEGITIMATE POLICE CONDUCT, LAW-ENFORCEMENT

17   CONDUCT WITH A WITNESS AND WAS WELL CALCULATED TO

18   CAUSE THAT WITNESS TO PULL BACK FROM COOPERATING WITH

19   THE DEFENSE IN TERMS OF PROVIDING HER -- THE

20   STATEMENTS THAT SHE HAD GIVEN TO MISS LARSEN AND TO

21   STOP TALKING.

22            SHE SAYS IN THE CONVERSATION, "WELL, I JUST

23   DON'T WANT TO BE INVOLVED."  SO SHE WENT FROM HAVING

24   SPOKEN TO MISS LARSEN AND INDICATING A WILLINGNESS TO

25   MAKE THOSE STATEMENTS TO WHERE SHE JUST DIDN'T WANT

26   TO BE INVOLVED ANYMORE.

27            AND I HONESTLY HAVEN'T SEEN IT, A SITUATION

28   IN MY CAREER, WHERE YOU HAVE GOT SUCH CLEAR EFFORTS

1    TO SHAPE -- TO INTERFERE WITH THE ATTITUDES OF A

2    WITNESS ON AN IMPORTANT CASE.  AND SO I THINK THAT'S

3    MISCONDUCT.  I THINK IT IS OUTRAGEOUS CONDUCT.

4          AND THE QUESTION OF A REMEDY IS RIGHT NOW

5    WE DON'T KNOW WHETHER OR NOT MISS AYALA WILL BE

6    AVAILABLE TO TESTIFY, IF SHE IS AVAILABLE TO TESTIFY.

7          AND WHEN SHE SPEAKS TO THE DETECTIVE SHE

8    DOESN'T RECANT ANYTHING SHE SAID.  OF COURSE THE

9    DETECTIVE DOESN'T REALLY ASK HER ANY QUESTIONS --

10          THE COURT:  WELL THE DETECTIVE DIDN'T KNOW WHAT

11    IT WAS THAT SHE SAID.  THERE IS NO EVIDENCE THAT SHE

12    KNEW WHAT IT WAS SHE TOLD MISS LARSEN.

13          MR. BUEHLER:  WELL, SHE COULD HAVE ASKED.

14          THE COURT:  BUT SHE DIDN'T.

15          MR. BUEHLER:  I KNOW.  YES.

16          BUT RIGHT NOW IF MISS AYALA BECOMES

17    AVAILABLE AS A WITNESS, THEN, YOU KNOW, UNDER CASE

18    LAW YOU HAVE TO HAVE BOTH BAD FAITH CONDUCT LEADING

19    TO THE DESTRUCTION OR LOSS OF EVIDENCE BY

20    LAW-ENFORCEMENT PLUS THE PREJUDICE BEFORE THERE IS A

21    QUESTION OF SOME SORT OF REMEDY OR SANCTION.

22          RIGHT NOW WE DON'T KNOW WHAT THE STATUS OF

23    MISS AYALA IS AS A PROSPECTIVE WITNESS.  SO -- ONE OF

24    THE SANCTIONS THAT -- IF MISS AYALA IS NOT AVAILABLE

25    AS A WITNESS, AND KEEPING IN MIND THAT UNDER THE CASE

26    LAW WE HAVE CITED, THAT IS PEOPLE VERSUS MARTIN, THE

27    MISCONDUCT DOESN'T HAVE TO BE THE SOLE CAUSE OF THE

28    LOSS OF EVIDENCE OR TESTIMONY; IT IS JUST A

```
1   SUBSTANTIAL CAUSE, THEN I THINK IT WOULD BE
2   APPROPRIATE, FOR EXAMPLE, TO PERMIT MISS LARSEN'S
3   TESTIMONY AS TO WHAT SHE WAS TOLD BY MISS AYALA TO
4   COME IN AND PEOPLE NOT BE PERMITTED TO ASSERT THE
5   HEARSAY OBJECTION.  THAT WOULD BE A WAY OF MITIGATING
6   THE DAMAGE FROM THE INTERFERENCE BY DETECTIVE
7   THOMPSON.
8          AND IF THAT HAPPENS, THAT MISS AYALA IS NOT
9   WILLING TO TESTIFY, THEN THAT WOULD BE ONE WAY OF
10  DEALING WITH THAT, THAT I WOULD PROPOSE TO THE COURT.
11         ANOTHER WAY WOULD BE THAT THE COURT PUT TO
12  THE PEOPLE THE OPTION OF GIVING MISS AYALA THE
13  IMMUNITY NECESSARY FOR HER TO BE ABLE TO TESTIFY IN
14  THIS CASE SO SHE CAN COME IN AND TESTIFY.  THAT WOULD
15  BE ANOTHER WAY OF REMEDYING THE PROBLEM.
16     THE COURT:  WELL I DON'T THINK I AM IN A POSITION
17  TO ORDER THE PEOPLE TO GRANT HER IMMUNITY.
18     MR. BUEHLER:  I THINK THAT AS A MEANS OF DEALING
19  WITH MISCONDUCT BY THE DETECTIVE, I THINK THE COURT
20  WOULD HAVE THE POWER TO DO THAT.  I DON'T SEE WHY THE
21  COURT WOULDN'T HAVE THE POWER TO DO THAT BECAUSE YOU
22  ARE SIMPLY PUTTING TO THE PEOPLE, "IF YOU WANT TO TRY
23  THIS CASE, YOU HAVE CREATED A PROBLEM, SO YOU WANT TO
24  KEEP THIS CASE; YOU HAVE GOT TO DO THIS TO HELP
25  MITIGATE THE PROBLEM."
26     THE COURT:  MISS WIESE?
27     MS. OKUN-WIESE:  THE PEOPLE DIDN'T CREATE THE
28  PROBLEM.  YESTERDAY DEFENSE COUNSEL STOOD UP HERE AND
```

1    SAID THAT IT WAS DETECTIVE THOMPSON WHO HAD THE CASE

2    FILED AGAINST MISS AYALA.  WE KNOW THAT THAT'S NOT

3    TRUE BECAUSE WE HAD THE INVESTIGATING OFFICER HERE

4    TODAY, AND WE ALSO HAD THE D.A. WHO KNOWS NEITHER

5    MYSELF NOR DETECTIVE THOMPSON NOR HAD ANY CONTACT

6    WITH SANTA MONICA.

7         THE COURT LISTENED TO THE TAPE RECORDING OF

8    MISS AYALA'S CONTACT WITH DETECTIVE THOMPSON.  THE

9    COURT IS AWARE THAT WHEN DETECTIVE THOMPSON

10   INTERVIEWED OR SPOKE WITH MISS AYALA, SHE WASN'T

11   AWARE OF WHAT WAS GOING ON.  SHE WASN'T AWARE OF WHAT

12   THE CONTEXT OF THE INTERVIEW BY THE DEFENSE

13   INVESTIGATORS AND MISS AYALA WAS.  SHE SIMPLY WAS

14   CONTACTING HER TO TRY TO WORK THINGS OUT BETWEEN HER

15   AND JOHN BECAUSE THE INVESTIGATOR TOLD HER HE WAS A

16   RAPIST AND A MURDERER.

17        AND WE KNOW FROM MISS LARSEN'S TESTIMONY

18   YESTERDAY SHE PROVIDED MISS AYALA WITH ALL OF THE

19   REPORTS WITH CONFIDENTIAL INFORMATION IN THEM.  AND

20   SHE ALSO TOLD MISS AYALA THE CONNECTION OR THE

21   SIMILARITIES BETWEEN HIS ALLEGED CHOKING HER AND

22   HIS -- AND THE MURDER OF JULIANA.  THERE IS THE

23   CONNECTION THERE.

24        SO IN ESSENCE, SHE DID CALL JOHN GILMORE A

25   MURDERER.  THAT WASN'T WHAT DETECTIVE THOMPSON DID.

26   DETECTIVE THOMPSON ACTED COMPLETELY APPROPRIATE

27   DURING HER CONVERSATION.  AND WE ACTUALLY HAVE A

28   RECORDING OF THAT.  AND THE COURT HAS HAD THE BENEFIT

1    OF THAT.

2           AND NEITHER THE PEOPLE, NOR DETECTIVE

3    THOMPSON, COMMITTED ANY MISCONDUCT IN THIS CASE.

4    THERE IS NO NEED FOR A REMEDY IN THIS CASE AND

5    ESPECIALLY TO ORDER THE PEOPLE TO OFFER IMMUNITY OR

6    TO NOT MAKE A CORRECT HEARSAY OBJECTION.

7           SUBMITTED.

8      THE COURT:  I AM NOT PARTICULARLY ENAMORED WITH

9    EITHER OF THE CONVERSATIONS THAT TOOK PLACE WITH

10   MISS AYALA.

11          I AM NOT -- MISS LARSEN'S CONTACT WITH

12   MISS AYALA I THINK HAS SOME ASPECTS OF IT THAT I AM A

13   BIT CRITICAL OF.

14          DETECTIVE THOMPSON'S CONTACT WITH

15   MISS AYALA, I THINK I AM A BIT CRITICAL OF SOME OF

16   THAT.  I DON'T KNOW WHY DETECTIVE THOMPSON IS TRYING

17   TO PROMOTE THE RELATIONSHIP BETWEEN GILMORE AND AYALA

18   IN SOME KIND OF WAY AND TO VOUCH FOR MR. GILMORE AS

19   BEING A GOOD GUY THAT HAD PROBLEMS WHEN HE WAS 21.

20          I DON'T KNOW.  THAT SEEMS A BIT OUT OF

21   BOUNDS.

22          BUT SOME OF THE STUFF THAT YOUR

23   INVESTIGATOR DID ALSO REALLY SEEMED OUT OF BOUNDS.

24          BOTH SIDES APPEAR TO BE TRYING TO SORT OF

25   COURT FAVOR OR WHATEVER WITH THIS WITNESS, AYALA.

26   BUT I DON'T THINK THAT EITHER OF THOSE INTERVIEWS,

27   FROM WHAT I HAVE HEARD OF THEM, AND THE TAPED

28   INTERVIEW OF THOMPSON AND AYALA RISE TO THE LEVEL OF

1  SOME KIND OF MISCONDUCT.

2          THE WAY THAT THE RECORD OF THE INTERVIEW

3  WITH DETECTIVE THOMPSON AND MISS AYALA IS IS THAT

4  DETECTIVE THOMPSON DID NOT KNOW THE DETAILS OF WHAT

5  MISS AYALA HAD SAID TO MISS LARSEN AND DIDN'T

6  APPARENTLY TRY TO FIND OUT THOSE DETAILS.

7          IT SOUNDS LIKE THAT MISS AYALA, MR. GILMORE

8  AND MR. SCHWARCZ -- AND I DON'T KNOW, MAYBE THERE ARE

9  A BUNCH OF OTHER PEOPLE INVOLVED TOO -- THEY LIVE IN

10  A WORLD THAT'S DIFFERENT FROM THE WORLD THAT MOST OF

11  THE REST OF THE PEOPLE LIVE IN.  AND THEY HAVE THESE

12  RELATIONSHIPS THAT ARE VERY VOLATILE AND VIOLENT AND,

13  YOU KNOW, THEY SWITCH BOYFRIENDS LIKE I CHANGE

14  CLOTHES.  AND IT IS, YOU KNOW, KIND OF INTERESTING

15  FROM THE SOAP OPERA ASPECT, BUT THE REALITY OF THE

16  SITUATION IS THAT MISS AYALA PROBABLY, IF YOU ASK HER

17  ON WEDNESDAY HOW SHE FEELS ABOUT MR. GILMORE, SHE

18  DOESN'T LIKE HIM AND HE IS HORRIBLE; AND IF YOU ASK

19  HER ON THURSDAY, HE IS THE LOVE OF HER LIFE AND SHE

20  IS READY TO GET MARRIED TO HIM.

21          I DON'T THINK NECESSARILY THAT

22  DETECTIVE THOMPSON IS RESPONSIBLE FOR THAT AT ALL.

23  AND I -- HER EXPRESSION THROUGHOUT THAT PHONE CALL OF

24  NOT WANTING TO GET INVOLVED, SHE SAID THAT OVER AND

25  OVER AGAIN.  AND AT THE CONCLUSION OR NEAR THE END OF

26  THAT PHONE CALL DETECTIVE THOMPSON SAYS, "IF YOU

27  RECEIVE A SUBPOENA, YOU WILL HAVE TO TESTIFY AND YOU

28  ARE GOING TO HAVE TO TELL THE TRUTH."  AND IT IS LEFT

1   THERE.  AND WHETHER A WITNESS WANTS TO TALK TO

2   LAW-ENFORCEMENT OR WHETHER A WITNESS WANTS TO TALK TO

3   A DEFENSE INVESTIGATOR, IT IS UP TO THAT WITNESS TO

4   MAKE THAT DECISION FOR THEMSELVES.

5          SHE IS UNDER SUBPOENA NOW.  SHE HAS A CASE

6   PENDING AGAINST HER.  SHE HAS COUNSEL TO ADVISE HER

7   ON THAT.  AND AT THE MOMENT SHE HAS INDICATED THAT

8   SHE WISHED TO ASSERT HER 5TH AMENDMENT RIGHTS.

9          THE COURT DOESN'T SEE THAT THERE IS ANY

10   REMEDY NECESSARY BECAUSE I DON'T FIND THAT THERE WAS

11   MISCONDUCT ON THE PART OF DETECTIVE THOMPSON THAT

12   WOULD JUSTIFY THIS COURT EITHER ORDERING A GRANT OF

13   IMMUNITY OR ORDERING THAT HEARSAY EVIDENCE COME IN AT

14   THIS TRIAL.

15          SO YOUR REQUEST IS DENIED AT THIS TIME.

16          HAVE WE HANDLED NOW ALL OF THE MOTIONS THAT

17   WERE PENDING?

18      MS. OKUN-WIESE:  YES.

19      THE COURT:  I BELIEVE WE HAVE.

20      MR. BUEHLER:  I BELIEVE WE HAVE, YOUR HONOR.

21   I -- THE -- WE WILL FILE, MONDAY MORNING, THE MOTION

22   UNDER 1101B SETTING FORTH THE CASE LAW TO SUPPORT

23   THAT.

24      THE COURT:  OKAY.

25      MR. BUEHLER:  AND I THINK WE ARE SET ON THE

26   MOTIONS.

27      THE COURT:  ALL RIGHT.

28          JURORS ARE COMING IN AT 10:00 A.M.  THEY

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
 1    ARE PRE-SCREENED.

 2              YES, DID YOU WANT TO SAY SOMETHING ELSE?

 3         MR. BUEHLER:  I JUST NEED TO CONFER.

 4              YOUR HONOR, JUST TO REMIND THE COURT, WE DO

 5    HAVE GREG STUTCHMAN, THE FORENSIC EXPERT, COMING IN

 6    AT -- HE IS FLYING IN.

 7         THE COURT:  RIGHT.  AT 1:30.  THAT'S RIGHT.

 8         MR. BUEHLER:  SO WE SHOULD DO THAT SINCE HE WILL

 9    BE HERE.

10         THE COURT:  YES, WE WILL.  I AM GLAD YOU REMINDED

11    ME BECAUSE I HAD FORGOTTEN THAT FOR NOW.

12              OKAY, 1:30 THEN.

13         MR. BUEHLER:  THANK YOU.

14

15              (WHEREUPON, A LUNCH RECESS WAS

16              TAKEN UNTIL 1:30 P.M. OF THE

17              SAME DAY.)

18

19

20

21

22

23

24

25

26

27

28
```

```
1    CASE NUMBER:            BA361202
2    CASE NAME:              PEOPLE VERSUS KELLY SOO PARK
3    LOS ANGELES, CA         FRIDAY, MAY 10, 2013
4    DEPARTMENT 109          HON. KATHLEEN KENNEDY, JUDGE
5    REPORTER:               LAURIE A. SMALL, CSR NO. 4654
6    TIME:                   1:50 P.M.
7
8    APPEARANCES:
9      DEFENDANT KELLY SOO PARK, PRESENT WITH COUNSEL,
10   GEORGE W. BUEHLER AND MARK M. KASSABIAN, ATTORNEYS AT
11   LAW;
12     STACY OKUN-WIESE, DEPUTY DISTRICT ATTORNEY,
13   REPRESENTING THE PEOPLE OF THE STATE OF CALIFORNIA.
14
15       THE COURT:  ALL RIGHT, WE ARE ONCE AGAIN ON THE
16   RECORD IN THE MATTER OF PEOPLE VERSUS PARK.
17           THE DEFENDANT IS PRESENT WITH COUNSEL; THE
18   PEOPLE ARE REPRESENTED.
19     MR. BUEHLER:  YES, YOUR HONOR.  WE WILL CALL
20   GREGG STUTCHMAN.
21
22               GREGG STUTCHMAN,
23         CALLED AS A WITNESS BY THE DEFENSE,
24         WAS SWORN AND TESTIFIED AS FOLLOWS:
25
26       THE COURT CLERK:  YOU DO SOLEMNLY SWEAR THE
27   TESTIMONY YOU ARE ABOUT TO GIVE IN THE CAUSE NOW
28   PENDING BEFORE THIS COURT TO BE THE TRUTH, THE WHOLE
```

```
1   TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?
2        THE WITNESS:  I DO.
3        THE COURT CLERK:  THANK YOU.  PLEASE BE SEATED.
4            PLEASE STATE YOUR NAME; THEN SPELL YOUR
5   FIRST AND LAST NAME FOR THE RECORD.
6        THE WITNESS:  MY NAME IS GREGG, G-R-E-G-G.
7   STUTCHMAN, S-T-U-T-C-H-M-A-N.
8
9                  DIRECT EXAMINATION
10  BY MR. BUEHLER:
11       Q    MR. STUTCHMAN, WHERE DO YOU WORK?
12       A    I WORK AT STUTCHMAN FORENSIC LAB IN NAPA,
13  CALIFORNIA.
14       Q    AND WHAT IS YOUR PROFESSION?
15       A    I AM THE CHIEF FORENSIC ANALYST OF THAT
16  LAB.
17       Q    AND AS A FORENSIC ANALYST, WHAT DOES YOUR
18  WORK INVOLVE?
19       A    MY AREA INVOLVES THE SCIENTIFIC -- MY AREA
20  OF EXPERTISE IS AUDIO VIDEO AND IMAGING FORENSICS.
21  IN THAT CAPACITY MY WORK INVOLVES THE SCIENTIFIC
22  EXAMINATION, EVALUATION, COMPARISON, CLARIFICATION
23  AND ANALYSIS OF RECORDED EVIDENCE INCLUDING AUDIO
24  RECORDING.
25       Q    AND WHAT DOES FORENSICS MEAN?
26       A    FORENSICS MEANS WHERE LAW MEETS SCIENCE.
27       Q    HOW MANY YEARS HAVE YOU -- WELL, DO YOU
28  WORK IN THE CRIMINAL JUSTICE SYSTEM?
```

```
 1        A    I CURRENTLY DO.
 2        Q    AND FOR HOW MANY YEARS HAVE YOU BEEN
 3   WORKING IN THE CRIMINAL JUSTICE SYSTEM?
 4        A    FORTY YEARS.
 5        Q    CAN YOU TELL US ABOUT YOUR BACKGROUND AND
 6   EXPERIENCE.
 7        A    YES.  MY FIRST TEN YEARS WERE SPENT AS A
 8   POLICE OFFICER FROM 1973 TO '83.  I TRANSITIONED INTO
 9   THE PRIVATE SECTOR AND AS A STATE-LICENSED
10   INVESTIGATOR IN 1983 AND DID LEGAL INVESTIGATIONS FOR
11   A NUMBER OF YEARS.
12             I ORIGINALLY STARTED THE LAB AS PART OF THE
13   INVESTIGATION AGENCY IN 1992, AND THEN LATER PHASED
14   OUT THE INVESTIGATION SIDE TO PUT MY RESOURCES INTO
15   BUILDING THE LAB.  SO I HAVE RUN IT CONTINUOUSLY
16   SINCE 1992.
17        THE COURT:  SO YOU ARE SAYING YOU OPENED YOUR LAB
18   IN 1992?
19        THE WITNESS:  YES.  CORRECT.
20   BY MR. BUEHLER:
21        Q    WHAT SPECIALIZED TRAINING AND EXPERIENCE DO
22   YOU HAVE IN AUDIO FORENSICS?
23        A    MY SPECIALIZED TRAINING IN AUDIO FORENSICS
24   INCLUDES THE NEW YORK INSTITUTE OF FORENSIC AUDIO.
25   THIS IS A UNIVERSITY-ACCREDITED FACILITY.
26        THE COURT:  ACCREDITED BY WHAT UNIVERSITY?
27        THE WITNESS:  BY WESTERN KENTUCKY UNIVERSITY.  IT
28   WAS ACTUALLY IN KENTUCKY WHEN IT FIRST WAS STARTED.
```

```
1              THEY HAVE 30 TO 50 HOUR CLASSES YEARLY, AND
2    SOMETIMES TWICE A YEAR.  THE CLASSES INVOLVE BOTH
3    LECTURES, LAB PROJECTS AND ASSIGNMENTS AND WRITTEN
4    TESTS.  AND I BELIEVE THAT I HAVE COMPLETED EIGHT OF
5    THOSE, THE LAST ONE BEING MARCH OF THIS YEAR.
6         THE COURT:  YOU HAVE COMPLETED EIGHT OF THESE 30
7    TO 50 HOUR CLASSES?
8         THE WITNESS:  THAT IS CORRECT.
9              I ALSO -- MY TRAINING ALSO INCLUDES THE
10   AUDIO ENGINEERING SOCIETY WHICH IS AN INTERNATIONAL
11   ORGANIZATION OF AUDIO EXPERTS IN ALL ENDEAVORS.
12             THE DIGITAL SUMMIT INTERNATIONAL.  THIS IS
13   A TRAINING THAT WAS STARTED THREE YEARS AGO IN
14   CONJUNCTION WITH THE LAS VEGAS METROPOLITAN POLICE
15   DEPARTMENT, AND IT IS ATTENDED BY BOTH PRIVATE SECTOR
16   AND LAW-ENFORCEMENT AND INCLUDES ALL ASPECTS OF
17   ANALYSIS AND ENHANCEMENT OF DIGITAL EVIDENCE.
18             IT ALSO INCLUDES THE -- MY TRAINING ALSO
19   INCLUDES THE AMERICAN COLLEGE OF FORENSIC EXAMINERS
20   WHICH IS AN ORGANIZATION OF ABOUT 18,000 MEMBERS OF
21   ALL ASPECTS.  WITHIN THAT IS THE AMERICAN BOARD OF
22   RECORDED EVIDENCE THAT PUTS ON TRAININGS AT THE
23   YEARLY CONFERENCE.  AND I HAVE BOTH PRESENTED AND
24   RECEIVED TRAINING IN THAT ARENA.
25             IT ALSO INCLUDES THE CENTER FOR SPEECH
26   TECHNOLOGY, A COMPANY FOUNDED IN ST. PETERSBURG,
27   RUSSIA.  FORMER KGB AGENTS THAT HAD A LOT OF
28   TECHNICAL KNOWLEDGE, AND AFTER THE CHANGE IN THE
```

1    POLITICAL STRUCTURE IN RUSSIA, STARTED A SPEECH

2    TECHNOLOGY COMPANY.  AND THEY PUT ON CLASSES HERE AND

3    IN VARIOUS PLACES.  I COMPLETED A THREE WEEK-LONG

4    TRAINING PRESENTED BY THEM.

5         ALSO ADOBE SYSTEMS WHICH MAKES AUDIO --

6    WELL EVERYBODY KNOWS WHAT ADOBE IS, BUT ONE OF THE

7    PRODUCTS THEY MAKE IS ADOBE AUDITION WHICH WE USE

8    LARGELY IN AUDIO FORENSIC WORK.

9         OUR TECHNOLOGY WHICH IS JIM REAMES -- HE

10   WAS THE -- HE IS A RETIRED SPECIAL AGENT IN CHARGE OF

11   AUDIO FORENSICS FOR THE F.B.I. AFTER 32 YEARS.  HE

12   NOW DOES -- DOES ANALYSIS AND TRAINING.  AND I HAVE

13   RECEIVED TRAINING FROM HIM BOTH IN CLASSES AND IN MY

14   LAB WHERE HE HAS COME.

15        TRACER TECHNOLOGIES IS ANOTHER COMPANY THAT

16   PROVIDES TRAINING INCLUDING TO THE F.B.I.  I

17   ATTENDED, I BELIEVE, FOUR OF THEIR TRAINING SESSIONS.

18        ENHANCED AUDIO, AUDIO FORENSIC ENGINEERING

19   COMPANY, STARTED AND RUN BY ACTUALLY AUDIO ENGINEERS

20   WITH REGARDS TO FORENSICS, THE EMPHASIS, AND I HAVE

21   RECEIVED TRAINING FROM THEM.

22        ALSO A COMPANY CALLED KAY ELEMETRICS THAT

23   MAKES SOFTWARE USED FOR -- SOUND SPECTROGRAPH

24   SOFTWARE USED FOR VOICE IDENTIFICATION.

25        AND THE NATIONAL ASSOCIATION OF

26   BROADCASTERS, PACIFIC UNION COLLEGE, DIGITAL MEDIA

27   CENTER.

28        Q    IS AUDIO FORENSICS BASED IN SCIENCE?

```
1        A     IT IS.  IT IS BASED IN SCIENCE.  THE LAWS
2   OF PHYSICS AND SOUND ARE WHAT IT OPERATES IN.
3        Q     HAS YOUR AUDIO FORENSIC TRAINING INCLUDED
4   AUDIO ENHANCEMENT?
5        A     IT HAS.  EXTENSIVELY.
6        Q     WHAT IS AUDIO ENHANCEMENT?
7        A     AUDIO ENHANCEMENT IS THE DIGITAL FILTERING
8   OF FORENSIC RECORDINGS TO IMPROVE THE INTELLIGIBILITY
9   OF SPEECH AND ATTENUATE THE NOISE THAT MASKS SPEECH,
10  THE FREQUENCIES OUTSIDE THE SPEECH RANGE.
11       Q     AND HOW IS AUDIO ENHANCEMENT PERFORMED?
12       A     AUDIO ENHANCEMENT IS PERFORMED WITH DIGITAL
13  SOFTWARE LIKE ADOBE AUDITION WHICH I HAVE UP HERE.
14             THE FIRST -- THE FIRST ASPECT, THE FIRST
15  STEP IN AUDIO ENHANCEMENT IS TO CONDUCT CRITICAL
16  LISTENING AS WELL AS SOME OTHER INSTRUMENTAL ANALYSIS
17  OF THE RECORDING TO DETERMINE WHAT THE PROBLEMS ARE
18  AND THEN MAKE A PLAN OF ATTACK AND THEN BUILD THE
19  SCHEME OF FILTERS TO RUN ON THE RECORDING TO IMPROVE
20  THE INTELLIGIBILITY BY TAKING CARE OF THE PROBLEMS
21  THAT ARE CAUSING IT.
22       Q     AND DOES YOUR EXPERTISE ALSO INCLUDE
23  FORENSIC TRANSCRIPTION?
24       A     YES.
25       Q     AND WHAT IS FORENSIC TRANSCRIPTION?
26       A     FORENSIC TRANSCRIPTION IS WHEN AN EXPERT
27  PREPARES A TRANSCRIPT, NOT JUST LIKE A TRANSCRIBER
28  SITS DOWN, LISTENS TO IT AND TYPES UP WHAT SHE HEARS;
```

1    THE PROCESS IS DONE PLAYING THE FILE, THE RECORDING

2    ACTUALLY FROM THE SOUND FILE USING SOFTWARE LIKE

3    ADOBE AUDITION, OR THERE ARE OTHERS TOO.

4            IT IS DONE AFTER ENHANCEMENT SO YOU GET

5    THE -- REACH AS MUCH INTELLIGIBILITY AS YOU CAN.  AND

6    THEN YOU GO THROUGH PHRASE BY PHRASE, EVEN WORD BY

7    WORD AND LISTEN TO THE CON -- CONDUCT CRITICAL

8    LISTENING ON THE FILE USING FILTERS WITHIN THE

9    SOFTWARE.  AND THAT INCLUDES EQUALIZERS; IT INCLUDES

10   SLOWING OR STRETCHING.

11           THERE ARE -- THERE ARE FILTERS THAT ALLOW

12   THE SENTENCE OF THE PHRASE TO BE STRETCHED OUT OVER A

13   LONGER PERIOD OF TIME SO THAT YOU CAN HEAR THE

14   COMPONENTS OF THE WORD, THE VOWELS, THE CONSONANTS

15   THAT MAKE UP THE WORDS BETTER, AND WITH CRITICAL

16   LISTENING AND THE SOFTWARE, NUMEROUS TIMES OF

17   REVIEWING THE WORDS, THE PHRASES, TO IDENTIFY WHAT

18   THEY ARE.

19       Q    YOU HAVE USED THE TERM "CRITICAL

20   LISTENING."

21       A    YES.

22       Q    COULD YOU EXPLAIN THAT A LITTLE BIT MORE TO

23   THE COURT.

24       A    YES.

25           CRITICAL LISTENING IS A REPEATED AURAL

26   REVIEW.  SOMETIMES AS MANY AS DOZENS OF TIMES --

27       Q    WHEN YOU SAY "AURAL," ARE YOU USE -- ARE

28   YOU SAYING A-U-R-A-L?  WITH YOUR EARS, AND --

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)
261

```
 1        A     YES, THAT'S CORRECT.  I AM.

 2              -- REPEATED AURAL REVIEW OR AURAL

 3    LISTENING, SCRUTINIZING THE WORDS PRESENT AND

 4    LISTENING TO THE COMPONENTS OF THE WORD MANY TIMES,

 5    AND USING DIFFERENT FILTERS AND DIFFERENT SPEEDS

 6    UNTIL YOU ARE COMFORTABLE THAT YOU HAVE ACCURATELY

 7    DETERMINED WHAT THAT WORD IS.

 8              SOME TAKE MORE -- MORE LISTENING, MORE

 9    CRITICAL LISTENING, MORE FILTERING THAN OTHERS.

10        Q     AND IS CRITICAL LISTENING USED IN EVERYDAY

11    LIFE?

12        A     CRITICAL LISTENING IS USED IN EVERYDAY

13    LIFE.

14              AN EXAMPLE OF THAT WOULD BE TWO PEOPLE

15    HAVING A CONVERSATION IN A RESTAURANT OR ROOM, AND

16    THEY FOCUS ON THE SPEECH, THE WORDS THAT THE PERSON

17    IS -- THAT THEY ARE TALKING TO IS SAYING AND MENTALLY

18    TUNE OUT THE EXTRANEOUS NOISE THAT IS ALL AROUND THAT

19    WOULD BE IMPAIRING THEM FROM BEING ABLE TO HEAR THE

20    PERSON THEY ARE TALKING TO.

21        Q     SO WE MIGHT CALL THAT "LAY CRITICAL

22    LISTENING"?

23        A     RIGHT.  FOCUSED LISTENING.

24        Q     SOMETHING WE ALL DO DAILY IN TERMS OF

25    TRYING TO FOCUS IN ON A PARTICULAR SOUND OR SOURCE OF

26    SOUND?

27        A     YES, CORRECT.

28        Q     BUT WHEN YOU USE THE TERM "CRITICAL
```

```
1    LISTENING," IN YOUR FORENSIC WORK ARE YOU TALKING
2    ABOUT AN ENHANCED ABILITY TO CRITICALLY LISTEN?
3         A    YES.
4         Q    HOW DO YOU ACQUIRE THAT ENHANCED ABILITY?
5         A    THROUGH TRAINING -- TRAINING AND
6    EXPERIENCE.
7              WITH AUDIO FORENSIC TRAINING THE KEY IS
8    TO -- OF ENHANCEMENT IS TO BRING THE PROBLEMS DOWN
9    AND THE GOOD SPEECH UP SO YOU CAN MAKE OUT WHAT'S
10   BEING SAID.
11             A LOT OF FORENSIC RECORDINGS ARE NOT
12   DAZZLING IN THEIR AUDIO INTELLIGIBILITY, AND SO IT
13   TAKES SOME WORK TO DO THAT.
14             IT IS ALMOST LIKE DOING AN AUTOPSY OF THE
15   WORDS THAT ARE SPOKEN ON THE PARTICULAR PHRASE IN
16   QUESTION; TO BREAK THEM DOWN; TO LISTEN TO THE
17   COMPONENTS; TO LISTEN TO THE VOWELS, THE CONSONANTS,
18   TO LISTEN TO THE WORDS; HOW THEY BEGIN, HOW THEY END,
19   AND IDENTIFY WHAT THOSE ARE IN THAT METHOD.
20             IT IS ALSO -- CRITICAL LISTENING IS ALSO
21   USED IN VOICE IDENTIFICATION WHERE YOU ARE ANALYZING
22   SPECIFIC WORDS.
23             A LOT OF FORENSIC VOICE IDENTIFICATION HAS
24   TO DO WITH BOMB THREATS OR BODY WIRE BUYS OR
25   SOMETHING LIKE THAT, THAT YOU ARE NOW COMPARING THE
26   KNOWN WITH THE UNKNOWN.  AND TO DO THAT WE ANALYZE
27   THE WORDS, HOW THEY ARE SPOKEN, AND COMPARE THEM, ONE
28   WITH THE OTHER.
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1          BUT IN THE COURSE OF THAT, WE -- AS I SAY,

2    IT IS ALMOST LIKE A PATHOLOGIST WITH A BODY IN

3    ANALYZING THE WORDS, EVERYTHING ABOUT THE WORDS,

4    STUDYING THEM TO DETERMINE WHAT THEY ARE AND THEN

5    COMPARING THEM WITH OTHER WORDS.

6          Q    IS WHAT YOU HAVE DESCRIBED AS CRITICAL

7    LISTENING, IS THAT SOMETHING YOU TAKE CLASSES IN?

8          A    YES.  IT IS A WELL ESTABLISHED AND MUCH

9    USED METHOD IN AUDIO FORENSICS AND HAS BEEN FOR MANY,

10   MANY YEARS.  AND IT IS TAUGHT ON ALL FRONTS IN AUDIO

11   FORENSIC TRAINING.

12         IT IS USED FOR NOT ONLY FORENSIC

13   TRANSCRIPTS, FORENSIC ENHANCEMENTS, ALSO FORENSIC

14   AUTHENTICITY ANALYSIS AND VOICE IDENTIFICATION AND

15   SOUND IDENTIFICATION.

16         Q    SO HOW IS CRITICAL LISTENING USED IN THE

17   AUDIO ANALYSIS FOR FORENSIC TRANSCRIPTION?

18         A    IT IS USED TO -- AS I SAID, TO DISSECT THE

19   WORDS, SO-TO-SPEAK.  TO UNDERSTAND THE COMPONENTS OF

20   THE WORDS, TO LISTEN TO THEM PHRASE BY PHRASE AND

21   EVEN WORD BY WORD AND SCRUTINIZE THEM FOR THE

22   COMPONENTS OF THE WORDS.

23         Q    SO LET ME BACK UP AGAIN.

24         SO WHEN WE SPEAK OF FORENSIC TRANSCRIPTION,

25   DO I UNDERSTAND THAT CORRECTLY TO MEAN THAT YOU START

26   WITH A RECORDING OF SOME SORT?

27         A    CORRECT.

28         Q    AND YOU END WITH A TRANSCRIPT?

1      A    THAT IS CORRECT.

2      Q    AND THE TRANSCRIPT REPRESENTS YOUR

3   PROFESSIONAL OPINION OF WHAT'S BEING SAID IN THE

4   RECORDING?

5      A    ALSO CORRECT.

6      Q    OKAY.

7           AND SO JUST TO MAKE SURE WE UNDERSTAND, SO

8   IN THE PROCESS OF GETTING TO THE FORENSIC

9   TRANSCRIPTION, YOU ARE DOING A PROCESS OF

10  ENHANCEMENT?

11     A    CORRECT.

12     Q    WHICH INVOLVES THE USE OF SOFTWARE AND

13  OTHER TECHNICAL MEANS, CORRECT?

14     A    CORRECT.

15     Q    AND THEN YOU ARE ALSO -- ONCE YOU HAVE

16  ENHANCED THE RECORDING AS BEST YOU CAN, YOU THEN USE

17  A PROCESS OF CRITICAL LISTENING.  AND THROUGH THAT

18  YOU PRODUCE THE TRANSCRIPT?

19     A    THAT IS CORRECT.

20     Q    NOW DOES CRITICAL LISTENING REPRESENT A

21  SKILL THAT -- OR AN EXPERTISE THAT ORDINARY PEOPLE

22  DON'T HAVE AS YOU ARE USING THE TERM HERE?

23     A    TO ANOTHER LEVEL.  PEOPLE USE CRITICAL

24  LISTENING ON A DAILY BASIS AS I HAVE DESCRIBED.  BUT

25  THEY ARE NOT DEALING WITH FORENSIC RECORDINGS.

26          A FORENSIC AUDIO ANALYST RECEIVES TRAINING

27  WITH REGARDS TO ANALYSIS AND ENHANCEMENT AND DRAWING

28  OUT WHAT'S THERE.  AND THEN THE -- IN ADDITION TO

1    THAT, UTILIZING THE TRAINING AND THE EXPERIENCE OF
2    DOING THAT DAY IN AND DAY OUT ON THOUSANDS OF
3    RECORDINGS HONES THOSE SKILLS OF CRITICAL LISTENING
4    AS WELL AS AUDIO ENHANCEMENT.
5        Q    ARE YOU THE ONLY FORENSIC AUDIO ANALYST WHO
6    CONDUCTS FORENSIC TRANSCRIPTIONS IN THE MANNER YOU
7    HAVE DESCRIBED?
8        A    NO.  IT IS DONE BY MANY EXPERTS.
9        Q    IT IS A RECOGNIZED FIELD OF EXPERTISE?
10       A    IT IS.
11       Q    HAVE YOU EVER PRESENTED LECTURES ON
12   FORENSIC AUDIO MATTERS?
13       A    I HAVE.  I PRESENTED LECTURES, I BELIEVE,
14   ON 26 OCCASIONS.  NEW YORK, DENVER, SEVERAL PLACES IN
15   CALIFORNIA, NEVADA.  FOUR OF THOSE LECTURES HAVE BEEN
16   AT EITHER NATIONAL OR INTERNATIONAL CONFERENCES,
17   FORENSIC CONFERENCES.
18       Q    HAVE YOU EVER PREPARED PAPERS ON THE
19   SUBJECT OF FORENSIC AUDIO ANALYSIS?
20       A    I HAVE ON I BELIEVE SIX OCCASIONS.
21       Q    HAVE THEY BEEN PUBLISHED?
22       A    YES.
23       Q    ARE THEY LISTED IN YOUR CV?
24       A    YES.
25       Q    OVER THE PAST TWENTY YEARS HOW MANY
26   RECORDINGS WOULD YOU ESTIMATE YOU HAVE CONDUCTED SOME
27   TYPE OF ANALYSIS ON?
28       A    I WOULD ESTIMATE 4-TO 5,000.

1      Q     HAVE YOU TESTIFIED AS A FORENSIC EXPERT

2   WITNESS IN -- CONCERNING THESE MATTERS?

3      A     YES, I HAVE TESTIFIED ABOUT 180 TIMES.

4   THAT WOULD BE NATIONWIDE.  I HAVE ALSO TESTIFIED IN

5   CANADA.

6           MY TESTIMONY INCLUDES FEDERAL COURT AND

7   STATE COURT IN A VARIETY OF STATES.

8      Q     WHEN YOU SAY TESTIFIED 180 OCCASIONS, DO

9   YOU MEAN IN A COURT AT SOME LEVEL?

10     A     CORRECT.  OR DEPOSITION.  MY DEPOSITIONS

11  ARE FEW; MY COURT TESTIMONY IS THE LION'S SHARE OF MY

12  TESTIMONY.

13     Q     OKAY.

14          AND AS AN AUDIO FORENSIC EXPERT, HAVE YOU

15  PROVIDED TESTIMONY AS TO WHAT SPECIFIC WORDS ARE

16  WITHIN FORENSIC RECORDINGS?

17     A     YES, I HAVE.

18     Q     DO YOU BELONG TO ANY PROFESSIONAL

19  ASSOCIATIONS?

20     A     YES, I DO.

21          I BELONG TO THE AMERICAN COLLEGE OF

22  FORENSIC EXAMINERS, THE AMERICAN BOARD OF RECORDED

23  EVIDENCE IS ONE OF THE BOARDS OF SPECIALTY WITHIN

24  THAT ORGANIZATION.

25          AND FOR THE LAST THREE YEARS I HAVE BEEN

26  THE CHAIRMAN OF THE AMERICAN BOARD OF RECORDED

27  EVIDENCE.

28          I BELONG TO THE AUDIO ENGINEERING SOCIETY

```
1    INTERNATIONAL, THE EVIDENCE PHOTOGRAPHER'S
2    INTERNATIONAL COUNCIL, THE NATIONAL ASSOCIATION OF
3    PHOTOSHOP PROFESSIONALS, THE AMERICAN SOCIETY FOR
4    PHOTOGRAMMETRY, THE NORTH CALIFORNIA FRAUD
5    INVESTIGATORS ASSOCIATION AND THE CALIFORNIA
6    ASSOCIATION OF LICENSED INVESTIGATORS.
7         Q    OKAY.
8              NOW WHAT TYPES OF CLIENTS DO YOU TYPICALLY
9    PROVIDE FORENSIC SERVICES FOR?
10        A    YOUR TYPICAL CLIENTS ARE PRIVATE ATTORNEYS,
11   PUBLIC DEFENDERS, DISTRICT ATTORNEYS'S OFFICES,
12   LAW-ENFORCEMENT AGENCIES AND INSURANCE FRAUD
13   INVESTIGATORS.
14        Q    HAVE YOU TESTIFIED IN CRIMINAL CASES?
15        A    OH, MANY, MANY, MANY CRIMINAL CASES.
16        Q    HAVE YOU TESTIFIED ONLY AS AN EXPERT FOR
17   THE DEFENSE?
18        A    NO.  WE DO WORK IN MY LAB FOR BOTH THE
19   PROSECUTION AND THE DEFENSE, AND I TESTIFY FOR BOTH.
20   AND ON OCCASION I HAVE ACTUALLY BEEN THE EXPERT FOR
21   BOTH ACCEPTED.
22        Q    IN THE SAME CASE?
23        A    IN THE SAME CASE.
24        Q    HAVE YOU DONE WORK FOR THE NEWS MEDIA?
25        A    YES.  NBC NEWS AND SAN JOSE MERCURY NEWS,
26   THE HISTORY CHANNEL PROGRAM, INSIDE EDITION, PROGRAM
27   DESTINATION TRUTH, CHANNEL 2 NEWS, TELEVISION NEWS,
28   UP IN SAN FRANCISCO.
```

1          MR. BUEHLER:  YOUR HONOR, MAY I MARK AS AN

2    EXHIBIT A LIST OF CASES IN WHICH MR. -- IT IS A

3    PARTIAL LIST OF CASES, NOT 180 CASES IN WHICH

4    MR. STUTCHMAN HAS TESTIFIED.

5          THE COURT:  OKAY.

6               SO IS THIS HOW YOU WANT TO DENOTE THIS,

7    LORI?

8          THE COURT CLERK:  IT WOULD BE -- FOR THIS

9    PROCEEDING, IT IS DEFENSE A.

10          THE COURT:  OKAY.

11          MR. BUEHLER:  MAY I APPROACH, YOUR HONOR?

12          THE COURT:  YES.

13

14          (MARKED FOR IDENTIFICATION

15          DEFENSE EXHIBIT NO. A, PARTIAL LIST OF

16          CASES RE STUTCHMAN TESTIMONY.)

17

18    BY MR. BUEHLER:

19          Q    COULD YOU JUST DESCRIBE WHAT DEFENSE A IS,

20    MR. STUTCHMAN.

21          A    YES.

22               I WENT THROUGH MY TESTIMONY LIST THAT I USE

23    FOR RULE 26 REPORT AND LOOKED FOR SIMILAR CASES TO

24    THIS ONE THAT I HAVE TESTIFIED IN.

25          Q    AND COULD YOU --

26          A    I SAY SIMILAR NOT IN TERMS OF MURDER CASES,

27    BUT IN TERMS OF THE TYPE OF ANALYSIS.

28          Q    AND IN THESE CASES WERE YOU TESTIFYING

1    BASED UPON -- IT -- WAS A COMPONENT OF THE EXPERTISE

2    THAT YOU USED THE CRITICAL LISTENING THAT YOU HAVE

3    DESCRIBED?

4        A    THAT IS CORRECT.

5        Q    AND WERE YOU ACCEPTED AS AN EXPERT IN EACH

6    ONE OF THESE CASES?

7        A    YES.

8        Q    INCLUDING IN YOUR CAPACITY OF CONDUCTING

9    CRITICAL LISTENING?

10       A    CORRECT, AND PREPARING FORENSIC

11   TRANSCRIPTS, AND EVEN TESTIFYING IN COURT TO WHAT THE

12   WORDS ARE BEFORE THE JURY.

13       Q    AND WHEN YOU SAY THESE ARE SIMILAR CASES,

14   WHAT DO YOU MEAN BY SIMILAR NOW?

15       A    FORENSIC RECORDINGS WHERE THERE WAS -- MOST

16   OF THEM I THINK WERE INTERVIEWS THAT WERE GOING ON OR

17   911 CALLS WHERE THE BACKGROUND VOICE WAS RELEVANT.

18   ONE, A MURDER CASE WHERE THE 911 CALL PICKED UP THE

19   SUSPECT YELLING, YELLING AT THE PERSON THAT WAS SHOT

20   OR SHOT AT.

21            THERE WERE SOME -- A COUPLE OF THEM --

22   THREE OF THEM AT LEAST -- THAT WERE RECORDED COVERTLY

23   IN HOSPITALS BY A LAW-ENFORCEMENT AGENCY, AND

24   BACKGROUND SPEECH WAS VERY RELEVANT AND VERY

25   IMPORTANT.

26            COVERT UNDERCOVER RECORDINGS IN BARS, ON

27   THE STREET, BY A THIRD PARTY TURNING ON A DIGITAL

28   RECORDER WHEN AN INCIDENT WAS TAKING PLACE.  THOSE.

```
 1      Q    IN ANY OF THESE CASES ON THIS LIST ON
 2   DEFENSE EXHIBIT A WERE YOU TESTIFYING FOR THE
 3   PROSECUTION?
 4      A    YES.
 5      MR. BUEHLER:  YOUR HONOR, MAY I MARK AND OFFER AS
 6   DEFENSE B, A COPY OF MR. STUTCHMAN'S CV?
 7      THE COURT:  ALL RIGHT.
 8
 9        (MARKED FOR IDENTIFICATION
10        DEFENSE EXHIBIT NO. B, COPY OF
11        MR. STUTCHMAN'S CV.)
12
13   BY MR. BUEHLER:
14      Q    MR. STUTCHMAN, YOUR CV THAT WE HAVE MARKED
15   AS EXHIBIT B SETS FORTH THE VARIOUS PLACES YOU
16   RECEIVED TRAINING, AS WELL AS --
17      A    YES, IT DOES.
18      Q    -- THE PAPERS -- THE PRESENTATIONS YOU HAVE
19   MADE, LECTURES YOU HAVE MADE AND SO FORTH?  IS THAT
20   CORRECT?
21      A    YES, THAT'S CORRECT.
22      MR. BUEHLER:  SO YOUR HONOR, I WILL OFFER
23   MR. STUTCHMAN AS AN EXPERT IN FORENSIC AUDIO ANALYSIS
24   AND, I THINK THE WORD IS TRANSCRIPT PRESENTATION --
25   PREPARATION.
26      MS. OKUN-WIESE:  I AM STILL GOING TO OBJECT TO
27   HIM GIVING HIS OPINION AS TO WHAT IS ON THE TAPE.  IT
28   IS HEARSAY AND IT IS SOMETHING A LAYPERSON CAN HEAR.
```

1    THE COURT:  WELL, I MEAN, I TAKE IT THAT WHAT YOU

2  ARE SUGGESTING IS A LAYPERSON CAN'T HEAR IT; ONLY YOU

3  CAN HEAR IT.

4    THE WITNESS:  I BELIEVE THAT A LAYPERSON -- I

5  BELIEVE WHEN I PLAY IT THAT YOU WILL BE ABLE TO HEAR

6  IT.  I HAVE HAD A NUMBER OF PEOPLE IN MY OFFICE

7  LISTEN TO IT AND THEY CAN HEAR IT TOO.

8    THE COURT:  WELL WE WILL SEE WHAT HAPPENS.  I

9  MEAN I HAVE HEARD IT, AND I DIDN'T HEAR IT.

10    THE WITNESS:  HOPEFULLY THESE SPEAKERS WILL HELP

11  YOU.

12    MR. BUEHLER:  YOUR HONOR, IN OFFERING HIM AS AN

13  EXPERT, I WAS NOT ASKING THE COURT TO RULE

14  NECESSARILY ON WHETHER OR NOT HE COULD OFFER AN

15  OPINION BECAUSE I WOULD EXPECT YOUR HONOR TO WANT TO

16  HEAR FURTHER EXPLANATION FROM HIM ABOUT THIS

17  PARTICULAR RECORDING.

18    THE COURT:  OKAY.  I GUESS -- I HAVE NEVER HEARD

19  OF -- I HAVE HEARD OF AUDIO EXPERTS.  I HAVE NEVER

20  HEARD OF A, QUOTE UNQUOTE, CRITICAL LISTENING EXPERT

21  OR SOMETHING OF THAT NATURE.

22         I AM NOT CONVINCED AND I WOULD LIKE TO KNOW

23  WHETHER THERE IS -- THIS IS -- PASSES A

24  KELLY-FRYE-TYPE ANALYSIS BECAUSE IT IS -- IT IS

25  SOMETHING THAT I NEVER HEARD OF.

26         I HAVE HEARD OF ENHANCING TAPES, ENHANCING

27  VIDEO TAPES, THINGS OF THAT NATURE.  BUT TO HAVE

28  SOMEONE THAT'S SUPPOSEDLY SPECIAL FROM EVERYBODY ELSE

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1  THAT CAN HEAR THINGS WHEN NO ONE ELSE CAN HEAR, AND

2  THAT THAT HAS BEEN SOME KIND OF ACCEPTED SCIENTIFIC

3  FIELD THAT COMES IN, IN A TRIAL, IS NEWS TO ME.

4  BY MR. BUEHLER:

5     Q    MR. STUTCHMAN, CAN YOU ADD ANYTHING ELSE TO

6  WHAT YOU HAVE SAID ABOUT THE -- ABOUT YOUR AREA OF

7  EXPERTISE WHEN IT COMES TO CRITICAL LISTENING AND

8  PREPARATION OF FORENSIC TRANSCRIPTS?

9     A    I HAVE ON OCCASION -- WHEN I HAVE TESTIFIED

10 TO THIS TYPE OF THING, THERE HAVE BEEN 402 HEARINGS

11 PRIOR TO MY TESTIFYING BEFORE THE JURY, AND I HAVE

12 BEEN ALLOWED TO TESTIFY AND EVEN TO TESTIFY AS TO

13 WHAT THE WORDS THAT I HEARD -- THAT I PLACED IN THE

14 TRANSCRIPT ARE.

15    Q    AND HAVE YOU, IN WORKING FOR

16 LAW-ENFORCEMENT -- SO I GATHER YOUR WORK FOR

17 LAW-ENFORCEMENT ALSO INCLUDES SIMPLY ASSISTING THEM

18 IN INVESTIGATIONS AT TIMES?

19    A    THAT'S CORRECT, AND IN PREPARATION FOR

20 TRIALS.

21    Q    OKAY.

22         AND IN WORKING FOR LAW-ENFORCEMENT, HAVE

23 YOU TAKEN RECORDINGS THAT WERE NOT DECIPHERABLE BY A

24 LAYPERSON, AND THROUGH YOUR WORK, INCLUDING CRITICAL

25 LISTENING, DEVELOPED A TRANSCRIPTION THAT WAS THEN

26 USED BY LAW-ENFORCEMENT IN THEIR INVESTIGATION OF A

27 CASE?

28    A    THAT'S CORRECT.

1      Q     HOW OFTEN DOES THAT HAPPEN?

2      A     IT HAS HAPPENED ON A NUMBER OF OCCASIONS.

3   SOME OF THOSE HAVE ACTUALLY GONE TO TRIAL AND I

4   TESTIFIED.  OTHERS ENDED UP NOT GOING TO TRIAL.

5      Q     HAVE YOU IN SOME OF THOSE SITUATIONS

6   PRODUCED A FORENSIC TRANSCRIPTION WHICH TO THE

7   LAYPERSON WAS NOT -- THEY WEREN'T ABLE TO HEAR WHAT

8   YOU WERE HEARING, BUT WHERE -- IN TERMS OF THE

9   INVESTIGATION, WAS ACCEPTED THAT YOUR TRANSCRIPTION

10  WAS VALID?

11     A     WELL, I -- FIRST OF ALL, I WOULD NEVER -- I

12  WOULD NEVER PRESENT SOMETHING THAT COULDN'T BE HEARD

13  AND JUST SAY, PULLING IT OUT OF THE AIR, "THIS IS

14  WHAT IT SAYS."

15          THE PURPOSE OF THE WORK THAT I DO IN THIS

16  AVENUE IS TO ENHANCE, CLARIFY THE RECORDING TO THE

17  GREATEST EXTENT POSSIBLE AND THEN DO THE ANALYSIS TO

18  PREPARE A TRANSCRIPT.  THEN THE JURY CAN LISTEN TO

19  THAT.

20          THE TRANSCRIPT IS A GUIDE TO WHAT, YOU

21  KNOW, I HAVE CONCLUDED IS BEING SAID ON THERE.  BUT

22  THE FINAL THING IS FOR THE JURY TO HEAR IT.

23     MR. BUEHLER:  YOUR HONOR, MAY I EXAMINE

24  MR. STUTCHMAN REGARDING WHAT HE DID IN THIS

25  PARTICULAR CASE?

26     THE COURT:  OKAY.

27  BY MR. BUEHLER:

28     Q     SO MR. STUTCHMAN, WERE YOU CONTACTED BY

```
 1      MR. KASSABIAN AND ASKED TO PERFORM SOME WORK IN THIS
 2    CASE?
 3         A    I WAS.
 4         Q    AND WHAT DID HE ASK YOU TO DO?
 5         A    HE ASKED ME TO -- I RECEIVED A VIDEO.  IT
 6    WAS AN INTERVIEW VIDEO OF A MAN NAMED MR. GILBERT.
 7              THE DETECTIVE LEFT THE INTERVIEW ROOM --
 8         Q    I AM SORRY, DID YOU SAY GILBERT?
 9         A    I AM SAYING -- LET ME LOOK AT MY REPORT
10    HERE.
11              GILMORE.  I AM SORRY.  MR. GILMORE.
12              THE DETECTIVE LEFT THE INTERVIEW ROOM AND
13    LEFT MR. GILMORE IN THE ROOM BY HIMSELF.  HE BEGAN TO
14    CRY AND MAKE UTTERANCES, WHICH YOU COULD HEAR HE WAS
15    SAYING SOMETHING BUT YOU COULDN'T -- IT WASN'T REAL
16    CLEAR WHAT HE WAS SAYING.
17         Q    OKAY.  AND DID MR. KASSABIAN ASK YOU IF YOU
18    COULD ATTEMPT TO ENHANCE THAT AND DETERMINE WHAT WAS
19    BEING SAID?
20         A    YES, HE DID.
21         Q    NOW BEFORE -- AT THAT POINT DID HE TELL YOU
22    ANYTHING ABOUT THE FACTS OF THE CASE?
23         A    NO.  I KNEW NOTHING ABOUT THE CASE AT ALL.
24         Q    DID HE TELL YOU WHAT HE WAS LOOKING FOR?
25         A    HE DID NOT.
26         Q    SO HE SIMPLY ASKED YOU TO SEE IF YOU COULD
27    DECIPHER, DETERMINE, WHAT WAS BEING SAID?
28         A    CORRECT.
```

1      Q    AND WHAT DID YOU THEN DO?

2      A    I TOOK THE RECORDING, THE VIDEO, AND I

3    OPENED IT IN SONY SOUND FORGE.  THIS IS ANOTHER

4    PROGRAM WE USE FOR AUDIO FORENSICS.  IT ALLOWS ME TO

5    OPEN THE VIDEO AND SEE THE AUDIO SEPARATE FROM THE

6    VIDEO AS WE SEE HERE ON THE SCREEN.

7         I EXTRACTED THE SEGMENT OF AUDIO THAT HE

8    HAD REQUESTED FROM THAT AND SAVED IT TO A -- AND

9    DIDN'T ALTER -- I ALWAYS WORK FROM A COPY SO NOTHING

10   IS BEING CHANGED IN THE ACTUAL ORIGINAL RECORDING.

11        I COPIED IT TO A NEW FILE, AND THEN

12   USING -- USING I BELIEVE THREE PROGRAMS, I ENHANCED

13   IT.  ONE IS ADOBE AUDITION, IN ONE.  AND I RAN WHAT'S

14   CALLED A BANDPASS.  A BANDPASS ATTENUATES THE

15   NON-SPEECH FREQUENCIES.

16        AND THEN I OPENED IT IN SOUND FORGE AND RAN

17   A PARAMETRIC EQUALIZER THAT ADJUSTS THE FREQUENCIES,

18   AMPLIFIES SPEECH FREQUENCIES AND IMPROVES

19   INTELLIGIBILITY.

20        AND THEN I RAN IT -- OPENED IT IN A PROGRAM

21   CALLED IZOTOPE, RX2 ADVANCED, WHICH IS WIDELY USED IN

22   FORENSICS TO RUN A DENOISE FILTER TO FURTHER CLARIFY

23   THE WORDS SPOKEN.

24        THEN I CONDUCTED THE REVIEW, THE CRITICAL

25   LISTENING WITH THE FILTERS, WITHOUT THE FILTERS,

26   LISTENING FOR THE WORDS THAT WERE SPOKEN BASED ON HOW

27   THE -- WHAT THEY SOUNDED, THE VOWELS, THE CONSONANTS,

28   WHAT THEY STARTED WITH, WHAT THEY ENDED WITH.  AND

```
1    THEN I PREPARED A TRANSCRIPT OF THOSE WORDS.
2         Q    OKAY.
3              NOW THE FIRST PHASE OF WHAT YOU DID, IF I
4    COULD CHARACTERIZE IT THAT WAY, I THINK YOU SAID YOU
5    USED THREE DIFFERENT PROGRAMS?
6         A    THAT'S CORRECT.
7         Q    THAT WERE USED TO -- IN MY SIMPLIFIED
8    TERMS, THAT WERE USED TO DRAW THE SOUND OF THE
9    SPEAKER OUT AS BEST YOU COULD FROM ANY BACKGROUND OR
10   INTERFERENCE?
11        A    CORRECT.
12        Q    OKAY.  AND YOU PREPARED SOME CD'S
13   CONTAINING THE PHRASES THAT YOU WERE ATTEMPTING TO
14   INTERPRET, CORRECT?
15        A    THAT IS CORRECT.
16        Q    SO DO THOSE CD'S REPRESENT THE PRODUCT OF
17   THAT FIRST PHASE OF WORK, OR IS THERE SOMETHING
18   ADDITIONAL THAT'S INVOLVED?
19        A    YES.  THE FIRST TRACK ON THE CD REPRESENTS
20   THE FIRST PHASE.  THAT'S JUST THE ENHANCEMENT.  IT IS
21   PLAYED -- IT PLAYS FROM THE BEGINNING OF THE EXCERPT
22   TO THE END OF THE EXCERPT.
23              THEN THE SECOND TRACK IS THE -- THE FIRST
24   UTTERANCE IN QUESTION.  AND ON THAT ONE, WHAT I DID
25   AND WHAT I HAVE DONE IS TO COPY THAT PHRASE FROM THE
26   ENHANCED FILE AND COPY IT TO A NEW FILE ALL BY ITSELF
27   AND THEN COPY THAT PHRASE, THAT SEGMENT AND INSERT A
28   HALF SECOND OF SILENCE, APPROXIMATELY A HALF SECOND
```

```
 1    OF SILENCE IN BETWEEN, AND COPY AND PASTE.  SO WE
 2    HAVE ABOUT I BELIEVE TEN REPETITIONS OF THAT ONE
 3    PHRASE; THE LAST FIVE, I BELIEVE THAT I STRETCHED IT
 4    BY 20 PERCENT SO IT PLAYS IT -- 80 PERCENT OF ITS
 5    ORIGINAL SPEED SO I CAN BETTER HEAR THE COMPONENTS OF
 6    THE WORD THAT MAKE UP THE WORDS.  AND I DID THAT FOR
 7    THE SECOND AND THIRD UTTERANCE AS WELL.
 8        Q    OKAY.  AND THEN YOU HAD NOT YET PREPARED
 9    YOUR FORENSIC TRANSCRIPTION; IS THAT CORRECT?
10        A    THE FINAL PHASE WAS PREPARING THE FORENSIC
11    TRANSCRIPT.
12        Q    OKAY.  AND WHAT ADDITIONAL WORK OR ANALYSIS
13    WAS INVOLVED IN THAT?
14        A    WELL THE ADDITIONAL WORK AND ANALYSIS WAS
15    TO ACTUALLY TYPE UP, YOU KNOW, WHAT WAS GOING ON, THE
16    CRYING, THE SOBBING, THE UTTERANCE, "OWE BABY" AND GO
17    BACK AND REVIEW THE WORK THAT I HAD DONE AGAIN AND
18    AGAIN SO I WAS COMFORTABLE THAT I HAD IT AS
19    ACCURATELY AS COULD BE; THAT IT WAS ACCURATE STATING
20    WHAT HE SAID, AND PLACED THAT IN THE TRANSCRIPT.
21        Q    SO I ASSUMED YOU LISTENED REPEATEDLY?
22        A    I DID.
23        Q    HOW MANY TIMES DID YOU LISTEN TO EACH ONE?
24        A    OH, MANY, MANY, MANY TIMES.  I CAN'T GIVE
25    YOU A NUMBER, BUT A LOT.
26        Q    OKAY.  AND DID YOU REACH A LEVEL OF
27    CONFIDENCE IN TERMS OF -- LET ME BACK UP.
28        MR. BUEHLER:  MAYBE I SHOULD OFFER AS AN EXHIBIT
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
 1    A COPY OF MR. STUTCHMAN'S REPORT WHICH I HAVE MARKED
 2    AS DEFENSE C, YOUR HONOR.
 3         THE COURT:  ALL RIGHT.
 4
 5         (MARKED FOR IDENTIFICATION
 6         DEFENSE EXHIBIT NO. C, COPY OF STUTCHMAN
 7         REPORT.)
 8
 9    BY MR. BUEHLER:
10         Q    DO YOU HAVE A COPY OF YOUR REPORT THERE?
11         A    I DO.
12         Q    SO YOUR REPORT -- IN YOUR REPORT YOU SET
13    FORTH THE DIFFERENT PHASES OF WORK THAT YOU HAVE JUST
14    DESCRIBED; IS THAT CORRECT?
15         A    THAT'S CORRECT.
16         Q    AND THEN YOU HAVE INCLUDED IN YOUR
17    REPORT -- WITH YOUR REPORT AN EXHIBIT 1, AND THAT'S
18    THE CD THAT CONTAINS THE ENTIRE PASSAGE ENHANCED?
19         A    NO.  THAT'S THE ACTUAL COPY OF THE VIDEO
20    THAT I RECEIVED FROM MR. KASSABIAN.
21         Q    OH, OKAY.
22              THEN WHAT IS EXHIBIT 2?
23         A    EXHIBIT 2 CONTAINS FOUR TRACKS.  THEY ARE
24    THE ENTIRE SEGMENT THAT I ENHANCED AND REVIEWED.  AND
25    THEN TRACK TWO IS THE -- CONTAINS THE REPETITION AS I
26    DESCRIBED, LOOPED WITH THE SILENCE IN BETWEEN EACH
27    REPETITION, AND THEN FINALLY STRETCHED.  AND THEN
28    THAT'S TRACK TWO OF THE FIRST UTTERANCE.
```

```
1               AND THEN TRACK THREE, THE WORDS OF THE
2     SECOND UTTERANCE.  THE SAME REPEATED, AND THEN
3     FINALLY STRETCHED.
4               AND THEN FOUR IS THE WORDS AND THE THIRD
5     UTTERANCE.  AND AGAIN, THAT'S REPEATED, AND THE FINAL
6     ONES ARE STRETCHED.
7          Q    OKAY.  AND THEN EXHIBIT 3 IS A TRANSCRIPT?
8          A    YES.
9          Q    AND THE TRANSCRIPT SETS FORTH YOUR OPINION
10    AS TO WHAT IS BEING SAID IN THAT PASSAGE, CORRECT?
11         A    CORRECT.  IT HAS -- IT HAS WHO IS SPEAKING,
12    AND THEN IT HAS LAPSED TIME ON THE EXCERPT, THE
13    SEGMENT THAT I ENHANCED, SO IT IS EASY TO FIND, AS
14    WELL AS THE TRACK NUMBERS OF WHERE CERTAIN UTTERANCES
15    ARE ON THE CD THAT I PREPARED.
16         MS. OKUN-WIESE:  THE PEOPLE WILL BE OBJECTING TO
17    THE COURT RECEIVING THIS DOCUMENT.  LACK OF
18    FOUNDATION.
19         THE COURT:  I DON'T UNDERSTAND.  WHAT DO YOU MEAN
20    WITHOUT FOUNDATION?
21         MS. OKUN-WIESE:  WELL THE LAST DOCUMENT IS HIS
22    OPINION AS TO WHAT IS ON THE TAPE.
23         THE COURT:  RIGHT.
24         MS. OKUN-WIESE:  AND I DON'T THINK HE HAS
25    PROVIDED THE PROPER FOUNDATION TO GIVE THAT OPINION.
26         THE COURT:  AND WHAT DO YOU SAY IS LACKING IN
27    THAT FOUNDATION?
28         MS. OKUN-WIESE:  WELL, HE HAS INDICATED THAT HE
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
 1    IS NOT AN EXPERT, AND --
 2        THE COURT:  WHAT?
 3        MS. OKUN-WIESE:  WELL, HE INDICATED THAT A
 4    LAYPERSON CAN HEAR WHAT'S IN THAT TRANSCRIPT.  SO HE
 5    IS GIVING HIS OPINION AS TO WHAT'S ON THAT
 6    TRANSCRIPT.  AND IT IS A LAYPERSON WHO CAN GIVE THEIR
 7    OPINION BASED UPON THE ENHANCEMENT THAT HE HAS GIVEN.
 8        THE COURT:  WELL, RIGHT NOW I AM GOING TO HEAR
 9    ALL OF THIS BECAUSE THIS IS A 402 HEARING.
10            AND WE WILL GET TO WHETHER IT IS ADMISSIBLE
11    IN FRONT OF THE JURY AT ANOTHER POINT.  BUT IF YOU
12    ARE -- YOU HAVE SOME SPECIFIC CLAIM THAT HE LACKS
13    EXPERTISE IN SOME REGARD BASED UPON WHAT HE HAS
14    TESTIFIED TO, AND YOU WANT TO TAKE HIM ON VOIR DIRE
15    AND ASK HIM QUESTIONS ABOUT THAT, YOU MAY.
16        MS. OKUN-WIESE:  OKAY.
17
18                VOIR DIRE EXAMINATION
19    BY MS. OKUN-WIESE:
20        Q    SIR, WHEN YOU WENT THROUGH THIS RECORDING,
21    DID YOU TAKE NOTES OR WAS IT YOUR FIRST OPINION AS TO
22    WHAT YOU HEARD THAT YOU LABELED THAT STATEMENT?
23            DO YOU UNDERSTAND?
24        A    NO.  I AM SORRY.
25        Q    YOU SAID YOU LISTENED TO IT REPEATEDLY?
26        A    CORRECT.
27        Q    AND AFTER YOU LISTENED TO IT, YOU SAID YOU
28    LISTENED TO THE CONSONANTS AND THE VOWELS.
```

1    A    I LISTENED TO THE COMPONENTS OF THE WORDS,
2    WHAT THEY START WITH, WHAT THEY END WITH, THE LETTER
3    THAT YOU CAN HEAR AT THE BEGINNING, THE END, AND THE
4    CONSONANTS AND THE VOWELS.
5    Q    SO DO YOU LISTEN TO WHAT'S IN THE MIDDLE OF
6    THE WORD OR ONLY THE FIRST LETTER AND THE LAST
7    LETTER?
8    A    NO.  EVERY ASPECT OF THE WORD.  EVERY
9    SYLLABLE.  EVERYTHING ABOUT THAT WORD.
10   Q    NOW WHEN YOU LISTEN TO IT, DO YOU WRITE
11   DOWN NOTES AS TO POTENTIAL WORDS IT COULD BE, OR IS
12   IT JUST ONE WORD THAT YOU COME UP WITH AND THAT'S THE
13   WORD YOU STICK WITH?
14   A    I DO TAKE NOTES.  AS I MAKE OUT WORD BY
15   WORD, THAT GOES IN MY NOTES.  AND THEN THE NOTES WERE
16   INCORPORATED INTO THE TRANSCRIPT.
17   Q    OKAY.
18       SO MY QUESTION TO YOU IS, DO YOU COME UP
19   WITH A WORD AND STICK WITH THAT WORD, OR DO YOU EVER
20   CHANGE?
21   A    I -- I AM JUST GOING BACK IN MY MIND OF
22   MANY OF THESE THAT I HAVE DONE.
23       AND I DON'T -- I DON'T SETTLE LIGHTLY ON
24   WHAT A WORD IS.  I THOROUGHLY ANALYZE IT.  SO I AM
25   NOT GOING TO SAY "NOW THIS TIME IT SOUNDS LIKE RED,
26   AND THIS TIME IT SOUNDS LIKE BLUE.  MAYBE IT IS RED;
27   MAYBE IT IS BLUE."  I DON'T DO THAT.  I THOROUGHLY
28   ANALYZE THE WORD BEFORE I PUT DOWN WHAT IN MY OPINION

1    THAT WORD SAYS.

2        Q    AFTER YOU PUT THE WORD DOWN WHICH IN YOUR

3    OPINION IS WHAT IT SAID, DO YOU LISTEN TO IT AGAIN?

4        A    YES.

5        Q    HOW MANY TIMES DO YOU LISTEN TO IT

6    AFTERWARDS?

7        A    I DON'T KNOW THAT I HAVE A RULE OF THUMB,

8    BUT I LISTEN TO IT NUMEROUS TIMES.

9        Q    IS NUMEROUS 50 OR IS NUMEROUS 10?

10       A    I CAN'T QUANTIFY IT.  IN SOME CASES IT

11   REQUIRES MORE LISTENING.  IN OTHERS, IT REQUIRES LESS

12   LISTENING BECAUSE THERE IS JUST NO QUESTION THAT --

13   THAT WE GOT IT.

14       Q    WHEN DID YOU RECEIVE THIS TAPE?

15       THE COURT:  YOU KNOW, WHEN I SAID YOU COULD TAKE

16   THE WITNESS ON VOIR DIRE AS TO HIS QUALIFICATIONS

17   BECAUSE YOU CLAIM THERE WAS NO FOUNDATION -- IT

18   SOUNDS LIKE YOU ARE DOING GENERAL CROSS-EXAMINATION

19   AT THIS POINT WHICH IS NOT WHAT I HAD INDICATED AT

20   THIS POINT.  I DON'T KNOW THAT THE DEFENSE HAD

21   FINISHED THEIR DIRECT EXAMINATION.

22       MS. OKUN-WIESE:  I CAN HOLD OFF, OR I CAN ASK HIM

23   QUESTIONS ABOUT HIS QUALIFICATIONS.

24       THE COURT:  WELL THAT'S WHAT I HAD INVITED YOU TO

25   DO.

26   BY MS. OKUN-WIESE:

27       Q    SIR, YOU INDICATED THAT YOU HAVE TESTIFIED,

28   AND YOU GAVE US A LIST IN DEFENSE A, CORRECT?

1    A    YES, THAT'S CORRECT.

2    Q    AND I NOTICED ON HERE THAT ONE OF THE CASES

3  WAS A CRIMINAL TRIAL, CORRECT?

4    A    MOST OF THEM WERE.

5    Q    IS THERE A REASON WHY THE ONE AT THE BOTTOM

6  ONLY LISTS CRIMINAL TRIAL?

7    A    YOU KNOW, I DON'T KNOW.  MY OFFICE MANAGER

8  MAKES THIS LIST AND --

9    Q    OKAY.  YOU TALKED ABOUT THE TYPES OF

10  ANALYSIS YOU HAVE TESTIFIED TO BEFORE, AND IF I

11  UNDERSTOOD YOU CORRECTLY YOU TALKED ABOUT TAKING OUT

12  BACKGROUND NOISE IN 911 CALLS?

13    A    WHAT I -- IN THE 911 CALLS WHAT THE GOAL

14  IS, IS TO ENHANCE THE BACKGROUND SPEECH THAT'S TAKING

15  PLACE.  SO IF THERE IS NOISE, IF THERE IS -- THERE

16  IS -- ANYTHING THAT'S MASKING THE BACKGROUND SPEECH,

17  THEN WE WANT TO ATTENUATE THAT AND INCREASE THE

18  AMPLITUDE OF THE VOICE FREQUENCIES OF THE BACKGROUND

19  VOICE.

20    Q    OKAY.  AND THESE OTHER CASES THAT YOU

21  TESTIFIED TO SUCH AS PEOPLE VERSUS SOCORRO CARO, IS

22  THAT A CASE LIKE WE HAVE HERE WHERE YOU LISTENED TO A

23  DEFENDANT OR A WITNESS' STATEMENT AND YOU PULLED IT

24  OUT AND THEN PREPARED A TRANSCRIPT?

25    A    THAT IS CORRECT.

26    Q    OKAY.  AND YOU DID THAT, AND YOU TESTIFIED

27  IN EACH ONE OF THESE CASES IN A TRIAL?

28    A    THAT'S CORRECT -- YES, THAT'S CORRECT.

1       Q     AND YOU TESTIFIED TO WHAT WAS IN THE --

2    YOUR PREPARED TRANSCRIPT?

3       A     THAT IS CORRECT.

4       Q     AND THIS CRITICAL LISTENING THAT YOU TALK

5    ABOUT, IT IS YOUR OPINION THAT IT IS ACCEPTED IN THE

6    SCIENTIFIC COMMUNITY?

7       A     OH, YES.

8       Q     IS IT LISTED IN PUBLICATIONS?

9       A     IT IS.

10      Q     WHAT PUBLICATIONS IS IT LISTED IN?

11      A     STAND-BY.  AMERICAN JURIS -- JURIS

12   PRUDENCE, AS A REFERENCE FOR TRIAL ATTORNEYS.

13            THE -- YOU WILL FIND IT IN THE STANDARDS

14   AND GUIDELINES FOR AUDIO FORENSICS, THE NATIONAL

15   CENTER FOR MEDIA FORENSICS WHERE I HAVE RECEIVED

16   TRAINING.  IT IS IN THEIR CURRICULUM.

17            THE SWIGS WHICH IS THE SCIENTIFIC WORKING

18   GROUPS.  THERE ARE MANY DIFFERENT DISCIPLINES.  IT IS

19   DESCRIBED IN THERE AS A METHOD FOR AUDIO ANALYSIS.

20      Q     THE TESTING THAT YOU USED, ARE THESE THE

21   SCIENTIFIC PROCEDURES THAT OTHER CRITICAL THINKERS OR

22   CRITICAL LISTENERS USE?

23      A     YES.

24      Q     AND THEY USE WHICH ONES THAT YOU USED?

25      A     WHAT ARE YOU REFERRING TO?

26      Q     WELL, THE TESTING THAT'S DONE.  THE THREE

27   TESTING MECHANISMS THAT YOU USED IN THIS CASE.

28      A     OH.  OH, YOU ARE TALKING ABOUT THE

1   SOFTWARE?  THE SCIENTIFIC SOFTWARE?

2        Q    RIGHT.

3        A    OH, ABSOLUTELY.

4        Q    AND --

5        A    YES.

6        Q    WHAT IS IT THAT IS SCIENTIFIC ABOUT IT?  I

7   MEAN, IT SOUNDS TO ME LIKE YOU PUT A CD OR A DVD IN A

8   SYSTEM, AND YOU AMPLIFY IT AND THEN YOU LISTEN TO IT

9   LIKE A LAYPERSON WOULD LISTEN TO IT; IS THAT RIGHT?

10       A    NO.

11       Q    OKAY.

12       A    NO.

13            THE SOFTWARE THAT WE USE IN AUDIO FORENSICS

14   IS BASED ON SCIENTIFIC PRINCIPLES OF SOUND.  ALL OF

15   THE FILTERS THAT ARE IN THERE WORK ON ALGORITHMS THAT

16   HAVE A SPECIFIC FUNCTION TO ACHIEVE A SPECIFIC GOAL.

17            THE AVERAGE PERSON -- AND LET ME TELL YOU,

18   WE SEE THIS STUFF WHERE YOU GET A PRODUCTION PERSON

19   THAT WANTS TO BE A FORENSIC PERSON, AND THEY ARE USED

20   TO PRODUCTION.  THEY ARE USED TO MIXING.  THEY ARE

21   USED TO MAKING, YOU KNOW, RECORDS OR MUSIC OR

22   WHATEVER.  AND THEY USE THE TOOLS WITHIN THE SOFTWARE

23   SO POORLY, BECAUSE OF THEIR LACK OF SPECIFIC FORENSIC

24   KNOWLEDGE, THAT THEY ACTUALLY DO DAMAGE TO THE

25   RECORDING INSTEAD OF IMPROVING IT.

26            SO NO, THE LAYPERSON WOULD NOT BE ABLE TO

27   DO THIS.  THIS TAKES SOMEBODY WITH AN EXPERTISE IN

28   AUDIO SCIENCE.

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)
286

```
1       Q    DO YOU KNOW -- AND YOU MAY NOT KNOW -- AND
2    THIS WILL BE MY LAST QUESTION.
3            BUT DO YOU KNOW IF THERE HAS BEEN ANY
4    PUBLISHED CASE LAW REGARDING THIS TYPE OF FORENSIC
5    ANALYSIS AND THE TESTIMONY THEREOF?
6       A    OH, I AM SURE I HAVE.  I DON'T HAVE IT ON
7    THE TOP OF MY HEAD, BUT YES.  I SPOKE WITH A
8    COLLEAGUE OF MINE THAT ACTUALLY RAN THE NEW YORK
9    INSTITUTE OF FORENSIC AUDIO YESTERDAY BEFORE I CAME
10   DOWN HERE.  AND HE IS PROBABLY THE MOST KNOWLEDGEABLE
11   PERSON IN THIS ARENA WITH REGARD TO WHAT'S HAPPENING
12   WITH LAWS WITH THE ADMISSIBILITY.  AND HE SAID THAT
13   HE KNOWS OF NO CASE WHERE THIS TYPE OF EVIDENCE HAS
14   NOT BEEN -- HAS NOT SUCCEEDED TO PASS IN A HEARING OR
15   DAUBERT, KELLY-FRYE OR 402.
16      Q    BUT MY QUESTION IS, ARE YOU AWARE OF ANY
17   PUBLISHED CASES THAT DISCUSS THIS TYPE OF FORENSIC
18   USE OF EQUIPMENT AND THEN COMING INTO COURT AND
19   TESTIFYING?
20           JUST WHETHER OR NOT YOU ARE AWARE OF THE
21   CASE LAW.
22      A    WELL, I THINK IN ORDER FOR IT TO BE
23   PUBLISHED, IT HAS TO BE APPEALED AND RULED ON AT THE
24   APPELLATE LEVEL.  AND IT HAS BEEN MY EXPERIENCE THAT
25   DOESN'T HAPPEN.  IT COMES IN.
26      Q    HAVE YOU TESTIFIED IN L.A. COUNTY AS AN
27   EXPERT?
28      A    I HAVE.
```

1          Q      IN THIS COURTHOUSE?

2          A      PROBABLY.   THERE ARE SEVERAL COURTHOUSES,

3     AND I CAN'T REMEMBER WHICH ONE I WAS IN.

4          MS. OKUN-WIESE:  OKAY.  THANK YOU, YOUR HONOR.

5          THE COURT:  ALL RIGHT.

6               MR. BUEHLER, BACK TO YOU.

7          MR. BUEHLER:  THANK YOU, YOUR HONOR.

8

9               DIRECT EXAMINATION RESUMED

10    BY MR. BUEHLER:

11         Q      SO MR. STUTCHMAN --

12         MR. BUEHLER:  YOUR HONOR, CAN WE PLAY --

13         Q      WELL LET ME ASK YOU THIS, DID YOU BRING

14    YOUR OWN AUDIO EQUIPMENT WITH YOU TODAY?

15         A      YES, I DID.

16         Q      AND ARE YOU -- CAN YOU PLAY FOR US THE

17    EXHIBIT -- WELL, I GUESS BOTH EXHIBIT 1 AND 2?

18         A      YES.

19               OKAY.

20               THIS IS EXHIBIT 1 WHICH IS -- I HAVE QUEUED

21    IT UP TO THE POINT WHERE I WAS ASKED TO START.  AND

22    THIS IS -- LET ME REFER TO MY REPORT FOR THE STOPPING

23    TIME.

24               1:46 TO 1:50.

25

26               (AUDIO AND VIDEO PLAYED)

27

28         THE WITNESS:  THAT'S THE END OF THE SEGMENT.

```
 1   BY MR. BUEHLER:
 2        Q    OKAY.  AND THEN CAN YOU PULL UP EXHIBIT 2.
 3        A    YES.
 4             EXHIBIT 2, TRACK ONE, IS THE ENHANCEMENT OF
 5   THE SAME SEGMENT.
 6        Q    OKAY.
 7        MR. BUEHLER:  WITH THE COURT'S PERMISSION, I WILL
 8   JUST MOVE TO TRACK TWO WHICH IS THE ENHANCEMENT OF
 9   THE SPECIFIC SECTION.  TWO, THREE AND FOUR, RATHER
10   THAN REPLAY WHAT WE JUST LISTENED TO.
11        THE COURT:  OKAY.
12        THE WITNESS:  OKAY.
13             THIS WOULD BE TRACK TWO, AND THIS WOULD BE
14   THE SECTION ON LINE FIFTEEN.
15
16             (AUDIO PLAYED)
17
18   BY MR. BUEHLER:
19        Q    SO MR. STUTCHMAN, IT IS -- DO YOU HAVE AN
20   OPINION AS TO WHAT THE SPEAKER WAS SAYING THERE?
21        A    YES.
22        Q    IS THAT WHAT YOU HAVE PLACED IN YOUR
23   TRANSCRIPTION?
24        A    YES.
25        Q    AND WHAT DO YOU HEAR HIM SAYING?
26        A    "YES, I FOUND YOU WITH SOMEONE."
27        Q    OKAY.
28             CAN YOU GO TO TRACK THREE PLEASE?
```

```
 1        A    YES.

 2

 3             (AUDIO PLAYED)

 4

 5   BY MR. BUEHLER:

 6        Q    AND WHAT IS YOUR OPINION, MR. STUTCHMAN, AS

 7   TO WHAT THE SPEAKER IS SAYING THERE?

 8        A    I AM SORRY, I THOUGHT YOU WERE THERE.

 9             "I AM SO JACKED UP AT MYSELF."

10        Q    OKAY.  AND THAT'S IN YOUR TRANSCRIPT?

11        A    YES.

12        Q    AND THEN TRACK FOUR?

13        A    TRACK FOUR.

14

15             (AUDIO PLAYED)

16

17   BY MR. BUEHLER:

18        Q    AND WHAT IS YOUR OPINION AS TO WHAT THE

19   SPEAKER IS SAYING ON TRACK FOUR?

20        A    THE WORDS "I DID IT."

21        Q    AGAIN, BASED UPON YOUR TRAINING AND

22   EXPERTISE, IS IT YOUR TESTIMONY THAT YOU ARE

23   CONFIDENT THAT THOSE ARE THE WORDS THAT ARE BEING

24   SPOKEN ON THOSE THREE SELECTIONS?

25        A    IT IS.

26        Q    AND I ASSUME THERE ARE TIMES WHEN YOU ARE

27   ATTEMPTING TO ARRIVE AT A TRANSCRIPT, BUT YOU ARE

28   UNABLE TO REACH A CONCLUSION?
```

```
 1        A    YES.
 2        Q    IN YOUR TRAINING, HAVE YOU HAD PROJECTS
 3   WHERE YOU HAVE BEEN GIVEN AN AUDIO THAT WAS
 4   INDECIPHERABLE WHERE YOU HAVE GONE THROUGH EACH OF
 5   THESE PHASES, THE ENHANCEMENT PHASE AND THE CRITICAL
 6   LISTENING PHASE, AND THEN COME TO A TRANSCRIPTION?
 7        A    YES.
 8        Q    AND WAS THAT A SITUATION WHERE YOU AS A
 9   STUDENT DID THAT, AND THEN WERE TOLD WHETHER OR NOT
10   YOU HAD DONE IT ACCURATELY?
11        A    CORRECT.
12        Q    AND HOW MUCH TIME HAVE YOU SPENT IN THAT
13   TYPE -- WELL LET ME ASK YOU FIRST WHERE -- WHAT TYPES
14   OF SCHOOLS AND PLACES HAVE YOU BEEN GIVEN THAT --
15   GONE THROUGH THAT KIND OF TRAINING?
16        A    THE NEW YORK INSTITUTE OF FORENSIC AUDIO.
17        Q    AND HOW MANY HOURS DID YOU SPEND IN THAT
18   KIND OF TRAINING SESSION?
19        A    I HAVE SEVERAL HUNDRED HOURS OF TRAINING AT
20   THAT FACILITY.  AND I -- I CAN'T QUANTIFY IT, BUT IT
21   HAS BEEN A SUBSTANTIAL AMOUNT OF TIME AND HOURS SPENT
22   ON THIS TYPE OF ANALYSIS.
23        MR. BUEHLER:  THANK YOU.
24        THE COURT:  CROSS?
25        MS. OKUN-WIESE:  THANK YOU.
26
27
28
```

```
1                    CROSS-EXAMINATION
2    BY MS. OKUN-WIESE:
3         Q    HOW LONG DID YOU WORK ON THIS TAPE?
4         A    HOURS DO YOU MEAN?
5         Q    HOURS.
6         A    YOU ARE ASKING ME ANOTHER OFFICE MANAGER
7    QUESTION.
8         Q    WELL YOU INDICATED YOU TAKE NOTES, RIGHT?
9    YOU TAKE NOTES WHEN YOU START, AND THE PROCESS THAT
10   YOU GO --
11        A    OH, NO, I DON'T TAKE NOTES.  IT IS NOT LIKE
12   A TIME SHEET; THAT'S A SEPARATE THING.  THAT'S HOW WE
13   BILL.  AND I JUST HAND MY TIME SHEETS OFF TO MY
14   OFFICE MANAGER EVERY DAY.
15        Q    SO YOU DON'T HAVE ANY IDEA HOW MANY HOURS
16   YOU LISTENED TO THIS TAPE?
17        A    SEVERAL.  BUT I DON'T SPECIFICALLY HAVE
18   THAT WITH ME.
19        Q    OKAY.
20             YOU INDICATED WHEN YOU FIRST STARTED
21   TESTIFYING THAT YOU BELIEVE THAT BASED UPON YOUR
22   ENHANCEMENT OF THE TAPE THAT PEOPLE COULD LISTEN TO
23   IT AND TELL -- AND HEAR WHAT YOU SAY IT SAYS,
24   CORRECT?
25        A    I BELIEVE THAT IT WOULD BE VERY BENEFICIAL,
26   AS WITH ANY AUDIO RECORDING THAT YOU PLAY IN ANY
27   COURT, FOR THEM TO HAVE THE TRANSCRIPT AS A GUIDE TO
28   GO BY.
```

1       Q       BUT I BELIEVE WHEN YOU FIRST TESTIFIED I

2   MADE AN OBJECTION AND YOU TOLD THE COURT, "I BELIEVE

3   THAT SOMEBODY LISTENING TO THE ENHANCED VERSION WILL

4   HEAR IT THE WAY I HEAR IT."  DID YOU MEAN WITH THE

5   TRANSCRIPT?

6       A       YES.

7       Q       SO SOMEBODY NEEDS THE TRANSCRIPT TO REALLY

8   HEAR WHAT IT SAYS?

9       A       WELL I THINK THE TRANSCRIPT, YOU KNOW,

10   DRAWS IT TOGETHER AND PUTS IT IN CONTEXT.

11       Q       WOULD YOU AGREE WITH ME THAT IF YOU HAVE A

12   STATEMENT IN FRONT OF YOU AND THEN YOU READ THAT

13   STATEMENT AND THEN YOU LISTEN TO AN AUDIO RECORDING,

14   THAT YOU ARE MORE LIKELY TO TRY TO FIND THAT IN THE

15   RECORDING?

16       A       OR NOT.  OR NOT.  IF PEOPLE CAN'T HEAR IT,

17   I WOULD EXPECT THEM TO SAY, "I DON'T HEAR THAT."

18       Q       BUT YOU FEEL IN THIS CASE THAT IT IS

19   ENHANCED VERY WELL AND THAT THE TRANSCRIPT SAYS WHAT

20   IT SAYS?

21       A       THAT'S CORRECT.

22       Q       YOU TALKED ABOUT AUDIO FORENSICS BEING IN

23   THE LAW OF PHYSICS; IS THAT CORRECT?

24       A       YES, PHYSICS OF SOUND.

25       Q       DO YOU HAVE A DEGREE IN PHYSICS?

26       A       NO, I DON'T.

27       Q       HAVE YOU EVER TESTED YOUR CRITICAL

28   LISTENING AGAINST THE ACTUAL PERSON WHO MADE THE

```
1    STATEMENT?

2         A    I AM NOT SURE I FOLLOW YOU.

3         Q    WELL LIKE IN THIS CASE, YOU WROTE DOWN A

4    SPECIFIC SENTENCE OF WHAT YOU BELIEVE, IN THREE

5    DIFFERENT AREAS, MR. GILMORE WAS SAYING.  HAVE YOU

6    EVER TAKEN THAT NEXT STEP AND MET WITH THAT PERSON TO

7    FIND OUT IF THEY SAY THE SAME THING?

8         A    YES.

9         Q    HOW MANY TIMES HAVE YOU DONE THAT?

10        A    I HAVE DONE THAT MANY TIMES BECAUSE WE DO

11   THAT ROUTINELY ON VOICE IDENTIFICATION ANALYSIS WHERE

12   IT IS CALLED OBTAINING AN EXEMPLAR.

13        Q    WHAT'S THE DIFFERENCE BETWEEN VOICE

14   EXEMPLAR IDENTIFICATION AND THIS?

15        A    GOOD QUESTION.

16             VOICE IDENTIFICATION IS COMPARING THE KNOWN

17   WITH THE UNKNOWN.  SO YOU GOT EVIDENCE RECORDING, BUT

18   YOU DON'T KNOW FOR SURE WHO IT IS, OR LAW-ENFORCEMENT

19   DOESN'T KNOW FOR SURE WHO IT IS.  BUT THERE IS A

20   SUSPECT, OR IN SOME CASES THE PERSON HAS ALREADY BEEN

21   ARRESTED.

22             SO THE EVIDENCE RECORDING IS SENT TO US.

23   IF IT NEEDS TO BE ENHANCED, IT IS.  AND THEN THE

24   WORDS ARE TAKEN FROM THAT, THAT RECORDING.  WE CALL

25   IT SHORT-TERM MEMORY FILE, SIMILAR TO WHAT WE HAVE

26   SEEN HERE.  AND THEN WE OBTAIN A VERBATIM EXEMPLAR.

27             WE HAVE THE -- THE UNKNOWN -- THE KNOWN

28   PERSON SAY IT IN HIS VOICE, AND THEN COMPARING IT
```

```
 1    WITH -- THE KNOWN WITH THE UNKNOWN, DETERMINING, IS
 2    THIS THE SAME?  AND WHAT -- WHETHER IT IS SPEECH -- I
 3    HAVE TESTIFIED TO THAT WHERE THERE WAS A QUESTIONED
 4    WORD WHERE WHAT WAS REALLY THE WORD THAT WAS SAID.
 5         SO THE PERSON IN QUESTION WAS ASKED TO SAY
 6    THE VARIOUS POSSIBILITIES THAT IT COULD BE ARGUED
 7    THAT IT WAS SO IT COULD BE COMPARED WITH THOSE WORDS.
 8         Q    OKAY.
 9         A    HAVE I TOTALLY LOST YOU?
10         Q    A LITTLE BIT, BUT I WILL MOVE ON.
11         A    I AM SORRY.
12         Q    YOU SAID YOU HAVE DONE THAT MANY TIMES.
13    AND MANY TO ME MAY BE TWENTY; MANY TO YOU MAY BE 100.
14    DO YOU HAVE ANY IDEA?
15         A    PROBABLY CLOSER TO 150 TO 200.
16         Q    OKAY.
17         MS. OKUN-WIESE:  I HAVE NOTHING FURTHER AT THIS
18    POINT.
19         THE COURT:  REDIRECT?
20         MR. BUEHLER:  NO, YOUR HONOR.
21         THE COURT:  I HAVE A COUPLE QUESTIONS.
22         NOW I WAS FURNISHED A COPY OF THIS TAPE AS
23    PART OF AN EXHIBIT TO A MOTION.  AND I AM TALKING
24    ABOUT THE FINAL VERSION, THE ENHANCED VERSION.
25         THE WITNESS:  RIGHT.
26         THE COURT:  OKAY.  AND WHEN I LISTENED TO IT ON
27    MY COMPUTER, I HAD NO BENEFIT OF ANY TRANSCRIPTS.
28    AND QUITE FRANKLY, I THOUGHT THAT MY COMPUTER WAS
```

1   MALFUNCTIONING BECAUSE IT JUST KEPT ON REPEATING.   I

2   THOUGHT IT WAS -- AND I DIDN'T REALLY HAVE THE -- YOU

3   KNOW, THE BUILD UP TO WHAT IT WAS.

4       THE WITNESS:  RIGHT.

5       THE COURT:  BUT I DID LISTEN TO IT.  AND TO ME IT

6   SOUNDED LIKE GIBBERISH.  OKAY?  IT WAS

7   NON-DECIPHERABLE.

8           NOW HEARING IT AGAIN TODAY, I HAVE TO BE

9   HONEST WITH YOU, IT STILL SOUNDS LIKE GIBBERISH TO

10  ME, EVEN WITH YOUR TRANSCRIPT THAT YOU SAY IS

11  ACCURATE AND THAT'S WHAT THE PERSON SAYS.  HEARING

12  THAT WITH THESE SPEAKERS, YOU KNOW, THREE FEET FROM

13  ME -- OR ONE IS THREE FEET AND ONE IS FIVE FEET OR

14  WHATEVER, IT STILL SOUNDS LIKE GIBBERISH TO ME.

15          AND I HAVE TO SAY THAT, YOU KNOW, I HAVE A

16  REAL PROBLEM WITH YOUR, QUOTE UNQUOTE, "CRITICAL

17  HEARING."

18      THE WITNESS:  LISTENING.

19      THE COURT:  LISTENING.

20          AND THE -- THE JURY IS, YOU KNOW, THE

21  FINDERS OF FACTS IN THE CASE.  AND THEY HAVE TO MAKE

22  ULTIMATELY THE DETERMINATION.

23      THE WITNESS:  CORRECT.

24      THE COURT:  SO I AM CONCERNED ABOUT THE

25  SUGGESTIBILITY OF GIVING THEM A TRANSCRIPT WITH WHAT

26  YOUR CONCLUSION IS WHEN THE JURY ITSELF, IT SEEMS TO

27  ME, HAS TO -- WOULD HAVE TO LISTEN TO IT AND CONCLUDE

28  WHAT IT SAYS, PRESUMABLY COMING TO THEIR OWN

 1    CONCLUSION ABOUT IT WITHOUT THE SUGGESTIBILITY.

 2             IT SEEMS TO ME THERE IS A SUGGESTIBILITY

 3    FACTOR THAT REALLY CONCERNS ME.  NOW I DIDN'T FEEL

 4    THAT I WAS INFLUENCED BY YOUR SUGGESTIBILITY OF THE

 5    TRANSCRIPT BECAUSE I WAS LISTENING FOR WHAT YOU SAY

 6    IS THERE, AND I DON'T HEAR IT.

 7        THE WITNESS:  I AM AMAZED.

 8        THE COURT:  AND ALSO, I -- THIS IS NOT

 9    NECESSARILY TO YOU BUT JUST TO COUNSEL IN GENERAL --

10    I WOULD CERTAINLY LIKE TO KNOW IF THERE ARE SOME

11    CASES DEALING WITH THIS CRITICAL LISTENING, BECAUSE

12    IT IS SOMETHING THAT I HAVE NEVER ENCOUNTERED IN ALL

13    THESE YEARS.  EVER.

14             AND I DON'T KNOW WHETHER THE PEOPLE HAVE

15    CONSULTED AN EXPERT, BUT YOU MAY WANT TO.

16             I MEAN CONCEIVABLY, THIS IS A CRITICAL

17    PIECE OF EVIDENCE.  NOW I AM NOT SAYING THAT MY EARS

18    SHOULD BE THE EARS THAT DECIDE WHAT IT SAYS.  BUT I

19    AM JUST SAYING THAT MY EARS DON'T HEAR WHAT HE SAYS

20    IT SAYS.

21             I DON'T KNOW -- THIS -- YOU KNOW, I THINK

22    WE NEED A LITTLE BIT MORE RESEARCH WITH REGARD TO

23    ADMISSIBILITY OF -- I DON'T HAVE A PROBLEM WITH THE

24    ENHANCEMENT OR THE TECHNIQUES OR THE SOFTWARE, EVEN

25    THOUGH THOSE AREN'T THINGS THAT I KNOW ABOUT, BUT I

26    ASSUME THAT THERE IS A BODY OF KNOWLEDGE ABOUT THAT.

27    BUT THIS INTERPRETATION OF IT IS THE ISSUE.  IT IS

28    THE CRITICAL ISSUE.

1          AND I CAN'T IMAGINE THAT THERE COULD NOT
2    HAVE BEEN SOME CASE LAW SOMEWHERE THAT HAS DEALT WITH
3    THIS ISSUE, BUT PARTICULARLY IN CALIFORNIA.  I MEAN,
4    WE HAVE CASE LAW IN EVERYTHING.  AND, AS I SAID, I
5    HAVE NEVER SPECIFICALLY RESEARCHED THIS, BUT I HAVE
6    NEVER HAD THIS ISSUE.  EVER.  EVER.
7          SO I AM NOT PREPARED TO MAKE A RULING RIGHT
8    NOW, AND I THINK I NEED MORE.
9          IF THERE IS NO MORE QUESTIONS, THOUGH, THE
10   WITNESS CAN STEP DOWN.
11      MR. BUEHLER:  THANK YOU, YOUR HONOR.
12      THE COURT:  THANK YOU.
13      MR. BUEHLER:  WE WILL BE HAPPY TO DO THAT
14   RESEARCH, YOUR HONOR.
15      THE COURT:  OKAY.
16          I THINK WE HAVE PROBABLY GONE AS FAR AS WE
17   CAN TODAY.
18          SO JUST TO LET YOU KNOW, IN TERMS OF THE
19   VOIR DIRE, WE HAVE 65 PRE-SCREENED JURORS COMING IN
20   AT 10:00 O'CLOCK.  WHEN I SAY THEY ARE PRE-SCREENED,
21   THEY ARE PRE-SCREENED FOR ALL THE THINGS THAT YOU
22   FOLKS CHECKED ON THAT STIPULATION.  DID YOU CHECK ALL
23   THE BOXES?
24          NO.
25          OKAY.  WELL, WHATEVER IT WAS THAT YOU
26   AGREED TO, THAT'S WHAT THEY HAVE BEEN PRE-SCREENED
27   FOR.
28          AND SO WHAT HAVE THEY BEEN PRE-SCREENED

1    FOR, DO YOU REMEMBER?
2        MS. OKUN-WIESE:  IT WAS ONE THING I REMEMBER THEY
3    CHECKED OFF.  ONE BOX WAS THE ONLY ONE THEY HAD
4    AGREED TO.  AND I CAN'T REMEMBER WHICH ONE IT WAS.
5        MR. BUEHLER:  I THOUGHT IT WAS FOR HARDSHIP.
6        THE COURT:  WELL THERE ARE MANY ASPECTS OF
7    HARDSHIP.
8        MR. BUEHLER:  OH, OKAY.
9        THE COURT:  HAVE WE BEEN GETTING ANY PHONE CALLS
10   YET FROM JURORS?
11       THE COURT CLERK:  NO.  I HAVEN'T RECEIVED ANY.
12       THE COURT:  USUALLY WE START GETTING PHONE CALLS
13   AS PEOPLE -- THEY CALL US IN ADVANCE TO TIP US OFF AS
14   TO WHAT THEY MAY BE CLAIMING.
15       MR. BUEHLER:  WHILE WE ARE WAITING, YOUR HONOR, I
16   SENT THE PEOPLE A TWO -- TWO POSSIBLE QUESTIONNAIRES
17   THAT I WOULD PROPOSE USING.  I WANT TO RAISE THE
18   QUESTION IN COURT AS TO WHETHER THE COURT WOULD
19   REOPEN -- AND I DON'T YET KNOW THE PEOPLE'S POSITION.
20       MS. OKUN-WIESE:  I TOLD COUNSEL I BELIEVED IT WAS
21   TOO LATE.
22       THE COURT:  IT IS TOO LATE.  I AM NOT DOING A
23   QUESTIONNAIRE.  THAT WOULD HAVE BEEN SOMETHING WE
24   WOULD HAVE HAD TO HAVE DONE A MONTH AGO.
25       THE COURT CLERK:  THE ONLY THING THAT WAS CHECKED
26   OFF, YOUR HONOR, WAS "PAID VACATION PLANS."
27       THE COURT:  PAID VACATION?  WE DIDN'T EVEN CHECK
28   WHETHER THEY GOT PAID FOR THE NUMBER OF DAYS?

1    THE COURT CLERK:  SO IN GENERAL, IT IS ECONOMIC

2    HARDSHIP.  BUT THEN AFTER THAT THE ONLY OTHER BOX

3    THAT WAS CHECKED WAS VACATION PLANS.

4        THE COURT:  OKAY.  ALL RIGHT.  THEN I EXPECT

5    THERE IS GOING TO BE A FAIRLY LENGTHY HARDSHIP --

6        MR. BUEHLER:  THE -- IT SAYS "ANYONE WHO WOULD

7    EXPERIENCE ECONOMIC HARDSHIP IF REQUIRED TO SERVE."

8    AND THEN IN ADDITION TO THAT, "STIPULATED JURORS MAY

9    BE EXCUSED FOR:  PAID VACATION PLANS."

10           SO --

11       THE COURT:  OKAY.  WELL --

12       MR. BUEHLER:  WE WERE ANTICIPATING THAT ECONOMIC

13   HARDSHIPS WOULD BE ASSUMED BY THE JURY AS A PRETTY

14   BROAD CATEGORY.

15       THE COURT:  WE WILL SEE.  THERE WILL BE CLAIMS

16   THAT WE WILL HAVE TO DEAL WITH.

17           SO NEITHER ONE OF YOU HAVE TRIED A CASE IN

18   HERE.

19       MR. BUEHLER:  CORRECT, YOUR HONOR.

20       THE COURT:  I DO AN EXTENSIVE VOIR DIRE WHICH IS

21   ABOUT -- WHEN I SAY EXTENSIVE, I MEAN I AM COMPARING

22   IT TO WHAT I KNOW HAPPENS IN OTHER COURTROOMS.  AND

23   MINE IS PROBABLY AN HOUR AND 45 MINUTES OF

24   QUESTIONING OF TWELVE PEOPLE THAT I PLACE IN THE JURY

25   BOX.

26           AND THEN I WOULD GIVE EACH COUNSEL 15

27   MINUTES OF YOUR OWN TO -- ON THOSE TWELVE PEOPLE.

28           AND THEN WHEN THAT QUESTIONING HAS

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
 1    CONCLUDED, THEN I HEAR CHALLENGES FOR CAUSE.  AND
 2    THEN ONCE THE CAUSE CHALLENGES HAVE BEEN RULED ON,
 3    THEN WE GO ON TO THE EXERCISE OF PEREMPTORIES.  AND
 4    THE SUBSEQUENT QUESTIONING OF JURORS THAT TAKE THE
 5    PLACE OF THOSE TWELVE THAT ARE IN THE BOX IS
 6    HOPEFULLY MUCH MORE RAPID BECAUSE I DON'T ASK -- I
 7    KNOW WITH ME, I DON'T ASK EVERY QUESTION OVER AGAIN;
 8    I ASK WHETHER THEY HAVE HEARD THE QUESTIONS THAT HAVE
 9    BEEN ASKED BY MYSELF AND COUNSEL AND WHETHER THEY
10    WOULD HAVE ANSWERS TO THEM.
11         AND THEN I GO INTO A FEW OF THE AREAS,
12    BECAUSE THERE HAS BEEN A LOT OF INFORMATION THAT'S
13    BEEN COVERED BY THAT POINT.  AND THERE ARE SOME
14    CERTAIN THINGS THAT I THINK ARE IMPORTANT TO
15    EMPHASIZE.
16         I WILL ASK ABOUT WHETHER THEY HAVE SEEN ANY
17    PRETRIAL PUBLICITY WITH REGARD TO THIS CASE.
18         AND I HAVE TO BE HONEST WITH YOU, I HAVEN'T
19    SEEN ANYTHING MYSELF ABOUT THIS CASE AT ANY POINT.
20         I HAVEN!T SEEN ANY REPORTS, ALTHOUGH I -- I
21    ACCEPT THE FACT THAT YOU SAID THERE WAS A REPORT AT
22    SOME STATION THAT CHARACTERIZED HER AS A JAMES BOND
23    GIRL OR SOMETHING.  I NEVER SAW IT, NOR HAVE I READ
24    ANYTHING ABOUT THIS CASE.  THAT'S ME PERSONALLY.
25         I WILL BE SURPRISED WHETHER ANY OF THE
26    JURORS HAVE SEEN OR BEEN EXPOSED TO MUCH WITH REGARD
27    TO THIS CASE.
28         I DON'T KNOW WHETHER, BASED ON THE COVERAGE
```

1   AND THE PRESENCE OF THE MEMBERS OF THE MEDIA

2   YESTERDAY AND TODAY -- AND I DIDN'T WATCH THE NEWS

3   LAST NIGHT SO I DON'T KNOW WHETHER THERE WAS ANYTHING

4   ON ANY NEWS STATION LAST NIGHT, OR WHETHER THERE WILL

5   BE ANYTHING TONIGHT OR OVER THE WEEKEND.

6            OBVIOUSLY THAT'S AN AREA THAT WE WILL ASK

7   ABOUT, BUT I DON'T THINK PERSONALLY THAT IT IS GOING

8   TO BE MUCH OF AN ISSUE.

9            I DON'T KNOW IF ANYBODY ELSE HAS ANY

10  FEELINGS ABOUT THAT AT ALL.

11     MR. BUEHLER:  I KNOW THAT WHEN THIS CASE WAS

12  FIRST -- WHEN THE ARREST WAS FIRST MADE BACK IN 2010,

13  I BELIEVE THERE WAS QUITE A LOT OF PUBLICITY.  AND

14  THERE IS PLENTY OF PUBLICITY THAT ONE CAN FIND IF ONE

15  LOOKS FOR IT ON THE INTERNET.

16     THE COURT:  WELL OBVIOUSLY BECAUSE OF THE

17  INTERNET AND THINGS ARE THERE FOREVER, IF SOMEONE

18  WANTS TO FIND SOMETHING OUT ABOUT IT, THEY CAN.

19            BUT JUST INITIALLY, PEOPLE COMING IN HERE

20  WITH KNOWLEDGE OF THIS CASE, I DON'T THINK -- 2010,

21  IT IS LIKE DOG YEARS.  EVERY YEAR THAT PASSES IS LIKE

22  SEVEN YEARS, BECAUSE THE WAY THE WORLD IS TODAY AND

23  THE ATTENTION SPAN OF THE AVERAGE PERSON TODAY IS

24  LIKE 15 SECONDS.  AND I MEAN, I JUST WILL BE VERY

25  SURPRISED IF --

26     MR. BUEHLER:  THERE WERE REPORTS I BELIEVE ON THE

27  NEWS LAST NIGHT.  WE HAVE HAD MEDIA HERE, SO --

28     THE COURT:  THERE HAVE BEEN MEDIA HERE, BUT THAT

1  DOESN'T MEAN THEY REPORTED ANYTHING.

2         SOME OF THE MEDIA ARE FROM THOSE TV SHOWS

3  THAT WILL DO A PROGRAM ABOUT A CASE, AND THEY DON'T

4  GENERALLY DO IT WHILE THE CASE IS PENDING; THEY DO

5  IT -- THEY PUT THEIR PACKAGE TOGETHER AFTER THE CASE

6  IS OVER AND ONCE THERE IS A VERDICT.

7         I DON'T KNOW IF THAT'S THEIR INTENTION.

8  THEY DON'T GET MY PERMISSION OR CONFER WITH ME ABOUT

9  THAT.  BUT THAT'S THE WAY I HAVE SEEN IT IN THE PAST.

10     MR. BUEHLER:  I MEAN, LIKE CHANNEL 9 NEWS.  LOCAL

11  NEWS STATIONS.  SOME AT LEAST WERE CARRYING IT LAST

12  NIGHT I WAS TOLD; I DON'T FRANKLY WATCH TV NEWS

13  MYSELF.

14         SO I THINK THERE IS -- THERE COULD WELL BE

15  A NUMBER OF JURORS WHO HAVE PICKED UP SOMETHING

16  RECENTLY ON THE --

17     THE COURT:  WE WILL FIND OUT.  THAT'S ONE THING

18  THAT I WILL DEFINITELY ASK ABOUT.  BUT I DON'T THINK

19  IT HAS BEEN MUCH..  I MEAN, LIKE THE LAST CASE I DID,

20  IT WAS HUGE, HUGE, HUGE ISSUES OF MEDIA.  THAT WAS

21  THE CITY OF BELL.  AND THERE WERE ALL KINDS OF

22  THINGS.  AND IT WAS REALLY EXTENSIVE.  AND THERE WERE

23  A LOT OF JURORS THAT WE HAD TO EXCLUDE BECAUSE THEY

24  SAID THEY COULDN'T BE FAIR BASED ON COVERAGE.

25         BUT I DON'T THINK THAT'S GOING TO BE THE

26  SITUATION THAT WE ARE IN.  I WOULD BE VERY SURPRISED,

27  QUITE FRANKLY.

28         EACH SIDE GETS TWENTY PEREMPTORIES, JUST TO

1    REMIND YOU.  YOU PROBABLY KNOW THAT ALREADY ANYWAY,

2    BUT -- I DON'T KNOW IF THERE IS ANY PARTICULAR AREA

3    YOU WANT THE COURT TO ASK ABOUT OTHER THAN WHAT I

4    USUALLY DO WHICH ARE JUST THE TRADITIONAL AREAS THAT

5    I ALWAYS ASK ABOUT.

6         MR. BUEHLER:  IN ANTICIPATION THAT WE ARE TOO

7    LATE TO DO A JURY QUESTIONNAIRE, I DO HAVE A LIST OF

8    QUESTIONS THAT I CAN GIVE THE COURT.  THE COURT CAN

9    LOOK AT THEM.

10        THE COURT:  OKAY.  ALL RIGHT.

11        MR. BUEHLER:  IDEALLY WHAT I WOULD SUGGEST IF THE

12   COURT WERE WILLING WOULD BE TO, IN THE INITIAL VOIR

13   DIRE, TO HAND ONE OF THESE OUT TO EACH OF THE JURORS

14   AND LET THEM JUST IDENTIFY ANY OF THEM TO WHICH THEY

15   WOULD HAVE A YES.

16        THE COURT:  I WON'T DO THAT.  I DON'T DO THAT.

17        MR. BUEHLER:  BECAUSE IT CAN GIVE THE COURT --

18        THE COURT:  YES.  AND I WILL TELL YOU THE REASONS

19   WHY I DON'T DO THAT.  I DON'T THINK THAT'S A VERY

20   EFFECTIVE WAY TO GET INFORMATION.  I DON'T THINK THAT

21   YOU GIVE 65 PEOPLE A PIECE OF PAPER LIKE THIS, ASK

22   THEM TO READ IT AND THEN SAY "WHICH QUESTIONS DO YOU

23   HAVE A YES TO," AND GET ANY KIND OF A MEANINGFUL --

24        MR. BUEHLER:  YOUR HONOR, ACTUALLY I WAS THINKING

25   OF DOING IT TO THE TWELVE.

26        THE COURT:  OR JUST THE TWELVE.

27             NO.  THAT'S NOT THE WAY I DO IT.  THAT'S

28   NOT THE WAY I AM GOING TO DO IT IN THIS CASE.

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)
304

```
 1              ARE THERE ANY -- NOW DID WE SAY FOUR WEEKS?
 2   IS THAT WHAT WE PRE-SCREENED FOR?
 3        MS. OKUN-WIESE:  I BELIEVE SO.
 4        THE COURT CLERK:  YES, YOUR HONOR.
 5        THE COURT:  OKAY.
 6              NOW DO EITHER OF YOU KNOW OF ANY ISSUES,
 7   PROBLEMS, MEDICAL APPOINTMENTS, SOMETHING THAT'S
 8   GOING TO INTERFERE WITH YOUR ABILITY TO BE HERE AT
 9   ALL DURING THE NEXT FOUR WEEKS?
10        MR. KASSABIAN:  I JUST REALIZED I HAVE JURY
11   SERVICE ON THE 20TH.  I THINK I WILL BE ABLE TO GET
12   OUT OF THAT.
13        THE COURT:  YEAH, I THINK SO.
14              ANYTHING THAT ANYBODY ELSE HAS?
15        MS. OKUN-WIESE:  I HAVE A COURT APPEARANCE ON THE
16   MORNING OF THE 17TH, BUT I WILL SEE IF I CAN GET
17   SOMEONE TO STAND IN.
18        THE COURT:  I THINK YOU PROBABLY CAN.
19              OKAY.
20              BUT NO ONE HAS LIKE THE MEDICAL PROCEDURE
21   THAT THEY COULDN'T POSSIBLY PUT OFF AND IT IS GOING
22   TO COME UP AND YOU NEED TO GO, AND IT IS GOING TO BE
23   ON X DAY?
24              OKAY.  ALL RIGHT.  WELL THAT'S GOOD NEWS.
25              NOW DO WE STILL -- ARE WE STILL OF THE
26   OPINION THAT THAT TIMEFRAME IS AN ACCURATE ESTIMATE?
27        MR. BUEHLER:  YES.
28        MS. OKUN-WIESE:  I BELIEVE SO.
```

1    THE COURT:  INCLUDING DELIBERATIONS, CORRECT?

2    MS. OKUN-WIESE:  I BELIEVE SO.

3    THE COURT:  OKAY.

4         NOW NO ONE HAS PROVIDED ME A WITNESS LIST.

5    I NEED A WITNESS LIST FROM BOTH SIDES.  YOU DON'T

6    HAVE TO GIVE IT TO ME NOW, BUT YOU DO HAVE TO GIVE IT

7    TO ME ON MONDAY BECAUSE ONE OF THE THINGS I DO OF

8    COURSE FOR THE PROSPECTIVE JURORS IS READ THE WITNESS

9    LIST TO FIND OUT WHETHER THEY KNOW ANY OF THESE

10   WITNESSES.  SO I DO NEED THAT.

11        NOW MY CLERK IS CONCERNED WITH PREMARKING

12   EXHIBITS.  SO LORI, WHY DON'T YOU SPEAK TO THAT.

13   THE COURT CLERK:  I JUST WANT TO MAKE SURE THAT

14   WE WILL PUT -- HAVE A STIPULATION ON THE RECORD THAT

15   EVERYBODY STIPULATES THAT THOSE EXHIBITS ARE AS

16   STATED ON SOME LIST YOU ARE GOING TO GIVE ME AND

17   FILED WITH THE COURT.

18   MS. OKUN-WIESE:  YES.

19   THE COURT CLERK:  SO WE CAN FILE ONE AND MARK ONE

20   AS COURT'S EXHIBIT.  SO I NEED TWO.  SOMETHING TO PUT

21   INTO THE RECORD --

22   MS. OKUN-WIESE:  OKAY.

23   THE COURT CLERK:  OKAY?

24        AND THEN DON'T FORGET TO PUT THAT

25   STIPULATION ON THE RECORD ON MONDAY.

26   MS. OKUN-WIESE:  OKAY.  AND IF THERE IS

27   ADDITIONAL EXHIBITS THAT COME UP, THEY CAN JUST BE

28   ADDED AS WE GO ON.

```
 1        THE COURT CLERK:  YES.  EXACTLY.
 2        MS. OKUN-WIESE:  AND YOU GOT THE PRIOR LIST THAT
 3   I AM GOING TO CHANGE.
 4        THE COURT CLERK:  I DON'T HAVE ANY LIST.
 5        MS. OKUN-WIESE:  OH, I E-MAILED IT TO YOU.
 6        THE COURT CLERK:  DID YOU?
 7        MS. OKUN-WIESE:  YEAH, BUT I AM GOING TO CHANGE
 8   IT ANYWAY BECAUSE I TOOK OUT SOME OF THE EXHIBITS
 9   AFTER THE COURT'S RULING.
10        THE COURT CLERK:  I DIDN'T SEE IT.  I WILL
11   DOUBLECHECK THE E-MAIL.
12        THE COURT:  WELL SHE IS GOING TO REVISE IT ANYWAY
13   AFTER SHE SENT IT TO YOU.
14        MR. KASSABIAN:  HOW DO WE DIFFERENTIATE BETWEEN
15   DEFENSE AND PROSECUTION EXHIBITS?
16        THE COURT:  THE PEOPLE'S ARE NUMBERS AND THE
17   DEFENSE ARE LETTERS.
18        MR. KASSABIAN:  ALL RIGHT.
19        THE COURT:  AND IF YOU EXHAUST THE ALPHABET, THEN
20   IT IS AA, BB, CC.  AND IT KEEPS ON GOING.
21             IS THERE ANYTHING ELSE WE NEED TO DISCUSS
22   AT THIS POINT?
23        MR. KASSABIAN:  WHEN DO YOU WANT US ON MONDAY?
24        THE COURT:  I THINK YOU SHOULD BE HERE AT 9:30.
25   THE JURY IS COMING AT 10:00, BUT JUST IN CASE THERE
26   ARE ANY ISSUES THAT WE NEED --
27        THE COURT CLERK:  DON'T WE HAVE SOMETHING THAT
28   WENT OVER UNTIL MONDAY?
```

```
 1        THE COURT:  WELL, THAT MEDIA LAWYER WAS GOING TO

 2   MAYBE BRING SOME STUDIES OR SOMETHING.  9:00 O'CLOCK.

 3   SHE IS GOING TO BE HERE AT 9:00 O'CLOCK, SO YOU

 4   PROBABLY SHOULD BE HERE AT 9:00.  OR MAYBE SHE IS NOT

 5   GOING TO BE HERE; MAYBE HER PAPERWORK IS GOING TO BE

 6   HERE.  I DON'T KNOW.  SOMETHING IS SUPPOSED TO BE

 7   HERE AT 9:00.

 8        OKAY.  I THINK THAT WE ARE DONE FOR NOW.

 9   AND WE WILL SEE YOU ON MONDAY.

10        DEFENDANT IS ORDERED BACK.  BAIL TO STAND.

11        9:00 A.M. ON MONDAY.

12   MS. OKUN-WIESE:  THANK YOU.

13

14        (THE MATTER WAS CONTINUED TO MONDAY,

15        MAY 13, 2013, AT 9:00 A.M.)

16

17

18

19

20

21

22

23

24

25

26

27

28
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2               FOR THE COUNTY OF LOS ANGELES

3          DEPARTMENT 109    HON. KATHLEEN KENNEDY, JUDGE

4

5    THE PEOPLE OF THE STATE OF CALIFORNIA,    )
                                               )
6                                              )
                        PLAINTIFF,             ) BA361202-01
7                                              )
                                               )
8                    VS.                       )
                                               )
9                                              )
     KELLY SOO PARK,                           )
10                                             )
                                               )
11                      DEFENDANT.             )
                                               )
12   ──────────────────────────────────────────

13

14              I, LAURIE A. SMALL, OFFICIAL

15   REPORTER OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,

16   FOR THE COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT I DID

17   CORRECTLY REPORT THE PROCEEDINGS CONTAINED HEREIN AND THAT

18   THE FOREGOING PAGES, 1 THROUGH 131, INCLUSIVE, COMPRISE A

19   FULL, TRUE AND CORRECT TRANSCRIPT OF THE PROCEEDINGS AND

20   TESTIMONY TAKEN IN THE ABOVE-ENTITLED MATTER ON

21   MAY 10, 2013.

22              THIS TRANSCRIPT WAS PREPARED IN

23   COMPLIANCE WITH 237(A)(2) OF THE CODE OF CIVIL PROCEDURE.

24        DATED THIS 7TH DAY OF FEBRUARY, 2014.

25

26   _____
                    LAURIE A. SMALL
27             CSR NO. 4654, OFFICIAL REPORTER

28