**EXHIBIT  D**

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              FOR THE COUNTY OF LOS ANGELES

3      DEPARTMENT NO. 109    HON. KATHLEEN KENNEDY, JUDGE

4

5

6    THE PEOPLE OF THE STATE OF CALIFORNIA, ) NO. BA361202-01
                                            )
7                                           )
                          PLAINTIFF,        )
8              VS.                          )
9                                           )
                                            )
10                                          )
     KELLY SOO PARK,                        )
11                                          )
                                            )
12                        DEFENDANT.        )
13    _____)

                REPORTER'S TRANSCRIPT OF PROCEEDINGS
14
                         MAY 15, 2013
15
                           -oOo-
16

17   APPEARANCES:

18    FOR THE PEOPLE:      STACY OKUN-WIESE,
                           DEPUTY DISTRICT ATTORNEY
19

20

21    FOR THE DEFENDANT:   GEORGE BUEHLER,
                           MARK M. KASSABIAN,
22                         ATTORNEYS AT LAW

23

24

25

26

27   **COPY**              LAURIE A. SMALL
                           C.S.R. NO. 4654
28                         OFFICIAL COURT REPORTER

```
 1    CASE NUMBER:          BA361202
 2    CASE NAME:            PEOPLE VERSUS KELLY SOO PARK
 3    LOS ANGELES, CA       WEDNESDAY, MAY 15, 2013
 4    DEPARTMENT 109        HON. KATHLEEN KENNEDY, JUDGE
 5    REPORTER:             LAURIE A. SMALL, CSR NO. 4654
 6    TIME:                 9:05 A.M.
 7
 8    APPEARANCES:
 9      DEFENDANT KELLY SOO PARK, PRESENT WITH COUNSEL,
10    GEORGE W. BUEHLER AND MARK M. KASSABIAN, ATTORNEYS AT
11    LAW;
12      STACY OKUN-WIESE, DEPUTY DISTRICT ATTORNEY,
13    REPRESENTING THE PEOPLE OF THE STATE OF CALIFORNIA.
14
15           (THE FOLLOWING PROCEEDINGS WERE
16             HELD IN OPEN COURT OUTSIDE THE
17             PRESENCE OF THE JURY:)
18
19      THE COURT:  ARE YOU READY?
20      MR. BUEHLER:  YES.
21      THE COURT:  ALL RIGHT, WE ARE ONCE AGAIN ON THE
22    RECORD IN THE MATTER OF PEOPLE VERSUS PARK.
23           THE DEFENDANT IS PRESENT WITH COUNSEL; THE
24    PEOPLE ARE REPRESENTED.
25           WE HAVE NO JURORS OR ALTERNATE JURORS IN
26    THE COURT.
27           WE HAVE SOME MOTIONS THAT -- PRETRIAL
28    MOTIONS THAT WERE PENDING FROM EARLIER THIS WEEK AND
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1   FROM LAST WEEK.

2           AND -- SO LET'S TALK ABOUT, FIRST, THE

3   JUDICIAL IMMUNITY MOTION WHICH WAS FILED BY THE

4   DEFENSE AND OPPOSED BY THE PROSECUTION.

5           MR. BUEHLER?

6       MR. BUEHLER:  THANK YOU, YOUR HONOR.

7           WELL I THINK OUR POSITION IS SIMPLE, YOUR

8   HONOR; WE HAVE A WITNESS THAT THE COURT IS WELL AWARE

9   OF, MELISA AYALA, THAT WE BELIEVE IS AN ESSENTIAL

10  WITNESS WHO GIVES EXCULPATORY TESTIMONY, TESTIMONY

11  HIGHLY RELEVANT TO OUR THIRD PARTY CULPABILITY

12  DEFENSE.  THAT'S A DEFENSE THAT I BELIEVE WE ARE

13  ENTITLED TO MAKE, AND WE SHOULD NOT BE REQUIRED TO --

14  SO WE SHOULD BE ENTITLED TO MAKE THAT DEFENSE, AND WE

15  SHOULD NOT BE REQUIRED TO MAKE IT WITHOUT THE BENEFIT

16  OF MISS AYALA'S TESTIMONY.

17          NOW I REALIZE THERE IS SOME QUESTION IN THE

18  LAW AS TO WHETHER OR NOT THE COURT CAN ACTUALLY ORDER

19  PEOPLE TO GIVE IMMUNITY.

20          IN MY MIND, THE --

21      THE COURT:  EXCUSE ME.

22          DEPUTY THAT'S CHEWING GUM AND HAS YOUR

23  RADIO MAKING NOISE, I WOULD ASK YOU TO LEAVE MY

24  COURTROOM PLEASE.

25          PROCEED.

26      MR. BUEHLER:  I THINK FIRST OF ALL, YOUR HONOR,

27  THERE IS A QUESTION AS TO WHETHER THE PROSECUTION --

28  GIVEN THEIR OBLIGATION TO DO WHAT IS FAIR, I QUESTION

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1    THEIR UNWILLINGNESS TO SOLVE THIS PROBLEM FOR US AND

2    FOR THE COURT AND TO FIND A WAY TO -- EITHER THROUGH

3    USE IMMUNITY OR SOME OTHER MEANS -- TO ENABLE THIS

4    WITNESS TO BE AVAILABLE.

5         AND I DON'T THINK IT IS FITTING.  I DON'T

6    THINK THE PROSECUTION SHOULD BE IN THE POSITION OF

7    SAYING "WE ARE GOING TO TRY SOMEBODY FOR FIRST DEGREE

8    MURDER, AND WE ARE GOING TO INSIST ON GOING THROUGH

9    WITH THAT TRIAL WHEN WE KNOW THERE IS A WITNESS THAT

10   COULD PROVIDE EVIDENCE TO -- THAT'S CRITICAL TO A

11   DEFENSE THAT THE DEFENDANT HAS, AND WE ARE SIMPLY

12   GOING TO HAVE THE TRIAL AND RESOLVE GUILT OR

13   INNOCENCE WITHOUT THAT WITNESS BEING AVAILABLE."

14        AND WE KNOW THAT THE REASON THE WITNESS IS

15   NOT AVAILABLE IS BECAUSE THAT WITNESS IS UNDER

16   PROSECUTION IN A DIFFERENT, YEAR-OLD CASE.

17        SO BEFORE WE GET TO THE QUESTION OF WHAT

18   THE COURT CAN DO, I THINK THERE IS A REAL QUESTION AS

19   TO WHAT THE PROSECUTION SHOULD BE DOING AND WHETHER

20   THE COURT SHOULDN'T USE WHATEVER POWER IT HAS TO

21   SUGGEST TO THE PROSECUTION THAT THEY SHOULD BE TAKING

22   A DIFFERENT POSITION ON THIS ISSUE.

23        WE DO WANT TO HAVE A TRIAL, BUT WE WANT TO

24   HAVE A TRIAL THAT'S FAIR.  AND I DON'T THINK WE CAN

25   HAVE A TRIAL THAT'S FAIR IF WE CAN'T ASK QUESTIONS OF

26   A CRITICAL WITNESS FOR THE DEFENSE.

27        NOW THE PROSECUTION SAYS THAT IN TERMS OF

28   PRODUCING IMMUNITY OR GIVING THE WITNESS IMMUNITY,

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
 1    THAT THAT WOULD BE DETRIMENTAL TO THE PROSECUTION
 2    BECAUSE OF THE DANGER THAT IF THE WITNESS TESTIFIES
 3    UNDER A GRANT OF USE IMMUNITY, THAT COULD COMPLICATE
 4    THEIR PROSECUTION IN THE EL SEGUNDO CASE.
 5         I CONCEDE THAT THAT'S A REAL CONCERN OFTEN
 6    FOR PROSECUTORS; THAT WHATEVER TESTIMONY IS GIVEN
 7    UNDER THE GRANT OF USE IMMUNITY COULD PERHAPS MAKE IT
 8    DIFFICULT FOR THEM TO PROVE -- THAT THAT WASN'T THE
 9    SOURCE OF INFORMATION THAT THEY LATER PROSECUTE THE
10    WITNESS ON.
11         HERE WE ARE TALKING ABOUT A PROSECUTION
12    THAT'S A YEAR OLD AND THAT HAS BEEN WELL
13    INVESTIGATED.  AND WE HAD THE TWO PEOPLE -- THE
14    INVESTIGATOR FROM EL SEGUNDO AS WELL AS THE FILING
15    DEPUTY FROM THE AIRPORT COURT TESTIFY ABOUT THE FACT
16    THAT THERE HAS BEEN EXTENSIVE INVESTIGATION IN THAT
17    CASE BEFORE IT WAS FILED JUST ABOUT A MONTH OR SO
18    AGO.  SO I DON'T -- IT IS ENTIRELY SPECULATIVE, AND
19    IT SEEMS VERY UNLIKELY TO ME THAT THE USE -- THAT THE
20    TESTIMONY THAT THIS WITNESS WOULD GIVE UNDER USE
21    IMMUNITY ON A LIMITED SUBJECT IN THIS CASE POSES ANY
22    REAL DANGER OF COMPLICATING OR PREJUDICING THE
23    PEOPLE'S ABILITY TO PROSECUTE THAT WITNESS IN THE
24    OTHER CASE.
25         SO WITHOUT ANY -- ANY POTENTIAL DANGER,
26    DAMAGE, TO THE INTEREST OF THE PEOPLE, THEY ARE
27    SIMPLY IN THE POSITION OF SAYING, "WE DON'T WANT TO
28    GRANT HER IMMUNITY, AND THE COURT DOESN'T HAVE THE
```

1   POWER TO GRANT THE WITNESS IMMUNITY, SO LET'S START

2   WITH THE TRIAL, AND TOUGH LUCK THAT THE DEFENSE DOES

3   NOT HAVE THAT WITNESS AVAILABLE."

4           SO I DON'T THINK -- I THINK UNDER THE

5   PRINCIPLES DESCRIBED IN THE CASE LAW WE HAVE CITED,

6   THAT IT WOULD SEEM TO ME IT IS CLEAR THAT THE COURT'S

7   RESPONSIBILITY, POWER, TO PROTECT THE FUNDAMENTAL

8   RIGHT OF THE DEFENDANT TO BE ABLE TO MAKE HER

9   DEFENSE -- AS THE SUPREME COURT SAYS, HER COMPLETE

10  DEFENSE -- I BELIEVE THE COURT DOES HAVE INHERENT

11  POWER TO TAKE THE SITUATION UNDER CONTROL AND TO

12  GRANT USE IMMUNITY.

13      THE COURT:  MISS WIESE?

14      MS. OKUN-WIESE:  YOUR HONOR, IN THE DEFENSE'S

15  MOTION THEY ARE STATING THAT THE PEOPLE SHOULD BE

16  FAIR IN THIS CASE AND THAT IT IS ACTUALLY THE

17  PEOPLE'S FAULT THAT MISS AYALA DOESN'T WANT TO

18  TESTIFY.

19          IN THEIR MOVING PAPERS THEY BLAME

20  DETECTIVE THOMPSON FOR DISTORTING THE FACT FINDING

21  PROCESS.  AND LAST WEEK THE COURT DENIED THE

22  DEFENSE'S MOTION TO DISMISS BASED UPON ANY MISCONDUCT

23  THAT DETECTIVE THOMPSON COULD HAVE CAUSED.

24          IT WAS VERY CLEAR THAT, BY THE TAPE

25  RECORDING OF MISS AYALA, SHE DIDN'T WANT TO BE

26  INVOLVED IN THE FIRST PLACE.

27          AND I PROVIDED THE COURT WITH THE

28  CALIFORNIA CASE OF PEOPLE VERSUS COOK, 16 CAL.APP.

1    4TH, 1361.  AND IN THAT COURT, THEY STATED THAT NO

2    CALIFORNIA SUPREME COURT NOR CALIFORNIA COURT OF

3    APPEAL HAS EVER GRANTED USE IMMUNITY TO A THIRD PARTY

4    WITNESS.  AND THE RELIEF IN THAT CASE WHICH APPELLANT

5    WAS SEEKING SHOULD BE GRANTED, IF AT ALL, BY OUR

6    STATE'S HIGHEST COURT.

7            IN THAT COURT -- IN THAT CASE THEY REFER TO

8    THE CASE OF UNITED STATES -- STRIKE THAT --

9    GOVERNMENT VERSUS SMITH AT 615 F. 2ND, 964.  AND THAT

10   CASE WAS ACTUALLY CITED BY COUNSEL IN THEIR PAPERS.

11           AND IN THAT CASE THEY SAID THAT A COURT

12   GRANTING USE IMMUNITY SHOULD BE UNDER A VERY LIMITED

13   CIRCUMSTANCE.  AND THEY ACTUALLY SET OUT A

14   THREE-PRONG TEST WHICH I STATED IN MY MOVING PAPERS.

15           THE DEFENSE HAS THE BURDEN TO MEET THE

16   FIRST TWO PRONGS.  AND THE FIRST PRONG IS THAT "THE

17   PROFFERED TESTIMONY MUST BE CLEARLY EXCULPATORY AND

18   THE TESTIMONY MUST BE ESSENTIAL.  AND THEN ONCE THAT

19   IS PROVEN, THE BURDEN THEN SHIFTS FOR THE COURT TO

20   DECIDE WHETHER OR NOT THERE IS A STRONG GOVERNMENTAL

21   INTEREST WHICH COUNTERVAILS AGAINST A GRANT OF

22   IMMUNITY."

23           THE DEFENSE CANNOT PROVE IN THIS CASE THAT

24   MISS AYALA'S TESTIMONY IS CLEARLY EXCULPATORY.  WE

25   DON'T KNOW THE CIRCUMSTANCES THAT IT WAS UNDER.

26           THE COURT AND THE PEOPLE AND THE DEFENSE

27   ARE VERY WELL AWARE OF THE RELATIONSHIP BETWEEN

28   MR. GILMORE, MR. SCHWARCZ AND MISS AYALA.  WE DON'T

1   KNOW IF MISS AYALA WAS MAD AT MR. GILMORE AT THE

2   TIME.  THERE ARE SO MANY DIFFERENT THEORIES THAT THAT

3   STATEMENT, IF AT ALL MADE, COULD HAVE BEEN MADE

4   UNDER.  IT LEAVES THE COURT TO SPECULATE.  THAT IS

5   NOT CLEARLY EXCULPATORY, AND THE DEFENSE HAS FAILED

6   TO PROVIDE ANY ARGUMENT TO SHOW THAT THE STATEMENT,

7   IF MADE AT ALL BY MISS AYALA, IS ESSENTIAL TO THEIR

8   CASE.

9           THE DEFENSE WANTS A FAIR TRIAL.  FOR THE

10  PEOPLE TO GRANT MISS AYALA IMMUNITY AND LET HER

11  TESTIFY WHEN THE PEOPLE DON'T BELIEVE HER AT ALL

12  WOULD BE NOT GRANTING THE DEFENDANT A FAIR TRIAL.

13          MISS AYALA NOT ONLY HAS THE PENDING 245,

14  BUT SHE HAS A RECENT ARREST FROM JANUARY OF THIS YEAR

15  AGAINST MR. SCHWARCZ FOR DOMESTIC VIOLENCE.  THAT'S A

16  VERY RECENT ARREST.  THE PEOPLE WOULD BE PRECLUDED,

17  IF THAT CASE WAS FILED, FROM BRINGING IN ANY EVIDENCE

18  THAT WAS OBTAINED DURING THIS TRIAL IN THAT TRIAL.

19  IT IS PUTTING A HUGE BURDEN ON THE PEOPLE TO GO TO

20  BOTH HER 245 TRIAL AND A POTENTIAL 273 TRIAL AND HAVE

21  TO EXPLAIN TO THE COURT IN THOSE TRIALS HOW THE

22  PEOPLE DERIVED ANY INFORMATION.

23          THE PEOPLE ARE NOT WILLING TO GRANT

24  MISS AYALA IMMUNITY, AND THE PEOPLE ARE REQUESTING

25  THE COURT NOT GRANT MISS AYALA IMMUNITY.

26          THANK YOU.

27      THE COURT:  YOU KNOW, IT IS TRUE THAT THERE IS NO

28  CASE -- THERE IS NO CALIFORNIA CASE WHERE THE -- THAT

1    I COULD FIND AND THAT COUNSEL CITED THAT HAD THE

2    COURT GRANTING IMMUNITY TO A WITNESS, TO A THIRD

3    PARTY WITNESS.

4              AND BECAUSE OF THE SEPARATION OF POWERS

5    WHICH IS INNATE IN OUR SYSTEM, THE ISSUE OF WHETHER

6    THE PROSECUTION GRANTS IMMUNITY TO A WITNESS IS ONE

7    THAT IS FOR THE PROSECUTION I THINK -- AND I DON'T

8    THINK I HAVE THE POWER TO ORDER THEM TO GRANT

9    IMMUNITY.  IT IS A QUESTION OF PROSECUTORIAL

10   DISCRETION.

11             NOW WITH REGARD TO THE SUPPOSED STATEMENTS

12   OF MISS AYALA, THEY SEEM TO ME TO BE AMBIGUOUS AT

13   BEST.  I MEAN, YOU SAY THAT THEY ARE EXCULPATORY TO

14   YOUR CLIENT.  I DON'T SEE WHERE THEY ARE

15   UNAMBIGUOUSLY EXCULPATORY TO YOUR CLIENT WHEN

16   SUPPOSEDLY, AS I UNDERSTAND IT, MISS AYALA MAKES SOME

17   KIND OF A COMMENT THAT IS ATTRIBUTED TO JOHN GILMORE

18   THAT, "YOU ARE GOING TO FEEL LIKE JULIANA FELT," OR

19   SOMETHING, AND SUPPOSEDLY HE HAS HIS HANDS AROUND

20   MELISA AYALA'S THROAT AT THE TIME HE MAKES THAT

21   STATEMENT.

22             THAT'S NOT SAYING THAT HE COMMITTED THE

23   MURDER OF JULIANA REDDING.

24             BY THE TIME THAT INCIDENT WITH MELISA AYALA

25   TOOK PLACE, IF IT TOOK PLACE AT ALL, IT WAS WELL

26   AFTER THE MURDER OF JULIANA REDDING.  AND EVERYONE,

27   BY THAT TIME, KNEW THE CAUSE OF DEATH OF

28   JULIANA REDDING.

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1          SO I DON'T SEE THAT THAT IS AN UNAMBIGUOUS
2     STATEMENT THAT IMPLICATES JOHN GILMORE IN THE MURDER
3     OF JULIANA REDDING.
4          ADDITIONALLY, THIS WHOLE ONGOING SAGA
5     BETWEEN MELISA AYALA, JOHN GILMORE,
6     NICHOLAS SCHWARCZ -- I THINK THERE IS ANOTHER
7     DEFENDANT IN THAT CASE THAT'S PENDING AT THE AIRPORT
8     OF INCIDENTS GOING BACK AND FORTH, RESTRAINING ORDERS
9     GOING BACK AND FORTH BETWEEN THE PARTIES, ACCUSATIONS
10    GOING BACK AND FORTH BETWEEN THE PARTIES, MISS AYALA
11    BEING WITH JOHN GILMORE, BREAKING UP WITH HIM, GOING
12    TO NICHOLAS SCHWARCZ, BREAKING UP WITH
13    NICHOLAS SCHWARTZ, GOING BACK TO JOHN GILMORE,
14    BREAKING UP WITH JOHN GILMORE, GOING BACK TO NICHOLAS
15    SCHWARCZ, THIS WOULD BE A CAN OF WORMS THAT WOULD BE
16    A HUGE DIVERSION FROM THE ISSUES IN THIS CASE.
17          IT WOULD INVOLVE ANY NUMBER OF ADDITIONAL
18    WITNESSES, AND POTENTIALLY, AS I SEE IT, WOULD ALSO
19    PROBABLY INVOLVE AN ISSUE OF FURTHER GRANTING OF
20    IMMUNITY, BECAUSE IF THE ACCUSATIONS WERE GOING TO BE
21    MADE BY MISS AYALA AGAINST JOHN GILMORE FOR THIS
22    SUPPOSED INCIDENT THAT TOOK PLACE BETWEEN THEM, AND
23    THEN JOHN GILMORE IS CALLED AS A WITNESS, THEN HE
24    WOULD HAVE A 5TH AMENDMENT RIGHT AGAINST
25    SELF-INCRIMINATION WHICH WOULD INVOLVE A WHOLE NUTHER
26    ISSUE OF WHETHER SUCH A WITNESS WOULD BE AVAILABLE TO
27    TESTIFY, WHETHER HE WOULD INVOKE A 5TH AMENDMENT
28    RIGHT.  WE WOULD HAVE ANOTHER ISSUE OF WHETHER HE

1    SHOULD BE CONFERRED IMMUNITY, AND SO ON AND SO ON AND

2    SO ON WHICH WOULD SIMPLY, UNDER 352, BE FAR MORE

3    PREJUDICIAL THAN PROBATIVE, BE A WHOLE DIVERSION INTO

4    WHAT -- WE CALL IT A MINI TRIAL, EXCEPT IT WOULDN'T

5    BE A MINI TRIAL; IT WOULD PROBABLY BE A TRIAL THAT

6    WOULD BE AS LENGTHY AS THIS TRIAL JUST ON THE SUB

7    ISSUES OF THE RELATIONSHIP BETWEEN JOHN GILMORE,

8    MELISA AYALA, NICHOLAS SCHWARCZ AND WHO KNOWS, MAYBE

9    OTHERS AS WELL.

10            AND IN WEIGHING THAT AND CONSIDERING THE

11   STANDARDS AS SET FORTH IN THESE -- HUNTER AND THE

12   OTHER CASES THAT WERE CITED BY BOTH SIDES, I DON'T

13   THINK THAT THE DEFENSE HAS ESTABLISHED THE PRONGS

14   NECESSARY FOR THE COURT ON ITS OWN TO GRANT IMMUNITY,

15   AND I DON'T BELIEVE THAT I HAVE THE AUTHORITY TO

16   ORDER THE PROSECUTION TO GRANT IMMUNITY.  AND THEY

17   HAVE INDICATED THAT THEY DO NOT WISH TO DO SO UNDER

18   THE CIRCUMSTANCES OF THIS CASE.  AND I THINK THAT

19   THIS WHOLE SIDE SHOW THAT WOULD TAKE PLACE WOULD BE

20   FAR MORE PREJUDICIAL THAN PROBATIVE, UNDER 352.

21            THEREFORE, THE REQUEST TO HAVE IMMUNITY

22   GRANTED TO THE WITNESS, MELISA AYALA, IS DENIED AT

23   THIS TIME.

24            NOW GOING ON TO THE ISSUE OF -- ANOTHER

25   ISSUE THAT WAS PENDING WHICH IS A MOTION WITH REGARD

26   TO THE RECORDING AND THE TRANSCRIPT OF THE RECORDING

27   OF MR. JOHN GILMORE.

28            AND FOR THE RECORD, I BELIEVE THAT IT WAS

1    FRIDAY OF LAST WEEK THAT THE GENTLEMAN WHOSE NAME

2    ESCAPES -- MR. STUTCHMAN TESTIFIED.  AND THE TAPE WAS

3    PLAYED HERE IN COURT.  AND I HAD LISTENED TO THE

4    ENHANCED VERSION OF THAT TAPE IN CHAMBERS BEFOREHAND,

5    NOT REALIZING EXACTLY WHAT IT WAS THAT I WAS

6    LISTENING TO, LISTENED TO IT AGAIN DURING THE COURSE

7    OF THE HEARING AND HEARD FROM THE WITNESS OUT OF THE

8    PRESENCE OF ANY POTENTIAL JURORS.

9         SO I WILL HEAR FROM YOU NOW IF YOU WANT TO

10   BE HEARD ABOUT THAT.

11        OR MR. KASSABIAN, ARE YOU THE MOVER BEHIND

12   THAT?

13     MR. BUEHLER:  ACTUALLY I AM NOT THE MOVING PARTY.

14   AS I RECALL --

15     THE COURT:  WELL IT IS A MOTION TO EXCLUDE.

16        ALL RIGHT.  MISS WIESE?

17     MS. OKUN-WIESE:  YOUR HONOR, THE PEOPLE PROVIDED

18   THE COURT WITH THE FIRST COPY OF THE RECORDING

19   BECAUSE IN THE DEFENDANT'S MOVING PAPERS TO ADMIT

20   THIRD PARTY CULPABILITY, THEY INDICATED THAT THIS

21   TAPE RECORDING BY JOHN GILMORE WAS IN THE WORDS "I

22   DID IT."  AND THEY FAILED TO PROVIDE THE COURT WITH A

23   RECORDING.

24        I PROVIDED THE COURT WITH A RECORDING.  WE

25   PLAYED IT IN COURT MORE THAN ONE TIME.  WE PLAYED THE

26   INITIAL TRACK AND THEN THE BROKEN DOWN TRACKS IN

27   COURT, AND THEN ON FRIDAY WITH THE ASSISTANCE OF

28   MR. STUTCHMAN, WITH HIS EXTRA LOUD BOSE SPEAKERS HE

1    PLAYED IT AS WELL, AND HE ADVISED THE COURT WHAT HE

2    HEARD.  AND AT THAT TIME THE COURT INDICATED THAT

3    WHEN SHE HEARD IT IN COURT, SHE THOUGHT IT WAS

4    GIBBERISH.  AND EVEN WITH THE ENHANCED VERSION YOUR

5    HONOR THOUGHT IT WAS GIBBERISH.  AND THE PEOPLE

6    AGREE.

7             TO PROVIDE THAT COPY TO THE JURY WHEN THERE

8    IS SO MUCH CAUSE FOR SPECULATION, AND TO MISLEAD THE

9    JURY, UNDER 352, IT SHOULD BE EXCLUDED.

10            UNDER PEOPLE VERSUS POLK, 1996, 46 CAL.APP.

11   4TH, 944, THE COURT ACTUALLY ADMITTED A TAPE.  AND

12   THEY WENT THROUGH WHETHER OR NOT A TAPE RECORDING

13   SHOULD BE ADMITTED AND WHETHER OR NOT A TRANSCRIPT

14   SHOULD BE ADMITTED.  AND I UNDERSTAND THAT IT HAPPENS

15   ALL THE TIME, BUT IN POLK THERE WAS A SMALL PORTION

16   THAT WAS UNINTELLIGIBLE.  THE REMAINING PORTION, THE

17   RELEVANT PORTIONS, WERE INTELLIGIBLE.  AND THAT'S NOT

18   WHAT WE HAVE IN THIS CASE.  WE HAVE THE COMPLETE

19   OPPOSITE.  WE HAVE A THREE OR FOUR-MINUTE PORTION OF

20   A TWO-TO THREE-HOUR RECORDING OF JOHN GILMORE WHO WAS

21   JUST LEARNING OF HIS GIRLFRIEND'S DEATH.  AND THE

22   THREE-MINUTE PORTION OF MR. GILMORE IS HIM ON THE

23   VIDEO SOBBING.  AND THAT WAS THE REASON WHY I PLAYED

24   THE COURT THE ACTUAL VIDEO BECAUSE YOU HAVE TO

25   UNDERSTAND WHAT'S GOING ON.

26            MR. GILMORE IS SOBBING, AND HE PUTS HIS

27   HEAD DOWN, AND THEN HE SITS BACK.  AND THROUGHOUT THE

28   ENTIRE THREE MINUTES HE IS CRYING.

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1       THERE IS NOTHING INTELLIGIBLE IN THAT

2  PORTION OF THE RECORDING.  SO TO PROVIDE THAT PORTION

3  WITHOUT MORE WOULD TAKE AWAY ANY RELEVANCE.  IT WOULD

4  ASK THE JURY TO SPECULATE AT BEST ABOUT WHAT THEY ARE

5  HEARING.

6       I HAVE LISTENED TO THE TAPE; THE COURT HAS

7  LISTENED TO THE TAPE.  AND WE ARE IN AGREEMENT THAT

8  YOU CANNOT DECIPHER WHAT IS ON THAT TAPE.

9       AND I THINK THAT TO PRESENT THAT TO THE

10  JURY WOULD ASK THEM TO SPECULATE, AND I BELIEVE THAT

11  UNDER 352 IT IS MORE PREJUDICIAL THAN PROBATIVE.

12       THANK YOU.

13  MR. BUEHLER:  I AGREE WITH YOUR HONOR'S

14  INDICATION LAST FRIDAY THAT EVEN THOUGH THE COURT DID

15  NOT BELIEVE THAT MR. STUTCHMAN SHOULD BE PERMITTED TO

16  TESTIFY TO HIS EXPERT -- WHAT HE CALLS CRITICAL

17  LISTENING, HIS INTERPRETATION OF IT BASED UPON HIS

18  EXPERTISE AND EXPERIENCE, THE COURT DID INDICATE THAT

19  THE JURY WOULD BE ABLE TO HEAR IT SO THE JURY COULD

20  MAKE THEIR OWN DECISION.

21       NOW WE HAVE I BELIEVE A VERY INTELLIGENT

22  JURY THAT WE HAVE PICKED.

23  THE COURT:  I SURE HOPE SO.

24  MR. BUEHLER:  WE SPENT SOME TIME DOING IT; WE

25  TRIED TO.

26       AND I BELIEVE THAT THE JURY CAN DECIDE IN

27  THEIR OWN MINDS WHETHER IT IS SPECULATIVE, WHETHER IT

28  IS JUST CONFUSING, WHETHER IT IS JUST GIBBERISH OR

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1    WHETHER THEY CAN HEAR SOMETHING ON THAT TAPE THAT IS

2    INCRIMINATING TO MR. GILMORE AND EXCULPATORY TO

3    MRS. PARK.

4           SO I AGREE WITH THE COURT'S INITIAL

5    INSTINCT THAT THAT IS SOMETHING THAT SHOULD GO TO THE

6    JURY.

7           I AM TROUBLED BY THE FACT THAT IN EVERY

8    MOTION IN THIS CASE THAT AT BOTTOM, THE PEOPLE'S

9    POSITION IS "OUR EVIDENCE IS SO STRONG THAT THEIR

10   EVIDENCE SHOULDN'T BE TESTED BY THE PROCESS OF TRIAL.

11   SO WHEN WE ARE TALKING ABOUT IMMUNITY, THOSE

12   STATEMENTS AREN'T EXCULPATORY."

13          I DISAGREE.  AND I CAN'T DECIDE JUST HOW

14   EXCULPATORY SOMETHING IS UNTIL YOU PUT IT IN FRONT OF

15   THE JURY.

16          ON THE FACE OF IT, YOU HAVE GOT MISS AYALA

17   SAYING, "YOU KILLED JULIANA REDDING, DIDN'T YOU?"  HE

18   DOESN'T DENY IT.  IN FACT, INSTEAD HE SAYS, "DO YOU

19   WANT TO SEE HOW IT FELT?"

20       THE COURT:  THAT'S NOT THE WAY IT WAS

21   REPRESENTED, MR. BUEHLER.  THAT'S NOT THE STATEMENTS

22   THAT WERE REPRESENTED.

23       MR. BUEHLER:  I BELIEVE THAT WAS, YOUR HONOR.

24       THE COURT:  NO.

25       MR. BUEHLER:  IN ALL EVENTS, IT IS FOR THE JURY

26   TO DECIDE THESE TYPES OF ISSUES.  IN EFFECT, THE

27   PROSECUTION IS CONTINUALLY ASKING THE COURT TO MAKE

28   RULINGS BASED UPON THE ASSUMPTION THAT THE EVIDENCE

```
 1    THAT WE HAVE JUST ISN'T GOOD EVIDENCE, PARTICULARLY

 2    IN LIGHT OF HOW STRONG THEIR EVIDENCE IS.

 3              THAT'S NOT THE WAY TRIALS WORK.  THAT'S NOT

 4    HOW WE DECIDE GUILT OR INNOCENCE IN CASES.  AND SO I

 5    BELIEVE THIS TESTIMONY, THIS EVIDENCE ALSO SHOULD BE

 6    PRESENTED TO THE JURY.

 7              THANK YOU, YOUR HONOR.

 8        THE COURT:  I WOULD ONLY ADMIT THAT EVIDENCE IF

 9    IT IS RELEVANT IN SOME WAY.

10              NOW I DID NOT TAKE UP THE ISSUE OF ITS

11    RELEVANCE, AND I DON'T KNOW EXACTLY IN WHAT CONTEXT

12    YOU WOULD PLAN TO PLAY THAT TAPE.

13              BUT WHAT THE COURT WAS DOING IN TERMS OF

14    THE MOTION -- AND I AM NOT MAKING A DETERMINATION AS

15    TO WHETHER THE PROSECUTION'S EVIDENCE IS STRONG OR

16    WEAK OR ANYTHING ELSE; I DON'T KNOW WHAT THE

17    PROSECUTION'S EVIDENCE IS IN THIS CASE.

18              BUT THE ISSUE WAS WHETHER THE EXPERT

19    WITNESS, NUMBER ONE, QUALIFIES AS AN EXPERT AND SO

20    FORTH; AND SECONDLY HIS STATEMENT OR HIS

21    INTERPRETATION OF WHAT THE ENHANCED AUDIO SAYS SHOULD

22    COME BEFORE THE JURY.

23              NOW WHAT THE WITNESS SAID TO ME ON --

24    FROM THE WITNESS STAND AT THE TIME OF THE HEARING WAS

25    NOT ONLY THAT THIS IS WHAT HE HEARD WHEN THE TAPE WAS

26    PLAYED IN ITS ENHANCED FASHION AND THAT PEOPLE IN HIS

27    OFFICE HEARD IT AND COULD HEAR THE SAME THING, AND

28    THEN IN A MOMENT WHEN THE TAPE WAS PLAYED, THAT I
```

```
 1    WOULD HEAR THE SAME THING.
 2              OKAY.  I DID NOT HEAR WHAT MR. STUTCHMAN
 3    SAYS THAT I WOULD BE ABLE TO HEAR.  AND SO THAT'S THE
 4    POINT.
 5              NOW APPARENTLY THERE IS NO DISPUTE AS TO
 6    METHODOLOGY THAT MR. STUTCHMAN UTILIZED, THE
 7    DIFFERENT COMPUTER PROGRAMS OR WHATEVER -- YOU KNOW,
 8    HE WENT INTO DETAIL ON THAT.  AND SO I ASSUME THAT
 9    THE PEOPLE ARE NOT CHALLENGING THAT.
10              AND SO IT WOULD SEEM TO ME THAT IF THIS
11    TAPE IS RELEVANT, THAT MR. STUTCHMAN WOULD BE ABLE TO
12    TESTIFY TO THE METHODOLOGY THAT HE UTILIZED TO
13    ENHANCE THE TAPE.  HOWEVER, I DO NOT BELIEVE THAT HE
14    WOULD BE ENTITLED TO SAY WHAT HE FEELS THAT THAT TAPE
15    SAYS.  I DO THINK THAT THAT WOULD BE AN ISSUE OF FACT
16    FOR THE JURY.
17              AND THIS, QUOTE UNQUOTE, CRITICAL LISTENING
18    THAT HE DESCRIBED, I WAS -- I AM UNAWARE OF ANY CASE
19    THAT ALLOWS AN EXPERT TO TESTIFY AS A CRITICAL
20    LISTENER.  AND SO THAT'S NOT A MATTER, IT SEEMS TO
21    ME, FOR EXPERT TESTIMONY.  THAT IS A MATTER THAT THE
22    ORDINARY, AVERAGE PERSON WOULD HAVE TO COME TO THEIR
23    OWN OPINION ABOUT, WHICH WOULD BE TWELVE JURORS, IF
24    THE TAPE IS RELEVANT.  AND WE CAN DEAL WITH RELEVANCE
25    AT SOME OTHER POINT.
26              BUT ASSUMING THAT THE TAPE IS RELEVANT, IT
27    COULD COME IN; HE COULD TESTIFY CONCERNING WHAT HE
28    DID TO ENHANCE IT.  BUT I WOULD NOT ALLOW HIM TO
```

1    TESTIFY AS TO HIS OPINION AS TO WHAT IT SAID.  ALL

2    RIGHT?

3         MR. BUEHLER:  I UNDERSTAND, YOUR HONOR.

4         THE COURT:  ALL RIGHT.

5              NOW THE NEXT ISSUE IS THE 1101B, I BELIEVE,

6    EVIDENCE.  AND THAT IS THE DEFENSE MOTION.

7         MR. BUEHLER:  YES, YOUR HONOR.

8              AND THIS I THINK DOES GO TO THE QUESTION OF

9    WHAT WOULD MAKE THE TAPE THAT MR. STUTCHMAN ENHANCED

10   RELEVANT.  IN OTHER WORDS, ARE WE PERMITTED TO

11   INTRODUCE EVIDENCE OF THIRD-PARTY CULPABILITY?  ARE

12   WE PERMITTED TO INTRODUCE EVIDENCE THAT JOHN GILMORE

13   MAY HAVE BEEN THE MURDERER?

14              AND WE HAVE -- PART OF OUR SHOWING THERE,

15   PART OF OUR PROFFER, IS THE TESTIMONY OF MISS AYALA.

16   AT THAT POINT IT IS NOT CLEAR THAT THAT CAN BE

17   ADMITTED OR USED IN THE TRIAL.  BUT APART FROM THAT,

18   WE DO HAVE THIS HISTORY OF VIOLENCE, JEALOUSY,

19   JEALOUS OUTBURSTS AND SO FORTH, AND -- BY MR. GILMORE

20   TOWARDS JULIANA REDDING.

21              AND I THINK IT IS CLEAR, UNDER THE CASES

22   THAT WE CITE, THAT WHEN IT IS A QUESTION OF SOMEBODY

23   ENGAGING IN PRIOR ACTS OF VIOLENCE, VIS-À-VIS THE

24   PARTICULAR PERSON, THE PARTICULAR VICTIM, THEN THAT

25   IS RELEVANT BOTH TO SHOW MOTIVE AND ALSO TO SHOW

26   IDENTITY.

27              NOW I THINK THIS SORT OF BLEEDS INTO THE

28   OVERALL LAW IN PEOPLE VERSUS HALL.

```
 1            AND IN PEOPLE VERSUS HALL, YOUR HONOR, THE
 2   COURT IS NOT -- IN HALL AND THE CASES THAT COME AFTER
 3   IT, THE COURT DOESN'T PLACE ANY RESTRICTION ON
 4   CIRCUMSTANTIAL EVIDENCE OF THIRD PARTY CULPABILITY
 5   OTHER THAN IT NOT BE TOO REMOTE.  THE COURT IS QUITE
 6   CLEAR ABOUT THIS.  IT IS LIKE ANY OTHER QUESTION OF
 7   RELEVANT TESTIMONY.  AND IF IT IS RELEVANT, IF IT IS
 8   EITHER DIRECTLY RELEVANT OR IT IS CIRCUMSTANTIALLY
 9   RELEVANT -- AND OF COURSE AS THE JURY WAS ADVISED
10   REPEATEDLY YESTERDAY THERE IS NO DIFFERENCE IN THE
11   QUALITY OF THAT EVIDENCE.  CIRCUMSTANTIAL EVIDENCE
12   CAN BE JUST AS IMPORTANT AND JUST AS RELEVANT AS
13   DIRECT EVIDENCE.
14            SO I THINK IT IS CLEAR UNDER THESE CASES,
15   IN PEOPLE VERSUS HALL, THE CASES WE CITE IN
16   CONNECTION WITH THE 1101B ASPECT OF THIS, THAT WHERE
17   YOU HAVE GOT A VICTIM AND YOU HAVE SOMEBODY WHO HAS A
18   PATTERN OF BEHAVING IN A CERTAIN WAY TOWARDS THAT
19   VICTIM THAT CREATES CIRCUMSTANTIAL EVIDENCE THAT THAT
20   PERSON IS THE PERPETRATOR OF THE ASSAULT, OF THE
21   MURDER ON THE VICTIM, THEN THAT IS ADMISSIBLE FOR
22   IDENTITY.
23       THE COURT:  SO WHAT PATTERN ARE YOU SUGGESTING?
24   IS THERE ANY INCIDENT BETWEEN GILMORE AND REDDING
25   THAT'S OUTLINED IN YOUR PAPERS WHERE HE ACTUALLY USES
26   PHYSICAL VIOLENCE AGAINST HER?
27       MR. BUEHLER:  NOT AGAINST HER PERSONALLY.  BUT
28   AGAINST PROPERTY.  KICKING DOORS, FIST THROUGH A
```

```
1    WALL.  CLIMBING UP, TRYING TO GET THROUGH A WINDOW ON
2    A BALCONY, DAMAGE TO HER CAR.
3            THOSE SORTS OF THINGS.  THOSE SORTS OF --
4    WHEN HE -- WHEN SHE DOESN'T TALK TO HIM, WHERE SHE
5    SEEMS TO BE PUSHING HIM AWAY, A VIOLENT OUTBURST.
6            AND JUST BECAUSE IT HASN'T YET AT THAT
7    POINT EVOLVED INTO AN ATTACK UPON HER PERSON DOESN'T
8    MEAN THAT IT IS NOT -- ANY PERSON USING COMMON SENSE
9    WOULD SEE THAT THAT IS A PATTERN THAT COULD POINT TO
10   HIM.  IT MAY NOT BE ITSELF SUFFICIENT TO PROVE IT,
11   BUT IT IS RELEVANT TO ASK WHETHER THIS IS THE PERSON
12   THAT COULD HAVE COMMITTED AND DID COMMIT THIS CRIME.
13           NOW I KNOW IN PEOPLE VERSUS HALL AND THE
14   OTHER CASES THERE IS A CONCERN ABOUT IT HAS GOT TO BE
15   CLOSE ENOUGH IN PROXIMITY TO THE ACTUAL CRIME SO THAT
16   WE ARE NOT LETTING EVERY DEFENDANT COME ALONG AND
17   SAY, "WELL SIX MONTHS AGO SO AND SO SAID SOMETHING
18   NASTY.  FOUR MONTHS AGO SO AND SO MADE A THREAT
19   AGAINST THE VICTIM."  IT HAS TO BE PROXIMATE ENOUGH
20   THAT THE COURT CAN SAY THAT IT IS CIRCUMSTANTIALLY
21   RELEVANT TO SHOW THAT THIS PERSON MAY HAVE BEEN THE
22   ACTUAL PERPETRATOR OF THE OFFENSE.
23           AND HERE WE HAVE A PATTERN IN THE WEEK
24   BEFORE THE MURDER OF GILMORE HAVING -- WE HAVE TEXT
25   MESSAGES; WE HAVE HIS OWN TESTIMONY -- NOT HIS
26   TESTIMONY BUT STATEMENTS THAT HE MADE TO
27   INVESTIGATORS ABOUT HOW DURING THAT WEEK HE THOUGHT
28   THEY HAD GOTTEN THEIR RELATIONSHIP BACK TOGETHER.
```

1    BUT DIFFERENT THINGS HAPPENED THAT WEEK THAT WERE

2    INCONSISTENT WITH THAT, AND THEY MADE HIM ANGRY.  AND

3    THERE ARE TEXT MESSAGES THROUGHOUT THE WEEK SHOWING

4    THAT ANGER.

5         WE KNOW THAT THE MORNING, FRIDAY MORNING --

6    THE MURDER HAPPENED ON A SATURDAY.  MR. GILMORE

7    THOUGHT THAT THAT FRIDAY THEY WERE GOING TO HAVE

8    DINNER TOGETHER.  THEY DIDN'T HAVE DINNER TOGETHER.

9    SHE WAS OFF AND SHE WAS WITH TWO SEPARATE PEOPLE THAT

10   NIGHT OTHER THAN MR. GILMORE, WELL CALCULATED TO MAKE

11   HIM ANGRY.  IT DID MAKE HIM ANGRY.

12        AND THEN ON SATURDAY LEADING UP TO THE

13   MURDER THERE IS A PATTERN OF COMMUNICATIONS

14   THROUGHOUT THAT DAY WHICH REFLECT TONES AND ANGER.

15   AND RIGHT BEFORE THE MURDER THERE ARE TEXT MESSAGES

16   EXPRESSING INCREASING ANGER BY MR. GILMORE.  NOW I

17   THINK THAT'S CIRCUMSTANTIAL EVIDENCE THAT WOULD

18   SUPPORT AN INFERENCE THAT HE WAS INVOLVED IN THE

19   ACTUAL CRIME COMMITTED IN THIS CASE, AND THAT IS A

20   DEFENSE I THINK WE ARE ENTITLED TO PUT ON, YOUR

21   HONOR.  WE ARE ENTITLED TO INTRODUCE THAT EVIDENCE,

22   AND WE ARE ENTITLED TO BUTTRESS IT WITH THE EVIDENCE

23   OF MISS AYALA.

24        THAT'S -- AND I JUST WANT TO SAY THAT IF

25   THE COURT WON'T LET US DO THAT, I REALLY DO BELIEVE

26   WE HAVE CROSSED THE POINT TO WHERE WHAT GOES ON IN

27   HOLMES VERSUS SOUTH CAROLINA IS HAPPENING; THAT WE

28   ARE BEING DEPRIVED OF THE ABILITY, THE BASIC DUE

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
 1    PROCESS RIGHT TO MAKE A DEFENSE.

 2              WE ARE NOT MAKING THIS UP; IT IS IN THE

 3    EVIDENCE THAT THE PEOPLE HAVE GIVEN US, AND IT IS IN

 4    THE EVIDENCE THAT WE HAVE FOUND INDEPENDENTLY FROM

 5    MISS AYALA.  AND A JURY OUGHT TO BE ABLE TO HEAR THAT

 6    EVIDENCE BEFORE DECIDING WHETHER MRS. PARK COMMITTED

 7    THIS CRIME.

 8              THANK YOU.

 9         THE COURT:  MISS WIESE?

10         MS. OKUN-WIESE:  YOUR HONOR, JUST BECAUSE THE

11    DEFENSE WANTS TO BRING IN EVIDENCE DOESN'T MEAN HE IS

12    ENTITLED TO.  BOTH SIDES HAVE TO COMPLY WITH THE

13    RULES OF EVIDENCE.  AND THE TWO CASES CITED BY THE

14    DEFENSE IN THEIR MOVING PAPERS TO INCLUDE ALL OF

15    THIS -- ALL OF THESE ACTS BY JOHN GILMORE ARE VERY

16    DISTINGUISHABLE FROM OUR CASE.

17              THE FIRST CASE CITED BY THEM, RUFO VERSUS

18    SIMPSON, 2001, 86 CAL.APP. 4TH, 573, IS A WRONGFUL

19    DEATH ACTION.  AND IN THAT CASE MR. SIMPSON WAS A

20    DEFENDANT.  AND HE HAD PREVIOUSLY BEEN CHARGED WITH

21    DOMESTIC VIOLENCE, AND THEY WERE TRYING TO BRING IN

22    HIS OTHER ACTS DURING THAT TRIAL.

23              AND THE SECOND CASE RELIED ON BY THE

24    DEFENSE IS PEOPLE VERSUS DANIELS, 1971, 16

25    CAL.APP.3D. 36.  AND AGAIN, IN THAT CASE IT WAS A

26    DEFENDANT WHO WAS CHARGED WITH DOMESTIC VIOLENCE.

27    AND THE PROSECUTOR WAS SEEKING TO BRING IN PRIOR ACTS

28    BETWEEN THAT SAME DEFENDANT AND THAT SAME VICTIM.
```

1              THE DEFENSE IS TRYING TO ALLUDE THAT

2  MR. GILMORE AND MISS REDDING WERE IN THIS HUGE FIGHT.

3  WHAT THE DEFENSE HAS FAILED TO ADVISE THE COURT IS

4  THAT MISS REDDING LEFT MR. GILMORE THAT FRIDAY

5  MORNING AFTER SPENDING THE NIGHT WITH HIM.  THIS WAS

6  A YOUNG COUPLE GOING THROUGH BREAKUPS, GOING THROUGH

7  GETTING BACK TOGETHER.  IT IS A TYPICAL RELATIONSHIP,

8  GETTING BACK TOGETHER, ON AND OFF.

9              AND AS THE COURT POINTED OUT, MR. GILMORE,

10  BY ALL ACCOUNTS, BY WHAT THE PEOPLE HAVE AND THE

11  DEFENSE, MR. GILMORE NEVER LAID A HAND ON

12  MISS REDDING.

13              AND THE DEFENSE WANTS TO BRING FORTH THAT

14  HE HAS AT TIMES A HOT TEMPER AND THAT BECAUSE OF THAT

15  HOT TEMPER, HE THEN WENT AND STRANGLED JULIANA ON

16  MARCH 15TH.

17              THAT JUST DIDN'T HAPPEN, AND IT IS NOT

18  PERMISSIBLE TO COME IN UNDER THE EVIDENCE CODE.

19              AND JUST AS THE PEOPLE FILED AN 1101 MOTION

20  SEVERAL MONTHS BACK AND PROVIDED THE COURT WITH ALL

21  THE LAW, THE PEOPLE DID ONCE AGAIN PROVIDE ALL OF THE

22  LAW.

23              EACH OF THE CASES CITED BY THE PEOPLE WITH

24  RESPECT TO THIRD PARTY CULPABILITY REQUIRES THE

25  DEFENSE TO MEET A BURDEN.  THEY HAVE TO SHOW A NEXUS

26  BETWEEN THE THIRD PARTY AND THE ACTUAL PERPETRATION

27  OF THE CRIME.  AND AS I HAVE STATED IN BOTH OF MY

28  MOTIONS, "EVIDENCE OF MERE MOTIVE OR OPPORTUNITY TO

1    COMMIT THE CRIME IN ANOTHER PERSON WITHOUT MORE WILL

2    NOT SUFFICE TO RAISE A REASONABLE DOUBT ABOUT A

3    DEFENDANT'S GUILT."

4          THE DEFENSE HAS TO MEET THEIR BURDEN UNDER

5    1101B IN ORDER FOR THE EVIDENCE TO COME IN.  AND THEY

6    CANNOT MEET THAT BURDEN IN THIS CASE; AND THEREFORE,

7    THE EVIDENCE OF ANY PRIOR ACTS BY JOHN GILMORE SHOULD

8    BE EXCLUDED.

9        THE COURT:  IN MY REVIEW OF THE CASE LAW AND MY

10   REVIEW OF THE PAPERS THAT WERE CITED BY BOTH SIDES,

11   IT SEEMS TO ME THAT ON THIS ISSUE OF THIRD PARTY

12   CULPABILITY THAT THE DEFENSE HAS FAILED TO ESTABLISH

13   THAT NEXUS.  AND THAT IS REQUIRED; IT IS REQUIRED

14   UNDER HALL AND ALL OF THE CASES THAT HAVE

15   SUBSEQUENTLY CITED HALL ON THE ISSUE OF THIRD PARTY

16   CULPABILITY.

17          AND WHAT MISS WIESE JUST QUOTED A MOMENT

18   AGO, MERE OPPORTUNITY OR MOTIVE IS NOT SUFFICIENT;

19   THERE MUST BE A NEXUS.  AND YOU HAVE NOT ESTABLISHED,

20   IN ANYTHING -- POINTED ME TO ANY EVIDENCE --

21   SUBMITTED DECLARATIONS OF ANY EVIDENCE THAT SOMEHOW

22   CONNECTS MR. GILMORE WITH THE PERPETRATION OF THE

23   CRIME.

24          THERE HAS BEEN NO EVIDENCE THAT ANYBODY SAW

25   HIM AT OR NEAR THE APARTMENT AT THE TIME.  THERE IS

26   NO EVIDENCE OF ANY FORENSIC FINGERPRINTS, DNA, HAIR,

27   CLOTHING, ANYTHING ELSE OF MR. GILMORE THAT

28   ASSOCIATES HIM WITH THE LOCATION OF THE OFFENSE, WITH

1    ANY EVIDENCE THAT WAS RECOVERED FROM JULIANA REDDING
2    HERSELF OR FROM HER PROPERTY.  AND IN THE ABSENCE OF
3    SOME KIND OF CONNECTING EVIDENCE, YOU HAVE NOT MET
4    THAT BURDEN, IN THE COURT'S OPINION.  AND THEREFORE,
5    THESE INCIDENTS -- AND THEY ARE INCIDENTS THAT ARE
6    NOT INCIDENTS OF PHYSICAL VIOLENCE AGAINST
7    MISS REDDING.  IT APPEARS, FROM REVIEWING THOSE
8    INCIDENTS, THAT WHEN HE GETS ANGRY HE DOES NOT HURT
9    MISS REDDING, BUT HE PUNCHES A HOLE IN THE WALL OR
10   MAYBE PUTS A DENT IN HER CAR WHICH IS, YOU KNOW, NOT
11   GREAT CONDUCT; IT DOESN'T SOUND LIKE THE GREATEST
12   BOYFRIEND TO ME.  BUT IT IS NOT EVIDENCE THAT HE
13   PHYSICALLY ABUSED HER, STRUCK HER, CHOKED HER OR DID
14   ANYTHING SIMILAR TO WHAT ALLEGEDLY OCCURRED ON THE
15   NIGHT OR EARLY MORNING OF HER DEATH.
16             AND SO I DON'T MAKE UP THE LAW; THE LAW
17   EXISTS.  CALIFORNIA SUPREME COURT HAS SET FORTH --
18   AND THE STANDARD ON THIRD PARTY CULPABILITY, THERE
19   HAVE BEEN MANY CASES THAT HAVE INTERPRETED THAT.  AND
20   IT IS NOT BASED ON A COMPARISON OR A CONSIDERATION OF
21   THE STRENGTH OF THE PEOPLE'S CASE.  AGAIN, I DON'T
22   KNOW ABOUT THE STRENGTH OF THE PEOPLE'S CASE.  BUT
23   THAT'S NOT THE POINT.  THE POINT IS THAT MERE MOTIVE
24   OR OPPORTUNITY IS INSUFFICIENT.  AND WITHOUT THAT
25   NEXUS HAVING BEEN ESTABLISHED, THE COURT IS NOT GOING
26   TO ADMIT THIS OTHER EVIDENCE THAT YOU ARE SUGGESTING
27   THAT THE COURT SHOULD ADMIT.  I THINK IT IS MORE
28   PREJUDICIAL THAN PROBATIVE, AND I THINK IT WOULD

```
 1    DEFLECT THE JURY'S ATTENTION AWAY FROM THE ISSUES IN
 2    THIS CASE.
 3              WITHOUT THAT EVIDENCE ADMITTED, THE
 4    PROSECUTION STILL HAS THE BURDEN OF PROOF BEYOND A
 5    REASONABLE DOUBT THAT MISS KELLY PARK IS THE ONE THAT
 6    COMMITTED THE CRIME.  AND THAT'S THE POINT THAT THE
 7    JURY IS GOING TO HAVE TO CONSIDER AND COME TO TERMS
 8    WITH, IS WHETHER THE PROSECUTION HAS SUFFICIENT
 9    EVIDENCE TO SHOW THAT SHE IS GUILTY.
10              SO I DON'T BELIEVE THAT HER DUE PROCESS
11    RIGHTS OR RIGHT TO A FAIR TRIAL ARE COMPROMISED BY
12    REQUIRING THE DEFENSE TO ADHERE TO THE STANDARDS THAT
13    THE CALIFORNIA SUPREME COURT HAS SET FORTH WITH
14    REGARD TO THIRD PARTY CULPABILITY AND THE EVIDENCE
15    CODE AND EVERYTHING ELSE THAT APPLIES TO BOTH SIDES.
16              SO THE MOTION TO ADMIT THAT EVIDENCE IS
17    DENIED.
18              YOU HAVE A MOTION TO CONTINUE, TO HAVE THIS
19    MATTER CONTINUED UNTIL AFTER THE CASE IN EL SEGUNDO
20    INVOLVING MISS AYALA IS -- COMES TO ITS CONCLUSION
21    ONE WAY OR THE OTHER.  AND THAT MOTION TO CONTINUE IS
22    ALSO DENIED.
23              THIS CASE IS GOING FORWARD, AND THE JURY
24    WILL HEAR THE EVIDENCE THAT THEY HEAR AND COME TO THE
25    CONCLUSION THAT THEY COME TO.  MAYBE MISS AYALA WILL
26    CHANGE HER MIND; MAYBE SHE WILL AGREE TO TESTIFY; I
27    DON'T KNOW.  BUT SHE DOES HAVE HER CONSTITUTIONAL
28    RIGHTS.
```

1        AND WE ARE NOT PUTTING THIS CASE ON HOLD

2   FOR MONTHS AND MONTHS AND MONTHS TO SEE WHAT HAPPENS

3   WITH HER CRIMINAL PROSECUTION.

4        MR. BUEHLER:  IF I MAY, YOUR HONOR?

5        THE COURT:  YES.

6        MR. BUEHLER:  ON THAT POINT, I BELIEVE IT WAS

7   LAST FRIDAY WHEN THE FILING DEPUTY FROM THE AIRPORT

8   COURT WAS HERE.  AND I ASKED FOR, AND THE COURT

9   ORDERED, THAT THE -- ALL OF THE REPORTS RELATING TO

10  THE CASE AGAINST MISS AYALA OUT OF EL SEGUNDO BE

11  TURNED OVER TO ME AND TO MISS AYALA'S COUNSEL.

12       NOW WE SPOKE RECENTLY, YESTERDAY, WITH

13  MISS AYALA'S COUNSEL BECAUSE WE DON'T KNOW FOR

14  CERTAIN THAT SHE CAN'T BE AVAILABLE SOMETIME.  AND

15  THE FIRST THING HER LAWYER HAS TO DO IS EVALUATE WHAT

16  THE EVIDENCE IN THAT CASE IS, WHETHER IT IS GOING TO

17  BE RESOLVED QUICKLY; WHETHER THERE --

18       THE COURT:  IT IS NOT EVEN SCHEDULED FOR

19  ARRAIGNMENT UNTIL JULY.

20       MR. BUEHLER:  YOUR HONOR, MAYBE SHE WANTS TO

21  TESTIFY.  BUT HER LAWYER IS NOT --

22       THE COURT:  IF SHE WANTS TO TESTIFY, THAT'S A

23  WHOLE DIFFERENT, YOU KNOW, CAT.

24       MR. BUEHLER:  BUT HER LAWYER IS NOT GOING TO LET

25  HER UNTIL HE CAN AT LEAST EVALUATE THAT CASE.

26       MY CONCERN IS THAT WE HAVE NOT YET RECEIVED

27  THOSE REPORTS THAT THE COURT ORDERED THAT WE RECEIVE

28  FROM THE PROSECUTION.  I UNDERSTAND THEY ARE ON

1    MISS WIESE'S DESK.

2        THE COURT:  OKAY, THEN YOU WILL GET THEM TODAY.

3        MR. BUEHLER:  BUT I DO WANT TO POINT OUT -- WE

4    COULD HAVE A CONTINUANCE FOR AT LEAST A SHORT PERIOD

5    TO SEE IF WE ARE GOING TO BE ABLE TO GET HER TO

6    TESTIFY.

7        THE COURT:  WE ARE NOT EVEN GOING TO GET TO THE

8    DEFENSE FOR SOME TIME.

9            I AM NOT CONTINUING THIS MATTER,

10   MR. BUEHLER.

11       MR. BUEHLER:  CAN WE THEN MAKE SURE THAT WE

12   RECEIVE THOSE REPORTS TODAY?

13       THE COURT:  ABSOLUTELY.

14           YOU ARE GOING TO TURN OVER THOSE REPORTS

15   TODAY?

16       MS. OKUN-WIESE:  YES.

17       MR. BUEHLER:  ONE OTHER MATTER, YOUR HONOR.

18       THE COURT:  I AM SORRY?

19       MR. BUEHLER:  ONE OTHER MATTER.

20       THE COURT:  YES.

21       MR. BUEHLER:  BECAUSE I DO BELIEVE THAT THE COURT

22   IS MISREADING HALL.  I DON'T THINK THE TEST IS THE

23   ONE THAT THE COURT IS APPLYING.  AND, I MEAN, IT IS

24   FUNDAMENTAL TO OUR ABILITY TO GET A FAIR TRIAL THAT

25   WE BE ABLE TO MAKE THIS DEFENSE AND INTRODUCE THIS

26   EVIDENCE.

27           SO I WOULD LIKE A CHANCE TO PRESENT THAT

28   QUESTION ABOUT THE PROPER PARAMETERS OF UNITED STATES

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
 1    VERSUS HALL TO THE APPELLATE COURT.  WE WILL FILE
 2    PAPERS ASKING THEM FOR AN IMMEDIATE STAY.  CAN THE
 3    COURT GIVE US A DAY TO DO THAT AND SEE IF THE COURT
 4    OF APPEAL WILL RELOOK AT THAT?
 5        THE COURT:  NO.
 6            YOU MAY FILE WHATEVER YOU WANT TO FILE, BUT
 7    I AM NOT CONTINUING THIS MATTER OR STAYING THIS
 8    MATTER.
 9            YOU CAN PROCEED HOWEVER YOU FEEL IS
10    APPROPRIATE, BUT I AM NOT STAYING THIS CASE.
11        MR. BUEHLER:  YES, YOUR HONOR.
12            THERE WAS ONE OTHER MOTION.
13        THE COURT:  AND WHAT IS THAT?
14        MR. BUEHLER:  AND THAT WAS THE MOTION TO ADMIT
15    THE INTERVIEW OF MISS AYALA BY THE DEFENSE
16    INVESTIGATOR UNDER THE DECLARATION AGAINST --
17        THE COURT:  YOU ARE CLAIMING AN EXCEPTION TO THE
18    EVIDENCE CODE UNDER 1230?
19        MR. BUEHLER:  YES.
20        THE COURT:  THAT IS NOT A 1230 EXCEPTION TO THE
21    EVIDENCE CODE THAT SOMEHOW THERE IS SHAME BROUGHT TO
22    MISS AYALA BECAUSE SHE WAS A DOMESTIC VIOLENCE
23    VICTIM.  AND THEREFORE, THAT STATEMENT SHOULD COME IN
24    AS AN EXCEPTION TO THE HEARSAY RULE?
25        MR. BUEHLER:  I THINK IT FITS EXACTLY THE
26    LANGUAGE OF THE RULE.
27        THE COURT:  ABSOLUTELY NOT.
28        MR. BUEHLER:  THE QUESTION IS WHETHER A
```

1    REASONABLE PERSON WOULD MAKE THOSE STATEMENTS IF THEY

2    ARE NOT TRUE, GIVEN THE TYPE OF REACTION MOST PEOPLE

3    WOULD HAVE TO SOMEBODY MAKING STATEMENTS LIKE THAT IF

4    THEY ARE NOT TRUE.

5        THE COURT:  MISS WIESE?

6        MS. OKUN-WIESE:  WELL, GIVEN WHAT THE COURT KNOWS

7    ABOUT THE RELATIONSHIP BETWEEN THEM, IT WOULDN'T BE

8    UNLIKELY THAT MISS AYALA WOULD MAKE UP THOSE

9    STATEMENTS WHEN SHE IS UPSET WITH MR. GILMORE.

10            AND WHEN THE DEFENSE FILED THEIR MOTION,

11    THEY ACTUALLY PUT IN THE MOTION THAT JOHN GILMORE

12    IDENTIFIED HIMSELF TO HER AS THE TRUE KILLER OF

13    JULIANA REDDING.  THAT CAME OUT IN NO TESTIMONY

14    THAT'S BEEN PRESENTED IN THIS COURT.

15        THE COURT:  RIGHT.  THAT'S TRUE.  IT DID NOT.

16        MS. OKUN-WIESE:  AND I WOULD ASK THIS COURT TO

17    FIND THAT ANY STATEMENT MADE BY MISS AYALA AT THIS

18    POINT IS UNTRUSTWORTHY AND CANNOT BE ADMITTED UNDER

19    1230 OF THE EVIDENCE CODE.

20        THE COURT:  WELL, SHE CERTAINLY HAS A MOTIVE

21    TO -- SHE HAS ANIMOSITY TOWARD MR. GILMORE, AS

22    EVIDENCED BY THE CONTENTS OF THE INTERVIEW BY YOUR

23    INVESTIGATOR OF HER.  AS EVIDENCED BY -- SHE HAS --

24    SHE IS BEING PROSECUTED FOR HER OWN ASSAULT ON

25    GILMORE WITH SCHWARCZ AND ANOTHER PERSON.

26            AND THERE IS PLENTY OF MOTIVE FOR HER NOT

27    TO BE TRUTHFUL TO -- SHE HAS PLENTY OF ANIMOSITY

28    AGAINST GILMORE.  BUT IT IS JUST -- THAT IS NOT THE

```
 1    KIND OF STATEMENT THAT FALLS UNDER 1230 OF THE

 2    EVIDENCE CODE.  NOT EVEN CLOSE.

 3              SO THAT REQUEST TO ADMIT THAT STATEMENT IS

 4    DENIED.

 5              ALL RIGHT, ARE WE READY FOR THE JURY?

 6         MS. OKUN-WIESE:  YOUR HONOR, ONE THING.  I

 7    NEGLECTED YESTERDAY, IN TURNING OVER THE WITNESS

 8    LIST, TO ADD AN OFFICER ON THERE.  IT IS OFFICER

 9    DAVE ENRIQUEZ.  AND DETECTIVE THOMPSON POINTED -- AND

10    DETECTIVE THOMPSON POINTED OUT TO ME THAT I NEGLECTED

11    TO PUT HIM ON THE LIST.

12         THE COURT:  OKAY.

13         MS. OKUN-WIESE:  THANK YOU.

14

15              (PRETRIAL MOTIONS WERE

16               CONCLUDED AT THIS TIME.)

17

18

19

20

21

22

23

24

25

26

27

28
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                  FOR THE COUNTY OF LOS ANGELES

 3          DEPARTMENT 109    HON. KATHLEEN KENNEDY, JUDGE

 4

 5    THE PEOPLE OF THE STATE OF CALIFORNIA,    )
                                                )
 6                                              )
                              PLAINTIFF,        ) BA361202
 7                                              )
                                                ) REPORTER'S
 8                      VS.                     ) CERTIFICATE
                                                )
 9                                              )
      KELLY SOO PARK,                           )
10                                              )
                                                )
11                            DEFENDANT.        )
                                                )
12    _____ )

13

14                    I, LAURIE A. SMALL, OFFICIAL

15    REPORTER OF THE SUPERIOR COURT OF THE STATE OF

16    CALIFORNIA, FOR THE COUNTY OF LOS ANGELES, DO HEREBY

17    CERTIFY THAT I DID CORRECTLY REPORT THE PROCEEDINGS

18    CONTAINED HEREIN AND THAT THE FOREGOING PAGES, 1

19    THROUGH 30, INCLUSIVE, COMPRISE A TRUE AND CORRECT

20    PARTIAL TRANSCRIPT OF THE PROCEEDINGS TAKEN IN THE

21    ABOVE-ENTITLED MATTER ON MAY 15, 2013.

22                    THIS TRANSCRIPT WAS PREPARED

23    IN COMPLIANCE WITH 237(A)(2) OF THE CODE OF CIVIL

24    PROCEDURE.

25          DATED THIS 7TH DAY OF FEBRUARY, 2014.

26

27                    _____
                             LAURIE A. SMALL,
28                    CSR NO. 4654, OFFICIAL REPORTER
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

EXHIBIT E-1



```
 1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                FOR THE COUNTY OF LOS ANGELES

 3

 4   PEOPLE,                          )
                                      )
 5               Plaintiff,           )
                                      )
 6         vs.                        )   No. BA361202
                                      )
 7   KELLY SOO PARK,                  )
                                      )
 8               Defendant.           )
                                      )
 9

10

11

12

13

14

15          RECORDED INTERVIEW OF ██████████

16                 FEBRUARY 6, 2013

17

18

19

20                     Transcribed and certified by
                       MOLIS CARDOZA, CSR No. 13080
21

22

23

24

25
```

1             [BEGINNING OF RECORDED MATERIAL]

2             UNIDENTIFIED SPEAKER:  Hello?

3             DETECTIVE THOMPSON:  Hello.  My name is Karen

4  Thompson, and I'm a detective with Santa Monica Police

5  Department.

6             UNIDENTIFIED SPEAKER:  Uh-huh.

7             DETECTIVE THOMPSON:  And I'm trying to reach

8  ▓▓▓▓▓▓▓▓

9             UNIDENTIFIED SPEAKER:  Oh, okay.

10           DETECTIVE THOMPSON:  Is she around?

11           UNIDENTIFIED SPEAKER:  Yeah, hold on a second.

12           DETECTIVE THOMPSON:  Okay.  Thank you.

13           UNIDENTIFIED SPEAKER:  ▓▓▓▓?

14           MS. ▓▓▓▓▓:  What?

15           UNIDENTIFIED SPEAKER:  The detective is on the

16  phone.

17           MS. ▓▓▓▓A:  Hold on.  Hold on.

18           Hello?

19           DETECTIVE THOMPSON:  Hello.  Hi, I'm Karen

20  Thompson, and I'm a detective with Santa Monica Police

21  Department.

22           MS. ▓▓▓▓:  Uh-huh.

23           DETECTIVE THOMPSON:  And I just got off the

24  phone with John Gilmore, who is one of the people who we

25  are calling as a witness on the murder trial for

1    Julianna Redding's homicide here in Santa Monica.

2              MS. ████: Uh-huh.

3              DETECTIVE THOMPSON: And first, what I want to

4    tell you is that John is not the killer. And I can go

5    over the investigation with you and tell you how we know

6    this in -- in a minute. But the two people who showed

7    up at your house two weeks ago --

8              MS. ████: Uh-huh.

9              DETECTIVE THOMPSON: -- they are private

10   investigators who were hired by the defense team that is

11   representing the killer on this case.

12             MS. ████: Okay.

13             DETECTIVE THOMPSON: So the way they kind of

14   sweep in and they show you these ID cards that look

15   official and they have badges, but the badges are really

16   private investigators. Like they actually don't work

17   for law enforcement.

18             They are private investigators who are hired

19   by her defense attorneys to try and shoot holes in -- in

20   our prosecution of their -- of the bad guy.

21             MS. ████: Okay.

22             DETECTIVE THOMPSON: So all -- they can say

23   whatever they want to you. They're not under any legal

24   obligations to tell you the truth about anything.

25             MS. ████: Uh-huh.

1    DETECTIVE THOMPSON:  And -- and John mentioned

2    to me that they were waving around in your face, some

3    kind of a rape report alleging that John was a rapist?

4        MS.          Yes.

5        DETECTIVE THOMPSON:  I have just gotten off my

6    computer and I searched the databases for L.A. County

7    Sheriff's, LAPD, and all the local agencies here in the

8    South Bay and I can't find any report anywhere that says

9    that someone reported him as a rapist.

10        MS.          Okay.

11        DETECTIVE THOMPSON:  And more importantly, the

12    fact that he was never arrested or charged with such a

13    crime and he was never even questioned.  Like if they --

14    even if someone filed a report -- because a lot of

15    people file these crazy reports.

16        MS.          Uh-huh.

17        DETECTIVE THOMPSON:  But if they didn't call

18    him, the detectives for the agency, wherever this police

19    report might have been filed, if they didn't call him

20    and interview him about it, they didn't even think it

21    was a good enough case to investigate.

22        MS.          Uh-huh.

23        DETECTIVE THOMPSON:  So I just -- I don't want

24    you -- I mean, I don't want you to pass judgment on him

25    based on what these people, who are working for a murder

1    suspect, are telling you.

2            Does that make sense?

3            MS. ███████   No, that makes perfect sense.

4    Yeah.

5            DETECTIVE THOMPSON:  Okay.  So -- and then,

6    secondly, I actually think that you might have some

7    information.  Because we have been suspecting that they

8    were going to try to blame this all on John, like

9    they're -- because John has a temper.

10           You know, I -- I have -- I can see his

11   criminal background and what I see is that he's been in

12   a lot of bar-room fights when he was drunk.  I can see

13   that he's damaged property, and I see that he's got a

14   domestic violence arrest over an allegation that

15   happened with you, I think, and that's the one that he

16   took the plea bargain on and he's on probation for now?

17           MS. ███████   Uh-huh.

18           DETECTIVE THOMPSON:  But he's not a murderer

19   and he's not -- you know, like he was a -- he is a

20   young -- to me, he was a young 21-year-old back in the

21   days when he was partying and he got in a lot of

22   trouble.  But I don't think that he's a bad person and I

23   never -- and I certainly don't think that he committed

24   this murder.

25           MS. ███████   Okay.

1    DETECTIVE THOMPSON:  So -- but they've been

2    asking for police reports from like El Segundo and the

3    Los Angeles County Sheriff's.  So we suspected that they

4    were going to attack John and try to say, "Well, they

5    had this volatile relationship and they argued and he

6    did it," et cetera, et cetera.

7            MS. ███████:  Uh-huh.

8            DETECTIVE THOMPSON:  But what I'm going to

9    tell you is -- and this is a fact.  The girl who we

10   arrested and we charged with this murder, Julianna was

11   strangled to death.

12           MS. ███████  Uh-huh.

13           DETECTIVE THOMPSON:  This girl's DNA is on her

14   neck.

15           MS. ███████:  Uh-huh.

16           DETECTIVE THOMPSON:  After Julianna was

17   murdered, she was picked up and moved to the bed.

18   Because the intent was that they were going to burn the

19   apartment so they wanted it to make it look like she was

20   asleep.

21           MS. ███████:  Uh-huh.

22           DETECTIVE THOMPSON:  On Julianna's tank top,

23   when they picked her up, the killer left her DNA on the

24   front of her tank top and on the back of her tank top.

25           MS. ███████  Okay.

1     DETECTIVE THOMPSON:  Julianna tried to call

2   911 on her cell phone but the suspect grabbed the phone

3   out of her hand and she -- and disconnected the call

4   before it could even connect to -- to 911.

5           MS. ████████  Uh-huh.

6           DETECTIVE THOMPSON:  And we have the killer's

7   DNA on Julianna's phone.

8           MS. ████████  Uh-huh.

9           DETECTIVE THOMPSON:  We also have blood on the

10  front doorhandle where the killer closed the front door

11  and locked it after the murder was committed, because

12  she went out the backdoor.

13          MS. ████████:  Uh-huh.

14          DETECTIVE THOMPSON:  So that's -- so the

15  killer was injured during the struggle and she left her

16  blood DNA on the doorhandle.

17          Additionally, she was cleaning up and we have

18  a drop of her blood in the kitchen sink on a plate and

19  we have her left thumbprint inside of that drop of

20  blood.

21          MS. ████████:  Okay.

22          DETECTIVE THOMPSON:  And then right before she

23  left the apartment, she turned on the stove knob on the

24  stove and then blew out the flame and there was a candle

25  lit.  So she was trying to make the apartment explode to

1  destroy all the evidence and the fact that she had

2  committed a murder there.  And we have her DNA on the

3  stove knob.

4            MS. ████████  Okay.

5            DETECTIVE THOMPSON:  So there is -- there

6  isn't any doubt in my mind that we have arrested the

7  proper person for this murder.  You know, after we made

8  the arrest, I've gone on to interview multiple people

9  and what I have found is that this woman, kind of one of

10  her jobs for her employer, who was this horrible

11  Lebanese doctor, was to act as the muscle, kind of go

12  out and threaten and intimidate and cajole people into

13  complying with whatever the Lebanese doctor's business

14  desires were.

15            So Julianna's dad backed out of a business

16  deal with this doctor and so his employee, this girl,

17  went there to convince Julianna to get her dad back on

18  board and Julianna didn't agree to it and the girl lost

19  her temper and killed her.

20            MS. ████████:  Yeah.

21            DETECTIVE THOMPSON:  So is that answering some

22  of your questions?

23            MS. ████████:  No, you know, I -- I just didn't

24  want to be dragged into this in the first place.

25            DETECTIVE THOMPSON:  No, I understand.  Yeah.

1          MS. ████████  Like I didn't know John.

2          DETECTIVE THOMPSON:  Uh-huh.

3          MS. ██████:  And like I didn't know this

4    situation.

5          DETECTIVE THOMPSON:  You didn't --

6          MS. ████████  All -- I just kind of got dragged

7    into it by these private investigators coming and they

8    made it seem like Julianna was -- had -- dating this

9    woman.

10         DETECTIVE THOMPSON:  They were -- they told

11   you that Julianna was dating this woman?

12         MS. ████████  Yeah, that's why her DNA was all

13   over Julianna.  And then they had like all these papers

14   and saying that John was like raping this like

15   15-year-old girl and like so they pretty much

16   brainwashed me.

17         DETECTIVE THOMPSON:  Uh-huh.  Well, I -- I

18   understand why they're going to try -- like there is no

19   viable explanation for why Kelly's DNA is all over

20   Julianna.

21         MS. ████████  Uh-huh.

22         DETECTIVE THOMPSON:  But another -- let me

23   tell you another thing, is I pulled Julianna's phone

24   records and I pulled them from November of 2007 all the

25   way up to the day of the murder, which was in March 15th

1  of 2008.

2              MS. ███████:   Yeah.

3              DETECTIVE THOMPSON:   Kelly Park and Julianna

4  Redding never exchanged even one text message or one

5  telephone call.  So if they were dating, how is that

6  possible?

7              MS. ███████:   Yeah.

8              DETECTIVE THOMPSON:   Do you get what I'm

9  saying?

10             MS. ███████    Yeah.

11             DETECTIVE THOMPSON:   So -- so they bent the

12  facts to try to, you know, make you think something

13  else.  I mean, that's an outright lie, that they're

14  telling you that Kelly was dating Julianna.

15             So how can you believe this story they're

16  telling you about John raped a 15-year-old girl?

17             Do you know what I mean?

18             MS. ███████    Yeah, well you know I told them

19  when they came.  Like I didn't know John at the time.

20             DETECTIVE THOMPSON:   Uh-huh.

21             MS. ███████:   Like this is just all crazy

22  because I don't think John is over it, and it's hard for

23  him.  And a lot of people tell me that I look like her.

24  So I know it could be hard for John sometimes.

25             DETECTIVE THOMPSON:   Uh-huh.

1    MS. [redacted]  But I just don't want to be

2    dragged into it because I didn't know him at the time.

3          DETECTIVE THOMPSON:  No, I understand.  What

4    makes you think that they're going to drag you into it?

5    What kind of questions were they asking you?

6          MS. [redacted]:  They were just asking me about

7    like my domestic violence -- my domestic violence case

8    with John, like what happened.

9          DETECTIVE THOMPSON:  Uh-huh.

10         MS. [redacted]  And how did it happen?  And all

11   this stuff and I just -- I even asked her like, "Do I

12   have to get a lawyer or something?"

13         And she was like, "No, well, if you want one."

14         And I was like, "Well, I don't know.  Like are

15   you going to bring me into the trial because I don't

16   want to be a part of it.  I don't."

17         DETECTIVE THOMPSON:  What was her name, the

18   woman who -- the private investigator?  Do you know?

19         MS. [redacted]:  Linda.

20         DETECTIVE THOMPSON:  Linda.

21         MS. [redacted]:  Uh-huh.

22         DETECTIVE THOMPSON:  Do you know her last

23   name.

24         MS. [redacted]  I have her card.  Hold on.

25         DETECTIVE THOMPSON:  Was there only one or was

1   there two?

2           MS. ██████   There was two.  There was also a

3   man, but I don't remember what the man's name was.

4           DETECTIVE THOMPSON:  He didn't give you a

5   card?

6           MS. ██████   He gave me a card but -- they both

7   gave me a card and they both wrote down their

8   investigate -- like their badge num- -- badge numbers or

9   something.

10          DETECTIVE THOMPSON:  They're private

11  investigator badge numbers, which are nothing.  Yeah.

12          MS. ██████:  Yeah.  And I don't actually have

13  it.  It's at -- I was at someone's house when they came

14  and they came to their -- that person's house.  And so

15  it's at his -- his house.  When I get it, I can give you

16  a call.

17          DETECTIVE THOMPSON:  Okay.

18          MS. ██████   And I can give you all that

19  information.

20          DETECTIVE THOMPSON:  Okay.

21          MS. ██████   But I don't have it with me now.

22          DETECTIVE THOMPSON:  So there -- so basically

23  what they tell you, because it gives me an idea of their

24  strategy.  Basically what they told you is that Kelly

25  and Julianna were dating and that's why her DNA is all

1    over her.

2            MS. ████████    They said Kelly had been dating

3    another woman and her.  So Julianna liked women and

4    that's why the DNA was everywhere and, you know, because

5    I was like, "Well, why" -- John's name is not in any of

6    the reports.

7            DETECTIVE THOMPSON:  Uh-huh.

8            MS. ███████:  So like it just doesn't make sense

9    for them to like want to like prosecute him or whatever.

10   Like I know that John said that they -- they took him in

11   and they had questioned him and all this stuff.

12           And I was like, "Well, he's not in any of --

13   the" -- like if you Google Julianna's name, done it

14   before or like --

15           DETECTIVE THOMPSON:  Uh-huh.

16           MS. ██████:  He's not in anything.  So like --

17   and they're like, "Well, we're just wondering why he is

18   getting away with this rape stuff and he's getting away

19   with this stuff and he's getting away with all these

20   things?  We have a feeling that he -- he knows somebody

21   on the inside."

22           DETECTIVE THOMPSON:  They're so full of it.

23           MS. ██████   Yeah.

24           DETECTIVE THOMPSON:  Well, first of all,

25   that's another difference.  John cooperated with the

1    investigation.  He came here and he let us take

2    photographs of him.  All -- I mean, we made him take off

3    his shirt so we could see if had he any scratches or

4    any -- you know, he let us take DNA from under his

5    fingernails and saliva from him and he let us take his

6    fingerprints.  You know, he stayed here and gave us the

7    statement for two or three hours.

8         This woman, her -- is involved in a murder and

9    knows a person who is dead and doesn't come forward for

10   two years?  She didn't come forward at all until we

11   arrested her.

12        MS. ▮▮▮▮:    Yeah.

13        DETECTIVE THOMPSON:  So again, it shows her

14   guilt.  John -- and you know, John was dating Julianna

15   and interestingly enough, we didn't find his

16   fingerprints or his DNA anywhere in the apartment.

17        MS. ▮▮▮▮    Yeah.

18        DETECTIVE THOMPSON:  And it was because she

19   cleaned up, but she just didn't do good enough job.  You

20   know, she didn't think to do the phone and she didn't

21   think to do the girl's neck.  And she didn't realize her

22   DNA would be on the shirt.  You know, she -- she didn't

23   get it all.

24        MS. ▮▮▮▮    Yeah.

25        DETECTIVE THOMPSON:  But she cleaned up all

1    the blood from the fight, you know, that was on the

2    floor and stuff and Julianna's hair that she pulled out

3    and the necklace that she broke.  She cleaned up those

4    kind of things.

5              MS. ████:  So they fought on the floor?

6              DETECTIVE THOMPSON:  Yeah.  Yeah, they fought

7    on the floor in the living room and that -- so Julianna

8    died in the living room but this woman picked her up and

9    moved her to the bed in her bedroom.

10             MS. ████:  Oh, okay.

11             DETECTIVE THOMPSON:  Because that way if a

12   fire started, it would look like she was sleeping in her

13   bed.

14             MS. ████:  Yeah.

15             DETECTIVE THOMPSON:  Yeah.  So, I mean, I -- I

16   don't -- I don't know what's going on with you or John.

17   John was really upset about the whole thing because

18   he -- he feels like they just made you lose faith in

19   him, I guess.

20             MS. ████:  Yeah, they kind of did.

21             DETECTIVE THOMPSON:  But I'm here to tell you

22   every step of the way, John has cooperated with us.  You

23   know, he had -- he was the one who waited for the police

24   to show up at Julianna's apartment when -- when, you

25   know, the mom couldn't find her.  And he submitted

1  himself to every interview and gave us fingerprints and
2  DNA.  Everything we asked for, he was cooperative.
3          MS. █████: Yeah.
4          DETECTIVE THOMPSON:  The only thing about John
5  was that John was a young 21-year-old, you know,
6  hothead, partying surfer guy back then.
7          MS. █████: Yeah.
8          DETECTIVE THOMPSON:  You know, and he has
9  tattoos.  He looked ominous, but he's not a bad guy.
10  And this woman -- you know, they're going to tell every
11  lie they can to try to get her off.  Because if she's
12  found guilty, she's going to go to jail for 25 to life.
13          MS. █████: Yeah.
14          DETECTIVE THOMPSON:  And, you know, I can see
15  why they're focusing on the Julianna likes women because
16  the night before, there was a girl who had a crush on
17  Julianna, that she works with, and the girl spent the
18  night at Julianna's apartment and that girl is a
19  lesbian.  So they're going to try to swing it that way.
20          You know, anything they can do to get one
21  juror -- juror to buy a crazy story.  Then they have one
22  person who is like, "Well, I'm not quite sure," and
23  that's that, you know, that one person who hangs the
24  jury.
25          MS █████    Yeah.

1       DETECTIVE THOMPSON:  So, you know, you

2  weren't -- you -- what -- what I can tell you is that

3  you weren't involved in any of this back in 2008 and you

4  didn't know John then.  The most that you might have to

5  testify to -- and it's not going to be us that calls

6  you, it's gonna be them, the defense, who is going to

7  drag you into this, is they might put you on the stand

8  and ask you to testify about the domestic violence

9  incident.

10       But we are aware that they're to do this and

11  we are already filing motions to squash it because

12  they're not really allowed to --

13       MS. ██████:  I don't want to.

14       DETECTIVE THOMPSON:  -- bring anything up,

15  except for crimes of moral turpitude.

16       MS. ██████:  Yeah.

17       DETECTIVE THOMPSON:  So they might get it in

18  but the most you'll have to talk to is that day of

19  domestic violence and -- and that will be it.

20       MS. ██████  Okay.

21       DETECTIVE THOMPSON:  You know, so -- and if

22  you have any questions at any time, you can call me.  I

23  am a police officer.  I do work for a law enforcement

24  agency and I am working with the prosecution --

25       MS. ██████  Uh-huh.

1    DETECTIVE THOMPSON:  -- to put this woman in

2    jail and we've been working for a long time.  I arrested

3    her in 2010 and they have been stalling for the trial,

4    you know, for two years.

5              MS. ██████    Yeah.

6              DETECTIVE THOMPSON:  So --

7              MS. ██████   Okay.  Can I have your number,

8    please?

9              DETECTIVE THOMPSON:  Sure.  I left it on your

10    cell phone but I'll give it to you also.

11              MS. █████:  Okay.

12              DETECTIVE THOMPSON:  My desk line is      ) --

13              MS. █████:  Uh-huh.

14              DETECTIVE THOMPSON:  --

15              MS. █████:  Uh-huh.  Okay.

16              DETECTIVE THOMPSON:  And my cell is

17    (310) 628-5877.

18              MS. █████:  So if these people come like

19    trying to call me or come back again, what am I supposed

20    to --

21              DETECTIVE THOMPSON:  You don't have to talk to

22    them.  You can say, "Look, you're not with law

23    enforcement.  I know what you are and I know that you

24    are working for -- for the murder suspect and I don't

25    want to talk to you."  You are under no legal obligation

1    at all to speak to them.

2           MS. ▓▓▓▓: Okay.

3           DETECTIVE THOMPSON: That's why they were --

4    like when they contacted you, they're like, "Oh, and

5    we're investigating the murder of Julianna Redding."

6    They didn't -- that's why they didn't tell you that they

7    were working for the defense.

8           MS. ▓▓▓▓: Yeah.

9           DETECTIVE THOMPSON: They intentionally misled

10   you.

11          MS. ▓▓▓▓: Yeah.

12          DETECTIVE THOMPSON: Does that make sense?

13          MS. ▓▓▓▓: Yeah, that does.

14          DETECTIVE THOMPSON: So other than them

15   talking about they said Kelly was dating another woman

16   and Julie and Julie looked -- and Julianna liked women

17   and was allegedly dating Kelly Park, did they mention

18   anything else?

19         MS. ▓▓▓▓: They just said that the night

20   before, Julianna had been with some other girl that

21   liked her.

22         DETECTIVE THOMPSON: Uh-huh.

23         MS. ▓▓▓▓ And then that night, Julianna was

24   with her, that Kelly girl. And I think that's it. They

25   were just kind of pretty much badmouthing John a lot and

1  asking me a lot of questions about mine and his domestic

2  violence case.

3      DETECTIVE THOMPSON:  Okay.

4      MS. ██████  Like they asked me like -- you

5  know, because he -- he jumped on the bed and put his

6  hands around my neck?

7      DETECTIVE THOMPSON:  Uh-huh.

8      MS. ██████  So they -- they asked me how it

9  happened and I showed them how it happened and I told

10  them how it happened and that's just -- that was kind of

11  about it.

12      DETECTIVE THOMPSON:  So their goal might not

13  have even been to get at this women thing.  This might

14  have just -- that just might have been to get you to let

15  your guard down and tell them.

16      Because Julianna was strangled, so what a

17  great thing to bring in, is to say that John tried to

18  strangle you.

19      MS. ██████:  Yeah.

20      DETECTIVE THOMPSON:  Right?  So they're going

21  to -- so I'm going to tell you ahead of time.  What we

22  are anticipating is that they're gonna try to blame this

23  all on John.

24      MS. ██████:  Okay.

25      DETECTIVE THOMPSON:  We're anticipating that.

1    Don't believe what they're saying.

2              MS. ██████    Okay.

3              DETECTIVE THOMPSON:   Okay?  Their -- their job

4    is to create confusion and to convince one juror to have

5    doubt.  And if they can get just one person in that

6    group of 12 to doubt that Kelly did this, she's going to

7    get off.

8              MS. ██████    Yeah.

9              DETECTIVE THOMPSON:   And John is a likely

10   story, especially with the fact that your domestic

11   violence case was the hands around the neck.

12             MS. ██████:   Yeah.

13             DETECTIVE THOMPSON:   Right?

14             MS. ██████    Yeah.

15             DETECTIVE THOMPSON:   So -- so they prob- --

16   my guess is they probably are going to try to call you

17   to testify about that.  And you -- and you are under an

18   obligation to appear if you get a subpoena from the

19   court.

20             But when you get it, you know, you can call me

21   and let me know and I'll tell you, you know, what to do.

22   You're -- you're probably going to have to check in with

23   somebody and let them know that you got this subpoena.

24             MS. ██████:   Okay.

25             DETECTIVE THOMPSON:   But you -- legally that's

1  a court order for you to show.  But until you have a

2  subpoena, you don't have to go anywhere.

3            MS. ████  Okay.

4            DETECTIVE THOMPSON:  Okay?  And you don't have

5  to talk to them if you don't want to.  You -- if they

6  call you, you don't even need to call back.  You can

7  just not call back.

8            MS. ████  Okay.

9            DETECTIVE THOMPSON:  You're not under any

10  obligation to do anything.  And if some --

11            MS. ████  I just don't -- I don't -- I don't

12  want to hurt John in any way.

13            DETECTIVE THOMPSON:  No, I understand.  But --

14  but you have to tell the truth and you'll have to let us

15  do our job and our job will be, you know, to -- to make

16  all -- to talk with the crazy juror that might believe

17  this story, out of that story.

18            MS. ████  Yeah.

19            DETECTIVE THOMPSON:  You know, that will be

20  our job.  I mean, it wouldn't -- doesn't make -- it

21  wouldn't make sense to me that John strangled Julianna

22  but then we find this woman's DNA on her neck.  That

23  doesn't make sense.  We would find John's DNA on her

24  neck.

25            MS. ████  Yeah.

1          DETECTIVE THOMPSON:  Right?

2          MS. ████████   Yeah.

3          DETECTIVE THOMPSON:  So, you know, if any

4 questions pop into your mind -- and, I mean, I just

5 reached out to John now and was telling him -- I told

6 him the same thing.  I go -- I warned him.  "That look.

7 You know, it's looking like they're gonna try to blame

8 it on you.  So be ready for that."

9       And, you know, he's cooperative.  He gave me

10 all the information, because we are subpoenaing him as a

11 witness because he was the one who was there when we

12 found her.

13          MS. ████████   Yeah.

14          DETECTIVE THOMPSON:  And there were -- they

15 were, you know, talking on the phone the night before.

16 That's another thing.

17       John -- you know, they talked at 9:45 p.m. at

18 night and Julianna told John, "Well, I'm just going to

19 watch Seinfeld"; right?  Which we know comes on at ten

20 o'clock.  "And, you know, if you decide that you want to

21 come over, you can."

22       Well, seven minutes later, Julianna was

23 calling 911.  So that woman got into Julianna's house

24 and they were already in a physical altercation seven

25 minutes after John and Julianna talked and that's when

1    we assumed she died and we have John on video.

2              So we know that he didn't do it.  We can track

3    him on video in a Jack-In-The-Box.  We have him on video

4    in an Albertsons.  We have him on video at the ZJ

5    Boardinghouse.  We have him on video almost the entire

6    night.  And then we have a whole bunch of witnesses who

7    were at a party with him on Ocean Park Boulevard and he

8    didn't leave.  So we know he didn't do it.

9              MS. ███████  Yeah.

10             DETECTIVE THOMPSON:  Does that make you feel

11   any better to hear this from me?

12             MS. ██████  Yeah, it does.

13             DETECTIVE THOMPSON:  Okay.  Do you have any

14   questions for me?

15             MS. ██████:  No, I don't.

16             DETECTIVE THOMPSON:  Okay.  So you have my

17   number.  If something pops into your head, you can call

18   me any time.

19             MS. ██████  Okay.  Thank you.

20             DETECTIVE THOMPSON:  Okay?  And if your

21   parents have questions, they can call me, too.  I'm --

22   whatever you guys need.

23             MS. ██████:  Okay.  Thank you.

24             DETECTIVE THOMPSON:  Okay.  Hang in there.

25             MS. ██████  I will.



Deposition of ▮▮▮▮▮▮▮                                                PEOPLE VS. KELLY SOO PARK

1           DETECTIVE THOMPSON:   Okay.   Bye.

2           [CONCLUSION OF RECORDED MATERIAL]

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF CALIFORNIA          )
                             )   ss.
COUNTY OF LOS ANGELES        )


        I, MOLIS CARDOZA, CSR No. 13080, a Court

Reporter for the County of Los Angeles, State of

California, do hereby certify:

        That said audio recorded material was

transcribed into typewriting under my direction and

supervision, except in the instances where the

transcript indicates "inaudible."  And I hereby certify

that said material is a full, true, and correct

transcript of the audio recorded material.

        I further certify that I am neither counsel

for nor related to any party to said action, nor in any

way interested in the outcome thereof.

        IN WITNESS WHEREOF, I hereunto subscribe my

name this 2nd day of May, 2013.


                    *M. Cardoza*

                    Certified Shorthand Reporter
                    in and for the County of Los Angeles,
                    State of California

369

**EXHIBIT E-2**



**EXHIBIT E-2:**  The CD is manually filed pursuant to Local Rule

5-4.2 because it is not conducive to e-filing

**EXHIBIT F**

JACKIE LACEY
District Attorney
Los Angeles County District Attorney
By: STACY OKUN-WIESE; State Bar No. 204333
Deputy District Attorney
MAJOR CRIMES DIVISION
210 W. TEMPLE STREET 17TH floor
LOS ANGELES, CA  90012

**SUPERIOR COURT OF STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES**

| PEOPLE OF THE STATE OF CALIFORNIA,<br>Plaintiff,<br><br>v.<br><br><br>KELLY SOO PARK<br><br>Defendant. | **Case No. BA361202**<br><br>NOTICE OF MOTION AND<br>MOTION IN LIMINE TO EXCLUDE<br>EVIDENCE OF ALLEGED THIRD<br>PARTY CULPABILITY;<br>SUPPORTING POINTS AND<br>AUTHORITIES<br><br>Date: 5/13/03<br>Time:  8:30 a.m.<br>Dept.:  109 |

TO THE HONORABLE KATHLEEN KENNEDY, DEFENDANT KELLY PARK

AND HER ATTORNEYS, MARK KASSABIAN AND GEORGE BUEHLER:

PLEASE TAKE NOTICE THAT ON May 13, 2013 at 8:30 a.m., in Department 109 of

the above entitled court, or as soon thereafter as the matter may be heard, THE PEOPLE OF

THE STATE OF CALIFORNIA, will move this Honorable Court to exclude evidence of alleged

third party culpability.  Anticipating that the defense in this case may attempt to elicit and/or

Rev. BB570-8/06 DA Case 28094196

**MOTION TO EXCLUDE EVIDENCE OF THIRD PARTY CULPABILITY**                    1

introduce inadmissible evidence of third party culpability, the People respectfully request this court to order the defense attorneys and all witnesses called to testify to refrain from discussing, referencing, eliciting or introducing evidence that a third party, whether identified or unidentified, is the actual perpetrator.  There is insufficient evidence of such third party culpability to either raise a reasonable doubt as to the defendant's guilt and/or the probative value, if any, is substantially outweighed by the prejudicial effect, undue consumption of time and/or confusion of the issues.

This motion will be based upon this motion, the files and pleadings in the above entitled matter, the grand jury transcript, the attached Points and Authorities, and on such further evidence and argument as may be introduced at the hearing on this motion.

Dated this 9th day of April, 2013                    Respectfully submitted,

                                        JACKIE LACEY
                                        District Attorney of Los Angeles County


                                        By: _Stacy Okun-Wiese_
                                        STACY OKUN-WIESE
                                        Deputy District Attorney
                                        Attorney for Plaintiff

# I.
# INTRODUCTION

Defendant Park (hereinafter "Defendant") may attempt to present third party culpability

evidence at trial that Juliana Redding's (hereinafter "Redding") boyfriend, John Gilmore

(hereinafter "Gilmore") is the true killer.  While a defendant has a right to present third party

culpability evidence, she may only do so if it is, "capable of raising a reasonable doubt as to the

defendant's guilt." *People v. Hall* (1986) 41 Cal.3d 826, 833.  Third party culpability evidence

only raises a reasonable doubt as to the defendant's guilt when it directly or circumstantially

links the third party to the actual commission of the crime.  Even if the defendant's proffered

evidence passes this test, this Court can still exclude it under Evidence Code section 352 if the

evidence will waste time, confuse the issues, or mislead the jury.[1] (*People v. McWhorter* (2009)

47 Cal.4th 318, 367-368.)

The People move to bar the testimony of any witness regarding any inadmissible third

party culpability evidence.  The defense may attempt to question Gilmore, Ryan Bonvouloir

(hereinafter "Bonvouloir"),  Timothy Maharg (hereinafter "Maharg"), Melissa Ayala, Nicholas

Schwarcz, Brandon Bowden, Ryan Reid, Charles Nicolai, Savannah Chronis, Colin Cook,

Stephanie Davila, Nick Norman (hereinafter "Norman"), Noah Lewkow, Justin Swartz, Josef

Stoop, Marcel Bourget, Richard Agnew, Wesley Gober, Dwight Oh, Jamee Dezlin, and/or John

Gilmore Sr. about Gilmore's prior and subsequent violent conduct and/or his relationship with

Redding, in order to suggest that Gilmore is the person responsible for Redding's murder.

However, the evidence the defendant may seek to present in this case does not meet the

standards set forth in *Hall.*  The defendant's third party culpability evidence is far too speculative

---

[1]    Evidence Code Section 352 provides: The court in its discretion may exclude evidence if
its probative value is substantially outweighed by the probability that its admission will: (a)
necessitate undue consumption of time, or (b) create substantial danger of undue prejudice, of
confusing the issues, or of misleading the jury.

and unreliable to raise a reasonable doubt as to the defendant's guilt.  Moreover, the evidence does not constitute direct or circumstantial evidence linking Gilmore to the actual perpetration of the crime.  Lastly, even if the defendant's third party culpability evidence meets the *Hall* requirements, admission of the evidence would only serve to waste time, confuse the issues, and mislead the jury.  Therefore, the defendant should be precluded under Evidence Code section 352 to introduce the evidence.

## II.
## STATEMENT OF FACTS

On the evening of March 15, 2008, Redding went out to dinner with her friend, Kelly Duncan.  At dinner, Redding argued with Gilmore over the phone.[2]  Gilmore and Redding had plans to see each other that evening, but Gilmore decided he was going to spend his evening with co-workers at a party instead of going to Redding's apartment.  Prior to attending the party that evening, Gilmore went with his co-workers Maharg and Bonvouloir to Albertson's grocery store, where he left his car for the night and bought beer.  The visit was recorded by Albertson's security monitoring system.  Gilmore and his friends left Albertson's together and at approximately 9:00 p.m., arrived at the party located at 825 Ocean Park.  Until approximately 9:30 p.m., Gilmore and Redding argued via text message about Gilmore breaking their plans.  At 9:45 and 9:46 p.m., Redding tried calling Gilmore on his cell phone.  Gilmore missed both calls.

At 9:52 p.m. Redding dialed 9-1-1 from her cell phone, but the call was never sent.  There were no further calls made or texts sent from Redding's phone.  At 9:53 p.m., Redding's neighbor, Lynn Mitchell-Parish (hereinafter "Parish"), heard loud screaming and things being thrown coming from inside Redding's apartment.  At 9:53 p.m., Gilmore called Redding's cell phone.  The phone was answered, but was immediately disconnected.  Gilmore called again and

---

[2]    Redding dated Gilmore on and off from 2006 until she was murdered.

although the phone was picked up, he heard static and the phone was disconnected. At 9:55

p.m., Gilmore called a third time, but this call went straight to voicemail. Gilmore continued to

call and text message Redding throughout the night. Redding never answered her phone and

never responded by text message.

At approximately 12:30 a.m., Gilmore left the party with Maharg and Bonvouloir and

went to Jack in the Box. Like Albertson's, Jack in the Box had a security system that recorded

Gilmore at the location with his friends. After leaving Jack in the Box, Gilmore and Maharg

spent the night at ZJ Boarding House, where they were both employed. ZJ Boarding House

security monitoring system verifies Gilmore and Maharg entering and leaving the premises.

At approximately 9:00 a.m. on the following morning, Gilmore called Redding, but

again, the call went straight to voicemail. Gilmore then went to Redding's apartment. Upon

arriving there, Gilmore noticed Redding's car parked in front of the building, even though she

had a scheduled modeling shoot that morning. Gilmore knocked on Redding's door for several

minutes. After there was no answer, Gilmore left to go surfing with his friend, Nick Norman.

He surfed until approximately 3:00 – 4:00 p.m. After surfing, Gilmore called Redding and

again, there was no answer. He tried to locate her at her work, Primitivo Restaurant, but no one

there had seen or heard from her. Gilmore went back to Redding's apartment for a second time

and again, there was no answer. Gilmore became increasingly concerned so he went to

Redding's neighbor's apartment and asked if he had Redding's parents' phone number. After

obtaining the number, Gilmore drove to the residence of one of Redding's friends, Natasha

Hovey. However, she was not home. Gilmore returned to his car and received a call from

Redding's mother. He explained to Redding's mother that Redding was not answering the door,

but that her car was parked in front of the building. Redding's mother called the police and Gilmore went back to Redding's apartment to meet them.

The police arrived at approximately 6:00 p.m. on March 16, 2008, and discovered Redding dead in her apartment. Autopsy results determined that strangulation was the cause of death. Based on circumstantial evidence, Redding's time of death was approximately 10:00 p.m. Inside the apartment, there was a burning candle on the living room coffee table and gas emanating from the stove. The defendant's blood and fingerprint were recovered from a plate in Redding's kitchen. In addition, the defendant's DNA was recovered from the kitchen stove, Redding's neck, clothes, cell phone, and from the front interior door of Redding's apartment. Redding did not know the defendant.

Gilmore has an arrest record beginning in 2002. He has been arrested two times for violating Penal Code section 242, with no conviction in either; five times for violating Penal Code section 594, with three convictions; once for violating Penal Code section 459, with no conviction; and three times for violating Penal Code section 245(a)(1), with no convictions. On May 18, 2012, four years after Redding's murder, Gilmore was convicted for violating Penal Code section 273.5. He pushed his then-girlfriend onto their bed and grabbed her neck. When police arrived at the scene, the victim told police that Gilmore had done this once before with one hand when they were at a party.

## ARGUMENT

### III.

### THE DEFENDANT'S POTENTIAL THIRD PARTY CULPABILITY EVIDENCE DOES NOT DIRECTLY OR CIRCUMSTANTIALLY LINK GILMORE TO REDDING'S MURDER AND THEREFORE DOES NOT RAISE A REASONABLE DOUBT AS TO THE DEFENDANT'S GUILT.

Although a defendant has a right to present third party culpability evidence, the evidence must be "capable of raising a reasonable doubt as to the defendant's guilt." *Hall, supra*, 41 Cal.3d 826. In *Hall*, the Court deemed that the proper inquiry for a trial court to make when determining the admissibility of third-party culpability evidence was whether the information being proffered by the defense can raise a reasonable doubt as to the defendant's guilt. *Id.* at 833. "At the same time," the Supreme Court continued, "we do not require that any evidence, however remote, be admitted to show a third party's possible culpability. As this [C]ourt observed in [*People v. Mendez* (1924) 193 Cal. 39, overruled in part, on other grounds, in *People v. McCaughan* (1957) 49 Cal.2d 409], evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: *there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime*." (*See id.*) [emphasis added]. Although it is not required that the evidence show "substantial proof of a probability" that a third person committed the crime, evidence that is simply remote will not be admitted. (*See Hall, supra,* 41 Cal.3d at 833; *People v. Edelbaher* (1989) 47 Cal.3d 983, 1017.) California courts have repeatedly and uniformly upheld and applied the rule expressed in *Hall*, frequently reiterating the above-quoted passage in published appellate decisions. (*See e.g. People v. Yeoman* (2003) 31 Cal.4th 93, 140-41; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1136.)

As further observed by the California Supreme Court, the inquiry does not end with the mandated finding of "direct and circumstantial evidence linking the third person to the actual perpetration of the crime." (*See Hall, supra,* 41 Cal.3d at p. 833.) "[O]nce [evidence of third party culpability] has been found relevant and admissible, the court may nonetheless exercise its discretion under Evidence Code section 352 to exclude it where its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion." (*See Gutierrez, supra,* 28 Cal.4th at p. 1136, citing *Hall,* 41 Cal.3d at 834.)

With markedly few exceptions, the California Supreme Court has, since *Hall,* universally approved of trial court rulings excluding proffered defense evidence of alleged third party culpability.[3] (*See also e.g. People v. Bradford* (1997) 15 Cal.4th 1229, 1325 [holding evidence that a murder victim feared a violence-prone boyfriend inadmissible under *Hall* and Evidence Code Section 352]; *People v. Davis* (1995) 10 Cal.4th 463, 501 [defendant's unsupported testimony implicating a third party does not meet the standard of proof set forth in *Hall*]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1125 [evidence of bad relationship between murder victim

---

[3]    The published appellate decisions that found error in the trial court's exclusion of evidence of third party culpability involved a fact pattern in which the defendant was denied an opportunity to present a third party's *confession* to a charged criminal offense or a question existed as to the cause of death. In *People v. Cudjo* (1993) 6 Cal.4th 585, 610-12, the Supreme Court found that the trial court had committed error (albeit harmless) in refusing to allow the defense to present evidence that the defendant's brother (a third party to the action and a "prime suspect") had confessed to the murder with which the defendant had been charged. *See People v. Jackson* (1991) 235 Cal.App.3d 1670 [the trial court improperly excluded evidence that a third party had admitted to shooting the murder victim]. In *People v. Basuta* (2001) 94 Cal.App.4th 370, the appellate court found that the defense should have been permitted to present evidence that the victim's mother had physically abused her child when the State's case relied on the theory that the child's death resulted from the defendant's similarly abusive conduct. *Cf. People v. Minifie* (1996) 13 Cal.4th 1055, 1065-68 [the third party evidence exclusionary rule is not applicable when a self-defense claim can be bolstered by evidence of the violent history of the victim's associates].

and his brother properly excluded absent evidence linking brother to the perpetration of the murder]; *People v. Alcala* (1992) 4 Cal.4th 742, 792-93 [evidence of the physical and temporal proximity of a third party to the murder crime scene appropriately disallowed at trial, even though the third party was on parole for murder]; *People v. Sandoval* (1992) 4 Cal.4th 155, 176-77 [appointment books referencing potential suspects does not "rise at all above possible ground of suspicion"]; *People v. Clark* (1992) 3 Cal.4th 41, 132-33 [evidence of a murder committed by the defendant's friend properly ruled inadmissible due to dissimilarities between the two decapitation murders]; *People v. Pride* (1992) 3 Cal.4th 195, 237-38 [a third party's motive, even when coupled with opportunity, will not suffice to raise a reasonable doubt about the defendant's guilt]; *People v. Kaurish* (1990) 52 Cal.3d 648, 685-86 [a third party's anger towards the victim is not sufficiently probative absent a direct link to the crime itself]; *Edelbacher, supra*, 47 Cal.3d at 1017 [mere motive is insufficient to justify the admission of evidence of third party culpability].)   A review of the most recent third party culpability cases considered by the California Supreme Court reveals its adherence to the strict standard of admissibility in such cases in the clearest possible terms.

In *McWhorter, supra,* 41 Cal.4th at 371-372, the trial court properly excluded significant motive and propensity evidence that pointed to the victim's ex-husband because none of the proffered evidence directly or circumstantially linked the ex-husband to the murders. In that case, the victims, a mother and her child, were found murdered in their home. *Id.* at 422. The defendant was arrested after police found a very recent photograph of him in a disposable camera inside the victims' apartment, learned that the defendant just moved away from the victims' apartment complex, and found out that the defendant had recently been in possession of a large sum of money. *Id.*

At trial, the defense sought to introduce several pieces of third party culpability evidence: 1) reports documenting that the ex-husband was convicted in 1994 and 1996 of domestic violence against his common law wife; 2) the victim's recent expression of fear of the ex-husband; 3) the ex-husband's motive based on mandatory child support; 4) circumstantial evidence of a possible cowboy boot print left at the scene, combined with testimony that the ex-husband always wore cowboy boots; 5) one of the ex-husband's ex-wives' testimony that he beat her when they were married; and 6) witness testimony that the ex-husband was sitting outside of the victim's house eight months before the victim's murder. *Id.* The defense argued that the prior acts and additional evidence identified the ex-husband as the murderer. *Id.* at 370.

The court granted the prosecution's motion to exclude the third party culpability evidence. It found that the ex-husband's possible motive of ending child support payments by killing the victims, "very attenuated." The court further found that the evidence relating to the cowboy boots was insufficiently probative to prove the killer's identity. Lastly and most importantly, the court found that the ex-husband's past and subsequent acts of violence against women constituted inadmissible propensity evidence. *Id.* at 372.

On appeal, the Court agreed with the trial court's exclusion of the third party evidence stating that, "much of the defendant's offer of proof consisted of mere evidence of a propensity for violence to prove identity that would not have been admissible in a trial for murder or, even if it was, would not itself have established identity." *Id.* The Court went on to say that when evidence is not being offered for something other than criminal disposition, such as motive or intent, but rather to show that the third party is more likely the perpetrator because of his propensity for violence, that evidence is properly excluded under Evidence Code section 1101. Further stating, "*Hall* did not abrogate Evidence Code section 1101 as applied to such evidence."

*Id.*, citing *People v. Davis* (1995) 10 Cal.4th 463. Because the connection to the crime was not through physical evidence, but rather through speculation based on a similar modus operandi, the evidence was ruled inadmissible character evidence. Its only purpose would have been to show the ex-husband's propensity for violence, rather than establishing his presence at the crime scene. Thus, the Court held that the trial court's ruling was proper and affirmed its decision to exclude the proffered evidence of third party culpability. *Id.* at 372.

Similarly, in *Davis, supra*, 10 Cal.4th at 500, the court properly excluded third party culpability evidence holding that evidence of the third party's prior acts constituted character evidence that only served to show the third party's propensity for violence. In that case, the defendant, after asking the victim for a ride, killed her. *Id.* at 489, 500. At trial, the defense sought to introduce evidence that Myron Ashley Reid was the person responsible for the victim's death. That evidence consisted of the following: 1) an incident where Reid engaged in an act of forcible rape while furnishing cocaine; 2) an incident where Reid forcibly drove off with a woman and threatened her with a knife, and 3) testimony from a witness who saw a man in the same vicinity as the victim who matched Reid's description. *Id.* at 495.

On appeal, the defendant argued that the trial court erred when it refused to allow the defendant to present third party culpability evidence. *Id.* at 500. Specifically, the defendant argued that evidence of Reid's prior violence toward women and cocaine-related activity supported his contention that Reid was the killer. He further argued that Evidence Code section 1101 should only apply to a defendant, not evidence pertaining to a third party. *Id.* In short, he maintained that, "evidence showing a character trait or disposition to commit such acts should be admissible to prove a third party's conduct on a specific occasion." *Id.* The Court disagreed and affirmed the trial court's ruling. *Id.* The Court reasoned that there is nothing in Evidence Code

section 1101 or case law, which provides that Evidence Code section 1101 should only apply to defendants. *Id.* at 501. The Court went on to discuss *Hall, supra,* and *People v. Farmer* (1989) 47 Cal.3d 888; overruled on other grounds. In *Farmer,* the court relying on *Hall,* stated that evidence proffered against a third party should be treated like any other evidence. Thus, if evidence is not being offered to prove a fact other than a third party's criminal disposition and therefore being used to show that a person is more likely to be the perpetrator because of his violent history, the evidence will properly be excluded. "Such evidence does not amount to direct or circumstantial evidence linking the third person to the perpetration of the actual crime. " (*Davis, supra,* 10 Cal.4th at 501, citing *Farmer, supra,* 47 Cal.3d at 921.)

Like the evidence offered in *McWhorter* and *Davis,* evidence of Gilmore's acts establish neither a direct nor circumstantial link to the actual crime and will therefore not raise a reasonable doubt as to the defendant's guilt. The proffered evidence amounts to nothing more than inadmissible character evidence under Evidence Code section 1101. Additionally, in this case, the facts support an even more compelling argument for the exclusion of the proffered third party evidence. Gilmore's conviction for domestic violence was sustained four years after Redding's murder and was against someone *other than* Redding. In fact, *none* of Gilmore's other arrests or convictions involves Redding and unlike *McWhorter,* Gilmore was dating Redding when she was killed. There is nothing to suggest that Gilmore's alleged acts establish even an inkling of direct or circumstantial evidence to link Gilmore to the actual crime. In fact, Gilmore's whereabouts are completely accounted for during the time Redding was killed. Witness testimony and surveillance video places Gilmore at a party with his friends from 9:00 p.m. on March 15, 2008 until approximately 12:30 a.m. on March 16, 2008 and then spending the night at ZJ Boarding House, where he woke up at 9:00 a.m. As phone records indicate, Gilmore

continued to call Redding throughout the night and the following day, to no avail. Because of
this, at approximately 9:30 a.m., Gilmore went to Redding's apartment. After getting no answer
there either, he went surfing with Nick Norman until 3:00 to 4:00 p.m. The evidence supports
that Redding's death occurred around 9:53 p.m., based upon the following: 1) Parish heard loud
screaming and items being thrown in Redding's apartment at 9:53 p.m. ; 2) The 9-1-1 call was
made at 9:52 p.m.; 3) Gilmore called Redding twice and was hung up on at 9:53 p.m.; 4)
Gilmore continued to call Redding and the phone went straight to voicemail up until her body
was found; 5) phone records indicate the 9-1-1 call was the last call made from Redding's phone
6) Redding did not arrive for her model shoot on the morning of March 16, 2008. It is clearly
established that when Redding was murdered, Gilmore was not there. Lastly, there is an absolute
lack of physical evidence to suggest that Gilmore was anywhere near Redding's apartment when
she was killed. To the contrary, the defendant's DNA was found on Redding and around her
apartment. That is evidence that links *her* to the murder, not Gilmore.

It is likely the defense will attempt to introduce Gilmore's prior convictions and arrests
merely to suggest that because he sustained those arrests and convictions, he therefore killed
Redding. This tenuous argument is purely speculative and can neither directly nor
circumstantially link Gilmore to Redding's murder. The potential testimony regarding Gilmore's
arrests, convictions and relationship with Redding would reveal nothing more than Gilmore's
propensity for violence against *other* individuals  The evidence would be offered not to prove a
fact such as intent or motive, but rather used to show that Gilmore is the more likely perpetrator
because he has a history of violence. As stated, this type of third party evidence is inadmissible
character evidence and because it neither directly nor circumstantially links Gilmore to
Redding's murder, it will not suffice to raise a reasonable doubt about the defendant's guilt."

Hall, *supra,* 41 Cal.3d at 833; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1017.) Because there is no reasonable likelihood that the evidence could create a doubt regarding the defendant's guilt, it fails under the first prong of the *Hall* test and should be excluded.

## IV.

### ASSUMING THE COURT FINDS AN ADEQUATE LINK BETWEEN GILMORE AND REDDING'S MURDER, A FURTHER ANALYSIS UNDER EVIDENCE CODE SECTION 352 REQUIRES EXCLUSION.

In the event the defense meets its burden by making an adequate evidentiary link between Gilmore and Redding's murder, the court may nonetheless exercise its discretion under Evidence Code section 352 to exclude that evidence when its probative value is substantially outweighed by the risk of undue delay, prejudice, or of confusing or misleading the jury. *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1136. The purpose of Evidence Code 352 is to give the court the discretion to determine what evidence is admissible based on principles of fairness and reliability. *People v. Yeoman, supra,* 31 Cal. 4th at 142. Here, because the physical evidence connects only the defendant to the murder of Redding, admission of third-party culpability evidence would both contravene these principles and confuse the jury about the real issues of the case. Therefore, even if the evidence is capable of raising a reasonable doubt, the court can exercise its discretion under Evidence Code section 352 and exclude it if its probative value is substantially outweighed by undue delay, prejudice, or confusion to the jury. (*Guttierez, supra,* 28 Cal. 4th 1136.)

In *People v. Geier* (2007) 41 Cal.4th 555, 582, the defendant wanted to introduce testimony that a third party suspect may have confessed to the murder. Documentary evidence, however, effectively proved that the third party was in a hospital approximately 160 miles away on the night of the crime. *Id.* The trial court properly excluded the third party culpability

testimony because the court found that the "admission of the evidence would have necessitated a

mini-trial on the question of Sloan's whereabouts on the night of the murder thus creating the

possibility 'of confusing the issues, or of misleading the jury.'" *Id.* (citing Evid. Code section

352). The reviewing court found no error in the trial court's exclusion of the evidence. *Id.*

Nonetheless, in its analysis, the appellate court assumed for the sake of argument that the trial

court had erred and went on to hold that:

> Other than the minimally probative testimony of these witnesses,
> there was no evidence at all, direct or circumstantial, that
> connected [third party] to the actual perpetration of the rape and
> murder of [the victim]. By contrast, the evidence that defendant
> was the perpetrator was extremely strong . . . 'we conclude it is not
> reasonably probable that a result more favorable to the defendant
> would have been reached in the absence of the error.'

*Id.* at 583 (citing *People v. Hall*, 41 Cal.3d at 836; *People v. Watson* (1956) 46 Cal.2d 818, 837).

The Supreme Court of California again upheld that same principle in *People v. Hartsch* (2009)

49 Cal.4th 472, 496. In *Hartsch*, the Court stated that when third party culpability evidence is

subject to exclusion under the statute, it permits the trial court to determine whether the probative

value of evidence is substantially outweighed by the probability of undue prejudice. *Id.*

In *Gutierrez, supra,* the defendant was precluded from presenting evidence at trial that

the murder victim owed a large sum of money to a drug dealer, that she was preparing to

participate in a drug transaction that was allegedly aborted the night before the murder, and that

she had acquired firearms ammunition the night before the murder took place. 28 Cal.4th at

1083. After conducting a "*Hall* hearing" to determine the admissibility of the purported third

party culpability evidence, the court ruled that such evidence was inadmissible for that purpose.

Upon review of *Gutierrez*, the California Supreme Court determined that the trial court had

correctly prevented the defense from calling three witnesses who were prepared to testify to the

facts stated above. Citing both *Hall's* third party culpability rule and Evidence Code Section

352, the Court ruled that "the trial court properly found that there was no evidence, beyond mere

speculation, that [a] third party either had been present with [the murder victim] *on the day of her*

*murder* or had been *shown to be connected to the crime in some other way." See Gutierrez,*

*supra,* 28 Cal.4th at 1137 [emphasis added]. The court reasoned that allowing the introduction

of such hearsay evidence would be prejudicial and would only serve to confuse the jury about the

real issues of the case. Because the victim's immersion in drug culture did not provide evidence

that another individual was linked to her murder, it would only serve to mislead the jury into

speculating whom, other than the defendant, could have caused her death. *Id.*

In the case of *Yeoman, supra,*, the Court considered the defense claim that it was

improperly denied an opportunity at trial to suggest three additional possible killers. 31 Cal.4th

93. At trial, the defense explained that evidence of a telephone conversation between a witness

called by the prosecution and a third party would give rise to an inference that the third party (or

his agent) committed the murder in an effort to suppress the murder victim's anticipated

testimony in another case. *Id.* As in the other cases previously discussed, the justices found that

"the trial court correctly exercised its discretion to exclude the [proffered] evidence." *See id.* at

140. The Court continued: "Evidence that a third person actually committed a crime for which

the defendant has been charged is relevant, but, like all evidence, subject to exclusion at the

court's discretion under Evidence Code Section 352 if its probative value is substantially

outweighed by the risk of undue delay, prejudice or confusion." (See *id.)* After quoting *Hall,*

*supra,* and its firmly-established rule that "there must be direct or circumstantial evidence linking

the third person to the actual perpetration of the crime," the Supreme Court considered the third

party culpability evidence proffered by the defense at trial and dismissed the defendant's claims

1   in summary fashion: "[T]he law does not require the admission of evidence made relevant only
2   by speculative hypothesis." (*See id.* at 141.)

3       Here, the undue consumption of time, danger of confusing the issues, and danger of
4   misleading the jury far outweigh the probative value of the defendant's proffered third party
5
6   evidence.  The testimony regarding Gilmore's convictions and his relationship with Redding
7   would have no probative value because the testimony would not provide an actual connection to
8   the murder.  Rather, the testimony would give the defense the power to ask the jury to speculate
9   that because Gilmore has arrests and convictions for violence, he must have killed Redding. This
10
11  evidence neither establishes Gilmore's presence at the crime scene nor connects him to the crime
12  in some other way. Beyond mere speculation, the couple's relationship status or Gilmore's acts
13  does not raise a reasonable doubt as to the defendant's guilt.  In fact, it has no effect on the
14  evidence the prosecution has against the defendant.  Allowing the defense to present evidence of
15  Gilmore's arrests and convictions would only serve to confuse the jury about the real issue in this
16
17  case.  Consequently, the probative value of the proffered testimony is substantially outweighed
18  by the probability that it will create undue prejudice, confuse and/or mislead the jury and should
19  therefore, be excluded.

20
21
22
23
24
25
26
27
28

## V.

## CONCLUSION

The Supreme Court decision of *People v. Hall*, and its progeny, have set forth, reiterated, and emboldened a legal principle that prevents the defense from introducing evidence of "third party culpability" except in circumstances in which the evidence links a third party to the actual perpetration of the crime(s) charged. As discussed previously, appellate courts have consistently, routinely, and almost uniformly upheld trial court rulings that excluded the proffered evidence that a third party may have been culpable for a criminal offense.

The evidence concerning Gilmore's arrests, convictions, and relationship with Redding lacks true probative value and, if allowed, would inevitably lead the trier-of-fact to speculate impermissibly about whether there is a nexus between the alleged third party culpability evidence and the charges before them. Under California law, therefore, the third party culpability evidence must be deemed inadmissible in its entirety at trial and excluded.

The People respectfully ask this Court to order the defense and all witnesses called to testify at trial to refrain -- while in the presence of jurors or potential jurors -- from discussing, referencing, eliciting or introducing evidence that Gilmore is responsible for Redding's murder.

DATED this 9th day of April, 2013

JACKIE LACEY

District Attorney of Los Angeles County

By: *Stacy Okun Wiese*
STACY OKUN-WIESE
Deputy District Attorney

Rev. BB570-8/06 DA Case 28094196

**EXHIBIT  G**

1   GEORGE W. BUEHLER (BAR NO. 60701)
2   MARK M. KASSABIAN, (BAR NO. 156595)
    BUEHLER & KASSABIAN, LLP
3   350 West Colorado Boulevard
    Suite 200
4   Pasadena, California 91105
    Tel: (626) 792-0500
5   Fax: (626) 792-0505
    e-mail: mkassabian@buehlerkassabian.com
6   Attorneys for Defendant
7   KELLY SOO PARK

**FILED**

LOS ... COURT

MAY 0 6 2013

JOHN ... EXECUTIVE OFFICER/CLERK
BY _____ Deputy
A. Jordan

8

9                   SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                        COUNTY OF LOS ANGELES

11
    PEOPLE OF THE STATE OF            )   Case No. BA361202
12  CALIFORNIA,                       )
                                      )
13          Plaintiff,                )   OPPOSITION TO MOTION IN LIMINE TO
                                      )   EXCLUDE EVIDENCE OF THIRD PARTY
14                                    )   CULPABILITY
                                      )
15      v.                            )   Date: May 13, 2013
                                      )   Time: 8:30 a.m.
16                                    )   Dept.: 109
    KELLY SOO PARK,                   )
17                                    )
            Defendant.                )
18  _____ )

19

20

21

22

23

24

25

26

27

28
                                          **Opposition to Motion to Exclude
                                          3rd Party Culpability Evidence**

                                    392

# I. INTRODUCTION

The People's Motion raises two separate issues: First, the People challenge the defense to produce third party culpability evidence that is more than mere speculation. Second, the People seem concerned that some of the defense's evidence is going to be inadmissible character evidence.

Fortunately, the resolution of both issues is easy: As to the evidence, as set out below, the Defense will introduce much, much more than bare speculation about third party culpability. Instead, the defense will present an abundance of circumstantial and even direct evidence, *including John Gilmore's confessions on three separate occasions* that he was the one who killed his ex-girlfriend. As to character evidence, the defense is well aware of the evidentiary rules and will abide by them. The proffered evidence about Mr. Gilmore's history is relevant without going through character.[1]

# II. DISCUSSION

A.  THE PEOPLE AGREE THAT THE DEFENSE HAS THE RIGHT TO INTRODUCE DIRECT AND CIRCUMSTANTIAL EVIDENCE THAT SOMEONE ELSE MURDERED JULIANA REDDING.

Even according to the People's Motion, "a defendant has a right to present third party culpability evidence . . . when it directly or circumstantially links the third party to the actual commission of the crime." (Mot. at 3:5.) Even according to the People, such evidence need only be "capable of raising a reasonable doubt." (*Id.* at 3:6.)

The California Supreme Court has long "reaffirm[ed] the admissibility of

---

[1]Separately, the defense will introduce evidence about Ivan Ivanov, an apparently disturbed man who believed he was in love with the victim, was actively stalking her at the time of the murder, had no alibi for the night of the murder, and was found days later to exhibit cuts and bruises on his face and body. None of this is improper character evidence.

Opposition to Motion to Exclude<br>3rd Party Culpability Evidence

1

1    any relevant evidence that raises a reasonable doubt as to a defendant's guilt,

2    including evidence tending to show that a party other than the defendant

3    committed the offense charged." (*People v. Hall* (1986) 41 Cal.3d 829, 829-834

4    (holding that trial court improperly rejected defendant's offer of proof of a third

5    party's culpability; rejecting prior rule to the extent that it created a "distinct and

6    elevated standard for admitting this kind of exculpatory evidence")). The third

7    party evidence need not show "substantial proof of a probability" that the third

8    person committed the act; it need only be capable of raising a reasonable doubt of

9    the defendant's guilt. (*Id.* at 833.)

10        In Hall, the Supreme Court warned trial courts against reaching "a hasty

11   conclusion ... that the evidence of [the third party's] guilt [is] 'incredible.'" (*Id.* at

12   834.) In other words, the trial court must not substitute its own assessment of the

13   evidence for that of the jury. (*See also People v. Von Villas* (1992) 10

14   Cal.App.4th 201, 265 ("the trial court must be cautious not to invade the province

15   of the jury by making credibility determinations about the proffered evidence").)

16   If the evidence is relevant, it comes in, unless its probative value is substantially

17   outweighed by the factors set forth in Evidence Code § 352. (*Hall,* 41 Cal.3d at

18   834.) And of course, evidence is relevant if it has any tendency - even the slightest

19   - to prove or disprove any material disputed fact. (Cal. Evid. Code § 210.) The

20   Defense's evidence here goes far, far beyond this minimal standard and must be

21   admitted.

22        **1.    The Defense Easily Establishes Sufficient Direct and**

23              **Circumstantial Evidence of Third Party Culpability.**

24              a.    John Gilmore.

25        With respect to John Gilmore, the victim's boyfriend at the time of the

26   murder, the evidence shows:

27        •    Mr. Gilmore had a long history of violence and jealousy towards Ms.

28              Redding, including multiple attempts to break into her apartment.

1    • Mr. Gilmore fought with Ms. Redding, including during the afternoon
2       and evening of the murder, when he accused her of ruining their
3       relationship and sent her numerous angry, expletive-filled messages.
4    • Ms. Redding turned off her cell phone, or ignored Gilmore's calls and
5       texts, shortly before she was killed.  Witnesses will testify that Mr.
6       Gilmore would become extremely angry when Ms. Redding would
7       turn off her cell phone and ignore him.  His angry texts that evening
8       accused her of turning off the phone.
9    • Mr. Gilmore admits he was in the neighborhood of Ms. Redding's
10      house the night of the murder.
11   • Most significantly, on three separate occasions, including once while
12      being recorded, Mr. Gilmore admitted that he strangled Ms. Redding:
13      • After Ms. Redding's death, Mr. Gilmore began a relationship
14         with M.A. On three occasions, he choked M.A. and on two of
15         those occasions *Mr. Gilmore told M.A. that he was going to*
16         *make her feel "what Juliana felt."*
17      • Even more significantly, during Mr. Gilmore's interrogation by
18         the police the night after the murder, he was in an interrogation
19         room with a hidden audio and video recorder.  The officers
20         asked Mr. Gilmore about what happened and then left the
21         room.  While the officers were out of the room, Mr. Gilmore
22         broke down in tears and, among other inculpatory statements,
23         said "Yes. I found you with someone" and *"I did it."*
24      In the face of this evidence, the People assert only that Mr. Gilmore could
25   not have killed Ms. Redding because he told them he was at a party with beer,
26   marijuana,[2] and friends and the partygoers did not notice him leave until after the
27
28      [2]Witnesses will testify that Mr. Gilmore became "angry" when he smoked

1   time the People think the murder occurred.[3] But obviously the defense is entitled

2   to challenge this relatively weak alibi and put the friends' knowledge and

3   credibility in front of the jury.  A third party with a history of violence toward this

4   victim, motive, opportunity, and three separate admissions of guilt certainly passes

5   the relatively low hurdle even as articulated by the People, namely this evidence

6   "direct[ly and] circumstantial[ly] links [John Gilmore] to the actual commission of

7   the crime."  The defense therefore has the right to put it before the jury.

8       In short, the People's Motion challenged the defense to produce evidence of

9   Mr. Gilmore's culpability and the defense has done so in spades.  Therefore, the

10  motion to exclude the theory of Mr. Gilmore's culpability must be denied.

11          b.    Ivan Ivanov.

12      Separately, the defense will present evidence that Ivan Ivanov committed

13  the murder.  With respect to Mr. Ivanov, a married maintenance worker with

14  apparent psychological issues, the evidence shows:

15  ●    Mr. Ivanov told the police that he had been the handyman at Ms.

16       Redding's old apartment and that he had a crush on her and that he

17       thought she loved him.

18  ●    Sometime after Ms. Redding moved out of the apartment, Mr. Ivanov

19       saw that someone had drawn a heart in the dirt on his car window.

20       For some reason, Mr. Ivanov believed this was Ms. Redding and he

21       sent her a message saying "if you intend to act as you have in the past,

22       next time you should draw a skull."

23  ●    Sometime thereafter, Mr. Ivanov began receiving "spam cell phone

24  _____

25  marijuana.

26      [3]None of the friends say they were with him the entire time.  Instead, they

27  say only that they saw him at the party and did not notice him gone.  The party was

28  in a private residence and was rather large, with about 40 attendees spread
    throughout the residence.

                                          Opposition to Motion to Exclude
                        4                 3rd Party Culpability Evidence

1    calls." He believed these were sent by Ms. Redding and that she was

2    flirting with him.

3    ● In mid-January 2008, Mr. Ivanov sent Ms. Redding flowers. He

4    instructed the florist not to tell Ms. Redding who had sent them.

5    ● In mid-February 2008, Mr. Ivanov again sent her flowers. He

6    instructed the florist to write on the card "the same as January."

7    ● Ms. Redding was murdered in mid-March. About a week after the

8    murder, Ivanov was interviewed by the police. During that interview,

9    it was established that Mr. Ivanov had numerous cuts, bruises, and

10    abrasions on his face, hands, and body.

11    ● The police never established Mr. Ivanov's alibi for the night of the

12    murder.

13    The Defense is allowed to tell the jury about Mr. Ivanov's activity directed

14 at the victim near the time of her death and is allowed to point out his cuts and

15 bruises as well as his apparent lack of any alibi.

16    **2.    The Third Party Evidence is Even More Compelling In Light of**

17         **the Totality of the Evidence in This Case.**

18    The People concede that the standard for admission of evidence of third

19 party culpability is no more stringent than any other evidence, namely relevance is

20 the standard for admission. Whether evidence is relevant and whether it passes

21 Evidence Code § 352 depends on the general landscape of evidence in the case.

22 This raises two very important points here.

23    a.    The People's case is relatively thin, which means that raising

24         reasonable doubt is easier for the defense than in some other

25         cases.

26    First, the People's evidence of guilt in this case is thinner than usual.

27 Although the People claim that Ms. Park's DNA was at the scene of the crime,

28 because of the nature of DNA evidence, this shows nothing more than the fact that

**Opposition to Motion to Exclude**<br>**3rd Party Culpability Evidence**

5

1  Ms. Park's DNA was present. It says nothing about how it got there. Thus, it is

2  inculpatory only if one assumes that there could be no innocent explanation for it,

3  an assumption that the defense will show is incorrect.

4      Moreover, the People have never offered any sensible explanation as to why

5  Ms. Park would have killed Ms. Redding. And indeed, this Court ruled against the

6  People on their § 1101(b) effort to try to offer an overly strained explanation.

7  Though motive is not an element of the offense, the lack of any sensible theory of

8  motive as to why Ms. Park would have committed this crime is certainly

9  something the jury can consider when deciding whether to believe, for example,

10  that the evidence about Mr. Gilmore raises a reasonable doubt as to Ms. Park's

11  guilt.

12      In other words, because the People's case is relatively weak, defense

13  evidence need not be overwhelming in order to be "capable of raising a reasonable

14  doubt." Of course, John Gilmore's actions and multiple confessions are indeed

15  overwhelming and would be devastating even to a much stronger case than what

16  the People have here. But the fact that the People's case is weaker than usual is all

17  the more reason why the defense is entitled to introduce its evidence of third party

18  culpability here.

19          b.    The People cannot submit a one-sided and incomplete

20              recitation of its theory of the case and use that to bar the

21              Defense from proving the People's theory wrong.

22      Apart from being simply wrong on the merits, the People's Motion is

23  procedurally defective. As described above, the determination of whether the

24  defense's evidence is capable of raising a reasonable doubt is a conclusion that can

25  be made only in light of the evidence. But the People's Motion provides no

26  evidence at all, being instead just the DDA's proffer of what appears to be her

27  theory of the case or perhaps her draft closing argument. While the People may

28  have the right to make this argument to the jury and while they may genuinely

6

**Opposition to Motion to Exclude**
**3rd Party Culpability Evidence**

1  believe in their theory of the case, the People's Motion relies on nothing more than

2  counsel's unsupported and one-sided argument to assert that defense evidence

3  rebutting the theory would just be a waste of time. But that is not how trials work.

4        The defense is entitled to present its evidence - evidence that is relevant,

5  admissible, and, frankly, devastating to the People's case. As noted earlier, the

6  defense is entitled to have the jury determine the weight of the evidence and no

7  one can substitute his or her judgment for that of the jury. (*See Von Villas*, 10

8  Cal.App.4th at 265 (cautioning trial court "not to invade the province of the jury

9  by making credibility determinations about the proffered evidence").) The People's

10 unsupported proffer of its closing argument cannot take away that right.

11        **3.    None of the Cases Cited by the People Supports Their Argument**

12             **That the Defense Should be Barred From Introducing The**

13             **Evidence at Issue Here.**

14        The People refer to a number of cases in support of their Motion. But even

15 a brief review of those cases reveals that they are inapposite. Every case cited by

16 the People has one or more of the following features: (1) no specific third party

17 was actually identified by the defense as a possible culprit; (2) if a third party was

18 identified, the defense proffered evidence only about what the third party did to

19 someone else, not to the victim of the charged offense; (3) the defense's proffered

20 evidence would have proven only a third party's character attributes, from which

21 the defense wanted to impermissibly argue his propensity to commit the charged

22 offense; or (4) the defense's proffered evidence at most indicated a third party's

23 motive or opportunity to commit the charged offense, but not his actual identity as

24 the perpetrator.

25        The People rely heavily on *People v. McWhorter* (2009) 47 Cal.4th 318.

26 (Motion at 9-11). But in that case, the proffered evidence was merely that the third

27 party had been violent towards women other than the victim and speculation about

28 a motive the third party may have had to kill the victim. The Supreme Court

**Opposition to Motion to Exclude**
                                      **3rd Party Culpability Evidence**

1 │ affirmed  the exclusion of the evidence because the proffered evidence was only
2 │ inadmissible propensity evidence and mere speculation. Contrast that to the
3 │ evidence in this case, where the defense is prepared to show, for example, that the
4 │ third party was violent with the victim on previous occasions, was in an escalating
5 │ fight with her the night she was killed, and then admitted to the killing. None of
6 │ this is speculation and none of it is propensity evidence.

7 │      The other cases cited by the People are even less impressive than
8 │ *McWhorter*. In *People v. Edelbacher* (1989) 47 Cal.3d 983, 1017-18, the defense
9 │ "did not [even] identify a possible suspect other than defendant or link any third
10 │ person to the commission of the crime." In *People v. Yeoman* (2003) 31 Cal.4th
11 │ 93, 139-141, the defense offered nothing more than a bare potential motive for a
12 │ third party to kill the victim (namely, that the third party was being prosecuted for
13 │ burglarizing the victim's car).  In *People v. Gutierrez* (2002) 28 Cal.4th 1083,
14 │ 1137 "there was no direct or circumstantial evidence to link ... any ... identifiable
15 │ third party with [the victim] in the hours before her death, or indeed on the date of
16 │ her death" (emphasis added).  In *People v. Bradford* (1997) 15 Cal.4th 1229,
17 │ 1324-25, the defense proffered only some hearsay evidence that the victim
18 │ previously had been afraid of an unidentified man, which obviously was
19 │ "insufficient to link someone other than defendant to the actual ... murder."

20 │      In *People v. Davis* (1995) 10 Cal.4th 463, 500-501, the defense offered only
21 │ that the third party generally sold drugs and was sexually violent. In *People v.*
22 │ *Rodrigues* (1994) 8 Cal.4th 1060, 1124-25, the defense offered nothing more than
23 │ an uncle's hearsay statement that the victim and the third party were not on
24 │ speaking terms. In *People v. Alcala* (1992) 4 Cal. 4th 742, 792, the defense offered
25 │ only evidence showing that a third party was in the vicinity of the crime two days
26 │ afterwards. In *People v. Sandoval* (1992) 4 Cal.4th 155, 176, the defense wanted
27 │ the trial court to admit the victim's calendar, on the bare speculation theory that
28 │ people listed in the calendar might have killed the victim.  The evidence was

1  properly excluded. In *People v. Clark* (1992) 3 Cal.4th 41, 132-33, the defense

2  wanted to introduce evidence of a third party's crime against a different victim.

3  Here, on the other hand, the third party evidence is about what the third parties did

4  to the victim. In *People v. Pride* (1992) 3 Cal.4th 195, 237-38, the defense had

5  nothing but a bare potential motive with no evidence of any activity toward the

6  victim. Finally, in *People v. Kaurish* (1990) 52 Cal.3d 648, 684-85, "[t]he most

7  that [defense] counsel was prepared to establish was that [a third party] had a

8  motive for being angry with the victim's mother, and possibly with the victim."

9       To summarize: even a cursory review of the case law reveals that the People

10  cannot find a single case allowing the exclusion of evidence like the Defense will

11  offer here, namely evidence that a third party's actions *toward this victim*

12  combined with other circumstantial and direct evidence about the third party's

13  relationship *with this victim* suggest that a third party committed this murder and

14  the defendant did not.

15       As noted earlier, the defense's evidence of third party culpability need not

16  pass any heightened standard of relevance. Thus, it easily passes the applicable

17  test and the defense is entitled to have the jury consider it.

18  B.   THE DEFENSE WILL NOT INTRODUCE INADMISSIBLE CHARACTER EVIDENCE

19       ABOUT JOHN GILMORE.

20       Though it is intertwined with the issue just discussed, the People's Motion

21  also seeks to exclude inadmissible character evidence about Mr. Gilmore. This

22  issue too is easy to resolve since the Defense does not intend to introduce any such

23  evidence.

24

25

26

27

28

                                                 Opposition to Motion to Exclude
                                    9            3rd Party Culpability Evidence

1        **1.    Here, the strong evidence about Mr. Gilmore's history of**

2            **aggression towards Ms. Redding and his acts on the night of the**

3            **murder easily establish a reasonable doubt about Ms. Park's guilt**

4            **without going through character or propensity.**

5        Mr. Gilmore's entire relationship with Ms. Redding leading up to her death

6    was violent. Some of Ms. Redding's best friends will testify about how Mr.

7    Gilmore's jealousy boiled over during the fights that he had with her, triggering

8    him to punch holes in walls and try to break into her apartment by climbing a

9    balcony, tearing a gate off its hinges, trying to force open a glass door, and kicking

10    on a front door so badly it would no longer lock properly. These included an

11    instance as little as two weeks before Ms. Redding's murder. Generally, Mr.

12    Gilmore would not stop his efforts to break in until someone threatened to call the

13    police.

14            a.    <u>Mr. Gilmore's previous violence towards Ms. Redding and his</u>

15                <u>breaking into her apartment until he was threatened with</u>

16                <u>calling the police.</u>

17        Eden Routledge was a friend and coworker of Ms. Redding. She will testify

18    - based on first-hand observation of Mr. Gilmore's and Ms. Redding's interactions

19    with each other - that Mr. Gilmore was very jealous of Ms. Redding and how other

20    men would look at her. Mr. Gilmore and Ms. Redding fought constantly by text

21    message. Ms. Routledge spent an evening with Ms. Redding in early March 2008

22    at Ms. Redding's apartment on Centinela in Santa Monica, the apartment where

23    Ms. Redding was killed only about two weeks later. Mr. Gilmore was furious that

24    night that Ms. Redding was ignoring his text messages.[4] He arrived at Ms.

25    Redding's apartment and started banging on the door. He even knocked a gate off

26

27    _____

28        [4]Recall that Mr. Gilmore accused Ms. Redding of ignoring his messages on
the night of the murder.

**Opposition to Motion to Exclude**
**3rd Party Culpability Evidence**

1   its hinges.

2       Other witnesses will corroborate Ms. Routledge's testimony about Mr.
3   Gilmore's violence towards and jealousy of Ms. Redding.  In 2006 and 2007,
4   before Ms. Redding lived at the Centinela apartment, she shared a different
5   apartment with Sara Murphy in Marina Del Rey.  Ms. Murphy will describe Mr.
6   Gilmore's jealousy of Ms. Redding and how he became upset when other men
7   looked at her.  One night in 2007, Ms. Murphy and Ms. Redding were home when
8   Mr. Gilmore climbed onto a balcony to gain access to their apartment and started
9   arguing with Ms. Redding.  He dented and cracked a door in the process.  Ms.
10  Murphy threatened to call the police, and Mr. Gilmore jumped off the balcony and
11  ran away.  When asked who might have wanted to kill Ms. Redding, Ms. Murphy
12  could only think of Mr. Gilmore, due to his intense jealousy.

13      Kristina Redding - Juliana's aunt - was a guest at the Marina Del Rey
14  apartment during the same incident in late 2007.  Mr. Gilmore showed up at about
15  1:00 a.m.  Kristina was awakened by the sound of pounding at the front door.  She
16  looked through the peephole and saw Mr. Gilmore kicking and pounding on the
17  door, demanding to see Juliana.  He damaged the door so badly that it would no
18  longer lock properly.  Kristina threatened to call the police, and Mr. Gilmore left -
19  but only temporarily.  When Kristina walked back into the living room after
20  several minutes, she saw Mr. Gilmore standing on the balcony, trying to force
21  open the sliding glass door.  When he saw Kristina, he jumped off the balcony and
22  fled.  Mr. Gilmore's aggression left both Juliana and Murphy visibly shaken and
23  cowering under a blanket in a bedroom.  Mr. Gilmore returned early the next day
24  again asking to be let in, and would only leave when Kristina told him to get off
25  the property or she would call the police.  When Kristina and Juliana walked to the
26  carport later in the day, Kristina noticed a large dent in the right rear door of
27  Juliana's car, which had not been there before Mr. Gilmore's unannounced and
28  threatening visit.

Opposition to Motion to Exclude
3rd Party Culpability Evidence

Stephanie Davila was another close friend of Ms. Redding's, and lived in a Marina Del Rey apartment with Ms. Redding for a time. She also witnessed Mr. Gilmore's jealousy of Ms. Redding and his bad temper, which was exacerbated by his drug use. Ms. Davila will testify about a time when Mr. Gilmore punched holes in the walls of the apartment during an argument with Ms. Redding. On another occasion, Mr. Gilmore climbed onto the balcony and argued with Ms. Redding some more.

        b.    <u>Mr. Gilmore's anger towards Ms. Redding on the night of her murder.</u>

Kelly Duncan, one of Ms. Redding's best friends, had dinner with Ms. Redding at a Westwood restaurant the night that Ms. Redding was killed. During dinner, Ms. Redding and Mr. Gilmore were arguing on the phone. Mr. Gilmore was upset because Ms. Redding had not waited to have dinner with him.[5]

Mr. Gilmore's text messages and calls with Ms. Redding throughout the afternoon and night of her murder show his obsession and frustration with her building to a frenzy:

- At 2:53:43 p.m., he texted her "Dont matter about space your ignorin someones shone [sic] calls also when that's the reason I broke up with you in the first place cause you say I do"
- At 7:59:17, Ms. Redding called Mr. Gilmore; the call lasted six seconds.
- At 9:45:37, Ms. Redding called Mr. Gilmore again; the call lasted four seconds.
- At 9:46:14, Ms. Redding called Mr. Gilmore a third time; the call lasted three seconds.

---

[5] As noted, Mr. Gilmore lied to the police about this and told the police that he was the one who declined Ms. Redding's invitation rather than vice versa.

1    • At 9:50:11, Mr. Gilmore texted Ms. Redding: "Cause you write
2        messages like iam gong to add then! Your fuckin dumb! Ruin a
3        good tigoh [sic]" [6]
4    • At 9:53:10, Mr. Gilmore called Ms. Redding; the call was marked
5        "received" on her cell phone, but lasted only three seconds. Mr.
6        Gilmore called her again thirty-seven seconds later; this call was
7        marked "missed" on her cell phone.
8    • At 9:54:15, clearly referencing the calls Ms. Redding had placed to
9        him, Mr. Gilmore texted her: "Didnt hear the phone"
10   • Only 44 seconds later, he texted her again: "You turned off your
11       phone?"
12   • At 9:56:21, Mr. Gilmore texted Ms. Redding: "This is a joke ! You
13       dont get a relationship so dumb! Call me when you grow up till then
14       were done ! Look au [sic] what you just did"
15   • At 10:00:17, Mr. Gilmore accused Ms. Redding: "You ruined it all"
16   • At 10:21:20, Mr. Gilmore's text to Ms. Redding reflected his
17       frustration: "You honesty couldn't be more hurtful please dont call me
18       i will call you i need to think now dont understand why you had to do
19       this love you always"
20       The People claim that Mr. Gilmore could not have committed the murder
21   because 1) they believe the murder happened at 9:53 p.m. and 2) they believe Mr.
22   Gilmore never left the party until 12:30 or 1:00 a.m. But the evidence does not
23   support either claim.
24       First, the People's argument about the time of death is based on an aborted
25   911 call dialed from Ms. Redding phone. But the defense will show that this call
26
27       [6]The same keys on a phone that spell "tigoh" also spell "thing". Accounting
28   for the misspellings, Mr. Gilmore probably was telling Ms. Redding that she had
     "ruin[ed] a good thing."

1  had nothing to do with the murder. Second, whatever the time of the murder, Mr.
2  Gilmore's alibi is hardly airtight: He alleges that he was at a party with about 40
3  people and others at the party say that they didn't notice him leave. Even if they
4  are telling the truth, since the party was only a few minutes from Ms. Redding's
5  apartment, he could easily have left the party, visited Ms. Redding's apartment,
6  and returned to the party without anyone necessarily noticing.

7           c.     Mr. Gilmore's Attacks On Another Girlfriend, And His
8                  Admissions To Her About Strangling Ms. Redding.

9       In 2010, Mr. Gilmore started dating M.A. M.A. describes him as "psycho,"
10  "unpredictable," and "obsessive over me." She suspected Mr. Gilmore of having
11  killed Ms. Redding. Mr. Gilmore would fly into violent rages, "black out,"
12  destroy things, and later have no memory of the outburst. He heavily abused
13  drugs and alcohol. Mr. Gilmore used the same nickname for M.A. - "bunny" - that
14  he had used for Ms. Redding. He was wildly jealous of another man that M.A.
15  also was dating, even threatening to kill that man and hang the man's dog.

16      Mr. Gilmore began abusing M.A. early in their relationship. Notably, his
17  violence towards her included *three separate instances* of grabbing her by the
18  throat and choking her - the very same kind of attack that killed Ms. Redding. On
19  two of those occasions, Mr. Gilmore told M.A. that *he was going to make her feel*
20  *how Ms. Redding had felt.*

21      The first time was soon after they started dating. Mr. Gilmore and M.A.
22  were with friends at a party, he sent her to get beer, she returned with the "wrong"
23  beer, and he grabbed her by the throat and threw her against a wall. Mr. Gilmore
24  then forced her into his truck, drove off, hit her with an open hand while driving,
25  and threw her out of the truck. He returned, forced her into the truck once more
26  and dragged her into the apartment and through the hallway to his bedroom.

27      The second time was after Mr. Gilmore and M.A. had broken up and then
28  reunited. They went out of town together and got in a fight in the hotel room.

14

**Opposition to Motion to Exclude
3rd Party Culpability Evidence**

1  M.A. confronted Mr. Gilmore, stating, "I know you killed Juliana Redding." Mr.

2  Gilmore replied, "you want to see how she felt?", threw M.A. on the bed, and

3  started choking her so badly she could not move or speak.

4       On the third occasion, M.A. confronted Mr. Gilmore with computer photos

5  of Mr. Gilmore and another woman. Mr. Gilmore hit M.A. in the face with the

6  laptop and M.A. fell down. Mr. Gilmore then jumped on her, started choking her

7  again, and said he was "going to show you how she [Redding] felt."[7]

8            d.    Mr. Gilmore's admission during his interrogation by the police

9                  on the night Ms. Redding's body was discovered.

10 In addition to telling M.A. what he had done, Mr. Gilmore also admitted his guilt

11 in a recording: On the night Ms. Redding's body was discovered, while Mr.

12 Gilmore was being interrogated about the murder, officers left him alone in the

13 interrogation room with a running audio-video recorder. Mr. Gilmore broke down

14 in tears and said "Yes, I found you with someone!" and, even more clearly, *"I did

15 it."*

16      **2.    The Evidence About Mr. Gilmore Is Admissible.**

17       The People's Motion to exclude the evidence about Mr. Gilmore must be

18 denied if direct or circumstantial evidence links Mr. Gilmore to the actual

19 perpetration of Ms. Redding's murder. (*Hall*, 41 Cal.3d at 833.) The evidence

20 presented here goes far, far beyond that requirement and is easily admissible. The

21 People assert, however, that this devastating evidence should nevertheless be

22 excluded because it goes only to Mr. Gilmore's general propensity for violence.

23 But the previous review of the evidence about Mr. Gilmore shows this to be

24

25      [7]Mr. Gilmore's statement to his later girlfriend, M.A., is admissible
   nonhearsay because it would be offered not for its truth, but merely to prove that
26 he said it. To the extent it would be offered for its truth, it is admissible under any
   of a number of hearsay exceptions, such as a declaration against interest (Cal.
27 Evid. Code § 1230) or contemporaneous statement (Cal. Evid. Code § 1241). The
28 same is true of the interrogation admissions.

1    entirely wrong.

2           Evidence Code § 1101(b) permits the admission of evidence that a person

3    committed a crime, civil wrong, or other act when relevant to prove some fact -

4    such as identity - other than his disposition to commit such an act.  Mr. Gilmore's

5    violent outbursts towards Ms. Redding, his phone and text correspondence with

6    her the night of the murder, and his threats to make M.A. feel how Ms. Redding

7    had felt are all examples of "other acts" (indeed, they are crimes and civil wrongs,

8    too) relevant to prove that he was the one who killed Ms. Redding.

9           Where the defense's proffered evidence points directly to a third party as

10   having committed similar violence, against the same victim, which the prosecution

11   alleges resulted in the victim's death, California courts have ruled it admissible to

12   prove the third party's identity as the killer. For example, in *People v. Basuta*

13   (2001) 94 Cal.App.4th 370, the People alleged that the defendant - a child daycare

14   provider - had violently shaken a baby to the point of killing him. (*Id.* at 377-81.)

15   The defense offered evidence that the baby's death resulted instead from an

16   accidental trauma causing a rebleed of an earlier brain injury. (*Id.* at 382.) The

17   defense further offered testimony that the child's mother had a pattern of jerking

18   and shaking the baby. The defense contended that it should be allowed to show

19   that the mother had caused the earlier brain injury. (*Id.* at 385.) The trial court

20   ruled that the defense could establish the fact of the earlier brain injury, but could

21   not present evidence that the baby's mother might have caused that injury, holding

22   that the matter would be collateral, confusing, and time-consuming. (*Id.*)

23          The Court of Appeal reversed, holding that the defense "should ... have

24   been allowed to present evidence that it was [the baby's] mother, and not [the

25   defendant] who was the cause of [the] first injury .... [I]t was an abuse of

26   discretion to exclude evidence that [the mother] had physically abused [this

27   victim].  Such evidence showed more than a mere motive or opportunity." ( *Id.* at

28   388.)

                                    **Opposition to Motion to Exclude**
                    16              **3rd Party Culpability Evidence**

1    In their Motion, the People completely miss the impact of this evidence, the
2  reason why the defense proffers it, and the reason why it is admissible. First, the
3  People claim that the defense's proffer is nothing more than an amalgamation of
4  evidence of Mr. Gilmore's character, offered to prove his conduct in accordance on
5  the night of Ms. Redding's death, and that it is therefore inadmissible under
6  Evidence Code § 1101(a). (Motion at 13). Not at all. The defense does not
7  contend that because Mr. Gilmore is a violent and aggressive person generally, he
8  therefore must have been the one who killed Ms. Redding in particular. To the
9  contrary, the proffered evidence is clearly admissible under Evidence Code §
10  1101(b) to prove his identity, not Ms. Park's, as Ms. Redding's murderer. Except
11  for the evidence about M.A., the proffered evidence is not proof of Mr. Gilmore's
12  hostility or violence towards anyone other than Ms. Redding.[8]

13    Even the evidence about Ms. Ayala is not offered to prove Mr. Gilmore's
14  character, but rather to prove *what he said about Ms. Redding*.[9] The circumstances
15  in which he said it (namely, his attempted strangulation of M.A.) are relevant,
16  admissible, and necessary to explain and give context to the statement. The jury
17  should not be denied the opportunity to learn that when Mr. Gilmore threatened to
18  make a later girlfriend "feel like Juliana felt", he was choking that girlfriend at that
19  very moment. Divorcing the statement from its circumstances would unfairly
20  divest it of its true meaning and impact.

21

22    [8]The People seriously mislead the Court when they claim that "[t]he
23  potential testimony regarding Mr. Gilmore's arrests, convictions, and relationship
24  with Ms. Redding would reveal nothing more than Mr. Gilmore's propensity for
       violence against *other* individuals." (Motion at 13 (emphasis in original)).
25

26    [9]Mr. Gilmore attacked both women in the same way, by choking. But
       because he specifically invoked Ms. Redding's murder when he attacked M.A., the
27  defense need not prove that the attacks on the two women shared idiosyncratic
       attributes beyond the method of violence. (*Cf. People v. Elliott* (2012) 53 Cal.4th
28  535, 581.)

**Opposition to Motion to Exclude**
**3rd Party Culpability Evidence**

17

1    Indeed, if Mr. Gilmore were on trial here - as he ought to be - the People

2    would vehemently argue that his long history of violent aggression against Ms.

3    Redding must be admitted under § 1101(b) to prove not only identity, but also his

4    motive, opportunity, intent, preparation, plan, and absence of mistake or accident.

5    The Mr. Gilmore evidence is no less admissible just because he is an uncharged

6    third party instead of the defendant.

7        Second, the People focus on Mr. Gilmore's various convictions and arrests.

8    (Motion at 6, 12-13).[10] Mr. Gilmore certainly has a long and serious rap sheet, but

9    that is not the evidence at issue here. Rather, what the defense is proffering - and

10   what must be admitted - are the details of his specific instances of violence

11   towards Ms. Redding, his frustration toward her that built like a pressure cooker

12   on the night she was killed, his admission in the interrogation room, and his highly

13   self-incriminatory statements about making his next target of domestic abuse feel

14   just like he had made Ms. Redding feel when he strangled her.

15       As to the evidence regarding Mr. Ivanov, since all of the evidence relates to

16   Mr. Ivanov's conduct toward Ms. Redding and none of it shows general character

17   or propensity, it too is directly admissible to show that Mr. Ivanov killed Ms.

18   Redding.

19

20

---

21       [10]Mr. Gilmore has had many, many incidents of violence and run-ins with

22   authority. Just a sampling of the incidents that generated separate reports

23   includes: pulling a knife on his own father; vandalizing a car in a fit of rage;
     getting into an argument with a woman on the street and threatening to burn her

24   house down and then attempting to run her over; getting kicked out of a shopping

25   mall for abusing a racial minority store owner and then hurling racist profanities at
     the racial minority mall security officers and shouting about "White Power!";

26   assault and vandalism at Saddleback Ranch; and another incident of felony

27   vandalism in connection with an altercation with an African American couple,

28   including making racist comments to the police who responded. These are all in
     *addition* to incidents involving Ms. Redding or M.A.

**Opposition to Motion to Exclude**
**3rd Party Culpability Evidence**

18

C.   THE EVIDENCE OF THIRD PARTY CULPABILITY SHOULD NOT BE EXCLUDED UNDER SECTION 352.

Probably recognizing that they cannot keep the evidence about Mr. Gilmore out on the grounds that it is irrelevant or otherwise inadmissible, the People ask this Court to exclude it under Evidence Code § 352. They claim that "because the physical evidence connects only the defendant to the murder of Ms. Redding, admission of third-party culpability evidence would both contravene [§ 352] and confuse the jury about the real issues of the case." (Motion at 14).

Apparently, the People believe that wherever there is any physical evidence implicating one person, all other evidence implicating someone else is inadmissible under § 352 - even including that person's self-incriminating statements and eyewitness testimony about his acts of aggression against the victim right around the time of the crime. As the Court knows (and the People should too), § 352 does not work this way. Admitting the evidence about Gilmore in no way will risk undue delay, prejudice the prosecution, or confuse or mislead the jury.

To put it simply: in a murder trial in which the entire question is the identity of the killer, there is no way that specific, concrete, and reliable evidence pointing to a suspect as the likely murderer would violate § 352. The People claim that if the jurors learn about Mr. Gilmore's violent and abusive relationship with Ms. Redding, they might be "confuse[d] ... about the real issues of the case." Just the opposite will occur. Showing the jurors credible evidence that someone other than the defendant committed this crime will *focus* them on - not confuse them about - the issue in the case, namely, who bears responsibility for Ms. Redding's death? The People's real goal here is not to protect the jury from confusion, but rather to present only their own, sanitized, one-sided version of the events. Neither the Evidence Code nor the Due Process Clause permits that.

Furthermore, admitting the Gilmore evidence will not necessitate undue

**Opposition to Motion to Exclude
3rd Party Culpability Evidence**

1  consumption of time. As described above, the evidence consists of a few

2  witnesses who observed Mr. Gilmore's aggression towards Ms. Redding, a small

3  amount of documentary evidence demonstrating his text messages to her on the

4  night she died, and Ms. Ayala's testimony about his attacks on her and his

5  admissions about Ms. Redding. This will not disproportionately increase the

6  length of the trial or excessively consume court resources.

7      Moreover, no undue prejudice to the People will result if the Mr. Gilmore

8  evidence is admitted. The evidence will increase the likelihood that Ms. Park is

9  acquitted, but that is not prejudice, and certainly not any undue or unfair prejudice.

10  If Ms. Park is acquitted because the jury recognizes that the Gilmore evidence

11  establishes a reasonable doubt about her guilt, then that is a fair and appropriate

12  outcome on the merits of the case. The People are never prejudiced when all the

13  relevant facts are introduced and a just result is reached.

14      The cases cited by the People do not support the exclusion of the Mr.

15  Gilmore evidence on § 352 grounds. The principal reason why they do not is that §

16  352 sets forth a balancing test, in which the evidence's probative value must be

17  weighed against the likelihood that its admission will result in delay, prejudice,

18  confusion, or misleading of the jury. In the cases cited by the People, the

19  proffered defense evidence had such little probative value (if any at all) that the

20  courts easily held that the dangers identified in § 352 would substantially

21  outweigh the evidence's probativeness.

22      For example, in *People v. Geier* (2007) 41 Cal.4th 555, 582-83, "there was

23  no evidence at all, direct or circumstantial, that connected [the third party] to the

24  actual perpetration of the [crime]" other than "the minimally probative testimony

25  of [two] witnesses." That alone distinguishes that case completely from this case.

26  On the § 352 analysis, there were only two witnesses proffered by the defense.

27  The first witness' testimony did "not rise even to the status of motive evidence,"

28  and even though it could possibly be construed as opportunity evidence, the

Opposition to Motion to Exclude
3rd Party Culpability Evidence

20

1  Supreme Court reiterated that evidence of a third party's mere opportunity to
2  commit the crime does not suffice. The second witness gave conflicting
3  testimony: she said that the third party told her that he did not mean to kill the
4  victim, but also that he was being wrongly framed for the crime. The Supreme
5  Court noted that this testimony had "minimal probative value" due to its "confused
6  and contradictory tenor," and that the danger of serious undue delays (a mini-trial
7  on the question of the third party's whereabouts at the time of the crime) would
8  substantially outweigh that minimally probative value. There is nothing similar
9  here. First, the evidence about Mr. Gilmore is not confused or contradictory. It is
10 plain, straightforward, and reliable. Second, there will not be any lengthy
11 mini-trial on Mr. Gilmore's whereabouts when Ms. Redding was killed. Even the
12 People agree that he was right in the vicinity and in frequent contact with her
13 leading up to her death, not 160 miles away as the third party was in *Geier*.

14     In *Gutierrez*, 28 Cal.4th at 1137, "the trial court properly found that there
15 was no evidence, beyond mere speculation, that [the defense-identified culprit] or
16 some other third party either had been present with [the victim] on the day of her
17 murder or had been shown to be connected to the crime in some other way." In
18 *Yeoman*, 31 Cal.4th at 141, the "defendant's offer of proof showed motive only,
19 and was thus insufficient." The facts here are very different. There is copious,
20 non-speculative evidence connecting Mr. Gilmore to the crime, and the defense's
21 offer of proof shows his identity as the likely perpetrator.

22                           III. CONCLUSION

23     The Defense's proffered evidence of third party culpability goes far, far
24 beyond speculation. Instead, the defense is prepared to offer specific
25 circumstantial and direct evidence suggesting that Ms. Redding was killed by a
26 third party and not by Ms. Park. None of the proffered evidence is character or
27 propensity evidence and all of it relates a third party's actions towards *this victim*.
28 As the Court said *Basuta*, 94 Cal. App. 4th at 388, the defense is entitled to

Opposition to Motion to Exclude
3rd Party Culpability Evidence

1  present to the jury evidence of the third party's conduct toward the victim in
2  question. Moreover, under *Hall* and *Von Villas*, it is not for this Court to accept
3  the People's dismissive mischaracterization of the evidence, especially when the
4  People have omitted so many crucial details about it. Excluding the third party
5  evidence would unfairly handicap Ms. Park's right and ability to present a defense,
6  and would amount to reversible error. The Court should deny the People's
7  Motion.
8
9  Respectfully submitted,
10
11  DATE: May 6, 2013                    BUEHLER & KASSABIAN, LLP
12
13
14                        By: _____
                              GEORGE W. BUEHLER
15                            Attorneys for Defendant
                              KELLY SOO PARK
16
17
18
19
20
21
22
23
24
25
26
27
28

                                              Opposition to Motion to Exclude
                         22                   3rd Party Culpability Evidence

**EXHIBIT  H**

GEORGE W. BUEHLER (BAR NO. 60701)
MARK M. KASSABIAN, (BAR NO. 156595)
BUEHLER & KASSABIAN, LLP
350 West Colorado Boulevard
Suite 200
Pasadena, California 91105
Tel: (626) 792-0500
Fax: (626) 792-0505
e-mail: mkassabian@buehlerkassabian.com
Attorneys for Defendant
KELLY SOO PARK

**FILED**
LOS ANGELES SUPERIOR COURT

MAY - 7 2013

JOHN A. CLARKE, EXECUTIVE OFFICER/CLERK
BY: _____

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

PEOPLE OF THE STATE OF
CALIFORNIA,

        Plaintiff,

        v.

KELLY SOO PARK,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. BA361202

SUPPLEMENTAL OPPOSITION TO
MOTION IN LIMINE TO EXCLUDE
EVIDENCE OF THIRD PARTY
CULPABILITY

Date: May 13, 2013
Time: 8:30 a.m.
Dept.: 109

## **EVIDENCE OF JOHN GILMORE'S ABUSE OF JANE DOE IS ADMISSIBLE.**

Defendant Kelly Soo Park may call another victim of John Gilmore, an ex-
girlfriend of Gilmore's, "Jane Doe" to testify at trial. The defense has disclosed
Ms. Doe's identity to the Court in camera, and seeks to protect her identity from
disclosure in discovery because of her legitimate fear for her safety.

Gilmore's violence toward Ms. Doe is strikingly similar to his violence
toward Juliana Redding and M.A.:

[Doe] said the domestic violence began with John breaking things in
her home like heaters and doors when he was mad, <u>which escalated to</u>

**Supp. Opposition to Mx to Exclude**
**3rd Party Culpability Evidence**

1  him pushing and eventually physically hurting [her]. On one occasion

2  in front of friends at an El Segundo bar, John got mad at [Doe] and

3  pushed her.

4               ***

5  In general, [Doe] said jealousy was a trigger for John to become

6  angry. After episodes like this, she said John would be "saying sorry

7  for his violence, then blames you, no remorse." [Doe] explained how

8  John blamed her for the respective incidents saying it was "my fault,

9  [you] triggered me." It was always 'poor me, I'm a victim,' [that was]

10  always a topic," per [Doe]. Other times, John would be more contrite

11  and say things like "I need help, I want anger management."

12               ***

13  During various anger outbursts, [Doe] said John broke things, such as

14  heaters and doors, and also put holes in walls. Once when John was

15  raging at her at home, [Doe] said he pushed her so hard she hit a wall

16  or a door, which gave her a huge bruise on her arm.

17               ***

18  At the times [Doe] asked or told John to move out, she said John

19  threatened her. [Doe] said she felt trapped in continuing the

20  relationship but did not see a way out. For example, on one occasion

21  when [Doe] told John to move out, she said John told her, "'I'll

22  fucking burn this place,' and then he threaten to kill himself." [Doe]

23  said John also threatened to let her little dogs out of the house so she

24  would lose them and never see them again. When John made threats,

25  [Doe] said John told her the "nastiest" things, which were "literally

26  scary."

27

28

                                      **Supp. Opposition to Mx to Exclude**
             2             **3rd Party Culpability Evidence**

1    Ms. Doe's testimony is not inadmissible character evidence against
2  Gilmore, it is direct evidence to prove his identity as the man who killed Juliana
3  Redding, admissible under California Evidence Code section 1101(b).

4    First, Doe's testimony is further evidence that one significant "trigger" for
5  Mr. Gilmore's violence against his girlfriends is jealousy and rejection, precisely
6  the circumstances leading up to Ms. Redding's death when, the night of March 15,
7  she turned off her phone, or ignored his calls and text messages. Second, it shows
8  how Gilmore's violence against his girlfriends escalated over time, from breaking
9  things in their apartments, and then culminating in physical attacks - just as
10  Gilmore escalated from punching holes in Ms. Redding's apartment walls and
11  tearing off gates, to killing her. Finally, Gilmore's threat to burn down Does
12  apartment is consistent with the prosecution's theory in the instant case, that Ms.
13  Redding's killer left an unlit gas burner running to burn down the apartment.

14    Indeed, the Evidence Code expresses a policy for the free admission of
15  evidence of other acts of domestic violence. Section 1109 states that section 1101
16  does not make other acts of domestic violence by a defendant accused of domestic
17  violence inadmissible. Thus, if Gilmore was, as he should be, the defendant here,
18  Ms. Doe's testimony would be freely admissible against him. It hardly comports
19  with due process to exclude that evidence because of the accident that he is a third
20  party to this action.

21  Respectfully submitted,

22

23  DATE: May 7, 2013                    BUEHLER & KASSABIAN, LLP

24

25                                       By: _____
26                                           MARK M. KASSABIAN
                                             Attorneys for Defendant
27                                           KELLY SOO PARK

28

                                         Supp. Opposition to Mx to Exclude
                              3          3rd Party Culpability Evidence

**EXHIBIT I**

ORIGINAL

1  BUEHLER & KASSABIAN, LLP
   GEORGE W. BUEHLER (BAR NO. 60701)
2  MARK M. KASSABIAN, (BAR NO. 156595)
3  350 West Colorado Boulevard
   Suite 200
4  Pasadena, California 91105
   Tel: (626) 792-0500
5  Fax: (626) 792-0505
6  e-mail: mkassabian@buehlerkassabian.com
   Attorneys for Defendant
7  KELLY SOO PARK

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                      COUNTY OF LOS ANGELES

11                              )    Case No. BA361202
   PEOPLE OF THE STATE OF       )
12 CALIFORNIA,                  )
                                )    SUPPLEMENTAL AUTHORITIES RE
13         Plaintiff,           )    CREDIBILITY ASSESSMENTS
                                )    REGARDING EVIDENCE OF THIRD
14                              )    PARTY CULPABILITY
                                )
15         v.                   )    Date: May 10, 2013
                                )    Time: 9:00 a.m.
16 KELLY SOO PARK,              )    Dept.: 109
                                )
17         Defendant.           )
                                )
18 ─────────────────────────────)

19

20

21

22                              **I**

23                        **INTRODUCTION**

24        The defense hereby submits supplemental authority showing the California

25 Supreme Court's clearly established rule that the trial court's credibility assessment

26 is not a proper factor in the court's determination of admissibility.  This rule is

27 clearly applied to determinations of the admissibility of third-party-culpability

28 evidence.

                                        **Supplemental Authorities**

## II

## PEOPLE V. HALL PROHIBITS TRIAL COURTS FROM MAKING CREDIBILITY DETERMINATIONS WHEN CONSIDERING THIRD PARTY CULPABILITY EVIDENCE

In *People v. Hall*, 41 Cal. 3d 826 (1986), the California Supreme Court rejected the notion that third party culpability evidence must meet a standard of admission higher than other evidence. The Court stated:

> [W]e reaffirm the admissibility of any relevant evidence that raises a reasonable doubt as to a defendant's guilt, including evidence tending to show that a party other than the defendant committed the offense charged. Such evidence may be excluded only when the court properly exercises its discretion under Evidence Code section 352 to reject evidence that creates a substantial danger of undue consumption of time or of prejudicing, confusing, or misleading the jury.

*Hall*, 41 Cal. 3d at 829, 718 P.2d 99, 101 (1986). *Hall* criticized the trial court for incorporating into its decision the trial court's determination that the evidence was not credible. Indeed, *Hall* cautioned trial courts against over-assuming the potential "prejudice" of third party culpability evidence:

> [Trial courts] should avoid a hasty conclusion such as the trial court's finding in the present case that evidence of [the defendant's] guilt was "incredible." *Such a determination is properly the province of the jury.*
>
> Furthermore, courts must focus on the actual degree of risk that the admission of relevant evidence may result in undue delay, prejudice, or confusion. As Wigmore observed, "if the evidence is really of no appreciable value no harm is done in admitting it; but if the evidence is in truth calculated to cause the jury to doubt, *the court should not attempt to decide for the jury that this doubt is purely*

1    *speculative and fantastic but should afford the accused every*
2    *opportunity to create that doubt."*
3    *Hall*, 41 Cal. 3d at 834 (citing (IA *Wigmore, Evidence* (Tillers rev. ed. 1980) §
4    139, p. 1724.) (emphasis supplied).

### III

### HALL'S INSTRUCTION THAT TRIAL COURTS MUST LEAVE CREDIBILITY DETERMINATIONS FOR THE JURY IS ECHOED BY ABUNDANT AUTHORITY

9    **A.    *People v. Cudjo***

10   In *People v. Cudjo*, 6 Cal. 4th 585 (1993), the California Supreme Court
11   found error when a trial court excluded third-party-culpability evidence on
12   credibility grounds.  The Court's lengthy discussion is instructive because it
13   illustrates that the *only* proper inquiries are relevance and § 352 and that neither
14   inquiry properly includes a court-assessment of "credibility."  In other words,
15   credibility must *always* left be to the jury.

16   When an objection to evidence is raised under Evidence Code section
17   352, the trial court is required to weigh the evidence's probative value
18   against the dangers of prejudice, confusion, and undue time
19   consumption.  Unless these dangers "substantially outweigh"
20   probative value, the objection must be overruled. (*See People v.*
21   *Babbitt* (1988) 45 Cal.3d 660, 688.)

22   …

23   The evidence had substantial probative value.  To withstand a
24   challenge under Evidence Code section 352, evidence of a third
25   party's culpability "need only be capable of raising a reasonable doubt
26   of [the] defendant's guilt." (*People v. Hall* (1986) 41 Cal.3d 826,
27   833.) Here, Culver would testify that Gregory, the other prime
28   suspect in the case, had confessed to the murder within hours after the

1   crime was committed and under circumstances providing substantial
2   assurances that the confession was trustworthy. The issue of
3   Gregory's guilt was highly material: given Kevin P.'s testimony
4   describing a single intruder, and given also the single set of shoe
5   prints leading away from the victim's residence, proof of Gregory's
6   guilt would exonerate defendant. Thus, Culver's testimony raised the
7   requisite reasonable doubt of defendant's guilt.

8   Finally, the evidence was highly necessary: although there was
9   other evidence tending to cast suspicion on Gregory, there was no
10  comparable direct evidence of Gregory's guilt. Gregory's decision to
11  exercise his privilege against self-incrimination precluded the defense
12  from calling Gregory as a witness.

13  Nor was there any danger of "undue prejudice" to the
14  prosecution. The evidence was not likely "to arouse the emotions of
15  the jurors" or "to be used in some manner unrelated to the issue on
16  which it was admissible." (*People v. Edelbacher* (1989) 47 Cal.3d
17  983, 1016; *see also, People v. Farmer* (1989) 47 Cal.3d 888, 912;
18  *People v. Karis* (1988) 46 Cal.3d 612, 638.)

19  As noted, the trial court apparently concluded that the evidence
20  was more prejudicial than probative because Culver was not a
21  credible witness. *However, such doubts, however legitimate, do not*
22  *constitute "prejudice" under Evidence Code section 352.* (*See People*
23  *v. Alcala* (1992) 4 Cal.4th 742, 791.) We have warned trial courts to
24  avoid hasty conclusions that third-party-culpability evidence is
25  "incredible"; this determination, we have affirmed, "is properly the
26  province of the jury." (*People v. Hall*, supra, 41 Cal.3d at p. 834.) . . .
27  .

28  *We conclude that doubts about Culver's credibility, though*

1     *reasonable and legitimate, did not provide a sufficient basis to*

2     *exclude his testimony. In sustaining the prosecutor's objection to this*

3     *evidence, the trial court abused its discretion.*

4 *People v. Cudjo*, 6 Cal. 4th 585, 609-10 (1993) (emphasis supplied).

5 **B.**    ***Vorse v. Sarasy***

6     In *Vorse v. Sarasy*, 53 Cal. App. 4th 998 (1997), the Court reversed a trial

7 court's decision to exclude evidence based on the trial court's credibility

8 determination and provided a helpful, if lengthy, discussion of the California

9 Supreme Court's rule reserving credibility determinations entirely for the jury. In

10 the course of the discussion, *Vorse* confirms that a trial court's assessment of

11 credibility is never a proper ground for making a decision as to the admission of

12 evidence:

13     The [trial] court apparently concluded Schmidt's testimony was of

14     limited probative value because the court did not believe it. Such an

15     analysis overlooks the essential differences between the roles of judge

16     and jury. It is axiomatic that questions of credibility are exclusively

17     within the province of the jury. (§ 312, subd. (b); see also Pen.Code, §

18     1127.) *The court may not set itself up as a gatekeeper excluding*

19     *otherwise competent and relevant evidence simply because the court*

20     *finds it unbelievable.*

21     The Supreme Court has spoken often on this topic in the

22     context of criminal trials. Third party culpability cases, in which the

23     defense offers evidence that someone other than the defendant

24     actually committed the offense, are analogous to the issue presented

25     here. "We recognize that an inquiry into the admissibility of such

26     evidence and the balancing required under section 352 will always

27     turn on the facts of the case. Yet courts must weigh those facts

28     carefully. *They should avoid a hasty conclusion . . . that evidence of*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*[the third party's] guilt was 'incredible.' Such a determination is*
*properly the province of the jury.*" (*People v. Hall* (1986) 41 Cal.3d
826, 834.)

    In *People v. Alcala* (1992) 4 Cal.4th 742, 755, the defendant
was convicted of the kidnapping and murder of a young girl. At trial,
he sought to call Tim Fallen to testify he had seen the girl on the
particular day. If believed, Fallen could have undercut the
prosecution's theory of when the girl was kidnapped, thus raising the
possibility that someone other than the defendant had killed her. The
prosecution moved to exclude Fallen's testimony because he had also
identified a photograph of a different little girl. "The trial court
accepted the prosecution's argument and excluded the testimony . . .
on the ground of relevancy and pursuant to Evidence Code section
352. Relying upon the language of that statute, the court stated that
Fallen's positive misidentification of the other girl destroyed whatever
probative value his testimony might have had, and that allowing such
testimony only would 'confuse the issues.' " (*Id.* at p. 790.)

    The Supreme Court concluded the trial court's action was error:
"Although the court was vested with wide discretion in determining
the relevance and weighing the prejudicial effect of proffered
evidence against its probative value [citation], *the circumstance that*
*Fallen's testimony readily was subject to impeachment did not afford*
*the court a legitimate basis for excluding this evidence.* Eyewitness
testimony may be vulnerable to impeachment for numerous reasons,
including the possible existence of prior, conflicting testimony; such
vulnerability, however, does not render the evidence irrelevant or
unduly prejudicial." (*People v. Alcala*, supra, 4 Cal.4th at p. 790.)

    Often a criminal defendant, seeking to suggest another might

Supplemental Authorities

1  be guilty, must rely upon hearsay testimony from witnesses whose
2  credibility is vulnerable.  Our Supreme Court, however, has made it
3  very clear that a trial court must proceed cautiously in excluding
4  evidence when it questions the veracity of the testifying witness.

5  . . .

6       The trial court's ability to exclude hearsay testimony based
7  upon an evaluation of the testifying witness's credibility is limited to
8  circumstances in which "the testimony is physically impossible or its
9  falsity is apparent 'without resorting to inferences or deductions.'
10  [Citations.] *Except in these rare instances of demonstrable falsity,*
11  *doubts about the credibility of the in-court witness should be left for*
12  *the jury's resolution*; such doubts do not afford a ground for refusing
13  to admit evidence under the hearsay exception for statements against
14  penal interest. [Citations.]" (*People v. Cudjo*, supra, 6 Cal.4th at pp.
15  608-609.)

16       Similarly, in *People v. Jackson* (1991) 235 Cal.App.3d 1670,
17  Division Four of this district held it was error to exclude, under
18  section 352, hearsay evidence of a third party's culpability. *"We know*
19  *of no rule that excludes testimony on the ground that it could be a*
20  *fabrication. . . . It is the duty of the trier of fact to assess credibility.*
21  *'Objection, your honor, this could be perjury!' has not yet made it*
22  *into the Evidence Code."* (*Jackson*, supra, at p. 1679, 1 Cal.Rptr.2d
23  778.)

24  *Vorse v. Sarasy*, 53 Cal. App. 4th 998, 1009-11 (1997) (emphasis supplied).

25  **C.   Secondary Sources Recognize This Rule**

26       A well respected treatise confirms the rule from Hall and Cudjo that an
27  assessment of credibility has no place in determining admissibility:

28       It is a common misconception that credibility is one of the factors

1  included in probative value; that if the court believes the testimony of
2  a witness is inherently unbelievable it may be excluded under § 352
3  because it lacks probative value. *Except in rare instances of*
4  *demonstrable falsity, where the testimony is physically impossible,*
5  *evidence may not be excluded simply because the court does not*
6  *believe it.* (*People v. Cudjo*, 6 Cal. 4th 585 (1993); *Vorse v. Sarasy*,
7  53 Cal. App. 4th 998, 1009-1013 (1st Dist. 1997).)
8  *Simons California Evidence Manual* § 1:28 (2012 ed.)

## IV

## CONCLUSION

11  There is direct and circumstantial evidence showing that John Gilmore
12 likely murdered Juliana Redding.  Relevance is satisfied and the evidence would
13 not cause any confusion, undue consumption of time, or improper prejudice.
14 Therefore, the evidence should be admitted.  *Hall* and *Cudjo* and abundant other
15 authority make clear that whether to believe this evidence must be left entirely to
16 the jury.

17 Respectfully submitted,

19 DATE: May 10, 2013                          BUEHLER & KASSABIAN, LLP

21                                             By: _____
22                                             MARK M. KASSABIAN
                                               Attorneys for Defendant
23                                             KELLY SOO PARK

1  **PROOF OF PERSONAL SERVICE**

2       At the time of service I was over 18 years of age and not a party to this
action.
3
        My business address is Buehler & Kassabian, LLP, 350 West Colorado
4  Boulevard, Suite 200, Pasadena, California 91105.

5       On **May 10, 2013** I caused the foregoing document: **SUPPLEMENTAL
AUTHORITIES RE CREDIBILITY ASSESSMENTS REGARDING**
6  **EVIDENCE OF THIRD PARTY CULPABILITY** to be personally served on
the person below:
7
        DDA Stacy Okun-Wiese
8       Major Crimes Division
        17-1140 CSF Crim. Justice Ctr.
9       212 West Temple Street
        Los Angeles, CA 90012
10
        I declare under penalty of perjury under the laws of the State of California
11 that the foregoing is true and correct.

12
   Dated: May 10, 2013
13                                          MARK M. KASSABIAN

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                        **Supplemental Authorities**