**EXHIBIT J**

1  JACKIE LACEY
   District Attorney of Los Angeles County
2  By: STACY OKUN-WIESE; State Bar No. 204333
   Deputy District Attorney
3  Los Angeles County District Attorney's Office
   MAJOR CRIMES DIVISION
4  210 West Temple Street
5  Los Angeles, CA 90012

6
7  Attorney for Plaintiff

8

9

10            SUPERIOR COURT OF THE STATE OF CALIFORNIA
              FOR THE COUNTY OF LOS ANGELES
11

12  PEOPLE OF THE STATE OF CALIFORNIA,          Case No. BA361202

13            Plaintiff,                        MOTION TO EXCLUDE RECORDING
                                                AND TRANSCRIPT OF JOHN
14            v.                                GILMORE INTERVIEW

15  KELLY SOO PARK                              Date:      May 14, 2013
                                                Time:      08:30 AM
16            Defendants.                       Court:     Department 109
17                                              Trial Date: May 13, 2013

18

19            TO THE HONORABLE KATHLEEN KENNEDY, JUDGE OF THE ABOVE

20  ENTITLED COURT, GEORGE BUEHLER AND MARK KASSABIAN, COUNSEL FOR THE

21  DEFENDANT, KELLY SOO'PARK.

22            The People submit the follow MOTION TO EXCLUDE RECORDING AND

23
24  TRANSCRIPT OF JOHN GILMORE INTERVIEW. This motion will be based upon this motion,

25  attached points and authorities, testimony of Gregg Stutchman, and on such other evidence and

26  argument made at the hearing.

27

28

Dated: May 14, 2013

Respectfully submitted,

JACKIE LACEY
District Attorney of Los Angeles County
By: _Stacy Okun_____
STACY OKUN-WIESE
Deputy District Attorney

## I.

## **INTRODUCTION**

On March 17, 2008, after learning of his girlfriend's murder, John Gilmore was interviewed for a period of three hours.  During the interview, Detective John Henry left Mr. Gilmore alone for several minutes.  During that portion Mr. Gilmore begins sobbing and calling out, "Baby."  The People had the entire transcript transcribed.  The defense "enhanced" the four-minute portion that Mr. Gilmore was alone and is now seeking to admit a transcript that contains three statements they argue Mr. Gilmore made.  The person who prepared the transcript of a hired forensic analyst by the name of Gregg Stutchman.  At a hearing held on May 10, 2013, Mr. Stutchman testified that based upon his enhancement, a layperson would be able to hear what he heard.  When further questioned, Mr. Stutchman testified that it was his expertise in "critical listening" that allowed him to decipher what Mr. Gilmore said during the four minutes.  Prior to Mr. Stutchman's testimony and during his testimony, both the original recording and the enhanced versions were played several times in open court.  During Mr. Stutchman's testimony, the court was provided with additional high quality extra speakers to listen with.  At the conclusion of the playback and discussion by Mr. Stutchman, the court stated what she heard with both versions was "gibberish."   The People are seeking to exclude the recording and transcript on the grounds that it is not an accurate reflection of the content of the recording and as such, will mislead the jury.

## II.

### **The Defense's Transcript Is Not An Accurate Reflection of John Gilmore's Interview And Should Be Excluded Pursuant to Evidence Code Section 352.**

A recording and transcript that create an inference of speculation or unfairness should be excluded.  Here, the defense is seeking to admit a recording and transcript that they allege says things that no one, other than their hired forensic specialist, can hear.  To be admissible, tape

Rev. B51-8/99 DA Case 27913479

MOTION TO EXCLUDE RECORDING AND TRANSCRIPT OF JOHN GILMORE INTERVIEW.

**432**

1   recordings do not need to be completely intelligible for the whole conversation as long as enough

2   of the conversation is intelligible to be relevant without creating an inference of speculation or

3   unfairness. *People v. Polk* (1996) 47 Cal.App.4[th] 944, 952. In *Polk,* the defendants were arrested

4   and placed in a police car. *Id.* at p. 951. Prior to being placed in the car, a cassette player was

5   turned on and left in the car. *Id.* The tape was subsequently recovered and listened to by a

6   detective who found much of the defendants' conversation inaudible. *Id.* As a result, the detective

7   had the tape enhanced. He then prepared a transcript of what he heard in the tape. *Id.* The

8   detective then met with a District Attorney Investigator who listened to the tape. *Id.* The detective

9   and investigator ultimately came to a census on what was said during the conversation. *Id.* Prior

10  to the trial, the defendants moved to exclude the tape and transcript. *Id.* Prior to ruling on the

11  defendants' motion, the court listened to the tape twice with the assistance of the prepared

12  transcript. *Id.* The court admitted the tape and transcript even though it identified certain words

13  and phrases that did not appear in the transcript and could not hear some words that did exist in the

14  transcript. *Id.* When the tape was played, the court instructed the jury that the tape was the

15  evidence and the transcript was to be used only as an aid. *Id.* at p. 952.

16          On appeal, the appellants argued that the trial court abused its discretion in admitting both

17  the tape and transcript into evidence. The court disagreed and upheld the trial court's decision to

18  permit the introduction of both the tape and transcript. *Id.* at p. 953. The court discussed the

19  introduction of the tape and transcript separately. The court stated that for a tape recording to be

20  admissible, it does not need to be completely intelligible for the entire conversation so long as

21  there is enough of the tape that can be understood to be relevant "*without creating an inference of*

22  *speculation or unfairness.*" *Id.* at p. 952 (emphasis added) A tape is admissible unless the audible

23  portions of the tape are so incomplete that the tape's relevance is destroyed. *Id.* The court found

24  that whether a tape is admissible is a matter that must be left to the discretion of the court. It

further held that, "there can be no doubt that before permitting recordings to be played to the jury the court should satisfy itself that they are substantially complete and substantially correct as to matters that are material and important." In appellants' case, the trial court listened to the tape recording and *satisfied* itself that the tape contained sufficient audible portions of a matter that was material and important. *Id.* at p. 953. Additionally, the court listened to the tape recording and found that there were several audible portions that were understandable without the assistance of the transcript. *Id.*

The court further held that the trial court did not abuse its discretion by admitting the transcript prepared by the detective. *Id.* at p. 954. The appellants argued that the tape was so unintelligible that the jury probably accepted the transcript as the evidence rather than the actual recording. *Id.* To support their argument, the appellants relied on the case of *United States v. Robinson* (6th Cir. 1982) 707 F.2d 872. In that case, the court recommended the following to ensure accuracy and fairness when determining whether transcripts should be admitted during trial: "1) the parties should stipulate to the accuracy of the transcript; 2) the trial court should make a pretrial determination of accuracy by reading the transcript against the tapes; or 3) the parties could present two transcripts to the jury, the prosecution's and defense's version. In addition, the court suggested the word "inaudible" should be inserted in the transcript in order to preclude jury speculation regarding unintelligible portions of the tape." *People v. Polk, supra,* 47 Cal.App.4th at p. 954, citing *United States v. Robinson, supra* 707 F.2d at p. 876-877.

The court found that the trial court indeed followed all of the recommended actions outlined by the court in *Robinson.* The trial court listened to the tape and compared it to the proffered transcript. The court required irrelevant and prejudicial portions deleted, and the court ordered the parties to meet and agree on the portions that should be deleted or replaced with "inaudible" or "unintelligible." *People v. Polk, supra,* 47 Cal.App.4th at 955. In affirming the trial

court's ruling to admit the transcript, the court found that the inaccuracies did not detract sufficiently from the overall accuracy of the transcript to call into question the reliability of the entire transcript. *Id.*

Similarly, in *People v. Miley,*(1984) 158 Cal.App.3d 25, 36, the appellant argued that the trial court abused its discretion when it admitted the tapes and transcripts of his tape-recorded conversations with another individual. The appellant's contention was that the tapes were partly unintelligible and the contents of the transcript were therefore, speculative. *Id.* The court disagreed and affirmed the conviction. *Id.* The court stated that when transcripts have been admitted at a trial, they can only be shown to be prejudicial at trial if it is shown that they are so inaccurate that a jury "might be misled into convicting an innocent man." *Id.*, citing *People v. Fujita* (1974) 43 Cal.App.3d 454, 472-473. The court held that wasn't the case with the tapes introduced against the appellant because they simply memorialized the appellant's "cold-blooded solicitation of the murder of his wife and if necessary, her daughters." *People v. Miley, supra,* 158 Cal.App.3d at p. 36. The court then discussed the trial court's actions in the case and stated the following, "the trial court took great care in the exercise of its discretion pursuant to Evidence Code section 352: the judge listened to the tapes and compared them with the transcripts prior to ruling on appellant's motion; several portions of the transcripts were marked out because the court determined that they were not an accurate reflection of the contents of the tape-recordings." *Id.*

Unlike *Polk* and *Miley,* the defense is seeking to admit a four-minute portion of an interview that is entirely inaudible. Even with a highly enhanced version presented by Mr. Stutchman, the tape is inaudible. The People are not willing to stipulate to a transcript that is incorrect. The court has, on two separate occasions, listened to the recording with the assistance of Mr. Stutchman's enhancement and the aid of the transcript. Thereafter, the court stated that what she heard was "gibberish." Here, the recording and transcript *are* so incomplete that the tape's

relevance *is* destroyed. Admitting the unintelligible tape recording proffered by the defense would create nothing short of an inference of speculation and unfairness by the jury. Therefore, the tape and transcript should be ruled inadmissible.

## CONCLUSION

The admission of the unintelligible portion of the John Gilmore tape would serve no other purpose than to mislead the jury and cause them to speculate. Thus, under an Evidence Code section 352 analysis, both the tape and transcript should be excluded.

DATED:    May 14, 2013

Respectfully submitted,
JACKIE LACEY
District Attorney of Los Angeles County


By: _____
STACY OKUN-WIESE
Deputy District Attorney

Rev. B51-8/99 DA Case 27913479
MOTION TO EXCLUDE RECORDING AND TRANSCRIPT OF JOHN GILMORE INTERVIEW.

436

**EXHIBIT K**

**ORIGINAL**

1  BUEHLER & KASSABIAN, LLP
   GEORGE W. BUEHLER (BAR NO. 60701)
2  MARK M. KASSABIAN, (BAR NO. 156595)
3  350 West Colorado Boulevard
   Suite 200
4  Pasadena, California 91105
   Tel: (626) 792-0500
5  Fax: (626) 792-0505
6  e-mail: mkassabian@buehlerkassabian.com
   Attorneys for Defendant
7  KELLY SOO PARK

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                    COUNTY OF LOS ANGELES

11  PEOPLE OF THE STATE OF          ) Case No. BA361202
12  CALIFORNIA,                     )
                                    )
13         Plaintiff,               ) DEFENDANT KELLY SOO PARK'S
                                    ) SUPPLEMENTAL MEMORANDUM IN
14                                  ) SUPPORT OF ADMISSIBILITY OF JOHN
       v.                           ) GILMORE'S OTHER ACTS
15                                  )
                                    )
16  KELLY SOO PARK,                 )
                                    )
17         Defendant.               )
   _____ )
18

19

20

21

22

23

24

25

26

27

28

                                    **Supplemental 1101(b) Memo**

**438**

1    Pursuant to this Court's directive, Defendant Kelly Soo Park hereby files
2    this Supplemental Briefing Showing the Admissibility of John Gilmore's other acts
3    under California Evidence Code Section 1101(b).

4    **OTHER ACTS EVIDENCE IS ADMISSIBLE SO LONG AS ITS RELEVANCE**
5    **IS NOT BASED ON A CHARACTER OR PROPENSITY ARGUMENT**

6    Evidence Code § 1101(a) provides the general rule that evidence of a
7    person's character may not be offered to prove conduct on a specific occasion.
8    However, § 1101(b) makes an "exception" to this rule and provides that evidence
9    of other acts is admissible when it is offered to show evidence other than pure
10    character.

11        The cases illustrating the exceptions are so much more
12        numerous than those applying the exclusionary rule that it has been
13        suggested that the true rule could be more realistically stated in
14        affirmative form: that *evidence of other crimes is admissible*
15        *whenever it is relevant to a material issue*, and that it should be
16        excluded *only* where its sole purpose and effect is to show the
17        defendant's bad moral character (disposition to commit crime).

18    *1 Witkin, Cal. Evid. 5th* (2012) § 77, p. 460 (citing *People v. Peete* (1946) 28 C.2d
19    306, 314, and other authority).

20    Here, evidence of John Gilmore's other acts is admissible because it is
21    relevant to material issues *other* than character.[1]

22
23
24
_____

25    [1]The Court asked for a supplemental showing on the § 1101 issue in
26    addition to that in Ms. Park's opposition to the People's motion to exclude third-
party culpability evidence. (*See* Opposition pp. 9-18). This brief does not restate
27    the previously briefed points showing that the Defendant has more than met the
threshold for raising third-party culpability. Having met that threshold, the
28    Defense is entitled to introduce all relevant evidence establishing Gilmore's
culpability.

1                    **Supplemental 1101(b) Memo**

I.   EVIDENCE OF MR. GILMORE'S ANGER, JEALOUSY, AND VIOLENCE TOWARD MS. REDDING IS ADMISSIBLE TO SHOW HIS IDENTITY AS HER KILLER.

When the question of fact is whether a person committed a crime against a particular victim, prior assaults by that person against that victim are admissible. If the person, "has had a prior relationship with the victim, prior assaults on the same victim are admissible on any issue in dispute, including identity, solely due to the identical perpetrator and victim, without any requirement of distinctive similarities. *Simons California Evidence Manual* § 6:11 (2012 ed.) (*citing People v. Linkenauger*, 32 Cal. App. 4th 1603, 1610-1613 (1995) and other cases) (emphasis added). "[E]vidence of threats or violence by an accused against the victim of an offense of violence is proof of the identity of the offender." *People v. Daniels*, 16 Cal. App. 3d 36, 46 (1971) (emphasis added).

> The courts have concluded that evidence of prior quarrels between the same parties is obviously relevant on the issue whether the accused committed the charged acts. . . . 'Evidence showing jealousy, quarrels, antagonism or enmity between an accused and the victim of a violent offense is proof of motive to commit the offense. Likewise, evidence of threats of violence by an accused against the victim of an offense of violence is proof of the identity of the offender.'

*Rufo v. Simpson*, 86 Cal. App. 4th 573, 586 (2001) (citing numerous cases) (emphasis added).[2]

Here, Mr. Gilmore's prior violence towards Ms. Redding show his identity as her killer and his motive to kill her. This is even more clear when one considers that the prior incidents involved Mr. Gilmore's rage at Ms. Redding's refusal to

---

[2] Though this issue arises most often with respect to evidence about the defendant rather than about a third party, nothing in the statutes, case law, or logic so limits it. Instead, admissibility is based on § 210, which says that *all* relevant evidence is admissible and it is not excluded by § 1101(a) since it is not offered for character.

2                           **Supplemental 1101(b) Memo**

1  interact with him, something that he angrily accused her of doing *on the night she*
2  *was killed.*

3      **1.**    **Mr. Gilmore's Violent Break-In Attempts At Ms. Redding's**
4              **Apartments And His Violence Targeting Her.**

5            a.    Gilmore's Jealousy And Violence Toward Ms. Redding At The
6                 Crime Scene Shortly Before Her Death

7        Eden Routledge was a friend and coworker of Ms. Redding. She will testify

8  that Mr. Gilmore was very jealous of Ms. Redding and how other men would look

9  at her. Mr. Gilmore and Ms. Redding fought constantly by text message.

10        Ms. Routledge was with Ms. Redding in early March 2008 at Ms. Redding's

11  apartment on Centinela in Santa Monica, the apartment where Ms. Redding was

12  killed about two weeks later. Mr. Gilmore was furious that Ms. Redding was

13  ignoring his text messages.[3] He arrived at Ms. Redding's apartment and started

14  banging on the window. He even knocked a gate off its hinges. (Kassabian Decl.,

15  Exs. 4, 9.)[4]

16            b.    Gilmore's Violent Break-In Attempts And Violence Against
17                 Ms. Redding In Late 2006

18        In 2006, before Ms. Redding lived at the Centinela apartment, she shared an

19  apartment with Sara Murphy in Marina Del Rey. Ms. Murphy will describe Mr.

20  Gilmore's jealousy of Ms. Redding and how he became upset when other men

21  looked at her.

22        One night in 2006, Ms. Murphy and Ms. Redding were home when Mr.

23  Gilmore tried to break into their apartment, pounding on the front door and

24

25  ───────────────
      [3]Mr. Gilmore accused Ms. Redding of ignoring his messages on the night of
26  the murder.

27        [4]Although the defense believes that its proffer is sufficient, it also submits
28  by declaration filed herewith, the discovery documents produced by the people
underlying the proffer.

3              **Supplemental 1101(b) Memo**

1   screaming at Juliana. He broke a hinge on the front door, then climbed onto their
2   three-story balcony, only leaving after a threat to call the police. He jumped off the
3   balcony and ran away. During that same incident Mr. Gilmore vandalized Ms.
4   Redding's car. (Kassabian Decl. Exs. 6, 7).

5       Kristina Redding - Juliana's aunt - was a guest at the Marina Del Rey
6   apartment during the same incident. Mr. Gilmore showed up at about 1:00 a.m.
7   and woke up Kristina with his pounding at the front door. Through the peephole
8   she saw Mr. Gilmore kicking and pounding on the door, demanding to see Juliana.
9   He badly damaged the door. Kristina threatened to call the police, and Mr.
10  Gilmore left - but only temporarily. When she walked back into the living room
11  after several minutes, she saw Mr. Gilmore standing on the balcony, trying to force
12  open the sliding glass door. He then jumped off the balcony and fled. Mr.
13  Gilmore's violence left both Juliana and Murphy visibly shaken and cowering
14  under a blanket in a bedroom.

15      Gilmore returned early the next day again asking to be let in, and would
16  only leave when Kristina told him to get off the property or she would call the
17  police. When Kristina and Juliana walked to the carport later in the day, Kristina
18  noticed a large dent in the right rear door of Juliana's car, which had not been there
19  before Mr. Gilmore's violent visit. (Kassabian Decl. Ex. 8.)

20          c.    Gilmore's Other Violence Targeting Ms. Redding In Marina
21                Del Rey

22      Stephanie Davila was another close friend of Ms. Redding's, and lived in a
23  Marina Del Rey apartment with Ms. Redding for a time. She also witnessed Mr.
24  Gilmore's jealousy of Ms. Redding, and his temper, which was exacerbated by his
25  drug use. Ms. Davila will testify that, during an argument with Ms. Redding, Mr.
26  Gilmore punched holes in the walls of the apartment. On another occasion, Mr.
27  Gilmore climbed onto the balcony and argued with Ms. Redding. (Kassabian Decl.
28  Ex. 2).

4                **Supplemental 1101(b) Memo**

2. **Mr. Gilmore's Prior Violence Against Ms. Redding Matches His Anger At Ms. Redding On The Night Of Her Death.**

Kelly Duncan, one of Ms. Redding's friends, had dinner with Ms. Redding at a restaurant the night that Ms. Redding was killed. During dinner, Ms. Redding and Mr. Gilmore argued on the phone. Mr. Gilmore was upset because Ms. Redding had not waited to have dinner with him.[5] (Kassabian Decl. Ex. 3).

Mr. Gilmore's text messages and calls with Ms. Redding throughout the afternoon and night of her murder show his obsession and frustration with her building to a frenzy:

- At 2:53:43 p.m., he texted her "Dont matter about space your ignorin someones shone [sic] calls also when that's the reason I broke up with you in the first place cause you say I do"

- At 7:59:17, Ms. Redding called Mr. Gilmore; the call lasted six seconds.

- At 9:45:37, Ms. Redding called Mr. Gilmore again; the call lasted four seconds.

- At 9:46:14, Ms. Redding called Mr. Gilmore a third time; the call lasted three seconds.

- At 9:50:11, Mr. Gilmore texted Ms. Redding: "Cause you write messages like iam gong to add then!  Your fuckin dumb!  Ruin a good tigoh [sic]"[6]

- At 9:53:10, Mr. Gilmore called Ms. Redding; the call was marked "received" on her cell phone, but lasted only three seconds.  Mr.

---

[5] As noted, Mr. Gilmore lied to the police about this and told the police that he was the one who declined Ms. Redding's invitation rather than vice versa.

[6] The same keys on a phone that spell "tigoh" also spell "thing".  Accounting for the misspellings, Mr. Gilmore probably was telling Ms. Redding that she had "ruin[ed] a good thing."

1    Gilmore called her again thirty-seven seconds later; this call was
2    marked "missed" on her cell phone.

3    ● At 9:54:15, clearly referencing the calls Ms. Redding had placed to
4    him, Mr. Gilmore texted her: "Didnt hear the phone"

5    ● Only 44 seconds later, he texted her again: "You turned off your
6    phone?"

7    ● At 9:56:21, Mr. Gilmore texted Ms. Redding: "This is a joke !  You
8    dont get a relationship so dumb!  Call me when you grow up till then
9    were done !  Look au [sic] what you just did"

10   ● At 10:00:17, Mr. Gilmore accused Ms. Redding: "You ruined it all"

11   ● At 10:21:20, Mr. Gilmore's text to Ms. Redding reflected his
12   frustration: "You honesty couldn't be more hurtful please dont call me
13   i will call you i need to think now dont understand why you had to do
14   this love you always" (Kassabian Decl. Ex. 1).

15   In short, because the evidence is offered to show Mr. Gilmore's motive and
16   identity with respect to killing Ms. Redding, his prior acts towards Ms. Redding
17   are clearly not excluded by § 1101(a).

18   II.   THE DEFENSE IS ENTITLED TO TELL THE JURY THAT MR. GILMORE WAS
19         CHOKING M.A. WHEN HE SAID HE WOULD MAKE M.A. "FEEL WHAT
20         JULIANA [REDDING] FELT"

21   M.A. has stated that on two occasions, Mr. Gilmore, while enraged, began
22   choking her and said he would make M.A. "feel like Juliana felt."

23   The Defense is entitled to let the jury know what Mr. Gilmore was doing
24   when he said this. Otherwise the statements make no sense. If the choking is
25   hidden from the jury, there is no way for them to know *how* Mr. Gilmore would
26   make M.A. feel what Ms. Redding felt or indeed what he meant at all and the jury
27   is entitled to that context.  Thus, these contextual facts are not being offered
28   merely to show character but instead are being offered to allow the jury to

6                    Supplemental 1101(b) Memo

1  understand the meaning of Mr. Gilmore's statement, i.e., that he would strangle

2  M.A. as he had strangled Ms. Redding and therefore this evidence is admissible.

3       Further, Mr. Gilmore's practice of choking M.A. when angry is admissible

4  to show identity because Ms. Redding was choked to death. *See, e.g., People v.*

5  *Linkenauger*, 32 Cal. App. 4th 1603, 1612 n.1 (1995) (prior use of butcher knife

6  qualifies as "signature" for identity purposes).

7  III.   THE DEFENSE IS ENTITLED TO SHOW MR. GILMORE'S JEALOUSY AS A

8         MOTIVE

9       M.A. and "Jane Doe" have described Mr. Gilmore's intense jealousy about

10  their possible interactions with other men. Other witnesses have described Mr.

11  Gilmore's similarly intense jealousy with respect to Ms. Redding.

12       Jealousy is a motive to commit a crime, especially domestic violence. Mr.

13  Gilmore clearly has this motive and he has displayed it on many, many occasions,

14  including with M.A., with Jane Doe, and with Ms. Redding. The Defense is

15  entitled to establish this motive and let the jury know that Mr. Gilmore had this

16  motive to kill Ms. Redding.

17

18  Respectfully submitted,

19

20  DATE: May 13, 2013                      BUEHLER & KASSABIAN, LLP

21

22                                  By:

23                                      MARK M. KASSABIAN
                                        Attorneys for Defendant
24                                      KELLY SOO PARK

25

26

27

28

7                    **Supplemental 1101(b) Memo**

**EXHIBIT L**

JACKIE LACEY
District Attorney of Los Angeles County
By: STACY OKUN-WIESE; State Bar No. 204333
Deputy District Attorney
Los Angeles County District Attorney's Office
MAJOR CRIMES DIVISION
210 West Temple Street
Los Angeles, CA 90012

Attorney for Plaintiff

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>KELLY SOO PARK<br><br>Defendants. | Case No. BA361202<br><br>**OPPOSITION TO DEFENDANT'S MOTION TO INTRODUCE PRIOR BAD ACTS OF JOHN GILMORE TO SUPPORT THIRD PARTY CULPABILITY**<br><br>Date:      May 14, 2013<br>Time:     08:30 AM<br>Court:    Department 109<br>Trial Date: May 13, 2013 |

TO THE HONORABLE KATHLEEN KENNEDY, JUDGE OF THE ABOVE ENTITLED COURT, GEORGE BUEHLER AND MARK KASSABIAN, COUNSEL FOR THE DEFENDANT, KELLY SOO PARK.

The People submit the follow OPPOSITION TO DEFENDANT'S MOTION TO INTRODUCE PRIOR BAD ACTS OF JOHN GILMORE TO SUPPORT THIRD PARTY CULPABILITY. This motion will be based upon this motion, the People's Motion to Exclude Third Party Culpability filed on April 9, 2013, the attached points and authorities, and on such other evidence and argument made at the hearing.

Dated: May 14, 2013

Respectfully submitted,

JACKIE LACEY
District Attorney of Los Angeles County

By: _Stacy Ok_

STACY OKUN-WIESE
Deputy District Attorney

## I.

## INTRODUCTION

On April 9, 2013, the People filed a motion to exclude evidence of third party culpability. The defense responded on May 6, 2013 and filed two supplemental briefs on May 13, 2013. The court tentatively ruled that there was insufficient evidence to support a third party claim. However, the defense is now seeking to introduce John Gilmore's prior acts to support their claim of third party culpability. However, prior acts, without a connection to the actual perpetration of the crime, are insufficient to support a third party culpability claim. As such, the court's tentative ruling should remain and the defense's motion to admit Mr. Gilmore's prior bad acts, should be denied.

## II.

### The Defense Cannot Introduce Prior Bad Acts To Support Their Argument of Third Party Culpability.

The defense is seeking to introduce what they claim are John Gilmore's prior bad acts against Juliana, to support their claim that Mr. Gilmore is the true killer. To support their argument, they rely heavily on *People v. Daniels* (1971) 16 Cal.App.3d 36 and *Rufo v. Simpson* (2001) 86 Cal.App.4th 573. However, those cases are quite distinguishable. First, both of those cases involve a "defendant" who was currently being charged with domestic violence and who had committed prior acts of domestic violence against the same victim. Moreover, the case of *Simpson* was a wrongful death action. All of the cases cited within *Simpson* dealt with defendants who were charged with crimes of domestic violence against the victim who was killed. Here, unlike the defendants in *Daniels* and *Simpson*, Mr. Gilmore is not a "defendant" who is currently charged with a crime of domestic violence. Additionally, there are *no* reports or witnesses to state that Mr. Gilmore has *ever* put his hands on Juliana.

As stated in the People's Motion to Exclude Third Party Culpability, evidence of mere motive or opportunity to commit the crime in another person, without more, will *not* suffice to raise a reasonable doubt about a defendant's guilt: there *must* be direct or circumstantial evidence linking the third person to the actual perpetration of the crime. *People v. Hall* (1986) 41 Cal.3d 826. Evidence proffered against a third party should be treated like any other evidence. Thus, if evidence is not being offered to prove a fact other than a party's criminal disposition, the evidence should be excluded. "Such evidence does not amount to direct or circumstantial evidence linking the third person to the perpetration of the actual crime. *People v. Davis* (1995) 10 Cal.4th 463, 501, citing *People v. Farmer* (1989) 47 Cal.3d 888, 921, overruled on other grounds. Here, the defense is seeking to introduce evidence without meeting the stringent standards set forth in Evidence Code section 1101(b). Without meeting that burden, the defense should be precluded from introducing the evidence at trial.

### III.

### CONCLUSION

The defense is seeking to admit character evidence without complying with Evidence Code section 1101(b). No matter how you view the evidence, it is character evidence and cannot be admitted without meeting certain requirements. The defense has failed to meet their burden and as such, the evidence of Mr. Gilmore's prior bad acts, should not be admitted.

DATED:      May 14, 2013

Respectfully submitted,
JACKIE LACEY
District Attorney of Los Angeles County

By: *Stacy O*
STACY OKUN-WIESE
Deputy District Attorney

**EXHIBIT M**

BUEHLER & KASSABIAN, LLP
GEORGE W. BUEHLER (BAR NO. 60701)
MARK M. KASSABIAN, (BAR NO. 156595)
350 West Colorado Boulevard
Suite 200
Pasadena, California 91105
Tel: (626) 792-0500
Fax: (626) 792-0505
e-mail: mkassabian@buehlerkassabian.com
Attorneys for Defendant
KELLY SOO PARK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

PEOPLE OF THE STATE OF
CALIFORNIA,

          Plaintiff,

     v.

KELLY SOO PARK,

          Defendant.

Case No. BA361202

BRIEF RE: ADMISSION OF M.A.'S
STATEMENT UNDER EVIDENCE CODE
§ 1230

Brief Re: Admission Of
M.A.'s Statements

1

**452**

1    I.     M.A.'S OUT OF COURT STATEMENT IS ADMISSIBLE UNDER EVIDENCE CODE
2          SECTION 1230 AS A STATEMENT AGAINST INTEREST OF AN UNAVAILABLE
3          WITNESS.

4        To the extent M.A. invokes the Fifth Amendment privilege and declines to
5 testify, her out-of-court statement is admissible under Evidence Code § 1230.
6 Evidence Code § 1230 provides:

7       Evidence of a statement by a declarant having sufficient knowledge
8       of the subject is not made inadmissible by the hearsay rule if the
9       declarant is unavailable as a witness and the statement, when made . .
10       . created such a risk of making him an object of hatred, ridicule, or
11       social disgrace in the community, that a reasonable man in his
12       position would not have made the statement unless he believed it to
13       be true.

14        Under this rule, "a party may introduce in evidence, for the truth of the
15 matter stated, an out-of-court statement by a declarant who is unavailable as a
16 witness at trial if the statement, when made, was against the declarant's . . . social
17 interest." *People v. Cudjo*, 6 Cal. 4th 585, 606-07 (1993).

18        Here, M.A.'s statement satisfies § 1230 and is admissible through the
19 investigator and other witnesses who were present when she made it.

20        First, M.A.'s invocation of the Fifth Amendment renders her "unavailable"
21 for purposes of the statute. *See Cudjo*, 6 Cal. 4th at 607. Thus, this unavailability
22 prerequisite is satisfied.

23        Second, M.A.'s statement was against her "social interest" in two ways:

24       •    M.A.'s statement subjects her to social stigma because she said that
25         John Gilmore abused her and that during the abuse he disclosed to her
26         that he had killed his last girlfriend but she nevertheless chose to stay
27         with him. It is well known that victims of domestic abuse are very
28         frequently ashamed of the fact that they have been abused and the

**Brief Re: Admission Of
M.A.'s Statements**

1             more dangerous and obvious the abuse, the more stigma attaches to

2             it.[1]  Put another way, there is clearly significant stigma attached to

3             someone's choice to remain with an abusive man who admits that he

4             killed his last girlfriend in a fit of domestic abuse.

5      ●    M.A.'s statement also subjects her to an additional and entirely

6             separate type of social disgrace: She disclosed to the investigator that

7             over two years ago, John Gilmore identified himself to her as the true

8             killer of Juliana Redding.  But instead of telling the police, or even

9             the defense, M.A. did nothing at all, choosing instead to remain

10           romantically involved with the admitted killer while he continued to

11           abuse her.  Further, M.A. allowed the prosecution of an apparently

12           innocent woman proceed.

13     One hardly need cite authority for the notion that a person who withholds

14 such critical information from law enforcement deserves social condemnation.

15 Such authority is certainly not hard to find, with the United States Supreme Court

16 itself pointing out that "[c]oncealment of crime has been condemned throughout

17 our history," the responsibility to report evidence of crimes is a "deeply rooted

18 social obligation," and the failure to do so is a "badge of irresponsible citizenship."

19 *Roberts v. U.S.*, 445 U.S. 552, 557-58 (1980); *see also In re Tapia*, 207 Cal. App.

20

21

---

22     [1]Just a few minutes of research reveals myriad sources acknowledging this

23 stigma.  This includes courts, *e.g,*
www.azcourts.gov/casa/Training/TrainingCourses/DomesticViolencepg2 .aspx

24 noting the "social stigma" associated with suffering domestic abuse, prosecution

25 agencies, e.g., U.S. Dep. Of Justice Man. Comment 3-7.00B, noting victims'
difficulty in disclosing domestic violence due to social stigma, and health care

26 experts including leading medical journals, *see e.g.*

27 www.ncbi.nlm.nih.gov/pmc/articles/PMC196400/ for an article hosted by the

28 National Institutes of Health discussing the challenges of treating victims of
domestic violence due to the attached stigma.

**Brief Re: Admission Of**
**M.A.'s Statements**

3

1  4th 1104, 1111 (2012).[2]

2  II.    CONCLUSION.

3      M.A. is "unavailable" under to Evidence Code § 1230.  The statements she

4  made to the investigator were against her "social interest" as described in *Cudjo*.

5  First, they revealed that she chose to remain with an abuser who admitted that he

6  had killed his last girlfriend and who threatened to kill her, thus implicating the

7  social stigma that attaches to victims of domestic abuse. And second, the

8  statements revealed that she had long known that this abuser, Mr. Gilmore,

9  essentially admitted to a murder but M.A. kept this information to herself.

10  Therefore, the investigator should be permitted to testify about M.A.'s out of court

11  statements should M.A. continue to assert the Fifth Amendment.

12

13  Respectfully submitted,

14

15  DATE: May 13, 2013                    BUEHLER & KASSABIAN, LLP

16

17                                        By: _____

18                                        MARK M. KASSABIAN
                                          Attorneys for Defendant
19                                        KELLY SOO PARK

20

21

22

23

24

25  _____

26      [2]This is not to say that the Court must necessarily find that failure to report
    every crime leads to social stigma.  But in the present case, the stigma certainly
27  attaches to M.A., who chose to remain with Mr. Gilmore despite his admissions
    and threats rather than do what she should have done, which is immediately
28  inform the authorities about his admission.

**Brief Re: Admission Of**
**M.A.'s Statements**

4

**EXHIBIT  N**

ORIGINAL

1  BUEHLER & KASSABIAN, LLP
2  GEORGE W. BUEHLER (BAR NO. 60701)
   MARK M. KASSABIAN, (BAR NO. 156595)
3  350 West Colorado Boulevard
   Suite 200
4  Pasadena, California 91105
   Tel: (626) 792-0500
5  Fax: (626) 792-0505
6  e-mail: mkassabian@buehlerkassabian.com
   Attorneys for Defendant
7  KELLY SOO PARK



FILED

MAY 0 6 2013

JOHN... ...OFFICER/CLERK
BY  K C..... Deputy
A. Jordan

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                      COUNTY OF LOS ANGELES

11                                      )  Case No. BA361202
   PEOPLE OF THE STATE OF             )
12  CALIFORNIA,                        )  NOTICE OF MOTION AND MOTION TO
                                       )  DISMISS CHARGES BASED ON
13              Plaintiff,             )  OUTRAGEOUS GOVERNMENT
                                       )  MISCONDUCT; REQUEST FOR
14                                     )  EVIDENTIARY HEARING AND OTHER
       v.                              )  REMEDIES; MEMORANDUM OF POINTS
15                                     )  AND AUTHORITIES
                                       )
16  KELLY SOO PARK,                    )
                                       )  Date: May 9, 2013
17              Defendant.             )  Time: 8:30 a.m.
                                       )  Place: Dept. 109
18  ─────────────────────────         )

19        TO THE SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY

20  OF LOS ANGELES AND TO THE PEOPLE OF THE STATE OF CALIFORNIA REPRESENTED

21  BY THE LOS ANGELES COUNTY DISTRICT ATTORNEY:

22        PLEASE TAKE NOTICE that on May 9, 2013, at 8:30 a.m. or as soon thereafter

23  as the matter may be heard, in Courtroom 109 of the Los Angeles Superior Court,

24  Defendant Kelly Soo Park will, and hereby does, move this Court to dismiss the

25  charges against her due to outrageous government conduct that has made it

26  impossible for her to exercise her Sixth Amendment rights to a fair trial and will

27  also seek an evidentiary hearing and further remedies as the Court may order.

28        This Motion is based on the prosecution's wholly improper efforts to

                                        Mx  To Dismiss
                    1           Outrageous Govt Misconduct

1   interfere with the defense's ability to call witnesses by recently charging multiple
2   defense witnesses with crimes allegedly arising from years-old conduct in order to
3   intimidate them from testifying, and by contacting a critical defense witness, lying
4   to her about the state of the evidence, "assuring her" that the third party who
5   essentially admitted his guilt to the witness is actually innocent, telling the witness
6   that the third party feels upset that that the witness lost faith in him, asserting that
7   the defendant is "the killer," and asserting that the defense team is a group of liars
8   that cannot be trusted and that will do anything to get the "killer" acquitted. All of
9   this caused the witness to refuse further contact with the defense.

10          This motion is based on the attachment Memorandum, declarations, and
11   exhibits and any other material of which the Court may take notice.

12
13   Respectfully submitted,

14
15   DATE: May 6, 2013                    BUEHLER & KASSABIAN, LLP

16
17                                        By: _____
18                                        GEORGE W. BUEHLER
                                          Attorneys for Defendant
19                                        KELLY SOO PARK
20
21
22
23
24
25
26
27
28

Mx To Dismiss
Outrageous Govt Misconduct

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

Within the past several days, the defense has learned that Santa Monica Police Detective Karen Thompson, the lead investigator on this case and a listed trial witness, has improperly (and illegally) interfered with the Defendant's fundamental right to obtain and present exculpatory witnesses at trial.

As set out below, Ms. Thompson has caused arrest warrants to be issued in order to intimidate defense witnesses, she lied to witnesses, and otherwise coerced them to refuse to communicate with the defense team.

Ms. Thompson's efforts to interfere were intentional and independently illegal even apart from the interference with Ms. Park's trial rights. Whether or not Ms. Thompson should be prosecuted must be left to appropriate authorities. In the meantime, however, the damage she has already caused to the defense case means that this matter must be dismissed. In addition, the defense seeks alternative remedies as discussed below.

### II.

### DETECTIVE THOMPSON'S ILLEGAL INTERFERENCE WITH THE DEFENDANT'S SIXTH AMENDMENT RIGHTS

**A.    Ms. Thompson's Efforts to Interfere with M.A.**

John Gilmore was the boyfriend of Juliana Redding, the victim in this case. After the murder, Mr. Gilmore became the boyfriend of M.A. In January 2012, a defense investigator interviewed M.A. and M.A. told the investigator and other witnesses very significant exculpatory information.

Specifically, M.A. told the investigator that Mr. Gilmore had choked her repeatedly and that on two occasions while choking her, he said that he was going to make M.A. feel what Ms. Redding had felt.

At some point after M.A. told this to the investigator, Detective Karen

Mx  To Dismiss
Outrageous Govt Misconduct

1

1    Thompson learned of the conversation. Detective Thompson called M.A. on

2    February 6, 2012, and recorded the conversation. The recording was turned over to

3    the defense just last Thursday, almost three months later and just days before trial.

4    A transcript of the recording is attached as Exhibit A.

5       Ms. Thompson's conduct during the conversation is astonishing and

6    outrageous. Throughout the conversation, one thing is clear: Detective Thompson

7    is not calling M.A. to learn information from her; she is calling to give information

8    to her, including much false information. In other words, Ms. Thompson is calling

9    for one purpose only: to convince the witness not to testify for the defense and not

10    to tell the jury about evidence that inculpates John Gilmore in the murder of

11    Juliana Redding.

12       The conversation begins with Detective Thompson introducing herself and

13    then immediately declaring:

14       I just got off the phone with John Gilmore, who is one of the people

15       who we are calling as a witness on the murder trial for Juliana

16       Redding's homicide here in Santa Monica. And first, what I want to

17       tell you is that John is not the killer. And I can go over the

18       investigation with you and tell you how we know this in -- in a

19       minute. But the two people who showed up at your house two weeks

20       ago -- they are private investigators who were hired by the defense

21       team that is representing the killer on this case.

22    (Transcript, Exh. 1 at 2:23-3:11.)

23       Ms. Thompson then continues the conversation by falsely claiming that the

24    investigator lied to M.A. about whether Mr. Gilmore had ever been accused of

25    rape.[1] (*Id.* at 4.) She then tries to convince M.A. to change her impression of John

26    Gilmore by telling her that "John has a temper" and "he was a young 21-year-old

27

28    [1]The records of the El Segundo Police Department show that Gilmore was investigated for the statutory rape of a 15-year-old girl.

**Mx To Dismiss**
**Outrageous Govt Misconduct**

2

1  back in the day when he was partying" but "he's not a murderer." (*Id.* at 5.)[2]

2       Ms. Thompson plays on M.A.'s lingering feelings for Mr. Gilmore, telling

3  her that "John was really upset" when he heard about M.A.'s statement because

4  "he feels like they [the investigators] made you lose faith in him."  When M.A.

5  said that she had, Ms. Thompson says "But I'm here to tell you . . . he's not a bad

6  guy.  And this woman [Park] - you know, they're going to tell every lie they can to

7  try to get her off." (*Id.* at 15:17-16:11.)

8       Also during the conversation, Ms. Thompson lies to M.A. about the state of

9  the evidence. First she lies about whether Ms. Park's blood was on the door handle

10  (*id.* at 6:10) but more significantly, she lies about what was going on between Mr.

11  Gilmore and the victim the night of the murder.

12       As Ms. Thompson is no doubt well aware, witness and documentary

13  evidence show that Mr. Gilmore and the victim were in an escalating fight that

14  evening. At 2:53 p.m., Mr. Gilmore sent Ms. Redding a text complaining about

15  Ms. Redding ignoring his phone calls. During Ms. Redding's dinner with Kelly

16  Duncan, Ms. Redding and Mr. Gilmore were arguing on the phone; Mr. Gilmore

17  was angry Ms. Redding did not want to have dinner with him.  At 9:50 p.m., Mr.

18  Gilmore texted Ms. Redding saying, "Cause you write messages like iam gong to

19  add then!  Your fuckin dumb!  Ruin a good tigoh [sic]"[3] At 9:56 p.m., Mr. Gilmore

20  texted Ms. Redding saying, "This is a joke !  You dont get a relationship so dumb!

21  Call me when you grow up till then were done !  Look au [sic] what you just did."

22  And at 10:00 p.m., Mr. Gilmore texted Ms. Redding saying, "You ruined it all."

23       Contrary to this evidence, Ms. Thompson tells M.A. that at 9:45 p.m., Ms.

24  Redding telephoned Mr. Gilmore and invited him to come over to watch *Seinfeld*

25  _____

26      [2]It is mystifying how a police detective can describe as mere "youthful

27  partying" incidents like abusing women and pushing them out of a pickup truck.

28      [3]Mr. Gilmore was probably telling Ms. Redding that she had "ruin[ed] a
good thing."

1  with her. This never happened and Ms. Thompson knows it never happened. But

2  she told it to M.A. in order to falsely convince her that Mr. Gilmore and Ms.

3  Redding were getting along just fine that evening rather than being in the middle

4  of an angry, expletive-laced fight.[4]

5      This is all part of her effort to convince M.A. that if she testifies, she will be

6  (1) falsely accusing an unquestionably "innocent" man, i.e., Mr. Gilmore; (2)

7  hurting Mr. Gilmore's feelings in the process; (3) helping an unquestionably guilty

8  "killer" to go free; and (4) becoming a pawn of the untrustworthy and lying

9  defense team.

10      Recognizing that M.A.'s testimony would be devastating, Ms. Thompson

11  was apparently not satisfied with her telephonic efforts to derail it. Thus, on March

12  27, 2013, the Los Angeles County District Attorney's Office filed a complaint

13  against M.A. alleging felony conspiracy, assault, and criminal threats for conduct

14  that occurred in the Spring of 2012. An arrest warrant, with $80,000 bond, was

15  issued but apparently has not been executed.  Obviously, M.A. will now be even

16  less likely to make it to the witness stand. Significantly, M.A. has refused any

17  contact with the defense team since Ms. Thompson's February 6, 2012, telephone

18  call.

19  **B.    Ms. Thompson's Efforts to Interfere with Ronnie Case.**

20      M.A. is not the only witness who has suddenly been arrested for old

21  conduct. Ronnie Case was a close business associate of Ms. Park's. At the very

22  end of February 2012, Ms. Thompson caused Mr. Case to be arrested and

23  prosecuted for conduct that allegedly occurred in Ventura in 2010.  Indeed, Ms.

24  Thompson, a Santa Monica officer, was present during the arrest and used the

25  occasion of Mr. Case's arrest to try to question him about the instant murder case.

26

---

27      [4]Ironically, Ms. Thompson lied about the evidence in the very same

28  conversation in which she warned M.A. that the *defense* will "tell every lie they can."

**Mx  To Dismiss**
**Outrageous Govt Misconduct**

4

1    In the course of this attempted interrogation, Ms. Thompson told Mr. Case that

2    "hypothetically" Ms. Park and her associates might kill Mr. Case and make it look

3    like self defense. The message was abundantly clear: Your life is in danger if you

4    don't switch sides, abandon the defense, and become a witness for the prosecution.

5                                        III.

6            THE GOVERNMENT MAY NOT INTERFERE WITH THE DEFENSE'S

7                        EFFORTS TO CALL WITNESSES

8        In *Washington v. Texas* (1967) 388 U.S. 14, the United States Supreme

9    Court clearly recognized the importance of the compulsory-process right.

10           "The right to offer the testimony of witnesses, and to compel their

11           attendance, if necessary, is in plain terms the right to present a

12           defense, the right to present the defendant's version of the facts as

13           well as the prosecution's to the jury so it  may decide where the truth

14           lies. Just as an accused has the right to confront the prosecution's

15           witnesses for the purpose of challenging their testimony, he has the

16           right to present his own witnesses to establish a defense. This right is

17           a fundamental element of due process of law."

18   (*In re Martin* (1987) 44 Cal.3d 1, 29.)[5]

19       These rights are violated when the government interferes with the

20   defendant's efforts to obtain favorable testimony, and such interference occurs

21   when the government intimidates defense witnesses. (*See id.*, at 44 Cal.3d at 30

22   (*citing People v. Warren* (1984) 161 Cal.App.3d 961, 971; *Berg v. Morris* (E.D.

23   Cal. 1980) 483 F.Supp. 179, 182; *People v. Bryant* (1984) 157 Cal.App.3d 582,

24   _____

25       [5]"The right to compulsory process is independently guaranteed by the

26   California Constitution. In the words of article I, section 15, 'The defendant in a
     criminal cause has the right ... to compel attendance of witnesses in the

27   defendant's behalf....' In light of the similar language in which they are couched,
     the state constitutional right must be deemed to be at least as broad and

28   fundamental as the federal." *In re Martin* (19187) 44 Cal.3d 1, 30.)

                                              **Mx  To Dismiss**
                               5              **Outrageous Govt Misconduct**

1   587-594; *United States v. Morrison* (3rd Cir. 1976) 535 F.2d 223, 226-228.) It also

2   occurs when the government issues arrest warrants or initiates prosecutions that

3   make witnesses reluctant to testify. (*In re Martin* 44 Cal.4th at 30):

> To establish a violation, the defendant must establish a causal link
> between the misconduct and his inability to present witnesses on his
> own behalf [but] he is not required to prove that the conduct under
> challenge was the 'direct or exclusive' cause. Rather, he need only
> show that the conduct was a substantial cause. The misconduct in
> question may be deemed a substantial cause when, for example, it
> carries significant coercive force and is soon followed by the
> witness's refusal to testify.

12   (*Id.* at 31 (citations omitted).

13                                    IV.

## IT IS A CRIME TO MALICIOUSLY DISSUADE A WITNESS FROM TESTIFYING AND A CRIME TO MAKE A FALSE STATEMENT TO A WITNESS IN ORDER TO AFFECT HER TESTIMONY

17       Penal Code § 133 makes it a crime to "knowingly make[] any false

18   statement [or] representation . . . to any witness or person about to be called as a

19   witness upon any trial . . . with intent to affect the testimony of such witness."

20   Penal Code § 136.1 makes it a crime to "[k]nowingly and maliciously prevent[] or

21   dissuade[] any witness . . . from attending or giving testimony at any trial."

22   "Maliciously" is defined as including an intent to "interfere in any manner with the

23   orderly administration of justice."  Penal Code § 136(1).

24       Penal Code § 137 makes it a crime to "attempt[] by the use of fraud to

25   induce any person to give false testimony or withhold true testimony."

26   Separately, it is a violation of federal law to use the color of law to deprive

27   someone of their constitutional rights.  Specifically, "It is well established that

28   persons arrested by state law enforcement officials and charged with a crime are

1  entitled to a trial to resolve the question of guilt; this right is one of those

2  guaranteed by the due process clause of the Fourteenth Amendment. A willful

3  effort to deprive a citizen of such right, or to intimidate him in its exercise, if

4  mounted under color of state law, violates 18 U.S.C. § 242." (*United States v.*

5  *O'Dell* (6th Cir 1972) 462 F.2d 224, 230).

V.

THE PROSECUTION'S APPARENTLY EFFECTIVE EFFORTS TO DEPRIVE

THE DEFENSE OF CRUCIAL WITNESSES MANDATE EXTRAORDINARY

REMEDIES INCLUDING DISMISSAL

10  As noted and as set out at length in other filings, it appears that John

11  Gilmore is much more likely to be the actual murderer in this case than is Ms.

12  Park. Mr. Gilmore admitted his guilt twice to M.A., while he was choking her in

13  the same manner that Ms. Redding was killed. He also admitted his guilt on tape

14  during his interrogation in March of 2008. Despite the weight of the latter

15  admission the defense is certainly entitled to bolster its case by calling M.A.

16  Ms. Thompson's call to M.A. on February 6, 2012, was not an investigatory

17  call at all. Indeed, the transcript shows that Ms. Thompson did not even ask M.A.

18  about what Mr. Gilmore had done or said to her. Instead, the entire purpose of the

19  call was to interfere with the defendant's ability to obtain testimony. It was

20  designed to convince M.A. not to talk with the defense and not to tell her story on

21  the witness stand; why else would Ms. Thompson spend so much time trying to

22  convince M.A. that Mr. Gilmore was innocent? Why else would she spend so

23  much time trying to convince M.A. that Ms. Park was guilty? Why else would she

24  tell M.A. that Mr. Gilmore was "hurt" that M.A. thought badly of him? Why else

25  would she tell M.A. that the defense are untrustworthy liars who will do anything

26  to get a "killer" off? Finally, in March 2013, why was M.A. charged with felonies

27  allegedly occurring in April 2012? And why was Mr. Case charged in late

28  February 2013 with crimes that allegedly occurred in 2010?

Mx  To Dismiss
7                        Outrageous Govt Misconduct

1    The purpose behind Ms. Thompson's conduct is abundantly clear: She is
2  prepared to do whatever she can, legal or not, to obtain a conviction of Ms. Park.
3  Indeed, she told as much to M.A. when she said she was "working for a long time"
4  to "put this woman in jail." (Exh. 1 at 17:1-2.) Indeed, according to the Santa
5  Monica Police Department's web site, Ms. Thompson received a Medal of Merit
6  from the Department in September 2011 for "solving" the Redding murder.[6]
7  According to news reports, Ms. Thompson had requested "special permission to
8  solve the case on her own time." Obviously, the acquittal of Ms. Park would be
9  awkward for Ms. Thompson. Thus, she seems to have decided to do whatever she
10  can, appropriate or not and legal or not, to try to obtain a conviction.

11    But this is not how our system works. It is a crime to make a false statement
12  to a witness in order to affect that witness's testimony. (See Penal Code §§ 133,
13  136.1, and 137.) It is a crime for a police officer to intentionally interfere with a
14  defendant's trial rights. (See 18 U.S.C. § 242.) And it violates the fundamentals of
15  Due Process and the Sixth and Fourteenth Amendments and the California
16  Constitution when law enforcement prevents defense witnesses from testifying.
17  This includes what happened here, namely lying to M.A. about the state of the
18  evidence in order to convince her that if she testifies she will "get a killer off" and
19  will harm someone whose "innocence" Ms. Thompson improperly and falsely
20  vouches for. It also includes telling a witness that if she testifies, her ex-boyfriend
21  will be "hurt" by her lack of faith. It also includes telling a witness that the defense
22  team is a bunch of liars who will do anything to spring the real "killer." It also
23  includes telling a witness that "hypothetically" he may be killed by the defendant
24  unless he switches sides and testifies for the prosecution. And it certainly includes
25  using arrest warrants and criminal charges in order to make witnesses unavailable
26  and to convince them not to testify for the defense.

27

28    [6]See http://www.smmirror.com/articles/News/Santa-Monica-Police-Department-Recognizes-150-Officers-At-Awards-Ceremony/32989

**Mx To Dismiss**
**Outrageous Govt Misconduct**

8

1      The damage done by Ms. Thompson's misconduct (and crimes) appears to

2  be irreversible. As noted, M.A. has refused any contact with the defense since Ms.

3  Thompson spoke with her. Pursuant to the standards set out by the California

4  Supreme Court in *In re Martin, supra,* 44 Cal. 3d 1, the charges must be

5  dismissed.

6      In addition to requesting a complete dismissal, the defense request the

7  following interim remedies:

8      **1.**    **That the People be ordered to immediately produce all records of**

9      **related to all communications that Ms. Thompson had with any**

10      **witnesses.** There is no explanation for why the People did not produce the

11      Thompson/M.A. recording until three months after it was made and just two

12      weeks before trial. The defense is entitled to know whether the People are

13      sitting on any other such material. Moreover, in the Thompson/M.A.

14      recording, Ms. Thompson asserts that she "just got off the phone with John

15      Gilmore." (Exh. 1 at 1:23.) The People have never produced any recording,

16      notes, MOI, or other records of that conversation.

17      **2.**    **That the Court order Ms. Thompson recused from further**

18      **participation in this matter.**

19      **3.**    **That the Court order Ms. Thompson not to have any**

20      **communication whatsoever with any witness or likely witness in this**

21      **matter.**

22      **4.**    **That the Court set an evidentiary hearing at which the defense**

23      **may inquire about the scope of Ms. Thompson's interference with these**

24      **and potentially other witnesses, including the causes for the filing of**

25      **charges against M.A. and Mr. Case.**

26      Immediately after obtaining the recording, the Defense sent a letter to the

27  People raising some of these issues, including the request for the additional

28  discovery. The People have not responded to this letter. Thus, the Defense

1  reserves the right to seek further or alternative remedies as it learns more about

2  what happened here.

3                                    VI

4                               CONCLUSION

5          It is as much [the prosecutor's] duty to refrain from improper

6          methods calculated to produce a wrongful conviction as it is to use

7          every legitimate means to bring about a just one. Prosecutors are

8          public fiduciaries. They are servants of the People, obliged to pursue

9          impartially in each case the interests of justice and of the community

10         as a whole.

11  (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1326-27 (quoting *Berger v. United*

12  *States* (1935) 295 U.S. 78, and *Haraguchi v. Superior Court* (2008) 43 Cal.4th

13  706.))

14         This duty to refrain from improper methods easily includes the duty to

15  refrain from violating the law in an attempt to dissuade witnesses and easily

16  includes the duty to refrain from interfering with the defendant's fundamental right

17  to obtain and present critical exculpatory testimony. Ms. Thompson has obviously

18  forgotten that she is not a partisan, she is a fiduciary of all of the People of the

19  State of California and her purpose is not to convict Ms. Park as much as it is to

20  help find the truth. Ms. Thompson has shown that she cannot be trusted to

21  remember her proper role and she has already caused irreparable harm to the

22  defense's case.

23  Respectfully submitted,

24  DATE: May 6, 2013                      BUEHLER & KASSABIAN, LLP

25

26

27  By: _____

28         GEORGE W. BUEHLER
           Attorneys for Defendant
           KELLY SOO PARK

                                         Mx To Dismiss
                          10             Outrageous Govt Misconduct

ORIGINAL

1  BUEHLER & KASSABIAN, LLP
   GEORGE W. BUEHLER (BAR NO. 60701)
2  MARK M. KASSABIAN, (BAR NO. 156595)
3  350 West Colorado Boulevard
   Suite 200
4  Pasadena, California 91105
   Tel: (626) 792-0500
5  Fax: (626) 792-0505
6  e-mail: mkassabian@buehlerkassabian.com
   Attorneys for Defendant
7  KELLY SOO PARK

8

9          SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                COUNTY OF LOS ANGELES

11                                    )  Case No. BA361202
   PEOPLE OF THE STATE OF             )
12 CALIFORNIA,                        )  NOTICE OF ERRATA: MOTION AND
                                      )  MOTION TO DISMISS CHARGES BASED
13          Plaintiff,                )  ON OUTRAGEOUS GOVERNMENT
                                      )  MISCONDUCT; REQUEST FOR
14                                    )  EVIDENTIARY HEARING AND OTHER
                                      )  REMEDIES; MEMORANDUM OF POINTS
15    v.                              )  AND AUTHORITIES
                                      )
16 KELLY SOO PARK,                    )
                                      )
17          Defendant.                )  Date: May 9, 2013
                                      )  Time: 8:30 a.m.
18 _____)  Place: Dept. 109

19        TO THE SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY

20 OF LOS ANGELES AND TO THE PEOPLE OF THE STATE OF CALIFORNIA REPRESENTED

21 BY THE LOS ANGELES COUNTY DISTRICT ATTORNEY:

22        PLEASE TAKE NOTICE that the Memorandum of Points and Authorities for

23 Defendant Kelly Soo Park's Motion And Motion To Dismiss Charges Based On

24 Outrageous Government Misconduct; Request For Evidentiary Hearing And Other

25 Remedies, filed May 6, 2013, contains the following typographical errors

26 regarding dates:

27        1.     Page 1, line 22: "2012" should read "2013."

28        2.     Page 2, line 2: "2012" should read "2013."

                                                      **Notice of Errata: Mx To Dismiss**
                              1                        **Outrageous Govt Misconduct**

3.    Page 4, line 17: "2012" should read "2013."

4.    Page 4, line 22: "2012" should read "2013."

5.    Page 7, line 16: "2012" should read "2013."

Defense counsel apologizes for any confusion or inconvenience these errors have caused.

Respectfully submitted,

DATE: May 7, 2013                               BUEHLER & KASSABIAN, LLP

By: _____

MARK M. KASSABIAN
Attorneys for Defendant
KELLY SOO PARK

Notice of Errata: Mx  To Dismiss
Outrageous Govt Misconduct

**EXHIBIT O**





JACKIE LACEY
District Attorney of Los Angeles County
By: STACY OKUN-WIESE; State Bar No. 204333
Deputy District Attorney
Los Angeles County District Attorney's Office
MAJOR CRIMES DIVISION
210 West Temple Street
Los Angeles, CA 90012

Attorney for Plaintiff

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>KELLY SOO PARK<br><br>Defendants. | Case No. BA361202<br><br>**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS CHARGES BASED ON ALLEGED OUTRAGEOUS GOVERNMENT MISCONDUCT.**<br><br>Date:    May 9, 2013<br>Time:    08:30 AM<br>Court:    Department 109<br>Trial Date: May 13, 2013 |

TO THE HONORABLE KATHLEEN KENNEDY, JUDGE OF THE ABOVE ENTITLED COURT, GEORGE BUEHLER AND MARK KASSABIAN, COUNSEL FOR THE DEFENDANT, KELLY SOO PARK.

The People submit the following Opposition to the defendant's Motion to Dismiss filed on May 6, 2013. This motion will be based upon this motion, the files and pleadings in the above entitled matter, the grand jury transcript, the attached Points and Authorities, and on such further evidence and argument as may be introduced at the hearing.

DATED:      May 7, 2013                    Respectfully submitted,

                                           JACKIE LACEY
                                           District Attorney of Los Angeles County

                                           By: _Stacy Okun-Wiese_____
                                           STACY OKUN-WIESE
                                           Deputy District Attorney

# I

## **INTRODUCTION**

On April 6, 2013, Detective Karen Thompson contacted John Gilmore, Juliana's on and off again boyfriend, in an attempt to serve him for the upcoming trial. Mr. Gilmore advised Detective Thompson that defense investigators contacted his girlfriend, Melissa Ayala, and told her that Mr. Gilmore was the true killer and that he was a rapist. Mr. Gilmore further told Detective Thompson that Ms. Ayala, as a result of the investigators, broke off her engagement with Mr. Gilmore.[1] Detective Thompson was not provided with any further details of the interview between Ms. Ayala and the private investigator. Detective Thompson asked Mr. Gilmore if he wanted her to call Ms. Ayala and he said, "Yes." Therefore, on February 6, 2013, Detective Thompson contacted Ms. Ayala.

The conversation between Detective Thompson and Ms. Ayala was recorded (Exhibit A). Detective Thompson began the conversation by advising Ms. Ayala that the investigators who showed up at her house were not under any obligation to tell her the truth.[2] Detective Thompson spoke to Ms. Ayala about the defendant being accused of killing Juliana and the evidence that supported the prosecution's belief that the defendant is the true killer. (Defense Motion to Dismiss, Exh. 1 at p. 6, lines 8 – p. 8, line 3.) Detective Thompson then informed Ms. Ayala, in response to Ms. Ayala telling her that the investigators said that the defendant was dating Juliana, that there was absolutely no evidence to support that statement. In fact, the opposite was true. She told Ms. Ayala that the the evidence supported the fact that Juliana did not know the defendant. (Defense

---

[1] Mr. Gilmore and Ms. Ayala had a very tumultuous relationship. They both have in the past had restraining orders against one another and cases filed against one another.

[2] This statement is clearly supported by evidence that the investigators told Ms. Ayala that Mr. Gilmore is a murderer and a rapist. There is *no* evidence that Mr. Gilmore is responsible for the murder of Juliana Redding *or* that he is a rapist. There has *never* been a filing against Mr. Gilmore for rape.

Motion to Dismiss, Exh. 1 at p. 9, line 1 – p. 10, line 19.)  Ms. Ayala started to cry during the

conversation and stated that she didn't want to get dragged into the situation because she didn't

know Mr. Gilmore in 2008 and *didn't know the situation*.  (Defense Motion to Dismiss, Exh. 1 at

p. 9, lines 1 – line 4.)  She stated, "All – I just kind of got dragged into it by these private

investigators coming and they made it seem like Julianna was—bad—dating this woman. . .And

then they had like all these papers and saying that John was like raping this like 15-year-old girl

and like so they pretty much *brainwashed me*." (Defense Motion to Dismiss, Exh. 1 at p. 8, line 23

– p. 9, line 16.)  Ms. Ayala then told Detective Thompson that the investigators told her that Mr.

Gilmore was getting away with rape stuff and getting away with all of these things because he

probably knows somebody on the inside.  (Defense Motion to Dismiss, Exh. 1 at p. 13, lines 8 –

21.)  In response, Detective Thompson truthfully told Ms. Ayala that Mr. Gilmore fully cooperated

with the investigation.  (Defense Motion to Dismiss, Exh. 1 at p. 13, line 24 – p. 14, line 11.)

Detective Thompson then continued to talk about the evidence the prosecution has against the

defendant and stated that John felt as though Ms. Ayala had lost faith in him. (Defense Motion to

Dismiss, Exh. 1 at p. 14, line 13 – p. 15, line 19.)  Ms. Ayala's immediate response was, "Yeah,

they kind of did." (Defense Motion to Dismiss, Exh. 1 at p. 15, line 20.)

On April 12, 2013, the People received via email, a witness list and a typed written report

of an interview of Melissa Ayala.  There was no recording provided.  Prior to April 12, 2013, with

the exception of what Ms. Ayala told Detective Thompson on February 6, 2013, the People had no

further information regarding the interview of Ms. Ayala.  The People were further advised by the

defense on April 17, 2013, that a case was filed against Ms. Ayala.

There was nothing improper about Detective Thompson's contact with Ms. Ayala.

Detective Thompson called Ms. Ayala in an attempt to explain the two obvious lies she was told

by the investigator in January 2013.  The defense investigators defamed Mr. Gilmore by calling

him a rapist and a murderer in an attempt to get Ms. Ayala so upset that she would say hurtful things about him.  As the court can hear from the recording, Ms. Ayala was obviously upset about hearing her fiancé was a murderer and a rapist, two false allegations.  In fact, she told Detective Thompson that she was brainwashed.  Detective Thompson merely provided Ms. Ayala with the evidence the prosecution has against the defendant and the reasons why Mr. Gilmore was not and is not being charged with Ms. Redding's murder.

On April 9, 2013, the People filed a motion to exclude third party culpability evidence concerning John Gilmore.  If the court grant's the People's motion, this issue is moot.  Ms. Ayala will only be called to testify in the event the court denies the People's motion *and* the defense can meet its burden under Evidence Code sections 1101(b) and 352.

## II.

**Detective Thompson's Contact with Ms. Ayala was Entirely Appropriate and Did Not Violate the Defendant's Rights.**

In their moving papers, the defense alleges that Ms. Ayala told their investigators that on two occasions while choking her, Mr. Gilmore said that he was going to make Ms. Ayala feel what Ms. Redding had felt.  (Defense Motion To Dismiss, pg. 1, lines 25-27.)  However, the report, which was not accompanied by a recording or any notes, states while on a trip to Temecula, Ms. Ayala and Mr. Gilmore got into an argument.  During that argument, Ms. Ayala stated, "I know you killed Juliana," and according to Ms. Ayala, Mr. Gilmore threw her on the bed and stated, "You want to see how she felt?"  It is unclear how the defense takes that statement to support their contention that Mr. Gilmore admitted his guilt in the murder.  First of all, anyone who knows anything about the case knows that Ms. Redding was strangled, so for the defense to say that when Mr. Gilmore allegedly made the statement, "You want to see how she felt," in response to an allegation of murder, means nothing.  Nowhere in the investigator's unrecorded report does Ms. Ayala state Mr. Gilmore admitted that he is responsible for Ms. Redding's murder.

Furthermore, according to the actual police report of the incident where Mr. Gilmore put his hands around Ms. Ayala's neck, *nowhere* does it mention Ms. Redding or that Mr. Gilmore mentioned her during the fight. (Exhibit B)  In fact, the argument began over another ex-girlfriend that that Ms. Ayala was jealous of.  The report mentions two other incidents where Mr. Gilmore hit her.  However, again, there is no mention of Ms. Redding.  In fact, there is no mention at all about the alleged incident in Temecula.  The report is dated 2/12/12.

The defense argues that Detective Thompson "falsely claimed" that their investigator lied to Ms. Ayala about whether Mr. Gilmore had ever been accused of rape.  However, Ms. Ayala was not told he was accused of rape.  She was told he was a rapist and a piece of paper was thrown in her face (Defense Motion to Dismiss, Exh. 1 at p. 4, lines 1-4; p. 9, lines 12-16.)  Mr. Gilmore was neither accused nor "investigated" for rape.  Based upon the recording between Detective Thompson and Ms. Ayala and the police report regarding the alleged offense, it appears that the defense investigator was clearly mistaken when he labeled Mr. Gilmore a rapist.

The defense further alleges that Detective Thompson was trying to change Ms. Ayala's impression of Mr. Gilmore by telling her that Mr. Gilmore had a temper and was a young 21-year old, but that he is not a murderer.  Ms. Ayala is not a percipient witness to the murder and she doesn't have any information regarding such murder.  Therefore, it is unclear what effect Detective Thompson's conversation with Ms. Ayala could have on her testimony.  Mr. Gilmore has a conviction for a violation of Penal Code section 273.5.  As stated before, Ms. Ayala would only be admitted to testify about Mr. Gilmore's conduct if the court denies the People's Motion to Exclude Third Party Culpability and the defense meets its burden.  The acts are documented in the report and if Ms. Ayala decided not to be truthful, the defense could call the reporting officers.  So what effect Detective Thompson could have on Ms. Ayala's testimony is speculative, at best.

The defense also claims that Detective Thompson lied about the state of the evidence

against the defendant. Specifically, they say she lied about blood on the door. Maybe the defense

hasn't looked at the evidence recently, but the DNA on the door is a mixture and the major

contributor is the defendant. The defense also claims that Detective Thompson lied about an

escalating fight between Mr. Gilmore and Ms. Redding. According to Kelly Duncan and Mr.

Gilmore, Mr. Gilmore was upset with Ms. Redding for not waiting for him to have dinner. Once

Ms. Redding got home, she and Mr. Gilmore attempted to reach one another by phone, but were

unsuccessful. At 9:45 p.m.and 9:46 p.m., Ms. Redding called Mr. Gilmore. (Exhibit C) At 9:54

p.m., Mr. Gilmore sent a text to Ms. Redding stating, "Didn't hear the phone." He then sent

another text, "You turned off your phone?" (Exhibit D) At 9:52 p.m., 9-1-1 was dialed from Ms.

Redding's phone and then at 9:53:10 p.m. and 9:53:47, Mr. Gilmore called Ms. Redding's phone,

but was hung up on. (See Exhibit E) After not responding to his calls and text messages, Mr.

Gilmore sent a couple of more texts insinuating Ms. Redding was avoiding his calls.

Unfortunately, Ms. Redding was not avoiding his calls. Rather, she was being murdered. The

defense argues that Detective Thompson tried to convince Ms. Ayala that if she testified against

Mr. Gilmore that she would be falsely accusing an innocent man, hurting his feelings, helping a

guilty person go free and would become a pawn of an untrustworthy and lying defense team. The

People urge the court to "listen" to the audio recording of the conversation. Detective Thompson's

actions during her conversation with Ms. Ayala were entirely appropriate and the People stand

behind her actions completely. As to the defense's argument that Detective Thompson's

knowledge that Ms. Ayala's testimony would be devastating so she had the District Attorney's

Office file a felony case against Ms. Ayala, it is preposterous. In another motion filed alleging the

People and Detective Thompson are in conspiracy against Ms. Ayala and the defendant, the People

and Detective Thompson filed declarations stating neither had anything to do with the filing

against Ms. Ayala for a crime she committed against Mr. Gilmore in 2012. It is unfortunate that

Rev. B51-8/99 DA Case 27913479

Ms. Ayala now has an outstanding arrest warrant, but the defense can still subpoena her to be in court and to testify, if the defense is successful in the third party culpability motion.

## III.

### Detective Thompson Did Not Interfere with the Defendant's Right as a Result of the Arrest of Ronnie Case.

The defense argues that Ms. Ayala is not the only witness who has recently been arrested. They claim that Detective Thompson had Ronnie Case arrested for conduct that occurred in 2012. That case was wholly investigated by Detective Thompson because it related to the arrest of Mr. Case and the defendant. It was an ongoing investigation and continued to be investigated until it was accepted by the Ventura District Attorney's Office for filing. As the defense is aware, because they have received the discovery on that case, the paperwork is substantial. Up until the decision was made to file the case, Detective Thompson was completing additional follow-up and investigation. Moreover, Mr. Case has not been listed as a witness by either the prosecution or the defense in this case. In fact, Mr. Case has been and continues to be a potential suspect in this case. So, for the defense to argue that the act of arresting Mr. Case is interfering with the defendant's rights, they are incorrect.

## IV.

### The People Did Not Interfere with the Defense's Efforts to Call Witnesses.

The defense argues that the People interfered with the defense's right to call witnesses and to support their contention, they cite several cases. However, the cases cited by the defense are entirely distinguishable from the instant case. In *In re Martin* (1987) 44 Cal.3d 1, 31, the Court discussed at length what a defendant must do to prevail on a claim of a violation of his constitutional compulsory-process right. A defendant must demonstrate misconduct, although he isn't required to show the agent of the government acted in bad faith or with improper motives. *Id.*

"Rather, he need show only that the agent engaged in activity that was wholly unnecessary to the proper performance of his duties and of such a character as to "*transform* a defense witness from a willing witness to one who would refuse to testify." *Id.* The defendant must also demonstrate interference which is a "causal link between the misconduct and his inability to present witnesses on his own behalf." *Id.* Finally, the defendant must also demonstrate "materiality," which equates to "some plausible plausible showing of how the testimony of the witness would have been both material and favorable to the defense." *Id.* at p. 32. In *In re Martin*, the first defense witness was arrested after he testified in favor of the defense at trial. The arrest was made just outside of the courtroom in front of two additional defense witnesses and a reporter. The arrest was televised. *Id.* at p. 34. The three additional defense witnesses refused to testify after the arrest. *Id.* The Court found that the arrest of the witness interfered with the defense's right to present witnesses. *Id.*

Unlike *In re Martin,* here there was no interference or misconduct by Detective Thompson during her contact with Ms. Ayala. Detective Thompson never threatened Ms. Ayala with prosecution, she never threatened her with perjury, and she never told Ms. Ayala not to come to court. To the contrary, Detective Thompson told Ms. Ayala to come to court if subpoenaed and to tell the truth. The defense cannot make a showing of even the first prong of demonstrating that an interference of the defendant's rights occurred. The defense cannot show that Detective Thompson's conversation with Ms. Ayala was "wholly unnecessary" to the performance of her duties and of such a character as to transform Ms. Ayala from a willing witness to one who would refuse to testify. There is no evidence that Ms. Ayala was a willing defense witness at any point in time, especially because there is no recording of her interview with the defense investigator. Listening to her taped conversation with Detective Thompson, one would think otherwise as she stated several times that she didn't want to be involved. Furthermore, there is no evidence of a

causal link between Detective Thompson's conversation with Ms. Ayala and the defendant's ability to present witnesses on her behalf. Lastly, in light of the DNA evidence, it is unlikely that the testimony of Ms. Ayala would be material and favorable to the defense. That is, assuming the court permitted it in the first place. The defense has therefore, failed to meet their burden stated in *In re Martin*.

The defense also cites the case of *People v. Bryant* (1984) 157 Cal.App.3d 588-89, to support their contention that Detective Thompson interfered with the defense's right to present witnesses. In *Bryant*, the court reversed the defendant's conviction after finding that the prosecutor intimidated the witness in court. *Id.* There, the prosecutor "advised" the court and the witness that the witness had been charged with perjury for his testimony given at the preliminary hearing and that if he gave the same testimony, he would be charged again. *Id.* The court found that the prosecutor's statement threatening a perjury charge was intimidation. *Id.* at p. 590.

Here, unlike the prosecutor in *Bryant*, Detective Thompson made no threat toward Ms. Ayala. Moreover, there was nothing intimidating about the conversation. Detective Thompson was very calm during the conversation and gave Ms. Ayala facts about the case, not some false allegations that Mr. Gilmore was a murder and rapist. When Ms. Ayala advised Detective. Thompson that she didn't want to be involved in the trial and that she didn't want to testify, Detective Thompson told her that if she received a subpoena, she was obligated to appear in court. (Defense Motion to Dismiss, Exh. 1 at p. 21, lines 15-19)   Detective Thompson also advised Ms. Ayala that she may have to speak about the domestic violence and that she was required to tell the truth. (Defense Motion to Dismiss, Exh. 1 at p. 22, lines 11-20.)   There is nothing in the recording that even comes close to interfering with the defense's right to call witnesses.

## V.

### Detective Thompson Did Not Attempt to Dissuade Ms. Ayala from Testifying at the Defendant's Murder Trial.

The People strongly agree with the defense that it is a crime to deceive a *witness* or person *about to be called as a witness.* (Penal Code section 133) The People also agree that it is a crime to knowingly and maliciously dissuade a witness from attending or giving testimony at any trial. (Penal Code section 136.1) However, contrary to the defense's argument, Detective Thompson did neither. In fact, Detective Thompson wasn't even *aware* that Ms. Ayala would be called as a witness when she spoke with her on February 6, 2013. Furthermore, there is *nothing* to even suggest Detective Thompson was attempting to dissuade Ms. Ayala from testifying. However, It *is* clear that the defense investigator violated these sections when he interviewed Ms. Ayala after telling her *falsely* that Mr. Gilmore was a rapist and a murderer. If anyone is guilty of making a false statement to affect a witness's testimony, it is the defense investigator. As previously stated and shown, there is *no* evidence that Mr. Gilmore is guilty of either rape or murder. In fact, the only evidence the defense believes they have is the so called alleged admission of guilt made to Ms. Ayala by Mr. Gilmore.

When Detective Thompson spoke with Ms. Ayala, there was absolutely no intent on her part to deceive or dissuade Ms. Ayala from testifying. In fact, when Detective Thompson spoke to Ms. Ayala, Detective Thompson had *no* idea what information Ms. Ayala had provided to the investigator other than Mr. Gilmore was a rapist and a murderer. As previously stated, the People did not receive the report of Ms. Ayala's interview until April 12, 2013, two months later. So, what could Detective Thompson have been trying to dissuade Ms. Ayala from saying at the trial. In effect, Detective Thompson *told* Ms. Ayala that she may have to come into court and talk about the domestic violence that occurred between Ms. Ayala and Mr. Gilmore after Ms. Ayala said she didn't want to be involved. In order to dissuade a witness from testifying, one must be aware of

what they are trying to dissuade the witness from testifying about.  The defense's argument just doesn't make sense, plain and simple.

## VI.

**The Prosecution Did Not Interfere With the Defense's Case; Therefore, a Dismissal or Any Other Remedy Is Unnecessary.**

The People did not interfere with the defense's case by contacting Ms. Ayala and therefore, no remedy is necessary.  The defense is arguing that Mr. Gilmore is the actual killer and that the evidence to support that is his alleged "admission" to Ms. Ayala and his alleged "confession" during his interview. (Exhibit F)[3]  As stated above, there is no alleged "admission" by Mr. Gilmore to Ms. Ayala.  Furthermore, it is impossible to hear anything from Mr. Gilmore during the two minute period the defense is pointing to other than the word "jacked up" because Mr. Gilmore is sobbing.  The People urge the court to listen to both the tape recording and the enhanced version because at this point, the defense is attempting to mislead the court with information that doesn't exist.

The defense argues that the purpose behind Detective Thompson's conduct is "abundantly clear" and that she is willing to do anything she can to obtain a conviction against the defendant.  Detective Thompson is a very dedicated police officer and completed a very thorough investigation in this case.  It is not uncommon for an officer to receive a Medal of Merit from a department when that officer conducts a thorough investigation and actually solves an unsolved crime.  To belittle Detective Thompson's work in this case by stating she will do whatever she can to win, is appalling and unnecessary.

The defense asked for additional remedies in the event the court does not dismiss the case.

---

[3] On May 6, 2013, the People received an "enhanced" version of two minutes of Mr. Gilmore's interview with Detective Henry on March 17, 2008. (Exhibit G)  The defense contends that in the tape recording while Mr. Gilmore is sobbing, their expert hear Mr. Gilmore say, "I found you with someone else," "I am all jacked up over this, " and "I did it."
Rev. B51-8/99 DA Case 27913479

First, the People have turned over all records related to communications that Detective Thompson had with the witnesses. The People did not turn over the tape recording of Ms. Ayala because until April 12, 2013, the People were unaware that Ms. Ayala was a potential witness. In addition, it wasn't until the defense asked about Ms. Ayala's case and any notes Detective Thompson had that Detective Thompson located the recording. Detective Thompson has spoken to numerous witnesses regarding this case and Mr. Case's possession case. Lastly, there is nothing exculpatory in the recording. In fact, the opposite is true. Ms. Ayala tells Detective Thompson that she felt brainwashed when she spoke with the defense investigator and that she didn't want to be involved.

The defense is requesting the Court recuse Detective Thompson from further participation in this matter and that she have no communication with witnesses. Detective Thompson did absolutely nothing improper in this case. She is the investigating officer and should not be punished for solving a case.

## VII.

## CONCLUSION

The defense has failed to meet their burden to support their contention that Detective Thompson interfered with their right to present witnesses. To the contrary, Detective Thompson acted completely appropriate during her contact with Ms. Ayala on February 6, 2013. The defense's motion to dismiss should therefore be denied in its entirety.

Dated: May 7, 2013                    Respectfully submitted,

                                      JACKIE LACEY
                                      District Attorney of Los Angeles County


                                      By: _Stacy Okun-Wiese_
                                      STACY OKUN-WIESE
                                      Deputy District Attorney

Rev. B51-8/99 DA Case 27913479

**EXHIBIT P**

ORIGINAL

ORIGINAL

ORIGINAL

FILED

May 13

1  BUEHLER & KASSABIAN, LLP
2  GEORGE W. BUEHLER (BAR NO. 60701)
   MARK M. KASSABIAN, (BAR NO. 156595)
3  350 West Colorado Boulevard
   Suite 200
4  Pasadena, California 91105
   Tel: (626) 792-0500
5  Fax: (626) 792-0505
6  e-mail: mkassabian@buehlerkassabian.com
   Attorneys for Defendant
7  KELLY SOO PARK

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                    COUNTY OF LOS ANGELES

11                              )   Case No. BA361202
   PEOPLE OF THE STATE OF       )
12  CALIFORNIA,                 )   BRIEF RE: GRANTING IMMUNITY TO
                                )   M.A.
13         Plaintiff,           )
                                )
14                              )
         v.                     )
15                              )
                                )
16  KELLY SOO PARK,             )
                                )
17         Defendant.           )
18  ──────────────────────────  )

19

20

21

22

23

24

25

26

27

28

                                          **Brief Re: Granting**
                              1           **Immunity To M.A.**

1    Courts have recognized that the power to confer immunity generally is

2  granted by statute to the executive. But courts have also acknowledged that there

3  are hypothetical cases in which "a judicially conferred use immunity might

4  possibly be necessary to vindicate a criminal defendant's rights to compulsory

5  process and a fair trial." *People v. Stewart*, 33 Cal. 4th 425, 468, 93 P.3d 271, 302

6  (2004) (citing *People v. Hunter*, 49 Cal.3d 957, 974, 264 Cal.Rptr. 367, 782 P.2d

7  608 (1989)). *Government of Virgin Islands v. Smith*, 615 F.2d 964, 972 (3rd Cir.

8  1980), is "one case which has clearly recognized" such authority, and from the

9  *Smith* case, California courts have highlighted two clearly limited circumstances in

10  which judicially conferred use immunity might be constitutionally necessary.

11  *Stewart*, 33 Cal. 4th at 468-69.

12    The first of the two tests recognizes the authority of a trial court to confer

13  immunity upon  a witness when three elements are met: (1) the proffered

14  testimony is clearly exculpatory; (2) the testimony is essential; and (3) there is no

15  strong governmental interest which countervails against a grant of immunity. *Id.*

16  at 469.

17    Here, these three elements are met.  M.A.'s testimony is clearly exculpatory

18  and is essential to the defense.

19    There is also no strong governmental interest countervailing against a grant

20  of immunity for MA. On this point, it is critical that <u>there is zero possibility that</u>

21  <u>M.A. could or will incriminate herself for Redding's murder</u>. No one - not the

22  People or the defense - believes or claims that M.A. killed Redding or had any

23  knowledge of or involvement in the murder.  In the cases finding that the defense

24  had not met its burden of establishing this third element of the test, there was

25  typically a distinct possibility, if not a strong likelihood, that the witness for whom

26  the defense sought use immunity might himself have committed the charged

27  offense. *See, e.g., Stewart*, 33 Cal. 4th at 469-70 (witness gave directly

28  contradictory statements to police and to defense investigator regarding the events

**Brief Re: Granting**<br>**Immunity To M.A.**

2

1   of the crime; his statements to defense suggested that he himself may have been

2   the killer, and even his statement to police suggested that he might have aided and

3   abetted; if either were true, there would be strong governmental interest in not

4   granting him any immunity; even a grant of use immunity would have

5   substantially burdened the People, by forcing them to prove at any later

6   prosecution of the witness in connection with the homicides at issue that the

7   evidence offered was not obtained or derived from witness' immunized testimony

8   at defendant's trial; conferral of such immunity would have facilitated perjury by

9   witness).

10          Here, in contrast, the concern that motivated the Stewart court to reject

11   immunity for a defense witness does not exist.  M.A. will not in any way implicate

12   herself in Redding's death.  Courts' reluctance to grant use immunity for defense

13   witnesses often stems from "apprehension that defense witness immunity could

14   create opportunities for undermining the administration of justice by inviting

15   cooperative perjury among law violators." *Stewart*, 33 Cal. 4th at 468 (citing

16   *Carter v. United States*, 684 A.2d 331, 338-339 (D.C.1996)).  Kelly Park does not

17   know M.A. There is no cooperation between Park and M.A., only an effort by

18   Park to obtain as testimony the statements M.A. voluntarily made to Park's

19   investigator.

20          The second of the two tests that authorize a trial court to grant immunity to

21   a defense witness recognizes such authority when the prosecutor intentionally

22   refuses to grant immunity to a key defense witness for the purpose of suppressing

23   essential, noncumulative exculpatory evidence, thereby distorting the judicial

24   factfinding process. *Stewart*, 33 Cal. 4th at 470 (citing *United States v.*

25   *Westerdahl*, 945 F.2d 1083, 1086-1087 (9th Cir.1991) (defense-requested

26   immunity should be granted when defense witness would provide relevant

27   testimony and prosecution intentionally has distorted the factfinding process,

28   which may be shown when government relies heavily upon immunized testimony

**Brief Re: Granting**
**Immunity To M.A.**

3

1  of government witness while denying immunity to defense witness whose

2  testimony would directly contradict that of government witness)).

3      Here, Detective Thompson  has distorted the fact-finding process by her

4  telephone conversation with M.A. after the defense investigator's interview of

5  M.A. Detective Thompson's endorsement of John Gilmore, her encouragement to

6  M.A. to get back into relationship with Gilmore, and her disparagement of Park

7  and her lawyers and investigators constituted deliberate misconduct designed to

8  transform a defense witness from a willing witness to one who would refuse to

9  testify. Up until the Detective's call on February 6 of this year, M.A. was ready to

10  testify and there was no inkling of any issue.

11      Moreover, as if there were not already abundant evidence of the People's

12  bad faith, the People did immunize two of their own witnesses.  Brian Van Holt

13  got full use immunity from the People, testified before the grand jury, and is on the

14  People's witness list for trial.  Shelly Rosekelly got limited immunity and is also

15  on the People's witness list for trial.  *Id.* (citing *Westerdahl*, 945 F.2d at 1083 (9th

16  Cir.1991) (prosecution's intentional distortion of factfinding process may be

17  shown when government relies heavily upon immunized testimony of government

18  witness while denying immunity to defense witness)).

19      The defense respectfully requests that the Court immunize M.A.

20

21  Respectfully submitted,

22

23  DATE: May 13, 2013                    BUEHLER & KASSABIAN, LLP

24

25                                        By: _____

26                                        MARK M. KASSABIAN
                                          Attorneys for Defendant
27                                        KELLY SOO PARK

28

                                                    **Brief Re: Granting**
                                    4               **Immunity To M.A.**

**EXHIBIT Q**

JACKIE LACEY
District Attorney of Los Angeles County
By: STACY OKUN-WIESE; State Bar No. 204333
Deputy District Attorney
Los Angeles County District Attorney's Office
MAJOR CRIMES DIVISION
210 West Temple Street
Los Angeles, CA 90012

Attorney for Plaintiff

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

| PEOPLE OF THE STATE OF CALIFORNIA, | Case No. BA361202 |
|---|---|
| Plaintiff, | **OPPOSITION TO DEFENDANT'S REQUEST TO GRANT USE IMMUNITY TO MELISSA AYALA** |
| v. | |
| KELLY SOO PARK | Date:      May 14, 2013 |
| Defendants. | Time:      08:30 AM |
| | Court:     Department 109 |
| | Trial Date: May 13, 2013 |

TO THE HONORABLE KATHLEEN KENNEDY, JUDGE OF THE ABOVE ENTITLED COURT, GEORGE BUEHLER AND MARK KASSABIAN, COUNSEL FOR THE DEFENDANT, KELLY SOO PARK.

The People submit the following OPPOSITION TO DEFENDANT'S REQUEST FOR THE COURT TO GRANT MELISSA AYALA USE IMMUNITY. This motion will be based upon this motion, attached points and authorities, and on such other evidence and argument made at the hearing.

Dated: May 14, 2013

Respectfully submitted,

JACKIE LACEY
District Attorney of Los Angeles County
By: _____
STACY OKUN-WIESE
Deputy District Attorney

# I.

## INTRODUCTION

The defense is seeking to have this court grant use immunity to a third party witness who exercised her right against self incrimination. However, the defense has failed to cite any controlling authority to support their request. In fact, there has never been a Supreme Court or appellate court in California that has granted such immunity to a third party witness. *People v. Cooke* (1993) 16 Cal.App.4th 1361, 1371. Instead, the defense relies on the case of *Government of Virgin Islands v. Smith* (3rd Cir. 1980) 615 F.2d 964, to support their claim. Even in *Smith*, the court stated that, "the opportunities for judicial use of immunity must be clearly limited; . . .the proffered testimony must be clearly exculpatory; the testimony must be essential; and there must be no strong governmental interests which countervail against a grant of immunity. *Id.* at p. 972.

# II.

## The Defense Cannot Meet Their Burden To Support a Judicial Grant of Immunity.

In the event the court were willing to entertain the idea of granting immunity to a third party witness, the defense has failed to meet their burden set forth in *Smith, supra,* 615 F.2d at p. 964. The defense has not and cannot prove that Ms. Ayala's testimony is exculpatory or essential to support the court granting her use immunity. "Immunity will be denied if the proffered testimony is found to be ambiguous." *People v. Cooke, supra* 16 Cal.App.4th at p. 1367, citing *People v. Hunter* (1989) 49 Cal.3d 957, 974. Here, the testimony that is being attributed to Ms. Ayala is ambiguous and subject to multiple interpretations. Thus, it is not *clearly* exculpatory. The alleged statements, "You want to see hw she felt" or "I'm going to show you how [Juliana] felt, which were allegedly made while Mr. Gilmore was choking Ms. Ayala can be interpreted in more than one way. One interpretation of the statement is that Gilmore was merely responding to Ms. Ayala's accusation and lashed out at her in anger, thus not lending any credibility to the

statement. A second interpretation could be that Ms. Ayala was not being truthful to the investigator when she made the statements, especially given the fact that the two statements were *never* mentioned during her interviews with the El Segundo police and given the status of her relationship with Mr. Gilmore. Lastly, the statements, if made, could mean what the defense is alluding to. However, that is quite unlikely given the status of the evidence in this case and the alibi that Mr. Gilmore has for the evening Ms. Redding was murdered. The three existing possibilities regarding the proffered testimony of Ms. Ayala can lead to only one conclusion, that the evidence is highly ambiguous. Due to the ambiguity of the proffered evidence, the defense has failed to meet their burden as to the first prong.

The second prong that must be met to support a grant of immunity is that the testimony must be essential. The defense has failed to explain how Ms. Ayala's testimony is essential to their case. In light of the evidence against the defendant and the number of witnesses and evidence the People have to prove that Mr. Gilmore did not murder Ms. Redding, it is unlikely the defense will ever be able to provide the court with an argument proving that Ms. Ayala's testimony is essential to their case.

Lastly, the court must find there is no strong government interest which countervails against the grant of immunity. Granting Ms. Ayala use immunity would "unduly hamper" any subsequent prosecution of Ms. Ayala. The People would be burdened with proving that evidence used at Ms. Ayala's subsequent trials[1] was derived from some other source rather than this trial. "Once the prosecutor objects and declares that a grant of immunity might hamper a criminal proceeding, the immunity cannot be granted." *People v. Cooke, supra,* 16 Cal.App.4[th] at p. 1369. Here, granting Ms. Ayala testimony would hamper the future prosecutions of Ms. Ayala. Therefore, immunity should not be granted.

---

[1] Ms. Ayala has a pending case for violations of Penal Code section 245(a)(1), 422, 182. In addition, Ms. Ayala has a recent arrest for a violation of Penal Code section 273.5.

## CONCLUSION

The defense is asking this court to grant use immunity to a third party.  They are essentially asking this court to bestow upon them a request that no appellate court or Supreme Court in California has found necessary to do thus far.   In the event this court found it necessary to grant them their request, the defense has failed to meet their burden of necessity.  Therefore, the defendant's request for immunity should be denied.


DATED:         May 14, 2013                          Respectfully submitted,
                                                     JACKIE LACEY
                                                     District Attorney of Los Angeles County


                                                     By: _Stacy Okun Wiese_____
                                                     STACY OKUN-WIESE
                                                     Deputy District Attorney

**EXHIBIT R**

**EXHIBIT R**

http://www.tv.com/shows/48-hours/watch/hollywood-secrets-2995128/
http://www.cbsnews.com/videos/Hollywood-secrets/

**497**